UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| RAYMOND GARAVITO<br>9767 S.W. 106 Terrace<br>Miami, FL 33176 | ) | |
| RAFAEL RODRIGUEZ<br>7501 Cordoba Circle<br>Naples, FL 34109 | ) | |
| ELLI MIZRAHI<br>14001 Mills Ave<br>Silver Spring, MD 20904 | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. _____ |
| AIR LINE PILOTS ASSOCIATION,<br>INTERNATIONAL<br>1625 Massachusetts Ave, N.W.<br>Washington, DC 20036 | ) | |
| Defendant. | ) | |

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs Raymond L. Garavito, Rafael Rodriguez, and Elli Mizrahi, active senior pilots of United Air Lines ("United"), individually and on behalf of all other similarly situated United pilots, hereby move this Court to issue a preliminary injunction to prevent the imminent distribution by Defendant Air Line Pilots Association, International ("ALPA") of approximately $186 million of pension benefits.[1] The distribution of these funds would deprive Plaintiffs of

---

[1] Plaintiffs originally intended to seek a temporary restraining order from this Court based on their belief that ALPA was planning an imminent distribution of the remaining retirement benefits at issue in

(continued...)

their rights under the Employee Retirement Income Security Act ("ERISA") and under common law trust principles. As set forth more fully in the accompanying Memorandum of Points and Authorities in Support: (1) Plaintiffs are substantially likely to succeed on the merits of their claim for injunctive and declaratory relief against ALPA; (2) Plaintiffs will be harmed irreparably by ALPA's imminent depletion of the funds currently held in a retirement benefit plan established for the purpose of compensating Plaintiffs for a portion of the vested pension benefits they lost in connection with United's bankruptcy; (3) any injury to ALPA or any other potentially interested party as a result of the relief sought herein is likely to be minimal, to the extent it exists at all; and (4) the public interest will be served by preserving benefits that ERISA and common-law trust doctrines are designed specifically to protect.

A Memorandum of Points and Authorities in Support of this motion and Proposed Form of Order are attached hereto.

---

(continued)

this case. Yesterday, Plaintiffs learned that ALPA had announced that final distribution is planned for the "second week of March." *See* February 16, 2007 United MEC Press Release, Memorandum of Points and Authorities in Support of Plaintiffs Motion for Preliminary Injunction at Exh. 1. Therefore, while ALPA's action remains "imminent," Plaintiffs are seeking – in lieu of a temporary restraining order – that the Court schedule a hearing in advance of the announced "second week of March" distribution date and then, based on the evidence to be presented at that hearing, enter a preliminary injunction to enjoin distribution of the funds. Plaintiffs also will be asking the Court to establish an expedited discovery schedule so that Plaintiffs are able to present to the Court the relevant evidence now in the sole possession of the Defendant. Plaintiffs currently are in the process of contacting ALPA to determine if ALPA will consent to a delay of the distribution so that a less accelerated schedule might be set.

Respectfully submitted,

Andrew H. Marks (D.C. Bar No. 932269)
Aryeh S. Portnoy (D.C. Bar No. 464507)
William Flanagan (D.C. Bar No. 311035)
Daniel G. Kim (D.C. Bar No. 484342)
CROWELL & MORING, LLP
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004
Phone: (202) 624-2500
Fax: (202) 628-5116

Michael S. Olin (D.C. Bar No. 372067)
Tucker Ronzetti (D.C. Bar No. 73755)
KOZYAK, TROPIN & THROCKMORTON, PA
2525 Ponce de Leon, 9th Floor
Miami, FL 33134
Phone: (305) 372-1800
Fax: (305) 372-3508

Attorneys for Plaintiffs

Of Counsel:   Jeffrey W. Pagano (D.C. Bar No. 965046)
CROWELL & MORING LLP
153 East 53rd Street, 31st Floor
New York, NY 10022
Phone: (212) 223-4000
Fax: (212) 223-4134

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RAYMOND GARAVITO<br>9767 S.W. 106 Terrace<br>Miami, FL  33176<br><br>RAFAEL RODRIGUEZ<br>7501 Cordoba Circle<br>Naples, FL  34109<br><br>ELLI MIZRAHI<br>14001 Mills Ave<br>Silver Spring, MD 20904<br><br>                  Plaintiffs,<br><br>            v.<br><br>AIR LINE PILOTS ASSOCIATION,<br>INTERNATIONAL<br>1625 Massachusetts Ave, N.W.<br>Washington, DC 20036<br><br>                Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. _____ |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
## OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs Raymond L. Garavito, Rafael Rodriguez, and Elli Mizrahi bring this action on

their own behalf and on behalf of all other similarly situated United Air Lines pilots (hereinafter,

collectively with other members of the class, "Plaintiffs") to stop the imminent distribution by

Defendant Air Line Pilots Association, International ("ALPA") of approximately $186 million of

United pilots' pension benefits (the "Pension Funds").  On information and belief, ALPA intends

to allocate to more junior United pilots at least $100 million of Pension Funds that are due to

Plaintiffs (the "Diverted Funds"). The distribution of these funds would deprive Plaintiffs of their rights under the Employee Retirement Income Security Act ("ERISA") and under common law trust principles.

ALPA is the administrator/trustee of a program (hereinafter, the "Pilots Retirement Compensation Program" or "Pilots Program") established to allocate and distribute retirement benefits to compensate United pilots for a portion of the accrued vested pension benefits they lost in connection with United's recent bankruptcy. Pursuant to the terms of the Pilots Program, ALPA is responsible for reasonably allocating and distributing the Pension Funds in a manner that will compensate United pilots for a portion of these lost retirement benefits. However, in direct violation of the terms of the Pilots Program and ALPA's fiduciary duties, ALPA, in its role as administrator of the Pilots Program, is in the process of shifting the Diverted Funds away from Plaintiffs and delivering them into the hands of more junior pilots who lost far less than Plaintiffs (and in some cases nothing at all) in the way of vested pension benefits. This diversion of pension benefits is the result of ALPA's adoption of an allocation methodology that gives unreasonable and arbitrary credit for speculative future service, despite the fact that compensation for post-bankruptcy service is unrelated to, and indeed inconsistent with, the purpose of the Pilots Program, *i.e.*, compensation for *lost* pension benefits.

ALPA already has distributed more than $350 million of the Pension Funds in this arbitrary, unreasonable, and discriminatory manner. In doing so, ALPA has violated its fiduciary duties to Plaintiffs under ERISA and common law. ALPA intends imminently to distribute all or substantially all of the remaining Pension Funds in the same arbitrary, unreasonable, and discriminatory manner. *See* February 16, 2007 United MEC Press Release at Exh. 1. Once the

remaining Pension Funds are distributed, the harm will be done – the benefits to which Plaintiffs are entitled and which are due to them under the Pilots Program will be depleted entirely.

As demonstrated herein, Plaintiffs meet all of the criteria for obtaining immediate injunctive relief in the form of a preliminary injunction. Plaintiffs are substantially likely to succeed on the merits of their claim for injunctive and declaratory relief against ALPA. They will be irreparably harmed by ALPA's depletion of the Pension Funds which constitute the entire corpus of the Pilots Program. Any injury to ALPA or any other potentially interested party as a result of the relief sought herein is likely to be minimal, to the extent it exists at all. Finally, the public interest will be served by preserving benefits that ERISA and common-law trust doctrines are designed specifically to protect. Accordingly, Plaintiffs respectfully request that the Court enjoin ALPA from distributing any of the remaining Pension Funds until Plaintiffs' claims can be resolved on the merits.[2]

## STATEMENT OF FACTS

Plaintiffs are active United pilots who had earned substantial pension benefits that had vested under the United employee pension plan ("United Plan") prior to United's bankruptcy. Verified Complaint for Preliminary and Permanent Injunction and Declaratory Relief ("Compl."), Exh. 2 at ¶ 22. These benefits had accrued, over time, based on the pilots' actual years of service and annual earnings. *Id.* In connection with its recently-concluded bankruptcy proceedings, however, United terminated the United Plan, effective December 30, 2004. *Id.* As a result, Plaintiffs stood to lose years of accrued benefits that already had vested, and upon which they were relying for their retirement. *Id.*

---

[2]    Plaintiffs are preparing for filing a Request for Hearing and Expedited Discovery.

In addition to the loss of already-earned retirement benefits, United's pilots, including Plaintiffs, also faced certain prospective harm as a consequence of the United bankruptcy. Compl. ¶ 23. This included reduced future wages and employee benefits other than their already vested pension benefits. *Id.*

In response to the hardship the bankruptcy imposed upon the pilots, United adopted certain mechanisms to compensate the pilots for their actual losses and to address potential future benefit reductions. To address the reduction of "future" wages and benefits, United offered compensation to the pilots in the form, *inter alia*, of equity grants. *Id.*; *see also* July 18, 2006 letter from Lynn Hughitt (United) to United employees ("July 18 Letter"), Exh. 3 at 1, 5.[3] United also established a new pension plan to provide retirement benefits for post-bankruptcy service. Compl. ¶ 32. Compensation for possible future impact is not at issue in this litigation. The Pilots Retirement Compensation Program, on the other hand, was established to compensate the pilots for the actual and immediate *losses* of their vested and accrued pension benefits. Compl. ¶ 25; July 18 Letter at 1, 5. The Pilots Program expressly was unrelated to the reduction of future wages and benefits that resulted from the bankruptcy and was established specifically to replace a portion of the retirement benefits the pilots *already* had accrued and that *already* had vested when the United Plan was terminated. Compl. ¶ 23; July 18 Letter at 1, 5.

The Pilots Retirement Compensation Program was established as follows: On July 28, 2006, United issued to ALPA a series of convertible notes ("United Notes") having a face value of $550 million. Compl. ¶¶ 1, 25. ALPA, as administrator/trustee of the Program, was responsible for designating a trust or similar vehicle to hold the proceeds of the United Notes,

---

[3]     Attached to the United letter is a "Q&A" providing certain details regarding the Pilots Program. For purposes of this motion, the letter and the attached "Q&A" are referred to collectively as "July 18 Letter."

*i.e.*, the Pension Funds, and for overseeing and implementing the distribution of the Pension Funds to the pilots.  Compl. ¶ 2; Letter of Agreement by and between UAL Corp., United Air Lines, Inc., and the Air Line Pilots in the service of United Air Lines, Inc. as represented by the Air Line Pilots Association, International ("LOA"), Exh. 4 at "Exhibit D."  In performing its responsibilities as Program administrator, ALPA was required to allocate and distribute the Pension Funds reasonably among the pilots, and in a manner that would compensate the pilots for a portion of the vested retirement benefits that the pilots *already* had lost as a result of the termination of the United Plan.  Compl. ¶¶ 2, 23, 25; LOA at "Exhibit D"; July 18 Letter at 1, 5.[4] Thus, while ALPA was given certain discretion to develop an allocation of the Pension Funds to meet the designated purpose of the Pilots Program, such discretion plainly was not unfettered: ALPA was constrained both by the terms of the Pilots Program itself – including the requirement that the allocation be reasonable and in accordance with the purposes of the Pilots Program – and by the ERISA regulatory scheme and common law duties which govern the acts of fiduciaries in a similar position of trust.

ALPA has failed to administer the Program fairly, reasonably, or equitably.  ALPA delegated decision-making authority for the allocation methodology to the United Master Executive Council ("MEC"), a group of United pilots that stood to benefit financially in an amount based entirely on a decision *they* themselves would make.  Compl. ¶ 2; Continuing Education Regarding Convertible Note Allocation, MEC R&I Committee ("MEC Summary"), Exh. 5 at 2.  ALPA did not submit any proposed allocation methodology to a vote by its

---

[4]    Pilots' vested benefits also were guaranteed by the Pension Benefit Guaranty Corporation ("PBGC") up to a statutory maximum value of approximately $28,500.  Compl. ¶ 24.  The value of the PBGC payment was – and should be – factored into the final allocation of Pension Funds to the United pilots.

members, nor did it identify any independent or objective third-party to develop a fair,

reasonable, and equitable allocation methodology consistent with the purpose of the Pilots

Program. Compl. ¶ 26. While the full extent of the conflict of interest created by ALPA's

actions must await the discovery process in this case, this much is clear: ALPA permitted a

small group of pilots with a direct financial stake in the allocation of the Pension Funds to decide

the fate of the retirement benefits of all eligible pilots, including Plaintiffs. ALPA took this

action with the full knowledge that junior pilots – with little or no vested pension benefits to be

compensated out of the Pilots Program – were represented substantially in the MEC and among

the voting union members, and would benefit directly and substantially from an allocation

methodology that gave weight to speculative factors like projected future benefits that might be

earned, rather than the lost actual vested benefits that the pilots already had earned. Compl.

¶¶ 26, 32.

      In fact, the MEC rejected a methodology that, consistent with the terms of the Pilots

Program, would have allocated the Pension Funds in proportion to the pilots' actual losses of

accrued and vested pension benefits. Compl. ¶ 26; MEC Summary at 2-3. Instead, the MEC

devised – and ALPA adopted – a dramatically different methodology, the "GAP 2 Plan," that

assigned substantial and disproportionate "future credit" to junior pilots by compensating them

out of the Pilots Program not only for the loss of their pre-bankruptcy vested benefits, but also

for projected, and entirely speculative, future career earnings with United (including assumed

promotions and pay increases) until the mandatory retirement age of 60. Compl. ¶ 26; July 18

Letter at 1, 5; *see also, generally* MEC Summary. ALPA adopted this methodology with full

knowledge that many – and perhaps most – of the more junior pilots to whom the GAP 2 Plan

provides the greatest amount of "future credit" will never in fact perform the assumed future

services at all, or earn *any* of the corresponding benefits ALPA is handing them now in a lump-sum payment. Compl. ¶ 27.[5]

On information and belief, the result of this "GAP 2" allocation will be to divert more than $100 million of the limited Pension Funds in the Pilots Program from Plaintiffs to junior pilots who lost little or no vested benefits as a result of the United bankruptcy, and who are being compensated separately for possible reductions of future earnings and benefits. Compl. ¶¶ 27-28.[6]  In short, ALPA is administering the Pilots Program in such a way as to allow the junior pilots – who could simply quit working the day after receiving their distribution – to walk away with a windfall lump sum payment of "retirement" benefits, while Plaintiffs, who already have worked a long career with United and who are much closer to mandatory retirement, are deprived of the pension benefits they *already* earned and which *already* had vested. Compl. ¶ 29.

---

[5]    Plaintiffs are seeking, and are entitled to, discovery regarding, *inter alia*, ALPA's actual rationale for adopting the unreasonable, arbitrary, and discriminatory "Gap 2 Plan" allocation methodology. Substantial questions exist regarding the process pursuant to which ALPA and the MEC determined the allocation methodology for the Pilots Program and the Pension Funds. The MEC claims to have considered a "series of detailed presentations from the R&I Committee and its actuarial and legal advisors" before rejecting a methodology which would have compensated the pilots in proportion to their lost vested benefits. MEC Summary at 2. Yet, the MEC minutes are barren of any substantive discussion regarding the development of the methodology ALPA ultimately adopted and the reasons for the rejection of an approach based on the pilots' actual lost vested rights. Indeed, it appears that each time the topic of Pension Fund allocation was raised during the MEC meetings, the issue was tabled for further discussion, a motion was made to take the discussion off the record, or the reporter simply failed to memorialize the discussion. *See, e.g.*, Minutes of MEC meetings at Exh. 6. For this reason, discovery is necessary to establish the actual basis for ALPA's decision-making and its knowledge of the impact of the "GAP 2 Plan" allocation on the Plaintiff class.

[6]    Even for those junior pilots who had accrued vested benefits by the time the United Plan was terminated, most of them had yet to exceed even the statutory maximum benefit guaranteed by the PBGC. Therefore, these pilots will be *fully* compensated for their losses by their PBGC payments alone. ¶ 30.

**ARGUMENT**

**THE COURT SHOULD ISSUE A PRELIMINARY INJUNCTION TO PRESERVE THE *STATUS QUO* WHILE PLAINTIFFS' RIGHTS ARE DETERMINED.**

The facts of this case fall squarely within the well established paradigm for injunctive relief. Without judicial intervention, ALPA will complete the distribution of the Pension Funds pursuant to the arbitrary, unreasonable, and discriminatory GAP 2 Plan. Such action will deplete completely the corpus of the Pilots Retirement Compensation Program and will deprive Plaintiffs of the hard-earned retirement benefits which they earned and to which they are entitled; moreover, it will deny Plaintiffs a congressionally created cause of action for retirement benefits due under ERISA. *See* 29 U.S.C. § 1132(a)(1)(B). Accordingly, this Court should enter a preliminary injunction to preserve the *status quo* so that Plaintiffs' claims can be resolved on the merits.

To determine whether to issue a preliminary injunction, courts consider four well-established factors: (1) the likelihood of success on the merits; (2) the potential for irreparable injury to the movant if the injunction is not granted; (3) whether other interested parties might be substantially injured by the order; and (4) whether the public interest would be served. *CSX Transp., Inc. v. Williams*, 406 F.3d 667, 670 (D.C. Cir. 2005); *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977). Given the equitable nature of such relief, these factors are not to be applied in a formulaic fashion. Thus, injunctive relief "may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). "Conversely, when the other three factors strongly favor interim relief, a court may grant injunctive relief when the moving

8

party has merely made out a 'substantial' case on the merits. In sum, injunctive relief may be granted 'with either a high probability of success and some injury, or vice versa.'" *Canales v. Paulson*, No. 06-1330, 2006 WL 2520611, at *3 (D.D.C. Aug. 30, 2006) (quoting *Holiday Tours*, 559 F.2d at 843-45; other citations omitted).

In this case, all of the relevant factors support the issuance of an injunction. Plaintiffs have raised serious questions regarding ALPA's failure to comply with the terms of the Pilots Program and ALPA's unreasonable and arbitrary adoption of the GAP 2 Plan. Plaintiffs also have demonstrated that they will be irreparably harmed if ALPA is not stopped from making its intended imminent distribution of the remaining Pension Funds. The risk of harm to others is minimal and the public interest demonstrably warrants the preservation of hard-earned retirement benefits that, without injunctive relief, will be lost forever. For the reasons set forth herein, the Court should issue a preliminary injunction to preserve Plaintiffs' benefits until the merits of this case can be resolved.

## I.    **Plaintiffs Are Likely To Succeed On The Merits.**

This case raises the serious question of whether ALPA has violated ERISA and/or common law by abusing its position as administrator of the Pilots Program and depriving Plaintiffs of their accrued and vested retirement benefits. The implications of this case are equally serious: as Plaintiffs near the mandatory retirement age for airline pilots, the results of this case will determine the fate of both the pension benefits they have earned and accrued over their entire careers, and the sole remaining source of funding for those benefits.

On its face, this case involves an extraordinary and unreasonable decision by ALPA to take $550 million it was entrusted to distribute to eligible United pilots to replace a portion of their lost pensions, and to distribute those funds disproportionately to favor a group of junior pilots who had lost little or nothing as a result of the termination of the United Plan. This case

also raises the possibility of a concerted scheme to disadvantage senior United pilots in favor of a politically stronger and financially interested majority of junior pilots who stood to receive little from the implementation of the Pilots Program but sought a disproportionate piece of the action in the form of a lump-sum payout to address possible reductions in future wages and benefits resulting from the United bankruptcy.

Plaintiffs have brought this case against ALPA based on alleged violations of ERISA and common law trust principles. There can be little question that ALPA owed (and still owes) fiduciary duties to Plaintiffs in connection with its role as administrator/trustee of the Pilots Retirement Compensation Program.[7] *See, e.g.*, 29 U.S.C. § 1002(21). It is equally clear that ALPA is required to discharge its duties to Plaintiffs in a manner that is both reasonable and consistent with the specific purpose of the Pension Funds and the terms of the Pilots Program. *See, e.g.*, *supra* at 5; 29 U.S.C. § 1104(a). For the reasons set forth herein, Plaintiffs have a substantial likelihood of demonstrating that ALPA has administered the Pilots Program in a manner that has deprived Plaintiffs of benefits due to them as participants in the Program.

The first factor for injunctive relief is satisfied here. The evidence already gathered demonstrates, *inter alia*, that ALPA:

(a) designated a self-interested group of pilots, including those who stood to gain little from the intended purpose of the Pilots Program, to determine how to allocate the Pension Funds among the United pilot membership;

---

[7]    The Pilots Program is an "employee benefit pension plan" for ERISA purposes because it was established to provide retirement income to employees – in this case, in the form of funds specifically intended to replace a portion of accrued and vested pension benefits lost by United pilots upon the termination of the United Plan. Compl. ¶ 37; 29 U.S.C. § 1002(2). In the alternative, the Pilots Program is a common law trust. Either way, ALPA owed fiduciary duties to Plaintiffs in connection with its administration of the Pilots Program.

(b) rejected, without explanation, an allocation methodology that would have accomplished the intended purpose of the Pilots Program;

(c) adopted a methodology that substantially dilutes the value of Plaintiffs' actual lost benefits by significantly weighting projected future earnings (that already are addressed through separate mechanisms), and, correspondingly, favoring junior pilots over senior pilots; and

(d) diverted away from Plaintiffs substantial retirement benefits that were due to them under the Pilots Program.

*See supra* at 3-7.

Thus, even before any discovery is taken regarding the motivations of the MEC in recommending the allocation approach adopted by ALPA, it is clear *now* that ALPA has acted in an arbitrary and unreasonable manner and in violation of its fiduciary duties under ERISA and the common law. Indeed, ALPA's actions do not withstand scrutiny under *any* standard of review. *See Foltz v. U.S. News & World Report, Inc.*, 613 F. Supp. 634, 639 (D.D.C. 1985) ("*Foltz I*") (discussing possible standards of review for claims based on undervaluation of employee benefits; though stricter standard may apply, decisions "must, at the very least, satisfy the arbitrary and capricious standard of review"). Plaintiffs have brought to the Court's attention sufficient facts to demonstrate that ALPA failed to adhere to the terms of the Pilots Program and its fiduciary duties as administrator of that Program – the issues at the crux of this case. On this basis alone, there are sufficient grounds to believe that Plaintiffs are likely to succeed on the merits of their case. *See, e.g., id.* at 639-40 (ERISA plan participants demonstrated likelihood of success on the merits where they asserted a "colorable claim" that the plan's fiduciaries relied on an improper calculation methodology to pay them less than the value of their interests in the plan).

11

"It is well known that ERISA was passed to protect pension benefits by providing for the sound administration of the plans and to avoid discrimination and forfeitures of benefits." *Fechter v. HMW Indus., Inc.*, 879 F.2d 1111, 1121 (3d Cir. 1989) (citing *Massachusetts v. Morash*, 490 U.S. 107(1989)). Indeed, "the legislative history of ERISA indicates that the avenues of relief and the right of action afforded pension plan participants should be generously construed." *Foltz I*, 613 F. Supp. at 639. For this reason, Congress conferred upon benefit plan participants "broad remedies for redressing or preventing violations of the Act . . . includ[ing] actions for 'recovery of benefits due to participants.'" *Id.* (granting preliminary injunction on behalf of plan participants) (citation omitted). Plaintiffs already have lost through the United bankruptcy a substantial percentage of the retirement benefits they had earned over their long careers. Plaintiffs in this case seek only a fair, reasonable, and non-discriminatory allocation of the remaining benefits they already had earned and which are due to them under the Pilots Plan. *See, e.g.*, Compl. ¶ 6 and Prayer for Relief. Based on the egregious facts of this case, and the nature of the relief sought, Plaintiffs have demonstrated a sufficient likelihood of success on the merits. *See, e.g., Canales*, 2006 WL 2520611, at *5 (finding "at least a substantial possibility" that Plaintiff could succeed on the merits); *Foltz I*, 613 F. Supp. at 640.

## II.    Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief.

In ERISA, Congress provided participants and beneficiaries a "panoply of remedial devices" to protect their rights, including the express right to seek injunctive relief for violations of the Act or otherwise to enforce the terms of a benefit plan. *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146 (1985); 29 U.S.C. § 1132(a)(3). This is consistent with the general law of trusts which permits beneficiaries to pursue either equitable or legal relief in an action against a trustee and relieves beneficiaries of the speculative and burdensome process of chasing down trustees or improper recipients of trust funds for damages. *See* Restatement (Second) Trusts

12

§ 199 cmts a-b ("It is immaterial that there is an adequate remedy at law .... The beneficiary can maintain a suit to enjoin a breach of trust, if there is a reasonable likelihood that the trustee will commit such a breach"). As the district court explained in *Cobell v. Norton*, 283 F. Supp. 2d 66 (D.D.C. 2003), *vacated in part*, 392 F.3d 461 (D.C. Cir. 2004): "The beneficiaries of a trust can maintain a suit in equity to compel the trustee to perform his duties as trustee .... [;] even though he may have a remedy at law he is not compelled to pursue it but is entitled to relief in equity." *Id.* at 129 (citing 3 Austin W. Scott & William F. Fratcher, *The Law of Trusts* § 199.1 (4th ed. 1988)). This is especially true where, as here, plan participants are seeking relief directly against a benefits plan or the administrator thereof in the form of an injunction preventing the distribution of the *assets of the plan itself. Foltz v. U.S. News & World Report,* 760 F.2d 1300 (D.C. Cir. 1985) ("*Foltz II*").

In such cases, plaintiffs face more than the ordinary difficulties of collecting a judgment, but rather the prospect of losing forever the corpus of the plan from which they seek recovery. The D.C. Circuit has observed, "[i]n that event, it is clear beyond cavil that any cause of action under ERISA against the plan, 'as an entity,' in the words of the statute, would forever be lost. Irrevocable loss of a cause of action created by Congress for the remedial and humane purpose of protecting beneficiaries and participants of ERISA-covered plans could . . . well work irreparable injury warranting the fashioning of equitable relief under the well-settled standards articulated by this Court." *Foltz II*, 760 F.2d at 1308 (citations omitted). As the *Foltz II* court explained: "it would do violence to Congress' intent in carefully framing an arsenal of remedial legal weapons in this watershed statute not to preserve the *status quo* to the extent of keeping alive an otherwise viable, statutorily provided cause of action." *Id.* at 1309 (citations omitted); *see also Fechter*, 879 F.2d at 1121 ("[t]he loss of a cause of action would not serve the congressional purpose of

ensuring that the contractually defined pension benefits of employees are received by the plan participants and their beneficiaries").

If ALPA is permitted to proceed with its imminent distribution of the remaining Pension Funds, the assets of the Pilots Program will be depleted in their entirety. Indeed, the Pilots Program effectively will cease to exist.. *See Foltz II*, 760 F.2d at 1309 ("Plaintiffs would, nonetheless, have a hollow victory indeed if the Plan remained extant, as a formal matter, but was drained of all or virtually all of its assets"). Plaintiffs will, at that time, lose any cause of action they have against ALPA as administrator of the Program to recover the specific benefits ALPA was required to distribute to them. It is precisely this circumstance for which Congress created the right to equitable relief under ERISA and which compels equitable relief under bedrock trust principles. *See, e.g., id* at 1308-09; *see also Fechter*, 879 F.2d at 1121. The law does not require Plaintiffs, as plan participants, to seek disgorgement of funds from junior pilots to whom ALPA intends to divert a disproportionate amount of the Pension Funds; nor should Plaintiffs be required to pursue speculative alternate relief once ALPA has depleted the funds in the Pilots Program.

The $186 million of Pension Funds remaining in the Pilots Program does not belong to ALPA; nor is this simply a pool of fungible dollars that can be subject to a damages claim. The Pension Funds constitute a specifically identifiable corpus of retirement benefits which is required to be distributed in the specific manner set forth in the Pilots Program, *i.e.*, to compensate pilots for their lost actual vested pension benefits. The Pension Funds have been committed to ALPA's care, as administrator of the Pilots Program and as a fiduciary, to distribute in accordance with the terms of the Pilots Program. It is clear that ALPA intends to distribute the remaining Pension Funds in a manner that is inconsistent with the Pilots Program

14

and that will deprive Plaintiffs of their right to compensation for their lost vested pension

benefits. Plaintiffs ask nothing more at this time than for the Court to preserve the *status quo* so

that their claim for benefits due under the Pilots Program may be heard on the merits. "Congress

intended that ERISA participants' entitlement to benefits should be preserved. In view of this

remedial purpose, the loss of a cause of action for benefits due would work irreparable harm to

the class plaintiffs." *Foltz I*, 613 F. Supp. at 643 (citation omitted); *see also Fechter*, 879 F.2d at

1121 (finding that district court properly found irreparable harm in absence of injunction "to

preserve the *status quo*"); *Anthony v. Texaco*, 803 F.2d 593, 598 (10th Cir. 1986) (district court

properly issued preliminary injunction "which effectively preserved [the] beneficiaries' causes of

action as intended by Congress").

III.    <u>**The Balance of Harms Weighs Heavily In Plaintiffs' Favor.**</u>

While Plaintiffs will be irreparably harmed by ALPA's depletion of the Pension Funds,

neither ALPA nor any third parties – including the junior pilots – will be harmed to any

appreciable degree if this court grants preliminary injunctive relief. Plaintiffs have not sought

damages from ALPA, nor are they seeking to compel any junior pilots to surrender any proceeds

they already have received from the Pilots Plan, even if they have received more than their

equitable share. Plaintiffs seek only to preserve the corpus of the Pilots Program – in the same

form as was originally established for the benefit of *all* eligible pilots – until such time as a

reasonable, fair, and equitable allocation can be devised to accomplish the intended purpose of

the Pilots Program.

ALPA itself, in its capacity as administrator/trustee of the Pilots Program, will suffer no

harm if it is enjoined at this time from distributing the balance of the Pension Funds in the Pilots

Program. To the contrary, ALPA's interests, as fiduciary and administrator of the Pilots

Program, should be fully *aligned* with Plaintiffs' request that the Court maintain the *status quo*

until an equitable and non-discriminatory distribution of the Pension Funds may be implemented in accordance with the terms of the Pilots Program.

Nor would any United pilots who are not part of the class be significantly harmed as a result of the injunctive relief Plaintiffs seek. The class Plaintiffs seek to represent include exclusively pilots who will receive *less* than their *pro rata* share of the Pension Funds based on the relative amounts of their vested benefits under the United Plan. Compl. ¶14. The only "harm" any other pilots theoretically could articulate would be a relatively brief delay in their receipt of funds that were intended to be compensation for lost retirement benefits – *i.e.*, benefits that they would not have received for years and perhaps even decades but for the establishment of the Pilots Program as a result of the United bankruptcy. In any event, ALPA recently announced that it planned to deposit the Pension Funds into pilots' retirement accounts, and not as cash distributions. *See* Exh. 1. It is therefore even more unlikely that any pilot would realize any actual harm by the preliminary injunctive relief Plaintiffs seek.

Moreover, it bears emphasis that the scope and duration of the injunctive relief Plaintiffs seek here is limited, minimizing even further the possibility of harm. Plaintiffs do not in this case seek to forestall indefinitely the distribution of the Pension Funds, but rather to delay such distribution for only so long as necessary to afford them the ability to obtain from this Court a determination of the merits of their claim that ALPA has ignored and violated the terms of the Pilots Program and acted contrary to its fiduciary obligations under ERISA and common law. Should Plaintiffs prevail, *all* pilots would receive their fair portion of the remaining available vested retirement benefits that were lost in connection with the United bankruptcy and now are due to them under the Pilots Program. Plaintiffs also have requested that the Diverted Funds, *i.e.*, those funds which ALPA intends to divert improperly from Plaintiffs, be placed into a

16

constructive trust which will earn interest during the pendency of these proceedings, so that the value of the funds for all rightful recipients will be preserved. In short, Plaintiffs will be significantly and irreparably injured if the preliminary injunction is not granted and ALPA then distributes all of the funds in the Pilots Program. In contrast, neither ALPA nor other United pilots will suffer any significant harm if the requested relief is granted.[8]

## IV.    Public Interest Considerations Favor Injunctive Relief.

The public interest weighs heavily in favor of granting Plaintiffs immediate injunctive relief in this case. ERISA was designed specifically by Congress to promote the public interest by ensuring the just and equitable administration of pension plans and protecting the rights of the plans' participants and beneficiaries. *See supra* at 12. In its findings and declaration of policy introducing the Act, Congress determined that "the continued well-being and security of millions of employees and their dependents are directly affected by [employee benefit] plans; that [the plans] are affected with a *national public interest*; [and] that [the plans] have become an important factor affecting the *stability of employment . . .*" 29 U.S.C. § 1001(a) (emphasis added). It is for this reason that Congress conferred upon retirement plan participants "broad remedies" to redress or prevent violations, and admonished that the "avenues of relief and the right of action afforded pension plan participants should be broadly construed." *See supra* at 12.

Courts repeatedly have cited to ERISA's broad remedial scheme and the corresponding public interest in granting equitable and injunctive relief in ERISA litigation. *See, e.g., Gould v. Lambert Excavating, Inc.*, 870 F.2d 1214, 1221 (7th Cir. 1989) (citing statute); *Fechter v. HMW*

---

[8]    Because the requested injunction will leave the corpus of pension funds frozen and undistributed, Plaintiffs request that the Court exercise its discretion and waive the security requirement of Federal Rule of Civil Procedure 65(c), based upon a finding that the injunction is unlikely to cause the Defendant harm, as well as the other equitable elements Plaintiffs have shown. *See, e.g., Bowen v. Consolidated Elec. Distrib., Inc. Welfare Benefit Plan*, 461 F. Supp. 2d 1179, 1187 (C.D. Cal. 2006).

*Indus., Inc.*, No. 87-0506, 1989 WL 29246, at *8 (E.D. Pa. March 28, 1989), *aff'd in relevant*

*part*, 879 F.2d 1111 (recognizing public interest in ensuring that beneficiaries receive their

proper share of surplus fund assets upon the termination of over-funded pension plan); *Anthony*,

803 F.2d at 597 (citing congressional intent to infuse ERISA scheme with "traditional equitable

principles" and provide claimants with various remedies "to [e]nsure compliance").  Consistent

with the public interest which permeates ERISA and common law trust law, this Court should

grant Plaintiffs' request to preserve the *status quo* to ensure that those pilots who lost the most in

the way of retirement benefits in connection with the United bankruptcy are able to receive the

fair, reasonable, and equitable distribution intended for them under the Pilots Program.

## CONCLUSION

Plaintiffs have demonstrated that they have satisfied all four of the elements for the grant

of preliminary injunctive relief.  Accordingly, for the foregoing reasons, Plaintiffs respectfully

request that this court grant their Motion for Preliminary Injunction and enter the attached Form

of Order enjoining ALPA from distributing the remaining retirement benefits in the Pilots

Program pending this Court's decision on the merits of Plaintiffs' claims.


February 22, 2007                               Respectfully submitted,


                                                Andrew H. Marks (D.C. Bar No. 932269)
                                                Aryeh S. Portnoy (D.C. Bar No. 464507)
                                                William Flanagan (D.C. Bar No. 311035)
                                                Daniel G. Kim (D.C. Bar No. 484342)
                                                CROWELL & MORING LLP
                                                1001 Pennsylvania Avenue, NW
                                                Washington, D.C. 20004
                                                Phone: (202) 624-2500
                                                Fax: (202) 628-5116

Michael S. Olin (D.C. Bar No. 372067)
Tucker Ronzetti (D.C. Bar No. 73755)
KOZYAK, TROPIN & THROCKMORTON, PA
2525 Ponce de Leon, 9th Floor
Miami, FL 33134
Phone: (305) 372-1800
Fax: (305) 372-3508

Attorneys for Plaintiffs

Of Counsel:    Jeffrey W. Pagano (D.C. Bar No. 965046)
CROWELL & MORING LLP
153 East 53rd Street, 31st Floor
New York, NY 10022
Phone: (212) 223-4000
Fax: (212) 223-4134

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Plaintiffs' Motion for Preliminary Injunction and Memorandum of Points and Authorities in Support was sent via hand delivery or first-class mail postage prepaid this 22nd day of February 2006 to:

Jonathan A Cohen, Esq. (hand delivery)
Air Line Pilots Association
1625 Massachusetts Avenue, NW
Washington, DC 20036

Captain John Prater
President, Air Line Pilots Association
1625 Massachusetts Avenue, NW
Washington, DC 20036

Clay Warner, Esq.
Air Line Pilots Association
535 Herndon Parkway
P.O. Box 1169
Herndon, VA 20172

Babette Ceccotti, Esq.
Peter Herman, Esq.
Cohen Weiss and Simon LLP
330 West 42nd Street
New York, NY 10036

Aryeh S. Portnoy

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RAYMOND GARAVITO<br>9767 S.W. 106 Terrace<br>Miami, FL 33176<br><br>RAFAEL RODRIGUEZ<br>7501 Cordoba Circle<br>Naples, FL 34109<br><br>ELLI MIZRAHI<br>14001 Mills Ave<br>Silver Spring, MD 20904<br><br>          Plaintiffs,<br><br>          v.<br><br>AIR LINE PILOTS ASSOCIATION,<br>INTERNATIONAL<br>1625 Massachusetts Ave, N.W.<br>Washington, DC 20036<br><br>          Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PROPOSED ORDER

Upon Consideration of Plaintiff's Motion for Preliminary Injunction and any response thereto, the Court hereby finds that:

(a)     Plaintiffs are likely to succeed on the merits of their claim for injunctive and declaratory relief;

(b)     Plaintiffs will be harmed irreparably by Defendant's imminent depletion of the funds currently held by Defendant that are the proceeds of the sale of the convertible notes received by ALPA from United Air Lines in connection with United's bankruptcy;

(c)      Any injury to Defendant or any other potentially interested party as a result of this injunction is likely to be minimal and is outweighed by the irreparable harm to Plaintiffs in the absence of such injunction; and

(d)      The public interest will be served by the issuance of this injunction.

Accordingly, it is this ___ day of February, 2007, hereby

ORDERED that Plaintiffs' Motion for Preliminary Injunction is granted; it is further

ORDERED, that Defendant Air Line Pilots Association, International is hereby enjoined until further order of the Court from distributing $_____ of the remaining funds being held by Defendant that are the proceeds of the sale of the convertible notes received by ALPA from United Air Lines in connection with United's bankruptcy.


_____
United States District Judge

cc:

Andrew H. Marks
Aryeh S. Portnoy
CROWELL & MORING, LLP
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004

Michael S. Olin
Tucker Ronzetti
KOZYAK, TROPIN & THROCKMORTON, PA
2525 Ponce de Leon, 9th Floor
Miami, FL 33134

Jonathan A Cohen, Esq.
Air Line Pilots Association
1625 Massachusetts Avenue, NW
Washington, DC 20036

Captain John Prater
President, Air Line Pilots Association
1625 Massachusetts Avenue, NW
Washington, DC 20036

Clay Warner, Esq.
Air Line Pilots Association
535 Herndon Parkway
P.O. Box 1169
Herndon, VA 20172

Babette Ceccotti, Esq.
Peter Herman, Esq.
Cohen Weiss and Simon LLP
330 West 42nd Street
New York, NY 10036

Exhibit 1

**From:** MEC Communications [mailto:ualmec-fastread@ames.alpa.org]
**Sent:** Friday, February 16, 2007 4:33 PM
**To:** ualmec-fastread
**Subject:** United MEC Week In Review, Friday, February 16, 2007

***Does Week In Review appear jumbled in your email display? <u>Click Here</u> for an online version***



**(Produced by the MEC Communications Committee)**

*Friday, February 16, 2007*

# Join MEC Strike Preparedness Committee In "Fix It Now (FIN)" Campaign



A key component in the United MEC's "Fix It Now! (FIN)" campaign is pilot involvement. Each and every United pilot has a stake in the MEC's effort to regain what was lost during United's bankruptcy case. And each United pilot has the power to make that happen.

MEC Strike Preparedness Committee Chairman <u>Captain Jim Anderson</u> is asking for volunteers to help "take back" our profession. A large part of the SPC's effort is building a solid Family Awareness Network that will help United pilot families meet, talk and share concerns and information. Now is the time to reengage and to engage your family in the issues that are before us, and those that we will face down the line. Your efforts and time are vital to the success in "Fixing Our Contract."

To volunteer, click on one of the following email addresses:

<u>Jim.Anderson@alpa.org</u>

or

<u>FamAware@alpa.org</u>



*This is your profession. This is your union. Get involved.*

## What's New

**In an effort to better serve pilots** with Crew Desk-related issues, the System Schedule Committee (SSC) has established a Crew Desk Subcommittee. This subcommittee will expand on the work already being done at the SSC level, including the PLTCM process. It will be comprised of SSC members and an LSC representative from each domicile.

The Crew Desk Subcommittee has established an email address, crewdeskual@alpa.org, to be used by pilots who want to submit Crew Desk questions and concerns directly to ALPA. All emails will be reviewed and answered by a subcommittee member. The email system will help the SSC compile and track recurring problems with the Crew Desk in a more efficient manner. This is not intended to replace the PLTCM reporting process, but rather to complement it.

Pilots are still encouraged to submit a PLTCM any time a problem arises regarding the Crew Desk. PLTCM reports go directly to the Company, are answered by a Company manager, and are reviewed by ALPA. In contrast, the new email address, crewdeskual@alpa.org, is appropriate for submitting Crew Desk questions and concerns directly to ALPA.

✈✈✈

**The United MEC will hold** a special meeting on Wednesday, February 21 to continue discussions on issues related to the Fix It Now! campaign. The meeting will be held at the Hilton Garden Inn, 2930 S. River Road, Des Plaines, Ill.

Parts of the meeting may be held in closed session. Pilots in good standing are welcome to attend all open sessions.

✈✈✈

**The MEC R&I Committee reminds you** that the PDAP Top-Off and Reserve Pool Distribution program is nearing the final distribution date. Distributions are planned for the second week of March, and, based on PDAP capacity, we will deposit all assets of the Grantor Trust into the PDAP for all eligible pilots.

This distribution will dispose of the Grantor Trust that holds the remaining cash from the sale of our Convertible Note. United will distribute as much of your total remaining convertible note proceeds, both from the PDAP Top-Off and Reserve Pool accounts, into your PDAP account. The 2007 Top-Off deposits will be made after back-filling any remaining 2006 IRS Section 415 capacity.

The process will take place over a two day period. On the first day, pilots with IRS Section 415 capacity in their 2006 PDAP will be Topped-Off. The next day, the remaining funds will be deposited into the PDAP based on room available in Plan Year 2007. It is anticipated that almost all pilots will have room in their 2007 PDAP for the remaining proceeds of the note.

## MEC News



**Work on the United MEC *Fix It Now!* Rally DVD** is now complete, and copies should be arriving in mailboxes in the coming days. A "FIN" sticker will be included with each DVD.

A <u>streaming video</u> of the rally is posted on the MEC website at <u>www.alpa.org/ual</u>. The video is broken down by speaker. <u>Click here</u> to access the video.



**The Wilson Center for Public Research** this week is conducting a telephone poll of United pilots on behalf of the United MEC.  The MEC periodically conducts these polls in order to measure the attitudes and pulse of the pilots concerning the state of our airline and our union.

We urge your cooperation and candor if you are contacted by the Wilson Center in the coming days. If you have any questions or comments about the poll, please contact the MEC Communications Committee at the MEC office at 1-800-922-ALPA.

Note: When the Wilson Center calls, one of the following three messages will appear on Caller ID:

      --Wilson Center For Public Research
      --Wilson CTR
      --Area Code 301 and 306 Prefix.

# Upcoming MEC Meetings

**--Council 11 (DCA):** 10 a.m., Tuesday, February 20, ALPA Office Building, 535 Herndon Parkway, Herndon, Va. (Guest Speaker: Phil Comstock, President, Wilson Center)

**--Council 34 (SFO):** 10 a.m., Tuesday, February 20, Westin Hotel (located just south of SFO Airport). Transportation available from the airport to the hotel via hotel transportation. Parking available for $5.

**--Council 12 (ORD):** Conference Call (call-in number to be provided by C 12 at a later date): 11 a.m., Tuesday, February 27.

-------------------------------

If you wish to unsubscribe from this list, please go to https://crewroom.alpa.org/alpa/DesktopModules/ToPreferences.aspx to update your Standard Mailings and/or E-Mail Distribution Lists preferences. Note: you may be prompted to logon to access this page.

Exhibit 2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RAYMOND GARAVITO<br>9767 S W 106 Terrace<br>Miami, FL 33176<br><br>RAFAEL RODRIGUEZ<br>7501 Cordoba Circle<br>Naples, FL 34109<br><br>ELLI MIZRAHI<br>14001 Mills Ave<br>Silver Spring, MD 20904<br><br>               Plaintiffs,<br><br>          v.<br><br>AIR LINE PILOTS ASSOCIATION,<br>INTERNATIONAL<br>1625 Massachusetts Ave, N.W.<br>Washington, DC 20036<br><br>             Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Civil Action No. _____ |

## VERIFIED COMPLAINT FOR PRELIMINARY INJUNCTION, PERMANENT INJUNCTION AND DECLARATORY RELIEF

### INTRODUCTION

Plaintiffs Raymond L. Garavito, Rafael Rodriguez, and Elli Mizrahi, individually and on behalf of all others similarly situated, (hereinafter, collectively with other members of the class, "Plaintiffs") bring this action against Defendant Air Line Pilots Association, International ("ALPA"), as administrator/trustee of a program for the allocation and distribution of funds to compensate pilots of United Air Lines ("United") for the loss of vested pension benefits. This program is an "employee pension benefit plan" within the definition of Section 3(2) of the

Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C.
§ 1002(2). The program is referred to herein as the "Pilots Retirement Compensation Program"
or the "Pilots Program."

      1.      This case involves the arbitrary, unreasonable, and discriminatory distribution of
pension benefit funds by ALPA to its members who were active United pilots as of December
30, 2004. These funds (hereinafter, "Pension Funds") totaled approximately $537 million and
were generated by United's conveyance to ALPA – in connection with the resolution of United's
bankruptcy proceedings – of convertible notes ("United Notes") having a face value of $550
million for the purpose of funding the Pilots Program. ALPA was designated to administer the
Pilots Program in order to offset a portion of the pension benefits that United's active pilots lost
when their United pension plan ("United Plan") was terminated in connection with United's
bankruptcy.

      2.      ALPA assumed responsibility for designating a trust or similar vehicle to hold the
Pension Funds for the benefit of eligible United pilots, and for overseeing and implementing, as
administrator/trustee, the distribution of those Pension Funds by means of the Pilots Retirement
Compensation Program. Under the terms of the Pilots Program, ALPA was required to allocate
and distribute reasonably the Pension Funds in order to replace a portion of the retirement
benefits that active employees lost when the United Plan was terminated. However, rather than
administer a fair, reasonable, and equitable plan of distribution of these Pension Funds, ALPA
delegated decision-making authority for the allocation methodology to the United Master

Executive Council ("MEC"),[1] a group of United pilots that, on information and belief, included members who stood to benefit financially from adoption of an allocation methodology based on factors other than the amount of vested pension benefits lost as a result of the United bankruptcy.

3.     Despite the conflicts of interest of the MEC members, ALPA, on the recommendation of the MEC, adopted a plan (the "GAP 2 Plan") that violated the terms of the Pilots Program by (a) failing appropriately to take into account the accrued and vested pension benefits that the Plaintiffs lost, and a portion of which the Pilots Retirement Compensation Program was intended to replace; and (b) unfairly, unreasonably, and unlawfully discriminating against Plaintiffs on the basis, *inter alia*, of their age and seniority.  In short, ALPA, chose to administer the Pilots Program in such a manner as to divert substantial Pension Funds from Plaintiffs and to give them to the more junior United pilots who had lost less vested pension benefits than Plaintiffs  (hereinafter "Junior Pilots").

4.     Plaintiffs, active senior pilots of United as of December 30, 2004 who have received and/or will receive less than a fair, reasonable, and equitable distribution of the Pension Funds due to them under the terms of the Pilots Program, bring this action for declaratory and injunctive relief under the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1101 *et seq.*, and common law, as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.  Plaintiffs seek to recover benefits due to them under the terms of the Pilots Retirement Compensation Program and to enjoin ALPA's wrongful depletion of the Pilots

---

[1]     On information and belief, ALPA has established a Master Executive Council for each airline at which it represents employees.  The MEC for each airline serves as the coordinating council for ALPA members at that airline.

Program's assets arising from ALPA's breach of its fiduciary duties to Plaintiffs as administrator/trustee of the Pilots Program.[2]

5.    ALPA already has distributed approximately $351 million of the Pension Funds based on the arbitrary, unreasonable, and discriminatory GAP 2 Plan allocation methodology devised by the MEC.  On information and belief, ALPA is on the verge of distributing all or substantially all of the remaining Pension Funds (totaling approximately $186 million) in the same arbitrary, unreasonable, and discriminatory manner, and it will do so unless this Court immediately enjoins such distribution.  The distribution of the remaining Pension Funds will cause irreparable injury to Plaintiffs, as it will exhaust completely the proceeds of the Pilots Program, and Plaintiffs will be unable to receive from the Pilots Program the reasonable and appropriate share of the pension benefits to which they are entitled.

6.    Plaintiffs are seeking both declaratory relief and permanent injunctive relief, as well as preliminary injunctive relief in the form of a preliminary injunction to ensure that a reasonable and lawful distribution of the Pension Funds can be effected upon the resolution of the merits of Plaintiffs' claims.  Specifically, Plaintiffs ask the Court, *inter alia*, to (a) declare that Plaintiffs are due certain benefits under the Pilots Program that have been allocated improperly by ALPA to Junior Pilots who are participants in the Pilots Program, and that ALPA, in adopting and implementing the GAP 2 Plan methodology, has acted in an arbitrary,

---

[2]    A complaint seeking monetary damages against ALPA recently was filed in the Northern District of Illinois on behalf of a group of senior United pilots who have alleged that ALPA breached its duty of fair representation under the Railway Labor Act in connection with its distribution of the proceeds of the sale of the United Notes.  *Mansfield v. Air Line Pilots Association, International*, 06-CV-6869 (N.D. Ill.). United has intervened in that case on the grounds that the relief sought by the Illinois plaintiffs could affect United's bankrupt estate or otherwise trigger the indemnity provisions of an agreement between ALPA and United if ALPA is held liable for monetary damages.  No such issues are raised by this Complaint, which seeks exclusively injunctive and declaratory relief and seeks no damages against ALPA or any of its officials.

capricious, and unreasonable manner in its administration of the Pilots Program, has breached its

fiduciary duties to Plaintiffs in violation of ERISA and common law, and has discriminated and

imposed a disparate financial impact against Plaintiffs; (b) order that an accounting of the Pilots

Program be undertaken to identify the exact amount of Pension Funds wrongfully being diverted

from Plaintiffs as a result of ALPA's allocation (hereinafter, the "Diverted Funds"); (c) enjoin

ALPA and the Pilots Program from distributing any of the Pension Funds still being held by

ALPA until an appropriate accounting is completed to identify the total amount of Diverted

Funds; (d) enjoin ALPA and the Pilots Program from distributing any of the Diverted Funds until

Plaintiffs' claims herein can be resolved on the merits; (e) order that the Diverted Funds be

placed in a constructive trust pending adoption of a fair, reasonable, and non-discriminatory plan

of distribution; and (f) order that the Diverted Funds be allocated to Plaintiffs in a fair,

reasonable, and non-discriminatory manner that is consistent with the terms of the Pilots

Program, and ERISA and common law principles.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29

U.S.C. § 1332(e)(1).

8.      Declaratory and injunctive relief is authorized by 28 U.S.C. § § 2201 and 2202,

respectively, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by 29 U.S.C.

§§ 1132(a)(1)(B) and (a)(3).

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). Venue also is

proper in this district pursuant to 29 U.S.C. § 1132(e)(2), because Defendant resides and may be

found in this District and because, upon information and belief, the Pilots Retirement

Compensation Program is being administered in this District and the breach occurred in this District.

## THE PARTIES

10.    Plaintiff Raymond Garavito ("Garavito") is a resident of Florida. As of December 30, 2004, Garavito was, and is today, an active United Airlines pilot who had participated in the United Plan for more than 20 years. Garavito received an initial distribution from the Pilots Program under the GAP 2 Plan in August 2006, and ALPA has indicated that he will receive the balance of his GAP 2 Plan allocation in March 2007. Garavito believes that the distribution is imminent. Garavito has been, and will be, damaged by the adoption of the GAP 2 Plan in the same way as all other members of the Class he seeks here to represent.

11.    Plaintiff Rafael Rodriguez ("Rodriguez") is a resident of Florida. As of December 30, 2004, Rodriguez was, and is today, an active United Airlines pilot who had participated in the United Plan for more than 20 years. Rodriguez received an initial distribution from the Pilots Program under the GAP 2 Plan in August 2006, and ALPA has indicated that he will receive the balance of his GAP 2 Plan allocation in March 2007. Rodriguez believes that the distribution is imminent. Rodriguez has been, and will be, damaged by the adoption of the GAP 2 Plan in the same way as all other members of the Class he seeks here to represent.

12.    Plaintiff Elli Mizrahi ("Mizrahi") is a resident of Maryland. As of December 30, 2004, Mizrahi was, and is today, an active United Airlines pilots who had participated in the United Plan for more than 20 years. Mizrahi received an initial distribution from the Pilots Program under the GAP 2 Plan in August 2006, and ALPA has indicated that he will receive the balance of his GAP 2 Plan allocation in March 2007. Mizrahi believes that the distribution is

imminent. Mizrahi has been, and will be, damaged by the adoption of the GAP 2 Plan in the same way as all other members of the Class he seeks here to represent.

13.    Defendant ALPA is the administrator/trustee of the Pilots Retirement Compensation Program – an ERISA-covered pension plan maintained and funded through the contribution of the United Notes. In its role as administrator/trustee, ALPA is responsible, pursuant to the terms of the Pilots Program, for reasonably allocating and distributing the Pension Funds in such a manner as to compensate eligible United pilots for a portion of their losses of vested pension benefits as a result of the termination of the United Plan. According to ALPA's website, its national officers conduct the association's work, at least in part, from its headquarters in Washington, D.C.

## CLASS ACTION ALLEGATIONS

14.    Plaintiffs bring this action on behalf of themselves and, under Fed. R. Civ. P. 23, as representatives of a Class consisting of the following:

> All pilots employed by United as of December 30, 2004, who will, under the GAP 2 Plan allocation methodology adopted by ALPA, receive less than a pro rata share of the Pension Funds based on the relative amounts of their vested benefits under the United Plan immediately prior to its termination, and after taking into account the value of amounts to be paid by the Pension Benefit Guaranty Corporation. Excluded from the Class are all members of the MEC who voted to adopt the GAP 2 Plan allocation methodology.

15.    Plaintiffs satisfy the "numerosity" requirement of Fed. R. Civ. P. 23(a)(1). The Class is so numerous and geographically disbursed that the joinder of all members is impractical. Plaintiffs reasonably believe that there were approximately 7,000 active United Airlines pilots as of December 30, 2004, of which number approximately one-third are believed to be members of the Class. The exact number and identity of the members of the Class are unknown to Plaintiffs at this time; such information is exclusively in the possession of the Defendant.

16.    Plaintiffs satisfy the "commonality" requirement of Fed. R. Civ. P. 23(a)(2). There exist in this litigation questions of law and fact common to all Class members, including, *inter alia*:

      a.    Whether ALPA's adoption and utilization of the GAP 2 Plan was arbitrary, capricious, unreasonable, discriminatory, and/or in bad faith;

      b.    Whether ALPA's adoption and utilization of the GAP 2 Plan allocation methodology was an abuse of its discretion;

      c.    Whether ALPA's adoption and utilization of the GAP 2 Plan deprived the Class members of benefits due to them under the Pilots Retirement Compensation Program;

      d.    Whether ALPA's adoption and utilization of the GAP 2 Plan breached its ERISA based fiduciary duties to the Class members;

      e.    Whether ALPA's adoption and utilization of the GAP 2 Plan breached its common law fiduciary duties to the Class members;

      f.    Whether ALPA's adoption and utilization of the GAP 2 Plan occurred while ALPA was operating under a possible or actual conflict of interest;

      g.    Whether the Class members are entitled to injunctive and/or declaratory relief; and

      h.    The nature of such relief.

17.    Plaintiffs satisfy the "typicality" requirement of Fed. R. Civ. P. 23(a)(3). Plaintiffs' claims are typical of the claims of the other Class members' claims. Plaintiffs and all members of the Class have been and/or will be similarly injured and damaged by Defendant's wrongful conduct alleged herein.

18.    Plaintiffs and their counsel satisfy the "adequacy" requirement of Fed. R. Civ. P. 23(a)(4). Plaintiffs will fairly and adequately protect the Class's interests. Plaintiffs' interests are coincident with, and not antagonistic to, the interests of the other Class members.

19.    Plaintiffs are represented by experienced and able counsel competent in the prosecution of such complex class action litigation.

20.    This action is maintainable as a class action under Rule 23(b)(1) because the prosecution of separate actions by or against individual members of the Class would create a risk of (A) inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class, or (B) adjudications with respect to individual members of the Class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

21.    This action is maintainable as a class action under Rule 23(b)(2) because Defendant has acted and/or refused to act on grounds generally applicable to the Class, thereby making appropriate preliminary and permanent injunctive and other equitable relief in favor of the Class.

## FACTS

22.    Plaintiffs are active United pilots who had earned and accrued substantial pension benefits that had vested under the United Plan prior to its termination.  These benefits had accrued, over time based on the pilots' actual years of service and annual earnings.  United, in connection with its recently-concluded bankruptcy proceedings, terminated the United Plan, effective December 30, 2004.  The termination of the Plan caused more than 7,000 active United pilots to lose their accrued and vested pension benefits under the Plan.

23.    United's pilots, including Plaintiffs, also suffered prospective losses as a consequence of the United bankruptcy.  Such losses included reduced future wages and employee benefits.   These losses of future benefits were unrelated to the pilots' vested pension benefit losses and were addressed in the United bankruptcy proceedings expressly through separate and unrelated mechanisms, including equity grants issued by United.  Neither the Pilots

Retirement Compensation Program nor the Pension Funds were intended to address losses of such future benefits. Rather, the Pilots Program and the Pension Funds were intended specifically to replace a portion of the retirement benefits that the pilots lost when the United Plan was terminated.

24.     The vested benefits for all pilots were guaranteed by the Pension Benefit Guaranty Corporation ("PBGC") up to a statutory maximum of approximately $28,500. As a result of the termination of the United Plan, United pilots who lost their vested pension benefits have received, or will receive, compensation from the PBGC up to this statutory maximum amount. Pilots' losses as a result of the termination of the United Plan, therefore, are represented by the difference between their total vested pension benefits and the value of the lost benefits they will receive as a result of the PBGC guarantee.

25.     To compensate its pilots for a portion of their loss of accrued and vested pension benefits, United, on July 28, 2006, issued to ALPA the United Notes, which had a face value of $550 million, the proceeds of which were to be distributed to a trust or similar vehicle for distribution to the pilots pursuant to the Pilots Retirement Compensation Program. Under the terms of the Pilots Program, ALPA was responsible for, *inter alia*, allocating and distributing the Pension Funds reasonably among the pilots in order to replace a portion of the vested retirement benefits the pilots lost upon the termination of the United Plan.

26.     On information and belief, ALPA chose not to submit any proposed allocation methodology to a vote by its members, or to identify an independent or objective third-party to develop a fair, reasonable, and equitable allocation methodology consistent with the purpose of the Pilots Program. Instead, ALPA delegated complete decision-making authority for determining the Pilots Program's allocation methodology to the MEC – members of which

would directly benefit from the unfair and discriminatory allocation methodology they were recommending. Pursuant to this authority, the MEC rejected a methodology that, consistent with the terms of the Pilots Program, would have allocated the Pension Funds consistent with the pilots' actual losses of accrued and vested pension benefits. Instead, the MEC devised an allocation methodology, *i.e.*, the GAP 2 Plan, that unreasonably and unfairly gives substantial and disproportionate "future credit" to the Junior Pilots by compensating them out of the Pilots Program's funds for projected, and entirely speculative, future career earnings with United (including promotions and pay increases) until the age of 60. ALPA adopted, and is in the process of distributing the Pension Funds according to, the MEC's GAP 2 Plan allocation methodology.

27.     By adopting and implementing the GAP 2 Plan, ALPA has acted, and is acting, in violation of the terms of the Pilots Program that required it to act reasonably to compensate the pilots for their vested pension benefit losses, and in violation of its statutory and common law fiduciary duties to Plaintiffs. ALPA adopted this methodology despite its knowledge that many – and perhaps most – of the Junior Pilots to whom the GAP 2 Plan gives the greatest amount of "future credit" will never in fact perform the assumed future services for United at all, or earn any of the corresponding benefits ALPA is providing them now with its current lump-sum distributions pursuant to the GAP 2 Plan. On information and belief, the result of this allocation is to divert in excess of $100 million of the limited Pension Funds in the Pilots Program from Plaintiffs to the younger Junior Pilots who lost little or no vested benefits as a result of the United bankruptcy.

28.     ALPA's GAP 2 Plan allocation methodology is demonstrably arbitrary, unreasonable, irrational, and discriminatory for several reasons. First, the formula selected by

ALPA fails to comply with the principal purpose of the Pilots Program that the Pension Funds were intended to compensate pilots for retirement benefits that were *lost* when the United Plan was terminated. It also fails to account for the fact that the Pension Funds were unrelated to *separate* compensation United provided its pilots to offset reductions in future wages and benefits resulting from the bankruptcy proceedings.

29.    Second, the methodology arbitrarily and unreasonably assumes that all Junior Pilots will work for United until age 60, but without any corresponding obligation to do so, or any consideration of the likelihood these future services ever will be performed. Under this methodology, the Junior Pilots could quit working on the day after ALPA distributes the remainder of the Pension Funds, and walk away with a windfall lump-sum payment of retirement benefits, all at the expense of Plaintiffs who are not being compensated enough even to replenish the benefits they *already* earned and which *already* had vested. These assumptions upon which the GAP 2 Plan is based are arbitrary and lack any reasonable basis.

30.    Third, on information and belief, by December 2004, when the United Plan effectively was terminated, the vested benefits of most Junior Pilots had yet to exceed even the statutory maximum benefit guaranteed by the PBGC. Therefore, many of the Junior Pilots will be *fully* compensated for their vested pension benefit losses by their PBGC payments alone. Yet, under ALPA's allocation methodology, these pilots nevertheless have received, and will continue to receive, a windfall of *additional* Pension Funds depleting further the limited pool of Pension Funds available to compensate Plaintiffs' actual losses.

31.    Plaintiffs lost more of their accrued and vested benefits when the United Plan was terminated because they had much more to lose. Plaintiffs' vested benefits also substantially exceeded the maximum PBGC payment, in some instances by hundreds of thousands of dollars.

Nevertheless, even though Plaintiffs' losses far exceeded those of the Junior Pilots, ALPA's arbitrary and unreasonable GAP 2 Plan allocation methodology will provide the Junior Pilots either a windfall of unearned benefits or a disproportionately higher share of their actual losses than Plaintiffs will receive. Indeed, each dollar paid to the Junior Pilots in excess of their proportionate share of any vested retirement benefits they lost has come or will come directly out of the limited pool of Pension Funds available to compensate Plaintiffs for their far greater losses of vested benefits.

32.    On information and belief, at the time it accepted the GAP 2 Plan allocation methodology recommended by the MEC, ALPA knew that Plaintiffs had lost far more in vested retirement funds than the Junior Pilots, and had far fewer years left until mandatory retirement to make up those losses. ALPA also knew that the Pilots Program was intended specifically to compensate pilots for *lost* vested benefits, and that pilots already were being compensated by United for prospective losses of future benefits and already had begun to participate in a new United retirement program that is providing retirement benefits for current and future service. ALPA also knew that it was unreasonable and inconsistent with industry norms to expect each of the Junior Pilots to work for United until the mandatory retirement age of 60. Finally, ALPA's representatives knew that the Junior Pilots were represented substantially in the MEC and among the voting union members and that, by failing to favor those employees over the Plaintiffs, ALPA's representatives could be compromising their own positions of power within the union leadership. As a result, on information and belief, ALPA and the MEC determined to favor the Junior Pilots, irrespective of the reasonableness or fairness of the process, by ensuring that the Pension Funds were allocated disproportionately in favor of the Junior Pilots.

33.     By implementing the Pilots Retirement Compensation Program by means of the

GAP 2 Plan allocation methodology,  ALPA has violated Plaintiffs' rights and its own duties

under ERISA and common law.  Specifically, ALPA has acted in an arbitrary, capricious, and

unreasonable manner, and has deprived Plaintiffs of benefits due to them under the terms of the

Pilots Program.  ALPA has taken (and continues to take) these actions willfully, in bad faith,

and/or with gross negligence, with the purpose and effect of discriminating against Plaintiffs by

neglecting their interests in order to confer disproportionate benefits on the union membership

majority Junior Pilots.

34.     Absent immediate injunctive relief, Plaintiffs will be irreparably harmed by

ALPA's actions because ALPA intends to deplete entirely the proceeds of the Pilots Retirement

Compensation Program by distributing the entirety of the Pension Funds in accordance with the

unreasonable and discriminatory GAP 2 Plan allocation methodology described above.  If ALPA

is permitted to do so, Plaintiffs will be unable to receive from the Pilots Program the reasonable

and appropriate share of the pension benefits they are due under the Pilots Program.

35.     To provide appropriate relief, an accounting should be ordered to determine the

difference between what Plaintiffs would receive under the GAP 2 Plan and Plaintiffs'

proportionate share of the Pension Funds based on vested amounts, taking into account the value

of benefits guaranteed by the PBGC.  The difference between these two computations represents

the total pool of Diverted Funds, which funds should be placed in a constructive trust.  The

Diverted Funds then should be reallocated among the Plaintiffs to place each of the Plaintiffs in

the position they would be under a proportionate allocation methodology based on all pilots' lost,

vested pension benefits.

**Count I**

**ERISA – 29 U.S.C. § 1132(a)(3)**

36.    Paragraphs 1 through 35 are incorporated as if fully set forth herein.

37.    The Pilots Retirement Compensation Program is an "employee benefit pension plan" within the definition of Section 3(2) of ERISA because the Program was established to provide retirement income to employees – in this case, in the form of funds specifically intended to replace a portion of accrued and vested pension benefits lost by United pilots upon the termination of the United Plan.  ALPA is the administrator of the Pilots Program.  Plaintiffs are participants in the Pilots Program.

38.    Plaintiffs are due certain benefits under the Pilots Retirement Compensation Program but are being deprived of those benefits by ALPA.  Specifically, ALPA has failed to act in accordance with the terms of the Pilots Program, including its obligation to allocate *reasonably* the Pension Funds to compensate Plaintiffs for a portion of their lost and accrued pension benefits.  ALPA also has acted, through the MEC, in a self-interested manner by choosing to compensate the Junior Pilots (including Junior Pilot members of the MEC) for pension benefits they never earned or accrued, thereby depriving Plaintiffs of their proportionate share of the Pilots Retirement Compensation Program proceeds.

39.    ALPA was obligated to act reasonably in determining the allocation and distribution of the Pension Funds under the Pilots Program.  In agreeing to administer the Pilots Program, ALPA also assumed fiduciary duties vis-à-vis its members who had lost their hard-earned, accrued and vested United pension plan benefits, and for whose benefit the Pension Funds were intended.

40.    By these actions and others in administering and implementing an unreasonable, unfair, and discriminatory allocation and distribution of the Pension Funds, ALPA, as the

-15-

administrator of the Pilots Program, has acted unreasonably and in an arbitrary and capricious manner, abused its discretion, breached its fiduciary duties to Plaintiffs, and operated under an actual conflict of interest in preventing Plaintiffs from recovering benefits due to them under the terms of the Pilots Program.

41.     Plaintiffs will suffer irreparable harm unless ALPA, as administrator of the Pilots Program, and the Pilots Program itself, are enjoined from distributing that portion of the Pension Funds that constitutes the amount wrongfully being diverted from Plaintiffs to the Junior Pilots, *i.e.*, the Diverted Funds.  Such relief is necessary to enable Plaintiffs to receive the benefits due to them under the Pilots Program.

## Count II

### ERISA – 29 U.S.C. § 1132(a)(1)(B)

42.     Paragraphs 1 through 41 are incorporated as if fully set forth herein.

43.     By violating the terms of the Pilots Program and breaching its fiduciary duties to Plaintiffs as set forth above, ALPA, as administrator of the Pilots Program, has caused Plaintiffs, as participants in the Pilots Program, to be deprived of benefits due to them under the terms of the Pilots Program.

44.     Plaintiffs will be irreparably injured unless they are able to recover the Diverted Funds pursuant to a reallocation methodology that is fair, reasonable, non-discriminatory, and consistent with ERISA and common law principles.

## Count III

### ERISA – 29 U.S.C. §§ 1109, 1332(a)(2)

45.     Paragraphs 1 through 44 are incorporated as if fully set forth herein.

46.     ALPA owes fiduciary duties to Plaintiffs in connection with its administration of the Pilots Retirement Compensation Program.  ALPA is required to discharge these duties with the care, skill, prudence, and diligence under the circumstances that a prudent individual or entity acting in a like capacity and familiar with such matters would use in the administration of a pension benefit program like the Pilots Program designed to compensate Plaintiffs for their actual losses of vested pension benefits.  ALPA also is required to administer the program in accordance with the terms under which the Program was established, *i.e.*, by reasonably allocating the Pension Funds in such a manner as to compensate Plaintiffs for a portion of the vested pension benefits they lost as a result of the termination of the United Plan.

47.     ALPA failed to act in accordance with its obligation to reasonably allocate the Pension Funds to Plaintiffs in such a manner as to compensate them for a portion of their actual lost vested pension benefits.  Instead, ALPA chose to compensate the Junior Pilots disproportionately, and for pension benefits they never earned or accrued, thereby depriving Plaintiffs of their fair, reasonable, and appropriate share of the Pension Funds.

48.     By these actions and others in administering and implementing an unreasonable and discriminatory allocation and distribution of the funds in an arbitrary, capricious, and unreasonable manner, ALPA breached its fiduciary duties to Plaintiffs.

49.     ALPA's breach proximately has caused, and will cause, irreparable injury to the extent Plaintiffs are deprived of their reasonable and appropriate share of the Pension Funds in connection with ALPA's administration of the Pilots Retirement Compensation Program.

## Count IV

## Common Law – Breach of Fiduciary Duty

50.     Paragraphs 1 through 35 are incorporated as if fully set forth herein.

51.     ALPA is a common law trustee of the Pilots Retirement Compensation Program and, as such, owes common law fiduciary duties to Plaintiffs in connection with that Program. ALPA is required to discharge these duties with the care, skill, prudence, and diligence under the circumstances that a prudent individual or entity acting in a like capacity and familiar with such matters would use in the administration of a pension benefit program like the Pilots Program designed to compensate Plaintiffs for their actual losses of vested pension benefits.

52.     ALPA failed to act in accordance with its obligation to reasonably allocate the Pension Funds to Plaintiffs in such a manner as to compensate them for a portion of their actual lost vested pension benefits.  Instead, ALPA chose to compensate the Junior Pilots disproportionately, and for pension benefits they never earned or accrued, thereby depriving Plaintiffs of their fair, reasonable, and appropriate share of the Pension Funds.

53.     By these actions and others in administering and implementing an unreasonable and discriminatory allocation and distribution of the funds in an arbitrary, capricious, and unreasonable manner, ALPA breached its fiduciary duties to Plaintiffs.

54.     ALPA's breach proximately has caused, and will cause, irreparable injury to the extent Plaintiffs are deprived of their reasonable and appropriate share of the Pension Funds in connection with ALPA's administration of the Pilots Retirement Compensation Program.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court grant judgment in their favor against Defendant on Counts I through IV and request that the Court:

a.      Declare that (a) Plaintiffs are due certain benefits under the Pilots Program that have been allocated by ALPA to other participants in the Pilots Program, including the Junior Pilots; and (b) ALPA, as administrator/trustee of the Pilots Program, in adopting the GAP 2

allocation for the distribution of the Pension Funds, has acted in an arbitrary, capricious, and unreasonable manner in its administration of the Pilots Program, has breached its fiduciary duties to Plaintiffs in violation of ERISA and common law, and has discriminated against Plaintiffs;

b.      Order that an accounting be undertaken to identify specifically the total pool of funds that the allocation methodology adopted by ALPA will wrongfully divert from Plaintiffs to other recipients, *i.e.*, the "Diverted Funds;"

c.      Enjoin any distribution of the Pension Funds until an appropriate accounting is completed to identify the total amount of Diverted Funds;

d.      Enjoin ALPA and the Pilots Program from distributing any of the Diverted Funds until Plaintiffs' claims herein can be resolved on the merits;

e.      Order that all of the Diverted Funds be placed in a constructive trust pending adoption of a fair, reasonable, and non-discriminatory plan of allocation and distribution;

f.      Order that all of the Diverted Funds be allocated to Plaintiffs in a fair, reasonable, and non-discriminatory manner that is consistent with the terms of the Pilots Program, and ERISA and common law principles;

g.      Award Plaintiffs their reasonable attorneys' fees and costs of suit; and

h.      Grant such other and further relief as may be just and proper under the circumstances.

DATED: February 22, 2007

Respectfully submitted,

Andrew H. Marks (D.C. Bar No. 932269)
Aryeh S. Portnoy (D.C. Bar No. 464507)
William Flanagan (D.C. Bar No. 311035)
Daniel G. Kim (D.C. Bar No. 484342)
CROWELL & MORING, LLP
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004
Phone: (202) 624-2500
Fax: (202) 628-5116

Michael S. Olin
Tucker Ronzetti (D.C. Bar No. 73755)
KOZYAK, TROPIN & THROCKMORTON, PA
2525 Ponce de Leon, 9th Floor
Miami, FL 33134
Phone: (305) 372-1800
Fax: (305) 372-3508

Attorneys for Plaintiffs

Of Counsel:   Jeffrey W. Pagano (D.C. Bar No. 965046)
              CROWELL & MORING LLP
              153 East 53rd Street, 31st Floor
              New York, NY 10022
              Phone: (212) 223-4000
              Fax: (212) 223-4134

## <u>VERIFICATION</u>

I, Raymond Garavito, declare, under penalty of perjury, that the allegations contained in the foregoing Verified Complaint for Preliminary Injunction, Permanent Injunction and Declaratory Relief, are true and correct to the best of my knowledge, information, and belief.

Executed: February 21, 2007

_____
Raymond Garavito

## VERIFICATION

I, Rafael Rodriguez, declare, under penalty of perjury, that the allegations contained in the foregoing Verified Complaint for Preliminary Injunction, Permanent Injunction and Declaratory Relief, are true and correct to the best of my knowledge, information, and belief.

Executed: February 21, 2007

Rafael Rodriguez

## **VERIFICATION**

I, Elli Mizrahi, declare, under penalty of perjury, that the allegations contained in the foregoing Verified Complaint for Preliminary Injunction, Permanent Injunction and Declaratory Relief, are true and correct to the best of my knowledge, information, and belief.

Executed: February 21, 2007

Elli Mizrahi

Exhibit 3



Lynn Hughitt
*Vice President - Compensation & Benefits*

**UNITED**                                   A STAR ALLIANCE MEMBER

July 18, 2006

Dear Colleague:

As part of United's Plan of Reorganization, many employees will be receiving cash proceeds from the sale of what are known as convertible notes. These notes, approved by the Bankruptcy Court, partially offset the retirement benefits that active employees lost when United's pension plans were terminated and replaced. They are unrelated to the equity grants that nearly all employees received earlier this year in recognition of the reductions in wages and benefits agreed to as part of the 1113 process of our Chapter 11 restructuring.

In ALPA's case, the $550 million face amount of convertible notes will be sold and the proceeds of the sale will be distributed to eligible participants. The ALPA R & I Committee has developed a website created for the purpose of providing you with the information, data and methodology that was used to calculate your individual convertible note allocation.

The formula used to determine the allocation for ALPA was discussed and approved by the United MEC in January 2006. Eligible participants include those who were on the United Pilots Seniority list as of January 1, 2005. Pilots can view their estimated individual allocation at https://www.ualpilots.org/mynoteallocation. Allocation among the eligible participants will be based on a pilot's projected A-Plan benefit to age 60 considering recoveries from the PBGC and C-Plan. The actual amounts allocated will depend on the demographics of the eligible members and the final proceeds from the sale of the convertible notes. Other ALPA restrictions may apply.

Enclosed is a brief set of questions and answers that provides a general overview of convertible notes, timing of the distribution(s), depositing funds into PDAP accounts and other process-related issues. Information is also available on a new "Notes Proceeds" page on SkyNet. In addition, we will continue to keep you updated via NewsReal and SkyNet as more information becomes available.

Once again, specific questions about ALPA's eligibility requirements or allocation methodology should be directed to https://www.ualpilots.org/mynoteallocation.

Sincerely,

*Lynn Hughitt*

Lynn Hughitt
Vice President – Compensation & Benefits

World Headquarters  1200 East Algonquin Road  Elk Grove Township, Illinois 60007  Mailing Address: Box 66100, Chicago, Illinois 60666

*The following Q-A provides a general overview of convertible notes allocations, including what they are, why are they being issued, to whom they will be allocated, when they will be distributed and how much each eligible employee group is likely to receive.*

**What are convertible notes?  Why are they being issued?**

Convertible notes are financial securities that can be converted into UAL stock at a designated conversion price.  UAL Corporation is issuing convertible notes to each union group and Salaried and Management (SAM) employees as part of its Plan of Reorganization and to comply with the most recent round of labor agreements.  These notes, approved by the Bankruptcy Court, partially offset the retirement benefits that active employees lost when United's pension plans were terminated and replaced.

**What will eligible employees receive?**

Each union's leadership (and United senior management on behalf of SAM employees) has decided to sell their notes to the general financial community and distribute the cash proceeds to eligible employees.

Each union determined its own formula for allocating the cash proceeds to the employees it represents.  The formula was set by the leadership of each labor group and, where required, approved by the labor group's membership during the ratification process.  SAM's allocation formula was determined by United senior management.  The amount of the notes as well as the allocation formula adopted by each group were designed to take into account part of the relative loss employees incurred due to the termination and replacement of their pension plans.

**When will the notes be issued?  When will employees receive the cash proceeds?**

The notes will be issued by UAL on or before August 1, 2006 and will be sold shortly after issuance.  Most of the cash proceeds will be distributed to employees – or contributed to their 401(k) or Pilot Directed Account Plan (PDAP) accounts – on or about August 15, 2006.  Until the distributions are made, proceeds from the notes sales will be held in trusts for the benefit of individual employee groups.

Some unions (and United senior management for SAM employees) may opt to hold back a small percentage of the proceeds as a contingency reserve.  Any remaining proceeds would be distributed at a later date, once the initial allocation has been completed successfully, but no later than March 15, 2007.

July 2006

**Which employee groups will be receiving notes? How much will these groups be receiving?**

As outlined in United's Plan of Reorganization and approved by the Bankruptcy Court, convertible notes are being allocated as follows:

- AFA -- $20 million
- ALPA -- $550 million
- AMFA -- $40 million
- IAM -- $60 million

- PAFCA -- $400,000
- SAM -- $56 million
- TWU -- $24,000

**How was it determined which employee groups would receive convertible notes?**

Notes allocations for applicable groups of represented employees were agreed to as part of the individual unions' latest collective bargaining agreements. The company made the decision to provide notes to SAM employees, reflecting the similar termination and replacement of their pension plan. The allocation of notes also was approved by the Bankruptcy Court as part of United's Plan of Reorganization.

**Why will the amounts that various employee groups receive vary so widely?**

The notes allocations for each labor group were determined by the company and the unions as part of negotiations that led to the most recent collective bargaining agreements. The specific amounts for each employee group were approved by the Bankruptcy Court as part of United's Plan of Reorganization.

**Among the employee groups that will be receiving notes, which specific represented employees are eligible for an allocation? Who set the eligibility requirements?**

Eligibility requirements for each employee group were set by the leadership of that group and, where required, approved by the union's membership during the ratification process. Basic eligibility information is available in the letter that accompanies this document. Questions about specific eligibility requirements should be directed to representatives of your labor group.

**Are any retirees, furloughees or other former employees eligible for notes?**

Each employee group's leadership addressed this question when they developed their allocation formula. As a result, eligibility requirements vary among the employee groups.

**How will the cash proceeds of the notes be distributed? Will this process involve employees' 401(k)/PDAP accounts, like the equity distribution process?**

As with the equity distribution process, each employee group is deciding whether or not it wishes to have United contribute the cash proceeds into employee 401(k) or Pilot Directed Account Plan (PDAP) accounts to the extent permissible under law. Any funds in excess of 2006 401(k)/PDAP legal limits will be distributed directly to employees, as will proceeds due to members of any employee groups that decide not to utilize 401(k)/PDAP accounts for distributions. Some employee groups are considering deferring a portion of each employee's distribution in excess of 2006 401(k)/PDAP limits until a contribution can be made in 2007 in order to defer or further minimize taxes.

Any direct distributions will occur through the normal payroll process as a taxable event. More information on this process will be available once the final decisions are made in the coming weeks.

**How do I know if my employee group is among those opting to deposit proceeds directly into 401(k)/PDAP accounts?**

The leadership of each employee group is communicating this information directly to its members. For SAM employees, the information will be available on SkyNet. Other employees should look to their union's website or contact their leadership if they have further questions.

**If I am a pilot and ALPA opts to deposit note proceeds into the PDAP, where will my proceeds be deposited?**

In this case, your cash proceeds will be deposited into the PDAP as a C-Plan Contribution. Your proceeds will be invested based upon the current C-Plan election you have on file. You may go online or contact the PDAP Service center between 0700-1900 CST on business days to change your C-Plan election. Additional information is available on the PDAP website at http://resources.hewitt.com/pdap or through the PDAP Service Center at 866-OUR-PDAP (866-687-7327).

**If I am not a pilot and my employee group is among those opting to deposit proceeds into 401(k) accounts, in which Fidelity fund will my proceeds be deposited?**

Your cash proceeds will be deposited into one of the Vanguard Lifecycle funds based on your age unless you choose to direct the deposit to a different fund. Additional information will be forthcoming from Fidelity closer to the distribution date describing when and how you can make this change. At that time, you will be able to make the election yourself on the internet at www.401k.com or you may call Fidelity directly at 800-245-9034 (or call collect from outside the U.S. at 508-787-9902).

**How much will the notes be worth to individual recipients?**

The ultimate value of the notes to each eligible employee will be determined by four primary factors:

- The total value of notes for your employee group;
- The formula used by each employee group to determine how much of the proceeds from the sale of the notes will be allocated to each eligible individual;
- The applicable tax rate for any direct (non-401(k) or PDAP) distributions of the proceeds; and
- Transaction costs – the costs associated with selling the notes and administering the transaction, which will be paid for from the proceeds from the sale of the notes.

Basic information about the allocation formula for your employee group is included in your letter. United will continue to keep employees informed via SkyNet, NewsReal and mail to their homes.

**Will employees be receiving the cash proceeds from the notes all at once?**

Not necessarily. Some employee groups have decided to hold back a portion of the proceeds as a contingency reserve to permit correction of any allocation errors in the original distribution or other unforeseen problems. Other employee groups are still evaluating the question. In addition, some

employee groups are considering deferring a portion of each employee's distribution in excess of 2006 401(k)/PDAP limits until a contribution can be made in 2007 in order to defer or further minimize taxes. Any cash proceeds held back as a contingency reserve or for 2007 401(k)/PDAP purposes would reside in a trust for each union group until the union's leadership is ready to proceed with a final distribution.

Tax requirements necessitate that all proceeds be distributed from the trusts to employees by March 15, 2007.

**Are these notes related in any way to the equity that most employees received after United emerged from bankruptcy?**

No, the notes are different from the recent equity distributions. As outlined in the company's Plan of Reorganization, the notes allocations are linked primarily to the termination and replacement of the company's defined benefit pension plans. Equity grants, on the other hand, reflect the new work rules and significant reductions in wages and benefits agreed to as part of the 1113 process of United's Chapter 11 restructuring.

**Will the allocation of the convertible notes affect the allocation of equity that I received earlier or that I might receive in the future?**

No.

**Do I need to take any special action at this time to receive any cash proceeds from the sale of these notes for which I may be eligible?**

No special action is needed to receive the proceeds from the sale of these notes. United will keep you informed of the process as the distribution date draws closer.

**Will employees have to pay taxes on the cash proceeds from the sale of the notes?**

Yes, if you receive a direct distribution of the cash proceeds. However, income taxes will be deferred – and FICA taxes avoided -- on the portion of the distribution deposited into your 401(k)/PDAP account should your employee group's leadership elect to have the distribution made (to the extent possible) as a company contribution to your plan. Any 401(k)/PDAP contributions are governed by annual contribution limits established by the Internal Revenue Code. Any amounts not contributed to a 401(k)/PDAP account will be distributed directly through the payroll process and will be subject to applicable tax withholding.

**When will I be receiving more information?**

United will be providing additional updates on a special Notes Proceeds section of SkyNet and in NewsReal as more information becomes available. The company will also be mailing each eligible employee a detailed statement with the specifics of his or her allocation once the notes proceeds have been distributed. In addition, a call center for employee questions will be available in August.

Questions about eligibility requirements and allocation methodology for union-represented employees should be directed to the respective unions.

**UNITED**

# Exhibit 4

Letter 05-01
*(Bankruptcy Exit Agreement)*

LETTER OF AGREEMENT
by and between
UAL CORP.,
UNITED AIR LINES, INC.
and
THE AIR LINE PILOTS
in the service of
UNITED AIR LINES, INC.
as represented by
THE AIR LINE PILOTS ASSOCIATION, INTERNATIONAL

THIS LETTER OF AGREEMENT, dated as of January 1, 2005, is made and entered into in accordance with the Railway Labor Act by and between UAL Corp. (hereinafter referred to as "UAL"), UNITED AIR LINES, INC. (hereinafter referred to as the "Company") and the AIR LINE PILOTS ASSOCIATION, INTERNATIONAL (hereinafter referred to as "ALPA" or the "Association").

WHEREAS UAL, the Company and the Association have reached agreement concerning the revisions to their current collective bargaining agreement (the "2003 Pilot Agreement" and, as revised by this Letter of Agreement, the "Revised 2003 Pilot Agreement") necessary for the Company to emerge from Chapter 11; and

WHEREAS certain of the revisions shall become effective as of January 1, 2005 (the "Effective Date"), assuming the complete satisfaction of the conditions described in paragraph 15 below prior to January 31, 2005 and others shall become effective on the effective date (the "Exit Date") of a plan of reorganization proposed by UAL (the "Plan of Reorganization"); and

WHEREAS the Company has represented to the Association that the Company has concluded that UAL cannot attract the exit financing necessary to emerge from Chapter 11 absent the termination of all of the Company's defined benefit plans;

THEREFORE the parties to this Letter of Agreement hereby agree as follows:

1.     Contract Extension.  The amendable date of the Revised 2003 Pilot Agreement shall be December 31, 2009.  Section 22.D of the Revised 2003 Pilot Agreement shall read in its entirety as follows:

This Agreement shall continue in full force and effect through and including December 31, 2009 and shall renew itself without change each succeeding January 1st thereafter, unless written notice of intended change is served in accordance with Section 6, Title I, of the Railway Labor Act by either party upon the other at least thirty (30) but not more than two hundred seventy (270) days

prior to December 31, 2009 or any year thereafter. The parties shall commence direct negotiations with respect to such notices no later than thirty (30) days following the delivery of such notice. In the event a new tentative collective bargaining agreement has not been concluded by August 1, 2009 (or August 1st of any year thereafter if applicable), and the services of the National Mediation Board (the "Board") have not previously been invoked, the parties shall, no later than August 1, 2009 (or August 1st of any year thereafter if applicable), jointly invoke the services of the Board under Section 5 of the Act.

2.    Hourly Pay Rates.  The rates for hourly pay (the "Hourly Rates") under Section 3-B of the 2003 Pilot Agreement shall be reduced by 11.8% on the Effective Date, and the reduced Hourly Rates shall thereafter be increased by 1.5% on May 1, 2006, by 1.5% on May 1, 2007, by 1.5% on May 1, 2008 and by 1.5% on May 1, 2009 (as provided in the 2003 Pilot Agreement). In addition to the increases contained in the preceding sentence, the Hourly Rates shall be increased by 1% on January 1, 2008. The Hourly Rates under Section 3-B of the Revised 2003 Pilot Agreement are set forth in Exhibit A to this Letter of Agreement.

3.    Other Contract Changes.  Certain other provisions of the 2003 Pilot Agreement shall be revised on the Effective Date as described on Exhibits B-1, B-2 and B-3 to this Letter of Agreement.

4.    Defined Benefit Pension Plan.

a.    In the event the Company seeks judicial approval to terminate the United Airlines Pilot Defined Benefit Pension Plan (the "A Plan") under 29 U.S.C §1341(c) following April 11, 2005, then, on and after May 11, 2005, (i) the Association shall waive any claim it may have that the termination of the A Plan would violate the terms and conditions of the existing collective bargaining agreement between the Company and the Association, and (ii) the Association shall not otherwise oppose the Company's efforts to terminate the A Plan under 29 U.S.C §1341(c); provided, however, that nothing in this Letter of Agreement shall be construed, deemed or characterized by UAL or the Company as any agreement of any form by the Association that the A Plan should be terminated;

b.    The Company: (i) shall not terminate or agree to terminate the A Plan effective at any time prior to the earlier of (A) ten (10 ) days before the Exit Date and (B) the last date that any of the Company's other defined benefit pension plans are terminated (the "Pension Termination Date") and (ii) shall oppose any effort by any other person or entity to terminate the A Plan effective at any time prior to the Pension Termination Date;

c.    The A Plan shall remain in full force and effect unless (i) the bankruptcy court issues an order declaring that the Company has met the requirements for plan termination under 29 U.S.C. §1341(c)(2)(B)(ii), and (ii) any of the following has

2

occurred: (A) no timely notice of appeal of the order has been filed, (B) the order has been affirmed following the exhaustion of all appeals, or (C) the Exit Date has occurred and the Plan of Reorganization has become effective without provision for the continuation of any such appeals; and

        d.     Notwithstanding any termination of A Plan retirement benefits, any and all of the Company's indemnification obligations under or applicable to the A Plan shall remain in full force and effect without regard to Section 22 of the Revised 2003 Pilot Agreement.

     5.     <u>Pension Contributions</u>.  In the event that the A Plan is terminated pursuant to 29 U.S.C §1341 or §1342 following judicial approval of such termination:

        a.     The Company shall make an additional monthly contribution (the "C Plan Contribution") to the United Airlines Pilot Directed Account Plan (the "PDAP") of six percent (6%) of pilot compensation (as measured under the PDAP) beginning with the earlier of (i) June 1, 2005 or (ii) the first day of the calendar month following the Exit Date (with a pro rated C Plan Contribution for the period between the Exit Date and the first of the month following the Exit Date); provided, however, that in the event the Exit Date follows June 1, 2005, C Plan Contributions will accrue from June 1, 2005 through the Exit Date and be contributed in a single lump sum payment to the PDAP on the Exit Date;

        b.     Prior to the Exit Date, the Company and the Association shall adopt a mutually-acceptable qualified or non-qualified plan arrangement to accept contributions that cannot be allocated to pilot defined contribution accounts under Section 415 of the Internal Revenue Code;

        c.     At any time prior to January 1, 2007, the Association may elect, on an irrevocable basis, to amend the Revised 2003 Pilot Agreement, effective January 1, 2008, (i) to increase the C Plan Contribution from six percent (6%) to seven percent (7%) of pilot compensation (as measured under the PDAP) and (ii) to reduce the Hourly Rates under Section 3-B of the Revised 2003 Pilot Agreement by one percent (1%);

        d.     The C Plan Contribution shall be in addition to the nine percent (9%) of pilot compensation contributed to the PDAP under the 2003 Pilot Agreement; and

        e.     Following the Exit Date, the Company shall not establish or re-establish any single-employer defined benefit plan for any UAL or Company employee group unless the pilot group is provided the option of electing to receive a comparable defined benefit plan in lieu of the C Plan Contribution.

3

6. <u>Profit Sharing</u>. The Revised 2003 Pilot Agreement shall provide for the pilot group to participate in the revised profit sharing program described in Exhibit C to this Letter of Agreement.

7. <u>Convertible Notes</u>. In the event that the A Plan is terminated pursuant to 29 U.S.C §1341 or §1342 following judicial approval of such termination, the Revised 2003 Pilot Agreement and the Plan of Reorganization shall provide for the issuance of $550 million of UAL convertible notes, as described in Exhibit D to this Letter of Agreement, to a trust or other entity designated by the Association. The terms of the UAL convertible notes described in Exhibit D shall be subject to mutually-acceptable modifications to optimize implementation for all parties from an accounting, securities law and tax law perspective.

8. <u>Distribution Agreement</u>. The Plan of Reorganization shall provide the pilot group with a distribution of UAL equity securities as provided in the amended distribution agreement described in Exhibit E to this Letter of Agreement.

9. <u>Additional Non-Labor Savings</u>. Prior to the Exit Date, the Association and the Company shall develop, and the Company shall begin pursuit of, a mutually-acceptable business improvement program reasonably projected to produce at least $150 million of annual savings in non-labor costs in addition to the savings contained in the Gershwin 5F business plan dated as of November 4, 2004 (the "Business Plan").

10. <u>Administrative Claim</u>. The Association shall accrue and be entitled to a stipulated, approved and allowed claim of administration under 11 U.S.C §503(b) in the amount of the actual cash savings provided to the Company under this Letter of Agreement from the Effective Date through the earlier of (i) the termination of this Letter of Agreement under paragraph 16 below or (ii) the Exit Date (the "Administrative Claim"). The Administrative Claim shall be extinguished upon the Exit Date unless the Association has terminated the Letter of Agreement under paragraph 16 below.

11. <u>Indemnity</u>. UAL and the Company shall provide indemnification on the Effective Date as described in Exhibit F to this Letter of Agreement.

12. <u>Plan Release and Exculpation</u>. The Plan of Reorganization shall include a plan exculpation and release provision (which provision shall be at least as comprehensive as the plan exculpation and release provision under the Plan of Reorganization for the debtor or any other person) for the Air Line Pilots Association, International, the United Master Executive Council of the Air Line Pilots Association, International, and each of their current or former (a) members, (b) officers, (c) committee members, (d) employees, (e) advisors, (f) attorneys, (g) accountants, (h) investment bankers, (i) consultants, (j) agents and (k) other representatives with respect to any liability such person or entity may have in connection with or related to the UAL bankruptcy cases, the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation or consummation of any of the Plan of

4

Reorganization, the disclosure statement concerning the Plan of Reorganization, the 2003 Pilot Agreement, this Letter of Agreement, the Revised 2003 Pilot Agreement or any contract, employee benefit plan, instrument, release or other agreement or document created, modified, amended or entered into in connection with either the Plan of Reorganization or any agreement between the Company, UAL and the Association, or any other act taken or omitted to be taken in connection with the United bankruptcy.

13.    Assumption of the Pilot Agreement. The Revised 2003 Pilot Agreement (other than with respect to the A Plan if the A Plan is terminated) shall be assumed under 11 U.S.C. §365 under the Plan of Reorganization.

14.    Bankruptcy Actions. The Company and the Association shall take the following actions to seek the approval of this Letter of Agreement by the bankruptcy court in In Re UAL Corporation et al., Case No. 02-B-48191 (Bankr. N.D. Ill.) (the "Bankruptcy Cases"):

a.    the Company shall file a motion for approval of the Letter of Agreement under 11 U.S.C. §363, in form and substance reasonably acceptable to the Association, by no later than January 21, 2005;

b.    the Company shall provide, to the extent reasonably practicable, the Association's counsel with copies of, and a reasonable opportunity to comment on, all motions, applications, proposed orders, pleadings and supporting papers prepared by the Company for filing with the bankruptcy court relating to court approval of this Letter of Agreement; and

c.    both the Company and the Association shall support and seek the approval of this Letter of Agreement in the Bankruptcy Cases without condition, qualification or exception; shall use their best efforts to obtain the support of the Official Committee of Unsecured Creditors and other parties and stakeholders for the Letter of Agreement; and shall take every reasonable action necessary to obtain judicial approval of this Letter of Agreement in the Bankruptcy Cases without condition, qualification or exception, including the filing of motions, objections and appeals.

15.    Conditions to Effectiveness. This Letter of Agreement shall become effective as of January 1, 2005, subject to the occurrence of all of the following prior to January 31, 2005: (a) acceptance by the United Master Executive Council of the Association, (b) United pilot membership ratification under the Association's Constitution and By-Laws, (c) if required, approval by the Company's Board of Directors, (d) execution by the President of the Association, and (e) withdrawal of the Company's motion to reject the 2003 Pilot Agreement under 11 U.S.C. §1113.

16.    Termination Rights. This Letter of Agreement may be terminated by the Association, by written notice from the Association to the Company (the "Termination Notice"), given before or after the Effective Date but no later than the Exit Date, but in

5

no event later than sixty (60) days following the occurrence of any of the following events:

a.      failure of the court to issue final judicial approval of this Letter of Agreement, without condition, qualification or exception, by January 31, 2005;

b.      a court of competent jurisdiction enters a final, non-appealable judicial order that the Company is not entitled to the termination of the A Plan under 29 U.S.C §1341(c);

c.      failure of the Company to implement, through binding agreement or final judicial order effective no later than June 1, 2005, revisions to (i) the labor contracts of the Company's other unionized employees and (ii) the wages, benefits and working conditions of the Company's salaried and management employees so that the aggregate revisions in (i) and (ii) are reasonably projected to produce at least $1.0 billion in average annual cash savings in labor and pension costs for the Company from January 1, 2005 through and including January 1, 2010, unless such action is cured to the reasonable satisfaction of the Association within twenty (20) days of the Termination Notice;

d.      the filing by UAL or United of, support by UAL or United for, or judicial confirmation or approval of (as the case may be), a plan of reorganization or a proposed disclosure statement which (i) contains any material term that is materially inconsistent with the Revised 2003 Pilot Agreement or this Letter of Agreement or (ii) proposes or confirms a capital structure or ownership structure that is not reasonably acceptable to the Association unless, in either case (i) or (ii), such action is cured to the reasonable satisfaction of the Association within twenty (20) days of the Termination Notice; or

e.      any other material breach of the Company's or UAL's obligations under this Letter of Agreement unless such breach is cured to the reasonable satisfaction of the Association within twenty (20) days of the Termination Notice.

In the event of such termination, (A) the Administrative Claim shall be paid on the Exit Date, (B) this Letter of Agreement shall otherwise become null and void in its entirety, and (C) the parties shall thereafter be governed by the 2003 Pilot Agreement (including the A Plan) and without regard to this Letter of Agreement.

17.      Fees and Expenses. The Company shall reimburse the Association for fees and expenses incurred in connection with this Letter of Agreement as described on Exhibit G to this Letter of Agreement.

18.      Agreement. This Letter of Agreement is a final, binding and conclusive commitment and agreement between UAL, the Company and the Association.

6

Notwithstanding anything to the contrary in this Letter of Agreement, judicial approval of this Letter of Agreement shall constitute approval and allowance of the Administrative Claim and shall otherwise have the same meaning and effect as the judicial approval of the 2003 Pilot Agreement in the Bankruptcy Cases signed on April 30, 2003.

19.    <u>Amendments; Waiver</u>.  This Letter of Agreement may be amended, modified, superseded or canceled and any of its provisions may be waived only by a written instrument executed by all parties or, in the case of a waiver, by the party waiving compliance.  Except as otherwise expressly provided in paragraph 16 above with respect to the delivery of a notice of termination, the failure of any party at any time to require performance of any provision of this Letter of Agreement shall not affect the right of that party at a later time to enforce the same or a different provision.  No waiver by any party of a right under this Letter of Agreement shall be deemed or construed as a further or continuing waiver of any such right with respect to the same or a different provision of this Letter of Agreement.

20.    <u>Notices</u>.  Any notice or other communication given under to the terms of this Letter of Agreement must be in writing and shall be deemed to have been duly given on the day it is delivered by hand, on the day it is sent by facsimile with confirmation of receipt by the transmitting machine, on the business day after it is sent by a national overnight mail service (delivery charge prepaid), or on the third business day after it is mailed first class, postage prepaid, in any case to the following addresses:

|  |  |
|---|---|
| If to the Company: | United Airlines, Inc.<br>1200 East Algonquin Road<br>Elk Grove Township, Illinois 60007<br>Attention:  Paul Lovejoy<br>Facsimile: 847-700-4099 |
| with copies to: | Kirkland & Ellis<br>200 East Randolph Drive<br>Chicago, Illinois 60601<br>Attention:  James H.M. Sprayregen<br>Facsimile: 312-861-2200 |
| If to the Association: | United Master Executive Council<br>Air Line Pilots Association, International<br>9550 West Higgins Road,  Suite 1000<br>Rosemont, IL  60018<br>Attention:  Master Chairman<br>Facsimile:  847-292-1777 |

7

with copies to:                Cohen, Weiss and Simon, LLP
                               330 West 42nd Street
                               25th Floor
                               New York, New York 10036
                               Attention: Babette Ceccotti
                               Facsimile: 212-695-5436

or to such other address or to such other person as any party shall have last designated by written notice provided to the other parties in the manner set forth in this paragraph.

21.     Counterparts.  This Letter of Agreement may be executed in two or more counterparts, all of which shall be considered one and the same instrument, and each of which shall be deemed an original.  Each party to this Letter of Agreement has agreed to permit the use of faxed or otherwise electronically transmitted signatures in order to expedite the consummation of the transactions contemplated hereby.

22.     Headings; Construction.  The paragraph headings in this Letter of Agreement have been inserted for convenience of reference only and do not restrict or otherwise modify any of the terms or provisions of this Letter of Agreement.  Unless otherwise expressly provided, the words "including" or "includes" in this Letter of Agreement do not limit the preceding words or terms and shall be deemed to be followed by the words "without limitation."

23.     Exhibits.  This Letter of Agreement includes all of Exhibits A through G hereto.  Except as otherwise expressly set forth therein, all capitalized terms in Exhibits A through G shall have the meanings defined in this Letter of Agreement.

24.     Fair and Equitable Pension Treatment.  In the event the Company implements, or reaches agreement with respect to, a legislative or other pension funding solution that permits the continuation or maintenance of any of the Company's defined benefit plans following the Pension Termination Date, the pilots will receive the full benefit of that legislative or other solution to maintain the pilot A Plan in the same status (e.g., frozen or active) as any other surviving plan so long as the pilot labor and pension savings contributed to the restructuring remain fair and proportional to other employee groups' labor and pension savings contributed to the restructuring in the manner contemplated under the Business Plan in light of any such legislative or other pension funding solution.

(Signature page to follow)

8

IN WITNESS WHEREOF, the parties have signed this Letter of Agreement this 31st day of January, 2005.

WITNESS:

_____

_____

_____

_____

FOR UNITED AIR LINES, INC.

_____
Peter B. Kain
Vice President – Labor Relations

FOR UAL CORPORATION

_____
Glenn F. Tilton
Chairman, President and CEO

WITNESS:

_____

_____

_____

_____

FOR THE AIR LINE PILOTS
ASSOCIATION, INTERNATIONAL

_____
Duane E. Woerth, President

_____
Mark Bathurst, Chairman
United Master Executive Council

9

**Exhibit A**
**Revised Pay Rates**

Section 3-B "Hourly Rates" is modified to read as follows:

3-B-1 Effective January 1, 2005 the hourly rates for Captains and First Officers shall be as follows. The hourly rates, overrides, and incentive pay established in this Section 3 shall govern all aspects of pilot compensation.

3-B-1-a Hourly Rates

| Captains | | | | | |
|------|----------|--------|----------|----------|----------|
|       | B747-400 | B777   | B767/757 | A320/319 | B737-300 |
| 1yr   | 166.91   | 166.91 | 136.79   | 116.24   | 116.24   |
| 2yr   | 167.86   | 167.86 | 137.83   | 117.24   | 117.24   |
| 3yr   | 168.74   | 168.74 | 139.10   | 118.28   | 118.28   |
| 4yr   | 169.66   | 169.66 | 140.03   | 119.40   | 119.40   |
| 5yr   | 170.62   | 170.62 | 141.13   | 120.52   | 120.52   |
| 6yr   | 171.50   | 171.50 | 142.18   | 121.58   | 121.58   |
| 7yr   | 172.45   | 172.45 | 143.13   | 122.67   | 122.67   |
| 8yr   | 173.59   | 173.59 | 144.33   | 123.75   | 123.75   |
| 9yr   | 174.55   | 174.55 | 145.28   | 124.68   | 124.68   |
| 10yr  | 175.97   | 175.97 | 146.78   | 126.23   | 126.23   |
| 11yr  | 177.31   | 177.31 | 148.36   | 127.68   | 127.68   |
| 12yr  | 178.91   | 178.91 | 149.75   | 129.21   | 129.21   |

| First Officers | | | | | |
|------|----------|--------|----------|----------|----------|
|       | B747-400 | B777   | B767/757 | A320/319 | B737-300 |
| 1yr   | 30.73    | 30.73  | 30.73    | 30.73    | 30.73    |
| 2yr   | 70.00    | 70.00  | 57.47    | 48.89    | 48.89    |
| 3yr   | 101.24   | 101.24 | 83.36    | 70.97    | 70.97    |
| 4yr   | 107.06   | 107.06 | 88.36    | 75.34    | 75.34    |
| 5yr   | 109.29   | 109.29 | 90.39    | 77.19    | 77.19    |
| 6yr   | 111.81   | 111.81 | 92.70    | 79.27    | 79.27    |
| 7yr   | 114.42   | 114.42 | 94.96    | 81.39    | 81.39    |
| 8yr   | 117.18   | 117.18 | 97.42    | 83.53    | 83.53    |
| 9yr   | 118.17   | 118.17 | 98.35    | 84.41    | 84.41    |
| 10yr  | 119.57   | 119.57 | 99.73    | 85.77    | 85.77    |
| 11yr  | 120.93   | 120.93 | 101.19   | 87.08    | 87.08    |
| 12yr  | 122.20   | 122.20 | 102.28   | 88.25    | 88.25    |

3-B-1-b deleted

3-B-2  Effective May 1, 2006 the hourly rates for Captains and First Officers shall be as follows:

3-B-2-a Hourly Rates

| | Captains | | | | |
|---|---|---|---|---|---|
| | B747-400 | B777 | B767/757 | A320/319 | B737-300 |
| 1yr | 169.42 | 169.42 | 138.84 | 117.99 | 117.99 |
| 2yr | 170.38 | 170.38 | 139.90 | 119.00 | 119.00 |
| 3yr | 171.27 | 171.27 | 141.19 | 120.06 | 120.06 |
| 4yr | 172.21 | 172.21 | 142.13 | 121.19 | 121.19 |
| 5yr | 173.18 | 173.18 | 143.25 | 122.32 | 122.32 |
| 6yr | 174.07 | 174.07 | 144.31 | 123.41 | 123.41 |
| 7yr | 175.03 | 175.03 | 145.27 | 124.51 | 124.51 |
| 8yr | 176.20 | 176.20 | 146.49 | 125.61 | 125.61 |
| 9yr | 177.16 | 177.16 | 147.46 | 126.55 | 126.55 |
| 10yr | 178.61 | 178.61 | 148.98 | 128.12 | 128.12 |
| 11yr | 179.97 | 179.97 | 150.59 | 129.60 | 129.60 |
| 12yr | 181.59 | 181.59 | 152.00 | 131.15 | 131.15 |

| | First Officers | | | | |
|---|---|---|---|---|---|
| | B747-400 | B777 | B767/757 | A320/319 | B737-300 |
| 1yr | 31.19 | 31.19 | 31.19 | 31.19 | 31.19 |
| 2yr | 71.05 | 71.05 | 58.34 | 49.63 | 49.63 |
| 3yr | 102.76 | 102.76 | 84.61 | 72.03 | 72.03 |
| 4yr | 108.66 | 108.66 | 89.68 | 76.47 | 76.47 |
| 5yr | 110.93 | 110.93 | 91.75 | 78.35 | 78.35 |
| 6yr | 113.49 | 113.49 | 94.09 | 80.46 | 80.46 |
| 7yr | 116.13 | 116.13 | 96.39 | 82.61 | 82.61 |
| 8yr | 118.93 | 118.93 | 98.88 | 84.78 | 84.78 |
| 9yr | 119.94 | 119.94 | 99.83 | 85.68 | 85.68 |
| 10yr | 121.37 | 121.37 | 101.23 | 87.06 | 87.06 |
| 11yr | 122.74 | 122.74 | 102.70 | 88.38 | 88.38 |
| 12yr | 124.03 | 124.03 | 103.81 | 89.57 | 89.57 |

3-B-2-b deleted

2

3-B-3  Effective May 1, 2007 the hourly rates for Captains and First Officers shall be as follows:

3-B-3-a Hourly Rates

| Captains | | | | | |
|---|---|---|---|---|---|
| | **B747-400** | **B777** | **B767/757** | **A320/319** | **B737-300** |
| 1yr | 171.96 | 171.96 | 140.92 | 119.76 | 119.76 |
| 2yr | 172.94 | 172.94 | 141.99 | 120.79 | 120.79 |
| 3yr | 173.84 | 173.84 | 143.30 | 121.86 | 121.86 |
| 4yr | 174.79 | 174.79 | 144.26 | 123.01 | 123.01 |
| 5yr | 175.78 | 175.78 | 145.40 | 124.16 | 124.16 |
| 6yr | 176.68 | 176.68 | 146.48 | 125.26 | 125.26 |
| 7yr | 177.66 | 177.66 | 147.45 | 126.37 | 126.37 |
| 8yr | 178.84 | 178.84 | 148.69 | 127.49 | 127.49 |
| 9yr | 179.82 | 179.82 | 149.67 | 128.45 | 128.45 |
| 10yr | 181.29 | 181.29 | 151.22 | 130.04 | 130.04 |
| 11yr | 182.67 | 182.67 | 152.85 | 131.54 | 131.54 |
| 12yr | 184.32 | 184.32 | 154.28 | 133.11 | 133.11 |

| First Officers | | | | | |
|---|---|---|---|---|---|
| | **B747-400** | **B777** | **B767/757** | **A320/319** | **B737-300** |
| 1yr | 31.66 | 31.66 | 31.66 | 31.66 | 31.66 |
| 2yr | 72.12 | 72.12 | 59.21 | 50.37 | 50.37 |
| 3yr | 104.30 | 104.30 | 85.87 | 73.12 | 73.12 |
| 4yr | 110.29 | 110.29 | 91.03 | 77.62 | 77.62 |
| 5yr | 112.59 | 112.59 | 93.13 | 79.53 | 79.53 |
| 6yr | 115.19 | 115.19 | 95.50 | 81.67 | 81.67 |
| 7yr | 117.87 | 117.87 | 97.83 | 83.85 | 83.85 |
| 8yr | 120.72 | 120.72 | 100.36 | 86.05 | 86.05 |
| 9yr | 121.74 | 121.74 | 101.32 | 86.96 | 86.96 |
| 10yr | 123.19 | 123.19 | 102.75 | 88.36 | 88.36 |
| 11yr | 124.59 | 124.59 | 104.24 | 89.71 | 89.71 |
| 12yr | 125.89 | 125.89 | 105.37 | 90.92 | 90.92 |

3-B-3-b deleted

3

3-B-4  Effective January 1, 2008 the hourly rates for Captains and First Officers shall be as follows:

3-B-4-a Hourly Rates

| | | | Captains | | |
|---|---|---|---|---|---|
| | **B747-400** | **B777** | **B767/757** | **A320/319** | **B737-300** |
| 1yr | 173.68 | 173.68 | 142.33 | 120.96 | 120.96 |
| 2yr | 174.67 | 174.67 | 143.41 | 122.00 | 122.00 |
| 3yr | 175.57 | 175.57 | 144.74 | 123.08 | 123.08 |
| 4yr | 176.54 | 176.54 | 145.70 | 124.24 | 124.24 |
| 5yr | 177.54 | 177.54 | 146.85 | 125.40 | 125.40 |
| 6yr | 178.45 | 178.45 | 147.94 | 126.51 | 126.51 |
| 7yr | 179.43 | 179.43 | 148.93 | 127.64 | 127.64 |
| 8yr | 180.63 | 180.63 | 150.18 | 128.77 | 128.77 |
| 9yr | 181.62 | 181.62 | 151.17 | 129.73 | 129.73 |
| 10yr | 183.10 | 183.10 | 152.73 | 131.34 | 131.34 |
| 11yr | 184.50 | 184.50 | 154.37 | 132.86 | 132.86 |
| 12yr | 186.16 | 186.16 | 155.82 | 134.45 | 134.45 |

| | | | First Officers | | |
|---|---|---|---|---|---|
| | **B747-400** | **B777** | **B767/757** | **A320/319** | **B737-300** |
| 1yr | 31.98 | 31.98 | 31.98 | 31.98 | 31.98 |
| 2yr | 72.84 | 72.84 | 59.80 | 50.87 | 50.87 |
| 3yr | 105.34 | 105.34 | 86.73 | 73.85 | 73.85 |
| 4yr | 111.40 | 111.40 | 91.94 | 78.39 | 78.39 |
| 5yr | 113.72 | 113.72 | 94.06 | 80.32 | 80.32 |
| 6yr | 116.34 | 116.34 | 96.46 | 82.49 | 82.49 |
| 7yr | 119.05 | 119.05 | 98.81 | 84.68 | 84.68 |
| 8yr | 121.93 | 121.93 | 101.37 | 86.91 | 86.91 |
| 9yr | 122.96 | 122.96 | 102.34 | 87.83 | 87.83 |
| 10yr | 124.42 | 124.42 | 103.78 | 89.25 | 89.25 |
| 11yr | 125.83 | 125.83 | 105.29 | 90.61 | 90.61 |
| 12yr | 127.15 | 127.15 | 106.42 | 91.83 | 91.83 |

3-B-4-b deleted

3-B-5  Effective May 1, 2008 the hourly rates for Captains and First Officers shall be as follows:

3-B-5-a Hourly Rates

### Captains

| | B747-400 | B777 | B767/757 | A320/319 | B737-300 |
|---|---|---|---|---|---|
| 1yr | 176.28 | 176.28 | 144.47 | 122.77 | 122.77 |
| 2yr | 177.29 | 177.29 | 145.57 | 123.83 | 123.83 |
| 3yr | 178.21 | 178.21 | 146.91 | 124.92 | 124.92 |
| 4yr | 179.19 | 179.19 | 147.89 | 126.10 | 126.10 |
| 5yr | 180.20 | 180.20 | 149.05 | 127.28 | 127.28 |
| 6yr | 181.12 | 181.12 | 150.16 | 128.41 | 128.41 |
| 7yr | 182.13 | 182.13 | 151.16 | 129.55 | 129.55 |
| 8yr | 183.34 | 183.34 | 152.43 | 130.70 | 130.70 |
| 9yr | 184.34 | 184.34 | 153.44 | 131.68 | 131.68 |
| 10yr | 185.85 | 185.85 | 155.02 | 133.31 | 133.31 |
| 11yr | 187.26 | 187.26 | 156.69 | 134.85 | 134.85 |
| 12yr | 188.95 | 188.95 | 158.16 | 136.46 | 136.46 |

### First Officers

| | B747-400 | B777 | B767/757 | A320/319 | B737-300 |
|---|---|---|---|---|---|
| 1yr | 32.46 | 32.46 | 32.46 | 32.46 | 32.46 |
| 2yr | 73.93 | 73.93 | 60.70 | 51.64 | 51.64 |
| 3yr | 106.92 | 106.92 | 88.03 | 74.95 | 74.95 |
| 4yr | 113.07 | 113.07 | 93.32 | 79.57 | 79.57 |
| 5yr | 115.42 | 115.42 | 95.47 | 81.53 | 81.53 |
| 6yr | 118.09 | 118.09 | 97.91 | 83.72 | 83.72 |
| 7yr | 120.84 | 120.84 | 100.29 | 85.95 | 85.95 |
| 8yr | 123.75 | 123.75 | 102.89 | 88.22 | 88.22 |
| 9yr | 124.80 | 124.80 | 103.87 | 89.15 | 89.15 |
| 10yr | 126.28 | 126.28 | 105.33 | 90.58 | 90.58 |
| 11yr | 127.72 | 127.72 | 106.87 | 91.97 | 91.97 |
| 12yr | 129.06 | 129.06 | 108.02 | 93.21 | 93.21 |

3-B-5-b deleted

3-B-6  Effective May 1, 2009 the hourly rates for Captains and First Officers shall be as follows:

3-B-6-a Hourly Rates

### Captains

| | B747-400 | B777 | B767/757 | A320/319 | B737-300 |
|---|---|---|---|---|---|
| 1yr | 178.93 | 178.93 | 146.64 | 124.61 | 124.61 |
| 2yr | 179.95 | 179.95 | 147.75 | 125.68 | 125.68 |
| 3yr | 180.88 | 180.88 | 149.11 | 126.80 | 126.80 |
| 4yr | 181.87 | 181.87 | 150.11 | 127.99 | 127.99 |
| 5yr | 182.91 | 182.91 | 151.29 | 129.19 | 129.19 |
| 6yr | 183.84 | 183.84 | 152.41 | 130.34 | 130.34 |
| 7yr | 184.86 | 184.86 | 153.43 | 131.49 | 131.49 |
| 8yr | 186.09 | 186.09 | 154.72 | 132.66 | 132.66 |
| 9yr | 187.11 | 187.11 | 155.74 | 133.65 | 133.65 |
| 10yr | 188.64 | 188.64 | 157.35 | 135.31 | 135.31 |
| 11yr | 190.07 | 190.07 | 159.04 | 136.87 | 136.87 |
| 12yr | 191.79 | 191.79 | 160.53 | 138.51 | 138.51 |

### First Officers

| | B747-400 | B777 | B767/757 | A320/319 | B737-300 |
|---|---|---|---|---|---|
| 1yr | 32.94 | 32.94 | 32.94 | 32.94 | 32.94 |
| 2yr | 75.04 | 75.04 | 61.61 | 52.41 | 52.41 |
| 3yr | 108.53 | 108.53 | 89.35 | 76.08 | 76.08 |
| 4yr | 114.76 | 114.76 | 94.72 | 80.76 | 80.76 |
| 5yr | 117.15 | 117.15 | 96.90 | 82.75 | 82.75 |
| 6yr | 119.86 | 119.86 | 99.38 | 84.98 | 84.98 |
| 7yr | 122.65 | 122.65 | 101.80 | 87.24 | 87.24 |
| 8yr | 125.61 | 125.61 | 104.43 | 89.54 | 89.54 |
| 9yr | 126.68 | 126.68 | 105.43 | 90.49 | 90.49 |
| 10yr | 128.18 | 128.18 | 106.91 | 91.94 | 91.94 |
| 11yr | 129.63 | 129.63 | 108.47 | 93.35 | 93.35 |
| 12yr | 130.99 | 130.99 | 109.64 | 94.60 | 94.60 |

Renumber balance of Section 3-B

**Exhibit B-1**
**Other Contract Revisions**

1. Section 3-B-10-a "Late Night Flying" deleted

2. Section 5-G-1-e-(1)-(d) deleted

3. Section 5-G-1-e-(2) modified to read as follows:

   5-G-1-e-(2) A pilot functioning as a reserve will not be scheduled into a day(s) off.

4. Section 20-J-4-d deleted

5. Section 22-A-2 add this LOA

6. Letter Of Agreement 04-09 "PBS Contract Modifications" change to 20-E-2-b is modified to read as follows:

   20-E-2-b In equipment domiciles which have both international and domestic trips, the senior 50% of the pilots whose lines will be vacated for OE lines will be subject to assignments as reserves per domestic reserve rules. The junior 50% of the pilots whose lines will be vacated for OE lines are subject to assignments as reserves per international reserve rules. If an odd number of OE lines exist, the odd line will be identified as a domestic regular reserve line for days off consideration.

7. The contractual provisions identified in paragraphs 2, 3, 4 and 6 above will take effect on the first day of the month following the Effective Date.

**Exhibit B-2**
**Other Contract Revisions**

(Retiree Life Insurance)

January 1, 2005

Captain Mark Bathurst, Chairman
UAL-MEC Air Line Pilots Association
9550 West Higgins Suite 1000
Rosemont, Illinois 60018

Dear Mark:

During the negotiations which led to the Letter of Agreement 05-01 (Bankruptcy Exit),
the parties agreed that the following change will apply to pilots who, on January 1, 2005,
are active (including paid leave), receiving Pilot Disability Income benefits, furloughed,
on medical leave of absence, on military leave or on other approved leave:

> No retiree life insurance will be payable upon the death of any pilot who retires
> after January 1, 2005.

If this letter accurately reflects our agreement, please sign and return three (3) copies for
our files.

Sincerely,

Peter B. Kain
Vice President - Labor

Accepted and agreed to this
3/ ___ day of January 2005

Captain Mark Bathurst, Chairman
UAL-MEC Air Line Pilots Association

17

**Exhibit B-3**
**Success Sharing**

Section 3-M-1-e of the 2003 Pilot Agreement shall be revised to read in its entirety as follows:

Pilots will receive the following cash incentive payments based on United's actual performance under the annual incentive program (with linear interpolation between the performance points):

| | |
|---|---|
| Threshold Performance: | 0.5% of Wages |
| Target Performance | 1.0% of Wages |
| Maximum Performance | 2.0% of Wages |

**Exhibit C**
**Profit Sharing**

| | |
|---|---|
| **Effective Date of Profit Sharing Plan:** | As of January 1, 2005 (so that the first year covered by the profit sharing plan shall be calendar year 2005). |
| **Profit Sharing Pool:** | In the event that the Company has more than $10 million in Pre-Tax Earnings in the relevant calendar year, 7.5% of Pre-Tax Earnings in 2005 and 2006 and 15% of Pre-Tax Earnings in each calendar year thereafter. |
| **Pre-Tax Earnings:** | UAL consolidated net income as determined in accordance with GAAP, but excluding (i) consolidated federal, state and local income tax expense (or credit); (ii) unusual, special, or non-recurring charges; (iii) charges with respect to the grant, exercise or vesting of equity, securities or options granted to UAL and United employees, and (iv) expense associated with the profit sharing contributions. |
| **Eligibility:** | All domestic employees of UAL Corp. or United Airlines, Inc. (including all pilots) who have completed one year of service as of December 31st of the year for which Pre-Tax Earnings are being measured. |
| **Allocation:** | For each eligible employee, a pro rata share of the Profit Sharing Pool for each calendar year based on the ratio of the employee's Considered Earnings for the year to the aggregate amount of Considered Earnings for all eligible employees that year. |
| **Considered Earnings:** | As currently defined in the Company's Success Sharing Plan (i.e., base pay, overtime, holiday pay, longevity pay, sick pay, vacation pay, shift differential, premiums, pre-tax contributions to a 401(k) plan, pre-tax medical plan contributions, and flexible spending account contributions but not expense reimbursement, incentive or profit sharing payments, imputed income or other similar awards or allowances). |
| **Payment Date:** | By no later than April 30th of the following year. |
| **Distribution:** | In cash, subject to 401(k) deferrals. |
| **Relationship to Other Programs:** | Incremental to the Success Sharing Plan; in lieu of the existing profit sharing plan described in Section 3-M-2 of the 2003 Pilot Agreement. |
| **Documentation:** | Implementing documentation reasonably acceptable to the Association. |
| **Duration:** | Continuing unless and until terminated in a future pilot collective bargaining agreement. |

10

### Exhibit D
### Convertible Notes

| | |
|---|---|
| **Issuer:** | Reorganized UAL Corp. |
| **Guarantor:** | United Airlines, Inc. |
| **Issue:** | [___]%[1] Senior Subordinated Convertible Notes Due 2021 (the "Notes") to be issued no later than 180 days following the Exit Date (the "Issuance Date"). |
| **Initial Holder:** | A trust or similar non-permanent vehicle for the benefit of eligible United pilots; the Notes or the value of the Notes to be distributed to such pilots or pilot retirement accounts as soon as reasonably practicable given tax, accounting, securities and market considerations; all rights of the Notes to be exercised by individual pilots while the notes remain in the trust. Distribution mechanics, eligibility and allocation among such pilots to be reasonably determined by the Association. |
| **Principal Amount:** | $550,000,000 in denominations of $1,000. |
| **Term:** | 15 years from the Issuance Date. |
| **Amortization:** | None prior to maturity; full principal to be repaid at the maturity date except to the extent converted or prepaid. |
| **Interest Rate:** | Semi-annually in arrears, in cash, at an annual rate of [___]%[1]; provided, however, that (i) the first full year of interest from the Issuance Date may be paid in cash or in kind at the option of the Issuer; (ii) if such interest is paid in kind, it will be in Common Stock, but only to the extent there exists Common Stock that is exempt from registration under 11 U.S.C. § 1145; and (iii) if such interest is paid in kind, it shall be delivered to the Holders under applicable market terms at issuance for public convertible debt securities of this type (e.g., any notice period and stock payment premium). |
| **Security:** | None. |
| **Ranking:** | Junior to the Reorganized UAL exit facility, customary secured indebtedness, indebtedness contemplated under a plan of reorganization, and other mutually agreed-upon indebtedness; pari passu to all current and future UAL or United Airlines senior |

---

[1] The parties shall work together to set an interest rate for the Notes no later than thirty (30) days prior to the Issuance Date which shall ensure that the Notes will trade at par value or better on Issuance (the "Par Value Interest Rate"). Failing agreement on the Par Value Interest Rate, the parties shall solicit rate recommendation from two national trading firms and shall adopt the average of the two suggested rates.

|  | unsecured debt; senior to all current and future subordinated debt. |
| --- | --- |
| **Conversion Rights:** | The Holder may convert any number of the Notes into the Issuer's common stock (the "<u>Common Stock</u>"), at any time, at the Conversion Price. |
| **Conversion Price:** | The product of (x) 125% and (y) the average closing price of the Common Stock for the sixty consecutive trading days following the Exit Date. |
| **Transferability:** | To the greatest extent feasible under applicable law, the Notes and the Common Stock shall be issued under 11 U.S.C. §1145, and the Notes and the Common Stock into which they shall be convertible shall be freely transferable by the Holders without registration under the Securities Act of 1933. |
| **Common Stock:** | When delivered, the Common Stock into which Notes may convert shall be fully paid and non-assessable. Issuer shall use its best efforts to list the Common Stock on a national stock exchange or NASDAQ prior to the Issuance Date. |
| **Call Rights:** | No call for five years from the Issuance Date; thereafter, callable in cash or Common Stock if the Common Stock has traded at no less than 125% of the Conversion Price for the sixty (60) consecutive trading days prior to the call date. |
| **Put Rights:** | Soft put right on the fifth and tenth anniversary of the Issuance Date for all principal and accrued interest as of such date; payable in cash or shares of Common Stock. |
| **Mandatory Prepayments:** | Mandatory prepayment upon a "fundamental change" with a customary make whole premium, if any, for public convertible debt securities of this type; no prepayment obligations for mergers in which the Issuer is the surviving entity; no make whole premium in other mergers. |
| **Anti-Dilution Protections:** | The Conversion Price will be subject to customary anti-dilution adjustments,[2] including upon (i) stock or extraordinary cash dividends, (ii) reclassifications, subdivisions or combinations of the Common Stock, (iii) the issuance of rights or warrants to all holders of Common Stock convertible into or exercisable for Common Stock at less than the then-current market price, (iv) distribution of the capital stock of an Issuer subsidiary to holders of the Common Stock and (v) any other distributions of assets by the Issuer to holders of the Common Stock. |
| **Mergers and Business Combinations:** | The Notes will enjoy customary adjustments and protections in the event the Common Stock is converted into, reclassified into or |

---

[2] Anti-dilution adjustments shall not be applicable to securities issued or assets distributed under the Plan of Reorganization.

exchanged for cash, other assets or securities.

**Other Terms and Conditions:** The Notes are intended to be public market securities and to trade at par value. The documentation of the Notes shall include such other terms and conditions as are customarily found in public market convertible securities of this type.

**Implementation:** Implementing documentation reasonably acceptable to the Association and the Company.

**Distribution:** The Association and the Company will coordinate any distribution of the Notes so that such distribution does not unreasonably interfere with capital markets activities of the UAL or the Company. The Association's investment bankers will be the exclusive distribution agent for the Notes.

13

**Exhibit E**
**Amended Distribution Agreement**

1.     Section 2 of Letter of Agreement 03-07 to the 2003 Pilot Agreement (the "Distribution Agreement") is hereby amended to read in its entirety as follows:

In consideration for the pilot contract revisions under the Section 1113 Restructuring Agreement reached between UAL, the Company, and ALPA effective May 1, 2003 (the "2003 Restructuring Agreement"), which modifies the parties' 2000 collective bargaining agreement ("2000 Agreement") and resolves numerous union grievances concerning the administration of the 2000 Agreement, and in consideration of the pilot contract revisions under the revisions to the 2003 Pilot Agreement effective in 2005 (the "Revised 2003 Pilot Agreement"), any plan of reorganization proposed or supported by UAL and the Company as proposed and/or amended from time to time (the "Plan"), shall provide that, on or as soon as reasonably practicable after the effective date of such Plan, the pilot group will receive a percentage distribution of the equity, securities and/or other consideration provided to general unsecured creditors under the Plan (the "Distribution") calculated by the following formula:

$A/(A+B)$, where:

A is the sum of (i) $2,742,574,581, representing the dollar value of 30 months of average cost reductions under the 2003 Restructuring Agreement as reasonably measured under Labor Model 1.1A FINAL, and (ii) $300,000,000, representing the dollar value of 20 months of cost reductions under the Revised 2003 Pilot Agreement (the "ALPA Amount"); and

B is the total amount of all other allowed prepetition general unsecured claims against the Debtors (UAL and its 27 debtor subsidiaries).

2.     Section 3 of the Distribution Agreement is hereby amended to read in its entirety as follows:

In the event the other employees of the Company receive a Distribution in excess of $865,000,000 in connection with the 2005 labor cost reductions (the "Other Employee Distribution"), then the $300,000,000 amount described in paragraph 2 of this Distribution Agreement shall instead equal the product of (x) $300,000,000 and (y) a fraction, the numerator of which is the actual amount of the Other Employee Distribution and the denominator of which is $865,000,000.

3.     Except as revised in the preceding paragraphs, the Distribution Agreement shall remain unchanged and in full force and effect.

14

**Exhibit F**
**Indemnity Agreement**

1.     Indemnification.  UAL and the Company (collectively, "United") hereby
indemnify and hold harmless the Association, its members, officers, committee members, agents,
employees, counsel, financial advisors and representatives (each, an "Indemnified Person") from
any and all losses, damages, fines, penalties, taxes, expenses, claims, lawsuits, or administrative
charges of any sort whatsoever (including reasonable attorney's fees and costs arising in
connection with the investigation and defense of any such matter) relating to, concerning or
connected with the negotiation or implementation of this Letter of Agreement (any such event, a
"Claim"), except to the extent that a Claim against an Indemnified Person is finally determined
by a court of competent jurisdiction to have resulted from the gross negligence, fraud or willful
misconduct of such Indemnified Person.

2.     Indemnification Procedure.

      a.     An Indemnified Person must give prompt notice to the Company of the
facts and circumstances that may constitute a Claim under this Indemnity Agreement; provided,
however, that any delay by an Indemnified Person in giving such notice shall not relieve United
of its obligations under this Indemnity Agreement except to the extent that such delay causes
material damage or prejudice to United.

      b.     United shall be entitled to participate in judicial, administrative proceeding
concerning an actual or potential Claim (an "Action") and, upon ten (10) days notice to the
applicable Indemnified Person, may assume the defense of such Claim with counsel reasonably
satisfactory to the Indemnified Person.  Following any assumption of the defense of an Action by
United, United shall not be liable for any subsequent fees of legal counsel or other expenses
incurred by the Indemnified Person in connection with the defense of such Action, subject to
reimbursement for actual out-of-pocket expenses incurred by the Indemnified Person as the
result of a request for cooperation or assistance by United; provided, however, that if, in the
reasonable opinion of outside counsel to the Indemnified Person, there exists an actual, material
conflict of interest between the United and the Indemnified Person, United shall be liable for the
legal fees and expenses of separate counsel to the Indemnified Person; provided, further, that the
Indemnified Person shall have the right to participate in the defense of an Action with its own
counsel at its own expense.

      c.     No compromise or settlement of any Action shall be binding on United for
purposes of United's obligations under this Indemnity Agreement without United's express
written consent, which consent shall not be unreasonably withheld.  United shall not compromise
or settle any Action or otherwise admit to any liability for any Claim on a basis that would
reasonably be expected to adversely affect the future activity or conduct of the Indemnified
Person without the prior written consent of the Indemnified Person, which consent shall not be
unreasonably withheld.

      d.     In the event United assumes the defense of any Action under this
Indemnity Agreement, United shall (i) keep the Association and the applicable Indemnified

15

Person informed of material developments in the Action, (ii) promptly provide the Association and such Indemnified Person with copies of all pleadings, responsive pleadings, motions and other similar legal documents and papers received in connection with the Action, (iii) permit the Association and such Indemnified Person and their counsel, to the extent practicable, to confer on the defense of the Action, and (iv) permit the Association and such Indemnified Person and their counsel, to the extent practicable, an opportunity to review all legal papers to be submitted prior to their submission. The parties shall provide to each others such assistance as may be reasonably required to insure the proper and adequate defense of the Action, and each party shall use its good faith efforts and cooperate with each other party to avoid the waiver of any privilege of another party.

     3.    Plan of Reorganization; Survival.   This indemnity agreement shall be assumed under the Plan of Reorganization and shall continue in full force and effect thereafter without regard to the terms of Section 22 of the Revised 2003 Pilot Agreement.

16

**Exhibit G**
**Fees and Expenses**

1.      The Company shall reimburse the Association for the reasonable, actual fees and out-of-pocket expenses incurred by the Association in connection with the review, design, negotiation, approval and ratification of this Letter of Agreement (its "Expenses") including:

a.      reasonable flight pay loss incurred by the Association in review and negotiation of this Letter of Agreement and Special MEC Meetings or LEC Meetings called for the purpose of reviewing, approving or ratifying the Letter of Agreement ; and

b.      the reasonable, actual fees and expenses of the Association's outside legal, pension, and other professional advisors (in each case based on normal hourly rates for actual time expended).

up to a maximum, aggregate total of $2.5 million.  Of the total reimbursement for Expenses, $1 million shall be paid on the Effective Date, and the remaining $1.5 million will be paid on the Exit Date.

2.      On the Exit Date, the Company shall also pay, or reimburse the Association for paying, the expenses incurred by the Association's investment bankers in connection with the Letter of Agreement and a structuring fee for the Association's investment bankers.

3.      The Company shall seek judicial approval for its obligations under this Exhibit G at the same time that it seeks judicial approval of this Letter of Agreement.

4.      The parties acknowledge and agree that the Company's agreement to reimburse the Association for fees and expenses under this Letter of Agreement is a result of the special collective bargaining circumstances created by the parties' desire to negotiate modifications to the pilot collective bargaining agreement as part of the Company's bankruptcy reorganization.

17

**UAL Corporation**
**1200 East Algonquin Road**
**Elk Grove Township, Illinois 60007**

January __, 2005

Captain Mark Bathurst, Chairman
United Mater Executive Council, ALPA
9550 West Higgins, Suite 1000
Rosemont, Illinois 60018

Dear Mark:

As we have discussed many times over the past few months, the Company has reluctantly concluded that it must terminate all of its defined benefit pension plans in order to obtain the financing necessary to emerge from Chapter 11. The recent adverse changes in the industry revenue environment have further confirmed this conclusion, and we currently believe that we need to seek the termination and replacement of our defined benefit plans through negotiation or litigation. The Company and its labor groups are concurrently in the process of scheduling a trial on pension termination issues before the bankruptcy court, if necessary, for early May of this year, subject to the court's availability.

Nonetheless, over the next ninety days, the Company has agreed to work diligently with the pilot group and all other employee groups, with a completely open mind, to explore all issues and possibilities with respect to our pensions plan, including changes in legislation that would allow the Company to afford the pilot pension plan within the constraints of the Company's financial reality.

As we explore every remaining pension possibility during this ninety-day period, the Company will not seek judicial approval to terminate the A Plan under 29 U.S.C. §1341(c) and, as a consequence, we will not call on the Association to withdraw its opposition to the termination of the A Plan during this period. We are also committed to the proposition that termination of the A Plan should be addressed in the context of a global solution in the bankruptcy that treats all employee groups fairly and equitably, not through agency proceedings divorced from the bankruptcy.

Mark, the Company is unequivocally committed to the fair and equitable treatment of the pilot group in every aspect of the restructuring and we fully understand the unique harm that the pilot group will suffer in a pension termination. . I also recognize the leadership role that you, the MEC and the pilot group have taken during these difficult discussions, and the Company is committed to proceeding in partnership with the Association in our joint effort to return United Airlines to its rightful place at the top of our industry.

Sincerely,
Glenn F. Tilton
Chairman, President and Chief Executive Officer

Exhibit 5

## Continuing Education Regarding
## Convertible Note Allocation
### MEC R & I Committee

IMPORTANT NOTE!

> **Any identification of data issues or other omissions must be brought to the Committees attention, in writing no later than December 31, 2006. Contact the R & I Committee at UALMECRI@alpa.org**

Distribution of the Convertible Note proceeds has now begun. In an effort to provide further information about the Convertible Notes, your MEC passed the following resolution at the July 2006 MEC meeting:

> *"BE IT RESOLVED, that the MEC directs the Retirement & Insurance Committee to enact a renewed education effort for the pilot group to include, but not be limited to:*
>
> ➢ *an explanation of the original concept of the Notes allocation as presented during the ratification process for the 2005 exit agreement*
>
> ➢ *a simplified summary of the "building blocks" that make up a pilot's individual allocation*
>
> ➢ *an explanation of the variability of the amounts in the final allocation method"*

Your R & I Committee provides this document as additional education regarding the Note allocation methodology. We also encourage you to utilize this document and the following resources for further study of your individual allocation:

➢ Gap allocation website at https://www.ualpilots.org/myNoteallocation

➢ The "Gap Specifications" resources document on the MEC website

➢ The "PDAP Top-Off Taxable Remainder Qs & As" on the MEC website

➢ Convertible Notes Statement – provided by United

➢ R & I Memo dated 8/25/06 – RE: Note Allocation Issues

➢ MEC Representatives, LEC R & I Committees and the MEC R & I Committee structures are available as a resource to address Note allocation and distribution questions.

## <u>Original Concepts of the Note Allocation</u>

At the Bankruptcy Exit Agreement road shows in December 2004, pilots were told:

> ➤ Under the Agreement, all distribution mechanics, including eligibility and allocation among eligible pilots, would be determined by the MEC

> ➤ Subject to further MEC review and decision, the Note proceeds would be allocated by the MEC in a manner that took into account active pilot losses from the terminated A-Plan pension;

> ➤ Some, but not all, of the pension losses suffered by active pilots would be offset by PBGC payments and by future C-Plan contributions; and

> ➤ The pension losses suffered by active pilots includes two elements: losses of benefits attributable to service up to the date of A-Plan termination and losses of expected benefits attributable to pilot service over the rest of their careers

Beginning with its January 2005 meeting, after the Bankruptcy Exit Agreement was ratified by the pilot group, the MEC began exploring several allocation techniques suggested by the R&I Committee. By the fall of 2005, the MEC had narrowed the techniques under consideration to three: the "Gap 1" method, the "PLSA method" and the "Gap 2" method.

The "Gap 1" method was an allocation technique which would have considered only those losses on termination of the A Plan attributable to loss of benefits accrued prior to Plan termination, measured by the amount of pilots' accrued benefits as of the date of termination, minus the amount pilots would receive from the PBGC. Gap 1 ignored losses of benefits pilots would have accrued in the future, based on their service after Plan termination, and also ignored the value of pilots' post-termination C Plan benefits.

The "PLSA method" was a technique which would have allocated the Note proceeds in proportion to pilots' Partial Lump Sum entitlements under the A Plan. This methodology was a simplified proxy for the Gap 1 method in the sense that it would have based allocations on benefits attributable to service in the past, up to the date of plan termination.

The "Gap 2" method was an allocation technique that attempted to take into account both the loss of benefits accrued up to the date of Plan termination as well as the loss of benefits that would have accrued in the future had the Plan not been terminated, taking into account expected payments from the PBGC and the projected value of future C Plan contributions.

At its October 2005 meeting, after the latest in a series of detailed presentations from the R&I Committee and its actuarial and legal advisors, the MEC eliminated the "Gap 1" and "PLSA" methods from further consideration and directed a working group, consisting of

the R&I Committee and four MEC members to refine the Gap 2 methodology for consideration by the MEC. On January 18, 2006, the MEC formally adopted the Gap 2 method, thereafter referred to simply as the "Gap method", as the basis for allocation of the Note proceeds.

## Overview of the Gap Allocation Methodology

The Gap Allocation Methodology (previously called the "Gap 2 methodology") allocates the Convertible Note proceeds among eligible pilots in proportion to their losses on termination of the A-Plan, taking into account both:

(a)  The benefits already accrued as of the date the Plan terminated (called the "DOPT"); and

(b)  The additional benefits pilots could reasonably have expected to earn between DOPT and their age-60 normal retirement date if the A-Plan had survived.

For purposes of the Gap Methodology, a pilot's loss—the "Gap" in the "Gap Methodology"—is the difference between his total projected A Plan benefit (a + b), *minus* the smaller amount the pilot can actually expect to receive with the terminated A Plan from two sources: (*i*) PBGC payments; and (*ii*) projected C-Plan contributions between June 2005 and age 60 (including projected investment earnings on those contributions during that period). Putting it another way, the Gap Allocation Method has the following building blocks that determine every pilot's distribution amounts:

- Your A-Plan benefit projected to age 60, assuming a "normal" career, computed as if the A-Plan had not terminated

- Your estimated PBGC Payout

- Future Value of your projected C fund contributions (including accumulated investment earnings) to age 60

- Your Note Allocation proceeds

To build this recovery model, we first identify a target. Simply stated, we utilized our best actuarial resources to estimate your projected A-Plan benefit at normal retirement (age 60), ignoring the termination of the Plan, and using the A Plan benefit formula:

Years of Participation *x* Final Average Earnings *x* Multiplier

3

Having projected the pilot's A-Plan benefit, we then determine the pilot's gap/loss by considering recoveries which include other sources of retirement income made available through C-Plan benefits and PBGC payments:

Projected A-Plan Benefit
*Minus*
C-Plan Benefit (Annuitized)
*Minus*
PBGC Benefit (Annuitized)
*Equals*
GAP

We also make adjustments for any PLSA (and its effect on the PGBC guarantee) or other withdrawals from the Plan, as well as benefits accrued in other non-pilot plans, such as pilots who were previously hired as mechanics, flight attendants, etc.

Finally, the net Note proceeds are allocated among eligible pilots in proportion to their respective gap losses. Under the Gap Allocation Methodology, each pilot's share of the Note proceeds will enable the pilot to recover a percentage of his or her gap loss which is, as nearly as possible, equal to the recovery percentage provided to all other pilots. The final recovery percentage will not be known until the correction process is completed and all the Note proceeds have been distributed, but we currently expect it will be approximately 41%.

## Details of Gap Allocation Computations

For pilots interested in mining down into the details of the computations of the projected A Plan benefit, the estimated PBGC payments and the value of the C-Plan contributions used to determine pilots' gap losses were given in the Gap Specifications Document available on the MEC website. Here are some highlights:

*Projected A Plan Benefit.* In the benefit formula used to project pilot A-Plan benefits (Years of Participation x Final Average Earnings x the Benefit Multiplier):

- "Years of Participation" include all Years of Participation (YOP) prior to Date of Plan Termination (DOPT) and all expected YOP after DOPT, projected to the pilot's age 60 normal retirement date, up to a maximum of 30 years.

- "Final Average Earnings" are determined on the basis of pilots' projected earnings under the "Adjusted Stove-Pipe" pay progression model.

- The "multiplier" is 1.35.

- The projected A-Plan benefit cannot be less than the pilot's "protected accrued benefit" as of May 31, 2003.

*Projected C Plan Benefit.* The C Plan benefit available to pilots at their normal retirement dates will be the amount the pilot accumulates from Company C-Plan

4

contributions over the balance of the his or her career, plus the investment earnings generated by those contributions while they are credited to his or her PDAP account. The Gap Allocation Methodology, projects pilot C Plan contributions as 6% (the contractual C Plan contribution rate) of the pilot's projected annual pay under the Adjusted Stove-Pipe pay progression model. The Gap Allocation Methodology assumes that the contributions will generate an investment return averaging 6% a year. The MEC selected 6% based on the advice of its independent actuaries and after reviewing historical and actuarial non-risk free investment return data. Obviously, every pilot's actual rate of return will depend on his or her own investment selections. But in order to place a value on pilots' C-Plan benefits, some reasonable assumption as to investment returns must be used.

*Adjusted Stove-Pipe Pay Progression Model.* **The purpose of the "Adjusted Stove-Pipe" pay progression model is to determine Final Average Earnings for purposes of projecting pilots' A Plan benefits and to project a pilot's future C-Plan contributions.** The model assumes that pilot pay will increase and that the increases are attributable to two sources: (*i*) expected contractual increases (in accordance with Contract 2005 scheduled increases through the amendable date and 1½% pay raise a year as of each May 1 thereafter) and (*ii*) the pilot's exercise of his or her seniority rights to move upward in fleet and seat.

All pilots enter the "Adjusted Stove-Pipe" model in the fleet/seat status actually held on January 1, 2005. The pilot's actual 2005 pensionable earnings are used as the starting point for wage growth analysis. For 2006 and beyond, pilot seniority will determine the fleet/seat to which eligible pilots are assigned for purposes of determining annual pay for that year.

The Adjusted Stove-Pipe Pay Progression Model is based on the Company's fleet plan as of January 1, 2005. It recognizes vacancies created by normal age 60 retirements and assumes that, beginning February 1, 2006, each pilot will bid the vacancies thus created, thereby securing the highest-paying vacant fleet/seat position to which he or she is entitled by virtue of seniority (called "pos due" in the model.) The model further assumes that, as of each February 1st thereafter, the pilot will move up into the next higher-paying fleet/seat position ("pos due") which is deemed to be vacant and available under the model, to which seniority would entitle her/him. That becomes the pilot's position, and determines pensionable earnings, for the entire ensuing year. If, as of any February 1st, the model does not project the availability of any vacant higher-paying fleet/seat position which the pilot's seniority would entitle her/him to hold, the pilot is treated as remaining in the prior year's fleet/seat position. This exercise is repeated until the pilot reaches age 60. The resulting pay progression projection is the basis for projecting the pilot's C-Plan contributions over the balance of a career and for projecting a FAE to compute projected A-Plan benefit.

The Adjusted Stove-Pipe Pay Progression Model does not provide for displacements and does not recognize vacancies created through "trickle down" bidding dynamics or domicile preferences. For 2005 and 2006 only, it does recognize age 59 bypass pay and activation pay contractual provisions.

*Estimated PBGC Payments.* The PBGC will make payments to all pilots who were "vested," *i.e.*, all pilots who had at least 5 years of service as of DOPT (December 30, 2004.)

PBGC payments will be made from assets of the Plan (in the case of benefits in Priority Category 3) or from the PBGC's own funds (in the case of benefits in Priority Category 4) or from a combination of Plan assets and PBGC funds (where a pilot's funded Priority Category 3 benefit is less than the PBGC maximum guarantee.) *See*, Section 8 of the Gap Specifications Document on the MEC website for a more detailed explanation.

The amount pilots will receive from the PBGC has been estimated by Buck Consultants, LLP, a highly-regarded national actuarial consulting firm retained by the MEC to act as independent actuaries on behalf of UAL pilots, based on data furnished by UAL. Because the data on forming the basis for our actuaries' calculations has been corrected and updated as compared to the "unscrubbed" Company data on which PBGC estimated benefit statements are based, the R&I Committee believes that our actuaries' estimates are generally more reliable than the current PBGC estimates. (Our estimates have recently been adjusted to take into account the PBGC treatment of PLSA withdrawals, which was discussed in the recent letter we sent you concerning the web site and Company allocation figures.)

*Present Value of Future A-Plan Benefits, C-Plan Benefits and PBGC Payments.* The Note proceeds which have just been distributed <u>and</u> those that are being held for distribution early next year represent dollars on hand today. In contrast, the projected A Plan benefits, projected C Plan benefits and PBGC payments all represent dollars which will be paid in the future. Therefore, in order to compare apples-to-apples in the Gap Allocation Methodology, the A Plan and C Plan benefits and the PBGC benefits must be converted into the equivalent of today's dollars to be comparable to the Note proceeds. To do this, the value of a future benefit in today's dollars is calculated using a "discount rate" to reflect the time value of money. "Discount rate" is an expression of the opportunity cost of money, nominal interest rates and present and expected inflation, and reflects the fact that a promise to pay a dollar a year from today does not represent the same economic value as a dollar actually paid today. If you receive a dollar today and invest it for a year at, say, 1% interest, it will earn a penny during the year so, a year from now, that dollar would be worth $1.01. Or, putting it the other way round, a dollar payable a year from now is really only equivalent to 99¢ in today's money, using a discount rate of 1%.

Based on the actuarial advice it received from its independent actuarial consultants, the MEC selected a fixed 6% discount rate for determining the present value of benefits payable in the future

*Summary.* The Note proceeds are allocated to pilots in proportion to their losses determined under the Gap Allocation Methodology. Each pilot's gap loss is equal to the present value of his or her projected A Plan benefit (based on projected Years of Participation, FAE determined under the Adjusted Stove-Pipe pay progression model and the 1.35 multiplier), *minus* the present value of the pilot's projected C Plan benefit and estimated PBGC payments. The assumptions used in projecting pay and investment returns, and in determining the present value of future benefits, were adopted by the MEC based on the advice of its independent actuarial consultants.

*Special Cases.* Special eligibility and/or allocation rules may apply to pilots in certain categories including, for example, pilots who terminated or resigned prior to February 1, 2006; pilots who are deceased prior to that date; pilots currently or formerly

6

on furlough; pilots on Military Leave; Parental/Family Leave or other leave status; pilots on PDI; pilot instructors, standards captains and management pilots. These special cases are explained in the Gap Specifications Document on the MEC website.

### Variability of Individual Note Allocations

Some pilots have expressed concern about what they perceive to be a discrepancy between the amount of their allocation (as shown on the Gap Allocation website) and the amount they expected based on their understanding of what they were told, or shown, via graphs and other communications from the MEC. Those pilots' concern about the accuracy of the allocation model arises, in part, from their assumption that one can safely "compare their allocation amount with fellow pilots" who seem similar in age, seniority or some other demographic. Keep in mind: each pilot's projected earnings are unique. Projected earnings affect both the projected A Plan benefit, which is the starting point in analyzing loss, and the timing and amount of projected C Plan contributions, which is one of the sources of pilot recovery. What the Gap allocation model has highlighted is the individual differences among pilots within the A Plan and the resultant differences in allocations. Just as two different pilots with different career expectations would have received different benefit amounts under the A plan, these same pilots will have different Note allocations as a result of the Gap Allocation Methodology.

The Note allocation methodology has many individual inputs and considerations. As we examine the variability of allocations, we focus on 5 major inputs:

   o   Age

   o   Projected years of participation in the A plan, given a "normal" career

   o   PBGC Payout

   o   Final Average Earnings

   o   Future Value of C fund contributions

The variability of individual allocations is best illustrated by the use of examples and **actual** disbursements across all major input ranges. Consider the following examples:

## Example #1 (The effect of Age and Projected Years of Participation)

**Pilot A: 1992 Hire, Current Age 51, 320 Captain: $18,000 allocation**
**Pilot B: 1992 Hire, Current Age 46, 320 Captain: $39,000 allocation**
**Pilot C: 1998 Hire, Current Age 38, 767 First Officer: $55,000 allocation**

It is easy to see why pilots A and B might feel slighted when comparing allocations with pilot C. They have more years at the Company, more years of participation in the A plan,

7

and they are older, with less time until retirement to make up for the loss of the A plan. Pilots & B were hired a class apart from each other, and they have had identical seat movement through the last 14 years. There appear to be two reasons for these apparently counter-intuitive results:

1) **Note allocations are not based solely on seniority.**

2) **Payouts are not predicated solely on accrued retirement benefits. They are also based on what would have been earned given a normal career progression and retirement on an individual basis.**

As pilots, we are used to seniority being given precedence over other issues as it is in almost every other aspect of our professional lives.

However, the MEC decided to utilize the contractual and defined benefit plan rules and regulations to the maximum extent possible and as such, based the Note allocation payout on A Plan retirement expectations rather than just seniority.

The GAP methodology developed by the R & I Committee and adopted by the MEC uses the Note proceeds to fund a percentage of the gap that exists between your expected "full career" retirement annuity and what can reasonably be projected as annuity payments from the PBGC and C Fund.

Pilot A above would have received a yearly A-plan benefit of $50,000 at age 60, after 22 years of participation. Pilot B above would have received a yearly A-plan benefit of $63,000 at age 60, after 27 years of participation, and pilot C above an annual A-plan benefit of $83,000 at age 60, after 29 years of participation. **This A-plan benefit projection is the core metric from which your GAP allocation is calculated.**

In addition, the PBGC benefit will also be different for each pilot because of age and the rules associated with "protected benefits."

The MEC allocation formula is based on funding the "gap" between the normal A Fund retirement expected before A Plan termination and the sum of: (i) the PBGC payout and (ii) the projected, annuitized value of C fund contributions.

Pilots A&B are both receiving near the maximum annual age 60 payout from the PBGC of approximately $28,850. Pilot C will receive only $10,000 a year from the PBGC due to the fact that she had accumulated only 5 years of participation in the A-Plan and had not yet accrued much of an A Plan balance. (Remember, A-Plan accrual is affected by the formula: Multiplier x YOP x FAE; where FAE considers the last 10 years of a pilot's career). All other things being equal, the Gap methodology requires a larger payout for Pilot C as an offset to the smaller PBGC payout at age 60.

This is where some pilots feel the formula seems unfair. Pilots A&B have accrued a substantially larger retirement benefit at date of termination than pilot C, yet their payouts

8

are smaller. However, if we take each pilot as an individual and give them a full career with a normal A Plan retirement, minus their PBGC benefit and their annuitized C Plan benefit, the formula treats every pilot in exactly the same manner and "fills every pilot's GAP bucket" so that each pilot receives an equal recovery basis (approximately 41% of the GAP.)

## **Example #2 (The effect of Age and C fund on distribution)**

### **Pilot D: 1985 Hire, Current Age 45, 767 Captain: $67,004 allocation**

### **Pilot E: 1985 Hire, Current Age 49, 767 Captain: $93,928 allocation**

### **Pilot F: 1985 Hire, Current Age 53, 767 Captain: $100,935 allocation**

In this example, all three of these pilots were hired in the same class, and had similar seat progression throughout their careers. Pilot D will receive substantially less money from the Note disbursement than his two classmates due to the fact that he has additional years of C fund contributions coupled with compounding of interest on all C fund deposits throughout those additional years.

In this example, the age difference between pilots D and E, and pilots E and F, is 4 years. In short, Pilot D is receiving less money than pilots E and F, because he has more time to make up for the loss of his A fund benefit, while Pilot F is getting more money to make up for the fact that he has less time to make up for the loss of his A fund benefit. Accordingly, Pilot F has a larger gap than Pilots D and E, and that corresponding gap results in a larger Note allocation to fill the individual gap. You may have noticed that the difference between pilots D and E is larger than the difference between Pilots E and F. This is because when Pilot F was hired at 32 years of age, he was looking at 27 years of participation in the A plan. Pilot D, hired at 24, had the effect of his looking at 35 years of participation and Pilot E, 31 years.

Pilots D and E are capped at 30 years of participation (C2003 provision), and will get credit for Final Average Earnings (FAE) times 30 years, multiplied by 1.35%. Pilot F will get FAE times 27 years times 1.35%. The reduction in the multiplier for Pilot F creates a smaller relative gap and therefore the difference in Note allocation between pilots E and D is not as large as the difference between pilots D and E.

It is important to realize that the age of a pilot does NOT always play the same role in the model, because there are other factors involved in determining Note payouts as evidenced in example #1.

9

## Example #3 (The effect of earnings on distribution)

**Pilot G: 1991 Hire, Current Age 55, A320 Captain: $57,850 allocation**

**Pilot H: 1991 Hire, Current Age 55,   767 Captain: $79,287 allocation**

In this case, the two pilots can be considered twins in all areas, except their current seat and past earnings. The pilots were hired in the same class and their birthdays are three days apart. The difference is that pilot G has always traded pay for quality of life issues, and pilot H has been aggressive at every opportunity to maximize pay.

The look back for final average earnings uses the highest 3 years of the last ten years of a pilot's pensionable earnings. Pilot H had FAE in excess of $220,000 prior to the C2003 wage reductions, and this FAE will roll forward to the FAE calculation for the Note distribution. Pilot G, who had lower earnings during the same period, will have to rely on his FAE based on his last 3 years of participation, as he does not have significantly larger numbers to carry forward.

As in the A-Plan benefit calculation, under the Note allocation methodology timing can be just as important as the amount of accrued and or projected earnings. It is important to note that in this example, if the pilots were 50 years old instead of 55, then their Note allocations would probably be very similar. This would occur because the FAE lookback of ten years would not include the higher earnings from Pilot H's pre-wage reduction earnings.

## Example #4 (Note allocation greater than $500,000)

The effect of "being in the right place at the right time". Yes—5 pilots out of the 7,501 of our total eligible pilots will receive in excess of $500,000 from the Note. Remember, these pilots have very large A-Plan losses and corresponding Gaps. These five pilots are getting exactly the same percentage of recovery from the Note allocation as every other pilot.

First, these pilots had above average career and final average earnings—which provided them with a large accrued and projected A-Plan benefit at age 60. The GAP allocation methodology does not recognize any difference between qualified and non-qualified benefits. It includes both, which is in contrast to the defined benefit pension plan and the PBGC, which do not recognize non-qualified earnings. Because of this, these pilots' A-Plan projected benefits are large. Second, these pilots have zero or close to zero C-Plan benefits due to their retirement in early 2005. (You will recall that the C-Plan benefit was effective in June 2005).

### "Stove-Pipe" pay progression model- Observations

There is one more issue that should be addressed regarding the inputs or "building blocks" of the gap allocation model. This would be a subset of the Final Average

Earnings (FAE) calculation that determines career progression, called the "Stove-Pipe" method. The Stove-Pipe model determines the point at which a pilot will progress through the seat changes associated with their projected career. Some pilots have questioned the timing of their progression, and sent a number of inquiries. The most common complaint is:

**"I can hold a 767 Captain bid now, but the website shows me as an LCO Captain until 2009, for example."**

It is important to realize that although this pilot may be able to hold 767 captain now, that is only because there are pilots senior to her that have elected not to take a 767 captain bid for quality of life or other reasons.

If all pilots senior to this pilot bid the highest paying position they could hold, then this pilot would not be able to hold the 767 until 2009. In trying to determine the best method for calculating the proceeds from the Note, it was determined to base career progression on a model that had all pilots bid the highest paying position that their seniority would allow. Since this method is used for all pilots, it creates a level playing field for determining seat progression and accompanying pay rate increases.

In addition, the Gap model does not hold a pilot back from upgrading to the next position due to restrictions associated with freezes or domicile selection criteria. The model also assumes no pay differential that would result from lineholder vs. reserve status. All pilots are assumed to be paid at 984 hours annually. In essence, this model simply moves you up in fleet and seat as pilots senior to you retire at age 60. There is no fleet growth built into the model, nor fleet shrinkage. In addition, potential mergers, new equipment or aircraft purchases or pending or proposed changes to age limitations via legislation are not included as the MEC dealt with the facts as they currently exist.

## In Summary

The MEC's stated purpose for the Note allocation and distribution was to fund to the maximum extent possible, the gap between the "normal" and current projected retirement benefits that exist for all qualifying pilots based on an individual pilot's anticipated career path. It would be nice if we had sufficient assets to fully fund our pension losses, but the projected proceeds from the sale of the Note will only cover approximately 41% of each pilot's individual funding gap.

It becomes obvious after looking at these examples that there is more to an individual's Note allocation than simply looking at age, seniority, or length of time invested in the A plan. The formula uses many different inputs to arrive at a pilot's specific "funding gap," and any comparisons between pilots must be looked at in light of the effects of all these specific inputs to fully understand the differences in payouts.

11

## For those of you who would prefer to see numbers:

The next section of the report includes various graphs and data that reveal how the Note allocation is dispersed throughout the pilot population.

### Allocation by Dollar Amounts—All Eligible Pilots

| Allocation Dollars | Number of Pilots | Allocation Dollars | Number of Pilots | Allocation Dollars | Number of Pilots |
|---|---|---|---|---|---|
| >600,000 | 0 | 300,001 - 350,000 | 50 | 50,001 - 75,000 | 2741 |
| 550,001 - 600,000 | 1 | 250,001 - 300,000 | 153 | 40,001 - 50,000 | 1650 |
| 500,001 - 550,000 | 4 | 200,001 - 250,000 | 181 | 30,001 - 40,000 | 723 |
| 450,001 - 500,000 | 7 | 150,001 - 200,000 | 133 | 20,001 - 30,000 | 353 |
| 400,001 - 450,000 | 17 | 100,001 - 150,000 | 419 | 10,001 - 20,000 | 207 |
| 350,001 - 400,000 | 11 | 75,001 - 100,000 | 807 | 01 - 10,000 | 43 |
| | | | | 0 - 0 | 1 |



The total number of eligible pilots = 7,501

Pilot Allocations ranges:
| 40,001 - 100,000 | 69% |
|---|---|
| 30,001 - 100,000 | 79% |

12

## Allocations by Dollar Amounts—MEC only

MEC Only



Total MEC members plus the 3 Officers = 27

40,001 – 100,000 range = 74%
30,001 – 100,000 range = 81%


## Corrections Process, the PLSA/PBGC Adjustments, and the Reserve Pool Funds

By now most pilots have accessed the Gap Allocation website and read the Gap Specifications document. Between the time the website went live on June 30, 2006 and the present, the Committee continued its due diligence and dynamic stress testing of the allocation model. We would like to thank every pilot who took the time to review their data and queried us on various topics. Pilot inquiries have been a great help in identifying anomalies. From the very beginning, the Committee endeavored to produce a process that was open, dynamic and interactive. Part of this process included facilities to make corrections as we moved closer to distribution day. Accuracy was and remains our primary goal.

We were careful to disclose and to continue to reiterate that the individual Note allocation payouts displayed on the Gap allocation website are estimates and these payouts **assume**

13

full distribution of the proceeds *without* the $30 million hold back.  Again, these are estimates for two main reasons:

1. We used an assumed Note proceeds amount of $500M.
2. We assumed no correction factors.

As you now know, our investment banker was successful in selling our Note for $544.5M. The net amount to the pilots, after fees and expenses but before accrued interest, is $537M. This is a fantastic result.

The Committee would like to advise you of several issues that have come up since the website "live" date:

1. PBGC calculation of the guaranteed benefit for pilots who withdrew their PLSA from the A-Plan, and

2. PLSA amounts reported initially by the Company to ALPA, and

3. Participation dates associated with the "group of 570" pilots, and

4. Years of Participation credit for some pilots who worked as non-pilots prior to becoming eligible for the A-Plan benefit

5. Stove-Pipe Pay Progression Model seniority number anomaly

Every one of these issues has been corrected, and the result is that all pilots will have a revised Note allocation payout amount.  Approximately half the pilots will receive a larger Note payout than that displayed on the Gap Allocation website; approximately half will receive a smaller amount. The reason for this is obvious; some pilots were entitled to a larger Note payout than originally calculated—the funds must come from the total pool of Note proceeds.  In addition, there were originally 95 pilots that were to receive an allocation of ZERO—now all but one pilot will receive some Note allocation.

1.    **PBGC calculation of the guaranteed benefit for pilots who withdrew their PLSA from the A-Plan**

What we have learned from pilots who are already receiving PBGC payments (retirees) is that the PBGC is calculating their guaranteed benefit differently than the Committee initially did. The PBGC used an alternate, but allowable, method to reflect the PLSA withdrawals. The result is that these pilots receive a much smaller PBGC benefit each year and therefore their originally calculated Note allocation was too low.  In the end, these pilots' total benefits are the same as if they never took their PLSA.

As a result, these pilots' Note allocations had to be recalculated.  This new payout was reflected in the initial Note distribution on August 14-16[th], 2006

**2.    Initial PLSA amounts reported by the Company to ALPA**

In March 2006, the Company sent ALPA a file of all pilots who withdrew their PLSA's. We used this file to calculate the Note allocations. After inquiries by some pilots, we asked the Company to reaffirm the data in this file. On August 4, the Company informed us that there is another, more current file reflecting the PLSAs of pilots who retired in late 2005. Some of these pilots did not receive their non-qualified portion of the PLSA from the Company. You may recall that during the bankruptcy hearings, the Company unilaterally stopped paying the non-qualified portion of the PLSA to pilots who retired after September 2005. This new file reflects this dispute.

As a result, these pilots' Note allocations had to be recalculated. This new payout was reflected in the initial Note distribution on August 14-16th, 2006

**3.    Participation dates associated with the "group of 570" pilots**

Letter 05-23, Exhibit A and the associated Grievance Settlement directed the Company to adjust the training dates of the "group of 570" pilots. In effect, this training date adjustment required an adjustment to their associated date of participation in the A-Plan.

As a result, these pilots' Note allocations had to be recalculated. This new payout was reflected in the initial Note distribution on August 14-16th, 2006

**4.    Years of Participation credit for some pilots who transferred into the pilot plan from other plans**

We all know of pilots who were previously hired at UAL as mechanics, flight attendants or CSR's. The time they accumulated in those pension plans roll over to the pilots A-Plan. While most of these cases were displayed correctly, some of these pilots' years of participation in the A-plan were not reflected in the data shown on the website. There were 8 pilots in this category.

As a result, these pilots' Note allocations had to be recalculated. This new payout was reflected in the initial Note distribution on August 14-16th, 2006

Another correction needed to be made for 1 pilot who had earnings in a contributory management plan during the 1970's. This plan was not a defined benefit plan; rather it was a contributory plan. The Company reported this withdrawal from this '70's plan as a PLSA withdrawal from the A-Plan, but it was not.

As a result, this pilot's Note allocation had to be recalculated. This new payout was reflected in the initial Note distribution on August 14-16th, 2006

**5.      Stove-Pipe Pay Progression Model  Programming Anomaly**

In the course of final review and testing, it was discovered that a programming error had occurred in connection with the Adjusted Stove-Pipe pay progression model.

Under the Stove-Pipe pay progression model, 2005 pay is actual 2005 pensionable earnings, as reported by the Company.   For all subsequent years, pilot seniority determines projected fleet & seat and projected pay.

In the Gap model, a Pilot's seniority is determined by assigning an "effective seniority number" for each year, beginning in 2006 and ending with the year a pilot turns age 60.

A Pilot's effective seniority number is determined by subtracting the number of pilots with greater seniority who have left the seniority list (i.e., turned age 60 prior to the current year.)   Actual retirements – early and normal – and deaths in 2005 are also accounted for.  Consequently, for 2006, an individual pilot's effective seniority number is determined by removing from the pilot population those pilots who retired in 2005 and had greater seniority.  For 2007, a pilot's effective seniority number is determined by removing from the pilot population pilots who retired in 2006 and had greater seniority. This algorithm for 2007 is repeated in every subsequent year until each pilot reaches age 60.

In the web site model, the determination of the effective seniority number for a given year was determined by removing from the pilot population the number of retired pilots with greater seniority in the second prior year, rather than in the immediately preceding prior year.  Consequently, the assignment of effective seniority numbers was one year "off" and a pilot's movement up the Stove-Pipe was delayed one year.

The effect of the error was to treat everyone as retiring at age 59 rather than 60.  The relevant corrections have been made to those pilots affected; these corrections were reflected in the August 14-16[th] distribution.

**Summary**

Some of these corrections were brought to the Committee by you via the ualmecri@alpa.org email address; some by your LEC representatives; some by your telephone calls to us; and some by the Committee's continual stress testing of the model. We set out to ensure accuracy and we designed this corrections process with just these results in mind.  We believe it worked, and will continue to ensure corrections are made throughout the distribution process.

The fact that we were able to make these corrections BEFORE the initial August 14-16 distribution is important as we did not need to utilize any of the $30M reserve pool.  The reserve is intact and will be there for future corrections/omissions discovered between now and December 31, 2006.  To the extent the reserve exceeds the amount needed to

make necessary adjustments for corrections/omissions; the excess will be distributed to pilots early next year.

**IMPORTANT NOTE!**

> **Any identification of data issues or other omissions must be brought to the Committees attention, in writing no later than December 31, 2006. Contact the R & I Committee at UALMECRI@alpa.org**

The Committee is committed to seeing that this distribution is completed in a timely, orderly and thoughtful process. As you can see, the positive information loop created by the website and MEC/LEC internal and external communications has resulted in a strong allocation and distribution process. We will keep you advised of our progress on these and other issues that may surface during the August through February 2007 distribution process.

Fraternally,

UAL-MEC R&I Committee

Captain Jeffrey Barath, Chairman
Captains Marty Torres and Jim Bowman, members

# Exhibit 6

MINUTES

# MINUTES

## UAL-MEC MEETING
## JANUARY 24-28, 2005
## WESTIN MAUI RESORT
## LAHAINA, HAWAII

### MONDAY, JANUARY 24, 2005

0900   Meeting called to order by Chairman Bathurst

0903   Chairman's Report – Mark Bathurst

　　　 Discussed the following:
- FSAP program
- Court hearing update
- Ratification of tentative agreement on Jan. 31
- Communications efforts

1000   Vice Chairman's Report – Wendy Morse

　　　 Discussed the following:
- Ancillary training
- Leave of Absence denial
- Vacation donation
- Sick leave counseling
- FODM change
- PNR's

1026   Secretary/Treasurer's Report – Mike Hamilton

　　　 Discussed the following:
- 2004 budget recap
- 2005 budget summary
- LEC budgets
- Furlough fund review
- Electronic meetings

1043   Calderon/Everhard

　　　 "Move to approve the minutes from the October 11-15, 2004 regular meeting, the Nov. 15-17, 2004 special meeting, the Dec. 1-2, 2004 special meeting, the Dec. 16, 2004 special meeting, the Jan. 14, 2005 special meeting, and the Jan. 18, 2005 conference call."

　　　　　　　　　　　　　　　Carried

1100   ALPA Executive Vice President – Mark Seal

　　　 Discussed the following:
- LEC accounts
- Pending legislation from ALPA national to Senate
- Budgeting issues at some airlines
- Council funding

MINUTES

1132   <u>AGENDA ITEM 202 – Reinstatement of F/O Roger D. Gerhardt</u>

"BE IT RESOLVED, First Officer Roger Gerhardt is reinstated into active membership as a member in good standing and may exercise all privileges and responsibilities of membership in ALPA in accordance with the ALPA Constitution & By-Laws and the UAL-MEC Policy Manual."

<div align="center">Carried</div>

1133   <u>AGENDA ITEM 203 – Membership Committee Report</u>

"Move to show Agenda Item 203 (Membership Committee Report) as received."

<div align="center">Carried</div>

1134   <u>AGENDA ITEM 204 – International Committee Report</u>

"Move to show Agenda Item 204 (International Report) as received."

<div align="center">Carried</div>

1135   <u>AGENDA ITEM 206 – Pass Travel Committee Report</u>

"Move to show Agenda Item 206 (Pass Travel Committee Report) as received."

<div align="center">Carried</div>

1136   <u>AGENDA ITEM 501 – SSC Reports [Oct., Nov. & Dec.]</u>

"Move to show Agenda Item 501 (SSC Reports [Oct., Nov. & Dec.]) as received."

<div align="center">Carried</div>

1137   <u>AGENDA ITEM 504 – Hotel Committee Report</u>

"Move to show Agenda Item 504 (Hotel Committee Report) as received."

<div align="center">Carried</div>

1143   Recess to Subcommittees


**<u>FRIDAY, JANUARY 28, 2005</u>**

0804   Meeting reconvened

0805   Administrative announcements

0853   <u>AGENDA ITEM 207 – Preserving the Pilots "A" Plan</u>

"Move to show Agenda Item 207 (Preserving the Pilots "A" Plan) as discussed."

<div align="center">Carried</div>

MINUTES

0855    AGENDA ITEM 205 – $550 Million Bond combined with AGENDA ITEM 208 – Distribution of
        Convertible Notes

        AGENDA ITEM 208 – Distribution of Convertible Notes is Survivor

        "Move to defer Agenda Item 208 (Distribution of Convertible Notes) to the next regular or special
        meeting."

                                        Carried

0856    Briggs/Graver

        "Move to go off the record."

                                        Carried

0915    Barton/Graver

        "Move to go back on the record."

                                        Carried

0920    Calderon/Otis

        "Move to show Agenda Item 204 – International Committee Report, Resolution 2 as direction given to
        the MEC Chairman."

                                        Carried

0925    Calderon/Merone

        "Move to show the following Agenda Items as direction given to the Negotiating Committee:

        Agenda Item 505 (Flight Diversions and Pay Protection)
        Agenda Item 506 (Lineholders to Pickup Short-Notice Trips)
        Subcommittee #2-Floor Resolution 1
        Subcommittee #2-Floor Resolution 2 "

                                        Carried

# MINUTES

### UAL-MEC MEETING
### APRIL 18-22, 2005
### INTERCONTINENTAL HOTEL
### <u>CHICAGO, ILLINOIS</u>

## <u>MONDAY, APRIL 18, 2005</u>

0900    Meeting called to order by Chairman Bathurst

0903    <u>Chairman's Report – Mark Bathurst</u>

      Discussed the following:
- Fuel efficiency report
- Age 60 survey
- AMS
- Executive Council meeting
- Unlimited jumpseat privileges

1006    Calderon/Rossi

    "Move to go off the record and in closed session."

                                   Carried

1139    Calderon/Swindells

    "Move to go back on the record and in open session."

                                   Carried

1140    <u>Vice Chairman's Report – Wendy Morse</u>

      Discussed the following:
- Inappropriateness of doctors calling people's physicians
- First flight of day papers
- Denver tax
- Outstanding resolutions on MEC website
- 20th anniversary of 1985 pilot strike

1150    Recess for lunch
1330    Reconvene

MINUTES

1416    <u>Central Air Safety Committee Report – Gary Moore</u>

Discussed the following:
- ALPA Fleet Coordinator Training
- Operational Efficiency Training
- Domicile safety awareness days
- Current issues and hot topics
    - Cell phone – NPRM
    - Centralized load plan
    - Iraq overflight
    - Polar Side Letter of Agreement (01-20)
    - Outsourcing of maintenance
    - Single segment dispatch
- FSAP reporting system, security report, operational report integration
- Incident review
- Summary of concerns

1519    <u>Retirement & Insurance Committee Report – Marty Torres</u>

Discussed the following:
- Health Plan Rate Setting Letter of Agreement
- C-Plan

1600    Aleshire/Rossi

"Move to go off the record and in closed session."

Carried

1705    Swindells/Coil

"Move to go in open session and back on the record."

Carried

1715    Swindells/Briggs

"WHEREAS, before his recent retirement from United Airlines, Jerry Mugerditchian was a long-serving and loyal ALPA member and Officer, and

WHEREAS, the Mugerditchian family recently lost their beloved wife and mother, Cheryl, after a long illness, and

WHEREAS, Cheryl Mugerditchian is survived by an entire United family, with Mark, an active United pilot, Jennifer, who used to work in scheduling and Mike, who is too young to work here yet is still a member of the United family, and husband Jerry;

THEREFORE BE IT RESOLVED, the UAL-MEC extends its deepest heartfelt sympathies to the Mugerditchian family for their tragic loss of Cheryl Mugerditchian."

Carried by acclamation

1726    Recess

MINUTES                                                                    Page 12 of 32

1442   AGENDA ITEM 201 – Distribution of Convertible Notes

Moved and Seconded by Subcommittee

"Move to defer Agenda Item 201 (Distribution of Convertible Notes) to the next regular MEC meeting."

Carried

1443   Otis/Aleshire

"Move to reconsider Agenda Item 113 (8-P Transfer Request, Council 33)."

Carried

1450   AGENDA ITEM 113 – 8-P Transfer Request, Council 33

Otis/Aleshire

"Move to approve the 8-P Transfer Request of Council 33."

Carried

1451   SUBCOMMITTEE 3, FLOOR RESOLUTION 2

Moved and Seconded by Subcommittee

"WHEREAS, the Polar Operations Committee letter of agreement, LOA 01-20, was negotiated in good faith with full input by the "Gang of 6" and the company, and signed by Captain Steve Forte, and

WHEREAS, Polar flying was recently judged by UAL corporate safety to have a higher "Risk Factor" than Iraqi over-flights, and

WHEREAS, timely, accurate, and complete NOTAMS are integral to the safe conduct of all flights and are especially critical when operating in this high risk environment, and

WHEREAS, paragraph two of the LOA states, "We have secured in our budget for 2002 the funds for a NOTAM server.", and

WHEREAS, as of April 21, 2005 there is still no NOTAM server and all international NOTAMS are sorted by hand, and

WHEREAS, this presents an unacceptable burden on dispatchers and pilots operating these flights and handicaps their ability to accurately determine suitability of diversion airports and places their professional certification at risk,

BE IT RESOLVED, the MEC directs the Master Chairman to use all appropriate resources to induce the company to obtain a NOTAM server as required in the Polar Operations Committee letter of agreement, LOA 01-20."

Carried

1452   AGENDA ITEM 305 – FFDO Liaison Within Professional Standards

Moved and Seconded by Subcommittee

# MINUTES

### UAL-MEC MEETING
### JULY 18-22, 2005
### INTERCONTINENTAL HOTEL
### CHICAGO, ILLINOIS

## MONDAY, JULY, 2005

0900    Meeting called to order by Chairman Bathurst

0903    <u>Chairman's Report – Mark Bathurst</u>

    Discussed the following:
- Meteorologists outsourcing
- Jumpseat process
- Polar flying
- AMS Program
- Grievance review meeting with Company
- Increase in discipline issues

1012    <u>Vice Chairman's Report – Wendy Morse</u>

    Discussed the following:
- First flight of day papers
- Polar letter
- Travel benefits
- AMS
- PBS computer infrastructure
- Legality check in trip trade system
- Leave of absence checklist
- Uniform changes survey
- Trip trade testing and LOA
- ALPA status of management pilots
- Denver tax
- Ken Dunlap resignation

1025    <u>Secretary/Treasurer's Report – Mike Hamilton</u>

    Discussed the following:
- Furlough Fund reimbursements
- Budget
- SRSRC update

1043    Briggs/Swindells

    "Move to approve the Minutes from the April 18-22, 2005 regular and the May 19, 2005 Special MEC Meetings."

<div align="center">Carried</div>

1044    <u>ALPA National Report to MEC – Paul Rice, ALPA Vice President Administration/Secretary and Mark Seal, ALPA Executive Vice President</u>

Discussed the following:
- Executive Board update
- Legislative update
- Polar Air Cargo contract
- AFL-CIO election
- Jet Blue
- Union affiliation review
- Ryanair issue – Europe
- Merger Policy
- United pilot expulsion for non-payment of dues
- Dept. of Labor investigation into MEC elections

1133    Swindells/Barton

"Move to go off the record and in closed session."

Carried

1200    Recess for lunch
1330    Reconvene – still closed and off the record

1745    Barton/Briggs

"Move to go back on the record and in open session."

Carried

1746    Recess

**TUESDAY, JULY 19, 2005**

0900    Reconvene

0901    Administrative announcements

0905    Retirement & Insurance Committee Report – M. Torres, R. Brand, D. Mandolini

Discussed the following:

- Convertible Note Allocation and Distribution

1200    Recess for lunch
1330    Reconvene

1331    AGENDA ITEM 103 – Election of R&I Committee Member & Chairman

M. Seal and H. Hunter are appointed Ballot Certification Committee

Nominees:    Marco Salazar
             Jeff Barath

Rossi/Calderon

MINUTES                                                            Page 5 of 28

0901   AGENDA ITEM 210 – Convertible Note Discussion and Deliberation HAS BEEN WITHDRAWN

      Neil Swindells holding proxy for John Briggs

0903   System Schedule Committee Report – Jeff Nooger

      Discussed the following:
- Management changes
- Manpower
- Route/Fleet
- Lines/DSL's
- PBS
- Crew Desk
- SSC/LSC Policy Manual Changes

1046   Negotiating Committee Report – Tim Brown

- Discussed the following:
- Open items
- Med Evac Letter of Agreement
- PC/PT bidding
- Credit cap grievance win
- Reserve test update
- Trip trade update

1152   Recess for lunch
1330   Reconvene

      Wayne Aleshire is holding proxy for Brian Graver

1331   Aleshire/Merone

      "Move to go in closed session and off the record."

                             Carried

1530   Recess to subcommittees

1900   Recess

**THURSDAY, JULY 21, 2005**

0900   Reconvene – Still closed and off the record

0901   MEC receives an industry update from Dan Akins, Consultant; and Ana McAhron-Schulz of ALPA's
      Economic & Analysis Dept.

1217   Recess for lunch
1350   Reconvene – Still closed and off the record

1358   Genovese/Barton

MINUTES                                                              Page 6 of 28

"Move to go back on the record and in open session."

<div align="center">Carried</div>

AGENDA ITEM 201 – Distribution of Convertible Notes

Moved and Seconded by Subcommittee

"Move to defer Agenda Item 201 (Distribution of Convertible Notes) to the next regular or special MEC meeting."

<div align="center">Carried</div>

AGENDA ITEM 207 – Convertible Note Distribution: PLSA

Moved and Seconded by Subcommittee

"Move to defer Agenda Item 207 (Convertible Note Distribution: PLSA) to the next regular or special MEC meeting."

<div align="center">Carried</div>

1359    AGENDA ITEM 203 – MEC Communication to Pilots re the A Plan

Moved and Seconded by Subcommittee

"Move to show Agenda Item 203 (MEC Communication to Pilots re the A Plan) as discussed."

<div align="center">Carried</div>

1400    AGENDA ITEM 204 - Retirement & Insurance Committee Report

Moved and Seconded by Subcommittee

"Move to show Agenda Item 204 (Retirement & Insurance Committee Report) as received."

<div align="center">Carried</div>

AGENDA ITEM 205 – International Committee Report

Moved and Seconded by Subcommittee

"Move to show Agenda Item 205 (International Committee Report) as received."

<div align="center">Carried</div>

1402    AGENDA ITEM 212 – Reinstatement of Capt. Chris Tuckfield

Moved and Seconded by Subcommittee

"BE IT RESOLVED, that the UAL-MEC approve the reinstatement of Capt Chris Tuckfield into active membership as a member in good standing and may exercise all privileges and responsibilities of membership in ALPA IAW the ALPA Constitutions and By-Laws and the UAL-MEC Policy Manual."

MINUTES

1553   AGENDA ITEM 202 – Reserve Aggressive Pick-Up Modifications

Moved and Seconded by Subcommittee

"Move to defer Agenda Item 202 (Reserve Aggressive Pick-Up Modifications) to the next regular MEC meeting."

Carried

1555   AGENDA ITEM 206 – Treatment Access to the UAL Pilots' Directed Account Plan, C-Plan & 401K Plan Assets

Moved and Seconded by Subcommittee

"Move to defer Agenda Item 206 (Treatment Access to the UAL Pilots' Directed Account Plan, C-Plan & 401K Plan Assets) to the next regular MEC meeting."

Carried

1600   Recess


**FRIDAY, JULY 22, 2005**

0802   Reconvene

Joe Genovese holding proxy for Al Merone
Roberto Calderon holding proxy for Phil Otis
Steve Gillen holding proxy for Mike Hastings

0803   R&I Committee Chairman Bob Brand addresses MEC re Convertible Note Allocation

0904   System Schedule Committee Chairman Jeff Nooger addresses MEC re PBS related issues

0918   Recess for subcommittees

1000   Reconvene

1008   SUBCOMMITTEE 1, FLOOR RESOLUTION 2

Moved and Seconded by Subcommittee
"BE IT RESOLVED, the MEC directs the Secretary Treasurer to establish the furlough fund's Date of Plan Termination (DOPT) on June 30, 2006 IAW with the UAL MEC Policy Manual Volume II.

BE IT FURTHER RESOLVED, the MEC directs the Secretary Treasurer to present to the MEC the policy manual language change reflecting the establishment of the Furlough Fund's DOPT at the next regular or special MEC meeting.

BE IT FURTHER RESOLVED, the MEC directs the Secretary Treasurer to communicate this language change to the eligible participants of the furlough fund.

## MINUTES

### SPECIAL UAL-MEC MEETING
### SEPTEMBER 20-21
### HILTON GARDEN INN
### DES PLAINES, ILLINOIS

## TUESDAY, SEPTEMBER 20, 2005

0900    Meeting convened by Chairman Mark A. Bathurst

0901    Captain Morse briefed the MEC on the Polar situation

0903    Administrative

0905    <u>Chairman's Report – Mark Bathurst</u>

     Discussed the following:
- Contract Audit/Education
- Command Seminar
- Domestic Code Share Meeting
- Trans States Update – informational picketing
- Go Jet
- Strategy Board of Directors Meeting
- Return of Furloughed Pilots – September 26-27
- Semi-Annual Pilot Dispatch Meeting
- Regular MEC Meeting – October, 2005
- Semi-Annual Board Meeting – October 25-26, Herndon, Virginia
- UAL Board of Directors Meeting
- Chronology leading to Allocation of Notes

0938    Q&A

0949    <u>R& I Presentation to MEC – Bob Brand, Dave Mandolini and Jeffrey Barath</u>

     Discussed the following:
- Purpose of Notes
- Our Goal/Your Mission
- Questions asked from video
- Who asked questions
- Eligibility
- Last time – Gap 1, Gap 2 and PLSA
- Additional Sensitivity Analysis
- Blended Method
o  Gap 1 and PLSA
o  Blended and Gap 2
- Assumptions Used in Today's Update
- Summary

1016    <u>R & I Presentation – Paul Rusin</u>

     Discussed the following:

MINUTES

- Gap 2 sensitivity to assumptions
- Adjustment for PLSA withdrawals
- Rationale for Blended Method

1052   Q&A

1200   Working Lunch

1220   Rossi/Calderon

"Move to go off the record and in closed session."

<div align="center">Carried</div>

1300   Briggs/Calderon

"Move to go open and on record."

<div align="center">Carried</div>

1502   Q&A with R&I Committee from morning report

1558   <u>Administrative</u>

MEC Meeting will be October 3, 2006 in New Orleans
Board of Directors meeting will be October 9, 2006 in New Orleans

1600   Gillen/Hastings

"WHEREAS, Captain Mike Dzieciolowski has selflessly served the members of the Airlines Pilots Association as a member of the UAL-MEC and the UAL-MEC Negotiating Committee, and

WHEREAS, Mike (aka D+12) has recently decided to retire from United and hang up his Negotiator's note taking pad, and

WHEREAS, the United Airlines Master Executive Council sincerely appreciates Mike's tireless work on its behalf, and

WHEREAS, the UAL-MEC Office staff will miss Mike but will not miss spelling, pronouncing, explaining, typing, and reading and using up the office printer cartridge allotment when printing D+12's last name, and

WHEREAS, Mike will be sorely missed as a member of the Negotiating Committee, and

WHEREAS, the UAL-MEC Office staff will miss D+12 and his all around Handy Man jobs,

THEREFORE BE IT RESOLVED, that the UAL-MEC hereby bestows upon Mike the honorary titles of "Negotiator Emeritus" and "Tool Time Extrodinare;" which are both easier to pronounce than his last name, and

BE IT FURTHER RESOLVED, that the UAL-MEC provides Mike with a standing invitation as a guest of the United MEC hospitality, and

BE IT FURTHER RESOLVED, that the UAL-MEC wishes Mike and his wife lovely Lisa; "<u>buena suerte</u>" in all their future plans, and

(2)   Work with the SSC Crew Desk Sub-Committee, as needed and determine by the SSC.

(3)   Become familiar with the sections and letters of the contract necessary deal with Crew Desk issues.

(4)   Develop a forum for the local council's pilots to communicate their Cre Desk issues and questions.

(5)   Coordinate with the LSC Chairman, and the SSC Crew Desk Su Committee as necessary, to resolve issues that arise with the Crew desk."

<div align="center">Carried (requires 2/3 vote)</div>

0929   Jeff Nooger updated the MEC on the domicile servers and bidding

0934   Q&A

0936   <u>SUBCOMMITTEE 2 – FLOOR RESOLUTION 2</u>

Moved and seconded by subcommittee

"THEREFORE BE IT RESOLVED, the UAL-MEC directs the Master Chairman to ensure that the payout of the convertible note be exempt from any ALPA dues."

<div align="center">Carried</div>

0937   <u>AGENDA ITEM 201 – DISTRIBUTION OF CONVERTIBLE NOTES</u>

Moved and seconded by subcommittee

"Move to defer Agenda Item 201 (Distribution of Convertible Notes) to next regular MEC Meeting."

<div align="center">Carried</div>

0938   <u>AGENDA ITEM 202 – CONVERTIBLE NOTE DISTRIBUTION:  PLSA</u>

Moved and seconded by subcommittee

"Move to defer Agenda Item 202 (Convertible Note Distribution: PLSA) to next regular MEC Meeting."

<div align="center">Carried</div>

M I N U T E S

0948    R & I PRESENTATION

     Discussed the following:

- Gap 2 - the Parts
- recovery % of projected A Plan Benefit
- % of projected A-Plan Benefit Recovered by PLSA Allocation

1005    Q& A

1131    Aleshire/Calderon

     "Move to go off the record."

                                            Carried

1137    Briggs/Otis

     "Move to go back on record."

                                            Carried

1138    Checkout/Working Lunch

1225    Discussion on further R&I activity

1230    Barton/Rossi

     "Move to go off record."

                                            Carried

1348    Hastings/Otis

     "Move to go on record."

                                            Carried

1349    Coil/Velzeboer

     "Move to show Subcommittee 2, Floor Resolution 6 as direction given to the MEC Chairman and the Negotiating Committee."

                                            Carried

1356    Briggs/Calderon

     "Move to adjourn."

                                            Carried

                              Respectfully submitted,

<u>**MINUTES**</u>

**UAL-MEC MEETING**
**OCTOBER 17-21, 2005**
**WESTIN MICHIGAN AVENUE**
<u>**CHICAGO, ILLINOIS**</u>

<u>**MONDAY, OCTOBER 17, 2005**</u>

0903    Meeting called to order by Chairman Bathurst

0904    <u>Chairman's Report – Mark Bathurst</u>

     Discussed the following:
- Pass travel
- US/EU negotiations
- ALPA budget
- Election review of open positions
- LEC participation
- SCRC

0949    <u>Vice Chairman's Report – Wendy Morse</u>

     Discussed the following:
- Update on actions taken per MEC direction given at July MEC meeting
- Off the record resolutions update
- Denver tax lawsuit

1011    <u>Secretary/Treasurer's Report – Mike Hamilton</u>

     Discussed the following:
- Budget update
- Election process
- Future MEC meeting locations
- Furlough fund update
- MEC meeting hotel issues

1027    <u>ALPA National Report to MEC – Paul Rice, ALPA Vice President Administration/Secretary</u>

     Discussed the following:
- Budget
- Bankruptcy update – ALPA carriers
- Strike issues update
- Merger updates
- TSA & GJo Jet
- National Officer compensation
- IFALPA work
- Pensions and CRM
- Global aviation group
- US/EU talks
- Trans-border flying – Canada

> Bob Engelman
> Carolyn Pasqualino
> Steve Wallach

Graver/Gillen

"Move to close nominations."

<div align="center">Carried</div>

Results of 1st Ballot for First Member:
Bob Miller – 1
Bob Engelman – 1
Carolyn Pasqualino – 0
Steve Wallach – 12
Voided Ballot – 1

Steve Wallach elected as First Member of the International Committee.

Results of 1st Ballot for Second Member:
Carolyn Pasqualino – 11
Bob Miller – 3

Carolyn Pasqualino elected as Second Member of the International Committee.

Steve Wallach elected as Chairman of the International Committee by acclamation.

Carolyn Pasqualino elected as Vice Chairman of the International Committee by acclamation..

1532    <u>Retirement & Insurance Committee Report – Bob Brand, Dave Mandolini and Jeff Barath</u>

Discussed the following:
- Past presentations
- Gap 2-3 sets of assumptions
- Two step Gap 2
- Constant percentage of recovery

1705    Rossi/Hastings

"Move to go off the record and in closed session."

<div align="center">Carried</div>

1815    Recess

## WEDNESDAY, OCTOBER 19, 2005

0900    Reconvene – still closed and off the record.

1118    Barton/Graver

"Move to go in open session but remain off the record."

a form and manner acceptable to the Administrator, and

WHEREAS, the FOQA ARC (Aviation Rulemaking Committee) has developed the Voluntary Aviation Safety Information-sharing Program (VASIP) as the process to accomplish information sharing required by the FOQA Rule, and

WHEREAS, the ALPA International FOQA/ASAP Project Team has endorsed the VASIP as an acceptable method of compliance with the Rule while maintaining all confidentiality and de-identification requirements, and

WHEREAS, the ALPA members of the UAL FOQA/FSAP Steering Committee also endorse United's participation in VASIP, and

WHEREAS, the FOQA/FSAP Steering Committee believes the VASIP program will provide true value through safety enhancement through our participation in the VASIP program,

THEREFORE BE IT RESOLVED, that the UAL-MEC directs the FOQA/FSAP Steering Committee to continue its participation in the VASIP development program."

<div align="center">Carried</div>

1601    <u>RETIREMENT & INSURANCE COMMITTEE PRESENTATION TO MEC REGARDING $550 MILLION CONVERTIBLE NOTE ALLOCATION METHODOLOGIES</u>

1625    Otis/Swindells

        "Move to go into a committee of the whole."

<div align="center">Carried</div>

1654    Calderon/Otis Resolution (see 1710)

        Discussion.

1705    Briggs/Swindells SUBSTITUTE motion

<div align="center">Failed</div>

1710    Back on Calderon/Otis Resolution

        "Move to eliminate *Gap 1* and *PLSA* from further consideration in regards to Note Allocation Methods."

<div align="center">Carried<br>(10 For<br>5 Against)</div>

1711    Briggs requests recording of the vote<br>
Voting For:        Gillen, Hastings, Rossi, Barton, Aleshire, Graver, Genovese, Merone, Calderon, Otis<br>
Voting Against:      Swindells, Briggs, Coil, Velzeboer, Everhard

1721    Recess

8.    ~~Vacancy Bidding:~~

~~Any bid or claim to a vacancy outside of our current bidding procedures shall not be
considered including failure to transmit CRT bids. (January 1988)~~
**FRIDAY, OCTOBER 21, 2005**

0905    Reconvene

Neil Swindells holding proxy for John Briggs

0906    AGENDA ITEM 204 (Convertible Note Distribution: PLSA and AGENDA ITEM 214 (GAP 1 Method
of Note Allocation) ARE WITHDRAWN

0907    Calderon/Otis

"Move to approve the Minutes of the July 18-22, 2005 regular and the Sept. 20-21, 2005 special MEC
Meetings."

Carried

0913    Tim Brown, Negotiating Committee Chairman, addresses MEC regarding trip trading, and AFBS

0931    AGENDA ITEM 405 – Recalled Pilots Stock Distribution

Moved and Seconded by Subcommittee

"WHEREAS, the UAL-MEC in May, 2004, developed a method for allocating the equity in the new
United to be given to the pilots in partial compensation for the contractual concessions which they had
made, and

WHEREAS, that methodology distinguished between active pilots and those on furlough, and

WHEREAS, the duration of the Agreement reached in 2003 (72 months) was used in the formula to
establish the allocation for active pilots who would reach age 60 during the term of that Agreement, and
that duration was extended in the amendments made to the Agreement in 2005, wherein the length of the
Agreement was extended to a total of 80 months, and

WHEREAS, since May, 2004, a significant number of furloughed pilots have been recalled, and more
may return to active status before the Distribution Date of the stock;

THEREFORE BE IT RESOLVED, that pilots retiring during the term of the current Agreement shall
receive a prorated share of the allocation based upon the duration of the 2003 Agreement, as amended
by the 2005 Agreement, i.e. a pro-ration based upon the number of months in active service divided by
80, and

BE IT FURTHER RESOLVED, that active pilots on the Distribution Date who have been recalled from
furlough since May, 2004, shall also receive a prorated share of the allocation afforded the most junior
active pilot who was not furloughed, which shall be calculated in the same way as that for pilots who
reach age 60 during the Agreement, i.e. a pro-ration based upon the number of months in active service
divided by 80, and

BE IT FURTHER RESOLVED, that the equity set aside in 2004 for the furloughed pilots (5% of the
total) shall be reduced by the extent to which the furloughed group itself has been reduced as of the
Distribution Date, e.g. if the furloughed group has been reduced by, for example, 10% from the total of
2172 by reason of recalls, resignations, or otherwise, then the equity allocated to the remaining

furloughed pilots as of the Distribution Date shall be reduced by a like amount, and

BE IT FURTHER RESOLVED, that the most junior active pilot receiving an allocation n the Distribution Date shall not receive less than that received by a pilot still on furlough."

<div align="center">Carried</div>

0934  Graver/Coil

"Move to go into closed session and off the record."

<div align="center">Carried</div>

1106  "Move to go open and back on the record."

<div align="center">Carried</div>

1107  Recess for lunch
1240  Reconvene

1241  Babbette Ceccotti addresses MEC regarding most recent Bankruptcy Court hearings.

1317  Barton/Rossi

"Move to go into a committee of the whole."

<div align="center">Carried</div>

1318  Further Discussion on $550 Million Convertible Note Allocation Methodologies

1326  Rossi/Graver

"Move to eliminate *Gap 1/PLSA Blended Method* and *Gap 1: Two Step* from further consideration in regards to Note Allocation Methods."

<div align="center">Carried</div>

1343  Otis/Gillen

"Move to eliminate *Gap 2: Constant % of A-Plan Recovery (Post Allocation)* from further consideration in regards to Note Allocation Methods."

<div align="center">Carried</div>

1345  Gillen/Aleshire

"Move to eliminate *Gap 2: Contract 2009* from further consideration in regards to Note Allocation Methods."

<div align="center">Carried</div>

1415  Graver/Aleshire

"BE IT RESOLVED, that for the purpose of salary increase assumptions, that there are separate FAE

methodology and separate C Plan methodology, and

BE IT FURTHER RESOLVED, that the FAE methodology would base career retirement expectations on fleet and seat seniority, and

BE IT FURTHER RESOLVED, that the C Plan methodology could be based on traditional pilot bidding behavior."

<div align="center">Carried</div>

1455    Genovese/Coil Resolution

1456    Barton/Rossi SUBSTITUTE~~Genovese/Coil~~

"Move to remove the *$10,000 base allocation* and the *$15,000 base allocation* from the *Gap 2: Two Step* Note Allocation Methods."

<div align="center">Carried</div>

1502    Hastings/Gillen

"BE IT RESOLVED, the MEC directs the MEC Chairman to use appropriate resources to make the C-Fund more transparent to the pilot group before the date of disbursement, and,

BE IT FURTHER RESOLVED, the C-Fund process be communicated to the pilots.
(Intent:  Develop some mechanism where the pilot can see C-Fund credits accumulate.)"

<div align="center">Carried</div>

1504    Gillen/Genovese

"BE IT RESOLVED, that MEC directs the Master Chairman to use all appropriate resources to continue a prompt analysis of the Company's proposal to place the pilot equity distribution into the pilots' 401(k) accounts, including the use of any and all vehicles available to minimize the applicability of the Section 415 limits, and

BE IT FURTHER RESOLVED, that the MEC directs the Master Chairman to communicate with the membership concerning the issue, including the advantages and disadvantages of this proposal."

<div align="center">Carried</div>

1506    Swindells/Hastings

"BE IT RESOLVED, the R& I Committee adds a Gap2d assumption that uses 4.5/4.5 and 4% for a salary assumption to provide apples to apples comparisons between the 6% and 4.5% assumption sets."

<div align="center">Carried</div>

1507    Everhard/Otis

"Move to remove the 7.5% rate of return assumption from Gap 2 and replace it with a 6% rate of return assumption."

<div align="center">Carried</div>

MINUTES

1517  Discussion on Eligibility Criteria for the Convertible Note and Special Circumstances Categories

1521  Hastings/Everhard

"Move to include *Military Leave pilots* in Note Allocation eligibility."

Carried

1531  Gillen/Hastings

"Move to include *pilots on maternity/parental leaves of absences* in Note Allocation eligibility."

Carried

1546  Gillen/Velzeboer

"Move to include *pilots on ALPA leaves of absences* in Note Allocation eligibility."

Carried

1557  Joe Genovese holding proxy for Al Merone

1558  Swindells/Calderon

"WHEREAS, the pilots of United Airlines have provided significant financial leadership when compared to both management and other labor groups in order to save United Airlines from potential liquidation, and

WHEREAS, this pilot group has provided over $3 billion dollars in contractual sacrifices, in addition to the decimation of our retirement expectations, and

WHEREAS, this pilot group will receive significantly LESS than management's proposed 15% stock allocation for all our "shared sacrifices," and

WHEREAS, this proposed windfall is FAR in excess of any level that could possibly be considered fair, equitable, or even normal and customary at the exit of bankruptcy, and

THEREFORE BE IT RESOLVED, that the UAL-MEC opposes, in the strongest possible terms, the egregious and gluttonous attempt by UAL management to seize 15% of the post bankruptcy equity in our new United Airlines."

Carried Unanimously

1559  SUBCOMMITTEE 4, FLOOR RESOLUTION 3

Moved and Seconded by Subcommittee

"WHEREAS, many UAL pilots have expressed a desire to modify our uniform standards such that the uniform hat would be an optional wear item, and

WHEREAS, many domestic airlines have already adopted similar optional hat wear uniform standards, and

MINUTES

## MINUTES

### SPECIAL UAL-MEC MEETING
### NOVEMBER 29-30, 2005
### HILTON GARDEN INN
### DES PLAINES, ILLINOIS

## TUESDAY, NOVEMBER 29, 2005

0900    Meeting called to order by Chairman Mark A. Bathurst

      Captain Bathurst introduces the following MEC members-elect:
      Melvin Mason, Council 11 Chairman-elect
      Glenn Klopfer, Council 11 Secretary/Treasurer-elect

0903    Gillen/Hastings

      "Move to extend speaking privileges to the new MEC members-elect.

<div align="center">Carried</div>

0904    Administrative announcements

0906    **AGENDA:**    Note Allocation Update

0913    Retirement & Insurance Committee presentation by Bob Brand and Jeff Barath

1001    Q & A

1115    Swindells/Calderon

      "WHEREAS, the "$20K base" methodology was initially intended to take the furloughee PLSA payouts into account, and

      WHEREAS, the MEC, MEC R&I Committee and consultant actuary have all agreed that any pilot who received their PLSA payout will have his Note proceeds adjusted accordingly,

      THEREFORE BE IT RESOLVED, the MEC removes the "$20K base" methodology from further consideration."

<div align="center">Carried</div>

1140    Hastings/Swindells

      "WHEREAS, the 4% pay growth assumption is not as accurate a pay model as other models being considered by the MEC,

      THEREFORE BE IT RESOLVED, the UAL-MEC removes the 4% pay growth assumption from consideration."

<div align="center">Carried</div>

1200    Steve Scheri holding proxy for Al Merone

1205    Recess for lunch.
1355    Reconvene

1356    Continuation of Q & A to the R & I Committee

1508    Mike Abram, ALPA legal counsel, addresses MEC re note allocation overview and ratification process

1513    Q & A

1600    Calderon/Everhard

"Move to go into closed session and off the record."

Carried

1722    Briggs/Barton

"Move to go back on the record and in open session."

Carried

**WEDNESDAY, NOVEMBER 30, 2005**

0905    Reconvene

0906    Administrative announcements

0914    Genovese/Calderon

"Move to go off the record."

Carried

0915    Stephen Presser addresses MEC

1018    Briggs/Graver

"Move to go back on the record."

Carried

1019    Further R & I presentation to MEC by Bob Brand and Jeff Barath

1025    Q & A

1130    Recess for lunch and subcommittee meetings

1319    Reconvene

1320    Calderon/Otis

"WHEREAS, this MEC has benefited tremendously from Oly Olson's steadfast dedication to the

concept of not only casual Friday, but also sweatshirt Monday, sneakers Tuesday, woodsman Wednesday, no socks Thursday, and Hawaiian Anyday, and

WHEREAS, this MEC will sorely miss its frequent updates on high technology gadgets and assorted computer/telephone products, and

WHEREAS, Oly's efforts will certainly result in improved MEC productivity very soon after his departure, and

WHEREAS, the council 57 Communications Chairman position is being held open for Matthew Olson,

THEREFORE BE IT RESOLVED, that UAL MEC sincerely thanks Oly for his contribution, especially during these endlessly changing times, and

BE IT FURTHER RESOLVED, that the MEC will monitor, and if necessary curtail Oly's involvement on the CompuServe forum so that his family will notice his presence, let him rest, and allow him to return to us in the near future."

<p align="center">Carried by acclamation</p>

1322    Further R & I presentation and clarification of note allocation methods

1350    Q & A

1352    Swindells/Calderon Resolution

1409    Otis/Calderon SUBSTITUTE  (Please Note:  this resolution was later reconsidered.  Refer to 1505 for final disposition of this item.)

1425    Coil/Rossi AMENDMENT

<p align="center">Carried</p>

1430    Graver/Barton AMENDMENT

<p align="center">Failed</p>

1438    Voting on SUBSTITUTE as Amended

<p align="center">Carried</p>

1439    Swindells/Briggs Resolution

<p align="center">Failed</p>

1455    **SUBCOMMITTEE 1, FLOOR RESOLUTION 1**

Moved and Seconded by Subcommittee

"WHEREAS, all United Airlines' pilots have had their expected retirement benefit decimated by the loss of the Defined Benefit (A) Plan, and

WHEREAS, the MEC has determined that $550 million Convertible Note will be allocated to help recover part of that A fund loss, and

WHEREAS, the MEC has decided to use the Gap 2 method of allocation, which projects the use of the new C plan to offset a part of our losses as a permanent and integral component of our retirement benefit package, and

WHEREAS, based on our CBA history, some within the pilot group have expressed their concerns regarding any projections that attempt to extrapolate benefits far into the future which are based upon "when the last active pilot will retire",

THEREFORE BE IT RESOLVED, that the MEC adopt, as a permanent change to the MEC Policy Manual, that:

1)    the C plan company contribution will always remain in place at a minimum value of 6% of wages, and

2)    the B plan company contribution will always remain in place at a minimum value of 9% of wages.

BE IT FURTHER RESOLVED, that this change to the MEC Policy Manual will occur before any Gap 2 methodology for the $550 million Convertible Note Distribution is adopted by the Association, and

BE IT FURTHER RESOLVED, that the UAL MEC Secretary Treasurer submit a proposed MEC Policy Manual change at the next regularly scheduled MEC meeting."

Carried

1458    Gillen/Scheri

"Move to reconsider Otis/Calderon (1409) Resolution

Carried

1459    Gillen/Scheri Resolution

1500    Gillen/Hastings AMENDMENT

Carried

Voting on Resolution as Amended

"BE IT RESOLVED, that the MEC directs the MEC R&I Committee to provide data and charts at the next regular or special MEC meeting:

1)    The Fleet and Seat as presented

2)    The Stove Pipe method as presented

3)    A Stove Pipe method modified for CURRENT fleet and seat moving forward

4)    A Stove Pipe method modified for a stair step method based on pilots' previous bidding behavior

5)    A Fleet and Seat method modified to reflect actual pay rates for that upgraded seat and fleet.

MINUTES

<div align="center">

**MINUTES**

**UAL-MEC MEETING**
**JANUARY 16-20, 2006**
**FAIRMONT HOTEL**
**CHICAGO, ILLINOIS**

</div>

**MONDAY, JANUARY 16, 2006**

0900    Meeting called to order by Chairman Bathurst

0901    Chairman Bathurst introduces new MEC members-elect Gordon Thomson – Council 11, Steven Edgar, Council 34 and Derek Brauch, Council 57.

0904    Chairman's Report – Mark Bathurst

    Discussed the following:
- Delta update
- Claim sale update
- Executive Board resolution
- Management Employee Incentive Program
- Centralized Load Plan

1013    Vice Chairman's Report – Wendy Morse

    Discussed the following:
- Electronic Voting at MEC Meetings
- Deadhead check-in
- Institution of MEC data storage system
- New Orleans hotels
- Captain's Authority and jump seat policy
- Pass Travel system
- FOQA
- Leather jackets
- Bird flu
- Flight Ops optional hat

1027    Secretary/Treasurer's Report – Mike Hamilton

    Discussed the following:
- Budget update
- Agenda items update
- Expense deadline
- Flight Pay Loss
- Furlough Fund
- Future meeting dates
- Hotel Committee update
- Jumpseat

1118    ALPA National Report to MEC – Paul Rice, ALPA Vice President Administration/Secretary and Mark Seal, Executive Vice President

Carried

1014    <u>Hotel Committee Report – Bob Ward</u>

   Discussed the following:
   - New Challenges to CBA and practice
   - System Board 2005-2006
   - Impact of Company's position of short layovers
   - Transportation challenges
   - Life Safety Standards
   - Hotel Committee Guidelines
   - New disagreements
   - Recent challenges and rate increases
   - Credit Cards at check-in
   - Layover website

1047    <u>R & I Committee Report – Bob Brand & Jeff Barath</u>

   Discussed the following:
   - Convertible Note Allocation
   - Previous direction from October 2005
   - Pay/Growth Assumptions (fleet/seat, stove pipe)
   - Tasks to accomplish
   - Related Key assumptions
   - Pilot Distribution Chart
   - Economic assumptions
   - Next steps
   - Pay Model Summary
   - Recommendation criteria
   - R&I Committee recommendations

1202    Recess for lunch

1340    Reconvene


1341    **Elections**

   Mark Seal and Jeff Nooger are appointed as the Ballot Certification Committee

1341    <u>AGENDA ITEM 101 – Election of Grievance Review Committee Alternate Member</u> has been
   DEFERRED to the April 2006 MEC Meeting

   <u>AGENDA ITEM 102 – Election of Training Committee Alternate Member</u>

   Nominees:     Larry Austin
                 Doug Trotter

1342    Briggs/Barton

   "Move to close nominations for the Training Committee Alternate Member."

Carried

M I N U T E S

1532   Recess to subcommittee meetings

## WEDNESDAY, JANUARY 18, 2006

0900   Reconvene

0906   Bob Nichols addresses MEC on legal standards re Note Allocation

0910   R & I Committee addresses MEC re Note Allocation Eligibility, Date and Calculations

0914   Aleshire/Merone Floor Resolution

"WHEREAS, the United Airlines MEC supports the GAP 2 Methodology to be used as the distribution model for the allocation of the 550 million dollar convertible note, and

WHEREAS, the GAP 2 Methodology is based on past and future earnings, and

WHEREAS, the assumptions to support GAP 2 methodology should reflect as closely as possible with a pilots career expectations and earnings, and,

WHEREAS, the earnings of a pilot should be based on historical evidence of bidding behavior, and

WHEREAS, the financial assumptions are supported by industry standards, rendering them defensible, reasonable and easy to understand,

THEREFORE BE IT RESOLVED, the United MEC endorses the Gap 2 methodology for determining individual pilot Convertible Note allocations, and

BE IT FURTHER RESOLVED, the United MEC endorses a six percent discount rate to determine the C-Plan benefits and present value of lost benefits, and

BE IT FURTHER RESOLVED, the United MEC endorses a six percent ROI on the C-Plan Contributions, and

BE IT FURTHER RESOLVED, the United MEC endorses a seniority based pay growth model ('Adjusted Stove Pipe') with adjustments based on current position held; ending with position due at retirement, for the purposes of determining Final Average Earnings."

Carried Unanimously

0918   Hastings/Briggs Floor Resolution

Discussion.

0933   Gillen/Coil SUBSTITUTE Motion

Failed

0940   Merone/Genovese SUBSTITUTE Motion

Discussion.

1011   Aleshire/Barton

"Move to table this item."

Failed

1012    Merone/Genovese SUBSTITUTE Motion is withdrawn

Back on original Floor Resolution (0918)

1026    Swindells/Briggs SUBSTITUTE Motion

"WHEREAS, the Convertible Note first became a benefit in LOA 05-02, and

WHEREAS, the effective date of the LOA was 1/1/05,

THEREFORE BE IT RESOLVED, the UAL-MEC creates an eligibility date of 01/01/05 for the Convertible Note for all pilots on the United Airlines Pilot System Seniority List."

Carried Unanimously

1028    Hastings/Everhard Floor Resolution

1037    Otis/Merone AMENDMENT

1038    Voting on Hastings/Everhard Floor Resolution as Amended

Carried

*NOTE: This Resolution was ultimately reconsidered.  Please refer to Wednesday, January 18 at 1415 for final disposition of this item.*

1040    Hastings/Barton Floor Resolution

"BE IT RESOLVED, that Pilots who entered Pilot Disability Insurance status on or after 1/1/05, but before the Bankruptcy Exit Date shall be treated consistent with the allocation methodology developed by the UAL-MEC R&I committee, to wit:

Projected earnings will have a soft freeze.
There will be no C-Plan accrual.
Pay Progression Model snapshot.
No pilot on PDI will receive more than a similar seniority, active status pilot."

Carried

1044    Hastings/Briggs Floor Resolution

Coil/Velzeboer SUBSTITUTE

Failed

Gillen/Hastings SUBSTITUTE

"BE IT RESOLVED, Pilots that resigned their United Airlines pilot system seniority number after the Date of Eligibility, but before the Bankruptcy Exit Date shall not be eligible for the Note Allocation."

Carried

1117  Hastings/Swindells Floor Resolution

"BE IT RESOLVED, that a Pilot who dies after the Date of Eligibility, but before the Bankruptcy Exit Date, shall have their allocation reduced in a manner as developed by the UAL-MEC R&I committee, to wit:

The greater of the A-Plan 'hard freeze' or the pre-retirement survivor benefit.
C-Plan blocked out.
Pay progression snapshot.
No deceased pilot will receive more than a similar seniority, active status pilot."

Carried

1123  Hastings/Calderon Floor Resolution

"BE IT RESOLVED, that Pilots who are terminated shall be included in the note allocation unless they have an adverse determination by the System Board of Adjustment by the Bankruptcy Exit Date."

Carried

1125  Hastings/Genovese Floor Resolution

"BE IT RESOLVED, that the estates of the 9/11 pilots will be included in the note allocation as though they are active pilots."

Carried Unanimously

1154  Captain Bathurst presents the annual D.B. Robinson Safety Award to Rick Valdez in recognition of Captain Valdez's significant and outstanding contributions in the air safety arena.

1204  Recess for lunch

1345  Reconvene

1349  Rossi/Velzeboer Floor Resolution

1352  Hastings/Velzeboer SUBSTITUTE

Carried

*NOTE: This Resolution was ultimately reconsidered. Please refer to Thursday, January 19 at 1540 for final disposition of this item.*

1358  Gillen/Gromek Floor Resolution

"WHEREAS, for over the past four years Mike Hastings has dutifully served the UAL-MEC while subject to the tyranny of two different MEC chairmen and while causing great exasperation to two different council chairmen, and

WHEREAS, the count for Mike's use of the phrases 'I thank you for that', 'Over here', 'Ladies and Gentlemen', and 'Based on my past experience on the SSC' has reached unequaled and intolerable levels, and

WHEREAS, countless MEC committee chairs, advisors and guest speakers can no longer endure the withering questioning punctuated by references to esoteric sections of the code of the Internal Revenue Service of the United States, and

WHEREAS, such withering questioning only came after the beady little eyes surfaced from behind a laptop screen that was up during entire presentations, and

WHEREAS, we can no longer protect the Chicago cabal from cuticle clippings that rained down repeatedly while 'someone' chose to groom himself outside of the privacy of his own hotel room,

THEREFORE BE IT RESOLVED, that the UAL-MEC approve a change to its policy manual section covering seating at MEC meetings in order for the newest member of the National Affairs Steering Committee to be remain surgically attached to 'Briggsey', and

BE IT FURTHER RESOLVED, the UAL-MEC heretofore releases Mike from his bonds of service as Vice-Chairman of Council 11 and as Chairman of MEC Subcommittee 5, and

BE IT FURTHER RESOLVED, the UAL-MEC gives its most heartfelt thanks to Sue Ann and the Hastings family for sharing their beloved husband and father with us lo these many years, and

BE IT FURTHER RESOLVED, the UAL-MEC recognizes and thanks Mike for his service, his tenacity, his attention to detail, and his bottomless reserve of energy, all tapped in the defense of the contractual rights of his brother and sister pilots."

<p style="text-align:center">Carried</p>

1401   Hastings/Merone Floor Resolution

"WHEREAS, the Management Equity Incentive Program (stock) is not related to A-Plan termination, and

WHEREAS, the Association cannot accurately determine whether a management pilot is able to 'double-dip', specifically earn both a pilot retirement and a management retirement, and

WHEREAS, pilot managers that are officers of the corporation enter into an individual employment agreement separate from the Pilot Agreement,

THEREFORE BE IT RESOLVED, that management pilots who are officers of the corporation on or after the Date of Eligibility shall be excluded from the note allocation, and

BE IT FURTHER RESOLVED, in so far as the Association can determine, management pilots who receive retirement benefits outside of the Pilot Agreement shall have their note allocation offset for that benefit, and

BE IT FURTHER RESOLVED, this issue will be determined by the Date Note of Issuance."

<p style="text-align:center">Carried</p>

1415   Briggs/Swindells

"Move to reconsider the Hastings/Everhard (1038) Floor Resolution as Amended."

<p style="text-align:center">Carried</p>

1428   Briggs/Swindells Floor Resolution

"BE IT RESOLVED, that Pilots who were on or entered into a Personal Leave of Absence (as provided by section 12-A of the CBA) on or after the date of eligibility and before the Bankruptcy Exit Date shall be included in the convertible note allocation with an offset made for time while on leave, the duration of which will be consistent with the authorized period of absence."

<div align="center">Carried</div>

1429    Recess

1441    Reconvene

1442    AGENDA ITEM 201 (Distribution of Convertible Notes) HAS BEEN WITHDRAWN
AGENDA ITEM 203 (Pilot Eligibility) HAS BEEN WITHDRAWN
AGENDA ITEM 204 (Furlough Distribution) HAS BEEN WITHDRAWN
AGENDA ITEM 205 (Note Tax Issues) HAS BEEN WITHDRAWN
AGENDA ITEM 206 (Payout Options of Convertible Notes) HAS BEEN WITHDRAWN
AGENDA ITEM 207 (6% Assumptions) HAS BEEN WITHDRAWN
AGENDA ITEM 402 (Deceased Pilot Note Distribution) HAS BEEN WITHDRAWN
AGENDA ITEM 403 (9-11 Pilots Convertible Bond Eligibility) HAS BEEN WITHDRAWN

1454    AGENDA ITEM 202 – Membership Ratification on Convertible Note Distribution Proposal

Moved and Seconded by Subcommittee

"Move to show Agenda Item 202 (Membership Ratification on Convertible Note Distribution Proposal) as discussed."

<div align="center">Carried</div>

1456    Gillen/Hastings Floor Resolution

"WHEREAS, an abundance of action and a scarcity of spoken words are the hallmark of a successful tenure as non-status representative, and

WHEREAS, Christine Gromek has displayed the taciturn temperament that endeared her to this body notwithstanding the occasional eruption of Mt. Gromek with spewing 'Freakin' this and 'BS' that, and

WHEREAS, Chris has shown the tact and skill necessary to navigate such treacherous waters, in addition being one of the few who understand the Navy meaning of being a 'Hooker',

THEREFORE BE IT RESOLVED, the UAL-MEC thanks Chris Gromek for her service, her sense of comity, her quiet effectiveness, and her true friendship, and

BE IT FURTHER RESOLVED, the UAL-MEC establish the 'Gromek' initiation process for current and future non-status representatives to follow her example that a secretary/treasurer is at their best when often seen and seldom heard, and

BE IT FURTHER RESOLVED, the UAL-MEC extends its best wishes to Chris and her family for fair skies and following seas as they clear the 'Perfect Storm' of the UAL bankruptcy."

<div align="center">Carried by Acclamation</div>

1457    System Schedule Committee Report – Jeff Nooger

Discussed the following:

WHEREAS, seven years as a rep is a long time, even though in retrospect, they were pretty easy years, especially when you only have 13 years at the company, and

WHEREAS, Steve has patiently endured eruptions from Mt. Gromek on his right and flying cuticles from his more hygiene-challenged Vice on his left, and the occasional ambush from other quarters, and

WHEREAS, Steve has elevated the standard of attire for this MEC in heated competition with the former MEC S/T, but in the never-ending spirit of cooperation and comity has now graciously agreed to pass the "hankie" to Captain Barath, and

WHEREAS, Steve will soon be off for service as an LCA where the company will take full advantage of his experience and people skills to assign him the hard cases, the kind that really can interest you, and

WHEREAS, when taking all this into consideration, the MEC has determined that Steve is a glutton for punishment,

THEREFORE BE IT RESOLVED, the next time Steve serves as a rep, it is his turn to answer all the former C-150 e-mails, and

BE IT FURTHER RESOLVED, the UAL-MEC offers our deepest appreciation and thanks for his leadership, quick wit, comic relief and floor expertise in helping guide the MEC through legislative challenges, and

BE IT FURTHER RESOLVED, that the UAL-MEC recognizes Captain Gillen and honors his dedicated and selfless service to his fellow pilots during what was arguably one of the most demanding times for representational leadership in airline and company history requiring many painful decisions, at the cost of personal relationships and time with his family, and

BE IT FURTHER RESOLVED, that the UAL-MEC offers our heartfelt thanks to Denise, the rock of his family, and his three lovely children for the many hours of sacrifice so that their Dad and Husband could do the work of the pilots, and

BE IT FURTHER RESOLVED, the UAL-MEC wishes Steve well, a quick recharge of the old batteries, a speedy return to ALPA service and an old Irish blessing befitting of the legacy of your surname – "May the road rise up to meet you. May the wind always be at your back. May the sun shine warm upon your face . . . ."

Carried by Acclamation

0910   R & I Committee addresses MEC regarding the convertible note allocation

0959   Recess

1005   Reconvene

1017   Subcommittee 2, Floor Resolution 8

Moved and Seconded by Subcommittee

"BE IT RESOLVED, notwithstanding the general eligibility rule established for convertible note proceeds, the following eligibility rules will apply specifically to currently furloughed pilots:

1)   The pilot must be offered a recall class (and subsequently agree to accept that offer) that was officially announced by UAL by the Bankruptcy Exit Date, regardless of the date the class is scheduled to begin,

MINUTES

2) If the pilot had previously bypassed an offer of recall, she/he is ineligible unless she/he meets the provisions of item (1) above"

*Intent: To include any and all furloughees to fill recall classes that are announced by the company BEFORE the Bankruptcy Exit Date, but which may begin AFTER the Bankruptcy Exit Date, regardless of when they receive their notification or accept the offer to attend the above recall. The time allowed to accept offers of recall is covered by other language elsewhere.*

*For example: An offer sent out by UAL before the Bankruptcy Exit Date may be for a class of 20 pilots to attend a class scheduled after the Bankruptcy Exit Date. As long as the pilot is being offered to attend THAT class, he is eligible, regardless of when that pilot is notified by UAL, unless she/he bypasses*

Carried Unanimously

1020   Aleshire/Holman

"WHEREAS, Brian Graver has served the pilot group in a plethora of positions from the C34 Grievance Committee, Council 6 Vice Chairman, the MEC Negotiating Committee, C34 Vice Chairman and now the MEC Merger Committee, and

WHEREAS, Brian's quick wit and unique diction in delivery of statements such as 'I may be a little slooow' knowing full well that Brian operates at the speed of light, and

WHEREAS, his intellect and wit is demonstrated by statements like 'if I could substitute a substitute I might substitute it with' … which was a well known tactic known as the Cockerell, named after a well known and distinguished former now very retired Council 34 member, and

WHEREAS, Brian is certainly passionate about his beliefs and is never fearful demonstrating them, and

WHEREAS, we can thank Brian for his perseverance for introducing leather to the appearance of the pilots, and

WHEREAS, Brian's career skyrocketed from new hire to Captain in 4 years interrupted by a bit of a tail stall back to a Fifi First Officer very similar to his affair with motorcycles, and

WHEREAS, this MEC has observed an amorphous transition through colorful bow ties, a goatee, tattoos and verrrrry long sideburns, and

WHEREAS, Brian certainly lives an adventurous lifestyle and enjoys the thrill of the hunt including his African safari's, and

WHEREAS, as a result of his adventurous lifestyle, he has incurred just a 'few' accidents using motorcycles, skis, and jeeps to accomplish bodily destruction, and

WHEREAS, Brian somewhere along this adventurous lifestyle, he met Beth, a wonderful and fitting fiancé,

THEREFORE BE IT RESOLVED, that the UAL-MEC wishes Brian smooth skies as he leaves the table and moves to his next phase of life, and

BE IT FURTHER RESOLVED, that the UAL-MEC hereby wishes Brian, Beth, Jade and Clay the best of Health and Happiness, and

BE IT FURTHER RESOLVED, that the UAL-MEC hereby agrees to avoid the phrase 'Break a Leg' when wishing Brian good luck!"