UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RAYMOND GARAVITO, RAFAEL RODRIGUEZ, and ELLI MIZRAHI, <br><br> Plaintiffs, <br><br> v. <br><br> AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) Case No. 1:07-cv-00384 (PLF) |

## MOTION OF DEFENDANT AIR LINE PILOTS ASSOCIATION, INTERNATIONAL TO TRANSFER PURSUANT TO 28 U.S.C. § 1404(a)

Defendant Air Line Pilots Association, International ("ALPA") moves pursuant to 28

U.S.C. §1404(a) to transfer this proceeding to the United States District Court for the Northern

District of Illinois, where two cases arising out of the same transaction are currently pending.  In

support of this motion, ALPA submits the attached memorandum, the Declaration of Captain

Mark Bathurst, and a proposed Order.

February 28, 2007

Respectfully submitted,

*Clay Warner*

Clay Warner  (D.C. Bar No. 398346)
David Semanchik (D.C. Bar No. pending)
AIR LINE PILOTS ASSOCIATION,
    INTERNATIONAL
LEGAL DEPARTMENT
1625 Massachusetts Avenue, N.W.
Washington, DC  20036
Phone:  (202) 797-4095
Fax:  (202) 797-4014

Of Counsel:

Peter Herman (*pro hac vice* application forthcoming)
COHEN, WEISS AND SIMON LLP
330 West 42d Street
New York, New York  10036
(212) 356-0209

Andrew S. Marovitz (*pro hac vice* application forthcoming)
Andrew S. Rosenman (*pro hac vice* application forthcoming)
Debra Bogo-Ernst (*pro hac vice* application forthcoming)
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, Illinois  60606
(312) 782-0600

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| RAYMOND GARAVITO, RAFAEL RODRIGUEZ, and ELLI MIZRAHI,<br><br>Plaintiffs,<br><br>v.<br><br>AIR LINE PILOTS ASSOCIATION, INTERNATIONAL,<br><br>Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 1:07-cv-00384 (PLF) |

## MEMORANDUM IN SUPPORT OF
## MOTION OF DEFENDANT AIR LINE PILOTS ASSOCIATION, INTERNATIONAL TO TRANSFER PURSUANT TO 28 U.S.C. § 1404(a)

### PRELIMINARY STATEMENT

The complaint in this case and a motion for preliminary injunction were served on ALPA

on Friday, February 23, 2007, along with a motion for expedited discovery. In a telephonic

hearing on Monday, February 26, the Court permitted counsel for ALPA to make an oral motion

to transfer, based primarily on the fact that two cases arising from the same transaction –

*Mansfield v. ALPA*, No. 06-CV-6869, and *Hudson v. ALPA*, 07-CV-590 – are currently pending

in the Northern District of Illinois.[1]

---

[1] Copies of the complaints in the two cases are attached as exhibits 1 and 2 to this memorandum. The *Hudson* case was originally filed in the District of Oregon, and then transferred to the Northern District of Illinois pursuant to a stipulated motion. A copy of the stipulated motion is exhibit 3, and a copy of the transfer order in *Hudson* is exhibit 4. *Hudson* was then reassigned within the Northern District of Illinois to the judge hearing the *Mansfield* case, Judge Matthew F. Kennelly, on the grounds of relatedness. A copy of the order granting reassignment is attached as exhibit 5.

On Wednesday morning, February 28, the Court entered an Order denying ALPA's motion without prejudice. The Court stated:

> While the defendant has presented several compelling arguments in favor of transferring this case in the interest of justice because of the pending related cases in the Northern District of Illinois, on the limited record before it and due to the expedited nature of the proceedings, the Court cannot assess properly all the required factors, particularly those related to the convenience of parties and witnesses.

In addition, the Court ordered that ALPA would be permitted to "raise this motion again at any time during the pendency of this case in a formal filing with the Court and with the appropriate supporting documentation."

Under 28 U.S.C. §1404, a court may transfer a civil action "for the convenience of parties and witnesses, in the interest of justice . . . to any other district or division where it might have been brought." Here, the "the interest of justice" dictates that this Court transfer this action to the Northern District of Illinois in order to conserve judicial resources and prevent inconsistent adjudications. Both *Mansfield* and *Hudson* arise out of the same set of events as this case: the allocation of the proceeds of corporate notes provided by United pursuant to a collective bargaining agreement between ALPA and United. Indeed, in a form filed (but not served) with the complaint, the plaintiffs in this proceeding specifically identified *Mansfield* as a "related case" on the grounds that it "involves common issues of fact" and "grows out of the same event or transaction." (A copy of that form is attached as exhibit 6.) Moreover, *Mansfield* purports to be brought on behalf of a class that mirrors the class alleged here. And the plaintiffs in *Hudson* are currently seeking the same relief – a preliminary injunction barring a distribution of funds set to occur after March 8 – which has created the urgency and furor here. Judge Kennelly has scheduled a hearing on the *Hudson* plaintiffs' motion for temporary injunctive relief next Tuesday, March 6, which provides the plaintiffs here sufficient time to present their motion and

have it heard before a judge who is already familiar with the facts. An order reflecting this schedule is attached as exhibit 7.

In addition, the private interests of the parties dictate that this action be transferred to the Northern District of Illinois because the underlying events occurred there, most of the potential witnesses can be found there, and the named plaintiffs work there. And since none of these plaintiffs resides in the District of Columbia, their choice of forum is entitled to little deference.

## ARGUMENT

I.    **THIS ACTION SHOULD BE TRANSFERRED TO THE NORTHERN DISTRICT OF ILLINOIS, WHERE TWO PREVIOUSLY FILED ACTIONS ARISING OUT OF THE SAME UNDERLYING EVENTS ARE PENDING AGAINST THE SAME DEFENDANTS**

### A.    Transfer to the Northern District of Illinois Will Be In the Interest of the Justice Under Section 1404

Under 28 U.S.C. §1404, a court may transfer a civil action "for the convenience of parties and witnesses, in the interest of justice . . . to any other district or division where it might have been brought." The purpose of the statute is to "prevent the waste of time, energy and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense." *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964) (citations omitted). Courts in this circuit strive to "prevent duplicitous litigation" and consider the existence of similar pending litigation in other districts to be "of great importance" when determining whether to transfer an action under 28 U.S.C. §1404. *California Farm Bureau Fed'n v. Badgley*, No. 02-2328, 2005 WL 1532718, at *1 (D.D.C. June 29, 2005) (granting motion to transfer under Section 1404 to the district where "a similar lawsuit" was pending). In "the interest of justice," therefore, the U.S. District Court for the District of Columbia often transfers cases to other districts where cases arising out of the same events and facts exist. *See Reaves v. U.S. Dept. of Justice*, 355 F.Supp.2d 510, 517 (D.D.C. 2005) (acting *sua sponte* to transfer case to district handling "nearly

3

identical claims" against the same defendant); *Williams v. Purdue Pharma Co.*, No. 04-451, 2004 WL 1219061, at *1 (D.D.C. June 3, 2004) (granting motion to transfer under Section 1404 to district where pending cases involved "nearly identical issues of fact and law"); *Smiths Industries Medical Sys., Inc. v. Ballard Medical Products, Inc.*, 728 F.Supp. 6, 7 (D.D.C. 1989) (transferring litigation *sua sponte* because of "an ongoing related case in another jurisdiction"); *Upjohn Co. v. General Accident Ins. Co. of Am.*, 581 F.Supp. 432, 435-36 (D.D.C. 1984) (transferring litigation to district where pending case was "substantially similar").

This Court has held that "[t]o permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that §1404(a) was designed to prevent." *Badgley*, 2005 WL 1532718, at *1, quoting *Continental Grain Co. v. The FBL-585*, 364 U.S. 19, 26 (1960). For example, if this action proceeds in the District of Columbia, time-consuming, duplicative discovery could be held in both venues simultaneously. Further, two federal judges will have to familiarize themselves with the same complicated factual issues involved in all three pending cases.[2] *See Williams,* 2004 WL 1219061, at *1 ("Requiring a second federal judge to attempt to master [the facts of the litigation] would be a poor use of scarce judicial resources.").

Transferring this case to the Northern District of Illinois will also prevent inconsistent rulings regarding the distribution of the note proceeds – both with respect to the two pending motions for preliminary injunction, and with respect to the final relief requested. The chance of inconsistent results in the pending injunction motions is clear, since those motions will be heard on succeeding days in different courts. And with respect to final relief, all three groups are seeking to change the allocation of a fixed set of assets, and each apparently has their own

---

[2] If this action is transferred to the Northern District of Illinois, it will likely be heard by Judge Kennelly, who is currently handling the *Mansfield* and *Hudson* cases.

4

preferred allocation mechanism. Since the pool of assets is fixed, a larger allocation for any group necessarily means a smaller allocation for the other groups, so the possibility of conflicting results is very real. *See Upjohn Co.*, 581 F.Supp. at 436 ("Courts have a strong interest in avoiding . . . 'piecemeal and perhaps conflicting determination[s].'").

Moreover, the litigation interests of the plaintiffs in this case will not in any way be compromised by transfer to the Northern District of Illinois. Judge Kennelly is already familiar with the underlying facts, and is currently considering a motion for injunctive relief sought by the plaintiffs in *Hudson*. Accordingly, as noted above, the plaintiffs will have an opportunity to present their preliminary injunction motion and receive a timely, informed ruling.

**B.    Other Factors Under Section 1404 Also Weigh in Favor of Transfer**

This Court considers the following additional "private interest considerations" in determining whether to transfer an action under 28 U.S.C. §1404:

> 1) the plaintiffs' choice of forum, unless the balance of convenience is strongly in favor of the defendants; (2) the defendants' choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses, but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the ease of access to sources of proof.

*Badgley*, 2005 WL 1532718, at *1. Each of these factors also dictates that this action should be transferred to the Northern District of Illinois.

The claim arises from a collective bargaining agreement between ALPA and United Airlines, which was negotiated as a consequence of United's bankruptcy and threats by United that it would seek bankruptcy court approval to reject its agreement with ALPA. (Declaration of Captain Mark A. Bathurst ("Bathurst Decl.") ¶¶7, 8.) (United's bankruptcy was overseen by the United States Bankruptcy Court for the Northern District of Illinois, *In re UAL Corporation, Inc.*, Case No. 02-B-48191.) United maintains its corporate headquarters in the Northern District of Illinois, and ALPA maintains an office in the Northern District of Illinois that serves as the

5

headquarters for its United Master Executive Council ("MEC"), which is the ALPA coordinating

council charged with overseeing negotiations and other affairs for United pilots. (Bathurst Decl.

¶¶2-6.) The negotiations for the collective bargaining agreement occurred largely in the

Northern District of Illinois, and the records of those negotiations are largely maintained in the

Northern District of Illinois. (Bathurst Decl. ¶9, 11.) None of the negotiations occurred in the

District of Columbia. (Bathurst Decl. ¶9.)

The collective bargaining agreement provides, in part, that under certain conditions, the

proceeds from $550 million in corporate notes would be distributed by United as directed by

ALPA. (Bathurst Decl. ¶8.) The method by which the proceeds of the notes were to be

distributed was considered and finally determined by the MEC between January 2005 and

January 2006, at a series of meetings that occurred largely in the Northern District of Illinois.

(Bathurst Decl. ¶18.) None of the meetings was held in the District of Columbia. (Bathurst

Decl. ¶18.) The MEC acted on the advice of member committees, which met with ALPA staff

and outside advisors, including actuaries. (Bathurst Decl. ¶¶15, 17.) The committee meetings

occurred almost exclusively in the Northern District of Illinois, the primary staff advisors

maintain offices in the Northern District of Illinois, and the office of the outside actuary is in the

Northern District of Illinois. (Bathurst Decl. ¶¶5, 15-17.) *See Williams v. Purdue Pharma Co.*,

2004 WL 1219061, at *1 (transferring action to where "the majority of facts alleged in the

Complaint" occurred); *Badgley*, 2005 WL 1532718, at *2 (transferring case to district where

defendants acted).

Further, courts in the District of Columbia give the plaintiff's choice of forum

substantially less deference when the plaintiff's choice of forum is not the plaintiff's home

forum. *See Badgley*, 2005 WL 1532718, at *2 ("substantially less deference is warranted when

the forum preferred by the plaintiff is not his home forum"); *Kotan v. Pizza Outlet, Inc.*, 400

F.Supp.2d 44, 49 (D.D.C. 2005). Here, none of the plaintiffs resides in the District of Columbia,

and all three are assigned to work at O'Hare Airport, in the Northern District of Illinois.

(Bathurst Decl. ¶22.) In addition, since this is a putative class action with potential class

members residing in different areas across the nation, plaintiffs' choice of forum should be given

even less deference. *See Goggins v. Alliance Capital Management, L.P.*, 279 F.Supp.2d 228,

232 (S.D.N.Y. 2003) (stating that "in class actions less weight is given to the plaintiff's choice"

of forum).

### C.    Plaintiffs' ERISA Cases Are Not Applicable

In opposition to ALPA's oral motion to transfer, the plaintiffs argued that "special weight

[should be] given to a plaintiff's choice of venue in ERISA cases in view of ERISA's special

venue provision," and cited five ERISA cases in support of that proposition. *Joyce v. Eastern*

*Concrete Paving Co.*, No. 96-1343, 1996 WL 762323 (D.D.C. Sept. 5, 1996); *Combs v. Adkins*

*& Adkins Coal Co., Inc.*, 597 F. Supp. 122 (D.D.C. 1984): *Flynn v. Veazey Construction Corp.*,

310 F. Supp.2d 186 (D.D.C. 2004); *Int'l Bhd. of Painters v. Best Painting*, 621 F. Supp. 906

(D.D.C. 1985); *Flynn v. Ravare Masonry, Inc.*, No. 01-1236 (D.D.C. January 3, 2002).

However, each of those five cases involves a collection suit brought by a multi-employer pension

plan against an employer for obligations to the plan. As noted in *Hotel & Restaurant Employees*

*Local 25, et al. v. JPR, Inc.*, 136 F.3d 794, 803-4 (D.C. Cir. 1998), Congress made special

provision in ERISA to ease such collection suits, and those provisions include allowing

nationwide service of process, and allowing venue where the plan is administered. Plainly, this

is not a suit by a plan seeking collection from an employer. And if there were an ERISA plan at

issue here – and there clearly is not – that "plan" would be administered in the Northern District

of Illinois, where the terms of the collective bargaining agreement were negotiated, where the allocation decisions were reached, and where the funds will be distributed by United in accordance with those allocation determinations.

**D.      Venue is Proper in the Northern District of Illinois**

In order to transfer an action under 28 U.S.C. §1404, a court must find that venue is proper in the district where the action is to be transferred.  Under the general venue statute, venue is proper in non-diversity cases in "(1) a judicial district where any defendant resides, if all defendants reside in the same State, [or] (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated . . . ."  28 U.S.C. §1391.  ALPA "resides" in the Northern District of Illinois since the MEC has an office there.  In addition, as shown above, a "substantial part of the events . . . giving rise to the claim" occurred in the Northern District of Illinois.

## CONCLUSION

For the foregoing reasons, ALPA's motion to transfer should be granted.

February 28, 2007

<div style="margin-left: 50%;">

Respectfully submitted,

*Clay Warner*

Clay Warner  (D.C. Bar No. 398346)
David Semanchik (D.C. Bar No. pending)
AIR LINE PILOTS ASSOCIATION,
   INTERNATIONAL
LEGAL DEPARTMENT
1625 Massachusetts Avenue, N.W.
Washington, DC  20036
Phone:  (202) 797-4095
Fax:  (202) 797-4014

</div>

Of Counsel:

Peter Herman (*pro hac vice* application forthcoming)
COHEN, WEISS AND SIMON LLP
330 West 42d Street
New York, New York  10036
(212) 356-0209

Andrew S. Marovitz (*pro hac vice* application forthcoming)
Andrew S. Rosenman (*pro hac vice* application forthcoming)
Debra Bogo-Ernst (*pro hac vice* application forthcoming)
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, Illinois  60606
(312) 782-0600

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| RAYMOND GARAVITO, RAFAEL RODRIGUEZ, and ELLI MIZRAHI, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | Case No. 1:07-cv-00384 (PLF) |
| AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, | ) ) ) | |
| Defendant. | ) ) ) | |

**MOTION OF DEFENDANT AIR LINE PILOTS ASSOCIATION, INTERNATIONAL TO TRANSFER PURSUANT TO 28 U.S.C. § 1404(a)**

Defendant Air Line Pilots Association, International ("ALPA") moves pursuant to 28 U.S.C. §1404(a) to transfer this proceeding to the United States District Court for the Northern District of Illinois, where two cases arising out of the same transaction are currently pending. In support of this motion, ALPA submits the attached memorandum, the Declaration of Captain Mark Bathurst, and a proposed Order.

February 28, 2007

Respectfully submitted,

*Clay Warner*

Clay Warner  (D.C. Bar No. 398346)
David Semanchik (D.C. Bar No. pending)
AIR LINE PILOTS ASSOCIATION,
    INTERNATIONAL
LEGAL DEPARTMENT
1625 Massachusetts Avenue, N.W.
Washington, DC  20036
Phone:  (202) 797-4095
Fax:  (202) 797-4014

Of Counsel:

Peter Herman (*pro hac vice* application forthcoming)
COHEN, WEISS AND SIMON LLP
330 West 42d Street
New York, New York  10036
(212) 356-0209

Andrew S. Marovitz (*pro hac vice* application forthcoming)
Andrew S. Rosenman (*pro hac vice* application forthcoming)
Debra Bogo-Ernst (*pro hac vice* application forthcoming)
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, Illinois  60606
(312) 782-0600

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT OF
## THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| JOHN P. MANSFIELD, JR., MICHAEL W. BALLARD, JERRY H. GALLUD, MICHAEL GLAWE, DENNIS HOLMAN, RICHARD E. MILLER, JR., and PAUL R. WHITEFORD, JR., Individually and on Behalf of All Others Similarly Situated, | )<br>)<br>)<br>) No. 06 CV 6869<br>)<br>) Judge Matthew F. Kennelly<br>) |
| Plaintiffs, | ) Magistrate Judge Ashman<br>) |
| v. | ) AMENDED CLASS<br>) ACTION COMPLAINT<br>) |
| AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, | )<br>)<br>) |
| Defendant. | ) |

## FIRST AMENDED COMPLAINT FOR DAMAGES

Plaintiffs John P. Mansfield, Jr., Michael W. Ballard , Jerry H. Gallud , Michael Glawe,

Dennis Holman, Richard E. Miller, Jr., and Paul R. Whiteford, Jr. (collectively, "Plaintiffs"),

individually and on behalf of all others similarly situated, bring this action against defendant Air

Line Pilots Association, International ("ALPA" or "Defendant"), and state as follows:

## SUMMARY OF CLAIMS

1.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules

of Civil Procedure against defendant ALPA for breach of the union's duty of fair representation

under the Railway Labor Act ("RLA"), 45 U.S.C. § 151 et seq.  Plaintiffs, who all were active

senior pilots of United Airlines, Inc. ("United") as of December 30, 2004 (i.e., a pilot who had

approximately 17 years or more participation in United's defined benefit pension plan), seek to

represent a class of  similarly situated  active senior pilots as of that date, which Class is defined

more specifically in paragraph 31 below. United pilots who were retired as of December 30, 2004 are not members of the Class.

2.        ALPA – acting through its United Master Executive Council ("United MEC" or "MEC") – is in the process of taking from Plaintiffs and the Class more than $130 million in compensation for certain hard earned, accrued and vested pension benefits to which they are entitled and giving it to the United MEC members and United's junior pilots, who have no reasonable claim to such funds. The junior pilots comprise a majority of United's pilots and are politically more powerful than the members of the Class and thus more favored by the union. ALPA's actions are violating the basic tenets of collective bargaining representation which prohibits a union from discriminating against a minority group within the union through arbitrary, hostile and bad faith conduct, including neglecting the interests of a union minority solely to advantage the membership majority or taking action for the sole purpose of benefitting a stronger, more politically favored group over a minority segment of the union (e.g., Plaintiffs and Class members).

3.        Plaintiffs' claims arise out of ALPA's allocation of the proceeds from the sale of $550 million in securities (the "Pilot Notes" or "Notes") which were issued by United's parent corporation to ALPA in connection with United's recently-concluded bankruptcy proceedings. As United stated to its pilots in July 2006, the Notes were to partially offset the pension benefits that United's active pilots lost when their defined benefit pension plan (the "Pilot Plan" or "Plan") was terminated in United's bankruptcy, which termination was effective December 30, 2004.

4.        Prior to its termination, United pilots accrued vested benefits under the Plan based on the number of years they worked for the airline and the amount of their earnings, with benefits

accruing after one year of employment with United and vesting after five years participation in the Pilot Plan.

5.    The amount of a pilot's vested benefits under the Pilot Plan at the date of Plan termination is essentially computed by looking at the number of years of participation in the Plan and the pilot's "Final Average Earnings" over a defined period prior to the termination date. In other words, vested benefits under the Plan are based on the years of service a pilot *actually worked* at United *before* the termination of the Plan, and *not* on the number of years a pilot may *want to* or *expect to* or *believe that he might* work at United *after* the Plan is terminated. Vested benefits look back based on *actual facts*, not forward based on *speculation of an unknown future*.

6.    Because pension benefits under the Pilot Plan accrued to United's pilots based on the number of years they particpated in the Plan and their earnings before its termination, United's active senior pilots had more vested benefits under the Plan than the junior pilots. Vested benefits under the terminated Pilot Plan are guaranteed by the Pension Benefit Guaranty Corporation ("PBGC") – a federal corporation created by ERISA – up to a statutory maximum annual benefit of approximately $28,500 for airline pilots, who are required by federal regulation to retire at age 60.

7.    By the time the Pilot Plan terminated in December 2004, the benefits accrued by most of the junior pilots (as well as most of the members of United's MEC) did not exceed the maximum benefit guaranteed by the PBGC. This means that most of the junior pilots and most of the United MEC members will be compensated by the PBGC for the vested benefits they lost as a result of the termination of the Plan. On the other hand, Plaintiffs and the Class members' vested benefits greatly exceed the maximum benefit guaranteed by the PBGC, which means that the Plaintiffs – unlike the junior pilots – have actual, realized losses resulting from the Plan termination that will *not* be

-3-

compensated by PBGC payments when they retire. These actual losses approximate the difference between Plaintiffs' vested benefits which they earned under the Pilot Plan by the time of its termination and the PBGC insurance payments they will receive on retirement.

8.      The Pilot Notes issued by United were intended to compensate the active pilots for their losses, in part, resulting from the termination of the Pilot Plan. The only losses actually realized by the active pilots from the termination of the Plan are the accrued and vested (i.e, nonforfeitable) benefits they earned as of the termination date (December 30, 2004). Indeed, Section 2.5 of the Pilot Plan states:

> **2.5 Participation Not Contract of Employment.** The Plan does not constitute a contract of employment and participation in the Plan will not, of itself, give any employee the right to be retained in the employ of the Company, nor give any person any right or claim to any benefit under the Plan, unless such right or claim has specifically accrued under the provisions of the Plan.

9.      This "vested benefits" approach in determining pilot losses from the termination of the Pilot Plan is therefore consistent with the Plan itself (as with any other defined benefit pension plan) under which a pilots' retirement benefits accrued the longer the pilot worked and participated in the pension plan. In fact, Steven Presser (ALPA's financial advisor and, on information and belief, the architect of the Pilot Notes) stated several times publicly that the Notes were intended to replace about 80% of the active pilots' losses from the termination of the Pilot Plan (after expected PBGC payments were taken into consideration), which 80% figure could only be true utilizing a "vested benefits" methodology of determining pilot losses.

10.     This "vested benefits" approach in determining pilot losses from the termination of the Pilot Plan is also consistent with the purpose and spirit of the PBGC itself, which was created by Congress to guarantee pension benefits to employees (up to a statutory maximum), *but only if*

*such benefits are <u>actually</u> <u>vested</u> by the time the plan is terminated* (i.e., once a plan is terminated,

participants *cannot* earn additional benefits under the plan).

11.     The "vested benefits" approach is also consistent with the purpose and spirit of the

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.A. § 1001, et seq., which

was adopted to protect an employees' *vested* benefits under an employers' retirement plan. It is

consistent with bankruptcy law generally because the United pilots would only have a bankruptcy

claim for pension benefits that actually *accrued* and would not have a claim for benefits they haven't

yet earned.

12.     And, of course, the "vested benefits" approach is consistent with the pilots'

expectations in their dealings with the union and United generally because, as ALPA admitted in a

recent July 2006 communication to its members: "As pilots, we are used to seniority being given

precedence over other issues, as it is in almost every other aspect of our professional lives."

13.     On information and belief, the United MEC therefore first considered an allocation

methodology for the proceeds from the sale of the Pilot Notes based on the pilots' actual losses from

the termination of the Pilot Plan based on the pilots' vested benefits that would *not* be replaced with

the PBGC payments upon retirement (i.e., the "vested benefits" approach). The "vested benefits"

approach is substantially similar to what the United MEC referred to as the "GAP 1" methodology.

However, on information and belief, the members of the United MEC very quickly realized that most

of them and most of the United pilot union membership (the majority of which consist of junior

pilots) would receive very little, if anything, from the proceeds of the $550 million in Pilot Notes

because their realized losses from the termination of the Pilot Plan will be largely compensated by

PBGC payments upon retirement.

-5-

14.    The United MEC members knew that, although the senior pilots are the ones that will suffer the most because they have more actual losses from the termination of the Pilot Plan, a vested benefits methodology that would allocate the proceeds from the Pilot Notes primarily to the minority senior pilots would be unpopular among the majority junior pilots and therefore jeopardize the MEC members' positions of power with the union. Therefore, on information and belief, because the junior United pilots (forming the majority of ALPA union members) were crucial in voting the MEC members into power and are crucial in keeping the MEC members in power (through future voting), the United MEC decided that it would have to keep these majority junior pilots happy by providing them with a substantial portion of the proceeds of the Pilot Notes *regardless of whether they will suffer any actual losses from the termination of the Pilot Plan.* The United MEC accordingly rejected the vested benefits, "GAP1" methodology for allocation of the proceeds of the Pilot Notes.

15.    The MEC arbitrarily decided to allocate to the junior pilots (and most of the MEC's own members) a portion of the Pilot Note proceeds to which they would not otherwise be entitled under an actual loss/vested benefits methodology by reducing the senior pilots' rightful share of the proceeds by more than $130 million and transferring it to the junior pilots. This was accomplished, on information and belief, by inventing what the MEC has called the "GAP 2" allocation methodology. Under such an allocation, most of the junior pilots and MEC members will receive *more* than the benefits they actually accrued under the Pilot Plan upon its termination (considering the fact that the junior pilots' actual losses from the Pilot Plan termination will already be largely compensated by the PBGC).

16.    In essence, the "GAP 2" methodology creates and awards to United's junior pilots certain "phantom benefits" that they did not actually *earn* under the Pilot Plan as of the date of its

termination in December 2004. That is, instead of looking at the amount of vested benefits that the pilots actually lost by the termination of the Pilot Plan and allocating the Pilot Notes in accordance with these actual losses, the "GAP 2" methodology creates a fiction whereby a pilots' estimated "losses" are computed *as if the Pilot Plan* <u>*continued*</u> *and each pilot remained in the plan and continued to earn pay increases and accrue Plan benefits until that pilot's attainment of retirement age of 60 years old.*

17.     In effect, the majority junior pilots – although not vested in these "phantom benefits" as of the termination of the Pilot Plan and not having any legal claim to such benefits in United's bankruptcy proceedings – are being awarded benefits under "GAP 2" that they never actually earned *– all at the expense of the senior pilots (i.e. Plaintiffs and the other Class members) who worked at United for many more years and who reasonably expected to receive the pension benefits* <u>*that they actually earned*</u>**.** The "GAP 2" methodology creates an additional (and irrational) recovery for the junior pilots whose losses from the termination of the Plan are already compensated by the PBGC. These phantom benefits, however, can only be awarded to the majority junior pilots if a corresponding amount is taken away from the vested benefits that <u>*were earned*</u> by the minority senior pilots under the Pilot Plan, since the "pie" itself to be allocated (i.e., the $550 million in Notes) is a fixed amount.

18.     The unreasonableness of ALPA's actions – undertaken through the United MEC – is emphasized by the fact that, although the GAP 2 methodology assumes that a junior pilot will work until the pilot retires at age 60, nothing obligates him to do so. The assumption that a junior pilot *will* continue to work at United until he retires, *let alone continue as an airline pilot,* is itself irrational and unsupported. For example, among airline pilots 40 years old and younger polled in

-7-

2005 by the Wilson Center for Public Relations – a polling firm that polls various labor groups

(including ALPA pilots with the encouragement of ALPA) – *one-third* of them said they plan to

leave the piloting profession *before* age 60. In fact, about fifteen percent of the younger pilots polled

indicated a strong likelihood of leaving the airline industry within *just the next five years*. Their

principal reason is that they feel they made a "mistake" in choosing the piloting profession and are

young enough to start a different career. In addition:

> For many younger Baby-Boom-aged pilots, the notion of flying for the rest of their
> careers under current conditions is simply not viable, especially with changes in
> scheduling and work rules since 9/11 having significantly increased pilot fatigue.

Comstock, Talkin' 'Bout Your Generation, *Air Line Pilot*, February 2006, p. 9.

19.     As alleged below, the Pilot Plan was terminated by court order on June 13, 2006

(effective as of December 30, 2004). United thereafter issued to ALPA the $550 million (face value)

of Pilot Notes in accordance with its post-bankruptcy agreement with the union, and in July 2006

ALPA sold the Notes for a net sum of $545.5 million. In August 2006, ALPA made its first

distribution of approximately $355 million from the proceeds of the Pilot Notes to the pilots utilizing

its invented "phantom benefits" GAP2 methodology. ALPA has stated that the balance of the Note

proceeds (about $185 million) will be distributed following the GAP2 methodology in early 2007.

20.     By distributing the proceeds from the sale of the Pilot Notes under the invented

"phantom benefits" GAP2 methodology, ALPA – through the United MEC – is, *inter alia*, unfairly

discriminating against the senior pilots, neglecting the interests of the minority Plaintiff Class solely

to advantage the union membership majority, acting for the sole purpose of benefitting the stronger,

more politically favored junior pilots (as well as the majority of the MEC's own members) at the

expense of the weaker minority senior pilots, is engaging in self-dealing and has breached and

threatens to continue breaching its duty of fair representation to the Plaintiffs and the other Class members.

## **THE PARTIES**

21.     Plaintiff John Mansfield, Jr., is a resident of Illinois.  As of December 30, 2004, Mansfield was an active United pilot who had  participated in the Pilot Plan 25 years.  Mansfield received his first distribution from the proceeds of the Pilot Notes under the GAP2 methodology in August 2006 and ALPA has informed him that he will receive the balance of his GAP2 allocation in early 2007.  Mansfield  estimates that he would receive in excess of $100,000 more under a vested benefits  "GAP1" approach than the ALPA-invented, "phantom benefits" GAP2 methodology.

22.     Plaintiff Michael W. Ballard ("Ballard"), is a resident of Colorado. As of December 30, 2004, Ballard was an active United pilot who had  participated in the Pilot Plan for 26 years. Ballard received his first distribution from the proceeds of the Pilot Notes under the GAP2 methodology in August 2006 and ALPA has informed him that he will receive the balance of his GAP2 allocation in early 2007.  Ballard estimates that he would receive in excess of $200,000 more under a vested benefits  "GAP1" approach than the ALPA-invented, "phantom benefits" GAP2 methodology.

23.     Plaintiff Jerry H. Gallud ("Gallud"), is a resident of California.  As of December 30, 2004, Gallud was an active United pilot who had  participated in the Pilot Plan for 26 years.  Gallud received his first distribution from the proceeds of the Pilot Notes under the GAP2 methodology in August 2006 and ALPA has informed him that he will receive the balance of his GAP2 allocation

in early 2007.  Gallud estimates that he would receive in excess of $375,000 more under a vested

benefits  "GAP1" approach than the ALPA-invented, "phantom benefits" GAP2 methodology.

    24.    Plaintiff Michael Glawe ("Glawe"), is a resident of Illinois.  As of December 30,

2004, Glawe was an active United pilot who had  participated in the Pilot Plan for 26 years.  Glawe

received his first distribution from the proceeds of the Pilot Notes under the GAP2 methodology in

August 2006 and ALPA has informed him that he will receive the balance of his GAP2 allocation

in early 2007.  Glawe estimates that he would receive in excess of $240,000 more under a vested

benefits  "GAP1" approach than the ALPA-invented, "phantom benefits" GAP2 methodology.

    25.    Plaintiff Dennis Holman ("Holman"), is a resident of Illinois.  As of December 30,

2004, Holman was an active United pilot who had  participated in the Pilot Plan for 26 years.

Holman received his first distribution from the proceeds of the Pilot Notes under the GAP2

methodology in August 2006 and ALPA has informed him that he will receive the balance of his

GAP2 allocation in early 2007.  Holman estimates that he would receive in excess of $250,000 more

under a vested benefits  "GAP1" approach than the ALPA-invented, "phantom benefits" GAP2

methodology.

    26.    Plaintiff Richard E. Miller, Jr. ("Miller"), is a resident of Illinois.  As of December

30, 2004, Miller was an active United pilot who had  participated in the Pilot Plan for 25 years.

Miller received his first distribution from the proceeds of the Pilot Notes under the GAP2

methodology in August 2006 and ALPA has informed him that he will receive the balance of his

GAP2 allocation in early 2007.  Miller estimates that he would receive in excess of $275,000 more

under a vested benefits  "GAP1" approach than the ALPA-invented, "phantom benefits" GAP2

methodology.

27.    Plaintiff Paul R. Whiteford, Jr. ("Whiteford"), is a resident of Florida. As of December 30, 2004, Whiteford was an active United pilot who had participated in the Pilot Plan for 26 years. Whiteford received his first distribution from the proceeds of the Pilot Notes under the GAP2 methodology in August and ALPA has informed him that he will receive the balance of his GAP2 allocation in early 2007. Whiteford estimates that he would receive in excess of $200,000 more under a vested benefits "GAP1" approach than the ALPA-invented, "phantom benefits" GAP2 methodology.

28.    At all times relevant herein, Defendant ALPA was the certified collective bargaining representative under the RLA, 45 U.S.C. § 151 et seq., for all active United pilots, including Plaintiffs and the Class members. At all times relevant herein, ALPA represented – and owed a duty of fair representation to – all active United pilots as of December 30, 2004, regarding all matters relating to the allocation of the Pilot Note proceeds, whether or not such pilots retired after December 30, 2004. ALPA did not represent United pilots who were retired as of December 30, 2004 (and who are not members of the Class).

29.    In addition to a national office, ALPA has established a Master Executive Council ("MEC") for each airline at which it represents employees. The MEC for each airline serves as the coordinating council for ALPA members at that airline.

30.    Under ALPA's constitution and bylaws, the United pilots elect a United MEC to serve as their representative body within ALPA. The United MEC does not have its own constitution and bylaws, but operates as an agent of ALPA on those matters delegated to it by ALPA. Under its agreement with United, ALPA had the responsibility to reasonably determine the allocation method of the Pilot Notes and/or their proceeds to United's active pilots. ALPA is exercising the

-11-

improper acts complained of herein by authorizing its agent, the United MEC (which has its headquarters in this judicial district), to allocate the Pilot Notes proceeds as discussed herein.

## CLASS ACTION ALLEGATIONS

31.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. **Plaintiffs seek to represent a class of persons (the "Class") consisting of all active United pilots as of December 30, 2004, who would receive more from the allocation of the Notes proceeds under a vested benefits, GAP1 methodology than under the "phantom benefits," GAP 2 methodology used by ALPA.** After reasonable investigation by Plaintiffs' counsel based on information prepared by ALPA, Plaintiffs presently believes that the Class would thereby consist of all active United pilots as of December 30, 2004 who had at least 17 years of participation ("YOP") in the Pilot Plan as of December 30, 2004. Excluded from the Class are United pilots who were retired as of December 30, 2004.

32.    The members of the Class are so numerous that joinder of all members is impracticable. After investigation by Plaintiffs' counsel, Plaintiffs reasonably believe that there are in excess of 1800 members of the Class out of approximately 7,000 active United Pilots as of December 30, 2004.

33.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(A)    whether ALPA utilized the "GAP2" methodology solely for the benefit of a stronger, more politically favored group of union members over a weaker minority group (i.e. Plaintiffs and the Class members );

-12-

(B)    whether ALPA utilized the "GAP2" methodology without hostility or discrimination toward any union members;

(C)    whether ALPA exercised its discretion regarding an allocation method with complete good faith, honesty and without any self-dealing;

(D)    whether ALPA's actions in utilizing the "GAP2" methodology were arbitrary, capricious, unreasonable, hostile or in bad faith;

(E)    whether Plaintiffs and the Class members suffered damages as a result of ALPA's breach of its duty of fair representation; and

(F)    the appropriate relief for Plaintiffs and the Class from ALPA's breach of its duty of fair representation.

34.    Plaintiffs' claims and defenses are typical of the claims and defenses of the Class members.

35.    Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained competent counsel experienced in class action litigation in state and federal courts nationwide and Plaintiffs have no interest adverse to any Class member. Plaintiffs intend to prosecute this case vigorously on behalf of themselves and the Class.

36.    Class certification is proper under Rule 23(b)(1)(A) of the Federal Rules of Civil Procedure because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual members of the Class and establish incompatible standards of conduct for Defendant.

37.    Class certification is proper under Rule 23(b)(1)(B) of the Federal Rules of Civil Procedure because the prosecution of separate actions by individual Class members would create a

-13-

risk of adjudications with respect to individual Class members that would, as a practical matter, be dispositive of the interests of the other members not parties to this adjudication and/or substantially impair their ability to protect these interests.

38.    Class certification is proper under Rule 23(b)(2) of the Federal Rules of Civil Procedure because ALPA has acted, or refused to act, on grounds generally applicable to the Class, thereby making final injunctive relief or corresponding declaratory relief appropriate for the Class.

39.    Class certification is proper under Rule 23(b)(3) of the Federal Rules of Civil Procedure because common issues of law and fact predominate over any questions affecting only individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

40.    The need for class-wide notice does not provide a barrier to certification because notice can be effectively disseminated to the Class by techniques customarily used in consumer class actions, including published notice, Internet notice and direct mailings.

## NON-PARTIES UNITED AIRLINES AND UAL CORP

41.    Non-party United Airlines and its affiliates recently emerged from Chapter 11 bankruptcy proceedings – initially filed in December 2002 – through the confirmation in January 2006 by the United States Bankruptcy Court for the Northern District of Illinois of United's Second Amended Joint Plan of Reorganization ("Plan of Reorganization"). The Plan of Reorganization became effective and United formally exited bankruptcy on February 1, 2006 (the "Exit Date").

42.    Non-party UAL Corporation ("UAL") is the holding company for United and its affiliates. UAL issued the $550 million in Pilot Notes discussed herein in July 2006which were then sold by ALPA for about $545.5 million.

-14-

## JURISDICTION AND VENUE

43.    This court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1337 in that it arises under the laws of the United States and Acts of Congress regulating commerce, specifically the RLA, 45 U.S.C. § 151 et seq., and the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.A. § 1001, et seq.

44.    Venue is proper in this Court under 28 U.S.C. § 1391(b) because the Defendant resides, maintains offices, and does business in this judicial district and because a substantial part of the events giving rise to Plaintiffs' claim arose in this district.

## COMMON ALLEGATIONS

### A.    United Agrees To Give United Pilots $550 Million Convertible Notes In Consideration For The Termination Of The Pilot Plan

45.    Pursuant to a collective bargaining agreement between United and ALPA, United maintained the Pilot Plan and served as the Plan's sponsor and administrator for the benefit of its pilots. The collective bargaining agreement generally governed pilot pay, working conditions and benefits for United's pilots.

46.    The Pilot Plan provided for both tax-qualified and non-tax-qualified pension benefits; the former being insured by the Pension Benefit Guaranty Corporation ("PBGC") and protected by the provisions of ERISA relating to the termination of pension plans. 29 U.S.C. §§ 1321(a), (b)(8). The PBGC insures vested rights under ERISA pension plans. 29 U.S.C. § 1322(a).

47.    On December 9, 2002, United (and its parent company and affiliates) filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court").

-15-

48.     Normally, a bankruptcy trustee or a debtor in possession can freely reject the executory portion of a contract of the debtor.  Section 1113 of the Bankruptcy Code, however, permits the rejection of the executory portion of a collective bargaining agreement only with the approval of the bankruptcy court after negotiations with the union seeking modifications to the agreement, 11 U.S.C. § 1113(b)(2), and, if such negotiations fail, only if the bankruptcy judge determines that "the balance of the equities clearly favors rejection of such agreement." 11 U.S.C. § 1113(c)(3). Under ERISA, a pension plan can only be terminated by approval of the bankruptcy court through either a voluntary termination under 29 U.S.C. § 1341 – where the employer asks for termination – or an involuntary termination under 29 U.S.C. § 1342 – where the PBGC asks for termination.

49.     In early November 2004 United presented its unions with opening proposals for consensual modifications to United's collective bargaining agreements.  On November 24, 2004, United filed a motion for authority under Section 1113(c) of the Bankruptcy Code to reject its collective bargaining agreements.  The motion sought, *inter alia*, the removal of any requirement in the agreements that United maintain any defined benefit pension plans.

50.     After filing the Section 1113 motion, United proceeded to the negotiation phase with ALPA, which represented the interests of United's active pilots (including each of the Plaintiffs) in the negotiations.

51.     In December 2004, United and ALPA reached an agreement (the "Letter Agreement") on the terms of a modified collective bargaining agreement to resolve the Section 1113 proceedings. Under the Letter Agreement, ALPA agreed to waive any claim it had that the termination of the Pilot Plan would violate the terms and conditions of the existing collective bargaining agreement and

-16-

agreed not to otherwise oppose United's efforts to terminate the Pilot Plan under the voluntary

termination provision of 29 U.S.C. § 1341. The Letter Agreement also provided that the Pilot Plan

would remain in full force and effect until United met the requirements for a distress termination

under Section 1341(c) of ERISA.

52.     Section 7 of the Letter Agreement provides:

7. <u>Convertible Notes</u>. In the event that the A Plan is terminated pursuant to
29 U.S.C. § 1341 or § 1342 following judicial approval of such termination, the
Revised 2003 Pilot Agreement and the Plan of Reorganization shall provide for the
issuance of $550 million of UAL convertible notes, as described in Exhibit D to this
Letter of Agreement, to a trust or other entity designated by [ALPA]. The terms of
the UAL convertible notes described in Exhibit D shall be subject to mutually-
acceptable modifications to optimize implementation for all parties from an
accounting, securities law and tax law perspective.

53.     Exhibit D to the Letter Agreement provides that the Pilot Notes are to be distributed

as follows:

[To a] trust or similar non-permanent vehicle for the benefit of eligible United pilots;
the Notes or the value of the Notes to be distributed to such pilots or pilot retirement
accounts as soon as reasonably practicable given tax, accounting, securities and
market considerations; all rights of the Notes to be exercised by individual pilots
while the notes remain in the trust. Distribution mechanics, eligibility and allocation
among such pilots to be reasonably determined by [ALPA].

54.     United asked the Bankruptcy Court to approve the Letter Agreement under 11 U.S.C.

§ 363(b)(1), which requires that court approval be obtained for contracts made by the debtor during

the bankruptcy that are outside the ordinary course of business. The Bankruptcy Court subsequently

approved the Letter Agreement by order dated January 31, 2005.

55.     The order of approval extinguished any rights that United's retired pilots may have

had under the collective bargaining agreement. The order itself did not, however, terminate the Pilot

Plan. For that to happen, United still had to make application to this Court (i.e., the United States

-17-

District Court for the Northern District of Illinois) to approve the voluntary termination of the Plan by United under the distress termination provisions of 29 U.S.C. § 1341(c), or the Plan would have to be terminated after application by the PBGC under the involuntary termination provisions of 29 U.S.C. § 1342.

**B.     The Pilot Plan Is Terminated.**

56.     On December 29, 2004 – a few days after ALPA announced that it had reached an agreement with United regarding the termination of the Pilot Plan – the PBGC sent a Notice of Determination to United informing United of its determination that the Pilot Plan would have to be terminated "because the possible long-run loss of the [PBGC] with respect to the Plan may reasonably be expected to increase unreasonably if the Plan is not terminated." The PBGC informed United that the effective date of the termination would be December 30, 2004. On that date, the PBGC filed a Complaint in this District Court seeking an order terminating the Pilot Plan and appointing the PBGC as the statutory trustee of the Plan.

57.     In January 2005, the PBGC's termination action was referred to the Bankruptcy Court, which subsequently held a bench trial beginning on September 21, 2005. Following the trial (and after the disposition of certain appeals relating to the Bankruptcy Court proceedings), the matter was returned to the District Court with the Bankruptcy Court's proposed findings of fact and conclusions of law. The Bankruptcy Court recommended a finding that the PBGC met its burden under 29 U.S.C. § 1342 of establishing that termination of the Pilot Plan was necessary to avoid an unreasonable increase in the PBGC's liability for vested Plan benefits under ERISA, with an effective termination date of December 30, 2004.

58.    On June 13, 2006, the District Court issued its Memorandum Opinion and Order, which accepted the Bankruptcy Court's proposed findings of fact and conclusions of law (with certain modifications). On the same day, the District Court issued its decree terminating the Pilot Plan, with an effective termination date of December 30, 2004.

**C.    ALPA Discriminates Against The Senior Pilots By Distributing The Proceeds From The Pilot Notes Using The "GAP2" Methodology .**

59.    As noted above, the Letter Agreement provided that the distribution mechanics, eligibility and allocation among the active pilots was to be reasonably determined by ALPA. ALPA delegated the determination of the distribution mechanics, eligibility and allocation among the active pilots to the United MEC.

60.    The United MEC has stated to its members on numerous occasions (both in writing and orally) that the Pilot Notes were given by United as partial compensation for the pilots' losses from the termination of the Pilot Plan, as opposed to compensation for other concessions given by United's pilots during United's bankruptcy proceedings such as wage concessions. To accommodate other interests, the Letter Agreement provided for other compensation to be paid to United pilots in the form of new equity securities for such other pilot concessions.

61.    In fact, in a letter written by United to its active pilots dated July 18, 2006, United stated:

> As part of United Plan of Reorganization, many employees will be receiving cash proceeds from the sale of what are known as convertible notes. These notes, approved by the Bankruptcy Court, partially offset the retirement benefits that active employees lost when United's pension plans were terminated and replaced. They are unrelated to the equity grants that nearly all employees received earlier this year in recognition of the reductions in wages and benefits agreed to as part of the 1113 process of our Chapter 11 restructuring.

-19-

62. In connection with the union's ratification of the Letter Agreement creating the $550 million in Pilot Notes and giving ALPA "reasonable" discretion in determining how to distribute the Notes, ALPA began considering the methods to employ in eligibility, allocation and distribution of the Notes. The only *reasonable* way, of course, would be to determine what each pilot would actually lose upon the termination of the Pilot Plan by looking at the vested benefits the pilot had earned under the Plan prior to termination based on the number of years of participation each pilot had in the Plan. From these total losses would be deducted the amounts that each pilot would receive from the PBGC from insured qualified benefits to determine the pilots' actual losses from termination of the Pilot Plan (referred to herein as the "vested benefits" approach).

63. The senior pilots who had contributed the most to the Plan by working for United the longest amount of time in anticipation of receiving the benefits defined thereunder upon retirement stood to lose the most by the termination of the Pilot Plan. Indeed, the years of participation an employee had in a defined benefit plan had for years prior to the United bankruptcy had been the primary method of allocation of plan assets under ERISA upon the termination of defined benefit pension plans. On information and belief, this "phantom benefits" approach has never before been used by ALPA in dealing with issues relating to defined benefit pension plans such as the Pilot Plan.

64. The junior pilots, on the other hand, had been contributing to the Pilot Plan for a significantly lesser period than the senior pilots and therefore stood to lose less, if anything, by its termination. The majority of the junior pilots had not accrued benefits under the Pilot Plan by the date of its termination that exceeded the statutory maximum for the benefits guaranteed by the PBGC and, therefore, their actual lost vested benefits from the termination of the Pilot Plan would be

-20-

largely compensated by PBGC payments without receiving any amounts from the proceeds of the Notes.

65.     On information and belief, after quickly realizing that the vested benefits approach meant that most of the junior pilots would not share in the distribution of the proceeds from the Pilot Notes because they will have suffered no *actual* losses from the termination of the Pilot Plan, and that a distribution plan that excluded the junior pilots from sharing in the $550 million in Pilot Notes would be politically unpopular with the junior pilots, and knowing that the more politically powerful junior pilots were the individuals who would either keep ALPA's current United MEC in power or vote in new representatives, the United MEC decided that it had to adopt a distribution plan that would favor the interests of the junior pilots over the senior pilots by taking from the senior pilots their fair share of the Pilot Notes and transferring to the junior pilots a portion of the proceeds of the Notes they never would have gotten under the vested benefits methodology.

66.     ALPA, through its United MEC, therefore devised a way to give the junior pilots more of the Note proceeds than they were entitled to by adopting the "GAP 2" methodology, which essentially creates and awards to United's junior pilots certain "phantom benefits" that they would not otherwise have earned under the Pilot Plan as of its termination. That is, instead of looking at the amount of lost vested benefits under the Pilot Plan and allocating the Pilot Notes in accordance with each pilots' actual losses, the MEC's "GAP 2" methodology creates a fiction whereby a pilots' projected losses from the termination of the Pilot Plan are computed essentially *as if the Pilot Plan continued and each pilot remained in the plan and continued to earn pay increases until that pilot's attainment of retirement age of 60 years old.* In effect, the junior pilots – although not actually entitled to the benefits as of the termination of the Pilot Plan and not having any legal claim to such

-21-

benefits in United's bankruptcy proceedings – are awarded "phantom" benefits in ALPA's calculation of a pilot's purported "losses" from the termination of the Pilot Plan without being obligated to actually work for United in the future.

67.    In this way, ALPA'S United MEC figured out how to award the more politically powerful junior pilots *as well as themselves* a portion of the Pilot Notes to which they are not entitled. This additional share, however, can only come from the senior pilots' share of the Notes. And (as discussed above) the junior pilots' "take" under the "GAP 2" approach would be given to the junior pilot without any obligation whatsoever for him to stay and work at United until he actually reaches retirement age of 60 years old. Giving the junior pilots more than they accrued under the terminated Pilot Plan by essentially taking away vested benefits of the senior pilots is arbitrary, irrational, hostile and discriminatory towards the senior pilots who have actually *earned* their benefits by working for United for many more years than their junior counterparts

68.    The issuance of the $550 million in Pilot Notes, and thus the allocation of the Note proceeds under the "GAP2" approach, was contingent on the termination of the Pilot Plan.   As discussed above, that   contingency – which was fought over by various parties in United's bankruptcy proceedings – was removed on June 13, 2006, when the District Court issued its decree terminating the Pilot Plan with an effective termination date of December 30, 2004. On July 4, 2006, the United MEC announced to United's active pilots in an email that the "GAP 2" allocation method "is no longer under review," and informed them that they would be asked to vote on the mechanics for *distribution* (for tax purposes).

-22-

## ALPA'S BREACH OF ITS DUTY OF FAIR REPRESENTATION

69.    Plaintiffs reallege and incorporate by reference paragraphs 1-68 above as if fully set forth herein.

70.    Plaintiffs assert herein a claim against ALPA for its breach of duty of fair representation under the Railway Labor Act.  Under the RLA, ALPA, as the exclusive bargaining agent of United's pilots, owes to the Plaintiffs a duty of fair representation.  This duty encompasses the obligation to serve the interests of all United pilots without hostility or discrimination toward any, to exercise its discretion with complete good faith, and honesty and to avoid arbitrary conduct.  The objective of the duty of fair representation is to provide substantive and procedural safeguards for minority members of the collective bargaining unit.

71.    A union breaches its duty of fair representation if, *inter alia*, it intentionally causes harm to an employee, discriminates against an employee or employee group, neglects the interests of a membership minority solely to advantage the membership majority, or by acting for the sole purpose of benefitting a stronger, more politically favored group over a minority segment of the union.

72.    ALPA has breached its duty of fair representation to Plaintiffs and the Class by discriminating against, expressing hostility and acting with animosity towards them and choosing the interests of the stronger, more politically favored group of junior pilots over the interests of Plaintiffs and Class members in the allocation of the Pilot Note proceeds.

73.    ALPA's allocation of the Pilot Notes proceeds using the "GAP 2" methodology is arbitrary, discriminatory, unreasonable and in bad faith and constitutes a violation of its duty of fair representation.

74.    ALPA's use of the "GAP 2" methodology for the distribution of the Pilot Notes has, *inter alia*, effectively deprived Plaintiffs and the Class of their rightful allocation to the Pilot Notes thereby causing them to lose millions of dollars to which they are entitled, particularly because the Notes were being issued in compensation for the termination of the Pilot Plan and Plaintiffs and the Class have contributed longer and have suffered greater losses from such termination than the junior, more politically favored group of ALPA pilots.  ALPA's discriminatory substitution of a contrived distribution formula with phantom amounts in place of vested benefits as a polestar is irrational. ALPA's chosen "GAP 2" methodology is not the result of good faith actions.

75.    ALPA's discriminatory treatment of senior pilots violates public policy. ALPA failed to act in conformance with the cornerstone labor practice of reference to seniority. ALPA's "GAP 2" methodology does not reflect the themes of labor relations:  pension benefits are tied to and will vest as a result of service; accrued rights take preference over future expectancies; and avoiding disparate impact on older workers.

76.    ALPA's ex post facto discrimination is unreasonable.  ALPA's duty of fair representation to all of its members requires that it make reasonable decisions on its members' behalf. ALPA's decision to distribute the Notes according to "GAP 2" methodology unreasonably provides a windfall to the junior pilots at the expense of the senior pilots. ALPA's distribution has caused and, with the final distribution, will cause Plaintiffs and the Class to lose in excess of $130 million to which they are entitled, particularly because the Notes were issued in compensation for the termination of the Pilot Plan and Plaintiffs and the Class have contributed longer and have suffered greater losses from such termination than the junior, more politically favored group of ALPA pilots.

**WHEREFORE**, Plaintiffs request that the Court:

A.    Award Plaintiffs and the other Class members compensatory damages in an amount to be determined herein, including pre- and post-judgment interest;

B.    Award Plaintiffs and the other Class members  their reasonable attorneys fee and costs of suit; and

C.    Such other and further relief as is just and proper under the circumstances.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues triable by right by a jury herein.

Dated: January 23, 2007                              Respectfully submitted,


_____
One of Plaintiffs' Attorneys


Myron M. Cherry
Daniel J. Becka
Jacie Zolna
**MYRON M. CHERRY & ASSOCIATES, LLC**
30 North LaSalle Street - Suite 2300
Chicago, Illinois 60602
(312) 372-2100


Robert Foote
Craig S. Mielke
Foote, Meyers, Mielke & Flowers, LLC
416 South Second Street
Geneva, IL  60134
(630) 232-6333


-25-

Kathleen C. Chavez
Chavez Law Firm, P.C.
416 South Second Street
Geneva, IL  60134
(630) 232-4480

*Attorneys for the Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she caused the foregoing **First Amended**

**Complaint for Damages** to be served via E-filing procedure or E-mail upon:

Michael E. Abram, Esq.                  Andrew S. Rosenman, Esq.
Peter Herman, Esq.                      Andrew S. Marovitz, Esq.
Cohen, Weiss & Simon, LLP               Debra L. Bogo-Ernst
330 West 42nd Street                    Mayer, Brown, Rowe & Maw LLP
25th Floor                              71 South Wacker Drive
New York, New York  10036               Chicago, Illinois  60606
Via E-mail:    mabrams@cwsny.com
               pherman@cwsny.com

Kathryn F. Taylor, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois  60601

this 23rd day of January, 2007.

# EXHIBIT 2



1   John P. Crowell, OSB #82478
     Attorney at Law
2   1211 SW Fifth Avenue, Suite 2330
     Portland, OR 97204-3723
3   Telephone: (503) 222-4455
     e-mail: john@jpcrowell.com

4

     Mark G.  Passannante, OSB #94403
5   Broer and Passannante, P.S.
     1211 SW Fifth Avenue, Suite 2330
6   Portland, OR 97204-3723
     Telephone: (503) 294-0910
7   e-mail: markpassannante@msn.com

<span style="float:right">FILED'06 NOV 08 12:09USDC-ORP</span>

8

9

10               IN THE UNITED STATES DISTRICT COURT

11                 FOR THE DISTRICT OF OREGON

12

| | |
|---|---|
| 13  BRUCE HUDSON, RAYMOND CHOP, ERIC PASSANNANTE | ) ) ) ) Case No.  3:06-CV-1504-BR |
| 14 | ) |
| 15         Plaintiffs, | ) ) |
| 16            v. | ) ) ) |
|   AIR LINE PILOTS ASSOCIATION INTERNATIONAL, | ) AMENDED |
| 17  and | ) COMPLAINT |
|   AIR LINE PILOTS ASSOCIATION UNITED | ) |
| 18  AIRLINES MASTER EXECUTIVE COUNCIL, | ) (CLASS ACTION |
| | ) ALLEGATION) |
| 19 | ) |
|          Defendants. | ) Violation of the Duty of |
| 20 | ) Fair Representation, 29 |
| | ) USC § 185, and 45 USC |
| 21 | ) §151, and |
| | ) As Third-Party |
| 22 | ) Beneficiaries |
| | ) |
| 23 | ) JURY TRIAL DEMANDED |

24        COME NOW plaintiffs who allege, on behalf of themselves and all persons with whom

25  they are similarly situated,  as follows:

26

Page   - 1    AMENDED COMPLAINT

1            (Violation of the Duty of Fair Representation)

2                          1.

3      Plaintiffs  BRUCE HUDSON, RAYMOND CHOP and ERIC PASSANNANTE   are

4    individuals and citizens of the United States.

5                          2.

6      Plaintiffs are pilot employees of United Airlines ("United").  Plaintiffs are all members of

7    the labor union or unions comprised by defendants.  Defendants are labor organizations who owe

8    a duty of fair representation, under § 301(a) of the Labor-Management Relations Act of 1947, 29

9    U.S.C. §185 (a), and the Railway Labor Act, 45 USC §151,  to plaintiffs and the class of persons

10   whom plaintiffs represent.  Defendants, through their duly authorized officers or agents,  are

11   engaged in representing or acting for their employee members within this judicial district.

12                         3.

13     In about 2003, United filed for Chapter 11 bankruptcy reorganization.   In doing so, United

14   reduced its work force substantially, including laying off a number of pilots, including plaintiffs.

15   When plaintiffs were laid off, they were told by United that they were subject to being recalled at

16   a later date and that, hence, United would consider them to be "furloughed," rather than

17   terminated.   Plaintiffs have all been offered, and have accepted, recall from furlough.

18                         4.

19     As part of the chapter 11 bankruptcy proceedings, United ended the pension plan of the

20   pilots.  Plaintiffs were vested in United's pension plan.  In an agreement ("The Settlement

21   Agreement")  negotiated between United and defendants, United agreed to issue to defendants on

22   behalf of all United pilots a promissory note or notes in the sum of $550 million so as to be able

23   to effectuate the termination of the pilots' pension plan without further objection or litigation in

24   the bankruptcy court.  Defendants in turn have sold the note or notes to third parties for the sum

25   of $545.5 million in cash.  Under the terms of the Agreement, defendants were to "reasonably

26   determine" pilots' eligibility to share in the proceeds of the notes.  Defendants have determined

Page    - 2     AMENDED COMPLAINT

1   that they will disburse the funds only to active pilots and to those furloughed pilots who accepted

2   recall prior to United's exit from bankruptcy.  Defendants have decided that plaintiffs, who all

3   accepted recall subsequent to United's exit from bankruptcy, have been determined by

4   defendants to be ineligible for participation and will receive none of the proceeds.

5                                          5.

6        Defendants' failure to allocate any of the sums to plaintiffs and to those other furloughed

7   pilots who accepted or will accept recall after United's exit from bankruptcy is a breach of the

8   duty of fair representation, 29 U.S.C. §185 (a) and 45 USC §151, in that it is a decision which is

9   arbitrary, discriminatory, or in bad faith.   Plaintiffs have been damaged by defendants' breach in

10  amounts which will be proven at trial.  Plaintiffs demand a trial by jury.

11                                (Third-Party Beneficiaries)

12                                          6.

13       Plaintiffs reallege paragraphs 1-5.

14                                          7.

15       Under 29 USC § 185, plaintiffs are third-party beneficiaries of the Settlement Agreement

16  negotiated between United and defendants.  The Settlement Agreement obligated defendants to

17  "reasonably determine pilots' eligibility and allocation" for distribution of the sums paid

18  thereunder.  Defendants have breached their obligations to do so in that they have determined

19  that plaintiffs and all similarly situated persons are ineligible and will receive none of the funds.

20  Such determination is not reasonable.

21                                (Class Action Allegations)

22                                          8.

23       Plaintiffs' claims are suitable for class action treatment under Fed.  R.  Civ.  P.  23 in that:

24           a.      Approximately 2175 pilots were furloughed at or during the time of

25                   United's bankruptcy, of which approximately 1600 had either deferred

26                   recalled or had not been recalled at the time of United's exit from

Page   - 3    AMENDED COMPLAINT

John P. Crowell
Attorney at Law
1211 SW Fifth Avenue, Suite 2330
Portland, OR 97204-3723
(503) 222-4455  Fax:(503) 243-2717

1          bankruptcy.    Many, if not most, of those remaining furloughed pilots

2          have accepted, or will likely accept, recall. The class is thus so numerous

3          that joinder of all members is impracticable.

4      b.     There are common questions of law and fact applicable to all purported

5          class members in that all were furloughed pilots who had not yet accepted

6          recall at the time United exited from bankruptcy and all were excluded by

7          defendants' decision from sharing in the proceeds of the Settlement

8          Agreement.  The legal questions as to whether defendants' exclusion

9          decision was a breach of the duty of fair representation and/or a breach of

10         the Settlement Agreement are common to all purported class members.

11      c.     The claims of the representatives are typical of the claims of the purported

12         class members.

13      d.     The representatives and their counsel will fairly and adequately protect the

14         members of the class.  Each of the representatives has lost substantial

15         sums of vested retirement funds, each has accepted recall, and each has

16         claims which are not antagonistic to the class.  Plaintiffs' counsel are

17         experienced commercial litigators and are experienced in the prosecution

18         of class actions.

19      e.     Given the large number of putative class members,  class treatment is

20         superior to any other possible means of adjudication of the controversy.

21   ///

22   ///

23   ///

24

25

26

Page   - 4    AMENDED COMPLAINT

**John P. Crowell**
Attorney at Law
1211 SW Fifth Avenue, Suite 2330
Portland, OR 97204-3723
(503) 222-4455  Fax:(503) 243-2717

1

2      WHEREFORE, plaintiffs pray for judgment, on behalf of themselves and all similarly

3  situated furloughed pilots who have accepted or will accept recall after United's exit from

4  bankruptcy, as follows:

5     1.        For such sums as will adequately compensate them for their loss; and

6     2.        For their costs and attorneys' fees.

7

8                  John P. Crowell, OSB#82478
                  Of Attorneys for Plaintiffs

9

10

11                Mark G. Passannante, OSB #94403
                Attorneys for Plaintiffs

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Page  - 5    AMENDED COMPLAINT

John P. Crowell
Attorney at Law
1211 SW Fifth Avenue, Suite 2330
Portland, OR 97204-3723
(503) 222-4455  Fax:(503) 243-2717

# EXHIBIT 3

John S. Bishop, OSB No. 89022
E-mail: jbishop@mbjlaw.com
MCKANNA BISHOP JOFFE & SULLIVAN LLP
1635 NW Johnson St.
Portland OR 97209
Telephone: (503) 226-6111
Facsimile: (503) 226-6121

      Of Attorneys for Defendants

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF OREGON

| | |
|---|---|
| BRUCE HUDSON, RAYMOND CHOP, ERIC PASSANNANTE, | Civil No. 06-CV-1504-BR |
| Plaintiffs, | **STIPULATED MOTION FOR TRANSFER OF VENUE** |
| v. | |
| AIR LINE PILOTS ASSOCIATION INTERNATIONAL, and AIR LINE PILOTS ASSOCIATION UNITED AIRLINES MASTER EXECUTIVE COUNCIL, | |
| Defendants. | |

Plaintiffs and Defendants Air Line Pilots Association, International and Air Line Pilots

Association United Master Executive Council (collectively, "ALPA"), by and through their

counsel, hereby stipulate and agree that this matter should be transferred to a court in the United

States District Court for the Northern District of Illinois pursuant to 28 U.S.C. § 1406(a), which

permits a district court, in the event a case is filed in a district where venue is improper, to

transfer the case to a district where venue is proper, and/or 28 U.S.C. § 1404, which permits

transfer for the convenience of the parties, and in the interest of justice. Counsel for ALPA has

advised counsel for Plaintiffs that this district is not a proper venue for this suit and that, absent

PAGE 1 -    **STIPULATED MOTION FOR TRANSFER OF VENUE**

agreement, they will seek to have the matter transferred to the Northern District of Illinois.

Accordingly, the parties jointly move the Court for such order as is necessary to transfer this case

to the United States District Court for the Northern District of Illinois, pursuant to 28 U.S.C. §§

1406(a) and/or 1404.

In addition, the parties respectfully request that the transfer order indicate that the parties

have agreed that this case is related to the case entitled "John P. Mansfield, Jr. v. Air Line Pilots

Association, International," Case No. 06 C 6869, pending before Judge Matthew Kennelly in the

Northern District of Illinois, and that the court clerk for the Northern District of Illinois be

informed that this case should be assigned to Judge Kennelly, and possibly be consolidated or

coordinated with Mansfield.

WHEREFORE, the parties respectfully request that the Court grant their agreed motion to

transfer venue to the Northern District of Illinois.

DATED this ___/ / 7ᵗʰ___ day of January, 2007.

LAW OFFICES OF JOHN P. CROWELL
John P. Crowell (503) 222-4455

BROER AND PASSANNANTE
Mark G. Passannante (503) 294-0910


By _____
Of Attorneys for Plaintiffs
1211 S.W. Fifth Avenue, Suite 2330
Portland, OR  97204-3723

MCKANNA BISHOP JOFFE &
SULLIVAN LLP


_____
John S. Bishop, OSB No. 89022
Telephone: (503) 226-6111

Of Attorneys for Defendants

OF COUNSEL FOR DEFENDANTS:
Clay Warner
James K. Lobsenz (VA Bar No. 67287)
AIR LINE PILOTS ASSOCIATION,
INTERNATIONAL LEGAL
DEPARTMENT
535 Herndon Parkway
Herndon, VA 20170
Telephone: (703)689-4393

PAGE 2 -    **STIPULATED MOTION FOR TRANSFER OF VENUE**

Peter Herman
Cohen, Weiss and Simon
330 West 42nd Street, 25th Floor
New York, NY 10036-6976

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

Bruce Hudson, et al,

            Plaintiffs,

         v.

Air Line Pilots Association International, et al

            Defendants.

Civil No. CV 06-1504 BR

**ORDER
TO TRANSFER VENUE**

     Based on the stipulated Motion for Transfer of Venue (#14) submitted by the parties,

     **IT IS ORDERED AND ADJUDGED**  that the Motion is GRANTED, and this matter is

TRANSFERRED to the United States District Court for the Northern District of Illinois pursuant

to 28 U.S.C. §1406(a), for all purposes.

     Dated this __18th__ day of January, 2007.


               ___/s/ Anna J. Brown_____
               Anna J. Brown
               United States District Judge


ORDER TO TRANSFER VENUE

# EXHIBIT 5

# EXHIBIT 5

# United States District Court
# Northern District of Illinois

In the Matter of

Hudson, et al

v.

Air Line Pilots Assn

Case No. 07 C 590

Designated Magistrate Judge
Nan R. Nolan

## FINDING OF RELATEDNESS PURSUANT TO
## LOCAL RULE 40.4

In accordance with the provisions of Local Rule 40.4 of this Court, I find the above captioned case, presently pending on the calendar of Judge **Ronald A. Guzman** to be related to **06C6869** which is pending on my calendar. Accordingly, I request that the Executive Committee order said case to be reassigned to my calendar as a related case.

Judge Matthew F. Kennelly

Dated: February 15, 2007

## ORDER OF THE EXECUTIVE COMMITTEE

IT IS HEREBY ORDERED that the above captioned case be reassigned to the calendar of Judge **Matthew F. Kennelly**.

### ENTER

### FOR THE EXECUTIVE COMMITTEE

Chief Judge James F. Holderman

Dated: 2/16/07

Finding of Relatedness (Rev. 9/99)

# EXHIBIT 6

CLERK≠S OFFICE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CO-932
Rev. 4/96

## NOTICE OF DESIGNATION OF RELATED CIVIL CASES PENDING
IN THIS OR ANY OTHER UNITED STATES COURT

Civil Action No. _____
(To be supplied by the Clerk)

### NOTICE TO PARTIES:

Pursuant to Rule 405(b)(2), you are required to prepare and submit this form at the time of filing any civil action which is related to any pending cases or which involves the same parties and relates to the same subject matter of any dismissed related cases. This form must be prepared in sufficient quantity to provide one copy for the Clerk≠s records, one copy for the Judge to whom the cases is assigned and one copy for each defendant, so that you must prepare 3 copies for a one defendant case, 4 copies for a two defendant case, etc.

### NOTICE TO DEFENDANT:

Rule 405(b)(2) of this Court requires that you serve upon the plaintiff and file with your first responsive pleading or motion any objection you have to the related case designation.

### NOTICE TO ALL COUNSEL

Rule 405(b)(3) of this Court requires that as soon as an attorney for a party becomes aware of the existence of a related case or cases, such attorney shall immediately notify, in writing, the Judges on whose calendars the cases appear and shall serve such notice on counsel for all other parties.

_____

The plaintiff , defendant or counsel must complete the following:

I.   RELATIONSHIP OF NEW CASE TO PENDING RELATED CASE(S).

A new case is deemed related to a case pending in this or another U.S. Court if the new case:  [Check appropriate box(e≠s) below.]

| | | |
|---|---|---|
| ☐ | (a) | relates to common property |
| ☒ | (b) | involves common issues of fact |
| ☒ | (c) | grows out of the same event or transaction |
| ☐ | (d) | involves the validity or infringement of the same patent |
| ☐ | (e) | is filed by the same pro se litigant |

2.   RELATIONSHIP OF NEW CASE TO DISMISSED RELATED CASE(ES)

A new case is deemed related to a case dismissed, with or without prejudice, in this or any other U.S. Court, if the new case involves the same parties and same subject matter.

Check box if new case is related to a dismissed case:  ☐

3.   NAME THE UNITED STATES COURT IN WHICH THE RELATED CASE IS FILED (IF OTHER THAN THIS COURT):
     United States District Court for the Northern District of Illinois, Eastern Division

4.   CAPTION AND CASE NUMBER OF RELATED CASE(E≠S).  IF MORE ROOM IS NEED PLEASE USE OTHER SIDE.

John P. Mansfield, Jr., et al.                    v.    Air Line Pilots Association, International     C.A. No.  06CV6869

02/21/2007                                      _____  (COUNSEL FOR PLAINTIFFS)
DATE                                            Signature of Plaintiff /Defendant (or counsel)

# EXHIBIT 7

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 3.0
### Eastern Division

Bruce Hudson, et al.

Plaintiff,

v.                                            Case No.: 1:07–cv–00590

Honorable Matthew F. Kennelly

Air Line Pilots Association International, et al.

Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Tuesday, February 27, 2007:

 MINUTE entry before Judge Matthew F. Kennelly : Argument heard on plaintiffs' motion for temporary restraining order. Plaintiffs' reply in support of motion for temporary restraining order, or notification of withdrawal of motion, is to be filed by the close of business on 3/2/07. Plaintiffs' responses to United Air Lines' motion to intervene and motion for referral to bankruptcy court are to be filed by 3/5/07, unless plaintiffs withdraw their motion for temporary restraining order, in which case the response dates will be reset. Status hearing and ruling on motion for temporary restraining order set to 3/6/07 at 9:30 a.m. (or, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at **www.ilnd.uscourts.gov**.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **RAYMOND GARAVITO,**<br>**RAFAEL RODRIGUEZ, and**<br>**ELLI MIZRAHI,**<br><br>  **Plaintiffs,**<br><br>  **v.**<br><br>**AIR LINE PILOTS ASSOCIATION,**<br>**INTERNATIONAL,**<br><br>  **Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Case No. 1:07-cv-00384 (PLF)** |

## DECLARATION OF CAPTAIN MARK A. BATHURST

Mark A. Bathurst declares as follows:

  1.  I am employed as a pilot by United Air Lines, Inc. ("United"), currently holding a B-767 Captain position, and I am a member of the Air Line Pilots Association, International ("ALPA"), which is the collective bargaining representative for pilots employed by United.

  2.  I am the Master Chairman of the Master Executive Council at United (the "MEC," "United MEC," or "UAL MEC"), which is made up of representatives elected from the ALPA pilot membership employed by United, and which serves as the coordinating council for ALPA's activities at the airline. The Master Chairman is an elected position that I have held since January 1, 2004.

  3.  In the course of my duties as Master Chairman, I preside over the MEC meetings and facilitate the MEC's debate on various topics. I was present for all MEC meetings regarding the eligibility and allocation issues associated with the Senior Subordinated Convertible Notes of United (the "Notes") which are the subject of this lawsuit.

4.      ALPA's United MEC's offices are located in Rosemont, Illinois, a suburb of Chicago.

5.      The MEC's elected officers, including myself, and the MEC staff, including Russell Woody, an ALPA attorney who serves as Senior Benefits Counsel to the MEC, and Robert H. Nichols, an attorney within the ALPA representation department assigned full-time to the MEC as its Senior Contract Administrator and MEC Coordinator, all have their primary offices in Rosemont.

6.      United's world headquarters are located in the Chicago suburb of Elk Grove Village, Illinois.

7.      By way of background, in late 2002, United filed a petition with the United States Bankruptcy Court for the Northern District of Illinois in Chicago seeking protection from creditors pursuant to Chapter 11 of Title 11 of the United States Code.  In the course of that proceeding, in late 2004, United filed a second Section 1113 petition seeking to reject its collective bargaining agreement with ALPA.  Following United's filing of that petition, as required by statute, negotiations among the parties ensued.

8.      In early 2005, in return for ALPA's agreement, among other things, not to contest the termination of its defined benefit pension plan under certain conditions, and subject to other conditions, United agreed to issue the Notes holding a face value of $550 Million.  This agreement between ALPA and United was memorialized in a document known as the "Letter Agreement," which the plaintiffs attached to their complaint as Exhibit 4.  Pursuant to authority granted under the agreement, ALPA allocated the proceeds of the Notes among all United pilots deemed eligible (the "Allocation").

9.    The majority of negotiations that resulted in the Letter Agreement occurred in the Chicago metropolitan area. None of the negotiations occurred in Washington, DC.

10.    The parties to the negotiations that resulted in the Letter Agreement, the UAL MEC and United, were and are located in the Chicago metropolitan area.

11.    ALPA's records of the negotiations that resulted in the Letter Agreement are largely maintained in its MEC office in the Chicago metropolitan area.

12.    Shortly before the time that the above agreement was finalized and approved by the Bankruptcy Court on January 31, 2005, the MEC had begun the process of considering various methods of allocating the proceeds of the Notes.

13.    The process was a deliberate and careful one, undertaken over many months and with the benefit of actuarial analyses and legal advice.

14.    The MEC maintains its records of the deliberations in the MEC's office in the Chicago metropolitan area.

15.    One of the MEC standing committees is known as the Retirement and Insurance Committee ("R&I Committee"), comprised of certain pilot members elected by the MEC. The R&I Committee evaluated various methodologies for the allocation of the Notes, and reported on their work to the MEC for further deliberation.

16.    The R&I Committee's work on the issues in this case occurred almost wholly in the Chicago metropolitan area.

17.    The MEC and R&I Committee were aided in their deliberations by an outside actuary, Buck Consultants. Buck's Chicago office actuaries worked with the MEC.

18.    Throughout 2005, the MEC met regularly to analyze and evaluate possible Allocation methods and to decide who should be eligible to receive the proceeds. These

meetings occurred mostly in the Chicago metropolitan area. None of the MEC meetings occurred in Washington, DC.

19.    At a meeting in Chicago, Illinois, the MEC made the final decision as to the formula to be used for the Allocation (i.e., the so-called "GAP 2" methodology) on January 18, 2006, and adopted a formal resolution in this regard.

20.    Two days after the MEC's final decision, on January 20, 2006, the MEC sent a memo to all UAL pilots that notified them that the MEC had passed resolutions adopting GAP 2 as the allocation methodology for the proceeds of the notes.

21.    In addition to ALPA's communications, United wrote to all pilots in a letter dated July 18, 2006, to advise them of the timing of the distribution of the proceeds of the Notes to the pilots. United's Lynn Hughitt, Vice President – Compensation & Benefits, located in United's Chicago area headquarters, signed the letter. (See Exhibit 3 to the plaintiffs' complaint.)

22.    Finally, all three plaintiffs, Raymond Garavito, Rafael Rodriguez, and Elli Mizrahi, are Chicago-domiciled United pilots, who report to and conclude their flying assignments at Chicago O'Hare International Airport.

I declare under penalty of perjury that the foregoing is true and correct.

Mark A. Bathurst

Executed on February 28, 2007.

4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RAYMOND GARAVITO,<br>RAFAEL RODRIGUEZ, and<br>ELLI MIZRAHI,<br><br>       Plaintiffs,<br><br>       v.<br><br>AIR LINE PILOTS ASSOCIATION,<br>INTERNATIONAL,<br><br>       Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No.  1:07-cv-00384 (PLF) |

PROPOSED ORDER

Upon consideration of the Motion of Defendant Air Line Pilots Association, International

to Transfer Pursuant to 28 U.S.C. § 1404(a), it is hereby

ORDERED that the motion is GRANTED, and it is

FURTHER ORDERED that this matter is transferred to the United States District Court

for the Northern District of Illinois for all purposes.

Entered the _____ day of _____, 2007.


_____
PAUL L. FRIEDMAN
United States District Judge

## Certificate of Service

A copy of the **MOTION OF DEFENDANT AIR LINE PILOTS ASSOCIATION, INTERNATIONAL TO TRANSFER PURSUANT TO 28 U.S.C. § 1404(a); MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANT AIR LINE PILOTS ASSOCIATION, INTERNATIONAL TO TRANSFER PURSUANT TO 28 U.S.C. § 1404(a), and exhibits in support; PROPOSED ORDER**, and **DECLARATION OF CAPTAIN MARK A. BATHURST** was mailed this 28[h] day of February, 2007, postage prepaid, to the following:

Andrew H. Marks
Aryeh S. Portnoy
William Flanagan
Daniel G. Kim
CROWELL & MORING, LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004

Michael S. Olin
Tucker Ronzetti
KOZYAK, TROPIN & THROCKMORTON, PA
2525 Ponce de Leon, 9th Floor
Miami, FL  33134

Jeffrey W. Pagano
CROWELL & MORING LLP
153 East 53rd Street, 31st Floor
New York, NY  10022

Barbara Luna