UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| RAYMOND GARAVITO, RAFAEL RODRIGUEZ, and ELLI MIZRAHI | ) ) ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 07-0384 (PLF) |
| | ) | |
| AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, | ) ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

STATEMENT OF FACTS ........................................................................................3

ARGUMENT ......................................................................................................8

I.  PLAINTIFFS CANNOT SATISFY THEIR BURDEN OF SHOWING THEY HAVE A
    SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS ..................................8

    A.  ERISA Does Not Apply To Plaintiffs' Claims ........................................9

    B.  Plaintiffs' Claims Are Preempted By The RLA's Mandatory Arbitration Process ...13

    C.  Plaintiffs' Claims Are Independently Preempted By The RLA's Duty Of Fair
        Representation.......................................................................19

    D.  Plaintiffs' Disguised RLA Claim Is Barred By The Six-Month Statute Of
        Limitations. ........................................................................22

    E.  Plaintiffs Cannot Show That ALPA Breached A Duty of Fair Representation........23

    F.  The Exculpation Clause In United's Plan Of Reorganization Provides ALPA With
        A Complete Defense ..................................................................29

II. PLAINTIFFS' INACTION DURING THE LAST 13 MONTHS IS POWERFUL
    PROOF THAT THERE IS NO NEED FOR A PRELIMINARY INJUNCTION ...............30

III. PLAINTIFFS' MOTION SHOULD BE DENIED BECAUSE ENJOINING THE
     MARCH 2007 DISTRIBUTION MAY RESULT IN SUBSTANTIAL TAX COSTS
     AND EXCISE TAX PENALTIES TO *ALL* UNITED PILOTS...........................33

IV. IN THE UNLIKELY EVENT THAT INJUNCTIVE RELIEF IS WARRANTED,
    PLAINTIFFS MUST BE REQUIRED TO POST A SUBSTANTIAL BOND ..................34

CONCLUSION....................................................................................35

## Introduction

Defendant Air Line Pilots Association, International ("ALPA") submits this brief in opposition to Plaintiffs' motion for preliminary injunction. As discussed below, Plaintiffs' untimely motion falls far short of justifying the extraordinary and drastic relief of a preliminary injunction.

Plaintiffs' motion is flawed for many independent reasons. Among other things, Plaintiffs' inexplicable delay in filing this action and pursuing injunctive relief demonstrates that there is no emergency and their motion should be denied for that reason alone. ALPA informed Plaintiffs and all other active pilots on or about January 20, 2006 that ALPA had finalized the allocation methodology that they now challenge. Yet, Plaintiffs waited *13 months* after that decision was made to file this lawsuit. In the interim, many other events should have caused Plaintiffs to take action. For example, on July 18, 2006, Lynn Hughitt of United Airlines ("United") sent Plaintiffs a letter and Q&A document (which Plaintiffs have attached to their Memorandum as Exhibit 3) about the forthcoming distributions. Hughitt's letter specifically informed Plaintiffs that the Convertible Notes ("Notes") would be sold and the proceeds would be distributed in two stages: most of the distribution would occur "on or about August 15, 2006" and any remaining proceeds would then be distributed "no later than March 15, 2007." In fact, each Plaintiff received distributions in August 2006. Yet, instead of taking action after receiving Hughitt's letter and in advance of the August 2006 distributions, Plaintiffs sat idle while $351 million was distributed to them and to thousands of other pilots. Plaintiffs then *waited more than six additional months* before filing this lawsuit, at the eleventh hour, seeking to enjoin the remaining distributions.

Even if this Court were willing to overlook Plaintiff's dilatory conduct, their motion for preliminary injunction is completely baseless on its merits. Plaintiffs cannot satisfy their burden

of showing they have any likelihood of success on the merits, let alone the substantial likelihood of success that is required in this Circuit. At least three separate reasons support this conclusion. First, Plaintiffs cannot state a claim upon which relief can be granted under ERISA. Second, the Railway Labor Act ("RLA") preempts Plaintiffs' ERISA claims in Counts I through III of the Complaint because Plaintiffs' claims are dependent upon an interpretation of a collective bargaining agreement. Third, the duty of fair representation that arises under the RLA also independently preempts Plaintiffs' claims.

Plaintiffs undoubtedly know that their claims against ALPA would be barred by the six-month statute of limitations applicable to RLA duty of fair representation claims. Thus, Plaintiffs have attempted to recast what is plainly a RLA claim for breach of the duty of fair representation by dressing it up through ERISA and "common law fiduciary duty" theories. Plaintiffs' claims are baseless. It also should be noted that two sets of plaintiffs who filed separate but closely-related lawsuits over the same allocation decisions that Plaintiffs challenge in this case – which cases are pending in federal court in Chicago and are referenced in ALPA's February 28, 2007 motion to transfer venue – did not pursue either ERISA or common law fiduciary duty claims. Rather, they only filed claims under the RLA.

An additional, independent defense to the merits of Plaintiffs' claims is established through the Exculpation Clause in the Debtors' Second Amended Joint Plan of Reorganization ("POR") in the United bankruptcy proceeding. United's POR grants ALPA broad immunity and exculpation from any claims related to the distribution of any property pursuant to the POR – such as the proceeds of the Notes – and, more generally, from any claims connected to, related to, or arising out of United's restructuring.

Even in the unlikely event that Plaintiffs could overcome all of these hurdles and satisfy their burden of showing they have a substantial likelihood of success on the merits, a preliminary

injunction is unwarranted because the potential harm to *all* United pilots that may result from an injunction substantially outweighs any alleged irreparable harm to Plaintiffs. An order enjoining the March 2007 distributions may have significant, adverse tax consequences, including potential excise taxes. The planned distribution prior to March 15, 2007 avoids these potential tax ramifications by taking advantage of the "safe harbor" provision of the Internal Revenue Code. Consequently, even if the issuance of an injunction were appropriate – and it plainly is not – Plaintiffs must be required to produce a substantial bond to protect against the adverse harm that their requested relief could cause.

### Statement of Facts

ALPA is the exclusive collective bargaining representative of the airline pilots in the service of United. *See* Exhibit 1 (Declaration of Russell Woody) (hereafter "Woody Decl."), ¶ 2.[1] ALPA's United Airlines Master Executive Council ("MEC") is the coordinating council for ALPA for purposes of its representation of United pilots, comprising representatives elected by the United pilots and officers elected by the members of the MEC. *Id.* Here, Plaintiffs' claim arises out of events that followed the entry into a January 2005 Collective Bargaining Agreement ("CBA")[2] between ALPA and United (and its parent, UAL Corporation) in which, in pertinent part, United conditionally agreed to issue the Notes with a face value of $550 million as part of an agreement in which, among other things, ALPA agreed during United's bankruptcy

---

[1] The Declaration of Russell Woody and the Supplemental Declaration of Wendy Morse that are attached hereto as Exhibits 1 and 2, respectively, were filed in two related cases that are pending before the Honorable Matthew F. Kennelly in the United States District Court for the Northern District of Illinois. Specifically, Woody's Declaration was filed in *Hudson v. Air Line Pilots Ass'n, et al.*, Case No. 07 CV 590, and Morse's Supplemental Declaration was filed in *Mansfield v. Air Line Pilots Ass'n, Int'l*, Case No. 06 CV 6869.

[2] The CBA has been referred to from time to time as the "Letter Agreement," "Termination Agreement" or "TA." Plaintiffs attached the CBA as Exhibit 4 to their motion, and copies also are attached to the Woody and Morse Declarations. For ease of reference and to maintain consistency, ALPA will refer herein to the CBA/Letter Agreement as "the CBA."

proceedings not to oppose the termination of the defined benefit pension plan maintained for pilots by United if certain conditions were met. *Id.* ¶¶ 9-13 and Exhibit A thereto. *See also* Exhibit 2 (Supplemental Declaration of Captain Wendy J. Morse) (hereafter "Morse Supp. Decl."), ¶ 5.

Around the time that the CBA was finalized and approved by the Bankruptcy Court in January 2005 (in accordance with the terms of 11 U.S.C. § 363(b)(1)), ALPA had begun the process of considering various methods of allocating the proceeds of the Notes. Morse Supp. Decl. ¶¶ 5-6. The process was a deliberate and careful one, undertaken over many months and with the benefit of actuarial analyses and legal advice. *Id.* ¶ 7.

Woody worked closely with the MEC, its Retirement & Insurance ("R&I") Committee, various members of ALPA's legal and other staff, and outside actuaries, financial consultants and legal counsel regarding the allocation methodology determinations which are the subject of this lawsuit. Woody Decl. ¶ 3.

The numerous steps taken by ALPA to analyze and determine allocation methodologies occurred for at least the 14-month period between December 2004 and January 2006. *Id.* ¶¶ 3-4. For example, ALPA's independent actuarial consultants with respect to the Notes are Buck Consultants ("Buck"), a national actuarial and benefit consulting firm. Paul Rusin led the work for Buck. From August 2004 to January 2006, Rusin and his colleagues prepared numerous reports, computations and projections for the R&I Committee and MEC, prepared detailed estimates of the benefits to be paid to United pilots by the Pension Benefit Guaranty Corporation (the "PBGC") and advised ALPA regarding various other actuarial issues. ALPA paid Buck hundreds of thousands of dollars in fees for their extensive work. *Id.* ¶ 4.

ALPA also retained outside counsel from the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP to provide independent legal advice on ERISA matters, and, in particular,

possible techniques of tax-deferred delivery to pilots of the Notes and the proceeds of sale of the Notes. Representatives of the Paul Weiss firm attended meetings of the MEC at which the topic of the Notes was discussed. *Id.* ¶ 5. Further, ALPA frequently consulted with lawyers from ALPA's outside general counsel, the law firm of Cohen, Weiss and Simon LLP, on labor law, tax, bankruptcy and ERISA issues relating to the Notes. One or more members of Cohen Weiss attended all, or almost all, of the meetings of the MEC at which the Notes and allocation methodologies were discussed. *Id.* ¶ 6. Several members of ALPA's in-house legal department also were involved in analyzing various issues. *Id.* ¶ 7.

Commencing in the fall of 2004 and continuing through January 2006, the MEC and members of the R&I Committee, along with the aforementioned legal and financial consultants, devoted countless hours to the tasks of developing recommended eligibility criteria, identifying categories of pilots requiring specific eligibility decisions by the MEC, and working with ALPA's actuarial consultants to develop allocation models. *Id.* ¶ 8.

The CBA promised Plaintiffs nothing with respect to any monies to which they now claim they are entitled. An addendum that was expressly referenced in and attached to the CBA as Exhibit D discussed the structure of the Convertible Notes. Exhibit D of the CBA stated that the Notes, if and when issued, initially would be held in a trust or similar non-permanent vehicle for the benefit of eligible United pilots and further stated: "Distribution mechanics, eligibility and <u>allocation</u> among such pilots to be reasonably determined by [ALPA]." Morse Supp, Decl. ¶ 5 and p. 11 of Exhibit C thereto (emphasis added).[3] ALPA's members ratified that CBA through a vote in January 2005. Woody Decl. ¶ 13.

---

[3] Exhibit D of the CBA also provided that the proceeds of the Notes would be distributed "as soon as reasonably practicable given tax, accounting, securities and market considerations." This is important because, as discussed below, the March 2007 distribution date that ALPA thereafter established was selected for compelling tax reasons under the Internal Revenue Code.

Throughout 2005, the MEC met regularly to analyze and evaluate possible allocation methods, and to decide who should be eligible to receive the proceeds of the Notes. Morse Supp. Decl. ¶ 9. Among other things, the R&I Committee, with the assistance of the actuaries and counsel, began a series of "absorption analyses" designed to test the effects of the limits on contributions to the Pilot Directed Account Plan ("PDAP") under Section 415(c) of the Internal Revenue Code of 1986, on pilots' ability to shelter distributions of the proceeds of sale of the Notes by making the distributions in the form of contributions to the PDAP rather than in the form of direct payments to eligible pilots. Woody Decl. ¶ 14.

In addition, in January 2005 ALPA began to develop possible methodologies for allocating the proceeds of the Notes. The R&I Committee's preparations included development of allocation objectives and talking points, meetings and teleconferences with Rusin and his colleagues during which Buck's initial suggestions as to possible allocation formulas were presented, analyzed and discussed. *Id.* ¶ 15. The R&I Committee had a two-day meeting in January 2005 in which it contemplated at least four possible allocation methodologies, including, among others, the "GAP 1" and "GAP 2" methodologies. *Id.* ¶ 17. Under the "GAP 1" methodology, the Note proceeds would be allocated in proportion to the present value of pilots' lost pension benefits measured by accrued benefits as of the date of plan termination, less the estimated benefits payable by the PBGC. *Id.* Under the "GAP 2" methodology, the Note proceeds would be allocated in proportion to the present value of pilots' lost pension benefits measured by: (i) benefits accrued up to the date of plan termination plus benefits projected to be accrued in the future, over the balance of the pilot's career; offset by (ii) the value of the estimated benefit the pilot would receive from the PBGC plus the value of the additional PDAP contributions provided for by the CBA. *Id.*

Following the January 2005 meeting, the MEC considered GAP 2 and the other possible

methodologies during the course of at least eight subsequent meetings of the MEC in the ensuing year.  *Id.* ¶ 16 and ¶¶ 18-21 (discussing July, September, October and November 2005 meetings).

On January 18, 2006, approximately 14 months after the process began, the MEC finalized its decisions about how to allocate the proceeds of the Notes.  The MEC decided to adopt the GAP 2 allocation methodology.  Morse Supp. Decl. ¶ 10.

On January 20, 2006, two days after that final decision, the MEC sent a memo to all UAL pilots that notified them that the MEC had passed a resolution adopting GAP 2 as the allocation methodology for the proceeds of the Notes.  *Id.* ¶ 12.  The same document also incorporated a copy of the MEC's resolutions adopting GAP 2.  *Id.* ¶ 12 and Exhibit B thereto.

On July 18, 2006, United, through Lynn Hughitt, sent United pilots, including Plaintiffs, a letter and Q&A document about the forthcoming distributions.  *See* Exhibit 3 to Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction.  The first page of the Q&A specifically informed Plaintiffs of the two-stage distribution that would occur: most of the distribution would occur "on or about August 15, 2006" and any remaining proceeds would then be distributed "no later than March 15, 2007."  *See id.*

In August 2006, each Plaintiff received an initial distribution pursuant to the GAP 2 methodology that the MEC had adopted in January 2006.  *See* Verified Complaint ("Complaint"), ¶¶ 10-12.  In total, approximately $351 million was distributed to Plaintiffs and thousands of other pilots in August 2006; the remaining $186 million is scheduled to be distributed in March 2007.[4]  *Id.* ¶¶ 5, 10-12.

_____

[4]  The face value of the Notes was $550 million.  The proceeds of the sale of the Notes, after various expenses were deducted, were approximately $537 million.  *See* Complaint ¶ 1.

## <u>Argument</u>

It is well settled that a preliminary injunction "is an ***extraordinary and drastic remedy***, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis added). To obtain preliminary injunctive relief, a plaintiff generally "must demonstrate: 1) a substantial likelihood of success on the merits, 2) that [he] would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction." *Cityfed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746-47 (D.C. Cir. 1995). The burden of proving that this drastic remedy is appropriate is, of course, on Plaintiffs, the movants. *See, e.g., Cooper v. U.S.*, 2005 WL 3462281, at *1 n.1 (D.D.C. Nov. 3, 2005) ("In order to obtain a preliminary injunction, the plaintiff has the burden of demonstrating" the four factors.); *Univ. Legal Servs., Inc. v. St. Elizabeths Hosp.*, 2005 WL 3275915, at *7 (D.D.C. July 22, 2005) ("The burden of proof lies with Plaintiffs to show that injunctive relief is appropriate."). Here, however, Plaintiffs cannot possibly meet their burden as to several of the aforementioned elements.

## I.    PLAINTIFFS CANNOT SATISFY THEIR BURDEN OF SHOWING THEY HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

As noted above, Plaintiffs must, as a threshold matter, show that they have a ***substantial*** likelihood of success on the merits. *See also Bradshaw v. Veneman*, 338 F. Supp. 2d 139, 144 (D.D.C. 2004) (Friedman, J.) (denying motions for preliminary injunction where plaintiffs failed to show "any likelihood of success on the merits, much less the substantial likelihood required for emergency injunctive relief"). This is a burden that Plaintiffs have not met, and cannot possibly meet, because ALPA has several legal defenses that will defeat Plaintiffs' claims.

A.    <u>**ERISA Does Not Apply To Plaintiffs' Claims.**</u>

United has presented a number of arguments in opposition to Plaintiffs' ERISA claims in its March 2, 2007 Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction. To avoid unnecessary duplication, ALPA generally incorporates those arguments and will only briefly address the primary issues.

This case does not implicate ERISA for two primary reasons. First, Plaintiffs have completely invented the idea that the CBA somehow constitutes a "pension plan" under ERISA. Neither the CBA provision that provides for issuance of the Notes (¶ 7) nor any other provision of the CBA constitutes an ERISA plan. Second, even if Plaintiffs' fictional theory were true that an ERISA "plan" exists here, ALPA's only role would be as a settlor, not as a fiduciary. We now briefly discuss each of these points.

First, an employee benefit pension plan under ERISA must have three necessary components: (1) a plan, fund, or program; (2) established or maintained by an employer or by an employee organization; and (3) to provide retirement income or result in the deferral of income. 29 U.S.C. § 1002(2). *See also Kenney v. Roland Parson Contracting Corp.*, 28 F.3d 1254, 1257 (D.C. Cir. 1994). An alleged plan does not satisfy the third prong of this test – to "provide retirement income" or "result in the deferral of income" – unless it was ***designed*** to provide retirement income. *Murphy v. Inexco Oil Co.*, 611 F.2d 570, 575 (5th Cir. 1980) (finding no ERISA plan). *See also Oatway v. American Int'l Group, Inc.*, 325 F.3d 184, 188 (3d Cir. 2003) (same).

Plaintiffs argue that the "Pilots Program expressly was unrelated to the reduction of future wages and benefits that resulted from the bankruptcy and was established specifically to replace a portion of the retirement benefits the pilots *already* had accrued and that *already* had vested when the United [defined benefit pension] Plan was terminated." Plaintiffs'

Memorandum, pp. 4-5 (emphasis in original). Even a cursory reading of the CBA, however, shows that Plaintiffs' argument is frivolous. The CBA addressed and resolved **many** issues between the parties, not just the Notes. For example, the CBA addressed: (1) an extension of the term of the 2003 Pilot Agreement (*see* Plaintiffs' Memorandum, Exhibit 4, ¶ 1); (2) changes to pilots' pay rates (*Id.* ¶ 2, Exhibit A); (3) changes to work rules favorable to United (*Id.*, ¶ 3, Exhibit B-1); (4) the elimination of retiree life insurance for future retirees (*Id.,* Exhibit B-2); and (5) profit sharing and success sharing (*Id.* ¶ 6, Exhibit B-3, Exhibit C). In other words, although the CBA also conditionally obligated United to issue $550 million in Notes to be placed in "[a] trust or similar non-permanent vehicle for the benefit of eligible United pilots," and that ALPA would be responsible for reasonably determining the distribution mechanics, eligibility and allocation among such pilots (CBA Exhibit B, p. 11), those terms were not the only, or even primary, purpose of the CBA.[5]

Apart from the terms of the CBA themselves, judicial decisions related to United's bankruptcy proceeding reinforce the conclusion that the CBA with ALPA is not an ERISA "plan." The Seventh Circuit twice explained that United granted $550 million in Notes to its active pilots not just to lessen the impact of pension termination, but also to compensate for wage cuts and pilots foregoing their right to strike. *See In re UAL Corp.*, 468 F.3d 456, 459-60, 461 (7th Cir. 2006) (Notes also granted to active pilots because "pilots made substantial salary concessions" and "in exchange for surrendering the leverage that they enjoyed – United needs pilots to fly its planes"); *In re UAL Corp*, 443 F.3d 565, 569 (7th Cir. 2006) (explaining that "the

---

[5] As discussed in detail below, Plaintiffs have tried to shoehorn their claim through a manufactured ERISA "plan" or "common law fiduciary duty" in a feeble attempt to avoid RLA preemption, because the six-month statute of limitations applicable to duty of fair representation claims under the RLA undeniably sounds the death knell for all of Plaintiffs' claims in this lawsuit.

active pilots, represented by ALPA, received as we know sizable compensation" in terms of Notes because, among other reasons, "the active pilots had a stick to use against United –the threat of a strike").

Second, Plaintiffs' Complaint fails for an independent reason related to plan design, *i.e.*, determining the basic rules about what kind of benefits will be provided, to whom benefits are payable and how much of a benefit will be provided implicate settlor functions and not fiduciary functions.

Under ERISA, a settlor is the creator of a trust, and its decisions typically relate to plan design issues such as the establishment, funding, amendment, and termination of a benefit plan. *See Curtis-Wright Corp. v. Schoonejonger*, 514 U.S. 73 (1995). As the Supreme Court has explained, the acts of creating, designing, amending, modifying, or terminating a benefits plan are taken in a sponsor's settlor capacity and not the sponsor's fiduciary capacity. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 443-44 (1999) (use of the surplus assets of a defined benefit plan to increase new participants' benefits but not retired employees' benefits was not a fiduciary act); *Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996) (employer's decision to amend a benefits plan to create incentives for early retirement was not taken in a fiduciary capacity); *Curtiss-Wright Corp.* 514 U.S. at 79 (company's reservation clause, which provided that the company could amend its plan at any time, complied with ERISA).

Stated differently, ERISA does not create any substantive entitlement to benefits, but only "seek[s] to ensure that employees will not be left empty-handed once employers have guaranteed them certain benefits." *Lockheed Corp.*, 517 U.S. at 887. ERISA therefore only regulates an employer's actions in administering benefits and managing plan assets, but not an employer's decision to determine the level of benefits. *Id.* Plan creation, design, amendment,

modification, and termination are all decisions about the level of benefits that an employer will provide are therefore **not** subject to ERISA's fiduciary duties. *Id.*

The "GAP 2" allocation method plaintiffs contest here, in ERISA terms, would clearly be a plan design because it effectively sets the level of benefits and defines the beneficiaries. As this Court recognized in *Hartline v. Sheet Metal Workers' Nat'l Pension Fund*, 134 F. Supp. 2d 1, 13-16 (D.D.C. 2000), determining benefits levels through formulas is an act of plan design. In *Hartline,* retired union members claimed that the trustees of the union's defined benefits plan had breached their fiduciary duties by establishing a non-uniform and allegedly "inequitable" contribution rate system. *Id.* at 5-6, 8. The Court agreed with the trustees who argued that setting contribution rates was a settlor – not fiduciary – function because it "directly determines pension level benefits." *Id.* at 13, 16.

ERISA does not dictate what benefit a sponsoring employer or labor union must provide. Rather, it imposes standards on the administration of whatever program the parties see fit to set up. There is, for example, no provision in ERISA that would dictate that the entire Note proceeds had to be applied for the benefit of senior pilots. Even assuming that the distribution of the Note proceeds through the Grantor Trust constitutes some sort of "plan," the most that can be said for the CBA is that it provided for the establishment of a plan by ALPA in its discretion. Under that interpretation, when ALPA was determining eligibility criteria, allocation methodology and distribution mechanics, it was engaged in designing a plan. The ERISA fiduciary standards simply do not apply to that activity.

For all of these reasons, ERISA does not apply to this case and Plaintiffs are not entitled to a preliminary injunction for that reason alone.

**B.**    **Plaintiffs' Claims Are Preempted By The RLA's Mandatory Arbitration Process.**

Even if ERISA had some theoretical application to Plaintiffs' claims, it would not provide Plaintiffs with a viable cause of action. Section 514(d) of ERISA states: "Nothing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States . . . or any rule or regulation issued under any such law." 29 U.S.C. § 1144(d). The D.C. Circuit, among others, has cited Section 514(d) and concluded that this provision makes it clear that ERISA does not alter, supersede or otherwise nullify the compulsory arbitration provisions of the RLA. "On its face this [Section 514(d)] is a strong, comprehensive, express statement that ERISA is not to be read as displacing by implication any pre-existing federal legislation." *Air Line Pilots Ass'n, Int'l v. Northwest Airlines, Inc.*, 627 F.2d 272, 276 (D.C. Cir. 1980). *See also Everett v. USAir Group, Inc.*, 927 F. Supp. 478, 483 (D.D.C. 1996) (Friedman, J.), *aff'd*, 194 F.3d 173 (D.C. Cir. 1999); *Coker v. Trans World Airlines, Inc.*, 165 F.3d 579, 584 (7th Cir. 1999) ("Other courts of appeals have construed this language to preserve the exclusive jurisdiction of the Adjustment Board under the RLA over the arbitration of [contractual] disputes. . . . We agree.").

The RLA (45 U.S.C. § 151 *et seq.*) embodies the national policy of encouraging binding settlement of labor-management disputes through arbitration, without resort to litigation. Indeed, under the RLA arbitration is not merely encouraged, it is **compulsory**: employers, employees and unions are bound to submit all "disputes . . . growing out of grievances, or out of the interpretation or application of agreements concerning rates of pay, rules or working conditions" to system boards of adjustment for resolution. *See* 45 U.S.C. § 184.[6] The Supreme Court has

---

[6] The RLA provides for the establishment of system boards in both the railroad and airline industries, and the jurisdiction of railroad and airline system boards are nearly identical. *See* 45 U.S.C. §§ 153 and 184.

13

reiterated this point on numerous occasions. *See, e.g., Andrews v. Louisville & Nashville R.R. Co.*, 406 U.S. 320, 323 (1972); *Bhd. of Locomotive Engr's v. Louisville & Nashville R.R. Co.*, 373 U.S. 33, 38 (1963); *Bhd. of R.R. Trainmen v. Chicago River & Indiana R.R. Co.*, 353 U.S. 30, 39 (1957).

Courts have virtually no role in the RLA arbitration scheme. In enacting the RLA, Congress specifically intended for all grievances and questions of contract interpretation to be resolved by expert laymen familiar with the contract and the industry, and not by courts. *See, e.g., Union Pac. R.R. Co. v. Sheehan*, 439 U.S. 89, 94 (1978); *Gunther v. San Diego & Arizona Eastern Railway*, 382 U.S. 257, 261 (1965); *Andrews*, 406 U.S. at 322. Accordingly, Congress established arbitration as the exclusive forum in which such claims could be resolved:

> This record is convincing that there was general understanding between both the supporters and the opponents of the 1934 amendment [to the RLA] that the provisions dealing with the Adjustment Board were to be considered as compulsory arbitration in this limited field.

*Trainmen*, 353 U.S. at 39. Thus, arbitration before system boards is the "mandatory, exclusive and comprehensive" forum for all disputes involving contract interpretation. *Locomotive Engr's*, 373 U.S. at 38.

Every claim that involves an interpretation of an RLA collective bargaining agreement is subject to mandatory arbitration. *See Air Line Pilots Ass'n*, 627 F.2d at 275 (arbitration board jurisdiction "is exclusive and cannot be avoided by efforts to bring the dispute directly into court"). Even if a claim is grounded upon rights which stem from a source other than a CBA, the claim will be preempted if it cannot be adjudicated without interpreting the CBA, or if it can be conclusively resolved by interpreting the CBA. *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 261-62 (1994). *See also Jenisio v. Ozark Airlines, Inc. Ret. Plan*, 187 F.3d 970, 973 (8th Cir. 1999) ("The RLA's arbitration requirement applies to pension disputes such as those presented here if the pension plan is (1) itself a CBA or (2) maintained pursuant to a CBA."); *Brown*, 254

14

F.3d at 664 ("when the heart of the dispute between the parties is a disagreement over the interpretation of some part of a CBA, the resolution of which could by itself resolve the claim, the claim would be precluded by the RLA under the traditional rule").

All disputes that "arguably" are covered by an RLA CBA are "minor" disputes that are subject to the RLA and must be resolved by the System Board. *See, e.g., Consol. Rail Corp. v. Ry. Labor Execs. Ass'n*, 491 U.S. 299, 306-07 (1989); *Air Line Pilots Ass'n v. Delta Air Lines, Inc.*, 863 F.2d 87, 91 n.2 (D.C. Cir. 1988). The D.C. Circuit also has recognized that "a court's view of the merits is irrelevant to the question whether a dispute under the RLA is a 'minor' one that must be submitted to arbitration." *Air Line Pilots Ass'n v. Eastern Air Lines*, 869 F.2d at 1521.

Significantly, courts in this Circuit and others frequently have stressed that "[t]here is a strong presumption in favor of finding a dispute to be minor." *United Transp. Union v. Nat'l R.R. Passenger Corp.*, 966 F. Supp. 1, 2 (D.D.C. 1997) (concluding that court lacked jurisdiction to issue a preliminary injunction maintaining the status quo because dispute at issue was a minor dispute under RLA). *See also Air Line Pilots Ass'n v. Eastern Air Lines, Inc.*, 869 F.2d 1518, 1521 (D.C. Cir. 1989) ("if there is any doubt as to whether a dispute is major or minor a court will construe the dispute to be minor") (citation omitted); *Bloemer v. Northwest Airlines, Inc.*, 401 F.3d 935, 939 (8th Cir. 2005) ("There is a presumption that disputes are minor and thus arbitrable.").

This Court has previously rejected ERISA claims, including claims for breach of fiduciary duty, because they were preempted by the RLA. *Everett*, 927 F. Supp. 478. In *Everett*, this Court concluded that the plaintiffs' claims under ERISA for defendants' failure to pay benefits due and for breach of fiduciary duty under ERISA were preempted by the RLA. *Id.* at 483. The court emphasized that the plaintiffs failed to articulate any claims for breach of

fiduciary duty that were sufficiently independent of the contract interpretation issue such that the court could exercise jurisdiction. *Id.*

> Plaintiffs' central contention is that USAir purposely misinterpreted the collective bargaining agreement and, thus, the pension plan to exclude dividends from the calculation of plan benefits. In the Court's view, this is precisely the sort of interpretive issue encompassed by the RLA's mandatory arbitration provisions. Plaintiffs' claim for benefits arises directly out of this interpretive question and the Court therefore lacks jurisdiction over it.

*Id.* One of the ERISA fiduciary duty provisions on which the plaintiffs unsuccessfully rested their claim in *Everett* was 29 U.S.C. § 1132(a)(1)(B). *See id.* at 480. That is the very same provision that forms the basis of Count II of Plaintiffs' Complaint here.

Consistent with this Court's ruling in *Everett*, many other courts across the country also have held that the RLA preempts ERISA and breach of fiduciary duty claims that do not arise wholly independent of a bargaining agreement. *See, e.g.*, *Hastings v. Wilson*, 2007 WL 333617, at **4-5 (D. Minn. Feb. 1, 2007) (RLA preempted plaintiffs' claims that defendants breached fiduciary duties under ERISA because plaintiffs relied on provisions within the plans, trust agreements and bargaining agreements); *Lauletta v. Transworld Express, Inc.*, 1997 WL 27153, at *3 (E.D. Pa. Jan. 15, 1997) (RLA preempted breach of fiduciary duty claim under ERISA related to alleged improper administration of benefit plans because the damages claimed by plaintiffs "all flow from [defendant's] failure to maintain the employee benefit plans").

Several courts also have held that the RLA preempts ERISA claims that relate to pension benefits. "An employee pension plan falls within the scope of the Railway Labor Act and is subject to its mandatory arbitration procedures." *Long v. Flying Tiger Line, Inc.*, 994 F.2d 692, 694 (9th Cir. 1993). In *Long*, the court concluded that plaintiffs' pension-related claim, "despite being clothed as an independent ERISA claim," was a minor dispute that was subject to mandatory arbitration. *Id.* at 695. *See also Jenisio*, 187 F.3d at 973-74 (RLA preempted ERISA claims seeking increased benefits under two pension plans); *Trans World Airlines, Inc. v.*

16

*Sinicropi*, 887 F. Supp. 595 (S.D.N.Y. 1995) (ERISA claims for pension benefits preempted by RLA).

In *Sinicropi*, the court engaged in a lengthy analysis of the interaction between the RLA and ERISA. The plaintiffs in *Sinicropi* alleged several different ERISA claims, including various theories of breach of fiduciary duty. The court noted that, in the plaintiffs' view, the case was primarily about ERISA and whether or not the defendants' actions as fiduciaries of the pension plan violated the terms of the plan and of ERISA. *Sinicropi*, 887 F. Supp. at 603. The court, however, rejected the plaintiffs' assertions. The court explained that while provisions of ERISA that allow parties to sue for failure to adhere to a pension plan may be independent of a bargaining agreement, they "are not the type of 'rights,' however, that were meant to escape RLA and LMRA pre-emption." *Id.* at 606. In cases where substantive rights do not exist but for the bargaining agreement, "Congress' interest in having such disputes resolved through its specified mechanism pre-empts alternative mechanisms that otherwise would have entitled the aggrieved party to seek the same relief." *Id.* The court concluded that the plaintiffs' claims, even if they would be actionable under ERISA, were preempted by the RLA because none of the counts was independent of the CBA. "While ERISA may also provide a mechanism for plaintiffs to vindicate their rights, pre-emption requires that the RLA arbitration scheme be the exclusive vehicle for the pursuit of that goal." *Id.* The court further reasoned that it was "arguably true" that the plaintiffs may have been deprived of certain "rights" resulting from the defendants' alleged failure to consider ERISA's commands that fiduciaries act in accordance with plan documents and that they discharge their duties with prudence. *Id.* at 607-08. The court concluded, however, that those rights "are of no independent value to plaintiffs" because the rights were "generated solely by the Collective Bargaining Agreement, and thus may be vindicated, if at all, only through the RLA arbitration scheme." *Id.* at 608.

17

Applying the foregoing principles to the facts of this case ineluctably establishes that Plaintiffs' ERISA claims are preempted by the RLA because resolution of those claims cannot exist without interpretation of the CBA. In fact, all of Plaintiffs' claims are ***entirely dependent*** on the terms of the CBA.[7] Thus, this is a textbook example of a situation in which the RLA preempts ERISA claims. For instance, paragraph 1 of the Complaint alleges that ALPA was designated to administer the "Pilots Program." Paragraph 2 alleges that ALPA was "required to allocate and distribute reasonably the Pension Funds in order to replace a portion of the retirement benefits that active employees lost when the United plan was terminated." Paragraph 4 alleges that Plaintiffs "will receive less than a fair, reasonable and equitable distribution of the Pension Funds due to them under the terms of the Pilot Program" and that they "seek to recover benefits due to them under the terms of the Pilots Retirement Compensation Program." Paragraph 6 of the Complaint requests an injunction to "ensure that a reasonable and lawful distribution" of the funds occurs because ALPA allegedly acted in an "unreasonable manner in its administration of the Pilots Program." Paragraphs 13, 38, 39, 40, 44, 46, 47, 51 and 52, among others, each allege, in one form or another, that ALPA was responsible, pursuant to the terms of the Pilot Program, for "reasonably allocating" and distributing the Pension Funds and/or "to act reasonably in determining the allocation and distribution of the Pension Funds under the Pilot Program."

Every one of those allegations derives ***exclusively*** from the terms of the CBA itself. Exhibit D to the CBA is the central provision on which Plaintiffs rest all of their claims in this case. A provision of that Exhibit states: "Distribution mechanics, eligibility and allocation

---

[7] Plaintiffs' confusing allegations assert that there is a "Pilots Retirement Compensation Program" or "Pilots Program." Plaintiffs apparently invented those terms on their own because they do not point to a single document – from ALPA or from United – that ever used either of those phrases. It also is interesting to note that the six law firms representing the plaintiffs in the two related federal lawsuits in Chicago never have used these invented phrases in their filings.

among such pilots to be reasonably determined  by [ALPA]."  *See* Plaintiffs' Memorandum, Exhibit 4, Exhibit D, p. 11.  Here, all of Plaintiffs' claims rest on the theory that "[u]nder the terms of the Pilots Program, ALPA was required to allocate and distribute reasonably the Pension Funds" and that ALPA "violated the terms of the Pilots Program by (a) failing to take into account the accrued and vested pension benefits that Plaintiffs lost" and "(b) unfairly, unreasonably, and unlawfully discriminating against Plaintiffs on the basis, *inter alia*, of their age and seniority."  Complaint ¶¶ 2, 3.  This necessarily requires a court to interpret the terms of the CBA, and perhaps prior CBAs in order to determine what allegedly would have been a "reasonable" allocation for Plaintiffs under the circumstances.

The conclusion is inescapable that none of Plaintiffs' alleged "rights" to a larger percentage of the proceeds of the Notes exists in ***any*** way that is wholly independent of the CBA itself or the related documents referenced therein.  Accordingly, Plaintiffs' ERISA and fiduciary duty claims are preempted by the RLA and must be pursued, if at all, exclusively through the Adjustment Board.

## C.    Plaintiffs' Claims Are Independently Preempted By The RLA's Duty Of Fair Representation.

The RLA duty of fair representation also serves as an independent basis of preemption for Plaintiffs' ERISA claims, as well as their claim in Count IV for "common law breach of fiduciary duty."

A related but independent basis for preemption exists with respect to Count IV of the Complaint, in which Plaintiffs allege a "common law fiduciary duty" claim based on the exact same set of facts as their other Counts.  As to this claim, Count IV is preempted by the duty of fair representation that implicitly exists under the RLA.

In *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959), the Supreme Court explained that state law claims are presumptively preempted if they concern conduct that

19

is arguably or actually either prohibited or protected by federal labor law. *Id.* at 245. Although *Garmon* preemption first arose in the context of the National Labor Relations Act ("NLRA"), the *Garmon* preemption doctrine has been extended to conduct governed by the RLA. *See, e.g., Cooper v. TWA Airlines, LLC*, 349 F. Supp. 2d 495, 505 (E.D.N.Y. 2004) (citing *Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 383-84 (1969)). In fact, the scope of RLA preemption of state law claims is even broader. "Unlike preemption under the NLRA, the preemption of state law claims under the RLA has been more complete." *Peterson v. Air Line Pilots Ass'n, Int'l*, 759 F.2d 1161, 1169 (4th Cir. 1985). Accordingly, "state claims that attempt to regulate conduct protected or prohibited by the RLA are preempted." *Cooper*, 349 F. Supp. 2d at 505.[8] Similar analysis has been applied to bar claims arising out of other federal statutes (most notably RICO) that concern conduct regulated the NLRA and RLA. *Brennan v. Chestnut*, 973 F.2d 644, 646 (8th Cir. 1992) (NLRA); *Mann v. Air Line Pilots Ass'n*, 848 F. Supp. 990, 993-94 (S.D. Fla. 1994) (RLA).

Consistent with these settled legal principles, courts repeatedly have dismissed common law claims, including claims for "breach of fiduciary duty," for lack of subject matter jurisdiction because those claims are subsumed by the duty of fair representation that arises under the RLA. *See, e.g., Maurer v. Trans World Airlines, Inc.*, 316 F. Supp. 2d 84, 92 (D. Conn. 2003) (duty of fair representation preempted plaintiffs' claim for breach of fiduciary duty because claim arose out of same circumstances from which the duty of fair representation arises); *Ford v. Air Line Pilots Ass'n*, 268 F. Supp. 2d 271, 292 (E.D.N.Y. 2003) (RLA preempted breach of contract and fiduciary duty claims that were duplicative of duty of fair representation claim); *Arnold v. Air*

---

[8] There are two limited exceptions to *Garmon* preemption: (1) conduct that is "deeply rooted in local feeling and responsibility," and (2) matters of "only peripheral concern" to federal labor relations law. It is quite clear that neither of these narrow exceptions applies to the facts of this case.

*Midwest, Inc.*, 1994 WL 247442, at *7 (D. Kan. May 24, 1994) (RLA preempted plaintiff's breach of contract and breach of fiduciary duty claims, both of which "alleged conduct that involves ALPA's representational activities and are subject to and subsumed within its federal duty of fair representation"), *aff'd*, 100 F.3d 857 (10th Cir. 1996).

Similarly, courts have rejected a host of other common law tort and contract-related theories because those claims were preempted by the duty of fair representation under the RLA. *See, e.g.*, *May v. Shuttle, Inc.*, 129 F.3d 165, 179 (D.C. Cir. 1997) (claim of fraud and deceit). *See also Bensel v. Allied Pilots Ass'n*, 387 F.3d 298, 320-23 (3d Cir. 2004) (fraudulent misrepresentation, tortious interference with contract and conspiracy claims); *Peterson*, 759 F.2d at 1170 (blacklisting, conspiracy and tortious interference claims); *Cooper*, 349 F. Supp. 2d at 504-08 (breach of contract, fraud, negligent misrepresentation, fraudulent inducement, breach of implied covenant of good faith and fair dealing, promissory estoppel and unjust enrichment).

The reason such common law claims are preempted by the duty of fair representation is that "even though it is possible for a union to assume duties in excess of the duty of fair representation, such duties cannot be mere refinements of what constitutes the duty of fair representation." *Nellis v. Air Line Pilots Ass'n*, 805 F. Supp. 355, 360 (E.D. Va. 1992) (tort, contract and quasi-contract claims preempted by RLA's duty of fair representation), *aff'd*, 15 F.3d 50 (4th Cir. 1994). *See also Cooper*, 349 F. Supp. 2d at 507-08. A claim is a mere refinement of the RLA duty "if it is based on the same conduct that would support a federal duty of fair representation claim or if it seeks to vindicate the same rights as the federal duty of fair representation." *Cooper*, 349 F. Supp. 2d at 508.

In this case, Plaintiffs allege that ALPA is a fiduciary under ERISA and common law in connection with its allocation of the "pension funds." In truth, the Complaint simply parrots the legal standard applicable to the duty of fair representation under the RLA because Plaintiffs

21

allege that ALPA made a "discriminatory allocation" and distributed the proceeds of the Notes in an "arbitrary" manner. *See* Complaint, ¶¶ 40, 48, 53. *See also Vaca v. Sipes*, 386 U.S. 171, 190 (1967) (union violates its duty of fair representation to the employees it represents only if its actions are arbitrary, discriminatory, or in bad faith). Indeed, the entire set of allegations in Count IV largely mirrors the duties subsumed within a union's duty of fair representation. Accordingly, Count IV clearly is preempted by the RLA's duty of fair representation.

The motive behind Plaintiffs' attempt to recast RLA claims under the guise of ERISA and/or a common law claim for breach of fiduciary duty is obvious. Had the claims properly been styled as claims under the RLA, they would be time-barred by the six-month statute of limitations, as we will now discuss.

### D. Plaintiffs' Disguised RLA Claim Is Barred By The Six-Month Statute Of Limitations.

A six-month statute of limitations applies to a claim brought against a union for breach of the duty of fair representation under the RLA. *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 155 (1983); *United Indep. Flight Officers v. United Air Lines, Inc.*, 756 F.2d 1262, 1269-70 (7th Cir. 1985). This limitations period begins to run "when plaintiffs knew or should have been aware of their injury." *May*, 129 F.3d at 177 (affirming summary judgment where plaintiffs filed their lawsuit after the limitations period expired). *See also Dozier v. Trans World Airlines, Inc.*, 760 F.2d 849, 851 (7th Cir. 1985) (six-month statute of limitations "generally begins to run when 'the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged [breach of duty].'") (citations omitted). In *Dozier*, the Seventh Circuit affirmed summary judgment for the union on statute of limitations grounds where the union denied the plaintiff's request for further processing of his grievance "in no uncertain terms" and then the same "clear sentiment appeared in every future communication received by plaintiff from the Union." *Dozier*, 760 F.2d at 851-52.

Here, the MEC unequivocally adopted GAP 2 on January 18, 2006.  Morse Supp. Decl., ¶¶ 10-12.  Those general decisions were first communicated to all UAL pilots on January 18, 2006, and again just two days later.  *See id.*  The January 20, 2006 communication to all United pilots included verbatim copies of the MEC's resolutions.  *See id.*  Thus, the six-month statute of limitations began to run no later than January 20, 2006.  Alternatively, the limitations period definitely began to run when Plaintiffs received additional information about the allocation methodology in July 2006 from Lynn Hughitt, which directed Plaintiffs to a website to view their estimated allocations.  Even under the most liberal interpretation possible, by the time Plaintiffs received their initial distributions in August 2006 (*see* Complaint, ¶¶ 10-12), they either knew or should have known that the allocation methodology was, in their minds, unreasonable.  ***Yet, even after Plaintiffs received that first distribution in August 2006, they waited more than six additional months, until February 22, 2007, to file this lawsuit.***  Under these circumstances, there is no question that Plaintiffs' disguised RLA claims are time-barred under the RLA as a matter of law.[9]

### E.     Plaintiffs Cannot Show That ALPA Breached A Duty of Fair Representation.

Even assuming *arguendo* that there were no statute of limitations bar here, Plaintiffs could not establish a substantial likelihood of success on the merits of a theoretical claim for a breach of the duty of fair representation.  A union violates its duty of fair representation to the employees it represents only if its actions are arbitrary, discriminatory, or in bad faith.  *Vaca*, 386 U.S. at 190.  This is a tripartite standard, but each prong poses a stringent burden on a plaintiff because federal labor laws neither require nor allow courts to second-guess the actions of unions engaged in collective bargaining functions.  Since a union, as the exclusive representative of a

---

[9]   In light of ALPA's statute of limitations defense, any attempt by Plaintiffs to amend their Complaint in order to add a RLA claim would be futile as a matter of law.

defined group of employees, must balance the often-conflicting interests of the group's members,

the Supreme Court long has granted unions very broad discretion to make their decisions.

> Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.

*Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953).

Although *Huffman* arose under the National Labor Relations Act, the same standard

applies under the RLA. For example, in *Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65 (1991),

the Supreme Court unanimously stressed the substantial deference that courts must give to a

union's decisions under the RLA:

> Congress did not intend judicial review of a union's performance to permit the court to substitute its own view of the proper bargain for that reached by the union. Rather, Congress envisioned the relationship between the courts and labor unions as similar to that between the courts and the legislature. Any substantive examination of a union's performance, therefore, must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities. . . . For that reason, the final product of the bargaining process may constitute evidence of a breach of duty only if it can be fairly characterized as so far outside a 'wide range of reasonableness' that it is wholly 'irrational' or 'arbitrary.'

*Id.* at 78 (citations omitted).

In *Gwin v. National Marine Engineers Beneficial Ass'n*, 966 F. Supp. 4 (D.D.C. May 1,

1997), the court cited *O'Neill* and stressed that "[a] union is entitled to great deference in

performing its representational duties." *Id.* at *7. *See also Ooley v. Schwitzer Div., Household

Mfg. Corp.*, 961 F.2d 1293, 1302 (7th Cir. 1992) ("Under this extremely deferential standard,

courts should not substitute their judgment for that of the union, even if, with the benefit of

hindsight, it appears that the union could have made a better call."). Similarly, "[c]ourts

generally defer to union's tactical decisions, even where their representation is not error free."

*Blasic v. Int'l Ass'n of Machinists, Auto. Lodge 1486*, 1999 WL 1075145, 162 L.R.R.M. (BNA) 2886 (D.D.C. Nov. 3, 1999). Mere negligence, poor judgment or ineptitude also are insufficient to establish a breach of the duty of fair representation. *Swatts v. United Steelworkers of Am.*, 808 F.2d 1221, 1224 (7th Cir. 1986) (citation omitted).

A different standard applies among the three prongs of the test. "Unfair representation as arbitrariness requires inquiry into the objective adequacy of union action; unfair representation as discrimination or bad faith requires inquiry into the subjective motivation behind union action." *Trnka v. Local Union No. 688*, 30 F.3d 60, 63 (7th Cir. 1994). Both the "discrimination" standard and the "in bad faith" standard are difficult burdens. The discrimination component requires substantial evidence of invidious discrimination that is "intentional, severe, and unrelated to legitimate union objectives." *Amalgamated Ass'n v. Lockridge*, 403 U.S. 274, 301 (1971). The bad faith component requires "substantial evidence of fraud, deceitful action or dishonest conduct." *Id.* at 299.

Here, Plaintiffs are **senior** pilots who claim that ALPA treated them unfairly. In contrast, the plaintiffs in *Hudson*, one of the related cases now pending in Chicago, are **junior** pilots who claim they too were treated unfairly by ALPA. The claims of both groups of plaintiffs arise out of the very same pool of proceeds of the Notes, and both groups of plaintiffs claim that they should have gotten a larger piece of the pie. Inevitably, however, some subset or subsets of the many thousands of United pilots would be dissatisfied with ALPA's allocation decisions. The fact that both junior and senior pilots are complaining at the same time about the same proceeds shows that ALPA acted well within its broad discretion under the RLA, even if groups on either end of the seniority scale appear to be dissatisfied with the end result. If federal courts could second-guess such decisions as easily as Plaintiffs would have the Court believe, it would completely contravene the purpose and framework of several federal labor laws, including the

25

RLA, that are designed to grant unions the wide latitude recognized by the Supreme Court. In *Huffman*, the Court explained that "[a] major responsibility of negotiators is to weigh the relative advantages and disadvantages of differing proposals." 345 U.S. at 338. The attached Declarations of Woody and Morse make it abundantly clear that the MEC evaluated competing proposals in great detail over an extended period of time. That certain groups feel that their shares of the proceeds of the Notes should have been bigger does not transform ALPA's reasonable exercise of its broad discretion into a violation of the RLA. Thus, Plaintiffs will not succeed on the merits of a RLA claim — even if they had properly and timely pursued such a claim in the first instance.

On many occasions, courts have applied the above-referenced legal standards and concluded that union decisions that disadvantage one group at the expense of a majority typically are not actionable under the RLA because such outcomes are inevitable. For example, in *Caudle v. Pan American World Airways, Inc.*, 676 F. Supp. 314 (D.D.C. 1987), the plaintiffs alleged that ALPA breached a duty of fair representation under the RLA following a merger between Pan Am and National. The former National pilots claimed that ALPA and Pan Am favored the pre-merger Pan Am pilots because "the union [was] dominated, in numerical and thus political terms, by former Pan Am pilots." *Id.* at 318-19. The district court rejected the plaintiffs' claims that ALPA "intentionally manipulated grievances to suit the whims of pre-merger Pan Am pilots," improperly excluded former National pilots from settlement discussions, and favored pre-merger Pan Am pilots in the settlement agreement. The court held that the union's actions were not actionable and granted ALPA's motion for summary judgment.

> A union's duty to fairly represent the individuals in its bargaining unit is a difficult task under the best of circumstances. Complicating ALPA's duty in this case was the tension resulting from the merger of Pan Am and National. The January 12, 1984, settlement agreement was neither a model of perfection, nor was the process leading up to the agreement entirely without flaw. Nonetheless, the duty of fair representation does not impose a requirement of perfection or

> flawlessness; rather, the duty is breached only when a union's conduct is "arbitrary, discriminatory, or in bad faith." Because the record does not reflect either discriminatory intent or bad faith, ALPA is entitled to summary judgment against the plaintiff.

*Id.* at 324. This analysis comported with the purpose of the RLA's highly deferential standard accorded to a union's decisions. "[T]he very nature of collective bargaining requires an agent to balance interests that quite often are contradictory." *Id.* at 317.

*Griffin v. Air Line Pilots Ass'n*, 32 F.3d 1079 (7th Cir. 1994), is another instructive case. The plaintiffs alleged that ALPA breached a duty of fair representation under the RLA by failing to intervene when their employer, Simmons Airlines, demoted them from junior captains to first officers. The plaintiffs also complained that ALPA committed a breach by proposing the demotions to Simmons as a possible solution to the airline's shortage of first officers, and argued that the union's proposed solution (which Simmons accepted) enabled their desirable jobs as first officers to be taken by more loyal members of the union's rank and file. The district court rejected the plaintiffs' claims and the Seventh Circuit affirmed that decision. The Seventh Circuit held that the union's decision to send the plaintiffs back into the lower ranks of first officer was not actionable under *any* prong of the DFR test.

> The union simply allowed [plaintiffs'] interest to be overridden to advance the will of the majority: it is the nature of any union that the majority can prevail against the minority. This may be distasteful, especially as here, where the minority has a sympathetic position. But it cannot be described as arbitrary, discriminatory or in bad faith. If it could, virtually every union decision – which, assuming dissent, always entails the majority's success against a minority – could be construed as a breach of duty of fair representation claim.

*Id.* at 1084. The court further explained that "[a]s with any organization that must decide an issue of controversy, we must assume that many union actions satisfy a majority of its members to the chagrin of a few. This concept might blur the best vision of a union, but it does not violate federal labor laws." *Id.* at 1083.

In *Rakestraw v. Air Line Pilots Ass'n*, 981 F.2d 1524 (7th Cir. 1992), which arose as a

result of a merger between Ozark and TWA airlines, pilots from Ozark claimed that ALPA breached its duty of fair representation by entering into a seniority merger agreement with the airline which provided that the start dates for all pilots would be the day they began work with their respective airlines.  Thus, this agreement did not provide protection for Ozark's younger and less senior group.  The younger pilots claimed they were penalized because they were not numerous enough to influence the union.  The Seventh Circuit affirmed judgment for ALPA. Relying on the Supreme Court's teachings in *O'Neill*, the court stressed that "the effort to aid one group at the expense of another is not *itself* arbitrary or in bad faith."  *Id.* at 1532 (italics in original).  The court also rejected the notion that merely slapping the label "bad faith" or "discrimination" on a classification that had a rational basis does not make it discriminatory. "Knowledge that some groups gain or lose as a result of a rule does not even amount to a discriminatory motive."  *Id.* at 1532.  The court further explained:

> The losers always may say that the union 'intended' them to lose.  As all of society is an assembly of minorities, the losers can point to some respect (age, sex, religion, politics, skill, health, membership in the union, status during the most recent strike) in which they are in a minority, and insist that the distinction must have been part of a 'bad faith' plot to 'penalize' them on account of that status.  Taken to its limits, the approach prevents the union from resolving differences internally and representing the interests of workers as a group.

*Id.* at 1531.  The court also emphasized that "*Huffman* and *O'Neill* show that a conflict among workers does not undercut the union's ability to choose."  *Id.*

Applying these principles to the facts, Plaintiffs would not have any likelihood, let alone a substantial likelihood, of prevailing on a duty of fair representation claim.  As discussed above and at length in the attached Declarations, the process ALPA undertook to devise and implement its allocation methodology determinations was laborious, expensive, and not even remotely "arbitrary, discriminatory or in bad faith."  The decision-making process included the benefit of substantial analyses by ALPA's independent actuarial consultants and in-house and outside

counsel.  Woody Decl. ¶¶ 1, 3-7.  Between the fall of 2004 and January 2006, members of the R&I Committee devoted countless hours to the tasks of developing allocation models.  *Id.* ¶ 8. The R&I Committee contemplated at least four possible allocation methodologies beginning in January 2005, including GAP 2.  *Id.* ¶ 17.  Following that meeting, the MEC considered GAP 2 and several other possible allocation methodologies during the course of at least eight subsequent meetings in the ensuing year.  *Id.* ¶ 16.  Ultimately, the MEC decided to adopt GAP 2 in January 2006.  These facts hardly evince conduct that is arbitrary, discriminatory or in bad faith.

### F.    The Exculpation Clause In United's Plan Of Reorganization Provides ALPA With A Complete Defense.

Plaintiffs' claims against ALPA also are barred for an unrelated but independent reason. Specifically, United's POR grants ALPA broad immunity and exculpation from any claims related to the distribution of any property pursuant to the POR – such as the proceeds of the Notes – and, more generally, from any claims connected to, related to, or arising out of United's restructuring.  Again, to avoid unnecessary duplication, ALPA incorporates that portion of the legal argument from United's memoranda in support of its motion to intervene and/or in opposition to Plaintiffs' Motion for Preliminary Injunction.[10]

For any or all of the foregoing reasons, it is highly ***unlikely*** that Plaintiffs would prevail on the merits of their claims.  Thus, this Court should deny their request for an injunction because they have fallen far short of meeting their burden to show a substantial likelihood of success on the merits.  *See Coleman-Adebayo v. Leavitt*, 326 F. Supp. 2d 132, 136, 144 (D.D.C. 2004) (Friedman, J.) (declining to address other injunction factors where plaintiff failed to show that she was not likely to prevail on the merits);  *See also Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 182 n.2 (D.C. Cir. 2006) (noting that a court may not issue a preliminary injunction

---

[10]  ALPA and United disagree as to certain indemnification issues, but those issues are not relevant to Plaintiffs' motion for preliminary injunction.

where plaintiff has no likelihood of success on the merits); *Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 624 (D.C. Cir. 1992) (affirming decision to deny preliminary injunction which was based on conclusion that there was no likelihood of success on the merits); *United Mine Workers of Am., Int'l Union v. Dye*, 2006 WL 2460717, at *6 (D.D.C. Aug. 23, 2006) ("If a plaintiff has no likelihood of success on the merits, inquiry into the remaining factors is unnecessary, for the injunctive relief must be denied on that ground alone.").

## II.    PLAINTIFFS' INACTION DURING THE LAST 13 MONTHS IS POWERFUL PROOF THAT THERE IS NO NEED FOR A PRELIMINARY INJUNCTION.

Even if Plaintiffs could show that they have a substantial likelihood of success on their merits, they cannot establish that they have suffered irreparable harm or that any emergency necessitates the drastic relief of a preliminary injunction.

Many courts have stressed that a delay in seeking injunctive relief is inconsistent with the notion that plaintiffs face irreparable harm.  "An unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm."  *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005).  *See also Sandoz, Inc. v. Food & Drug Admin.*, 439 F. Supp. 2d 26, 31-32 (D.D.C. 2006) (finding no irreparable harm where plaintiff "delayed pursuing th[e] action until the last minute").  *See also Fenje v. Feld*, 2002 WL 1160158, at *2 (N.D. Ill. May 29, 2002) ("delay in pursuing relief undercuts claims of irreparable harm and may be considered as circumstantial evidence that the potential harm to plaintiff is not irreparable or as great as claimed"); *Saukstelis v. City of Chicago*, 1990 WL 146711, at *8 (N.D. Ill. Oct. 3, 1990) (same), *aff'd*, 932 F.2d 1171 (7th Cir. 1991).

Moreover, any evidentiary difficulties resulting from such delays must be held against Plaintiffs, the movants:

> To the extent the urgency created by the delay prevents the evidence from being adequately developed, the weakness in the evidence or failure to make an adequate showing of a likelihood of success or irreparable harm will be held

against the movant.  Additionally, the delay may be considered in balancing the hardships.

*Fenje*, 2002 WL 1160158, at *2 (ruling that plaintiff's dilatory conduct in seeking injunctive relief meant that "doubts or close factual issues generally will be resolved against plaintiff").

In this Circuit, delays of several weeks or months are grounds for denying injunctive relief.  For example, in *Fund For Animals v. Frizzell*, 530 F.2d 982 (D.C. Cir. 1975), the D.C. Circuit affirmed denial of a motion for preliminary injunction where the movant sought relief on the day a final regulation was set to issue, despite its knowledge of the anticipated agency action some 44 days earlier.  The court stressed that the movant's delay was "inexcusable."  *Id.* at 987-88.  Similarly, in *Mylan Pharmaceuticals, Inc. v. Shalala*, 81 F. Supp. 2d 30 (D.D.C. 2000), the court denied a motion for preliminary injunction because, *inter alia*, the plaintiff's delay of over eight months in seeking relief "undercut[] its allegation of irreparable harm."  *Id.* at 42-44.

These principles clearly apply to Plaintiffs' conduct in this action and demonstrate that the drastic remedy of preliminary injunctive relief is unwarranted.  In fact, Plaintiffs delays are even more egregious than in the cases discussed above.  The MEC made its allocation decisions on January 18, 2006, more than 13 months before Plaintiffs filed their lawsuit.  The MEC's decisions were widely communicated to all pilots, both on January 20, 2006, and for months thereafter, as established, among other places, in Morse's Supplemental Declaration (Exhibit 2, ¶ 12) and in the Hughitt letter attached as Exhibit 3 to Plaintiffs' Memorandum.  The first round of distributions of proceeds, which amounted to approximately $351 of the total amount of $537 million – occurred in August 2006 – and Plaintiffs received distributions at that time.  *See* Complaint ¶¶ 5, 10-12.  Yet, despite their apparent dissatisfaction with the GAP 2 methodology, Plaintiffs never filed suit or sought to enjoin those distributions, even though they came from the very same general pool of proceeds from which Plaintiffs now seek a larger slice of the pie. Plaintiffs cannot reconcile their inaction in July and August 2006 with their current claim that

31

they allegedly will suffer irreparable injury if the March 2007 distributions are not enjoined.

Not only did Plaintiffs waive any claim of alleged irreparable harm by sticking their heads in the sand in the months leading up to and during the August 2006 distributions, they also sat idle *for more than six months thereafter*. It was not until the eleventh hour, on February 22, 2007, that Plaintiffs even filed their lawsuit. All of these facts further undermine any claim of an alleged emergency or alleged irreparable harm. Plaintiffs' motion and memorandum do not, of course, provide any explanation as to why they failed to seek injunctive relief long ago. The silence is deafening.

Instead of attempting to address their own inaction, Plaintiffs misleadingly assert in footnote 1 of their motion that it was not until February 21, 2007 that "Plaintiffs learned that ALPA had announced that final distribution is planned for the 'second week of March.'" Plaintiffs apparently never bothered to read the exhibits attached to their own filings! Exhibit 3 to their Memorandum is the July 18, 2006 letter from Lynn Hughitt. The first page of Hughitt's letter reiterated the widely-publicized point that the formula used to determine the allocation for ALPA "was discussed and approved by the United MEC in January 2006." Hughitt also attached a Q&A piece to her letter that answered questions about, among other things, the timing and distribution dates of the proceeds. The first page of that Q&A unequivocally stated that most of the proceeds would be distributed "on or about August 15, 2006" and that any remaining proceeds "would be distributed at a later date, once the initial allocation has been completed successfully, *but no later than March 15, 2007.*" *See* Plaintiffs' Memorandum, Exhibit 3, p. 2 (emphasis added).

Elsewhere in their brief, Plaintiffs assert (p. 16) that, if they were to prevail on the merits, "*all* pilots would receive their fair share of the remaining available vested retirement benefits." But not all pilots who received proceeds in August 2006 will receive distributions in March

2007. Woody Decl. ¶ 26. For example, retirees and pilots on leave received their entire distribution in August 2006 and will receive nothing in March 2007. *Id.* This means that Plaintiffs are now belatedly trying to divert funds from a more limited subset of pilots. *Id.* Had Plaintiffs sought a preliminary injunction prior to August 2006 and established that they were entitled to such drastic relief, the Court could have entered an order restraining the distributions to all pilots across the board in an equitable fashion. As it stands now, however, Plaintiffs' untimely request for a preliminary injunction – even in the unlikely event that such relief were warranted – would discriminate, solely because of Plaintiffs' own dilatory conduct, against the smaller subset of pilots who are awaiting distributions in March 2007.

## III.    PLAINTIFFS' MOTION SHOULD BE DENIED BECAUSE ENJOINING THE MARCH 2007 DISTRIBUTION MAY RESULT IN SUBSTANTIAL TAX COSTS AND EXCISE TAX PENALTIES TO *ALL* UNITED PILOTS.

Even if Plaintiffs' inexcusable delays did not defeat their claim of irreparable harm, one element that courts must consider is whether an injunction would substantially injure other interested parties. *Cityfed*, 58 F.3d at 746-47. Here, Plaintiffs' Memorandum asserts (p. 15) in purely conclusory fashion that "neither ALPA nor any third parties – including the junior pilots – will be harmed to any appreciable degree if this court grants preliminary injunctive relief." That bald assertion is entirely unpersuasive, because enjoining the March 2007 distributions may in fact have a significant adverse impact on *all* of ALPA's pilots at United who will be receiving distributions in March 2007.

The March 15, 2007 deadline for distribution of the remaining proceeds was selected for compelling tax reasons under the Internal Revenue Code. *See generally* Woody Decl. ¶¶ 23-25. Specifically, under Section 409A of the Internal Revenue Code, completion of the distribution prior to March 15, 2007 will enable *all* pilots to avoid the possibility of having some of the distribution, which would otherwise be contributed by United to the pilots' tax-qualified defined

33

contribution retirement plan on a tax-deferred basis, become subject to full immediate income and FICA taxation. *Id.* ¶ 25. In addition, the scheduled distribution will prevent each pilot from incurring the risk of a substantial excise tax penalty over and above the income tax otherwise due. *Id.* The reason is that the March 15, 2007 deadline for the distribution is consistent with the IRS's "safe harbor" exception to the strictures of Section 409A for short-term deferrals following the end of the tax year in which the income would otherwise be taxable. *See* Woody Decl. ¶ 25. Enjoining those distributions, on the other hand, could cause substantial tax disadvantages for *all* United pilots – and may result in new claims against ALPA and/or United. For this reason as well, Plaintiffs' motion should be denied.

## IV.    IN THE UNLIKELY EVENT THAT INJUNCTIVE RELIEF IS WARRANTED, PLAINTIFFS MUST BE REQUIRED TO POST A SUBSTANTIAL BOND.

Federal Rule of Civil Procedure 65(c) provides that "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Thus, courts routinely require parties seeking injunctive relief to post an appropriate bond. Indeed, Rule 65(c) "imposes a requirement of security … for the precise purpose of assuring compensation of the defendant for the resulting losses if the injunction proves to have been wrongfully granted." *Nat'l Kidney Patients Ass'n v. Sullivan*, 958 F.2d 1127, 1134-35 (D.C. Cir. 1992). *See also Bd. of Educ. of Oak Park & River Forest High Sch. Dist. v. Illinois State Bd. of Educ.*, 79 F.3d 654, 659 (7th Cir. 1996) ("Ordinarily, to get an injunction, [movant] must post a bond and if the injunction is later reversed the person enjoined is entitled to recover his damages, at least up to the limit of the bond, caused by the wrongful injunction."); *Storck USA LP v. Farley Candy Co., Inc.*, 797 F. Supp. 1399, 1414 (N.D. Ill. 1992) (purpose of security "is to protect the restrained party from damages incurred by that party as a result of the wrongful issuance of an injunction").

In this case, neither Plaintiffs' motion nor their supporting memorandum addresses the issue of a bond. As explained above, enjoining the March 2007 distributions could result in substantial adverse tax consequences to all United pilots. *See* Woody Decl. ¶¶ 23-25. Plaintiffs, in contrast, seek a benefit that would apply only to their putative class. The potential adverse tax ramifications, however, are much broader. This illustrates why, in the unlikely event that preliminary injunctive relief is warranted, the Court should require Plaintiffs to post a significant bond to account for the potential harm to *all* pilots if the distributions are wrongfully restrained. A conservative estimate is that only 20 percent of the $186 million in forthcoming distributions would be treated as ordinary income and subject to immediate taxation. Federal rates alone presumably would be much higher for most of the affected pilots. Nonetheless, using the conservative 20 percent figure, a proper bond would have to be no less than $37.2 million. But enjoining the distributions also may cause a separate and additional excise/penalty tax of 20 percent of the distributions under applicable provisions and regulations of the Internal Revenue Code. *See* Woody Decl. ¶ 25. This additional adverse consequence justifies increasing the bond requirement by another $37.2 million. Thus, the Court should require Plaintiffs to post a bond of at least $74.4 million as a condition precedent to any potential injunction.

## Conclusion

For the foregoing reasons, ALPA respectfully requests that this Court deny Plaintiffs' motion for preliminary injunction.[11] Alternatively, if any injunctive relief were to be granted, the Court should require Plaintiffs to post a bond of at least $74.4 million.

Respectfully submitted,

By: /s/ Archis A. Parasharami
Andrew A. Nicely (D.C. Bar No. 458805)
Archis A. Parasharami (D.C. Bar No. 477493)

---

[11] A Proposed Order to that effect is attached hereto as Exhibit 3.

MAYER, BROWN, ROWE & MAW LLP
1909 K Street, N.W.
Washington, D.C.  20006
(202) 263-3000

Andrew S. Marovitz (admitted pro hac vice)
Andrew S. Rosenman (admitted pro hac vice)
Debra Bogo-Ernst (admitted pro hac vice)
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, Illinois  60606
Phone:  (312) 782-0600
Fax:  (312) 701-7711

Of Counsel:

Peter Herman
COHEN, WEISS AND SIMON LLP
330 West 42d Street
New York, New York  10036
Phone:  (212) 356-0209
Fax:  (646) 473-8209

Clay Warner  (D.C. Bar No. 398346)
David Semanchik (D.C. Bar No. 502837)
AIR LINE PILOTS ASSOCIATION, INTERNATIONAL
LEGAL DEPARTMENT
1625 Massachusetts Avenue, N.W.
Washington, DC  20036
Phone:  (202) 797-4095
Fax:  (202) 797-4014

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that copies of Defendants' Memorandum of Points and Authorities In Opposition To Plaintiff's Motion For Preliminary Injunction and this Certificate of Service were served upon the following:

> Andrew H. Marks
> Aryeh S. Portnoy
> William Flanagan
> Daniel Kim
> Crowell & Moring, LLP
> 1001 Pennsylvania Avenue, NW
> Washington, DC 20004

via the court's electronic case filing system on March 1, 2007 and

> Michael S. Olin
> Tucker Ronzetti
> Kozyak, Tropin & Throckmorton, PA
> 2525 Ponce de Leon, 9th Floor
> Miami, FL 33134

> Jeffrey W. Pagano
> Crowell & Morning, LLP
> 153 East 53rd Street, 31st Floor
> New York, NY 10022

by overnight delivery (Saturday delivery) on March 2, 2007.

By: /s/ Archis A. Parasharami
      One of Defendant's attorneys

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| BRUCE HUDSON, RAYMOND CHOP, ERIC PASSANANTE, | ) ) ) | |
| *Plaintiffs*, | ) ) | **07 CV 590** |
| v. | ) ) ) | **Judge Kennelly** |
| AIR LINE PILOTS ASSOCIATION, INTERNATIONAL and AIR LINE PILOTS ASSOCIATION UNITED AIRLINES MASTER EXECUTIVE COUNCIL, | ) ) ) ) | **Magistrate Judge Ashman** |
| *Defendants*. | ) ) | |

### DECLARATION OF RUSSELL WOODY

I, RUSSELL WOODY, being competent to testify as a witness, hereby declare under penalty of perjury as follows:

1.   Since March 1, 2004, I have been employed by the Air Line Pilots Association, International ("ALPA"), as a Senior Benefits Counsel. I am a member of the bar of the Supreme Court of Illinois and a member of the trial bar of this Court. I am also a member of the bars of the United States Supreme Court, the United States Courts of Appeals for the Sixth, Seventh and Eighth Circuits, the United States District Court for the Eastern District of Wisconsin and the United States District for the District of Nebraska. Prior to accepting employment with ALPA, I was engaged in the private practice of law in the City of Chicago, Illinois for more than 35 years, specializing in federal labor law under the National Labor Relations Act and the Railway Labor Act and, from and after 1974, in the Employee Retirement Income Security Act of 1974 ("ERISA").

2.   ALPA is a labor organization within the meaning of the Railway Labor Act, 45 U.S.C. §151, *et seq.* (the "RLA"), and the exclusive collective bargaining representative of the airline pilots in the service of United Airlines, Inc. ("United"). As ALPA Senior Benefits Counsel, my assignments have included responsibility for advising and assisting the United Airlines Master Executive Council of ALPA (the "MEC"), the MEC officers and various of the MEC's committees, primarily including the Retirement and Insurance Committee (the "R&I Committee"). The MEC is the coordinating council for ALPA for purposes of its representation of United pilots, comprising representatives elected by the United pilots and officers elected by the members of the MEC. My office is in the MEC office in Rosemont, Illinois.

1

3. In my capacity as Senior Benefits Counsel, I have worked closely with the MEC, its officers and members, the members from time to time of the R&I Committee of the MEC, various members of ALPA Staff, ALPA's independent legal, actuarial and financial consultants and representatives of United, regarding, *inter alia*, the Senior Subordinated Convertible Notes (the "Notes") of United which are the subject of this lawsuit. In that connection, I attended almost all of the MEC meetings at which the Notes were discussed, assisting the R&I Committee in presentations to the MEC and responding to questions of MEC officers and members. I also attended numerous meetings of the R&I Committee regarding the Notes. I also participated in many conferences, in person and by telephone, with ALPA's consultants, participated in the drafting of most of the pertinent contractual and other documents relating to the Notes. I assisted in the drafting of, and reviewed from a legal point of view, each of the numerous written communications to the United pilot group on the subject of the Notes. During the period from December 2004 through July 2005, I estimate that I devoted in excess of 80% of my time to my responsibilities for the United pilot group, of which a substantial majority was devoted to matters relating to the Notes. During the period subsequent to July 2005 and continuing through December 2005, I devoted at least half my time to the United pilot group, almost all of which related to matters pertaining to the Notes and to the distribution of the equity in reorganized United to be distributed in respect of the ALPA bankruptcy claim, and from December 2005 through August 2006, I spent approximately 25% of my time to United pilot matters, most of which related to the mechanism for delivery of the proceeds of sale of the Notes. I make this affidavit on my own personal knowledge except where otherwise expressly indicated.

4. ALPA's independent actuarial consultants with respect to the Notes are Buck Consultants ("Buck"), a national actuarial and benefit consulting firm. I participated in the interview and retention of Buck in August 2004 and negotiated and drafted the consulting agreement between ALPA and Buck. The Buck principal and consulting actuary responsible for the ALPA engagement since August 2004 is Paul Rusin ("Rusin"), a Fellow of the Society of Actuaries and an ERISA Enrolled Actuary. Rusin and his colleagues, including Anthony J. Ledden, prepared numerous reports, computations and projections for the R&I Committee and MEC, prepared detailed estimates of the benefits to be paid to United pilots by the Pension Benefit Guaranty Corporation (the "PBGC") and advised ALPA regarding the actuarial assumptions and other actuarial issues relating to allocation and distribution. Rusin attended most of the meetings of the MEC at which the Notes, eligibility to participate and allocation methodology was discussed. I participated in numerous meetings and conferences with Rusin and his colleagues regarding allocation of Note proceeds and related matters and presentations to be made by Rusin and the R&I Committee to the MEC regarding the Notes. My responsibilities included review and approval of Buck fee and expense billings prior to their payment by ALPA. For the period from August 2004 through January 2006, when work relating to eligibility to participate in distribution of the proceeds of sale of the Notes and to the allocation methodology to be employed in the distribution was concluded, ALPA paid Buck hundreds of thousands of dollars in fees.

5. During my tenure at ALPA, the independent legal consultant on ERISA matters, who was consulted with respect to the Notes, and, in particular, with respect to possible techniques of

tax-deferred delivery to pilots of the Notes and the proceeds of sale of the Notes, was Robert C. Fleder ("Fleder") of the New York law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP. I was the primary ALPA representative responsible for consultation and communication with outside ERISA legal counsel and was involved in one or more presentations made by Fleder to the MEC. Fleder attended one or more meetings of the MEC at which the topic of the Notes was on the agenda.

6.    In addition to consultation with Rusin and Fleder, my responsibilities also entailed frequent consultation and interface with certain members and associates of ALPA's outside general counsel, Cohen, Weiss and Simon LLP of New York ("Cohen Weiss"). Cohen Weiss advised ALPA and the MEC regarding labor law, tax, bankruptcy and ERISA issues relating to the Notes, and took primary responsibility for negotiating and drafting the Grantor Trust described below. One or more members of Cohen Weiss attended all, or almost all, of the meetings of the MEC at which the Notes, eligibility to participate and allocation were discussed.

7.    In the course of the performance of my duties relative to the Notes, I also worked closely with members of ALPA legal and other staff, including Robert H. Nichols ("Nichols"), an attorney within the ALPA Representation Department, assigned full-time to the MEC as its Senior Contract Administrator and MEC Coordinator. In that capacity, Nichols attended all MEC meetings at which the Notes were discussed. I reported on the matter from time to time to my supervising attorney, Elizabeth Koby, to David Vance, the Director of the ALPA Department of Retirement and Insurance, and to Jonathan Cohen, ALPA's Chief Counsel and Director, Legal Department.

8.    It was also part of my duties to work closely with, to advise, counsel and assist the Chairman and members of the R&I Committee in their deliberations and in the consideration and development of recommendations to the MEC regarding pilot eligibility criteria and allocation methodology. The Chairman and members of the Committee are pilot volunteers elected by the MEC. Commencing in the fall of 2004 and continuing through January 2006, the members of the Committee devoted countless hours to the tasks of developing recommended eligibility criteria, identifying categories of pilots requiring specific eligibility decisions by the MEC, and working with ALPA's actuarial consultants to develop allocation models. Hundreds of man-hours were spent by Committee members, much of which represented Committee members' uncompensated personal time off but many hours of which entailed substantial flight-pay loss financial obligations for ALPA.

9.    On November 24, 2004, United filed a renewed motion under Section 1113 of the Bankruptcy Code, 11 U.S.C. §1113, seeking authority to reject the collective bargaining agreement between ALPA and United effective May 1, 2003, which had been concluded in a prior negotiation under Section 1113. On or about December 16, 2004, the MEC approved, subject to ratification by ALPA membership, a tentative revised collective bargaining agreement (the "TA"). I participated, on the ALPA side, in the drafting of the TA and I attended the MEC meeting on December 16, 2004.

10. Among numerous other provisions, the TA provided in substance that ALPA would not object to a voluntary distress termination of the United Airlines Pilot Defined Benefit Plan (the "A Plan") pursuant to Section 4041(c) of ERISA, 29 U.S.C. §1341(c), provided United accomplished the termination in accordance with the procedure set forth in 1341(c)(2)(B)(ii), a procedure which culminates in a determination by the bankruptcy court that, unless the plan is terminated, the debtor will be unable to pay all its debt pursuant to a plan of reorganization and will be unable to continue in business outside the chapter 11 reorganization process, and, on the basis of that determination, the court approves the termination. The TA (as clarified by the parties in the course of the proceedings on United's motion for bankruptcy court approval) further provided that, in the event the A Plan was terminated for any reason, United would issue $550 million in Senior Subordinated Convertible Notes to a trust or similar non-permanent vehicle for the benefit of eligible pilots, with distribution mechanics, eligibility and allocation among eligible pilots to be reasonably determined by ALPA.

11. Immediately following the MEC's approval of the TA on December 16, 2004, the MEC undertook a communications program intended to provide pilots the information they needed in connection with the ratification ballot. The program included the preparation of "talking points" relating to the Notes initially drafted by Nichols, reviewed and revised by me and attorneys at Cohen Weiss, with input from MEC officers. The talking points were prepared for the purpose of enabling MEC members to provide a consistent message to pilots regarding the meaning of the TA and to explain why the amounts pilots could individually expect to receive from the proceeds of sale of the Notes could not be known for a considerable time after ratification of the TA. The talking points were used by MEC members in their direct communications with pilots in the field. Among other points, the talking points stated:

....

"Under the TA, it is up to the MEC to decide how to allocate the Notes among the pilots. This includes making the determination as to who is eligible to share, what the allocation formula should be and what the delivery vehicle should be.

The MEC has not begun to address the allocation question and, for reasons which will be discussed, can't begin that process for some time, so it hasn't taken any position on these matters.

It seems likely that the Notes (or, more accurately, the proceeds from the sale of the Notes) will be allocated to pilots who are active as of some date chosen by the MEC. There are a number of possible dates the MEC might choose. One would be the effective date of the TA, if ratified (January 13, 2005). Another would be the date the Company exits bankruptcy (currently estimated for mid-2005). Another would be the date the Notes are issued, say, late 2005 or early 2006.

It also seems likely that the factors the MEC would consider, in determining the allocation formula, would include the losses of accrued pension benefits or of future accruals of benefits suffered by individual pilots as a result of termination of the A-Plan,

4

or both. This could be done in a variety of ways, including quantifying and comparing the losses based on actuarial assumptions the MEC would have to approve, or by weighting the formula for age and service.

. . . .

In addition, to the extent the MEC wants to take lost benefits into account in the allocation formula, there is a very significant amount of research and analysis to be done by the R&I Committee and our actuaries to quantify losses, to analyze the impact of the new "C-Plan" in offsetting those losses and to test the results of various possible allocation formulas. The Committee has begun this process, but it will necessarily take some time to complete. The R&I Committee will report its preliminary recommendations at the January MEC Meeting."

. . . .

12. Between December 16, 2004 and early January 2005, the MEC conducted a series of "roadshows" for the benefit of pilots at various pilot domiciles around the country. Specifically, roadshows were presented to pilots in Los Angeles, San Francisco, Chicago, Washington, D.C., Denver, Seattle and New York City. I personally attended the roadshow in Chicago on December 30, 2004. The roadshow presentations were made by a team which included one or more MEC officers, the MEC members representing pilots in the particular domicile, the MEC Negotiating Committee Chairman, the MEC R&I Committee Chairman, and Nichols, who spoke from a standard Power Point slide show and answered questions of pilots in attendance, based on the Notes talking points previously prepared. I assisted the R&I Committee Chairman, Captain Marty Torres, in the preparation of the portion of the roadshow Power Point dealing with retirement matters and the Notes. Captain Torres' presentation included slides expressly stating that termination of the A Plan would result in losses of retirement benefits attributable to past service of pilots because the payments pilots would receive from the PBGC would not fully replace pilots' accrued benefits, and would also result in loss of benefit accruals in the future because the follow-on employer contributions to the United Airlines Pilot Directed Account Plan (the "PDAP") under the TA would not equal the value of the benefits pilots would have accrued under the A Plan in the future.

13. Balloting on the TA concluded on January 6, 2005, with a majority of United pilots voting in favor of the TA. However, on January 7, 2005, Judge Wedoff, of the United States Bankruptcy Court for the Northern District of Illinois, denied United's motion to approve the TA on several grounds, all of which were unrelated to the Notes. Following the Bankruptcy Court ruling, ALPA and United agreed to modify the TA in certain particulars intended to meet the Judge's objections to the original TA. On January 14, 2005, United filed a motion in the Bankruptcy Court for approval of the revised TA. On January 21st, Judge Wedoff indicated that the revisions had, indeed, addressed his concerned and stated that, if the revised TA was ratified in the balloting then being conducted among ALPA's membership, he would sign an order granting the motion for approval. The balloting concluded on January 31st with a vote in favor of ratification. The Bankruptcy Court order granting approval of the TA was entered that same day. The revised letter agreement is attached hereto as Exhibit A.

5

14.  Beginning in late November and December 2004, the R&I Committee, with the assistance of Rusin, Fleder and myself, began a series of "absorption analyses" designed to test the effects of the limits on contributions to the PDAP under Section 415(c) of the Internal Revenue Code of 1986 (the "Code"), 26 U.S.C. §415(c), on pilots' ability to shelter distributions of the proceeds of sale of the Notes by making the distributions in the form of contributions to the PDAP rather than in the form of direct payments to eligible pilots.  These analyses, and the investigation of the availability of other tax-efficient techniques for delivering to eligible pilots their share of the Note proceeds continued throughout 2005 and in 2006, through July.

15.  In early January, the R&I Committee began working with Rusin and his colleagues at Buck, to develop possible methodologies for allocating the proceeds of the Notes, in preparation for making a detailed presentation to the MEC at its meeting scheduled for January 24th through 28th.  The Committee's preparations included development of allocation objectives and talking points, meetings and teleconferences with Rusin and his colleagues during which Buck's initial suggestions as to possible allocation formulas were presented, analyzed and discussed.

16.  The MEC has regularly scheduled quarterly meetings in January, April, July and October of each year.  Between the January 2005 meeting, at which the R&I Committee gave its first report on Notes, and the January 2006 meeting at which the MEC took final action on issues of eligibility and allocation methodology, the MEC also held several special meetings.  The R&I Committee reported at each regular meeting and several special meetings on progress with regard to the Notes.  On most occasions when the R&I Committee appeared before the MEC, it was accompanied by Rusin and by me.  Major presentations were made by the Committee on January 20-21, 2005; July 19, 2005; September 6, 2005; September 20, 2005; October 18, 2005; November 9, 2005; November 29, 2005; December 16, 2005 and January 17, 2006.  In the intervals between presentations to the MEC, the Committee continued to work with Rusin to refine and extend its allocation models, to respond to specific questions raised by MEC members at meetings and to respond to questions received from pilots on the Committee's web page.  Beginning in October, 2005, the Committee was assisted in its deliberations by an ad hoc subcommittee consisting of four MEC members, who joined the Committee, Rusin and myself in several meetings in November and December 2005.

17.  In January 2005, its initial report to the MEC on the Notes, the R&I Committee identified matters for decision, including the eligibility date, the treatment of various pilots in special status categories, the allocation methodology and the distribution mechanism, and laid out a project plan for addressing the issues to be determined.  The Committee presented analyses of estimated losses of past benefit accruals in the event of A Plan termination, and of projected losses of accruals in the future.  As to allocation methodologies, the Committee suggested at least four possibilities:

- "Gap 1": in which the Note proceeds would be allocated in proportion to the present value of pilots' lost pension benefits measured by accrued benefits as of

6

the date of plan termination, less the estimated benefits payable by the PBGC. Under Gap 1, furloughees would not receive any Note proceeds because they were not vested in the A Plan (either because they were not participants or had not served the five years required for vesting). Even if they were considered vested in the A Plan under the PBGC rules, they would have been fully covered by the PBGC insurance guarantee.

- "Gap 2": in which the Note proceeds would be allocated in proportion to the present value of pilots' lost pension benefits measured by: (*i*) benefits accrued up to the date of plan termination plus benefits projected to be accrued in the future, over the balance of the pilot's career; offset by (*ii*) the value of the estimated benefit the pilot would receive from the PBGC plus the value of the follow on additional PDAP contributions provided for by the TA. Because it is not possible to project future benefits for furloughees (*e.g.*, will they return to duty? If so, when?), it is not possible to calculate a distribution for any pilots, including active pilots as well as furloughees, under Gap 2.

- "PLSA": in which the Note proceeds would be allocated in proportion to pilots' Partial Lump Sum Amount entitlements under a formula contained in the A Plan.

- "Points": in which the Note proceeds would be allocated in proportion to points awarded to individual pilots based on their age and years of service, multiplied by compensation and reduced by the pilots' estimated PBGC benefits, with two different versions of this points methodology being presented.

The R&I Committee's presentation of methodologies was supported by detailed charts presented by Rusin. The presentation was discussed at length by the MEC with numerous questions directed to the presenters in a deliberation spanning two days of the MEC meeting.

18. On July 19, 2005, the R&I Committee gave another detailed report, in which it responded to questions and requests for additional research addressed to the Committee by the MEC at a special meeting on May 19, 2005. The report also reviewed and expanded the analysis of the four allocation methodologies presented to the MEC in January. In its July report, the Committee addressed the actuarial assumptions utilized in connection with the methodologies and presented additional charts illustrating the four allocation methodologies. The primary attention at this meeting was on allocation.

19. At the special MEC meeting on September 20, 2005, the Committee presented additional analysis with respect to the allocation methodologies and introduced a possible alternative methodology, called the "blended method", which was a combination of the Gap 1 and PLSA methodologies, in which pilot allocations would be based on the greater of the their entitlements of the Gap 1 and PLSA methodologies. In addition, the Committee gave a detailed presentation with respect to eligibility, both as to eligibility dates and categories of pilots who required special deliberation. The special categories included pilots on furlough and it was noted

7

that, as of August 30, 2005, there were approximately 1,950 pilots on furlough.

20.  At the October MEC meeting, the Committee provided extensive additional detail regarding the various allocation methods under consideration.  In addition, the MEC began the process of dealing with eligibility of special category pilots, dealing initially with pilots on various kinds of leave, and engaging in discussion of considerations affecting the eligibility determination with regard to other categories.

21.  On November 29, 2005, the Committee gave additional detailed analysis with respect to allocation methodology, responding to MEC inquiries from the October meeting and reflecting the fruits of its collaboration with the ad hoc MEC subcommittee.  In addition, the Committee addressed and offered its recommendations with respect to eligibility and to each of the remaining special categories of pilots whose eligibility had not yet been resolved. These included furloughees.  With respect to furloughees, now estimated to number slightly under 1,800, the Committee discussed whether furloughees should be eligible to share in allocation of the Notes proceeds if they were listed on the United recall class roster and/or had a return service date on or before the bankruptcy exit date.  Ultimately, it was determined by the MEC that furloughees would be eligible provided they had a recall class date as of the bankruptcy exit date, even if the class date was after the bankruptcy exit date.  United exited bankruptcy on February 1, 2006, and, under this rule, furloughed pilots with class dates extending into May 2006 were eligible.

22.  Final decisions with respect to eligibility and allocation methodology were made by the MEC on January 18, 2006, following a further presentation by the R&I Committee.  I was not present at that meeting.

23.  Following the January MEC meeting, the MEC, the R&I Committee and their advisors turned their attention to the distribution mechanism.  It had long been the MEC's intention to deliver as much as possible of the Note proceeds in the form of an employer contribution to the PDAP, to the maximum extent possible consistent with the limits of Section 415(c) of the Code, allocating the contribution to the 2006 limitation year.  Because the PDAP contribution technique had already been used for delivery of the cash and stock attributable to ALPA's bankruptcy claim, there was relatively little Section 415(c) capacity left for 2006.  As it ultimately turned out, only approximately $16 million of the $537 million in net proceeds from the sale of the Notes could be contributed to the PDAP for 2006.  Anticipating that the Section 415(c) capacity of the PDAP for 2006 would be limited, the R&I Committee worked with Fleder, Rusin, Buck in-house legal counsel and me, to investigate whether there was any other mechanism for delivering Note proceeds to pilots on a tax-deferred basis.   Among the possibilities considered was a concept known as a "spill-over" cash balance plan, but the complexities of plan design, anticipated difficulties in obtaining necessary administrative agency approvals and other considerations led to the abandonment of the idea.

24.  A technique ultimately adopted by the MEC was the use of a grantor or "rabbi" trust. A grantor trust is a trust established in accordance with IRS guidelines, under which property can

8

be deposited by an employer to a trustee without the deposit being considered a "transfer" triggering immediate taxation to the employee under Section 83 of the Code. Under the guidelines, no "transfer" occurs because the assets of the trust remain accessible to creditors of the employer in a bankruptcy or through execution of judgment. By using a grantor trust, ALPA was able to set aside approximately $186 million out of the Note proceeds so that it can be contributed by United to the PDAP as an employer contribution in the 2007 limitation year.

25. I participated in the drafting of the grantor trust. In addition to complying with the IRS Rabbi Trust Guidelines under Section 83 of the Code, it was also necessary to be sure the trust complies with the requirements of Section 409A of the Code, a section added by Congress in 2004, in the wake of the Enron experience, which imposes detailed requirements on non-qualified deferred compensation plans. Failure to comply with Section 409A results in the income attempted to be deferred becoming immediately taxable and, under Section 409A(a)(2)(B)(ii), subject to an additional 20% tax penalty over and above the income tax otherwise due. IRS Notice 2005-1, Q&A 4(c) and Proposed Regulation 1.409A-1(b)(4) provide a safe harbor exception to the strictures of Section 409A for what are called short-term or de minimis deferrals. A short-term deferral is a deferral of income which ends not later than two and a half months after the end of the tax year in which the income would otherwise be taxable. For that reason, the trust as amended expressly terminates on March 8, 2007 and United is required to make all distributions to the PDAP or directly to the pilots in cash no later than March 15, 2007. There is a significant risk that if, for any reason, distributions are not completed by March 15th, the entire $186 million currently held by the grantor trustee may be subjected to immediate taxation, including the 20% penalty tax.

26. In August 2006, a distribution of approximately $351 million less applicable taxes was made from the proceeds of the sale of the Notes to various pilot groups. Not all pilots who received proceeds in August 2006 will receive proceeds in March 2007. For example, retirees and pilots on leave received their entire distribution in August 2006 and will receive nothing in March 2007. Because the plaintiffs in the above-captioned case failed to challenge the distributions prior to the August 2006 distribution, the plaintiffs, in essence, are trying to divert funds from a limited subset of pilots now.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 26, 2007.

Russell Woody

9

# EXHIBIT A

Letter 05-01
(*Bankruptcy Exit Agreement*)

LETTER OF AGREEMENT
by and between
UAL CORP.,
UNITED AIR LINES, INC.
and
THE AIR LINE PILOTS
in the service of
UNITED AIR LINES, INC.
as represented by
THE AIR LINE PILOTS ASSOCIATION, INTERNATIONAL

THIS LETTER OF AGREEMENT, dated as of January 1, 2005, is made and entered into in accordance with the Railway Labor Act by and between UAL Corp. (hereinafter referred to as "UAL"), UNITED AIR LINES, INC. (hereinafter referred to as the "Company") and the AIR LINE PILOTS ASSOCIATION, INTERNATIONAL (hereinafter referred to as "ALPA" or the "Association").

WHEREAS UAL, the Company and the Association have reached agreement concerning the revisions to their current collective bargaining agreement (the "2003 Pilot Agreement" and, as revised by this Letter of Agreement, the "Revised 2003 Pilot Agreement") necessary for the Company to emerge from Chapter 11; and

WHEREAS certain of the revisions shall become effective as of January 1, 2005 (the "Effective Date"), assuming the complete satisfaction of the conditions described in paragraph 15 below prior to January 31, 2005 and others shall become effective on the effective date (the "Exit Date") of a plan of reorganization proposed by UAL (the "Plan of Reorganization"); and

WHEREAS the Company has represented to the Association that the Company has concluded that UAL cannot attract the exit financing necessary to emerge from Chapter 11 absent the termination of all of the Company's defined benefit plans;

THEREFORE the parties to this Letter of Agreement hereby agree as follows:

1.      Contract Extension.  The amendable date of the Revised 2003 Pilot Agreement shall be December 31, 2009.  Section 22.D of the Revised 2003 Pilot Agreement shall read in its entirety as follows:

This Agreement shall continue in full force and effect through and including December 31, 2009 and shall renew itself without change each succeeding January 1st thereafter, unless written notice of intended change is served in accordance with Section 6, Title I, of the Railway Labor Act by either party upon the other at least thirty (30) but not more than two hundred seventy (270) days

prior to December 31, 2009 or any year thereafter. The parties shall commence direct negotiations with respect to such notices no later than thirty (30) days following the delivery of such notice. In the event a new tentative collective bargaining agreement has not been concluded by August 1, 2009 (or August 1st of any year thereafter if applicable), and the services of the National Mediation Board (the "Board") have not previously been invoked, the parties shall, no later than August 1, 2009 (or August 1st of any year thereafter if applicable), jointly invoke the services of the Board under Section 5 of the Act.

2.     Hourly Pay Rates.  The rates for hourly pay (the "Hourly Rates") under Section 3-B of the 2003 Pilot Agreement shall be reduced by 11.8% on the Effective Date, and the reduced Hourly Rates shall thereafter be increased by 1.5% on May 1, 2006, by 1.5% on May 1, 2007, by 1.5% on May 1, 2008 and by 1.5% on May 1, 2009 (as provided in the 2003 Pilot Agreement). In addition to the increases contained in the preceding sentence, the Hourly Rates shall be increased by 1% on January 1, 2008. The Hourly Rates under Section 3-B of the Revised 2003 Pilot Agreement are set forth in Exhibit A to this Letter of Agreement.

3.     Other Contract Changes.  Certain other provisions of the 2003 Pilot Agreement shall be revised on the Effective Date as described on Exhibits B-1, B-2 and B-3 to this Letter of Agreement.

4.     Defined Benefit Pension Plan.

a.     In the event the Company seeks judicial approval to terminate the United Airlines Pilot Defined Benefit Pension Plan (the "A Plan") under 29 U.S.C §1341(c) following April 11, 2005, then, on and after May 11, 2005, (i) the Association shall waive any claim it may have that the termination of the A Plan would violate the terms and conditions of the existing collective bargaining agreement between the Company and the Association, and (ii) the Association shall not otherwise oppose the Company's efforts to terminate the A Plan under 29 U.S.C §1341(c); provided, however, that nothing in this Letter of Agreement shall be construed, deemed or characterized by UAL or the Company as any agreement of any form by the Association that the A Plan should be terminated;

b.     The Company: (i) shall not terminate or agree to terminate the A Plan effective at any time prior to the earlier of (A) ten (10 ) days before the Exit Date and (B) the last date that any of the Company's other defined benefit pension plans are terminated (the "Pension Termination Date") and (ii) shall oppose any effort by any other person or entity to terminate the A Plan effective at any time prior to the Pension Termination Date;

c.     The A Plan shall remain in full force and effect unless (i) the bankruptcy court issues an order declaring that the Company has met the requirements for plan termination under 29 U.S.C. §1341(c)(2)(B)(ii), and (ii) any of the following has

2

occurred: (A) no timely notice of appeal of the order has been filed, (B) the order has been affirmed following the exhaustion of all appeals, or (C) the Exit Date has occurred and the Plan of Reorganization has become effective without provision for the continuation of any such appeals; and

       d.      Notwithstanding any termination of A Plan retirement benefits, any and all of the Company's indemnification obligations under or applicable to the A Plan shall remain in full force and effect without regard to Section 22 of the Revised 2003 Pilot Agreement.

    5.     Pension Contributions. In the event that the A Plan is terminated pursuant to 29 U.S.C §1341 or §1342 following judicial approval of such termination:

       a.      The Company shall make an additional monthly contribution (the "C Plan Contribution") to the United Airlines Pilot Directed Account Plan (the "PDAP") of six percent (6%) of pilot compensation (as measured under the PDAP) beginning with the earlier of (i) June 1, 2005 or (ii) the first day of the calendar month following the Exit Date (with a pro rated C Plan Contribution for the period between the Exit Date and the first of the month following the Exit Date); provided, however, that in the event the Exit Date follows June 1, 2005, C Plan Contributions will accrue from June 1, 2005 through the Exit Date and be contributed in a single lump sum payment to the PDAP on the Exit Date;

       b.      Prior to the Exit Date, the Company and the Association shall adopt a mutually-acceptable qualified or non-qualified plan arrangement to accept contributions that cannot be allocated to pilot defined contribution accounts under Section 415 of the Internal Revenue Code;

       c.      At any time prior to January 1, 2007, the Association may elect, on an irrevocable basis, to amend the Revised 2003 Pilot Agreement, effective January 1, 2008, (i) to increase the C Plan Contribution from six percent (6%) to seven percent (7%) of pilot compensation (as measured under the PDAP) and (ii) to reduce the Hourly Rates under Section 3-B of the Revised 2003 Pilot Agreement by one percent (1%);

       d.      The C Plan Contribution shall be in addition to the nine percent (9%) of pilot compensation contributed to the PDAP under the 2003 Pilot Agreement; and

       e.      Following the Exit Date, the Company shall not establish or re-establish any single-employer defined benefit plan for any UAL or Company employee group unless the pilot group is provided the option of electing to receive a comparable defined benefit plan in lieu of the C Plan Contribution.

3

6.    Profit Sharing.  The Revised 2003 Pilot Agreement shall provide for the pilot group to participate in the revised profit sharing program described in Exhibit C to this Letter of Agreement.

7.    Convertible Notes.  In the event that the A Plan is terminated pursuant to 29 U.S.C §1341 or §1342 following judicial approval of such termination, the Revised 2003 Pilot Agreement and the Plan of Reorganization shall provide for the issuance of $550 million of UAL convertible notes, as described in Exhibit D to this Letter of Agreement, to a trust or other entity designated by the Association.  The terms of the UAL convertible notes described in Exhibit D shall be subject to mutually-acceptable modifications to optimize implementation for all parties from an accounting, securities law and tax law perspective.

8.    Distribution Agreement.  The Plan of Reorganization shall provide the pilot group with a distribution of UAL equity securities as provided in the amended distribution agreement described in Exhibit E to this Letter of Agreement.

9.    Additional Non-Labor Savings.  Prior to the Exit Date, the Association and the Company shall develop, and the Company shall begin pursuit of, a mutually-acceptable business improvement program reasonably projected to produce at least $150 million of annual savings in non-labor costs in addition to the savings contained in the Gershwin 5F business plan dated as of November 4, 2004 (the "Business Plan").

10.    Administrative Claim.    The Association shall accrue and be entitled to a stipulated, approved and allowed claim of administration under 11 U.S.C §503(b) in the amount of the actual cash savings provided to the Company under this Letter of Agreement from the Effective Date through the earlier of (i) the termination of this Letter of Agreement under paragraph 16 below or (ii) the Exit Date (the "Administrative Claim").  The Administrative Claim shall be extinguished upon the Exit Date unless the Association has terminated the Letter of Agreement under paragraph 16 below.

11.    Indemnity.  UAL and the Company shall provide indemnification on the Effective Date as described in Exhibit F to this Letter of Agreement.

12.    Plan Release and Exculpation.  The Plan of Reorganization shall include a plan exculpation and release provision (which provision shall be at least as comprehensive as the plan exculpation and release provision under the Plan of Reorganization for the debtor or any other person) for the Air Line Pilots Association, International, the United Master Executive Council of the Air Line Pilots Association, International, and each of their current or former (a) members, (b) officers, (c) committee members, (d) employees, (e) advisors, (f) attorneys, (g) accountants, (h) investment bankers, (i) consultants, (j) agents and (k) other representatives with respect to any liability such person or entity may have in connection with or related to the UAL bankruptcy cases, the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation or consummation of any of the Plan of

4

Reorganization, the disclosure statement concerning the Plan of Reorganization, the 2003 Pilot Agreement, this Letter of Agreement, the Revised 2003 Pilot Agreement or any contract, employee benefit plan, instrument, release or other agreement or document created, modified, amended or entered into in connection with either the Plan of Reorganization or any agreement between the Company, UAL and the Association, or any other act taken or omitted to be taken in connection with the United bankruptcy.

13. <u>Assumption of the Pilot Agreement</u>. The Revised 2003 Pilot Agreement (other than with respect to the A Plan if the A Plan is terminated) shall be assumed under 11 U.S.C. §365 under the Plan of Reorganization.

14. <u>Bankruptcy Actions</u>. The Company and the Association shall take the following actions to seek the approval of this Letter of Agreement by the bankruptcy court in In Re UAL Corporation et al., Case No. 02-B-48191 (Bankr. N.D. Ill.) (the "Bankruptcy Cases"):

a. the Company shall file a motion for approval of the Letter of Agreement under 11 U.S.C. §363, in form and substance reasonably acceptable to the Association, by no later than January 21, 2005;

b. the Company shall provide, to the extent reasonably practicable, the Association's counsel with copies of, and a reasonable opportunity to comment on, all motions, applications, proposed orders, pleadings and supporting papers prepared by the Company for filing with the bankruptcy court relating to court approval of this Letter of Agreement; and

c. both the Company and the Association shall support and seek the approval of this Letter of Agreement in the Bankruptcy Cases without condition, qualification or exception; shall use their best efforts to obtain the support of the Official Committee of Unsecured Creditors and other parties and stakeholders for the Letter of Agreement; and shall take every reasonable action necessary to obtain judicial approval of this Letter of Agreement in the Bankruptcy Cases without condition, qualification or exception, including the filing of motions, objections and appeals.

15. <u>Conditions to Effectiveness</u>. This Letter of Agreement shall become effective as of January 1, 2005, subject to the occurrence of all of the following prior to January 31, 2005: (a) acceptance by the United Master Executive Council of the Association, (b) United pilot membership ratification under the Association's Constitution and By-Laws, (c) if required, approval by the Company's Board of Directors, (d) execution by the President of the Association, and (e) withdrawal of the Company's motion to reject the 2003 Pilot Agreement under 11 U.S.C. §1113.

16. <u>Termination Rights</u>. This Letter of Agreement may be terminated by the Association, by written notice from the Association to the Company (the "Termination Notice"), given before or after the Effective Date but no later than the Exit Date, but in

5

no event later than sixty (60) days following the occurrence of any of the following events:

        a.      failure of the court to issue final judicial approval of this Letter of Agreement, without condition, qualification or exception, by January 31, 2005;

        b.      a court of competent jurisdiction enters a final, non-appealable judicial order that the Company is not entitled to the termination of the A Plan under 29 U.S.C §1341(c);

        c.      failure of the Company to implement, through binding agreement or final judicial order effective no later than June 1, 2005, revisions to (i) the labor contracts of the Company's other unionized employees and (ii) the wages, benefits and working conditions of the Company's salaried and management employees so that the aggregate revisions in (i) and (ii) are reasonably projected to produce at least $1.0 billion in average annual cash savings in labor and pension costs for the Company from January 1, 2005 through and including January 1, 2010, unless such action is cured to the reasonable satisfaction of the Association within twenty (20) days of the Termination Notice;

        d.      the filing by UAL or United of, support by UAL or United for, or judicial confirmation or approval of (as the case may be), a plan of reorganization or a proposed disclosure statement which (i) contains any material term that is materially inconsistent with the Revised 2003 Pilot Agreement or this Letter of Agreement or (ii) proposes or confirms a capital structure or ownership structure that is not reasonably acceptable to the Association unless, in either case (i) or (ii), such action is cured to the reasonable satisfaction of the Association within twenty (20) days of the Termination Notice; or

        e.      any other material breach of the Company's or UAL's obligations under this Letter of Agreement unless such breach is cured to the reasonable satisfaction of the Association within twenty (20) days of the Termination Notice.

In the event of such termination, (A) the Administrative Claim shall be paid on the Exit Date, (B) this Letter of Agreement shall otherwise become null and void in its entirety, and (C) the parties shall thereafter be governed by the 2003 Pilot Agreement (including the A Plan) and without regard to this Letter of Agreement.

      17.     _Fees and Expenses._ The Company shall reimburse the Association for fees and expenses incurred in connection with this Letter of Agreement as described on Exhibit G to this Letter of Agreement.

      18.     _Agreement._ This Letter of Agreement is a final, binding and conclusive commitment and agreement between UAL, the Company and the Association.

Notwithstanding anything to the contrary in this Letter of Agreement, judicial approval of this Letter of Agreement shall constitute approval and allowance of the Administrative Claim and shall otherwise have the same meaning and effect as the judicial approval of the 2003 Pilot Agreement in the Bankruptcy Cases signed on April 30, 2003.

    19.   <u>Amendments; Waiver</u>. This Letter of Agreement may be amended, modified, superseded or canceled and any of its provisions may be waived only by a written instrument executed by all parties or, in the case of a waiver, by the party waiving compliance. Except as otherwise expressly provided in paragraph 16 above with respect to the delivery of a notice of termination, the failure of any party at any time to require performance of any provision of this Letter of Agreement shall not affect the right of that party at a later time to enforce the same or a different provision. No waiver by any party of a right under this Letter of Agreement shall be deemed or construed as a further or continuing waiver of any such right with respect to the same or a different provision of this Letter of Agreement.

    20.   <u>Notices</u>. Any notice or other communication given under to the terms of this Letter of Agreement must be in writing and shall be deemed to have been duly given on the day it is delivered by hand, on the day it is sent by facsimile with confirmation of receipt by the transmitting machine, on the business day after it is sent by a national overnight mail service (delivery charge prepaid), or on the third business day after it is mailed first class, postage prepaid, in any case to the following addresses:

| | |
|---|---|
| If to the Company: | United Airlines, Inc.<br>1200 East Algonquin Road<br>Elk Grove Township, Illinois 60007<br>Attention: Paul Lovejoy<br>Facsimile: 847-700-4099 |
| with copies to: | Kirkland & Ellis<br>200 East Randolph Drive<br>Chicago, Illinois 60601<br>Attention: James H.M. Sprayregen<br>Facsimile: 312-861-2200 |
| If to the Association: | United Master Executive Council<br>Air Line Pilots Association, International<br>9550 West Higgins Road, Suite 1000<br>Rosemont, IL 60018<br>Attention: Master Chairman<br>Facsimile: 847-292-1777 |

7

with copies to:                Cohen, Weiss and Simon, LLP
                               330 West 42nd Street
                               25th Floor
                               New York, New York 10036
                               Attention: Babette Ceccotti
                               Facsimile: 212-695-5436

or to such other address or to such other person as any party shall have last designated by
written notice provided to the other parties in the manner set forth in this paragraph.

21.     <u>Counterparts</u>.  This Letter of Agreement may be executed in two or more
counterparts, all of which shall be considered one and the same instrument, and each of
which shall be deemed an original.  Each party to this Letter of Agreement has agreed to
permit the use of faxed or otherwise electronically transmitted signatures in order to
expedite the consummation of the transactions contemplated hereby.

22.     <u>Headings; Construction</u>.  The paragraph headings in this Letter of
Agreement have been inserted for convenience of reference only and do not restrict or
otherwise modify any of the terms or provisions of this Letter of Agreement.  Unless
otherwise expressly provided, the words "including" or "includes" in this Letter of
Agreement do not limit the preceding words or terms and shall be deemed to be followed
by the words "without limitation."

23.     <u>Exhibits</u>.  This Letter of Agreement includes all of Exhibits A through G
hereto.  Except as otherwise expressly set forth therein, all capitalized terms in Exhibits A
through G shall have the meanings defined in this Letter of Agreement.

24.     <u>Fair and Equitable Pension Treatment</u>.  In the event the Company
implements, or reaches agreement with respect to, a legislative or other pension funding
solution that permits the continuation or maintenance of any of the Company's defined
benefit plans following the Pension Termination Date, the pilots will receive the full
benefit of that legislative or other solution to maintain the pilot A Plan in the same status
(e.g., frozen or active) as any other surviving plan so long as the pilot labor and pension
savings contributed to the restructuring remain fair and proportional to other employee
groups' labor and pension savings contributed to the restructuring in the manner
contemplated under the Business Plan in light of any such legislative or other pension
funding solution.

(Signature page to follow)

8

IN WITNESS WHEREOF, the parties have signed this Letter of Agreement this 31st day of January, 2005.

WITNESS:

_____

_____

_____

_____

FOR UNITED AIR LINES, INC.

_____
Peter B. Kain
Vice President – Labor Relations

FOR UAL CORPORATION

_____
Glenn F. Tilton
Chairman, President and CEO

WITNESS:

_____

_____

_____

_____

FOR THE AIR LINE PILOTS ASSOCIATION, INTERNATIONAL

_____
Duane E. Woerth, President

_____
Mark Bathurst, Chairman
United Master Executive Council

**Exhibit A**
**Revised Pay Rates**

Section 3-B "Hourly Rates" is modified to read as follows:

3-B-1 Effective January 1, 2005 the hourly rates for Captains and First Officers shall be as follows. The hourly rates, overrides, and incentive pay established in this Section 3 shall govern all aspects of pilot compensation.

3-B-1-a Hourly Rates

| Captains | | | | | |
|---|---|---|---|---|---|
| | B747-400 | B777 | B767/757 | A320/319 | B737-300 |
| **1yr** | 166.91 | 166.91 | 136.79 | 116.24 | 116.24 |
| **2yr** | 167.86 | 167.86 | 137.83 | 117.24 | 117.24 |
| **3yr** | 168.74 | 168.74 | 139.10 | 118.28 | 118.28 |
| **4yr** | 169.66 | 169.66 | 140.03 | 119.40 | 119.40 |
| **5yr** | 170.62 | 170.62 | 141.13 | 120.52 | 120.52 |
| **6yr** | 171.50 | 171.50 | 142.18 | 121.58 | 121.58 |
| **7yr** | 172.45 | 172.45 | 143.13 | 122.67 | 122.67 |
| **8yr** | 173.59 | 173.59 | 144.33 | 123.75 | 123.75 |
| **9yr** | 174.55 | 174.55 | 145.28 | 124.68 | 124.68 |
| **10yr** | 175.97 | 175.97 | 146.78 | 126.23 | 126.23 |
| **11yr** | 177.31 | 177.31 | 148.36 | 127.68 | 127.68 |
| **12yr** | 178.91 | 178.91 | 149.75 | 129.21 | 129.21 |

| First Officers | | | | | |
|---|---|---|---|---|---|
| | B747-400 | B777 | B767/757 | A320/319 | B737-300 |
| **1yr** | 30.73 | 30.73 | 30.73 | 30.73 | 30.73 |
| **2yr** | 70.00 | 70.00 | 57.47 | 48.89 | 48.89 |
| **3yr** | 101.24 | 101.24 | 83.36 | 70.97 | 70.97 |
| **4yr** | 107.06 | 107.06 | 88.36 | 75.34 | 75.34 |
| **5yr** | 109.29 | 109.29 | 90.39 | 77.19 | 77.19 |
| **6yr** | 111.81 | 111.81 | 92.70 | 79.27 | 79.27 |
| **7yr** | 114.42 | 114.42 | 94.96 | 81.39 | 81.39 |
| **8yr** | 117.18 | 117.18 | 97.42 | 83.53 | 83.53 |
| **9yr** | 118.17 | 118.17 | 98.35 | 84.41 | 84.41 |
| **10yr** | 119.57 | 119.57 | 99.73 | 85.77 | 85.77 |
| **11yr** | 120.93 | 120.93 | 101.19 | 87.08 | 87.08 |
| **12yr** | 122.20 | 122.20 | 102.28 | 88.25 | 88.25 |

3-B-1-b deleted

3-B-2 Effective May 1, 2006 the hourly rates for Captains and First Officers shall be as follows:

3-B-2-a Hourly Rates

| Captains | | | | | |
|---|---|---|---|---|---|
| | B747-400 | B777 | B767/757 | A320/319 | B737-300 |
| 1yr | 169.42 | 169.42 | 138.84 | 117.99 | 117.99 |
| 2yr | 170.38 | 170.38 | 139.90 | 119.00 | 119.00 |
| 3yr | 171.27 | 171.27 | 141.19 | 120.06 | 120.06 |
| 4yr | 172.21 | 172.21 | 142.13 | 121.19 | 121.19 |
| 5yr | 173.18 | 173.18 | 143.25 | 122.32 | 122.32 |
| 6yr | 174.07 | 174.07 | 144.31 | 123.41 | 123.41 |
| 7yr | 175.03 | 175.03 | 145.27 | 124.51 | 124.51 |
| 8yr | 176.20 | 176.20 | 146.49 | 125.61 | 125.61 |
| 9yr | 177.16 | 177.16 | 147.46 | 126.55 | 126.55 |
| 10yr | 178.61 | 178.61 | 148.98 | 128.12 | 128.12 |
| 11yr | 179.97 | 179.97 | 150.59 | 129.60 | 129.60 |
| 12yr | 181.59 | 181.59 | 152.00 | 131.15 | 131.15 |

| First Officers | | | | | |
|---|---|---|---|---|---|
| | B747-400 | B777 | B767/757 | A320/319 | B737-300 |
| 1yr | 31.19 | 31.19 | 31.19 | 31.19 | 31.19 |
| 2yr | 71.05 | 71.05 | 58.34 | 49.63 | 49.63 |
| 3yr | 102.76 | 102.76 | 84.61 | 72.03 | 72.03 |
| 4yr | 108.66 | 108.66 | 89.68 | 76.47 | 76.47 |
| 5yr | 110.93 | 110.93 | 91.75 | 78.35 | 78.35 |
| 6yr | 113.49 | 113.49 | 94.09 | 80.46 | 80.46 |
| 7yr | 116.13 | 116.13 | 96.39 | 82.61 | 82.61 |
| 8yr | 118.93 | 118.93 | 98.88 | 84.78 | 84.78 |
| 9yr | 119.94 | 119.94 | 99.83 | 85.68 | 85.68 |
| 10yr | 121.37 | 121.37 | 101.23 | 87.06 | 87.06 |
| 11yr | 122.74 | 122.74 | 102.70 | 88.38 | 88.38 |
| 12yr | 124.03 | 124.03 | 103.81 | 89.57 | 89.57 |

3-B-2-b deleted

2

3-B-3  Effective May 1, 2007 the hourly rates for Captains and First Officers shall be as follows:

3-B-3-a Hourly Rates

| Captains | | | | | |
|---|---|---|---|---|---|
| | B747-400 | B777 | B767/757 | A320/319 | B737-300 |
| 1yr | 171.96 | 171.96 | 140.92 | 119.76 | 119.76 |
| 2yr | 172.94 | 172.94 | 141.99 | 120.79 | 120.79 |
| 3yr | 173.84 | 173.84 | 143.30 | 121.86 | 121.86 |
| 4yr | 174.79 | 174.79 | 144.26 | 123.01 | 123.01 |
| 5yr | 175.78 | 175.78 | 145.40 | 124.16 | 124.16 |
| 6yr | 176.68 | 176.68 | 146.48 | 125.26 | 125.26 |
| 7yr | 177.66 | 177.66 | 147.45 | 126.37 | 126.37 |
| 8yr | 178.84 | 178.84 | 148.69 | 127.49 | 127.49 |
| 9yr | 179.82 | 179.82 | 149.67 | 128.45 | 128.45 |
| 10yr | 181.29 | 181.29 | 151.22 | 130.04 | 130.04 |
| 11yr | 182.67 | 182.67 | 152.85 | 131.54 | 131.54 |
| 12yr | 184.32 | 184.32 | 154.28 | 133.11 | 133.11 |

| First Officers | | | | | |
|---|---|---|---|---|---|
| | B747-400 | B777 | B767/757 | A320/319 | B737-300 |
| 1yr | 31.66 | 31.66 | 31.66 | 31.66 | 31.66 |
| 2yr | 72.12 | 72.12 | 59.21 | 50.37 | 50.37 |
| 3yr | 104.30 | 104.30 | 85.87 | 73.12 | 73.12 |
| 4yr | 110.29 | 110.29 | 91.03 | 77.62 | 77.62 |
| 5yr | 112.59 | 112.59 | 93.13 | 79.53 | 79.53 |
| 6yr | 115.19 | 115.19 | 95.50 | 81.67 | 81.67 |
| 7yr | 117.87 | 117.87 | 97.83 | 83.85 | 83.85 |
| 8yr | 120.72 | 120.72 | 100.36 | 86.05 | 86.05 |
| 9yr | 121.74 | 121.74 | 101.32 | 86.96 | 86.96 |
| 10yr | 123.19 | 123.19 | 102.75 | 88.36 | 88.36 |
| 11yr | 124.59 | 124.59 | 104.24 | 89.71 | 89.71 |
| 12yr | 125.89 | 125.89 | 105.37 | 90.92 | 90.92 |

3-B-3-b deleted

3

3-B-4  Effective January 1, 2008 the hourly rates for Captains and First Officers shall be as follows:

3-B-4-a Hourly Rates

| | Captains | | | | |
|------|----------|------|-----------|----------|----------|
| | B747-400 | B777 | B767/757 | A320/319 | B737-300 |
| 1yr | 173.68 | 173.68 | 142.33 | 120.96 | 120.96 |
| 2yr | 174.67 | 174.67 | 143.41 | 122.00 | 122.00 |
| 3yr | 175.57 | 175.57 | 144.74 | 123.08 | 123.08 |
| 4yr | 176.54 | 176.54 | 145.70 | 124.24 | 124.24 |
| 5yr | 177.54 | 177.54 | 146.85 | 125.40 | 125.40 |
| 6yr | 178.45 | 178.45 | 147.94 | 126.51 | 126.51 |
| 7yr | 179.43 | 179.43 | 148.93 | 127.64 | 127.64 |
| 8yr | 180.63 | 180.63 | 150.18 | 128.77 | 128.77 |
| 9yr | 181.62 | 181.62 | 151.17 | 129.73 | 129.73 |
| 10yr | 183.10 | 183.10 | 152.73 | 131.34 | 131.34 |
| 11yr | 184.50 | 184.50 | 154.37 | 132.86 | 132.86 |
| 12yr | 186.16 | 186.16 | 155.82 | 134.45 | 134.45 |

| | First Officers | | | | |
|------|----------------|------|-----------|----------|----------|
| | B747-400 | B777 | B767/757 | A320/319 | B737-300 |
| 1yr | 31.98 | 31.98 | 31.98 | 31.98 | 31.98 |
| 2yr | 72.84 | 72.84 | 59.80 | 50.87 | 50.87 |
| 3yr | 105.34 | 105.34 | 86.73 | 73.85 | 73.85 |
| 4yr | 111.40 | 111.40 | 91.94 | 78.39 | 78.39 |
| 5yr | 113.72 | 113.72 | 94.06 | 80.32 | 80.32 |
| 6yr | 116.34 | 116.34 | 96.46 | 82.49 | 82.49 |
| 7yr | 119.05 | 119.05 | 98.81 | 84.68 | 84.68 |
| 8yr | 121.93 | 121.93 | 101.37 | 86.91 | 86.91 |
| 9yr | 122.96 | 122.96 | 102.34 | 87.83 | 87.83 |
| 10yr | 124.42 | 124.42 | 103.78 | 89.25 | 89.25 |
| 11yr | 125.83 | 125.83 | 105.29 | 90.61 | 90.61 |
| 12yr | 127.15 | 127.15 | 106.42 | 91.83 | 91.83 |

3-B-4-b deleted

4

3-B-5  Effective May 1, 2008 the hourly rates for Captains and First Officers shall be as follows:

3-B-5-a Hourly Rates

| | B747-400 | B777 | B767/757 | A320/319 | B737-300 |
|---|---|---|---|---|---|
| | | | **Captains** | | |
| 1yr | 176.28 | 176.28 | 144.47 | 122.77 | 122.77 |
| 2yr | 177.29 | 177.29 | 145.57 | 123.83 | 123.83 |
| 3yr | 178.21 | 178.21 | 146.91 | 124.92 | 124.92 |
| 4yr | 179.19 | 179.19 | 147.89 | 126.10 | 126.10 |
| 5yr | 180.20 | 180.20 | 149.05 | 127.28 | 127.28 |
| 6yr | 181.12 | 181.12 | 150.16 | 128.41 | 128.41 |
| 7yr | 182.13 | 182.13 | 151.16 | 129.55 | 129.55 |
| 8yr | 183.34 | 183.34 | 152.43 | 130.70 | 130.70 |
| 9yr | 184.34 | 184.34 | 153.44 | 131.68 | 131.68 |
| 10yr | 185.85 | 185.85 | 155.02 | 133.31 | 133.31 |
| 11yr | 187.26 | 187.26 | 156.69 | 134.85 | 134.85 |
| 12yr | 188.95 | 188.95 | 158.16 | 136.46 | 136.46 |

| | B747-400 | B777 | B767/757 | A320/319 | B737-300 |
|---|---|---|---|---|---|
| | | | **First Officers** | | |
| 1yr | 32.46 | 32.46 | 32.46 | 32.46 | 32.46 |
| 2yr | 73.93 | 73.93 | 60.70 | 51.64 | 51.64 |
| 3yr | 106.92 | 106.92 | 88.03 | 74.95 | 74.95 |
| 4yr | 113.07 | 113.07 | 93.32 | 79.57 | 79.57 |
| 5yr | 115.42 | 115.42 | 95.47 | 81.53 | 81.53 |
| 6yr | 118.09 | 118.09 | 97.91 | 83.72 | 83.72 |
| 7yr | 120.84 | 120.84 | 100.29 | 85.95 | 85.95 |
| 8yr | 123.75 | 123.75 | 102.89 | 88.22 | 88.22 |
| 9yr | 124.80 | 124.80 | 103.87 | 89.15 | 89.15 |
| 10yr | 126.28 | 126.28 | 105.33 | 90.58 | 90.58 |
| 11yr | 127.72 | 127.72 | 106.87 | 91.97 | 91.97 |
| 12yr | 129.06 | 129.06 | 108.02 | 93.21 | 93.21 |

3-B-5-b deleted

3-B-6  Effective May 1, 2009 the hourly rates for Captains and First Officers shall be as follows:

3-B-6-a Hourly Rates

| | | | Captains | | |
|---|---|---|---|---|---|
| | B747-400 | B777 | B767/757 | A320/319 | B737-300 |
| 1yr | 178.93 | 178.93 | 146.64 | 124.61 | 124.61 |
| 2yr | 179.95 | 179.95 | 147.75 | 125.68 | 125.68 |
| 3yr | 180.88 | 180.88 | 149.11 | 126.80 | 126.80 |
| 4yr | 181.87 | 181.87 | 150.11 | 127.99 | 127.99 |
| 5yr | 182.91 | 182.91 | 151.29 | 129.19 | 129.19 |
| 6yr | 183.84 | 183.84 | 152.41 | 130.34 | 130.34 |
| 7yr | 184.86 | 184.86 | 153.43 | 131.49 | 131.49 |
| 8yr | 186.09 | 186.09 | 154.72 | 132.66 | 132.66 |
| 9yr | 187.11 | 187.11 | 155.74 | 133.65 | 133.65 |
| 10yr | 188.64 | 188.64 | 157.35 | 135.31 | 135.31 |
| 11yr | 190.07 | 190.07 | 159.04 | 136.87 | 136.87 |
| 12yr | 191.79 | 191.79 | 160.53 | 138.51 | 138.51 |

| | | | First Officers | | |
|---|---|---|---|---|---|
| | B747-400 | B777 | B767/757 | A320/319 | B737-300 |
| 1yr | 32.94 | 32.94 | 32.94 | 32.94 | 32.94 |
| 2yr | 75.04 | 75.04 | 61.61 | 52.41 | 52.41 |
| 3yr | 108.53 | 108.53 | 89.35 | 76.08 | 76.08 |
| 4yr | 114.76 | 114.76 | 94.72 | 80.76 | 80.76 |
| 5yr | 117.15 | 117.15 | 96.90 | 82.75 | 82.75 |
| 6yr | 119.86 | 119.86 | 99.38 | 84.98 | 84.98 |
| 7yr | 122.65 | 122.65 | 101.80 | 87.24 | 87.24 |
| 8yr | 125.61 | 125.61 | 104.43 | 89.54 | 89.54 |
| 9yr | 126.68 | 126.68 | 105.43 | 90.49 | 90.49 |
| 10yr | 128.18 | 128.18 | 106.91 | 91.94 | 91.94 |
| 11yr | 129.63 | 129.63 | 108.47 | 93.35 | 93.35 |
| 12yr | 130.99 | 130.99 | 109.64 | 94.60 | 94.60 |

Renumber balance of Section 3-B

**Exhibit B-1**
**Other Contract Revisions**

1. Section 3-B-10-a "Late Night Flying" deleted

2. Section 5-G-1-e-(1)-(d) deleted

3. Section 5-G-1-e-(2) modified to read as follows:

   5-G-1-e-(2) A pilot functioning as a reserve will not be scheduled into a day(s) off.

4. Section 20-J-4-d deleted

5. Section 22-A-2 add this LOA

6. Letter Of Agreement 04-09 "PBS Contract Modifications" change to 20-E-2-b is modified to read as follows:

   20-E-2-b In equipment domiciles which have both international and domestic trips, the senior 50% of the pilots whose lines will be vacated for OE lines will be subject to assignments as reserves per domestic reserve rules. The junior 50% of the pilots whose lines will be vacated for OE lines are subject to assignments as reserves per international reserve rules. If an odd number of OE lines exist, the odd line will be identified as a domestic regular reserve line for days off consideration.

7. The contractual provisions identified in paragraphs 2, 3, 4 and 6 above will take effect on the first day of the month following the Effective Date.

7

**Exhibit B-2**
**Other Contract Revisions**

(Retiree Life Insurance)

January 1, 2005

Captain Mark Bathurst, Chairman
UAL-MEC Air Line Pilots Association
9550 West Higgins Suite 1000
Rosemont, Illinois 60018

Dear Mark:

During the negotiations which led to the Letter of Agreement 05-01 (Bankruptcy Exit), the parties agreed that the following change will apply to pilots who, on January 1, 2005, are active (including paid leave), receiving Pilot Disability Income benefits, furloughed, on medical leave of absence, on military leave or on other approved leave:

> No retiree life insurance will be payable upon the death of any pilot who retires after January 1, 2005.

If this letter accurately reflects our agreement, please sign and return three (3) copies for our files.

Sincerely,

Peter B. Kain
Vice President - Labor

Accepted and agreed to this
3/ day of January 2005

Captain Mark Bathurst, Chairman
UAL-MEC Air Line Pilots Association

17

**Exhibit B-3**
**Success Sharing**

Section 3-M-1-e of the 2003 Pilot Agreement shall be revised to read in its entirety as follows:

Pilots will receive the following cash incentive payments based on United's actual performance under the annual incentive program (with linear interpolation between the performance points):

| | |
|---|---|
| Threshold Performance: | 0.5% of Wages |
| Target Performance | 1.0% of Wages |
| Maximum Performance | 2.0% of Wages |

9

**Exhibit C**
**Profit Sharing**

| | |
|---|---|
| **Effective Date of Profit Sharing Plan:** | As of January 1, 2005 (so that the first year covered by the profit sharing plan shall be calendar year 2005). |
| **Profit Sharing Pool:** | In the event that the Company has more than $10 million in Pre-Tax Earnings in the relevant calendar year, 7.5% of Pre-Tax Earnings in 2005 and 2006 and 15% of Pre-Tax Earnings in each calendar year thereafter. |
| **Pre-Tax Earnings:** | UAL consolidated net income as determined in accordance with GAAP, but excluding (i) consolidated federal, state and local income tax expense (or credit); (ii) unusual, special, or non-recurring charges, (iii) charges with respect to the grant, exercise or vesting of equity, securities or options granted to UAL and United employees, and (iv) expense associated with the profit sharing contributions. |
| **Eligibility:** | All domestic employees of UAL Corp. or United Airlines, Inc. (including all pilots) who have completed one year of service as of December 31st of the year for which Pre-Tax Earnings are being measured. |
| **Allocation:** | For each eligible employee, a pro rata share of the Profit Sharing Pool for each calendar year based on the ratio of the employee's Considered Earnings for the year to the aggregate amount of Considered Earnings for all eligible employees that year. |
| **Considered Earnings:** | As currently defined in the Company's Success Sharing Plan (i.e., base pay, overtime, holiday pay, longevity pay, sick pay, vacation pay, shift differential, premiums, pre-tax contributions to a 401(k) plan, pre-tax medical plan contributions, and flexible spending account contributions but not expense reimbursement, incentive or profit sharing payments, imputed income or other similar awards or allowances). |
| **Payment Date:** | By no later than April 30th of the following year. |
| **Distribution:** | In cash, subject to 401(k) deferrals. |
| **Relationship to Other Programs:** | Incremental to the Success Sharing Plan; in lieu of the existing profit sharing plan described in Section 3-M-2 of the 2003 Pilot Agreement. |
| **Documentation:** | Implementing documentation reasonably acceptable to the Association. |
| **Duration:** | Continuing unless and until terminated in a future pilot collective bargaining agreement. |

10

## Exhibit D
## Convertible Notes

| | |
|---|---|
| **Issuer:** | Reorganized UAL Corp. |
| **Guarantor:** | United Airlines, Inc. |
| **Issue:** | [____]%[1] Senior Subordinated Convertible Notes Due 2021 (the "Notes") to be issued no later than 180 days following the Exit Date (the "Issuance Date"). |
| **Initial Holder:** | A trust or similar non-permanent vehicle for the benefit of eligible United pilots; the Notes or the value of the Notes to be distributed to such pilots or pilot retirement accounts as soon as reasonably practicable given tax, accounting, securities and market considerations; all rights of the Notes to be exercised by individual pilots while the notes remain in the trust. Distribution mechanics, eligibility and allocation among such pilots to be reasonably determined by the Association. |
| **Principal Amount:** | $550,000,000 in denominations of $1,000. |
| **Term:** | 15 years from the Issuance Date. |
| **Amortization:** | None prior to maturity; full principal to be repaid at the maturity date except to the extent converted or prepaid. |
| **Interest Rate:** | Semi-annually in arrears, in cash, at an annual rate of [___]%[1]; provided, however, that (i) the first full year of interest from the Issuance Date may be paid in cash or in kind at the option of the Issuer; (ii) if such interest is paid in kind, it will be in Common Stock, but only to the extent there exists Common Stock that is exempt from registration under 11 U.S.C. § 1145; and (iii) if such interest is paid in kind, it shall be delivered to the Holders under applicable market terms at issuance for public convertible debt securities of this type (e.g., any notice period and stock payment premium). |
| **Security:** | None. |
| **Ranking:** | Junior to the Reorganized UAL exit facility, customary secured indebtedness, indebtedness contemplated under a plan of reorganization, and other mutually agreed-upon indebtedness; pari passu to all current and future UAL or United Airlines senior |

---

[1] The parties shall work together to set an interest rate for the Notes no later than thirty (30) days prior to the Issuance Date which shall ensure that the Notes will trade at par value or better on Issuance (the "Par Value Interest Rate"). Failing agreement on the Par Value Interest Rate, the parties shall solicit rate recommendation from two national trading firms and shall adopt the average of the two suggested rates.

|  | unsecured debt; senior to all current and future subordinated debt. |
|---|---|
| **Conversion Rights:** | The Holder may convert any number of the Notes into the Issuer's common stock (the "Common Stock"), at any time, at the Conversion Price. |
| **Conversion Price:** | The product of (x) 125% and (y) the average closing price of the Common Stock for the sixty consecutive trading days following the Exit Date. |
| **Transferability:** | To the greatest extent feasible under applicable law, the Notes and the Common Stock shall be issued under 11 U.S.C. §1145, and the Notes and the Common Stock into which they shall be convertible shall be freely transferable by the Holders without registration under the Securities Act of 1933. |
| **Common Stock:** | When delivered, the Common Stock into which Notes may convert shall be fully paid and non-assessable. Issuer shall use its best efforts to list the Common Stock on a national stock exchange or NASDAQ prior to the Issuance Date. |
| **Call Rights:** | No call for five years from the Issuance Date; thereafter, callable in cash or Common Stock if the Common Stock has traded at no less than 125% of the Conversion Price for the sixty (60) consecutive trading days prior to the call date. |
| **Put Rights:** | Soft put right on the fifth and tenth anniversary of the Issuance Date for all principal and accrued interest as of such date; payable in cash or shares of Common Stock. |
| **Mandatory Prepayments:** | Mandatory prepayment upon a "fundamental change" with a customary make whole premium, if any, for public convertible debt securities of this type; no prepayment obligations for mergers in which the Issuer is the surviving entity; no make whole premium in other mergers. |
| **Anti-Dilution Protections:** | The Conversion Price will be subject to customary anti-dilution adjustments,[2] including upon (i) stock or extraordinary cash dividends, (ii) reclassifications, subdivisions or combinations of the Common Stock, (iii) the issuance of rights or warrants to all holders of Common Stock convertible into or exercisable for Common Stock at less than the then-current market price, (iv) distribution of the capital stock of an Issuer subsidiary to holders of the Common Stock and (v) any other distributions of assets by the Issuer to holders of the Common Stock. |
| **Mergers and Business Combinations:** | The Notes will enjoy customary adjustments and protections in the event the Common Stock is converted into, reclassified into or |

---

[2] Anti-dilution adjustments shall not be applicable to securities issued or assets distributed under the Plan of Reorganization.

exchanged for cash, other assets or securities.

**Other Terms and Conditions:**   The Notes are intended to be public market securities and to trade at par value. The documentation of the Notes shall include such other terms and conditions as are customarily found in public market convertible securities of this type.

**Implementation:**   Implementing documentation reasonably acceptable to the Association and the Company.

**Distribution:**   The Association and the Company will coordinate any distribution of the Notes so that such distribution does not unreasonably interfere with capital markets activities of the UAL or the Company. The Association's investment bankers will be the exclusive distribution agent for the Notes.

**Exhibit E**
**Amended Distribution Agreement**

1.     Section 2 of Letter of Agreement 03-07 to the 2003 Pilot Agreement (the "Distribution Agreement") is hereby amended to read in its entirety as follows:

In consideration for the pilot contract revisions under the Section 1113 Restructuring Agreement reached between UAL, the Company, and ALPA effective May 1, 2003 (the "2003 Restructuring Agreement"), which modifies the parties' 2000 collective bargaining agreement ("2000 Agreement") and resolves numerous union grievances concerning the administration of the 2000 Agreement, and in consideration of the pilot contract revisions under the revisions to the 2003 Pilot Agreement effective in 2005 (the "Revised 2003 Pilot Agreement"), any plan of reorganization proposed or supported by UAL and the Company as proposed and/or amended from time to time (the "Plan"), shall provide that, on or as soon as reasonably practicable after the effective date of such Plan, the pilot group will receive a percentage distribution of the equity, securities and/or other consideration provided to general unsecured creditors under the Plan (the "Distribution") calculated by the following formula:

$A/(A+B)$, where:

$A$ is the sum of (i) $2,742,574,581, representing the dollar value of 30 months of average cost reductions under the 2003 Restructuring Agreement as reasonably measured under Labor Model 1.1A FINAL, and (ii) $300,000,000, representing the dollar value of 20 months of cost reductions under the Revised 2003 Pilot Agreement (the "ALPA Amount"); and

$B$ is the total amount of all other allowed prepetition general unsecured claims against the Debtors (UAL and its 27 debtor subsidiaries).

2.     Section 3 of the Distribution Agreement is hereby amended to read in its entirety as follows:

In the event the other employees of the Company receive a Distribution in excess of $865,000,000 in connection with the 2005 labor cost reductions (the "Other Employee Distribution"), then the $300,000,000 amount described in paragraph 2 of this Distribution Agreement shall instead equal the product of (x) $300,000,000 and (y) a fraction, the numerator of which is the actual amount of the Other Employee Distribution and the denominator of which is $865,000,000.

3.     Except as revised in the preceding paragraphs, the Distribution Agreement shall remain unchanged and in full force and effect.

**Exhibit F**
**Indemnity Agreement**

1.    Indemnification. UAL and the Company (collectively, "United") hereby indemnify and hold harmless the Association, its members, officers, committee members, agents, employees, counsel, financial advisors and representatives (each, an "Indemnified Person") from any and all losses, damages, fines, penalties, taxes, expenses, claims, lawsuits, or administrative charges of any sort whatsoever (including reasonable attorney's fees and costs arising in connection with the investigation and defense of any such matter) relating to, concerning or connected with the negotiation or implementation of this Letter of Agreement (any such event, a "Claim"), except to the extent that a Claim against an Indemnified Person is finally determined by a court of competent jurisdiction to have resulted from the gross negligence, fraud or willful misconduct of such Indemnified Person.

2.    Indemnification Procedure.

a.    An Indemnified Person must give prompt notice to the Company of the facts and circumstances that may constitute a Claim under this Indemnity Agreement; provided, however, that any delay by an Indemnified Person in giving such notice shall not relieve United of its obligations under this Indemnity Agreement except to the extent that such delay causes material damage or prejudice to United.

b.    United shall be entitled to participate in judicial, administrative proceeding concerning an actual or potential Claim (an "Action") and, upon ten (10) days notice to the applicable Indemnified Person, may assume the defense of such Claim with counsel reasonably satisfactory to the Indemnified Person.  Following any assumption of the defense of an Action by United, United shall not be liable for any subsequent fees of legal counsel or other expenses incurred by the Indemnified Person in connection with the defense of such Action, subject to reimbursement for actual out-of-pocket expenses incurred by the Indemnified Person as the result of a request for cooperation or assistance by United; provided, however, that if, in the reasonable opinion of outside counsel to the Indemnified Person, there exists an actual, material conflict of interest between the United and the Indemnified Person, United shall be liable for the legal fees and expenses of separate counsel to the Indemnified Person; provided, further, that the Indemnified Person shall have the right to participate in the defense of an Action with its own counsel at its own expense.

c.    No compromise or settlement of any Action shall be binding on United for purposes of United's obligations under this Indemnity Agreement without United's express written consent, which consent shall not be unreasonably withheld.  United shall not compromise or settle any Action or otherwise admit to any liability for any Claim on a basis that would reasonably be expected to adversely affect the future activity or conduct of the Indemnified Person without the prior written consent of the Indemnified Person, which consent shall not be unreasonably withheld.

d.    In the event United assumes the defense of any Action under this Indemnity Agreement, United shall (i) keep the Association and the applicable Indemnified

15

Person informed of material developments in the Action, (ii) promptly provide the Association and such Indemnified Person with copies of all pleadings, responsive pleadings, motions and other similar legal documents and papers received in connection with the Action, (iii) permit the Association and such Indemnified Person and their counsel, to the extent practicable, to confer on the defense of the Action, and (iv) permit the Association and such Indemnified Person and their counsel, to the extent practicable, an opportunity to review all legal papers to be submitted prior to their submission. The parties shall provide to each others such assistance as may be reasonably required to insure the proper and adequate defense of the Action, and each party shall use its good faith efforts and cooperate with each other party to avoid the waiver of any privilege of another party.

3.    Plan of Reorganization; Survival.    This indemnity agreement shall be assumed under the Plan of Reorganization and shall continue in full force and effect thereafter without regard to the terms of Section 22 of the Revised 2003 Pilot Agreement.

16

## Exhibit G
## Fees and Expenses

1.      The Company shall reimburse the Association for the reasonable, actual fees and out-of-pocket expenses incurred by the Association in connection with the review, design, negotiation, approval and ratification of this Letter of Agreement (its "Expenses") including:

      a.      reasonable flight pay loss incurred by the Association in review and negotiation of this Letter of Agreement and Special MEC Meetings or LEC Meetings called for the purpose of reviewing, approving or ratifying the Letter of Agreement ; and

      b.      the reasonable, actual fees and expenses of the Association's outside legal, pension, and other professional advisors (in each case based on normal hourly rates for actual time expended).

up to a maximum, aggregate total of $2.5 million. Of the total reimbursement for Expenses, $1 million shall be paid on the Effective Date, and the remaining $1.5 million will be paid on the Exit Date.

2.      On the Exit Date, the Company shall also pay, or reimburse the Association for paying, the expenses incurred by the Association's investment bankers in connection with the Letter of Agreement and a structuring fee for the Association's investment bankers.

3.      The Company shall seek judicial approval for its obligations under this Exhibit G at the same time that it seeks judicial approval of this Letter of Agreement.

4.      The parties acknowledge and agree that the Company's agreement to reimburse the Association for fees and expenses under this Letter of Agreement is a result of the special collective bargaining circumstances created by the parties' desire to negotiate modifications to the pilot collective bargaining agreement as part of the Company's bankruptcy reorganization.

17

**UAL Corporation**
1200 East Algonquin Road
Elk Grove Township, Illinois 60007

January __, 2005

Captain Mark Bathurst, Chairman
United Mater Executive Council, ALPA
9550 West Higgins, Suite 1000
Rosemont, Illinois 60018

Dear Mark:

As we have discussed many times over the past few months, the Company has reluctantly concluded that it must terminate all of its defined benefit pension plans in order to obtain the financing necessary to emerge from Chapter 11. The recent adverse changes in the industry revenue environment have further confirmed this conclusion, and we currently believe that we need to seek the termination and replacement of our defined benefit plans through negotiation or litigation. The Company and its labor groups are concurrently in the process of scheduling a trial on pension termination issues before the bankruptcy court, if necessary, for early May of this year, subject to the court's availability.

Nonetheless, over the next ninety days, the Company has agreed to work diligently with the pilot group and all other employee groups, with a completely open mind, to explore all issues and possibilities with respect to our pensions plan, including changes in legislation that would allow the Company to afford the pilot pension plan within the constraints of the Company's financial reality.

As we explore every remaining pension possibility during this ninety-day period, the Company will not seek judicial approval to terminate the A Plan under 29 U.S.C. §1341(c) and, as a consequence, we will not call on the Association to withdraw its opposition to the termination of the A Plan during this period. We are also committed to the proposition that termination of the A Plan should be addressed in the context of a global solution in the bankruptcy that treats all employee groups fairly and equitably, not through agency proceedings divorced from the bankruptcy.

Mark, the Company is unequivocally committed to the fair and equitable treatment of the pilot group in every aspect of the restructuring and we fully understand the unique harm that the pilot group will suffer in a pension termination. . I also recognize the leadership role that you, the MEC and the pilot group have taken during these difficult discussions, and the Company is committed to proceeding in partnership with the Association in our joint effort to return United Airlines to its rightful place at the top of our industry.

Sincerely,
Glenn F. Tilton
Chairman, President and Chief Executive Officer

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOHN P. MANSFIELD, JR., on Behalf of Himself and All Others Similarly Situated, ) ) ) | |
| Plaintiff, ) | 06 CV 6869 |
| ) | |
| v. ) | Judge Kennelly |
| ) | |
| AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, ) ) | Magistrate Judge Ashman |
| ) | |
| Defendant. ) | |

## SUPPLEMENTAL DECLARATION OF CAPTAIN WENDY J. MORSE
## IN FURTHER SUPPORT OF ALPA'S MOTION TO DISMISS UNDER RULE 12(B)(1)

Captain Wendy J. Morse, having first-hand knowledge of the facts stated below, and being competent to testify as a witness, declares under penalty of perjury as follows:

1.    I am employed as a pilot by United Air Lines, Inc. ("United"), and I am a member of the Air Line Pilots Association, International ("ALPA"), which is the collective bargaining representative for pilots employed by United.

2.    ALPA maintains a Master Executive Council at United (the "MEC"), which is made up of representatives elected from the ALPA membership employed by United, and which serves as the coordinating council for ALPA's activities at the airline (often referred to as the "UAL MEC").

3.    As I noted in my earlier declaration, dated January 19, 2007, I have served as the Vice Chairman of the United MEC since January 1, 2004.

4.    For the Court's convenience, I will restate a few paragraphs of my January 19th declaration for context.  In late 2002, United filed a petition with the United States Bankruptcy

Court for the Northern District of Illinois seeking protection from creditors pursuant to Chapter 11 of Title 11 of the United States Code. As I had declared earlier, following the bankruptcy filing, ALPA agreed – in response to United's statements that it would seek to reject its collective bargaining agreement with ALPA – to change the terms and conditions of employment for United's pilots in order to reduce the airline's costs.

5.     As I had declared earlier, in return for ALPA's agreement to cost-saving changes in its collective bargaining agreement, during negotiations, United agreed in 2005 to provide ALPA with $550 Million in convertible notes (the "Notes"). United provided the Notes to ALPA, which were later sold on the open market for cash, and ALPA elected to allocate the proceeds of the Notes among all eligible United pilots (the "Allocation"). This agreement between ALPA and United is memorialized in a document known as the "Letter Agreement." Attached as Exhibit C is a true copy of the Letter Agreement.

6.     Shortly after the time that the above agreement was finalized and approved by the Bankruptcy Court in January 2005, ALPA had begun the process of considering various methods of allocating the proceeds of the Notes.

7.     The process was a deliberate and careful one, undertaken over many months and with the benefit of actuarial analyses and legal advice.

8.     Given the many thousands of pilots employed by United and the complex analyses involved in the Allocation process, no individualized, pilot-by-pilot analyses were done to compare each pilot's potential benefits under a formula for the Allocation known as "GAP 1" versus the benefits that pilot would receive under another Allocation formula called "GAP 2."

9.     Throughout 2005, the MEC met regularly to analyze and evaluate possible Allocation methods and to decide who should be eligible to receive the proceeds.

2

10.     As I noted in my January 19th declaration, the MEC made the final decision as to the formula to be used for the Allocation (i.e., the so-called "GAP 2" methodology) on January 18, 2006, and adopted a formal resolution in this regard.

11.     In addition, at the same meeting, the MEC decided who would be eligible for the Allocation, and established that all pilots on United's system seniority list as of January 1, 2005 would be eligible, subject to certain exceptions not relevant here.  Attached as Exhibit A is a true copy of the portion of the January 16-20, 2006 UAL MEC meeting minutes reflecting the MEC's formal resolution on eligibility.

12.     Two days after the MEC's final decision, the MEC sent a memo to all UAL pilots that notified them that the MEC had passed resolutions adopting GAP 2 as the allocation methodology for the proceeds of the notes, adopting the 1/1/05 eligibility date, and other criteria. Attached as Exhibit B is a true copy of the memo which was dated January 20, 2006.

I declare under penalty of perjury that the foregoing is true and correct.


Captain Wendy J. Morse

Executed on February 12, 2007.

# Exhibit A

<u>M I N U T E S</u>

**UAL-MEC MEETING**
**JANUARY 16-20, 2006**
**FAIRMONT HOTEL**
<u>**CHICAGO, ILLINOIS**</u>

## <u>MONDAY, JANUARY 16, 2006</u>

0900    Meeting called to order by Chairman Bathurst

0901    Chairman Bathurst introduces new MEC members-elect Gordon Thomson – Council 11, Steven Edgar, Council 34 and Derek Brauch, Council 57.

0904    <u>Chairman's Report – Mark Bathurst</u>

Discussed the following:
- Delta update
- Claim sale update
- Executive Board resolution
- Management Employee Incentive Program
- Centralized Load Plan

1013    <u>Vice Chairman's Report – Wendy Morse</u>

Discussed the following:
- Electronic Voting at MEC Meetings
- Deadhead check-in
- Institution of MEC data storage system
- New Orleans hotels
- Captain's Authority and jump seat policy
- Pass Travel system
- FOQA
- Leather jackets
- Bird flu
- Flight Ops optional hat

1027    <u>Secretary/Treasurer's Report – Mike Hamilton</u>

Discussed the following:
- Budget update
- Agenda items update
- Expense deadline
- Flight Pay Loss
- Furlough Fund
- Future meeting dates
- Hotel Committee update
- Jumpseat

1118    <u>ALPA National Report to MEC – Paul Rice, ALPA Vice President Administration/Secretary and Mark</u>

Failed

0940   Merone/Genovese SUBSTITUTE Motion

Discussion.

1011   Aleshire/Barton

"Move to table this item."

Failed

1012   Merone/Genovese SUBSTITUTE Motion is withdrawn

Back on original Floor Resolution (0918)

1026   Swindells/Briggs SUBSTITUTE Motion

"WHEREAS, the Convertible Note first became a benefit in LOA 05-02, and

WHEREAS, the effective date of the LOA was 1/1/05,

THEREFORE BE IT RESOLVED, the UAL-MEC creates an eligibility date of 01/01/05 for the Convertible Note for all pilots on the United Airlines Pilot System Seniority List."

Carried Unanimously

1028   Hastings/Everhard Floor Resolution

1037   Otis/Merone AMENDMENT

1038   Voting on Hastings/Everhard Floor Resolution as Amended

Carried

*NOTE:  This Resolution was ultimately reconsidered.  Please refer to Wednesday, January 18 at 1415 for final disposition of this item.*

1040   Hastings/Barton Floor Resolution

"BE IT RESOLVED, that Pilots who entered Pilot Disability Insurance status on or after 1/1/05, but before the Bankruptcy Exit Date shall be treated consistent with the allocation methodology developed by the UAL-MEC R&I committee, to wit:

Projected earnings will have a soft freeze.
There will be no C-Plan accrual.
Pay Progression Model snapshot.
No pilot on PDI will receive more than a similar seniority, active status pilot."

Carried

1044   Hastings/Briggs Floor Resolution

# Exhibit B

To:    UAL Pilots

From:    MEC Communications

January 20, 2006

The following resolutions concerning allocation and eligibility for the $550 million convertible note were adopted by the United MEC

## Convertible Note Allocation Resolution

Whereas, the United Airlines MEC supports the GAP 2 Methodology to be used as the distribution model for the allocation of the 550 million dollar convertible note, and

Whereas, the GAP 2 Methodology is based on past and future earnings, and

Whereas, the assumptions to support GAP 2 methodology should reflect as closely as possible with a pilots career expectations and earnings, and,

Whereas, the earnings of a pilot should be based on historical evidence of bidding behavior, and

Whereas, the financial assumptions are supported by industry standards, rendering them defensible, reasonable and easy to understand,

THEREFORE BE IT RESOLVED, the United MEC endorses the Gap 2 methodology for determining individual pilot Convertible Note allocations, and

BE IT FURTHER RESOLVED, the United MEC endorses a six percent discount rate to determine the C-Plan benefits and present value of lost benefits, and

BE IT FURTHER RESOLVED, the United MEC endorses a six percent ROI on the C-Plan Contributions, and

BE IT FURTHER RESOLVED, the United MEC endorses a seniority based pay growth model ('Adjusted Stove Pipe') with adjustments based on current position held; ending with position due at retirement, for the purposes of determining Final Average Earnings.

***

## Eligibility Date

Whereas, the Convertible Note first became a benefit in LOA 05-02, and

Whereas, the effective date of the LOA was 1/1/05,

THEREFORE BE IT RESOLVED, the UAL-MEC creates an eligibility date of 01/01/05 for the Convertible Note for all pilots on the United Airlines Pilot System Seniority List.

***

## Eligibility: Military Leave

Move to include Military Leave pilots in Note Allocation eligibility.

\* \* \*

## Eligibility: Maternity/Parental Leaves

Move to include pilots on maternity/parental leaves of absences in Note Allocation eligibility.

\* \* \*

## Eligibility: ALPA Leaves of Absence

Move to include pilots on ALPA leaves of absences in Note Allocation eligibility.

\*\*\*

## Allocation/Eligibility Adjustments

Allocation Adjustment: Personal Leaves of Absence

Be It Resolved, Pilots who were on or entered into a Personal Leave of Absence (as provided by section 12-A of the CBA) on or after the date of eligibility and before the Bankruptcy Exit Date shall be included in the convertible note allocation with an offset made for time while on leave, the duration of which will be consistent with the authorized period of absence.

\*\*\*

## Eligibility Clarification: Pilot Resignations

Be It Resolved, Pilots that resigned their United Airlines pilot system seniority number after the Date of Eligibility, but before the Bankruptcy Exit Date shall not be eligible for the Note Allocation.
\*\*\*

## Eligibility: Terminations

Be It Resolved, Pilots who are terminated shall be included in the note allocation unless they have an adverse determination by the System Board of Adjustment by the Bankruptcy Exit Date.

\*\*\*

## Allocation Adjustment: Pilot Disability Insurance

Be It Resolved, Pilots who entered Pilot Disability Insurance status on or after 1/1/05, but before the Bankruptcy Exit Date shall be treated consistent with the allocation methodology developed by the UAL-MEC R&I committee, to wit:

Projected earnings will have a soft freeze.
There will be no C-Plan accrual.
Pay Progression Model snapshot.
No pilot on PDI will receive more than a similar seniority, active status pilot.

\*\*\*

## Eligibility Adjustment: Deceased Pilots

Be It Resolved, a Pilot who dies after the Date of Eligibility, but before the Bankruptcy Exit Date shall have their allocation reduced in a manner as developed by the UAL-MEC R&I committee, to wit:

The greater of the A-Plan "hard freeze" or the pre-retirement survivor benefit.
C-Plan blocked out.
Pay progression snapshot.
No deceased pilot will receive more than a similar seniority, active status pilot.

\*\*\*

## Eligibility: 9/11 Pilots

Be It Resolved, the estates of the 9/11 pilots will be included in the note allocation as though they are active pilots.

\*\*\*

## Furloughee Eligibility

BE IT RESOLVED, notwithstanding the general eligibility rule established for convertible note proceeds, the following eligibility rules will apply specifically to currently furloughed pilots:

1) The pilot must be offered a recall class (and subsequently agree to accept that offer) that was officially announced by UAL by the Bankruptcy Exit Date, regardless of the date the class is scheduled to begin,
2) If the pilot had previously bypassed an offer of recall, she/he is ineligible unless she/he meets the provisions of item (1) above

Intent: To include any and all furloughees to fill recall classes that are announced by the company BEFORE the Bankruptcy Exit Date, but which may begin AFTER the Bankruptcy Exit Date, regardless of when they receive their notification or accept the offer to attend the above recall. The time allowed to accept offers of recall is covered by other language elsewhere.
For example: An offer sent out by UAL before the Bankruptcy Exit Date may be for a class of 20 pilots to attend a class scheduled after the Bankruptcy Exit Date. As long as the pilot is being offered to attend THAT class, he is eligible, regardless of when that pilot is notified by UAL, unless she/he bypasses

\*\*\*

## Eligibility: Pilot Managers

Whereas, the Management Equity Incentive Program (stock) is not related to A-Plan termination.

Whereas, the Association cannot accurately determine whether a management pilot is able to "double-dip", specifically earn both a pilot retirement and a management retirement.

Whereas, pilot managers that are officers of the corporation enter into an individual employment agreement separate from the Pilot Agreement.

Be It Resolved, management pilots who are officers of the corporation on or after the Date of Eligibility shall be excluded from the note allocation, and

Be It Further Resolved, in so far as the Association can determine, management pilots who receive retirement benefits outside of the Pilot Agreement shall have their note allocation offset for that benefit, and

Be It Further Resolved, this issue will be determined by the Date Note of Issuance.

# Exhibit C

Letter 05-01
(*Bankruptcy Exit Agreement*)

LETTER OF AGREEMENT
by and between
UAL CORP.,
UNITED AIR LINES, INC.
and
THE AIR LINE PILOTS
in the service of
UNITED AIR LINES, INC.
as represented by
THE AIR LINE PILOTS ASSOCIATION, INTERNATIONAL

THIS LETTER OF AGREEMENT, dated as of January 1, 2005, is made and entered into in accordance with the Railway Labor Act by and between UAL Corp. (hereinafter referred to as "UAL"), UNITED AIR LINES, INC. (hereinafter referred to as the "Company") and the AIR LINE PILOTS ASSOCIATION, INTERNATIONAL (hereinafter referred to as "ALPA" or the "Association").

WHEREAS UAL, the Company and the Association have reached agreement concerning the revisions to their current collective bargaining agreement (the "2003 Pilot Agreement" and, as revised by this Letter of Agreement, the "Revised 2003 Pilot Agreement") necessary for the Company to emerge from Chapter 11; and

WHEREAS certain of the revisions shall become effective as of January 1, 2005 (the "Effective Date"), assuming the complete satisfaction of the conditions described in paragraph 15 below prior to January 31, 2005 and others shall become effective on the effective date (the "Exit Date") of a plan of reorganization proposed by UAL (the "Plan of Reorganization"); and

WHEREAS the Company has represented to the Association that the Company has concluded that UAL cannot attract the exit financing necessary to emerge from Chapter 11 absent the termination of all of the Company's defined benefit plans;

THEREFORE the parties to this Letter of Agreement hereby agree as follows:

1.    <u>Contract Extension</u>.  The amendable date of the Revised 2003 Pilot Agreement shall be December 31, 2009.  Section 22.D of the Revised 2003 Pilot Agreement shall read in its entirety as follows:

This Agreement shall continue in full force and effect through and including December 31, 2009 and shall renew itself without change each succeeding January 1st thereafter, unless written notice of intended change is served in accordance with Section 6, Title I, of the Railway Labor Act by either party upon the other at least thirty (30) but not more than two hundred seventy (270) days

prior to December 31, 2009 or any year thereafter. The parties shall commence direct negotiations with respect to such notices no later than thirty (30) days following the delivery of such notice. In the event a new tentative collective bargaining agreement has not been concluded by August 1, 2009 (or August 1st of any year thereafter if applicable), and the services of the National Mediation Board (the "Board") have not previously been invoked, the parties shall, no later than August 1, 2009 (or August 1st of any year thereafter if applicable), jointly invoke the services of the Board under Section 5 of the Act.

2.    <u>Hourly Pay Rates</u>.  The rates for hourly pay (the "Hourly Rates") under Section 3-B of the 2003 Pilot Agreement shall be reduced by 11.8% on the Effective Date, and the reduced Hourly Rates shall thereafter be increased by 1.5% on May 1, 2006, by 1.5% on May 1, 2007, by 1.5% on May 1, 2008 and by 1.5% on May 1, 2009 (as provided in the 2003 Pilot Agreement). In addition to the increases contained in the preceding sentence, the Hourly Rates shall be increased by 1% on January 1, 2008. The Hourly Rates under Section 3-B of the Revised 2003 Pilot Agreement are set forth in Exhibit A to this Letter of Agreement.

3.    <u>Other Contract Changes</u>.  Certain other provisions of the 2003 Pilot Agreement shall be revised on the Effective Date as described on Exhibits B-1, B-2 and B-3 to this Letter of Agreement.

4.    <u>Defined Benefit Pension Plan</u>.

a.    In the event the Company seeks judicial approval to terminate the United Airlines Pilot Defined Benefit Pension Plan (the "A Plan") under 29 U.S.C §1341(c) following April 11, 2005, then, on and after May 11, 2005, (i) the Association shall waive any claim it may have that the termination of the A Plan would violate the terms and conditions of the existing collective bargaining agreement between the Company and the Association, and (ii) the Association shall not otherwise oppose the Company's efforts to terminate the A Plan under 29 U.S.C §1341(c); provided, however, that nothing in this Letter of Agreement shall be construed, deemed or characterized by UAL or the Company as any agreement of any form by the Association that the A Plan should be terminated;

b.    The Company: (i) shall not terminate or agree to terminate the A Plan effective at any time prior to the earlier of (A) ten (10) days before the Exit Date and (B) the last date that any of the Company's other defined benefit pension plans are terminated (the "Pension Termination Date") and (ii) shall oppose any effort by any other person or entity to terminate the A Plan effective at any time prior to the Pension Termination Date;

c.    The A Plan shall remain in full force and effect unless (i) the bankruptcy court issues an order declaring that the Company has met the requirements for plan termination under 29 U.S.C. §1341(c)(2)(B)(ii), and (ii) any of the following has

2

occurred: (A) no timely notice of appeal of the order has been filed, (B) the order has been affirmed following the exhaustion of all appeals, or (C) the Exit Date has occurred and the Plan of Reorganization has become effective without provision for the continuation of any such appeals; and

        d.       Notwithstanding any termination of A Plan retirement benefits, any and all of the Company's indemnification obligations under or applicable to the A Plan shall remain in full force and effect without regard to Section 22 of the Revised 2003 Pilot Agreement.

     5.    <u>Pension Contributions</u>.  In the event that the A Plan is terminated pursuant to 29 U.S.C §1341 or §1342 following judicial approval of such termination:

        a.       The Company shall make an additional monthly contribution (the "C Plan Contribution") to the United Airlines Pilot Directed Account Plan (the "PDAP") of six percent (6%) of pilot compensation (as measured under the PDAP) beginning with the earlier of (i) June 1, 2005 or (ii) the first day of the calendar month following the Exit Date (with a pro rated C Plan Contribution for the period between the Exit Date and the first of the month following the Exit Date); provided, however, that in the event the Exit Date follows June 1, 2005, C Plan Contributions will accrue from June 1, 2005 through the Exit Date and be contributed in a single lump sum payment to the PDAP on the Exit Date;

        b.       Prior to the Exit Date, the Company and the Association shall adopt a mutually-acceptable qualified or non-qualified plan arrangement to accept contributions that cannot be allocated to pilot defined contribution accounts under Section 415 of the Internal Revenue Code;

        c.       At any time prior to January 1, 2007, the Association may elect, on an irrevocable basis, to amend the Revised 2003 Pilot Agreement, effective January 1, 2008, (i) to increase the C Plan Contribution from six percent (6%) to seven percent (7%) of pilot compensation (as measured under the PDAP) and (ii) to reduce the Hourly Rates under Section 3-B of the Revised 2003 Pilot Agreement by one percent (1%);

        d.       The C Plan Contribution shall be in addition to the nine percent (9%) of pilot compensation contributed to the PDAP under the 2003 Pilot Agreement; and

        e.       Following the Exit Date, the Company shall not establish or re-establish any single-employer defined benefit plan for any UAL or Company employee group unless the pilot group is provided the option of electing to receive a comparable defined benefit plan in lieu of the C Plan Contribution.

3

6.     Profit Sharing.  The Revised 2003 Pilot Agreement shall provide for the pilot group to participate in the revised profit sharing program described in Exhibit C to this Letter of Agreement.

7.     Convertible Notes.  In the event that the A Plan is terminated pursuant to 29 U.S.C §1341 or §1342 following judicial approval of such termination, the Revised 2003 Pilot Agreement and the Plan of Reorganization shall provide for the issuance of $550 million of UAL convertible notes, as described in Exhibit D to this Letter of Agreement, to a trust or other entity designated by the Association.  The terms of the UAL convertible notes described in Exhibit D shall be subject to mutually-acceptable modifications to optimize implementation for all parties from an accounting, securities law and tax law perspective.

8.     Distribution Agreement.  The Plan of Reorganization shall provide the pilot group with a distribution of UAL equity securities as provided in the amended distribution agreement described in Exhibit E to this Letter of Agreement.

9.     Additional Non-Labor Savings.  Prior to the Exit Date, the Association and the Company shall develop, and the Company shall begin pursuit of, a mutually-acceptable business improvement program reasonably projected to produce at least $150 million of annual savings in non-labor costs in addition to the savings contained in the Gershwin 5F business plan dated as of November 4, 2004 (the "Business Plan").

10.     Administrative Claim.   The Association shall accrue and be entitled to a stipulated, approved and allowed claim of administration under 11 U.S.C §503(b) in the amount of the actual cash savings provided to the Company under this Letter of Agreement from the Effective Date through the earlier of (i) the termination of this Letter of Agreement under paragraph 16 below or (ii) the Exit Date (the "Administrative Claim").  The Administrative Claim shall be extinguished upon the Exit Date unless the Association has terminated the Letter of Agreement under paragraph 16 below.

11.     Indemnity. UAL and the Company shall provide indemnification on the Effective Date as described in Exhibit F to this Letter of Agreement.

12.     Plan Release and Exculpation.  The Plan of Reorganization shall include a plan exculpation and release  provision (which provision shall be at least as comprehensive as the plan exculpation and release provision under the Plan of Reorganization for the debtor or any other person) for the Air Line Pilots Association, International, the United Master Executive Council of the Air Line Pilots Association, International, and each of their current or former (a) members, (b) officers, (c) committee members, (d) employees, (e) advisors, (f) attorneys, (g) accountants, (h) investment bankers, (i) consultants, (j) agents and (k) other representatives with respect to any liability such person or entity may have in connection with or related to the UAL bankruptcy cases, the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation or consummation of any of the Plan of

4

Reorganization, the disclosure statement concerning the Plan of Reorganization, the 2003 Pilot Agreement, this Letter of Agreement, the Revised 2003 Pilot Agreement or any contract, employee benefit plan, instrument, release or other agreement or document created, modified, amended or entered into in connection with either the Plan of Reorganization or any agreement between the Company, UAL and the Association, or any other act taken or omitted to be taken in connection with the United bankruptcy.

13.    Assumption of the Pilot Agreement. The Revised 2003 Pilot Agreement (other than with respect to the A Plan if the A Plan is terminated) shall be assumed under 11 U.S.C. §365 under the Plan of Reorganization.

14.    Bankruptcy Actions. The Company and the Association shall take the following actions to seek the approval of this Letter of Agreement by the bankruptcy court in In Re UAL Corporation et al., Case No. 02-B-48191 (Bankr. N.D. Ill.) (the "Bankruptcy Cases"):

a.    the Company shall file a motion for approval of the Letter of Agreement under 11 U.S.C. §363, in form and substance reasonably acceptable to the Association, by no later than January 21, 2005;

b.    the Company shall provide, to the extent reasonably practicable, the Association's counsel with copies of, and a reasonable opportunity to comment on, all motions, applications, proposed orders, pleadings and supporting papers prepared by the Company for filing with the bankruptcy court relating to court approval of this Letter of Agreement; and

c.    both the Company and the Association shall support and seek the approval of this Letter of Agreement in the Bankruptcy Cases without condition, qualification or exception; shall use their best efforts to obtain the support of the Official Committee of Unsecured Creditors and other parties and stakeholders for the Letter of Agreement; and shall take every reasonable action necessary to obtain judicial approval of this Letter of Agreement in the Bankruptcy Cases without condition, qualification or exception, including the filing of motions, objections and appeals.

15.    Conditions to Effectiveness. This Letter of Agreement shall become effective as of January 1, 2005, subject to the occurrence of all of the following prior to January 31, 2005: (a) acceptance by the United Master Executive Council of the Association, (b) United pilot membership ratification under the Association's Constitution and By-Laws, (c) if required, approval by the Company's Board of Directors, (d) execution by the President of the Association, and (e) withdrawal of the Company's motion to reject the 2003 Pilot Agreement under 11 U.S.C. §1113.

16.    Termination Rights. This Letter of Agreement may be terminated by the Association, by written notice from the Association to the Company (the "Termination Notice"), given before or after the Effective Date but no later than the Exit Date, but in

5

no event later than sixty (60) days following the occurrence of any of the following events:

a.     failure of the court to issue final judicial approval of this Letter of Agreement, without condition, qualification or exception, by January 31, 2005;

b.     a court of competent jurisdiction enters a final, non-appealable judicial order that the Company is not entitled to the termination of the A Plan under 29 U.S.C §1341(c);

c.     failure of the Company to implement, through binding agreement or final judicial order effective no later than June 1, 2005, revisions to (i) the labor contracts of the Company's other unionized employees and (ii) the wages, benefits and working conditions of the Company's salaried and management employees so that the aggregate revisions in (i) and (ii) are reasonably projected to produce at least $1.0 billion in average annual cash savings in labor and pension costs for the Company from January 1, 2005 through and including January 1, 2010, unless such action is cured to the reasonable satisfaction of the Association within twenty (20) days of the Termination Notice;

d.     the filing by UAL or United of, support by UAL or United for, or judicial confirmation or approval of (as the case may be), a plan of reorganization or a proposed disclosure statement which (i) contains any material term that is materially inconsistent with the Revised 2003 Pilot Agreement or this Letter of Agreement or (ii) proposes or confirms a capital structure or ownership structure that is not reasonably acceptable to the Association unless, in either case (i) or (ii), such action is cured to the reasonable satisfaction of the Association within twenty (20) days of the Termination Notice; or

e.     any other material breach of the Company's or UAL's obligations under this Letter of Agreement unless such breach is cured to the reasonable satisfaction of the Association within twenty (20) days of the Termination Notice.

In the event of such termination, (A) the Administrative Claim shall be paid on the Exit Date, (B) this Letter of Agreement shall otherwise become null and void in its entirety, and (C) the parties shall thereafter be governed by the 2003 Pilot Agreement (including the A Plan) and without regard to this Letter of Agreement.

17.     Fees and Expenses. The Company shall reimburse the Association for fees and expenses incurred in connection with this Letter of Agreement as described on Exhibit G to this Letter of Agreement.

18.     Agreement. This Letter of Agreement is a final, binding and conclusive commitment and agreement between UAL, the Company and the Association.

6

Notwithstanding anything to the contrary in this Letter of Agreement, judicial approval of this Letter of Agreement shall constitute approval and allowance of the Administrative Claim and shall otherwise have the same meaning and effect as the judicial approval of the 2003 Pilot Agreement in the Bankruptcy Cases signed on April 30, 2003.

19.     Amendments; Waiver.  This Letter of Agreement may be amended, modified, superseded or canceled and any of its provisions may be waived only by a written instrument executed by all parties or, in the case of a waiver, by the party waiving compliance.  Except as otherwise expressly provided in paragraph 16 above with respect to the delivery of a notice of termination, the failure of any party at any time to require performance of any provision of this Letter of Agreement shall not affect the right of that party at a later time to enforce the same or a different provision.  No waiver by any party of a right under this Letter of Agreement shall be deemed or construed as a further or continuing waiver of any such right with respect to the same or a different provision of this Letter of Agreement.

20.     Notices.  Any notice or other communication given under to the terms of this Letter of Agreement must be in writing and shall be deemed to have been duly given on the day it is delivered by hand, on the day it is sent by facsimile with confirmation of receipt by the transmitting machine, on the business day after it is sent by a national overnight mail service (delivery charge prepaid), or on the third business day after it is mailed first class, postage prepaid, in any case to the following addresses:

| | |
|---|---|
| If to the Company: | United Airlines, Inc.<br>1200 East Algonquin Road<br>Elk Grove Township, Illinois 60007<br>Attention:  Paul Lovejoy<br>Facsimile: 847-700-4099 |
| with copies to: | Kirkland & Ellis<br>200 East Randolph Drive<br>Chicago, Illinois 60601<br>Attention:  James H.M. Sprayregen<br>Facsimile: 312-861-2200 |
| If to the Association: | United Master Executive Council<br>Air Line Pilots Association, International<br>9550 West Higgins Road,   Suite 1000<br>Rosemont, IL  60018<br>Attention:  Master Chairman<br>Facsimile:  847-292-1777 |

7

with copies to:          Cohen, Weiss and Simon, LLP
                         330 West 42nd Street
                         25th Floor
                         New York, New York 10036
                         Attention: Babette Ceccotti
                         Facsimile: 212-695-5436

or to such other address or to such other person as any party shall have last designated by
written notice provided to the other parties in the manner set forth in this paragraph.

21.     Counterparts.  This Letter of Agreement may be executed in two or more
counterparts, all of which shall be considered one and the same instrument, and each of
which shall be deemed an original. Each party to this Letter of Agreement has agreed to
permit the use of faxed or otherwise electronically transmitted signatures in order to
expedite the consummation of the transactions contemplated hereby.

22.     Headings; Construction.  The paragraph headings in this Letter of
Agreement have been inserted for convenience of reference only and do not restrict or
otherwise modify any of the terms or provisions of this Letter of Agreement. Unless
otherwise expressly provided, the words "including" or "includes" in this Letter of
Agreement do not limit the preceding words or terms and shall be deemed to be followed
by the words "without limitation."

23.     Exhibits.  This Letter of Agreement includes all of Exhibits A through G
hereto. Except as otherwise expressly set forth therein, all capitalized terms in Exhibits A
through G shall have the meanings defined in this Letter of Agreement.

24.     Fair and Equitable Pension Treatment.  In the event the Company
implements, or reaches agreement with respect to, a legislative or other pension funding
solution that permits the continuation or maintenance of any of the Company's defined
benefit plans following the Pension Termination Date, the pilots will receive the full
benefit of that legislative or other solution to maintain the pilot A Plan in the same status
(e.g., frozen or active) as any other surviving plan so long as the pilot labor and pension
savings contributed to the restructuring remain fair and proportional to other employee
groups' labor and pension savings contributed to the restructuring in the manner
contemplated under the Business Plan in light of any such legislative or other pension
funding solution.

(Signature page to follow)

8

IN WITNESS WHEREOF, the parties have signed this Letter of Agreement this 31st day of January, 2005.

WITNESS:

FOR UNITED AIR LINES, INC.

Peter B. Kain
Vice President – Labor Relations

FOR UAL CORPORATION

Glenn F. Tilton
Chairman, President and CEO

WITNESS:

FOR THE AIR LINE PILOTS ASSOCIATION, INTERNATIONAL

Duane E. Woerth, President

Mark Bathurst, Chairman
United Master Executive Council

**Exhibit A**
**Revised Pay Rates**

Section 3-B "Hourly Rates" is modified to read as follows:

3-B-1 Effective January 1, 2005 the hourly rates for Captains and First Officers shall be as follows. The hourly rates, overrides, and incentive pay established in this Section 3 shall govern all aspects of pilot compensation.

3-B-1-a Hourly Rates

| Captains | | | | | |
|---|---|---|---|---|---|
|  | B747-400 | B777 | B767/757 | A320/319 | B737-300 |
| 1yr | 166.91 | 166.91 | 136.79 | 116.24 | 116.24 |
| 2yr | 167.86 | 167.86 | 137.83 | 117.24 | 117.24 |
| 3yr | 168.74 | 168.74 | 139.10 | 118.28 | 118.28 |
| 4yr | 169.66 | 169.66 | 140.03 | 119.40 | 119.40 |
| 5yr | 170.62 | 170.62 | 141.13 | 120.52 | 120.52 |
| 6yr | 171.50 | 171.50 | 142.18 | 121.58 | 121.58 |
| 7yr | 172.45 | 172.45 | 143.13 | 122.67 | 122.67 |
| 8yr | 173.59 | 173.59 | 144.33 | 123.75 | 123.75 |
| 9yr | 174.55 | 174.55 | 145.28 | 124.68 | 124.68 |
| 10yr | 175.97 | 175.97 | 146.78 | 126.23 | 126.23 |
| 11yr | 177.31 | 177.31 | 148.36 | 127.68 | 127.68 |
| 12yr | 178.91 | 178.91 | 149.75 | 129.21 | 129.21 |

| First Officers | | | | | |
|---|---|---|---|---|---|
|  | B747-400 | B777 | B767/757 | A320/319 | B737-300 |
| 1yr | 30.73 | 30.73 | 30.73 | 30.73 | 30.73 |
| 2yr | 70.00 | 70.00 | 57.47 | 48.89 | 48.89 |
| 3yr | 101.24 | 101.24 | 83.36 | 70.97 | 70.97 |
| 4yr | 107.06 | 107.06 | 88.36 | 75.34 | 75.34 |
| 5yr | 109.29 | 109.29 | 90.39 | 77.19 | 77.19 |
| 6yr | 111.81 | 111.81 | 92.70 | 79.27 | 79.27 |
| 7yr | 114.42 | 114.42 | 94.96 | 81.39 | 81.39 |
| 8yr | 117.18 | 117.18 | 97.42 | 83.53 | 83.53 |
| 9yr | 118.17 | 118.17 | 98.35 | 84.41 | 84.41 |
| 10yr | 119.57 | 119.57 | 99.73 | 85.77 | 85.77 |
| 11yr | 120.93 | 120.93 | 101.19 | 87.08 | 87.08 |
| 12yr | 122.20 | 122.20 | 102.28 | 88.25 | 88.25 |

3-B-1-b deleted

3-B-2  Effective May 1, 2006 the hourly rates for Captains and First Officers shall be as follows:

3-B-2-a Hourly Rates

| | | | Captains | | |
|---|---|---|---|---|---|
| | B747-400 | B777 | B767/757 | A320/319 | B737-300 |
| 1yr | 169.42 | 169.42 | 138.84 | 117.99 | 117.99 |
| 2yr | 170.38 | 170.38 | 139.90 | 119.00 | 119.00 |
| 3yr | 171.27 | 171.27 | 141.19 | 120.06 | 120.06 |
| 4yr | 172.21 | 172.21 | 142.13 | 121.19 | 121.19 |
| 5yr | 173.18 | 173.18 | 143.25 | 122.32 | 122.32 |
| 6yr | 174.07 | 174.07 | 144.31 | 123.41 | 123.41 |
| 7yr | 175.03 | 175.03 | 145.27 | 124.51 | 124.51 |
| 8yr | 176.20 | 176.20 | 146.49 | 125.61 | 125.61 |
| 9yr | 177.16 | 177.16 | 147.46 | 126.55 | 126.55 |
| 10yr | 178.61 | 178.61 | 148.98 | 128.12 | 128.12 |
| 11yr | 179.97 | 179.97 | 150.59 | 129.60 | 129.60 |
| 12yr | 181.59 | 181.59 | 152.00 | 131.15 | 131.15 |

| | | | First Officers | | |
|---|---|---|---|---|---|
| | B747-400 | B777 | B767/757 | A320/319 | B737-300 |
| 1yr | 31.19 | 31.19 | 31.19 | 31.19 | 31.19 |
| 2yr | 71.05 | 71.05 | 58.34 | 49.63 | 49.63 |
| 3yr | 102.76 | 102.76 | 84.61 | 72.03 | 72.03 |
| 4yr | 108.66 | 108.66 | 89.68 | 76.47 | 76.47 |
| 5yr | 110.93 | 110.93 | 91.75 | 78.35 | 78.35 |
| 6yr | 113.49 | 113.49 | 94.09 | 80.46 | 80.46 |
| 7yr | 116.13 | 116.13 | 96.39 | 82.61 | 82.61 |
| 8yr | 118.93 | 118.93 | 98.88 | 84.78 | 84.78 |
| 9yr | 119.94 | 119.94 | 99.83 | 85.68 | 85.68 |
| 10yr | 121.37 | 121.37 | 101.23 | 87.06 | 87.06 |
| 11yr | 122.74 | 122.74 | 102.70 | 88.38 | 88.38 |
| 12yr | 124.03 | 124.03 | 103.81 | 89.57 | 89.57 |

3-B-2-b deleted

2

3-B-3  Effective May 1, 2007 the hourly rates for Captains and First Officers shall be as follows:

3-B-3-a Hourly Rates

| | Captains | | | | |
|---|---|---|---|---|---|
| | B747-400 | B777 | B767/757 | A320/319 | B737-300 |
| 1yr | 171.96 | 171.96 | 140.92 | 119.76 | 119.76 |
| 2yr | 172.94 | 172.94 | 141.99 | 120.79 | 120.79 |
| 3yr | 173.84 | 173.84 | 143.30 | 121.86 | 121.86 |
| 4yr | 174.79 | 174.79 | 144.26 | 123.01 | 123.01 |
| 5yr | 175.78 | 175.78 | 145.40 | 124.16 | 124.16 |
| 6yr | 176.68 | 176.68 | 146.48 | 125.26 | 125.26 |
| 7yr | 177.66 | 177.66 | 147.45 | 126.37 | 126.37 |
| 8yr | 178.84 | 178.84 | 148.69 | 127.49 | 127.49 |
| 9yr | 179.82 | 179.82 | 149.67 | 128.45 | 128.45 |
| 10yr | 181.29 | 181.29 | 151.22 | 130.04 | 130.04 |
| 11yr | 182.67 | 182.67 | 152.85 | 131.54 | 131.54 |
| 12yr | 184.32 | 184.32 | 154.28 | 133.11 | 133.11 |

| | First Officers | | | | |
|---|---|---|---|---|---|
| | B747-400 | B777 | B767/757 | A320/319 | B737-300 |
| 1yr | 31.66 | 31.66 | 31.66 | 31.66 | 31.66 |
| 2yr | 72.12 | 72.12 | 59.21 | 50.37 | 50.37 |
| 3yr | 104.30 | 104.30 | 85.87 | 73.12 | 73.12 |
| 4yr | 110.29 | 110.29 | 91.03 | 77.62 | 77.62 |
| 5yr | 112.59 | 112.59 | 93.13 | 79.53 | 79.53 |
| 6yr | 115.19 | 115.19 | 95.50 | 81.67 | 81.67 |
| 7yr | 117.87 | 117.87 | 97.83 | 83.85 | 83.85 |
| 8yr | 120.72 | 120.72 | 100.36 | 86.05 | 86.05 |
| 9yr | 121.74 | 121.74 | 101.32 | 86.96 | 86.96 |
| 10yr | 123.19 | 123.19 | 102.75 | 88.36 | 88.36 |
| 11yr | 124.59 | 124.59 | 104.24 | 89.71 | 89.71 |
| 12yr | 125.89 | 125.89 | 105.37 | 90.92 | 90.92 |

3-B-3-b deleted

3-B-4  Effective January 1, 2008 the hourly rates for Captains and First Officers shall be as follows:

3-B-4-a Hourly Rates

| | Captains | | | | |
|---|---|---|---|---|---|
| | B747-400 | B777 | B767/757 | A320/319 | B737-300 |
| 1yr | 173.68 | 173.68 | 142.33 | 120.96 | 120.96 |
| 2yr | 174.67 | 174.67 | 143.41 | 122.00 | 122.00 |
| 3yr | 175.57 | 175.57 | 144.74 | 123.08 | 123.08 |
| 4yr | 176.54 | 176.54 | 145.70 | 124.24 | 124.24 |
| 5yr | 177.54 | 177.54 | 146.85 | 125.40 | 125.40 |
| 6yr | 178.45 | 178.45 | 147.94 | 126.51 | 126.51 |
| 7yr | 179.43 | 179.43 | 148.93 | 127.64 | 127.64 |
| 8yr | 180.63 | 180.63 | 150.18 | 128.77 | 128.77 |
| 9yr | 181.62 | 181.62 | 151.17 | 129.73 | 129.73 |
| 10yr | 183.10 | 183.10 | 152.73 | 131.34 | 131.34 |
| 11yr | 184.50 | 184.50 | 154.37 | 132.86 | 132.86 |
| 12yr | 186.16 | 186.16 | 155.82 | 134.45 | 134.45 |

| | First Officers | | | | |
|---|---|---|---|---|---|
| | B747-400 | B777 | B767/757 | A320/319 | B737-300 |
| 1yr | 31.98 | 31.98 | 31.98 | 31.98 | 31.98 |
| 2yr | 72.84 | 72.84 | 59.80 | 50.87 | 50.87 |
| 3yr | 105.34 | 105.34 | 86.73 | 73.85 | 73.85 |
| 4yr | 111.40 | 111.40 | 91.94 | 78.39 | 78.39 |
| 5yr | 113.72 | 113.72 | 94.06 | 80.32 | 80.32 |
| 6yr | 116.34 | 116.34 | 96.46 | 82.49 | 82.49 |
| 7yr | 119.05 | 119.05 | 98.81 | 84.68 | 84.68 |
| 8yr | 121.93 | 121.93 | 101.37 | 86.91 | 86.91 |
| 9yr | 122.96 | 122.96 | 102.34 | 87.83 | 87.83 |
| 10yr | 124.42 | 124.42 | 103.78 | 89.25 | 89.25 |
| 11yr | 125.83 | 125.83 | 105.29 | 90.61 | 90.61 |
| 12yr | 127.15 | 127.15 | 106.42 | 91.83 | 91.83 |

3-B-4-b deleted

4

3-B-5  Effective May 1, 2008 the hourly rates for Captains and First Officers shall be as follows:

3-B-5-a Hourly Rates

| | | | Captains | | |
|---|---|---|---|---|---|
| | B747-400 | B777 | B767/757 | A320/319 | B737-300 |
| 1yr | 176.28 | 176.28 | 144.47 | 122.77 | 122.77 |
| 2yr | 177.29 | 177.29 | 145.57 | 123.83 | 123.83 |
| 3yr | 178.21 | 178.21 | 146.91 | 124.92 | 124.92 |
| 4yr | 179.19 | 179.19 | 147.89 | 126.10 | 126.10 |
| 5yr | 180.20 | 180.20 | 149.05 | 127.28 | 127.28 |
| 6yr | 181.12 | 181.12 | 150.16 | 128.41 | 128.41 |
| 7yr | 182.13 | 182.13 | 151.16 | 129.55 | 129.55 |
| 8yr | 183.34 | 183.34 | 152.43 | 130.70 | 130.70 |
| 9yr | 184.34 | 184.34 | 153.44 | 131.68 | 131.68 |
| 10yr | 185.85 | 185.85 | 155.02 | 133.31 | 133.31 |
| 11yr | 187.26 | 187.26 | 156.69 | 134.85 | 134.85 |
| 12yr | 188.95 | 188.95 | 158.16 | 136.46 | 136.46 |

| | | | First Officers | | |
|---|---|---|---|---|---|
| | B747-400 | B777 | B767/757 | A320/319 | B737-300 |
| 1yr | 32.46 | 32.46 | 32.46 | 32.46 | 32.46 |
| 2yr | 73.93 | 73.93 | 60.70 | 51.64 | 51.64 |
| 3yr | 106.92 | 106.92 | 88.03 | 74.95 | 74.95 |
| 4yr | 113.07 | 113.07 | 93.32 | 79.57 | 79.57 |
| 5yr | 115.42 | 115.42 | 95.47 | 81.53 | 81.53 |
| 6yr | 118.09 | 118.09 | 97.91 | 83.72 | 83.72 |
| 7yr | 120.84 | 120.84 | 100.29 | 85.95 | 85.95 |
| 8yr | 123.75 | 123.75 | 102.89 | 88.22 | 88.22 |
| 9yr | 124.80 | 124.80 | 103.87 | 89.15 | 89.15 |
| 10yr | 126.28 | 126.28 | 105.33 | 90.58 | 90.58 |
| 11yr | 127.72 | 127.72 | 106.87 | 91.97 | 91.97 |
| 12yr | 129.06 | 129.06 | 108.02 | 93.21 | 93.21 |

3-B-5-b deleted

5

3-B-6  Effective May 1, 2009 the hourly rates for Captains and First Officers shall be as follows:

3-B-6-a Hourly Rates

| | Captains | | | | |
|---|---|---|---|---|---|
| | B747-400 | B777 | B767/757 | A320/319 | B737-300 |
| 1yr | 178.93 | 178.93 | 146.64 | 124.61 | 124.61 |
| 2yr | 179.95 | 179.95 | 147.75 | 125.68 | 125.68 |
| 3yr | 180.88 | 180.88 | 149.11 | 126.80 | 126.80 |
| 4yr | 181.87 | 181.87 | 150.11 | 127.99 | 127.99 |
| 5yr | 182.91 | 182.91 | 151.29 | 129.19 | 129.19 |
| 6yr | 183.84 | 183.84 | 152.41 | 130.34 | 130.34 |
| 7yr | 184.86 | 184.86 | 153.43 | 131.49 | 131.49 |
| 8yr | 186.09 | 186.09 | 154.72 | 132.66 | 132.66 |
| 9yr | 187.11 | 187.11 | 155.74 | 133.65 | 133.65 |
| 10yr | 188.64 | 188.64 | 157.35 | 135.31 | 135.31 |
| 11yr | 190.07 | 190.07 | 159.04 | 136.87 | 136.87 |
| 12yr | 191.79 | 191.79 | 160.53 | 138.51 | 138.51 |

| | First Officers | | | | |
|---|---|---|---|---|---|
| | B747-400 | B777 | B767/757 | A320/319 | B737-300 |
| 1yr | 32.94 | 32.94 | 32.94 | 32.94 | 32.94 |
| 2yr | 75.04 | 75.04 | 61.61 | 52.41 | 52.41 |
| 3yr | 108.53 | 108.53 | 89.35 | 76.08 | 76.08 |
| 4yr | 114.76 | 114.76 | 94.72 | 80.76 | 80.76 |
| 5yr | 117.15 | 117.15 | 96.90 | 82.75 | 82.75 |
| 6yr | 119.86 | 119.86 | 99.38 | 84.98 | 84.98 |
| 7yr | 122.65 | 122.65 | 101.80 | 87.24 | 87.24 |
| 8yr | 125.61 | 125.61 | 104.43 | 89.54 | 89.54 |
| 9yr | 126.68 | 126.68 | 105.43 | 90.49 | 90.49 |
| 10yr | 128.18 | 128.18 | 106.91 | 91.94 | 91.94 |
| 11yr | 129.63 | 129.63 | 108.47 | 93.35 | 93.35 |
| 12yr | 130.99 | 130.99 | 109.64 | 94.60 | 94.60 |

Renumber balance of Section 3-B

6

**Exhibit B-1**
**Other Contract Revisions**

1. Section 3-B-10-a "Late Night Flying" deleted

2. Section 5-G-1-e-(1)-(d) deleted

3. Section 5-G-1-e-(2) modified to read as follows:

   5-G-1-e-(2) A pilot functioning as a reserve will not be scheduled into a day(s) off.

4. Section 20-J-4-d deleted

5. Section 22-A-2 add this LOA

6. Letter Of Agreement 04-09 "PBS Contract Modifications" change to 20-E-2-b is modified to read as follows:

   20-E-2-b In equipment domiciles which have both international and domestic trips, the senior 50% of the pilots whose lines will be vacated for OE lines will be subject to assignments as reserves per domestic reserve rules. The junior 50% of the pilots whose lines will be vacated for OE lines are subject to assignments as reserves per international reserve rules. If an odd number of OE lines exist, the odd line will be identified as a domestic regular reserve line for days off consideration.

7. The contractual provisions identified in paragraphs 2, 3, 4 and 6 above will take effect on the first day of the month following the Effective Date.

**Exhibit B-2**
**Other Contract Revisions**

(Retiree Life Insurance)

January 1, 2005

Captain Mark Bathurst, Chairman
UAL-MEC Air Line Pilots Association
9550 West Higgins Suite 1000
Rosemont, Illinois 60018

Dear Mark:

During the negotiations which led to the Letter of Agreement 05-01 (Bankruptcy Exit),
the parties agreed that the following change will apply to pilots who, on January 1, 2005,
are active (including paid leave), receiving Pilot Disability Income benefits, furloughed,
on medical leave of absence, on military leave or on other approved leave:

> No retiree life insurance will be payable upon the death of any pilot who retires
> after January 1, 2005.

If this letter accurately reflects our agreement, please sign and return three (3) copies for
our files.

Sincerely,

Peter B. Kain
Vice President - Labor

Accepted and agreed to this
31 day of January 2005

Captain Mark Bathurst, Chairman
UAL-MEC Air Line Pilots Association

17

**Exhibit B-3**
**Success Sharing**

Section 3-M-1-e of the 2003 Pilot Agreement shall be revised to read in its entirety as follows:

Pilots will receive the following cash incentive payments based on United's actual performance under the annual incentive program (with linear interpolation between the performance points):

| | |
|---|---|
| Threshold Performance: | 0.5% of Wages |
| Target Performance | 1.0% of Wages |
| Maximum Performance | 2.0% of Wages |

9

**Exhibit C**
**Profit Sharing**

| | |
|---|---|
| **Effective Date of Profit Sharing Plan:** | As of January 1, 2005 (so that the first year covered by the profit sharing plan shall be calendar year 2005). |
| **Profit Sharing Pool:** | In the event that the Company has more than $10 million in Pre-Tax Earnings in the relevant calendar year, 7.5% of Pre-Tax Earnings in 2005 and 2006 and 15% of Pre-Tax Earnings in each calendar year thereafter. |
| **Pre-Tax Earnings:** | UAL consolidated net income as determined in accordance with GAAP, but excluding (i) consolidated federal, state and local income tax expense (or credit); (ii) unusual, special, or non-recurring charges, (iii) charges with respect to the grant, exercise or vesting of equity, securities or options granted to UAL and United employees, and (iv) expense associated with the profit sharing contributions. |
| **Eligibility:** | All domestic employees of UAL Corp. or United Airlines, Inc. (including all pilots) who have completed one year of service as of December 31st of the year for which Pre-Tax Earnings are being measured. |
| **Allocation:** | For each eligible employee, a pro rata share of the Profit Sharing Pool for each calendar year based on the ratio of the employee's Considered Earnings for the year to the aggregate amount of Considered Earnings for all eligible employees that year. |
| **Considered Earnings:** | As currently defined in the Company's Success Sharing Plan (i.e., base pay, overtime, holiday pay, longevity pay, sick pay, vacation pay, shift differential, premiums, pre-tax contributions to a 401(k) plan, pre-tax medical plan contributions, and flexible spending account contributions but not expense reimbursement, incentive or profit sharing payments, imputed income or other similar awards or allowances). |
| **Payment Date:** | By no later than April 30th of the following year. |
| **Distribution:** | In cash, subject to 401(k) deferrals. |
| **Relationship to Other Programs:** | Incremental to the Success Sharing Plan; in lieu of the existing profit sharing plan described in Section 3-M-2 of the 2003 Pilot Agreement. |
| **Documentation:** | Implementing documentation reasonably acceptable to the Association. |
| **Duration:** | Continuing unless and until terminated in a future pilot collective bargaining agreement. |

**Exhibit D**
**Convertible Notes**

| | |
|---|---|
| **Issuer:** | Reorganized UAL Corp. |
| **Guarantor:** | United Airlines, Inc. |
| **Issue:** | [___]%[1] Senior Subordinated Convertible Notes Due 2021 (the "Notes") to be issued no later than 180 days following the Exit Date (the "Issuance Date"). |
| **Initial Holder:** | A trust or similar non-permanent vehicle for the benefit of eligible United pilots; the Notes or the value of the Notes to be distributed to such pilots or pilot retirement accounts as soon as reasonably practicable given tax, accounting, securities and market considerations; all rights of the Notes to be exercised by individual pilots while the notes remain in the trust. Distribution mechanics, eligibility and allocation among such pilots to be reasonably determined by the Association. |
| **Principal Amount:** | $550,000,000 in denominations of $1,000. |
| **Term:** | 15 years from the Issuance Date. |
| **Amortization:** | None prior to maturity; full principal to be repaid at the maturity date except to the extent converted or prepaid. |
| **Interest Rate:** | Semi-annually in arrears, in cash, at an annual rate of [___]%[1]; provided, however, that (i) the first full year of interest from the Issuance Date may be paid in cash or in kind at the option of the Issuer; (ii) if such interest is paid in kind, it will be in Common Stock, but only to the extent there exists Common Stock that is exempt from registration under 11 U.S.C. § 1145; and (iii) if such interest is paid in kind, it shall be delivered to the Holders under applicable market terms at issuance for public convertible debt securities of this type (e.g., any notice period and stock payment premium). |
| **Security:** | None. |
| **Ranking:** | Junior to the Reorganized UAL exit facility, customary secured indebtedness, indebtedness contemplated under a plan of reorganization, and other mutually agreed-upon indebtedness; pari passu to all current and future UAL or United Airlines senior |

---

[1] The parties shall work together to set an interest rate for the Notes no later than thirty (30) days prior to the Issuance Date which shall ensure that the Notes will trade at par value or better on Issuance (the "Par Value Interest Rate"). Failing agreement on the Par Value Interest Rate, the parties shall solicit rate recommendation from two national trading firms and shall adopt the average of the two suggested rates.

11

unsecured debt; senior to all current and future subordinated debt.

**Conversion Rights:** The Holder may convert any number of the Notes into the Issuer's common stock (the "Common Stock"), at any time, at the Conversion Price.

**Conversion Price:** The product of (x) 125% and (y) the average closing price of the Common Stock for the sixty consecutive trading days following the Exit Date.

**Transferability:** To the greatest extent feasible under applicable law, the Notes and the Common Stock shall be issued under 11 U.S.C. §1145, and the Notes and the Common Stock into which they shall be convertible shall be freely transferable by the Holders without registration under the Securities Act of 1933.

**Common Stock:** When delivered, the Common Stock into which Notes may convert shall be fully paid and non-assessable. Issuer shall use its best efforts to list the Common Stock on a national stock exchange or NASDAQ prior to the Issuance Date.

**Call Rights:** No call for five years from the Issuance Date; thereafter, callable in cash or Common Stock if the Common Stock has traded at no less than 125% of the Conversion Price for the sixty (60) consecutive trading days prior to the call date.

**Put Rights:** Soft put right on the fifth and tenth anniversary of the Issuance Date for all principal and accrued interest as of such date; payable in cash or shares of Common Stock.

**Mandatory Prepayments:** Mandatory prepayment upon a "fundamental change" with a customary make whole premium, if any, for public convertible debt securities of this type; no prepayment obligations for mergers in which the Issuer is the surviving entity; no make whole premium in other mergers.

**Anti-Dilution Protections:** The Conversion Price will be subject to customary anti-dilution adjustments,[2] including upon (i) stock or extraordinary cash dividends, (ii) reclassifications, subdivisions or combinations of the Common Stock, (iii) the issuance of rights or warrants to all holders of Common Stock convertible into or exercisable for Common Stock at less than the then-current market price, (iv) distribution of the capital stock of an Issuer subsidiary to holders of the Common Stock and (v) any other distributions of assets by the Issuer to holders of the Common Stock.

**Mergers and Business Combinations:** The Notes will enjoy customary adjustments and protections in the event the Common Stock is converted into, reclassified into or

---

[2] Anti-dilution adjustments shall not be applicable to securities issued or assets distributed under the Plan of Reorganization.

exchanged for cash, other assets or securities.

**Other Terms and Conditions:** The Notes are intended to be public market securities and to trade at par value. The documentation of the Notes shall include such other terms and conditions as are customarily found in public market convertible securities of this type.

**Implementation:** Implementing documentation reasonably acceptable to the Association and the Company.

**Distribution:** The Association and the Company will coordinate any distribution of the Notes so that such distribution does not unreasonably interfere with capital markets activities of the UAL or the Company. The Association's investment bankers will be the exclusive distribution agent for the Notes.

13

**Exhibit E**
**Amended Distribution Agreement**

1.      Section 2 of Letter of Agreement 03-07 to the 2003 Pilot Agreement (the "Distribution Agreement") is hereby amended to read in its entirety as follows:

> In consideration for the pilot contract revisions under the Section 1113 Restructuring Agreement reached between UAL, the Company, and ALPA effective May 1, 2003 (the "2003 Restructuring Agreement"), which modifies the parties' 2000 collective bargaining agreement ("2000 Agreement") and resolves numerous union grievances concerning the administration of the 2000 Agreement, and in consideration of the pilot contract revisions under the revisions to the 2003 Pilot Agreement effective in 2005 (the "Revised 2003 Pilot Agreement"), any plan of reorganization proposed or supported by UAL and the Company as proposed and/or amended from time to time (the "Plan"), shall provide that, on or as soon as reasonably practicable after the effective date of such Plan, the pilot group will receive a percentage distribution of the equity, securities and/or other consideration provided to general unsecured creditors under the Plan (the "Distribution") calculated by the following formula:

> $A/(A+B)$, where:

> A is the sum of (i) $2,742,574,581, representing the dollar value of 30 months of average cost reductions under the 2003 Restructuring Agreement as reasonably measured under Labor Model 1.1A FINAL, and (ii) $300,000,000, representing the dollar value of 20 months of cost reductions under the Revised 2003 Pilot Agreement (the "ALPA Amount"); and

> B is the total amount of all other allowed prepetition general unsecured claims against the Debtors (UAL and its 27 debtor subsidiaries).

2.      Section 3 of the Distribution Agreement is hereby amended to read in its entirety as follows:

> In the event the other employees of the Company receive a Distribution in excess of $865,000,000 in connection with the 2005 labor cost reductions (the "Other Employee Distribution"), then the $300,000,000 amount described in paragraph 2 of this Distribution Agreement shall instead equal the product of (x) $300,000,000 and (y) a fraction, the numerator of which is the actual amount of the Other Employee Distribution and the denominator of which is $865,000,000.

3.      Except as revised in the preceding paragraphs, the Distribution Agreement shall remain unchanged and in full force and effect.

**Exhibit F**
**Indemnity Agreement**

1. <u>Indemnification</u>. UAL and the Company (collectively, "United") hereby indemnify and hold harmless the Association, its members, officers, committee members, agents, employees, counsel, financial advisors and representatives (each, an "Indemnified Person") from any and all losses, damages, fines, penalties, taxes, expenses, claims, lawsuits, or administrative charges of any sort whatsoever (including reasonable attorney's fees and costs arising in connection with the investigation and defense of any such matter) relating to, concerning or connected with the negotiation or implementation of this Letter of Agreement (any such event, a "Claim"), except to the extent that a Claim against an Indemnified Person is finally determined by a court of competent jurisdiction to have resulted from the gross negligence, fraud or willful misconduct of such Indemnified Person.

2. <u>Indemnification Procedure.</u>

   a.    An Indemnified Person must give prompt notice to the Company of the facts and circumstances that may constitute a Claim under this Indemnity Agreement; provided, however, that any delay by an Indemnified Person in giving such notice shall not relieve United of its obligations under this Indemnity Agreement except to the extent that such delay causes material damage or prejudice to United.

   b.    United shall be entitled to participate in judicial, administrative proceeding concerning an actual or potential Claim (an "Action") and, upon ten (10) days notice to the applicable Indemnified Person, may assume the defense of such Claim with counsel reasonably satisfactory to the Indemnified Person. Following any assumption of the defense of an Action by United, United shall not be liable for any subsequent fees of legal counsel or other expenses incurred by the Indemnified Person in connection with the defense of such Action, subject to reimbursement for actual out-of-pocket expenses incurred by the Indemnified Person as the result of a request for cooperation or assistance by United; provided, however, that if, in the reasonable opinion of outside counsel to the Indemnified Person, there exists an actual, material conflict of interest between the United and the Indemnified Person, United shall be liable for the legal fees and expenses of separate counsel to the Indemnified Person; provided, further, that the Indemnified Person shall have the right to participate in the defense of an Action with its own counsel at its own expense.

   c.    No compromise or settlement of any Action shall be binding on United for purposes of United's obligations under this Indemnity Agreement without United's express written consent, which consent shall not be unreasonably withheld. United shall not compromise or settle any Action or otherwise admit to any liability for any Claim on a basis that would reasonably be expected to adversely affect the future activity or conduct of the Indemnified Person without the prior written consent of the Indemnified Person, which consent shall not be unreasonably withheld.

   d.    In the event United assumes the defense of any Action under this Indemnity Agreement, United shall (i) keep the Association and the applicable Indemnified

15

Person informed of material developments in the Action, (ii) promptly provide the Association and such Indemnified Person with copies of all pleadings, responsive pleadings, motions and other similar legal documents and papers received in connection with the Action, (iii) permit the Association and such Indemnified Person and their counsel, to the extent practicable, to confer on the defense of the Action, and (iv) permit the Association and such Indemnified Person and their counsel, to the extent practicable, an opportunity to review all legal papers to be submitted prior to their submission. The parties shall provide to each others such assistance as may be reasonably required to insure the proper and adequate defense of the Action, and each party shall use its good faith efforts and cooperate with each other party to avoid the waiver of any privilege of another party.

    3.    <u>Plan of Reorganization; Survival</u>.   This indemnity agreement shall be assumed under the Plan of Reorganization and shall continue in full force and effect thereafter without regard to the terms of Section 22 of the Revised 2003 Pilot Agreement.

16

### Exhibit G
### Fees and Expenses

1.      The Company shall reimburse the Association for the reasonable, actual fees and out-of-pocket expenses incurred by the Association in connection with the review, design, negotiation, approval and ratification of this Letter of Agreement (its "Expenses") including:

       a.      reasonable flight pay loss incurred by the Association in review and negotiation of this Letter of Agreement and Special MEC Meetings or LEC Meetings called for the purpose of reviewing, approving or ratifying the Letter of Agreement ; and

       b.      the reasonable, actual fees and expenses of the Association's outside legal, pension, and other professional advisors (in each case based on normal hourly rates for actual time expended).

up to a maximum, aggregate total of $2.5 million.  Of the total reimbursement for Expenses, $1 million shall be paid on the Effective Date, and the remaining $1.5 million will be paid on the Exit Date.

2.      On the Exit Date, the Company shall also pay, or reimburse the Association for paying, the expenses incurred by the Association's investment bankers in connection with the Letter of Agreement and a structuring fee for the Association's investment bankers.

3.      The Company shall seek judicial approval for its obligations under this Exhibit G at the same time that it seeks judicial approval of this Letter of Agreement.

4.      The parties acknowledge and agree that the Company's agreement to reimburse the Association for fees and expenses under this Letter of Agreement is a result of the special collective bargaining circumstances created by the parties' desire to negotiate modifications to the pilot collective bargaining agreement as part of the Company's bankruptcy reorganization.

**UAL Corporation**
**1200 East Algonquin Road**
**Elk Grove Township, Illinois 60007**

January __, 2005

Captain Mark Bathurst, Chairman
United Mater Executive Council, ALPA
9550 West Higgins, Suite 1000
Rosemont, Illinois 60018

Dear Mark:

As we have discussed many times over the past few months, the Company has reluctantly concluded that it must terminate all of its defined benefit pension plans in order to obtain the financing necessary to emerge from Chapter 11. The recent adverse changes in the industry revenue environment have further confirmed this conclusion, and we currently believe that we need to seek the termination and replacement of our defined benefit plans through negotiation or litigation. The Company and its labor groups are concurrently in the process of scheduling a trial on pension termination issues before the bankruptcy court, if necessary, for early May of this year, subject to the court's availability.

Nonetheless, over the next ninety days, the Company has agreed to work diligently with the pilot group and all other employee groups, with a completely open mind, to explore all issues and possibilities with respect to our pensions plan, including changes in legislation that would allow the Company to afford the pilot pension plan within the constraints of the Company's financial reality.

As we explore every remaining pension possibility during this ninety-day period, the Company will not seek judicial approval to terminate the A Plan under 29 U.S.C. §1341(c) and, as a consequence, we will not call on the Association to withdraw its opposition to the termination of the A Plan during this period. We are also committed to the proposition that termination of the A Plan should be addressed in the context of a global solution in the bankruptcy that treats all employee groups fairly and equitably, not through agency proceedings divorced from the bankruptcy.

Mark, the Company is unequivocally committed to the fair and equitable treatment of the pilot group in every aspect of the restructuring and we fully understand the unique harm that the pilot group will suffer in a pension termination. . I also recognize the leadership role that you, the MEC and the pilot group have taken during these difficult discussions, and the Company is committed to proceeding in partnership with the Association in our joint effort to return United Airlines to its rightful place at the top of our industry.

Sincerely,
Glenn F. Tilton
Chairman, President and Chief Executive Officer

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RAYMOND GARAVITO, RAFAEL RODRIGUEZ,    )
AND ELLI MIZRAHI,                      )
                                       )
              Plaintiffs,              )        Civil Action No. 1:07-cv-0384 (PLF)
                                       )
       v.                              )
                                       )
AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, )
                                       )
              Defendant.               )
_____)

## PROPOSED ORDER

Upon consideration of Plaintiffs' Motion for Preliminary Injunction and after a hearing on March 5, 2007, it is hereby

ORDERED that the motion is DENIED.

Entered the _____ day of _____, 2007.


                              _____
                              PAUL L. FRIEDMAN
                              United States District Judge