**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| RAYMOND GARAVITO, RAFAEL RODRIGUEZ, and ELLI MIZRAHI | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 07 CV 00384 |
| v. | ) ) | Hon. Paul L. Friedman |
| AIRLINE PILOTS ASSOCIATION, INTERNATIONAL, | ) ) ) | |
| Defendant. | ) ) | |

**PROPOSED INTERVENOR UNITED AIR LINES, INC.'S BRIEF**
**IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**INTRODUCTION**

Realizing that any claim they may have once had under the Railway Labor Act ("RLA") against the Air Line Pilots Association ("ALPA") is plainly barred by the RLA's six-month statute of limitations,[1] plaintiffs here attempt to shoehorn their claims into the framework of ERISA by inventing out of whole cloth an ERISA-sounding plan name – the "Pilots Retirement Compensation Program" (there is no such thing) – to describe garden-variety bankruptcy restructuring and grantor trust agreements that do **not** constitute an ERISA plan or an ERISA trust and do **not** give rise to any fiduciary duties under ERISA.

Worse still, plaintiffs repeatedly mischaracterize the pilot convertible note proceeds at issue in this case as "Pension Funds" (or "pension benefit funds") even though Judge Posner of the Seventh Circuit has already held just the opposite: that United granted the "$550 million in

---

[1]   This is because plaintiffs filed suit here more than six months following the receipt of a portion of the first distribution of note proceeds in August 2006.

notes" to its active pilots not just to lessen the impact of pension termination, but also because "pilots made substantial salary concessions" and "in exchange for surrendering the leverage that they enjoyed – United needs pilots to fly its planes."   *In re UAL Corp.*, 468 F.3d 456, 459-60, 461 (7th Cir. 2006) (rejecting retired pilots' claim that they should have received convertible notes); *see also In re UAL Corp*, 443 F.3d 565, 569 (7th Cir. 2006) (Posner, J.) (noting that "the active pilots, represented by ALPA, received as we know sizable compensation" in terms of convertible notes because, among other reasons, "the active pilots had a stick to use against United – the threat of a strike . . . .")

Thus, plaintiffs' repeated attempts to manufacture an ERISA case by characterizing the $550 million in convertible notes that United granted pilots as "Pension Funds" – and referring to ALPA as the "administrator" or "trustee" of the fictional "Pilots Retirement Compensation Program" – are contrary to both fact and law.  Plaintiffs therefore have no chance of success on the merits, much less a "substantial likelihood of success," as the injunction factors in this Circuit require.  This would be true even if plaintiffs had viable ERISA claims (which they absolutely do not) when the Court considers that ALPA allocated convertible note proceeds to each of the three named plaintiffs here in six-figure amounts that place each of them in the top 1% of convertible note distributions received by all pilots.  *See* Allocation Schedule to Irrevocable ALPA Trust (attached hereto as Exhibit A).[2]  In light of these numbers, plaintiffs' claims that they have somehow been victims of a "discriminatory allocation" by ALPA strains credulity. Just how much higher in the top 1% do they "deserve" to be?

---

[2]   Out of an abundance of caution to protect the confidentiality of the more than 7,000 pilots on Exhibit A who are not named plaintiffs in this action, United has not filed Exhibit A—a bulky document—in the public record, but has included it in the courtesy copy provided to the Court.  United will complete the filing of Exhibit A under seal as soon as possible.  *See* Notice of Filing of Exhibit A to Intervenor United Air Lines, Inc.'s Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction Under Seal.

Equally devastating to plaintiffs' chances on the merits – and as ALPA's Brief argues and United incorporates by reference – the RLA preempts plaintiffs' purported ERISA and common law fiduciary duty claims because those claims, on their face, require the interpretation of a collective bargaining agreement ("CBA"), namely the United-ALPA Letter Agreement that: (i) modified the ALPA CBA; (ii) obligated United to issue the convertible notes, and (iii) granted ALPA reasonable discretion to allocate those notes.   *See* ALPA's Opposition Brief at Pt. I(B).

Plaintiffs fare no better on any of the other essential elements necessary to obtain injunctive relief in this Circuit.   ***First***, there is no emergency or irreparable harm here as evidenced by plaintiffs' extreme delay in seeking this preliminary injunction.  While plaintiffs ask this Court to halt the final distribution of convertible note proceeds to eligible pilots on a claimed "emergency basis," the truth is their request comes more than ***thirteen months*** after ALPA made all allocation and eligibility decisions concerning the convertible notes at issue in this case, ***at least seven months*** (and probably longer) after plaintiffs were on notice regarding the specifics of that allocation, and more than ***six months*** following the first (and most significant) distribution of convertible note proceeds to eligible pilots (which plaintiffs admit they received).

***Second***, even though the Complaint seeks only injunctive relief, plaintiffs' alleged "injuries" are nevertheless compensable by money damages, demonstrating both an adequate remedy at law and further establishing the lack of irreparable harm here. In fact, plaintiffs candidly admit that they seek an injunction here to stop nothing more than the disbursement of ***cash***.

***Finally***, any "harm" alleged by plaintiffs is clearly outweighed by:

- The harm to the long-settled expectations of many pilots, as any delay in the final disbursement of the convertible note proceeds to eligible pilots past March 15,

2007 may subject them to significant (and unanticipated) increase in tax liabilities pursuant to § 409A of the Internal Revenue Code. When that section is violated, penalties include taxation of vested amounts, a 20% additional tax (or penalty), and interest at the IRS "late payment rate" plus one percent. I.R.C. § 409A(a)(1);

- The harm caused by disrupting the finality and smooth administration of United's confirmed POR; and

- The impairment of various rights United possesses under the ALPA Irrevocable Trust Agreement which governs the treatment and disposition of the remaining pilot note proceeds.

In sum, plaintiffs' claims have no chance of success on the merits, their Motion for injunctive relief is stale and suffers from several fundamental defects, any one of which conclusively dooms it as a matter of law.  Proposed Intervenor United therefore requests that this Court deny plaintiffs' motion in its entirety.

## <u>BACKGROUND</u>

### A.    United Agrees To Issue Convertible Notes To Pilots Upon Termination of the Pilot Pension Plan.

United and certain affiliates sought bankruptcy protection under Chapter 11 of the Bankruptcy Code on December 9, 2002.  Prior to initiating Chapter 11 reorganization proceedings, United maintained a defined benefit pension plan for its pilots (the "Pilot Plan"), and served as the Pilot Plan's sponsor and administrator. During United's Chapter 11 bankruptcy, United entered into negotiations with each of its unions, including ALPA, to renegotiate collective bargaining agreements pursuant to Section 1113 of the Bankruptcy Code.

On January 1, 2005, United and ALPA entered into a Letter Agreement containing the terms of a modified collective bargaining agreement to resolve a second round of Section 1113 proceedings in United's bankruptcy. (A copy of the Letter Agreement is attached hereto as Exhibit B).  The Letter Agreement resolved many open issues between ALPA and United including wages, work rules and profit sharing (Ex. B, ¶ ¶ 1, 2, 3, 6, and Exs. B-1, B-3, C

4

thereto). That Agreement also provided, among other things, that ALPA would not object to the termination of the Pilot Plan under certain specified conditions – a key concession from ALPA that was critical to the success of United's reorganization.   (*See* Ex. B, ¶ 4)   The Letter Agreement further provides:

> In the event that the [Pilot Plan] is terminated . . . the Revised 2003 Pilot Agreement and the Plan of Reorganization shall provide for the issuance of $550 million of UAL convertible notes, as described in Exhibit D to this Letter Agreement, to a trust or other entity designated by the Association.

(*Id*. ¶ 7).  Exhibit D to the Letter Agreement required the convertible notes to be placed in "[a] trust or similar non-permanent vehicle for the benefit of eligible United pilots," and provided that "[d]istribution mechanics, eligibility and allocation among such pilots to be reasonably determined by [ALPA]."  (Ex. B at p. 11)

Shortly after United and ALPA entered into the Letter Agreement, the Pension Benefit Guaranty Corporation announced its intention to terminate the Pilot Plan. Following a bench trial held in the Bankruptcy Court, the District Court issued a decree terminating the Pilot Plan effective December 30, 2004.

> **B.      Plaintiffs Have Known Since At Least Last Summer (and Probably Six Months Earlier) The Method Of Allocation And The Amounts Of Their Individual Shares.**

In January 2006, ALPA finalized its decisions about the eligibility and allocation of the convertible note proceeds.  *See* Wendy J. Morse Supplemental Declaration (Exhibit C hereto) ¶ 10.  Thus, ALPA's allocation decisions were finalized ***before*** United's Plan of Reorganization was approved by the Bankruptcy Court, and, consequently, ***before*** United exited from bankruptcy.

On January 20, 2006, ALPA sent a memo to all UAL pilots that notified them that the MEC had passed a resolution regarding who would be eligible for the note proceeds and ALPA's chosen allocation methodology for those proceeds.  *See* Exhibit D hereto.

Similarly, Lynn Hughitt, United's Vice President of Compensation & Benefits, sent a July 18, 2006 letter (attached to plaintiffs' own Complaint) to United pilots stating that ALPA had determined that "eligible participants include those who were on the United Pilots Seniority List as of January 1, 2005" and that "pilots can view their estimated individual allocation at https://www.ualpilots.org/mynoteallocation."   *See* Exhibit E hereto at 1.

Ms. Hughitt's letter also enclosed "a brief set of questions and answers that provides a general overview of convertible notes" and, among other things "the timing of the distribution(s)."  *Id.*   That "Q&A" enclosure further disclosed that "***most*** of the cash proceeds will be distributed to employees . . . on or about August 15, 2006" but that some unions (as ALPA elected) "may opt to hold back a small percentage of the proceeds" to be distributed later "but no later than March 15, 2007."   *See id.* at 2.   The memo further informed employees that one of the reasons unions may elect to delay a portion of the proceeds' disbursement into 2007 is "to defer or further minimize taxes" but that "[t]ax requirements necessitate that all proceeds be distributed from the trusts to employees by March 15, 2007."  *Id.* at 3, 4-5.

### C.    The ALPA Trust Agreement and The August 2006 Disbursement of Note Proceeds To Eligible Pilots.

On July 26, 2006, United entered into a trust agreement with the Bank of New York acting as Trustee and by which United placed the pilot convertible notes into an "Irrevocable ALPA Trust" to be sold by the Trustee.   *See* Irrevocable ALPA Trust Agreement (Exhibit F hereto) at p. 1 & Art. 1 § 1.1.   Under the terms of the trust, it is United – ***not*** ALPA – that draws upon the Trust Account and makes the distribution to eligible pilots. *See* Ex. F, Art. 2, § 2.1.

Although ALPA determines how distributions are made and informs United of the total amount to be paid to each pilot under the distribution scheme, it is United that actually withdraws (or is reimbursed) the money from the Trust and writes the checks. (*Id.*)    In addition, United also possesses several delineated rights under the Trust Agreement, including, among other things, the right to treat Trust assets as United's assets subject to claims of general creditors if United were to fall back into bankruptcy (Trust Agreement, Art. 1 § 1.4 & Art 3 § 3.3); and the right to take custody of the Trust assets, including any remaining funds that are intended for distribution to eligible pilots, upon the natural termination of the Trust on the "Bookkeeping Closing Date." (*Id.* at Art. 2 § 2.3).

Attached to the Irrevocable ALPA Trust is an "Allocation Schedule" that shows how ALPA decided to allocate the convertible note proceeds to individual pilots, by name. (*See* Ex. A.) That schedule is organized from top to bottom by the percent of the total proceeds each pilot is slated to receive. The three named plaintiffs in this case are all within the top 70 names listed out of approximately 7,500, meaning that ALPA allocated note proceeds to plaintiffs here in six-figured amounts that place them in the top 1% of all pilots. (*See* Ex. A at 1,2).

In August 2006, consistent with prior disclosures by ALPA and United, the majority of the convertible note proceeds were disbursed to eligible pilots in accordance with the Irrevocable ALPA Trust Agreement and the allocation formula set by ALPA seven months earlier.  Indeed, plaintiffs concede that they received convertible note proceed payments in August 2006 and that less than 35% of the total proceeds remain to be distributed.  Compl. ¶¶ 10-12; Pls. Motion for PI. at 14.

The above timeline proves that despite: (i) at least two notices to pilots during the first seven months of 2006 disclosing the methodology of the allocation and the estimated amount of

pilots' specific individual allocations; and (ii) plaintiffs knowing full-well that the majority of those proceeds would be paid out in August 2006, they never once objected to the initial disbursement process or attempted to stop it in any way.  Instead, plaintiffs quietly pocketed six-figure amounts but otherwise slept on their rights, while thousands of eligible pilots received substantially smaller payments from the convertible note proceeds and formed long-term financial expectations of a final payment from those same proceeds on or before March 15, 2007. More than a half year would pass before plaintiffs brought this action – on the eve of the final disbursement – based on the very same facts they have known since at least last summer and, most likely, as early as January of 2006.

### D. United's Plan of Reorganization Grants ALPA Limited Immunity From Claims – Like Plaintiffs' Here – Based On Actions Taken In Connection With United's Restructuring.

Consistent with the Letter Agreement, United's POR grants ALPA broad immunity and exculpation from any claims related to the distribution of any property pursuant to United's POR – such as the distribution of proceeds from the sale of the UAL convertible notes – and, more generally, from any claims of wrongdoing connected to, related to, or arising out of United's restructuring.

Specifically, United's POR – which was upheld by the Seventh Circuit in October 2006 against several challenges by other groups of disgruntled pilots, *see In re UAL Corp.*, 468 F.3d 456 (7th Cir. 2006) – contains an exculpation clause which provides, in pertinent part, that:

> [e]xcept as otherwise specifically provided in the Plan, ***no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Exculpated Claim*** . . .

POR (Ex. G) at 121 (Article X, Section G) (emphasis added) (the "Exculpation Clause" or "Exculpation Provision").  That same provision is also recited verbatim in the Court's final Confirmation Order.  (Confirmation Order (attached hereto as Exhibit G) at 3).  The defined term

"Exculpated Party" includes "the ALPA Released Parties" (Ex. G at 14-15, ¶ 90), which are, in turn, defined to include "ALPA, the United Master Executive Council of ALPA" and ALPA's former "members," "officers," "committee members," and other enumerated employees, consultants and/or agents of ALPA.  Ex. G at 7 (¶ 19).

"Exculpated Claim" is defined in the POR as follows:

> ***Any Claim related to any act or omission in connection with, relating to, or arising out of the Debtors' restructuring, the Debtors' Chapter 11 Cases***, formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement and Plan in any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation of the Plan, the Consummation of the Plan, the administration of the Plan, ***or the property to be distributed pursuant to the Plan***.

Ex. G at 14 (¶ 89) (emphasis added).  The only two exceptions to the POR's broad grant of exculpation and release are "for gross negligence or willful misconduct," but "in all respects [Exculpated Parties] shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan."   Ex. G  at 121 (Article X, Section G).

## ARGUMENT

## I.  PLAINTIFFS CANNOT SATISFY THE STANDARDS FOR THE EXTRAORDINARY AND DRASTIC REMEDY OF A PRELIMINARY INJUNCTION

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Cobell v. Norton,* 391 F.3d 251, 258 (D.C. Cir. 2004). To prevail, the moving party must demonstrate that he is substantially likely to succeed on the merits of his suit, (2) that in the absence of an injunction, he would suffer irreparable harm for which there is no adequate legal remedy, (3) that the injunction would not substantially harm other parties, and (4) that the injunction would not significantly harm the public interest. *Taylor*

*v. Resolution Trust Corp.*, 56 F.3d 1497, 1505-06 (D.C. Cir. 1995); *Serono Laboratories, Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998); *Long v. Department of Homeland Security,* 436 F.Supp.2d 38, 42 (D.D.C. 2006).   Based on these well-established authorities, plaintiffs' request for a preliminary injunction should be denied.

## II.   THERE IS NO EMERGENCY HERE AND PLAINTIFFS' EXTREME DELAY IN SEEKING RELIEF DEFEATS ANY CLAIM OF IRREPARABLE HARM.

An order for a preliminary injunction is an extraordinary remedy appropriate only in cases of an emergency – *i.e.*, the need for judicial intervention to prevent immediate irreparable injury.  But here, plaintiffs' failure to seek any injunctive relief for more than a year (or at the very least 7 months) after they received notice of ALPA's proposed allocation of the convertible notes confirms that there is no emergency here whatsoever.

It is axiomatic that "equity aids the vigilant, not those who slumber on their rights."  11 C. Wright & A. Miller, Federal Practice & Procedure § 2946, at 417 (2003).  Injunctions are "sought upon the theory that there is an urgent need for speedy action to protect the plaintiff's rights," but "[b]y sleeping on its rights a plaintiff demonstrates the lack of need for speedy action and cannot complain of the delay involved pending any final relief to which it may be entitled after a trial of all the issues."  *Gillette Co. v. Ed Pinaud, Inc.*, 178 F. Supp. 618, 622 (S.D.N.Y. 1959); *GTE Corp v. Williams*, 731 F.2d 676, 679 (10th Cir. 1984).

In short, a "long delay" before seeking injunctive relief "implies a lack of urgency and irreparable harm."  *Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985); *Newdow v. Bush*, 355 F.Supp.2d 265, 293 (D.D.C.2005). *See also Tenacre Foundation v. I.N.S.*, 892 F.Supp. 289, 294 n.5 (D.D.C. 1995) (stating that an eight-month "time lapse

undermines any assertions that plaintiff will suffer irreparable harm if the Court does not grant preliminary injunctive relief.").[7]

Indeed, lack of diligence, standing alone justifies the denial of injunctive relief precisely because it undercuts a claim of irreparable harm. *See Lazar's Auto Sales, Inc. v. Chrysler Financial Corp.,* 1999 WL 123501, at *4 (S.D.N.Y. March 2, 1999); *Hirschfeld v. Board of Elections,* 984 F.2d 35, 39 (2d Cir. 1992); *Spring Patents, Inc. v. Avon Rubber & Plastics, Inc.*, 183 F. Supp. 2d 1198, 1211 (D. Haw. 2001) (denying injunctive relief where movant had "waited almost two years to file this suit and to seek preliminary injunctive relief").

Here, the undisputed facts establish that plaintiffs unreasonably delayed before filing this suit and bringing the current motion seeking "emergency" relief.  Specifically:

- In January 2006, ALPA made its final eligibility and allocation decisions concerning the convertible notes and informed all pilots (almost certainly including plaintiffs here) of those decisions *before* United emerged from bankruptcy;

- In July 2006, United sent its own notice to pilots informing them where they could log onto the world wide web to go check their individual allocations according to ALPA's eligibility and allocation rules.

- In August 2006, consistent with United's and ALPA's prior correspondence, the *majority* of convertible note proceeds were distributed (including to plaintiffs) consistent with ALPA's eligibility and allocation decisions.

Notwithstanding this knowledge – and the repeated opportunities they had for at least seven months to assert their claims, plaintiffs here did nothing.   After sleeping on their rights for

---

[7] *See also Quince Orchard Valley Citizens Ass'n. v. Hodel,* 872 F.2d 75, 80 (4th Cir. 1989) ("Since an application for preliminary injunction is based upon an urgent need for the Protection of [a] plaintiff's rights, a long delay in seeking relief indicates that speedy action is not required") (internal citations omitted); *State Wide Lighting, Inc. v. Globe Illumination Co.*, No. 77-C-716, slip op. (E.D. Wis. May 16, 1979) ("The federal courts recognize that a delay in seeking relief indicates that speedy action is not required."); *Skehan v. Board of Trustees of Bloomsburg State College*, 353 F. Supp. 542, 543 (M.D. Pa. 1973) ("Delays in seeking preliminary injunctions have been held grounds for barring that relief.").

months, plaintiffs finally filed suit February 22, 2007 – mere days before the remaining convertible note proceeds were to be distributed.  Whatever so-called emergency plaintiffs claim exists is entirely self-created.  Plaintiffs' inexcusable and undisputed delay in filing this case and seeking injunctive relief are reasons enough to deny the requested preliminary injunction.  In short, there is no emergency here and plaintiffs' slumbering is proof positive of the lack of any irreparable harm to them in the absence of emergency relief.

## III.    PLAINITFFS HAVE AN ADEQUATE REMEDY AT LAW – MONEY DAMAGES – AND HAVE NO COMPETENT EVIDENCE OF "IRREPARABLE INJURY" IN THE ABSENCE OF A PRELIMINARY INJUNCTION.

"Irreparable harm" is an imminent injury that is both great and certain, and that legal remedies cannot repair. *City of Moundridge v. Exxon Mobil Corp.*, 429 F. Supp. 2d 117, 127 (D.D.C. 2006).  "The great equitable power to enjoin a party pendente lite should not be exercised unless it is **manifest** that the normal legal avenues are inadequate." *Dorfmann v. Boozer*, 414 F.2d 1168, 1173-74 (D.C. Cir. 1969) (emphasis added). *See also American Hospital Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980) (alleged injury is not "irreparable" if there exists an adequate legal remedy).  In this case, plaintiffs cannot establish "irreparable injury" because they have an adequate remedy at law – *i.e.*, money damages in the event plaintiffs prevail on the merits.

The cases plaintiffs cite in an attempt to circumvent the inadequate remedy at law requirement are wholly inapposite as the vast majority of them are ERISA cases, and as explained in Part IV, *infra*, ERISA has no application to this case at all.

While plaintiffs characterize their claims as purely injunctive in nature, the truth is that plaintiffs seek an injunction to reallocate proceeds -- in other words, to get more cash -- and also "attorneys' fees and costs of suit."  (Cmplt. at 19). These items are calculable and can be monetized. *See*, *e.g.*, *Lawson Products, Inc. v. Avent, Inc.*, 782 F.2d 1429, 1440 (7th Cir. 1986);

*Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380 (7th Cir. 1984); *Lee v. Christian Coalition of America, Inc.*, 160 F.Supp.2d 14 (D.D.C. 2001).  In fact, the alleged damages here are not just calculable, plaintiffs know exactly how to calculate them by using the rejected "GAP 1" methodology which plaintiffs prefer – not surprisingly, because they would receive more money (and others less) under that formula, pushing them even higher into the top 1% of all pilots in terms of the note proceeds. *See* Compl. ¶ 26, Motion for PI at 6.

## IV.   PLAINTIFFS CANNOT SHOW THEY HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR CLAIMS.

Far from establishing a "substantial likelihood of success on the merits" as required by the prevailing injunction standards in this Circuit, plaintiffs' Complaint fails to state a claim upon which relief can be granted.  Specifically:

### A.   There Is No Such Thing As The "Pilots Retirement Compensation Program" And the United-ALPA Letter Agreement Is Not Subject to ERISA.

According to plaintiffs, ALPA is the "administrator/trustee" of something called the "Pilots Retirement Compensation Program," which is an "employee pension benefit plan" under ERISA that originally contained approximately $550 million in "Pension Funds" derived from the sale of convertible notes of which approximately $186 million remains.  *See* Pls.' Motion for PI at 4; *Id.* at 1; Cmplt. ("Introduction")   The problem is, these so-called "facts" have nothing to do with reality or ERISA.

There is no such thing as the "Pilots Retirement Compensation Program" nor has there ever been.  As the Court may have suspected from the complete lack of any plan documentation concerning the so-called "Pilots Retirement Compensation Program" anywhere in the record, plaintiffs literally made up that term to make it sound like there is an ERISA-covered pension plan at issue in this case.  There is not.  Instead, it is apparent that plaintiffs' fictional "Pilots Plan" is nothing more than the United-ALPA Letter Agreement that modified the ALPA CBA

13

(*see* Pls. Motion for PI at 4-5) (citing to the Letter Agreement when describing ALPA's duties "as Program Administrator").  But that Agreement – regardless of the fancy name plaintiffs wish to attach to it – is not an "employee benefit pension plan" under ERISA.  To fall within that term, there must be: (1) a plan, fund, or program; (2) established or maintained by an employer or by an employee organization; and (3) to provide retirement income or result in the deferral of income.  *Kenney v. Roland Parson Contracting Corp.*, 28 F.3d 1254, 1257 (D.C. Cir. 1994); 29 U.S.C. § 1002(2).  A plan does not meet the third statutory requirement – to "provide retirement income" or "result in the deferral of income" – unless it was ***designed*** to provide retirement income.  *Murphy v. Inexco Oil Company*, 611 F.2d 570 (5th Cir. 1980) (finding no ERISA plan); *Oatway v. American International Group, Inc.*, 325 F.3d 184, 188 (3d Cir. 2003) (same); *Inman v. Klockner-Pentaplast of Am., Inc.*, 2006 WL 3821487 (W.D. Va. 2006) (same); *Moore v. Powers*, 279 F.Supp.2d 821 (E.D. Tex. 2003) (bonus plan was not an employee benefits plan within the meaning of ERISA because it was not designed to provide welfare or retirement benefits).

Realizing this rigorous "design requirement," plaintiffs go to great lengths to repeatedly refer to the convertible notes as "Pension Funds" and claim that: "[t]he Pilots Program expressly was unrelated to the reduction of future wages and benefits that resulted from the bankruptcy and was established specifically to replace a portion of the retirement benefits the pilots *already* had accrued and that *already* had vested when the United [defined benefit pension] Plan was terminated."  Pls. Motion for PI at 4-5 (emphasis in original).   But plaintiffs' characterizations could not be more off the mark.  As the Seventh Circuit has held on ***two*** separate occasions, United granted the "$550 million in notes" to its active pilots not just to lessen the impact of pension termination, but also to compensate for wage cuts and pilots foregoing their right to

strike.  *In re UAL Corp.*, 468 F.3d 456, 459-60, 461 (7th Cir. 2006) (Posner, J.) (notes also granted to active pilots because "pilots made substantial salary concessions" and "in exchange for surrendering the leverage that they enjoyed – United needs pilots to fly its planes"); *see also In re UAL Corp*, 443 F.3d 565, 569 (7th Cir. 2006) (Posner, J.) (noting that "the active pilots, represented by ALPA, received as we know sizable compensation" in terms of convertible notes because, among other reasons, "the active pilots had a stick to use against United – the threat of a strike . . . .")

In fact, while ALPA's agreement to not oppose pension termination was one subject covered by the United-ALPA Letter Agreement, that agreement also addressed and resolved many issues between the parties, including but not limited to: (i) an extension of the CBA's term (Ex. B ¶ 1); (ii) pay reductions (*Id.* ¶ 2, Exhibit A); (iii) work rule changes  (*Id.* ¶ 3, Exhibit B-1); (iv) the elimination of retiree life insurance for future retirees (*Id.* Exhibit B-2); and (v) profit sharing and success sharing (*Id.* ¶ 6, Exhibit B-3, Exhibit C).  Thus, while  the Letter Agreement obligated United to issue the $550 million in convertible notes to be placed in "[a] trust or similar non-permanent vehicle for the benefit of eligible United pilots" and, as plaintiffs repeatedly paraphrase throughout their papers, provided that "[d]istribution mechanics, eligibility and allocation among such pilots to be reasonably determined by [ALPA]"  (Ex. B at 11) – those were far from the Agreement's only (or even primary) purpose.

Given the Letter Agreement's diverse purposes and the Seventh Circuit's conclusive findings, the United-ALPA Letter Agreement does not create an "employee pension benefit plan" under ERISA and therefore no ERISA fiduciary duties can apply to that agreement.  Truth be told, the United-ALPA Letter Agreement is nothing more than a comprehensive restructuring

settlement between a Debtor and one of its creditors that resolved many disputed claims in exchange for different types and kinds of consideration.

> **B.     Likewise, the ALPA Irrevocable Trust Is Not Subject to ERISA.**

The ALPA Irrevocable Trust also is not subject to ERISA.  *First*, since the United-ALPA Letter Agreement does not create an "employee benefit plan" (see above), by extension the trust agreement that simply carries out the mechanics of that Letter Agreement also cannot create such a plan.   *Second*, the Trust, by its terms, is designed solely to "to be a grantor trust, of which UAL is the grantor, within the meaning of subpart E, part I, subchapter J, Chapter 1, subtitle A of the Code, and shall be construed accordingly."[3] Ex. F at 2 ("Intent of Trust"). *Third*, unlike the structure of an ERISA qualified plan (*see* I.R.C. § 501(c)(9)) the convertible note assets in the ALPA Irrevocable Trust are *not* beyond the reach of United's general creditors in the event of insolvency (*See* Trust Agreement, Ex. F, Art. 1 § 1.4 & Art 3 § 3.3) – or even the reach of United itself, who has a right to take custody of the asserts "upon the natural termination of the Trust on the "Bookkeeping Closing Date."  (Trust Agreement, Ex. F,  Art. 2 § 2.3).

*Finally*, neither the ALPA Irrevocable Trust nor the Letter Agreement could be an ERISA-qualified defined benefit plan because, under the terms of United's global bankruptcy settlement with the PBGC, United is *expressly forbidden* from establishing "any new ERISA-qualified defined benefit plans for a period of ten (10) years after the Exit Date."   (PBGC Settlement (attached hereto as Ex. H) at § 6(c))  Thus, as plaintiffs acknowledge, the only defined benefit pension plan for United pilots was terminated effective December 30, 2004 with the PBGC becoming the statutory trustee.  (Cmplt. ¶ 22)

---

[3] UAL refers to UAL Corporation., the parent company of United Air Lines, Inc.

C.    **Even If There Were Somehow An "Employee Pension Benefit Plan" Here, ALPA's Allocation of Assets to Plan Participants Would Not Trigger Any Fiduciary Obligations Under ERISA.**

Even if one were to set aside plaintiffs' threshold problem that neither the Letter Agreement nor the ALPA Trust constitute an "Employee Pension Benefit Plan," plaintiffs' ERISA claims would still fail as a matter of law.  Following plaintiffs' construct, ALPA would be, in ERISA terminology, the "Plan Sponsor" of the so-called "Pilots Retirement Compensation Program."   Under ERISA, a plan sponsor's decisions typically relate to plan design issues such as the establishment, funding, amendment, and termination of a benefit plan.  *See Curtis-Wright Corp. v. Schoonejonger*, 514 U.S. 73 (1995).

As the Supreme Court has explained at least three times, the acts of creating, designing, amending, modifying, or terminating a benefits plan are taken in a sponsor's settlor capacity and not the sponsor's fiduciary capacity.  *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 443-44 (1999) (use of the surplus assets of a defined benefits plan to increase new participants' benefits but not retired employees' benefits was not a fiduciary act); *Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996) (employer's decision to amend a benefits plan to create incentives for early retirement was not taken in a fiduciary capacity); *Curtiss-Wright Corp.* 514 U.S. at 79 (company's reservation clause, which provided that the company could amend its plan at any time, complied with ERISA).

Stated differently, ERISA does not create any substantive entitlement to benefits, but only "seek[s] to ensure that employees will not be left empty-handed once employers have guaranteed them certain benefits." *Lockheed Corp.*, 517 U.S. at 887.  ***ERISA therefore only regulates an employer's actions in administering benefits and managing plan assets, but not an employer's decision to determine the level of benefits. Id.***  Plan creation, design, amendment,

modification, and termination are all decisions about the level of benefits that an employer will provide are therefore **not** subject to ERISA's fiduciary duties. *Id.*

The "GAP 2" allocation method plaintiffs complain of here is clearly a plan design because it effectively sets the level of benefits and defines the beneficiaries. As this Court recognized in *Hartline v. Sheet Metal Workers' Nat'l Pension Fund*, 134 F. Supp. 2d 1, 13-16 (D.D.C. 2000), determining benefits levels through formulas is an act of plan design. In *Hartline,* retired union members claimed that the trustees of the union's defined benefits plan had breached their fiduciary duties by establishing a non-uniform and allegedly "inequitable" contribution rate system. *Id.* at 5-6, 8. The Court agreed with the trustees who argued that setting contribution rates was a settlor – not fiduciary – function because it "directly determines pension level benefits." *Id.* at 13, 16.

In sum, even if there was an ERISA plan here and regardless of how "unfairly" ALPA determined pilots' eligibility for sharing in the pilot note proceeds or allocated those proceeds, ALPA could not have breached any fiduciary duty to plaintiffs as a matter of law. Accordingly, the Complaint is subject to dismissal and plaintiffs cannot show any chance of succeeding on the merits of their claims.

> **D.    Plaintiffs' State Law Fiduciary Duty Claim, Like Their ERISA Claims, Are Preempted By the RLA.**

As set forth in ALPA's Opposition Brief (which United incorporates by reference), even if a claim is grounded upon rights other than those found in a CBA, the claim will be preempted by the RLA if it cannot be adjudicated without interpreting the CBA, or if it can be conclusively resolved by interpreting the CBA. *See* ALPA's Opposition Brief at Pt. I(B). Here, plaintiffs' claims are expressly (and repeatedly) premised upon ALPA's alleged obligation to "reasonably determine" allocation of the pilot note proceeds under the terms of the Letter Agreement, which

is part of the ALPA CBA.  (Compl. ¶¶ 39, 47, 52)  Accordingly, all of plaintiffs' claims, both under ERISA and common law, are preempted by the RLA.  *Everett v. USAir Group, Inc.*, 927 F. Supp. 478 (D.D.C. 1996) (Friedman, J.).  *See* ALPA's Opposition Brief at Pt. I(B).

> **E.    Many of Plaintiffs' Allegations and Claims, On Their Face, Are Barred By the Exculpation Clause Set Forth In United's Plan of Reorganization.**

The Exculpation Clause contained in United's Plan of Reorganization limits the type of claims third-parties (such as plaintiffs) can assert against ALPA (or any "Exculpated Party") related to United's restructuring and sets a prevailing standard of care for such claims.  *See* Background Section (D), *supra*.  Specifically, even if plaintiffs had legally viable claims,  ALPA could only be held liable to plaintiffs here if ALPA's conduct in allocating the notes constituted "gross negligence or willful misconduct," but provided that "in all respects [ALPA] shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan."   (*Id.*; Ex. G at 121 (Article X, Section G)).

Here, plaintiffs' complaint is full of claims that attempt to base liability on ALPA conduct described as either "arbitrary," "capricious" or "unreasonable."   (*See* Compl. ¶¶ 3, 5, 6, 28, 29, 33, 40, 48, 53).   But those are precisely the type of claims barred by the plain language of the Exculpation Clause.  Since much of the Complaint falls far short of alleging the "willful misconduct" or "gross negligence" required to overcome ALPA's limited immunity from claims related to United's restructuring, plaintiffs' likelihood of success must be discounted even further. This is especially true because plaintiffs trying to prove "willful misconduct" against them in an allocation where they ended up in the top 1% in terms of total proceeds would be an uphill battle to say the least.

V.    **PLAINTIFFS CANNOT ESTABLISH THAT THE THREATENED INJURY TO THEM OUTWEIGHS THE THREATENED INJURY TO ALPA, OTHER PILOTS, AND UNITED IF AN INJUNCTION WERE TO ISSUE.**

"Plaintiff must establish that a preliminary injunction will harm neither the defendants nor any other interested party." *Cortez III Service Corp. v. NASA.*, 950 F. Supp. 357, 363 (D.D.C. 1996). While plaintiffs have failed to show they will suffer any irreparable injury in the absence of a preliminary injunction (since they have an adequate remedy at law), ALPA, the eligible pilots, and United on the other hand *will* suffer substantial injury if the preliminary injunction plaintiffs request is granted.

*First*, as more fully explained and quantified in ALPA's Opposition to Plaintiffs' Motion for a PI, Pt. III, any delay in the final disbursement of the convertible note proceeds to eligible until after March 15, 2007 may subject them to significant (and unanticipated) additional taxes related to those payments. This result should come as no surprise to plaintiffs since they were advised by United back in July 2006 that unions such as ALPA may very well elect to delay a portion of the proceeds disbursement into 2007 "to defer or further minimize taxes," but that "[t]ax requirements necessitate that all proceeds be distributed from the trusts to employees by March 15, 2007." (Ex. E at 3, 4-5).  This is yet another reason why plaintiffs' inexcusable delay in filing this motion should result in the denial of their preliminary injunction request.  Had plaintiffs filed injunction papers well in advance of the March 15, 2007 cut-off, there would be no "tax penalty problem" with plaintiffs' motion.  But having waited until the eleventh hour, plaintiffs' motion simply cannot be granted without potentially inflicting significant harm to third-party pilots represented by defendant ALPA that clearly outweighs plaintiffs' claimed harm in the event their motion is denied.

*Second*, granting plaintiffs' motion would harm United in two ways:  (i) by disrupting the smooth administration and finality a confirmed Plan is *supposed* to provide to a reorganized

debtor and that debtor's stakeholders; and (ii) by potentially impairing various rights United possesses under the ALPA Irrevocable Trust Agreement which governs the treatment and disposition of the remaining pilot note proceeds.  Regarding this second point (and as more fully described in United's Motion to Transfer Venue (filed earlier today)), plaintiffs' request for a preliminary injunction that would essentially freeze all convertible note proceeds and place them "in limbo" until this litigation is resolved would potentially impair several of United's rights under the ALPA Trust Agreement including: (i) the right to treat Trust assets as United's assets subject to claims of general creditors if United were to fall back into bankruptcy (Ex. F, Art. 1 § 1.4 & Art 3 §  3.3); and (ii) the right to take custody of the Trust assets, including any remaining funds that are intended for distribution to eligible pilots, upon the natural termination of the Trust on the "Bookkeeping Closing Date." (*Id.* at Art. 2 §  2.3).

When judged against the plaintiffs' complete lack of irreparable harm in light of their adequate remedy at law and unreasonable delay, these are tangible injuries to United that – especially when combined with the severe adverse tax impact a preliminary injunction could have on most pilots – compellingly weigh against this Court granting the requested preliminary injunction.

## **CONCLUSION**

For all the foregoing reasons, United respectfully requests that the Court deny plaintiffs' Motion for a Preliminary Injunction in its entirety.

Dated: March 2, 2007                    Respectfully submitted,

                                        */s/ Alexander T.H. Nguyen*
                                        Alexander T.H. Nguyen (D.C. Bar No.
                                        499678)
                                        KIRKLAND & ELLIS LLP
                                        655 Fifteenth Street, N.W.
                                        Washington, DC 20005
                                        Telephone:    (202) 879-5000
                                        Facsimile:    (202) 879-5200

                                        John F. Hagan, Jr.
                                        Peter Stasiewicz
                                        KIRKLAND & ELLIS LLP
                                        200 East Randolph Drive
                                        Chicago, IL 60601
                                        Telephone:    (312) 861-2000
                                        Facsimile:    (312) 861-2200

                                        Counsel for United Air Lines, Inc.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| RAYMOND GARAVITO, RAFAEL RODRIGUEZ, and ELLI MIZRAHI | ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 07 CV 00384 |
| v. | ) | |
| | ) | Hon. Paul L. Friedman |
| AIRLINE PILOTS ASSOCIATION, INTERNATIONAL, | ) ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PROPOSED ORDER**

The PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION is, this _____ day

of _____, 2007, hereby DENIED in its entirety.


_____

Hon. Paul L. Friedman
United States District Judge

23

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing **PROPOSED INTERVENOR UNITED AIR LINES, INC.'S BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** was filed on March 2, 2007, and will, therefore, be served electronically, by facsimile, and by overnight mail upon:

Andrew H. Marks (D.C. Bar No. 932269)
Aryeh S. Portnoy (D.C. Bar No. 464507)
William Flanagan (D.C. Bar No. 311035)
Daniel G. Kim (D.C. Bar No. 484342)
CROWELL & MORING, LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
Phone:  (202) 624-2500
Fax:  (202) 628-5116
*Attorney for Plaintiffs*

Michael S. Olin
Tucker Ronzetti (D.C. Bar No. 73755)
KOZYAK, TROPIN &
THROCKMORTON, PA
2525 Ponce de Leon, 9th Floor
Miami, FL 33134
Phone:  (305) 372-1800
Fax:  (305) 372-3508
*Attorney for Plaintiffs*

Clay Warner (D.C. Bar No. 398346)
David Semanchik (D.C. Bar No. pending)
AIR LINE PILOTS ASSOCIATION,
INTERNATIONAL-LEGAL DEPT.
1625 Massachusetts Avenue, N.W.
Washington, DC 20036
Phone:  (202) 797-4095
Fax:  (202) 797-4014
*Attorney for Defendant*

Peter Herman (*pro hac vice* application forthcoming)
COHEN, WEISS AND SIMON LLP
330 West 42nd Street
New York, NY 10036
Phone:  (212) 356-0209
*Of Counsel for Defendant*

Andrew A. Nicely (D.C. Bar No. 458805)
Archis A. Parasharami (D.C. Bar No. 477493)
MAYER, BROWN, ROSE & MAW LLP
1909 K Street, N.W.
Washington, D.C. 20006
Phone: (202) 263-3000
Fax: (202) 263-3300

Jeffrey W. Pagano (D.C. Bar No. 965046)
CROWELL & MORING LLP
153 East 53rd Street, 31st Floor
New York, NY 10022
Phone:  (212) 223-4000
Fax:  (212) 223-4134
*Of Counsel for Plaintiffs*

Andrew S. Marovitz (*pro hac vice* application forthcoming)
Andrew S. Rosenman (*pro hac vice* application forthcoming)
Debra Bogo-Ernst (*pro hac vice* application forthcoming)
MAYER, BROWN, ROSE & MAW LLP
71 South Wacker Drive
Chicago, IL 60606
Phone:  (312) 782-0600
*Of Counsel for Defendant*

**/s/ Alexander T.H. Nguyen**