**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
RAYMOND GARAVITO, et al.,               )
                                        )
            Plaintiffs,                 )
                                        )
      v.                                )    Civil Action No. 07-CV-00384
                                        )
AIR LINE PILOTS ASSOCIATION,            )
INTERNATIONAL,                          )
                                        )
            Defendant.                  )
_____)

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT**
**OF MOTION FOR  PRELIMINARY INJUNCTION**

Remarkably, ALPA does not even attempt to justify the "GAP 2" methodology it developed to funnel disproportionate retirement benefits to junior United pilots and away from senior pilots represented by the Plaintiffs.  This is not surprising, because there is no reasonable explanation for the GAP 2 formula.  Also noticeably absent from ALPA's arguments is *any* explanation for the repeated representations by ALPA and United regarding the nature and purpose of the pension funds at issue in this case, *i.e.*, that they are "retirement benefits" intended *specifically* to replace a portion of the pension benefits lost by pilots as a result of United's bankruptcy.  ALPA simply pretends those statements never happened because they are fatal to its argument that ERISA does not apply to this case.

Equally striking is ALPA's failure even to assert that it would incur any harm if the Court grants the requested preliminary injunctive relief.  As demonstrated herein, there will be no tax disadvantage at all to pilots because of a delayed distribution.  The applicable IRS regulations expressly extend the so-called "safe harbor" period where, as here, the distribution of funds is "administratively impractical," *e.g.*, as a result of a court order.  Finally, ALPA fails even to

address Plaintiffs' showing that they will incur the precise type of irreparable injury recognized in *Foltz* if the retirement funds at issue are distributed later this week.

Instead, ALPA invokes a spate of defenses commonly asserted in labor law disputes to shield its arbitrary, unreasonable, and discriminatory distribution of the retirement funds at issue. Each of ALPA's arguments rests entirely on the erroneous premise that Plaintiffs are challenging or seeking interpretation of the ALPA-UAL collective bargaining agreement. They are not.

As demonstrated in Plaintiffs' opening papers, the distribution of the subject retirement funds would deprive Plaintiffs of their rights under ERISA and common law. Plaintiffs have demonstrated a strong likelihood of success on the merits and have at least raised sufficiently serious questions to warrant injunctive relief. Plaintiffs will be harmed irreparably by the imminent depletion of the funds currently held in the Trust. ALPA, on the other hand, will suffer no harm if the requested preliminary injunction is granted. Nor are the pilots who would receive the deposits into their individual retirement accounts if the injunction is not granted likely to suffer any harm if there is a delay in the distribution as a result of an order entered by this Court.[1] And, finally, the public interest will be served by preserving benefits that ERISA and common-law trust doctrines are designed specifically to protect.

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED IN DEMONSTRATING THAT THE GAP 2 DISTRIBUTION PLAN IS ARBITRARY, UNREASONABLE, AND DISCRIMINATORY.

ALPA's GAP 2 formula is arbitrary, unreasonable, and discriminatory. Specifically, the GAP 2 methodology is inconsistent with standard pension actuarial principles and results in a

---

[1]    United Air Lines, Inc. ("UAL") has moved to intervene and has filed its own brief in opposition to Plaintiffs' Motion ("UAL Br.") (along with hundreds of pages of additional materials). The purported ground for the requested intervention is meritless. The funds at issue have been placed in the Trust. There is no plausible theory of harm to itself that UAL can articulate either as a basis for the Motion to Intervene or as a grounds for denial of Plaintiffs' Motion.

significant and actuarially unsupportable bias in favor of younger pilots.  Declaration of Gene M. Kalwarski ("Kalwarski Decl."), Ex. 1 ¶ 6.

The D.C. Circuit, as well as other courts of appeals, have held that when ERISA plan allocation determinations are unreasonable on their face, the plan fiduciaries must demonstrate why the allocation should not be considered arbitrary and capricious.  "[T]he burden must be cast upon the trustees to come forward with evidence establishing the reasonableness of their requirement, *based on the purposes of the fund*."  *Roark v. Lewis*, 401 F.2d 425, 428 (D.C. Cir. 1968) (emphasis added).  The *Roark* court concluded that when "employees are denied pensions by a requirement which would give pensions to employees having worked a substantially lesser period of time for contributing employers, the burden is on the trustees to show some rational nexus between the Fund's purpose and the requirement."  *Id.* at 429.

In addition to providing a "rational nexus" to the plan's purpose, pension plan fiduciaries must base allocation decisions on sound actuarial principles.  In *Elser v. I.A.M. Nat'l Pension Fund*, 684 F.2d 648 (9th Cir. 1982), pension beneficiaries challenged the pension fund's practice of using a forfeiture provision to remove past service credit in calculating pension eligibility. The pension trustees claimed the practice was necessary for the solvency of the pension fund, but they "offered no evidence to show that the failure to cancel past service credit would result in an unfunded liability that would affect the actuarial soundness of the plan."  *Id.* at 657.  In affirming the trial court's decision that a lack of actuarial proof made this limitation of the pension arbitrary and capricious, the Ninth Circuit noted:

> [T]he Fund had the burden of showing some rational nexus between the
> Fund's purpose and the forfeiture provisions.  There is, of course, no
> question that preservation of the financial integrity of the Fund is a central
> concern of the trustees.  This is clearly recognized in *Roark* and *Central
> Tool*.  But here, as in *Central Tool*, appellant has submitted *no actuarial*

3

> *evidence to support its contention that the forfeiture provisions are necessary or reasonable* to protect the financial stability of the fund.

*Id.* at 658 (emphasis added). *See also Deak v. Master, Mates & Pilots Pension Plan*, 821 F.2d 572, 579 (11th Cir. 1987) (affirming ruling that an amendment to a pension plan was arbitrary and capricious because it was not based on actuarial analysis).

Here, ALPA has indisputably failed to follow sound actuarial principles. For instance, one of the key flaws of GAP 2 is that it assumes that all pilots will continue to stay actively employed as pilots at United until the airline industry's mandatory retirement age of 60. This assumption is unsound and inconsistent with standard actuarial principles because it fails to take into account the actual past experience of pilots at United. Kalwarski Decl. ¶ 7. There are numerous reasons why pilots do not continue to fly professionally until they are 60 years old, including early retirement, disablement, and death. *Id.* In fact, a recent survey of approximately 1,000 pilots conducted by the Wilson Center for Public Research, Inc. found that since September 11, 2001, one-third of pilots under age 40 say they plan to leave the profession before age 60. *Id.* ¶ 8. The survey also found that ALPA members in their 20s and 30s approach their job with "short time horizons" and have little expectation that their current job will be their life-long career. *Id.*

The GAP 2 formula fails to take into account the incontrovertible fact that not all pilots will fly for United until they turn 60. By giving equal weight to prospective "unearned" pensions and *fully accrued and vested* pensions based on a salary that already has been paid, ALPA's GAP 2 methodology controverts sound accounting principle. *Id.* ¶ 9. This methodology is also inconsistent with the order of priority of beneficiaries required by ERISA for terminated pension plans, which requires plan administrators to allocate assets of terminated pension plans based first on benefits already accrued. *Id.*

ALPA, in its brief and through the attached declaration of Russell Woody, contends that it retained Buck Consultants to provide actuarial advice in connection with ALPA's decision to utilize the GAP 2 allocation methodology. The fact that ALPA paid a lot of money to some actuaries is not enough to justify the adoption of GAP 2. GAP 2 is demonstrably inconsistent with sound actuarial principles. *See* Kalwarski Decl. ¶¶ 6-9. On this basis, Plaintiffs should be permitted to establish on the merits that GAP 2 is arbitrary, unreasonable, and discriminatory.

## II.    ALPA IS UNLIKELY TO PREVAIL ON ANY OF THE LEGAL DEFENSES IT HAS RAISED.

### A.   ERISA Applies to Plaintiffs' Claims.

The crux of ALPA's argument is that ERISA does not apply in this case because Plaintiffs are challenging the Letter Agreement itself – *not* the program for distributing the Pension Funds – and the Letter Agreement is not an ERISA plan. *See, e.g.*, Defendant's Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Preliminary Injunction ("ALPA Br.") at 18 ("all of Plaintiffs' claims are *entirely dependent* on the terms of the [Letter Agreement]") (emphasis in original). ALPA misconstrues the nature of this case; Plaintiffs do *not* challenge the Letter Agreement. This case is about one thing only – ALPA's role in the administration of the retirement compensation program – the Pilots Retirement Compensation Program – established to compensate pilots for the loss of pension benefits resulting from United's bankruptcy. That program falls squarely within the meaning of a "benefit plan" under ERISA.

### 1.   The Pilots Retirement Compensation Program is an ERISA-covered benefits plan.

Any analysis regarding whether a program qualifies as an ERISA benefit plan must begin with the plain language of the statute. ERISA defines an "employee benefit pension plan" as "any plan, fund, or program which [is] … establish[ed] or maintained by an employer or by an

employee organization, or by both,[2] to the extent that by its express terms *or as a result of surrounding circumstances* such plan, fund or program (i) provides retirement income to employees, or (ii) results in a deferral of income by employees . . . ." 29 U.S.C. § 1002(2)(a) (emphasis added). ALPA tries to avoid analyzing the Pilots Program against this standard, arguing that the Pilots Program "is nothing more than the United-ALPA Letter Agreement," Proposed Intervenor United Air Lines, Inc.'s Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction ("UAL Br.") at 13-14, and that the *Letter Agreement* is not an ERISA plan. That argument is a red-herring; Plaintiffs are not challenging the Letter Agreement in this case.

ALPA thus dismisses Plaintiffs' argument without analysis, relying heavily on the absence of a formal plan document (a circumstance of its own creation), and arguing quite simply that the Pilots Program just doesn't look like an ERISA plan. UAL Br. at 13, 16. However, ALPA's approach does not withstand scrutiny.

As the D.C. Circuit has observed: "[a] plan need not be formalized; the plaintiff can prevail if the existence of the plan can be inferred from the 'surrounding circumstances.'" *Kenney v. Roland Parson Contracting Corp.*, 28 F.3d 1254, 1257 (D.C. Cir. 1994). Indeed, it is firmly established in ERISA jurisprudence – in a test first articulated by the Eleventh Circuit in *Donovan v. Dillingham*, 688 F.2d 1367 (11th Cir. 1982) (*en banc*) – that a "'plan, fund, or program' under ERISA is established if from the surrounding circumstances a reasonable person can ascertain the [1] intended benefits, [2] a class of beneficiaries, [3] the source of financing,

---

[2]     The ALPA Trust states unequivocally that the Pilots Program was "establishe[d]" and "fund[ed]" by UAL. Irrevocable ALPA Trust ("ALPA Trust"), Ex. 2 at 2.

and [4] the procedures for receiving benefits." *Id*. at 1373.[3]  The Pilots Program manifestly

satisfies this test.[4]

### a. The evidence in this case demonstrates that the Pilots Program satisfies each of the *Dillingham* factors.

The Court need spend little time analyzing the second, third, and fourth factors of the

*Dillingham* test.  ALPA surely will not dispute that the class of "beneficiaries" of the Pension

Funds are the "Eligible Pilots" identified in the ALPA Trust document, *i.e.*, those pilots "who

were on the United Pilots Seniority list as of January 1, 2005."  *See, e.g.*, ALPA Trust at 1; July

18, 2006 Letter from Lynn Hughitt to United Employees ("July 18 Letter") at Ex. 3.  Indeed, the

exact names of  the beneficiaries are available and, purportedly, are included in an exhibit filed

by United under seal in this case.  UAL Br. at Ex. A.  Nor is there any question that the "source"

of the Pension Funds is the $550 million in Convertible Notes issued by United upon the

termination of the pilots' United Plan.  *See*, *e.g.*, ALPA Trust, at 1.  With respect to the

procedures for distribution and receipt of benefits under the program, although ALPA has to this

day failed to articulate any *reasoning* (justifiable or otherwise) for the distribution methodology

it adopted, ALPA and UAL have reiterated repeatedly to the "Eligible Pilot" community both the

details of the GAP 2 formula, and the intended procedures for distributing the funds, to the

---

[3]      The *Dillingham* test has been adopted by other circuits as well.  *See Kenney*, 28 F.3d at 1257 (collecting cases); *Cvelbar v. CBI Ill., Inc.*, 106 F.3d 1367, 1378 (7th Cir. 1997); *Thompson v Am. Home Assurance Co.*, 95 F.3d 429, 435 (6th Cir. 1996); *Int'l Res. v. New York Life Ins.*, 950 F.2d 294, 297 (6th Cir. 1991).

[4]      ALPA nowhere addresses the circumstances surrounding the establishment of the Pilots Program nor do they so much as acknowledge the existence of this well-established test for determining the existence of an ERISA plan.  The same is true for UAL, whose arguments ALPA incorporates by reference.  ALPA's avoidance of the applicable standards is glaring, yet not completely surprising.  As the D.C. Circuit has held, "when the elements underlying the *Dillingham* test are so one-sided as they are in this case, a court should find that the plan has been established in order to effectuate the broadly protective purposes of ERISA."  *Kenney*, 28 F.3d at 1259 (citing *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86 (1993)).

maximum extent possible, directly in the pilots' retirement accounts. *See, e.g.*, Continuing Education Regarding Convertible Notes Allocation, MEC R&I Committee ("MEC Summary") at Ex. 4; UAL-MEC Retirement & Insurance Committee Final Gap Data Verification ("Gap Data Verification") at Ex. 5. Indeed, ALPA goes to great lengths to discuss the purported "deliberate and careful" process – occupying "at least the 14-month period between December 2004 and January 2006," costing hundreds of thousands of dollars, and involving the devotion of "countless hours" by myriad professionals, including "outside actuaries, financial consultants and legal counsel" – which went into the determination of the final procedures for allocating and distributing the Pension Funds. *See, e.g.*, ALPA Br. at 4-7.[5]

The only *Dillingham* factor ALPA even arguably addresses is the "intended benefits" of the Pilots Program. *See, e.g.*, UAL Br. at 1-2, 14-15. Nevertheless, the evidence establishes conclusively that the "intended benefits" of the Pilots Program are retirement benefits provided by UAL directly into pilots' retirement accounts to the maximum extent possible under the law to replace a portion of the pension benefits that were lost as a result of UAL's bankruptcy. *See* Appendix of ALPA's and UAL's representations regarding the Pilot Program at Ex. 6 ("Appendix"). ALPA's attempts to obfuscate the true nature of these funds is to no avail.

It is even more difficult to understand ALPA's current position – that the "Pension Funds" were something other than "retirement income" or some other form of deferred income

---

[5]    To the extent ALPA tries to argue that the Pilots Program's "procedures" bring it outside of ERISA because of the absence of any formal "plan documentation," UAL Br. at 13, that argument has been rejected repeatedly by the Courts. *See, e.g.*, *Kenney*, 28 F.3d at 1257 ("plan need not be formalized"); *Musmeci v. Schwegmann Giant Super Markets*, 332 F.3d 339 (5th Cir. 2003) (holding that program with no formal written procedures for administering benefits was still ERISA benefits plan); *Dillingham*, 688 F.2d at 1372 ("ERISA does not require … a formal, written plan"); *Hughes v. White*, No. C2-05-0077, 2006 WL 3780640 at *7 (S.D. Ohio Dec. 22, 2006) (a "purported ERISA plan need not be written or formal to qualify as an ERISA benefit plan").

as contemplated by ERISA – given the sheer volume of documentary evidence that leaves no question regarding the nature of the "intended benefits" of the Pilots Program. A mere sampling of the available documentation makes clear beyond dispute that the Pension Funds were:

- Retirement benefits, *see, e.g.*, PDAP Method Summary at 7 (discussing how PDAP method adopted by ALPA converts "a significant part of the note distribution" to a "retirement benefit"); *see also* Appendix;

- Intended specifically to offset losses of pension benefits, *see* June 23, 2006 presentation by MEC Retirement and Insurance Committee to MEC entitled "Convertible Note Distribution: Tax Treatment, Implementation Process, Committee Recommendations ("R&I Presentation"), Ex. 7 at Slide 17 ("<u>You have told the pilots</u> the purpose of the Notes is to offset Pension losses") (emphasis in original); *see also* Appendix; and

- That were provided, to the maximum extent allowable under the law, to pilots as retirement/deferred income consistent with other retirement benefits, *see* R&I Presentation at Slide 17 ("the A-Plan was a tax deferred plan; by logical extension[,] the 'offset' funds shall be tax deferred"); *see also* Appendix.

ALPA appears to take the position, based on *dicta* taken out of context from two Seventh Circuit decisions arising out of the UAL bankruptcy, that the Pension Funds may have been intended not only to compensate pilots for lost benefits, but also to address "substantial salary concessions" going forward. ALPA Br. at 10-11; UAL Br. at 14-15. Plaintiffs are unaware – and can only learn through discovery – what UAL in fact intended. What is clear for purposes of *these* proceedings is that UAL unequivocally represented to its pilots that the Notes "partially offset the retirement benefits that active employees lost when United's pension plans were terminated and replaced," and are "*unrelated* to the [*separate* compensation] that nearly all employees received … in recognition of the reductions in wages and benefits [resulting from the United bankruptcy." July 18 Letter (emphasis added).

Finally, ALPA does not even try to address the fact that it admittedly spent hundreds of thousands of dollars and "countless" hours devising a way to *ensure* that the Pension Funds were delivered as retirement benefits, directly into the pilots' PDAP accounts. Nor do they mention

that almost all of the remaining Pension Funds will be distributed into those PDAP accounts, as "C-Plan" retirement contributions to be invested based on each pilot's "C-Plan" elections.  July 18 Letter at 4.  A PDAP is a qualified plan – a pension plan pursuant to the IRS Code – that contains each pilot's 401(k) contributions, United "B-Plan" and "C-Plan" contributions, post-tax elective pilots contributions, and rollover contributions.  PDAP Method Summary at 9.  Indeed, each of these retirement contributions *may not be commingled* with any non-pension assets.  The Pension Funds simply could not be distributed in this manner *unless* they were deferred retirement income.  Nor could ALPA or United achieve the deferred tax treatment they so desperately sought unless they distributed the Pension Funds in this manner as retirement benefits.

In light of this compelling evidence, Plaintiffs are likely to prevail in showing that the Pilots Program is a "plan, fund or program" within the meaning of ERISA.

### b.  The Program's Status Under ERISA Is Not Impacted by Its Tax Treatment or by UAL's PBGC Settlement.

ALPA makes two additional arguments to support its assertion that the Pilots Program is not an ERISA plan, based on the tax-status of the Pilots Program, and United's settlement of certain bankruptcy-related claims with the PBGC.  UAL Br. at 16.  Each of these arguments fails as well.

First, ALPA argues that the Pilots Program cannot be an ERISA plan because it is not "tax qualified" under §§ 401 and 501(c) of the IRS Code.  *Id*.  This argument is meritless.  Both the Department of Labor ("DOL") and the courts uniformly have recognized the application of ERISA to non-qualified pension plans. *See*, *e.g.*, DOL Advisory Opinion 75-40 (April 17, 1975) (ERISA is generally applicable to non-qualified plans); DOL Advisory Opinion 75-48 (December 13, 1975) (same); *Hampers v. W.R. Grace Co. Inc.,* 202 F. 3d 44 (1st Cir. 2000)

(non-qualified plan subject to ERISA); *Adams v. Louisiana Pacific Corp.,* 284 F. Supp. 2d 331

(W.D.N.C. 2003) (non-qualified plan subject to ERISA); *Miller v. Heller*, 915 F. Supp. 651

(S.D.N.Y. 1996) (non-qualified plan using grantor trust subject to ERISA).

ALPA also argues that UAL's agreement with the PBGC not to establish any other

defined benefit pension plans renders ERISA inapplicable to the Pilots Program.  UAL Br. at 16.

This argument is equally futile, if not misleading.  ALPA must know that United's agreement

with the PBGC applies only to defined *benefit* plans, the type of traditional retirement plan

subject to the Internal Revenue Code's minimum funding standards and the only type of pension

plan over which the PBGC has authority.  *See* 29 U.S.C. §§ 1002(35), 1301(a)(15).  The Pilots

Program, to the contrary, is a defined *contribution* plan, an entirely different class of pension

plan not subject to PBGC authority at all.  29 U.S.C. § 1002(34) (a defined contribution plan

provides for individual participant accounts and basis its benefit on the portion of the employer's

contribution allocated to such account).  The UAL-PBGC agreement is irrelevant to this case.

### 2.  ALPA's allocation of trust assets constitutes fiduciary activity subject to ERISA.

ALPA finally argues that, assuming the Pilots Program is an ERISA plan, the "settlor

function" doctrine immunizes any action by ALPA in administering the plan.  That doctrine

provides no safe-harbor for ALPA's conduct in this case.

The ALPA Trust Document – the product of an agreement between United and the Bank

of New York – makes clear that United established and funded the Trust, and that ALPA's *only*

role in the Pilots Program is to *implement* the program by authorizing the actual *payment* of

funds to pilots consistent with the program's terms, including the requirement that ALPA

allocate the funds "reasonably."  ALPA Trust at 1; Letter Agreement at Ex. D.   ALPA's role

falls squarely within the realm of fiduciary activity under ERISA, *i.e.*, discretionary activity

pursuant to standards and a grant of authority established by an ERISA plan's terms.  29 U.S.C. § 1002(21)(A); 29 C.F.R. § 2509.75-8, Q. D-3 (persons with designated authority who exercise discretion within the realm of such designated authority are plan fiduciaries); *Elec. Workers Sys. Council EM-3 v. AT&T*, 972 F. Supp 21 , 30-31 (D.D.C 1997), *aff'd sub nom*, *Sys. Council EM-3 v. AT&T Corp.*, 159 F.3d 1376 (D.C. Cir. 1998) (person who acts with discretion in area reserved to him plan terms is a fiduciary).

The "settlor function" doctrine creates a narrow exception to ERISA's fiduciary duty standards for such functions as the "establishment, funding, amendment, and termination of a benefit plan."  ALPA Br. at 11.  As the D.C. Circuit has recognized, this exception applies only for changes in the *structure or design* of a plan, not for acts relating to the *administration* of a plan.  *Sys. Council*, 159 F.3d at 1379-80; *Hartline v. Sheet Metal Workers Nat'l Pension Fund*, 134 F. Supp. 2d 1, 16 (D.D.C. 2000).  ALPA points to no evidence – nor can it – that its functions pursuant to the Pilots Program fall within the narrow "settlor function" exception, and thus exempt it from any of ERISA's fiduciary duty requirements.  Instead, all the evidence in this case demonstrates that ALPA's role in the Pilots Program was related to "administering benefits and managing plan assets" – a role ALPA concedes falls within ERISA's scope. ALPA Br. at 11.

There is no question raised in this case about ALPA changing any of the terms of the Pension Program once it was established by United.  ALPA was required to "reasonably" administer the assets of the Program – the same role it holds today.  The only question in this case is whether ALPA exceeded its authority under the *original* terms of the Pilots Program when it adopted the GAP 2 methodology.  Thus, unlike the cases ALPA cites where the "settlor function" applied, this case does not involve any plan amendments or other changes to the "structure or design" of the program.  ALPA's actions only impacted the management of the

assets within the Pilots Program – a function that repeatedly has been recognized as fiduciary in nature, and subject to ERISA. *Elec. Workers*, 972 F. Supp. at 30; *Sys. Council*, 159 F.3d at 1379-80; *Abbott v. Pipefitters Local Union No. 522 Hospital, Med. & Life Benefit Plan*, 94 F.3d 236, 240 (6th Cir. 1996).

The relief Plaintiffs seek further demonstrates why this case involves administrative, fiduciary actions rather than settlor functions. In *Hartline*, upon which ALPA heavily relies, the court placed substantial weight on the fact that Plaintiffs sought a complete "reformation of the plan's design." *Hartline*, 134 F. Supp. 2d at 16. In this case, Plaintiffs merely ask that ALPA be required to comply with terms of the Pilots Program as originally established.

To accept ALPA's position would be to grant plan administrators unlimited and unreviewable discretion to allocate Trust assets in any manner, no matter how arbitrary or capricious or, more importantly, irrespective of the fundamental terms of the plan itself. ALPA's discretion already is limited under the terms of the Pilots Program; it also is limited by ERISA.

## B. The Railway Labor Act has no impact on Plaintiffs' claims.

Plaintiffs' claims do not require interpretation of the Letter Agreement and are independent statutory claims under ERISA, and thus they are beyond the preemptive reach of the Railway Labor Act, 45 U.S.C. § 151 *et seq.* ("RLA"). RLA arbitral preemption regarding "minor disputes" applies "only to issues arising out of the interpretation of the collective bargaining agreement and not to independent statutory claims under ERISA." *Everett v. USAir Group, Inc.*, 927 F. Supp. 478, 482 (D.D.C. 1996). As the D.C. Circuit held in *Air Line Pilots Ass'n, Int'l v. Northwest Airlines, Inc.*, 627 F.2d 272, 277 (D.C. Cir. 1980), where a "complaint states a non-frivolous statutory claim under ERISA which is independent of the correct construction of the pension plan, the District Court [has] jurisdiction of that statutory claim. . . .

13

The [RLA's] arbitral provisions do not demand that such pure statutory, noncontractual claims be sent to arbitration; they can go directly to court."

Plaintiffs' claims have been properly pleaded as arising under ERISA and are independent claims "that do not turn on the interpretation of the collective bargaining agreement." *Everett*, 927 F. Supp. at 482; *see also Hawaiian Airlines, Inc. v Norris*, 512 U.S. 246, 260-63 (1994) (describing independent claims as "causes of action that can be resolved without interpreting the agreement"). No interpretation of the Letter Agreement between United and ALPA is necessary in order to adjudicate Plaintiffs' ERISA claims. ALPA's obligation to allocate the Note proceeds in a reasonable, non-arbitrary, and non-discriminatory manner is a matter of fiduciary duty principles under ERISA and common law. Indeed, it is ALPA's conduct *after* it was provided the funds – through a non-recourse vehicle of an irrevocable trust – that is the subject of Plaintiffs' claims.

The fact that the term "reasonably" is also in the Letter Agreement between United and ALPA does not convert Plaintiffs' claim into an RLA issue. Moreover, the term "reasonably" is in any event an unambiguous term that requires no interpretation – just application. *See Stephens v. Ret. Income Plan for Pilots of U.S. Air, Inc.,* 464 F.3d 606, 613-14 (6th Cir. 2006) (holding that resolution of the ERISA claim "[does] not involve the interpretation of the collective bargaining agreement by the Board but its ultimate result").

Plaintiffs' common law breach of fiduciary duty is likewise not preempted by the RLA. Defendant cites *Maurer v. Trans World Airlines, Inc.*, 316 F. Supp. 2d 84, 92 (D. Conn. 2003), for the proposition that common law claims are preempted by the duty of fair representation. Preemption of such claims, however, occurs when those claims require interpretation of a collective bargaining agreement and arise out of the same circumstances from which the duty of

fair representation arises.[6] *Id.; see, e.g., Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 210-13 (1985) (preempting state law claims if evaluating those claims requires consideration of collective bargaining agreement terms). Here, no dispute exists regarding the interpretation of the terms of the Letter Agreement, and Plaintiffs' common law fiduciary duty claims, like their ERISA claims, can be adjudicated entirely independent from *any* interpretation of the language of the Letter Agreement.

Because Plaintiffs' common law claim is not preempted, even if the Court concludes ERISA does not apply, the Plaintiffs are entitled to the equitable remedy of a constructive trust. The elements to establish constructive trust are clearly satisfied in these circumstances. As this Court has explained: "[A] constructive trust arises where a person who holds title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if permitted to retain it. . . . [T]he imposition of a constructive trust may be appropriate in a wide range of situations, including . . . breach of fiduciary duty." *In re Auto-Train Corp.*, 53 B.R. 990, 995-96 (D.D.C. 1985), *see also In re Inv. Sales Diversified, Inc.*, 38 B.R. 448, 450 (Minn. 1984) ("In general, a constructive trust arises where an abuse of a fiduciary relationship to the unjust enrichment of the breaching party is shown").

Here, if ERISA does not apply, the common law right of constructive trust certainly does. ALPA, which was empowered to "reasonably" distribute the pilots' funds, does not even contest that that obligation imposed a common law fiduciary duty. Because the remaining, undistributed funds constitute property held for the benefit of the pilots, and because the Plaintiffs have shown that ALPA intends to distribute those funds in violation of its fiduciary duties to the Plaintiffs

---

[6] It is interesting that Defendant's parenthetical in citing *Maurer* – whether consciously or not – cited only the "same circumstances" requirement, but not the "require interpretation of the CBA" requirement.

and the class they represent, the elements for a constructive trust have clearly been satisfied.

Injunctive relief is appropriate to impose such a trust. *United States ex rel. Rahman v. Oncology Assoc.*, 198 F.3d 489, 493-94 (4th Cir. 1999); *Health Cost Controls, Inc. v. Washington*, 187 F.3d 703, 711 (7th Cir. 1999); *Savoie v. Merchants Bank*, 84 F.3d 52, 54, 58-59 (2nd Cir. 1996).

### C.  The "Exculpation" provisions of the United-ALPA Letter Agreement are irrelevant to Plaintiffs' claims.

ALPA and UAL also argue that Plaintiffs' claims are barred by the exculpatory clause in the UAL Plan of Reorganization ("POR").[7]  UAL and ALPA contend that absent gross negligence or willful misconduct they are exculpated.[8]  This argument is meritless for three separate reasons.

First, no damages are sought against ALPA, much less UAL.  There is no claim to "exculpate."  ALPA is sued, essentially, in a specific capacity as a fiduciary that misallocated the fund it was charged with distributing "reasonably."  As ALPA still controls that fund, there is no claim to which the exculpation clause could apply.  Plaintiffs seek reallocation of the funds ALPA controls for others, not any damages from ALPA itself and certainly none from UAL.

Second, the exculpation clause does not apply to future misconduct.  Exculpation clauses are read "narrowly and strictly," and any attempts to exculpate a party from misconduct that has not even occurred, to the extent such an exculpation can be valid at all, must be specific.  *New Valley Corp. v. United States*, 119 F.3d 1576, 1584 (Fed. Cir. 1997).  There is no language in this clause to indicate it applies to conduct that might occur in the future.  Indeed, such clauses

---

[7]     The relevant sections of the POR can be found at page 7, defining "ALPA released party," page 14, defining "exculpated claim" and "exculpated party" and page 121, containing the "exculpation clause."

[8]     The complaint alleges a level of misconduct beyond the requirement of the exculpation clause. See Compl. ¶ 33.

appear to be barred under ERISA. *See Boeckman v. A.G. Edwards, Inc.*, 461 F. Supp. 2d 801,

808 (S.D. Ill. 2006) (noting that "ERISA § 410, 29 U.S.C. § 110 . . . provides that 'any provision

in an agreement or instrument which purports to relieve a fiduciary from responsibility or

liability, for any responsibility, obligation, or duty under this part shall be void as against public

policy'"). The claims here accrued, at the earliest, in August 2006, when the first funds were

distributed. The POR was approved on January 20, 2006, and thus these claims cannot be barred

by this clause. *Id.* at 814. While a release of known claims can be effective, the release of

claims accruing in the future can not. *Id.* at 808.

Finally, UAL relies on the last phrase in the definition of "exculpated claim," which

purports to apply the clause to "property to be distributed pursuant to the Plan." UAL Br. at 9.

In its most generous interpretation, this would apply to the distribution of the $550 million in

notes, nothing more. Plaintiffs are not challenging UAL's conduct in distributing that property,

and indeed, are not challenging UAL's conduct in any respect. Nor do Plaintiffs challenge the

Trust's receipt of the notes or ALPA's right to develop a reasonable methodology for distribution

of the proceeds. Rather, Plaintiffs challenge only ALPA's implementation of the Letter

Agreement's unambiguous mandate to reasonably allocate the pension funds. That Agreement

clearly governs ALPA's conduct here, and neither the POR nor its exculpation clause are

implicated in any way.

## III.    PLAINTIFFS HAVE DEMONSTRATED THAT THEY WILL BE IRREPARABLY INJURED BY THE DISTRIBUTION OF THE RETIREMENT FUNDS THIS WEEK UNDER THE GAP 2 FORMULA.

Plaintiffs established in their opening brief the irreparable harm they will suffer should

ALPA be permitted to deplete the last remaining assets of the Pilots Program. *See* Motion for

Preliminary Injunction at II. ALPA does not address this argument, nor does it even attempt to

distinguish the authority, including D.C. Circuit precedent, upon which Plaintiffs' argument is

based.  *See id*. (citing *Foltz v. U.S. News & World Report*, 760 F.2d 1300 (D.C. Cir. 1985); *Foltz v. U.S. News & World Report, Inc.*, 613 F. Supp. 634 (D.D.C. 1985); *Fechter v. HMW Indus., Inc.*, 879 F.2d 1111 (3d Cir. 1989); *Anthony v. Texaco*, 803 F.2d 593 (10th Cir. 1986)).  Plaintiffs will not repeat those arguments here except to reiterate that, absent the injunctive relief sought in this case, Plaintiffs will lose any ability to pursue the relief sought in this case – a right explicitly afforded them by Congress.  Plaintiffs have raised, at the very least, substantial questions regarding the legality of ALPA's actions in connection with its administration of the Pilots Program.  This Court should preserve what remains of the corpus of the Pilots Program until such time as the merits of this case may be adequately resolved.

## IV.  ALPA HAS FAILED TO DEMONSTRATE THAT EITHER IT OR ANY OF ITS MEMBERS ARE LIKELY TO SUFFER ANY HARM IF THE DISTRIBUTION OF THE RETIREMENT FUNDS IS DELAYED.

ALPA does not argue that it would suffer any harm if this Court enjoins the distribution of the retirement funds.  Instead, ALPA argues briefly (ALPA Br. 33-34) that a delay of the distribution beyond March 15 *may* have an adverse tax impact on pilots who end up receiving a distribution of the remaining funds, speculating there is a "possibility" that a pre-March 15 distribution may be deemed to be more tax advantageous to the fund recipients than a later distribution date. [9]  Thus, the sole basis for ALPA's "pilot injury" argument is that a pre-March 15 distribution will prevent the "risk" of certain potential tax consequences of a post-March 15 distribution.  Even ALPA therefore would concede that any potential tax consequence of a delayed distribution is wholly speculative.

---

[9]    Of course, if Plaintiffs succeed on their claim, the more junior pilots would receive far less, and perhaps nothing, in the way of additional retirement funds, so they would have little or no income from the distribution to be taxed.

ALPA, however, neglects to advise the Court that the very regulations on which it relies contain a specific exception that permits an employer to make a post-March 15 distribution and still have the employee qualify for the short-term deferral exception. As stated in the Proposed Regulations:

> (ii)    <u>Delayed payments due to unforeseeable events.</u>  A payment that otherwise qualifies as a short-term deferral . . . but is made after the 15th day of the third month following the end of the relevant taxable year (the applicable 2 ½ month period) may continue to qualify as a short-term deferral if the taxpayer establishes that it was administratively impracticable to make the payment by the end of the applicable 2 1/2 month period . . . and . . . such impracticability . . . was unforeseeable, and also that the payment is made as soon as reasonably practicable.

26 C.F.R. § 1.409A-1(b)(4)(ii).

An injunction entered by this Court would plainly satisfy the criteria of making a pre-March 15 distribution "administratively impracticable," and such an order would likewise satisfy the "unforeseeability" standard. Accordingly, there is no realistic basis for concluding that any pilots will suffer a tax disadvantage if they were to receive a distribution of the retirement funds in May 2007, for example, rather than in March.

UAL's "injury" argument is even more far-fetched. Under the terms of the Trust, any monies not yet distributed will remain in the Trust and thereby remain subject to the claims of UAL's creditors. ALPA Trust at 2, 5. UAL has explicitly recognized this fact. *See* UAL Br. at 20-21. The interim injunctive relief requested by Plaintiffs relates only to the allocation methodology adopted by ALPA and would not in any way disrupt the operation of the Trust. Nothing in the requested order would impair or negate UAL's ability to access undistributed Trust assets for the benefit of its creditors in the event of insolvency under Article 3 of the Trust. Nor is there any credible argument that UAL could be hurt by having the Pension Funds remain

available to it for a *longer* period of time. Thus, neither ALPA nor UAL would suffer any

significant harm if the injunction is granted.

**V.     ALPA'S "DELAY" ARGUMENTS ARE NOT GROUNDS FOR DENYING PLAINTIFFS THE RELIEF NECESSARY TO AVOID THE IRREPARABLE HARM THEY WILL OTHERWISE SUFFER.**

ALPA argues that injunctive relief should be denied because the individual Plaintiffs, on

behalf of a class of approximately 2,000 pilots who likely will lose all recourse if an injunction is

not granted, delayed unreasonably in bringing this claim. Plaintiffs submit herewith the

Affidavit of Plaintiff Raymond Garavito ("Garavito Aff.") on this issue, and suggest to the Court

that ALPA's argument is insufficient to deny the injunctive relief Plaintiffs seek.

It appears that the underlying facts are largely undisputed, although ALPA's recitation of

them is incomplete. In late January 2006, the UAL MEC adopted the GAP 2 methodology.

Apparently, the MEC advised its pilots of its decision in a very brief e-mail dated January 20,

2006. Aff. of Wendy J. Morse, Ex. D, UAL Br. at Ex. C. That e-mail states that "the GAP 2

methodology is based on past and future earnings" but provides absolutely no detail concerning

what this would mean to any individual pilot. No further explanatory information was available

until about July 2006, and even the information available then did not provide sufficient detail to

let the senior pilots know the real impact of GAP 2; *see e.g.,* July 18 Letter. As Mr. Garavito

states, he could obtain no oral explanation when he attempted to reach out by telephone to the

MEC, the R&I Committee, or the Captains' Representative. See Garavito Aff., Ex. 8 ¶ 5.

A review of the documents makes it clear that no pilot could reasonably have understood

the actual effect of the implementation of GAP 2 until the MEC R&I Committee issued the

document entitled "Continuing Education Regarding Convertible Note Allocation," attached as

Exhibit B to the Garavito Affidavit. Of critical importance is the fact that this document was not

created until some time *after* the first proceeds of the Convertible Notes *already* had been distributed in mid-August 2006. As is apparent from page 15 of that document (at the bottom), it could not possibly have been created before that time. ALPA has not submitted and plaintiffs have not seen any earlier document from which any senior pilot could reasonably understand that the MEC's decision to consider speculative future earnings in GAP 2 had turned allocation of the note proceeds upside down, causing significant harm to those pilots who had spent years earning vested benefits. The effects of GAP 2 are clearly shown at Example 1 on page 7 of this document. Indeed the comments to this example begin with the statement that "it is easy to see why pilots A and B [the older and more senior pilots] might feel slighted when comparing allocations with pilot C. They have more years at the Company, more years of participation in the A Plan, and they are older with less time until retirement to make up for the loss of the A Plan." Yet in this example, pilot C, who is younger, and has been with the company fewer years, ends up with an allocation *three times as large* as that of the older pilot who has six years more seniority.

Mr. Garavito does not recall when he first saw this document.[10] Although there are references in the earlier documents that suggested visits to the website to learn about the allocation, the site provided financial summaries of what pilots would receive, Garavito Aff. at Ex. D, but not the comparative information of the type revealed in Exhibit B.

The failure of ALPA to communicate the effects of GAP 2 to its pilots contributed at least as much to Plaintiffs' February filing as any delay the Court might attribute to Plaintiffs.

---

[10]     We note that at the very beginning of the document, the MEC says that it created this document as a "renewed education effort for the pilot group." This would appear to be, at the very least, Orwellian newspeak, as there is no indication from ALPA that the full effects of GAP 2 were ever made known to the pilots before the issuance of this document.

Indeed, having had detailed studies of GAP 2, GAP 1, and the PLSA method before adopting

GAP 2 in January 2006, the UAL MEC was well positioned to educate its membership about the

methodology it was considering and the manner in which it would affect them.  The UAL MEC

chose not to communicate at all, in any real sense, until some time after August 16, 2006, a full

seven months after it had adopted GAP 2, ten months after it had rejected GAP 1 in October

2005, and twenty-four months after it first began considering a means of distributing the $550

million in notes.  *See* Aff. of Russell Woody ¶¶ 4, 8, ALPA Brief at Ex. 1.  Indeed, as early as

January 2005, the MEC was presented by its actuaries with allocation methodologies.  *Id*. ¶ 15.

Yet neither the MEC nor ALPA, from January 2005 to late August 2006 (at the earliest) – a

period of 20 months – told the pilots how GAP 2 would really work.

Plaintiffs took less than six months to figure out what had happened to them, to locate

counsel who were sufficiently expert at understanding the panoply of issues presented by this

case, and to complete an investigation that justified the filing of a lawsuit.  Having failed to

communicate fairly with its pilots for 20 or more months, ALPA can hardly argue that equity

requires that the court deny relief because of the shortness of time.  *See, e.g., Fenje v. Feld,* No.

01C9684, 2002 U.S. Dist. Lexis 9492, at *2-6 (N.D. Ill. May 29, 2002); *National Law Ctr. on

Homelessness & Poverty v. United States VA*, 98 F. Supp. 2d 25, 27 (D.D.C. 2000).

## VI.    THE PUBLIC INTEREST FAVORS ALLOWING THE PLAINTIFFS TO HAVE AN OPPORTUNITY TO HAVE A TRIAL ON THE MERITS OF THEIR CLAIMS.

ALPA does not address the fourth factor of the preliminary injunction test – *i.e.*, the

public interest in granting the injunction Plaintiffs seek.  There is no disputing ERISA's explicit

public interest function and the importance of protecting the right of plan beneficiaries to

preserve retirement benefits that are in danger of being diverted from their rightful recipients.

*See* Motion for Preliminary Injunction at IV.  ALPA's brief, however, demonstrates an even

more pressing need for injunctive relief here.  In the over 50 pages of argument by ALPA and United, neither the employer nor the plan administrator so much as attempts to articulate a rational basis for the GAP 2 methodology ALPA adopted.  Plaintiffs' right to reasonable allocation of the Pension Funds hardly can be questioned.  The public interest requires ALPA to demonstrate that its actions were reasonable, non-discriminatory, and fair before it is permitted to deplete entirely Plaintiffs' remaining retirement benefits in the Pilots Program.

## VII.   UNDER THE CIRCUMSTANCES OF THIS CASE, THE COURT SHOULD NOT REQUIRE A BOND FROM THE PLAINTIFFS.

Whether a security bond is required pursuant to Fed. R. Civ. P. 65(c) falls squarely within this Court's discretion.  The Rule's "language 'in such sum as the court deems proper' has been read to vest broad discretion in the district court to determine the appropriate amount of an injunction bond."  *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999).  Indeed, "[t]he amount of security required is a matter for the discretion of the trial court; *it may elect to require no security at all.*"  *Citizen's Alert Regarding Env't v. U.S. Dept. of Justice*, No. 95-1702, 1995 WL 748246, at *12, n.10 (D.D.C. Dec. 8, 1995) (emphasis added) (quoting *Corrigan Dispatch Co. v. Case Guzman*, 569 F.2d 300, 303 (5th Cir. 1978)).  *See also Cobell v. Norton*, 225 F.R.D. 41, 50, n.4 (D.D.C. 2004) ("it is within the Court's discretion to waive Rule 65(c)'s security requirement where it finds such a waiver to be appropriate in the circumstances") (citing *Int'l Controls Corp. v. Vesco,* 490 F.2d 1334, 1356 (2d Cir. 1974) (no security required in absence of proof that enjoined party likely to be harmed)); *see also Continental Oil Co. v. Frontier Ref. Co.*, 338 F.2d 780, 782 (10th Cir. 1964) ("the trial judge has wide discretion in the matter of requiring security and if there is an absence of proof showing a likelihood of harm, certainly no bond is necessary").

As discussed *supra*, ALPA has failed to argue that it will incur any harm if the requested injunction is granted; nor has it established a likelihood of harm to anyone else. A security bond is unnecessary and is inappropriate in these circumstances. Plaintiffs request that the Court exercise its discretion to set no security bond or to set a bond of nominal value.

## VIII. PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION UNDER THE FOUR-PART TEST APPLIED BY THIS COURT.

It is well established that the four factors relevant for the issuance of a preliminary injunction "must be viewed as a continuum, with more of one factor compensating for less of another. 'If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak.'" *Bracco Diag., Inc. v. Shalala*, 93 F. Supp. 20, 27 (D.D.C. 1997) (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)). ALPA focuses almost exclusively on Plaintiffs' likelihood of success on the merits. Although Plaintiffs *have* demonstrated a substantial likelihood of success on the merits, they need not project certain success to obtain injunctive relief. Demonstrating a high degree of irreparable harm and a making out a "'substantial' case on the merits" is sufficient. *Canales v. Paulson*, No. 06-1330, 2006 WL 2520611, at *3 (D.D.C. Aug. 30, 2006) (quoting *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843-45 (D.C. Cir. 1977)); *see also Bracco*, 93 F. Supp. at 27 ("an injunction may be issued 'with either a high probability of success and some injury, *or vice versa*'" (quoting *Cuomo v. United States Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985) (emphasis added)).

ALPA simply ignores the undisputed and significant irreparable harm that Plaintiffs face. Indeed, ALPA makes no attempt to respond to Plaintiffs' argument that distribution of the remaining pension funds would eliminate Plaintiffs' entire *cause of action*. *See* Motion for Preliminary Injunction at 12-15. Plaintiffs face the prospect of losing forever the corpus of the

plan from which they seek recovery.  As noted in Plaintiffs' Motion:

> In that event, it is clear beyond cavil that any cause of action under ERISA against the plan, 'as an entity,' in the words of the statute, would forever be lost.  Irrevocable loss of a cause of action created by Congress for the remedial and humane purpose of protecting beneficiaries and participants of ERISA-covered plans could . . . well work irreparable injury warranting the fashioning of equitable relief under the well-settled standards articulated by this Court.

*Foltz v. U.S. News & World Report,* 760 F.2d 1300, 1308 (D.C. Cir. 1985) (citations omitted).

Although Plaintiffs are seeking their fair share of a monetary pool, and the ultimate injury is "'admittedly economic,' there is no adequate compensatory or other corrective relief that can be provided at a later date, tipping the balance in favor of injunctive relief." *Bracco*, 963 F. Supp. at 29 (quoting *Hoffmann-Laroche Inc. v. Califano,* 453 F. Supp. 900, 903 (D.D.C. 1978)).

In sum, Plaintiffs have demonstrated a high degree of irreparable harm and a sufficient likelihood of success on the merits, and they have shown that the balance of harms and public interest considerations weigh strongly in favor of the requested injunction relief.  For these reasons, this Court should grant Plaintiffs' motion for a preliminary injunction.

Respectfully submitted,

        /s/

Andrew H. Marks (D.C. Bar No. 932269)
Aryeh S. Portnoy (D.C. Bar No. 464507)
William Flanagan (D.C. Bar No. 311035)
Daniel G. Kim (D.C. Bar No. 484342)
CROWELL & MORING, LLP
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004
Phone: (202) 624-2500
Fax: (202) 628-5116

Michael S. Olin (D.C. Bar No. 372067)
Tucker Ronzetti (D.C. Bar No. 490820)
KOZYAK, TROPIN & THROCKMORTON, PA
2525 Ponce de Leon, 9th Floor
Miami, FL 33134
Phone: (305) 372-1800
Fax: (305) 372-3508

Attorneys for Plaintiffs

Of Counsel:    Jeffrey W. Pagano (D.C. Bar No. 965046)
CROWELL & MORING LLP
153 East 53rd Street, 31st Floor
New York, NY 10022
Phone: (212) 223-4000
Fax: (212) 223-4134

# CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Plaintiffs' Reply Memorandum in Support of

Motion for Preliminary Injunction was sent via hand delivery or first-class mail postage prepaid

this 5th day of March 2007 to:

**ATTORNEYS FOR DEFENDANT**

Jonathan A Cohen, Esq.
Air Line Pilots Association
1625 Massachusetts Avenue, NW
Washington, DC  20036

Clay Warner, Esq.
Air Line Pilots Association
535 Herndon Parkway
P.O. Box 1169
Herndon, VA  20172

Peter Herman, Esq.
Cohen Weiss and Simon LLP
330 West 42nd Street
New York, NY  10036

Andrew A. Nicely
Archis A. Parasharami
Mayer, Brown, Rowe & Maw LLP
1909 K Street, NW
Washington, DC  20006

Andrew S. Marovitz
Andrew S. Rosenman
Debra Bogo-Ernst
Mayer, Brown, Rowe & Maw LLP
71 South Wacker Drive
Chicago, IL  60606

**ATTORNEYS FOR PROPOSED
INTERVENOR**

Alexander T.H. Nguyen
Kirkland & Ellis LLP
655 Fifteenth Street, NW
Washington, DC  20005

John F. Hagan, Jr.
Peter Stasiewicz
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL  60601

_____/s/_____
   Aryeh S. Portnoy

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| RAYMOND GARAVITO, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-CV-00384 |
| | ) | |
| AIR LINE PILOTS ASSOCIATION, | ) | |
| INTERNATIONAL, | ) | |
| | ) | |
| Defendant. | ) | |

### DECLARATION OF GENE M. KALWARSKI, FSA, MAAA, EA

1.    I have been retained by Crowell & Moring LLP and Kozyak Tropin & Throckmorton, PA, counsel for Plaintiffs Raymond Garavito, Rafael Rodriguez, and Elli Mizrahi, to give my professional opinion regarding the methodology selected by Defendant Air Line Pilots Association, International ("ALPA") for the distribution of the proceeds of $550 million in convertible United notes ("Notes") issued by United to offset a portion of the retirement benefits that active employees lost when United's pension plans were terminated.

2.    I am a practicing actuary and am certified as a Fellow of the Society of Actuaries, a Member of the American Academy of Actuaries, and an Enrolled Actuary under ERISA.  I received my Bachelors of Science degree in 1974 from St. Bonaventure University, where I majored in Mathematics.

3.    I am currently the Chief Executive Officer of Cheiron, a full-service actuarial and financial consulting firm with offices in Washington, D.C., New York City, NY, Charlotte, NC, Chicago, IL, and Philadelphia, PA.

4.    Prior to founding Cheiron in 2002, I was a Principal and Consulting Actuary for more than 20 years with Milliman and, before that, for two years with Towers Perrin.  Between 1975 and 1979, I worked for the Pension Benefit Guaranty Corporation as a Member of the Multiemployer Task Force.

5.    In preparing this report, I have reviewed the following materials provided to me by counsel for Plaintiffs:

    a. Plaintiffs' Motion for Preliminary Injunction, including exhibits:
        i. February 16, 2007 United MEC Week in Review publication
        ii. Verified Complaint for Preliminary Injunction, Permanent Injunction, and Declaratory Relief
        iii. July 18, 2007 letter from Lynn Hughitt (UAL) attaching Q&A document regarding convertible notes
        iv. January 1, 2005 Letter of Agreement by and between United Air Lines Corp., United Air Lines, Inc., and the Air Line Pilots in the service of United Air Lines, Inc. as represented by the Air Line Pilots Association, International
        v. Continuing Education Regarding Convertible Note Allocation, MEC R&I Committee
        vi. Minutes of UAL-MEC Meetings for 1/05, 4/05, 7/05, 9/05, 10/05, 11/05, 1/06
    b. PDAP Top-Off and Taxable Remainder Distribution Method, ALPA Convertible Notes Questions and Answers
    c. August 15, 2006 letter from Lynn Hughitt (UAL) regarding allocation and distribution
    d. August 15, 2006 letter from MEC to United Pilots regarding offer of annuity products in connection with distribution
    e. August 15, 2006 letter from Captain Mark Bathurst, Chairman UAL-MEC, regarding distribution update
    f. August 16, 2006 email from MEC regarding distribution timeline
    g. Convertible Notes Statement for Raymond Garavito
    h. November 21, 2006 UAL-MEC Retirement and Insurance Committee Final GAP Data Verification Report from ALPA to United pilots
    i. Declaration of Russell Woody, Senior Benefits Counsel of ALPA, in *Hudson, et al. v. Air Line Pilots Association, International, et al.*, No. 07 CV 590 (N.D. Ill.) (Feb. 26, 2007).

6.    I have reviewed the methodology and assumptions employed by ALPA in developing the "GAP 2" formula for allocating the Note proceeds to United Airlines pilots who lost pension benefits as a result of the termination of the United Airlines Pilot Defined Benefit Pension Plan ("United Plan"). In my opinion, the GAP 2 distribution formula is unreasonable and inconsistent with standard pension actuarial principles and results in a significant and actuarially unsupportable bias in favor of younger pilots.

7.    Based on the materials that I have reviewed, the GAP 2 formula assumes that all pilots will continue to survive and stay actively employed as pilots at United until the airline industry's mandatory retirement age of 60. This assumption is unsound and inconsistent with standard actuarial principles because it fails to take into account the actual past experience of pilots at United, which demonstrates that that there will be significant turnover, early retirements, deaths, and disablements of pilots prior to the

mandatory retirement age of 60. It is standard actuarial practice to take into account such factors in determining how to fund a retirement plan like the United Plan over the years, and therefore the GAP 2 formula adopted by ALPA is inconsistent with a reasonable and actuarially-sound methodology. In my opinion, ALPA's failure to take into account and give appropriate weight to such factors makes its GAP 2 approach unreasonable and results in a significant and actuarially unsupportable diversion of pension funds from older pilots to younger pilots.

8.     The results of recent surveys conducted by the Wilson Center for Public Research, Inc. of airline pilots further show that it was unreasonable for ALPA to adopt a methodology that assumed that all current United pilots would continue to work as pilots for United until the age of 60. The attached Wilson Center survey was based on interviews of approximately 1000 current pilots. The survey, which states that it has a mathematical margin of error of no more than 5%, concludes that that since September 11, 2001, one-third of pilots under age 40 say they plan to leave the piloting profession before age 60. The survey further concludes that ALPA members in their 20s and 30s approach their job with "short time horizons" and have little expectation that their current job will be their life-long career.

9.     It is my further opinion that the equal weighting given by the GAP 2 formula to prospective "unearned" pensions based on a future uncertain salary and accrued and vested pensions based on a salary that already has been paid is inconsistent with the order of priority of beneficiaries required by ERISA for terminated pension plans. Section 4044 of ERISA requires plan administrators to allocate assets of terminated pension plans based first on benefits already accrued.

10.     Based on the affidavit filed by Russell Woody, Senior Benefits Counsel of ALPA, in *Hudson, et al. v. Air Line Pilots Association, International, et al.*, No. 07 CV 590 (N.D. Ill.), I understand that ALPA engaged Buck Consultants to provide actuarial consulting services to ALPA in connection with ALPA's decision to utilize the "GAP 2" allocation methodology. I further understand from Mr. Woody's affidavit that in this capacity Buck Consultants "prepared numerous reports, computations and projections for [ALPA's Retirement and Insurance Committee ("R&I Committee") and its United Airlines Master Executive Council ("MEC")], prepared detailed estimates of the benefits to be paid to United pilots by the Pension Benefit Guaranty corporation ("PBGC") and advised ALPA regarding the actuarial assumptions and other actuarial issues relating to allocation and distribution." I have been advised that these reports, computations, projections, detailed estimates, and other advice provided by Buck Consultants are not available to the Plaintiffs, and I have therefore not yet had an opportunity to review these important materials as well as other actuarial information and materials that ALPA may have used in deciding to utilize the "GAP 2" allocation methodology. Accordingly, I reserve the right to amend, supplement, and modify the conclusions contained in this report as additional information is made available.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  March 2, 2007

Gene W. Kalwarski, F.S.A.

# EXHIBIT 2

## IRREVOCABLE ALPA TRUST

This irrevocable trust agreement, dated July 25, 2006, (this or the "Trust Agreement") is by and between UAL Corporation, a Delaware corporation ("UAL"), United Air Lines, Inc., a Delaware corporation ("United"), and The Bank of New York, a New York bank corporation, as trustee (in such capacity, referred to in this Trust Agreement, together with its successors and assigns in such capacity, as the "Trustee") and approved by the Air Line Pilots Association, International ("ALPA") in its capacity as the collective bargaining representative of United's pilots. All references to the term "Trust" in this Trust Agreement, unless otherwise stated, shall refer to the irrevocable trust established by the terms of this Trust Agreement, which trust shall be named the "Irrevocable ALPA Trust." UAL and United are sometimes collectively referred to herein as the "Company."

WHEREAS, the Company and ALPA are parties to a Letter of Agreement dated January 1, 2005 (the "Bankruptcy Exit Agreement," attached hereto as Exhibit A);

WHEREAS, the Bankruptcy Exit Agreement and the plan of reorganization for the Company (the "Plan of Reorganization") provide that in the event that the United Air Lines Pilots' Defined Benefit Pension Plan is terminated, UAL shall issue Five Hundred and Fifty Million Dollars ($550,000,000.00) in original aggregate principal amount of convertible notes (the "Notes") and shall contribute such Notes to a trust for the benefit of certain current or former United pilots (the "Eligible Pilots");

WHEREAS, the United Air Lines Pilots' Defined Benefit Pension Plan has been terminated;

WHEREAS, UAL wishes to establish this Trust and to contribute to the Trust the Notes, subject to the claims of creditors in the event of Insolvency, as herein defined, until the Notes (or the proceeds realized upon sale of the Notes) are distributed to the Company for payment to or for the benefit of the Eligible Pilots, in such manner and at such times as specified in the Letter of Agreement (the "Letter Agreement"), attached hereto as Exhibit B, by and among the Company and ALPA dated the date hereof and Exhibit A thereto (the "Allocation Schedule");

WHEREAS, it is the intention of the parties that this Trust shall constitute for purposes of the Internal Revenue Code of 1986, as amended (the "Code") an unfunded arrangement for the benefit of Eligible Pilots;

WHEREAS, the benefit to be received by any Eligible Pilot shall be determined by ALPA, which benefit may be amended or modified by ALPA at any time prior to distribution of assets in the Trust to the Company for distribution to Eligible Pilots; and

WHEREAS, no Eligible Pilot has any claim or right to the assets in the Trust or any portion of such assets.

NOW, THEREFORE, the parties do hereby establish the Trust and agree that the Trust shall be comprised, held and disposed of by Trustee as provided in this Trust Agreement.

# ARTICLE 1
## Establishment of the Trust

1.1   Intent of Trust.   UAL hereby establishes the Trust and funds the Trust with the Notes prior to the sale of the Notes. The Trust shall sell the Notes to Goldman, Sachs, & Co. for $544.5 million under the terms of the purchase and sale agreement attached hereto as Exhibit C (the "Sale Transaction"). This amount, and all earnings on Trust assets, shall be held in trust, subject to the claims of the creditors of UAL and United in the event of Insolvency, as defined in Section 3.1 of this Trust Agreement, until (i) distributed for the payment of fees, expenses and taxes, (ii) distributed to the Company for payment to the Eligible Pilots, or (iii) forfeited to UAL because the Company will contribute an equal amount on behalf of Eligible Pilots to the United Air Lines Pilot Direct Account Plan (the "PDAP"), all in such manner and at such times as specified in the Letter Agreement and Article 2. The Trust is intended to be a grantor trust, of which UAL is the grantor, within the meaning of subpart E, part I, subchapter J, Chapter 1, subtitle A of the Code, and shall be construed accordingly.

1.2 Funding.   UAL shall fund the Trust by depositing with the Trustee the Notes. Such Notes, and the proceeds realized upon sale of such Notes, shall become the principal of the Trust to be held, administered and disposed of by the Trustee as provided in the Trust Agreement.

1.3 Irrevocability of Trust.   The Trust shall be irrevocable. Except as expressly provided in Articles 2 and 3, the Company shall have no right, title, or interest in the income or principal of the Trust.

1.4 Trust Principal and Earnings.   The principal of the Trust, and any earnings thereon, shall be held separate and apart from the funds of the Company and shall be used for the uses and purposes of the Eligible Pilots and general creditors as set forth in this Trust Agreement. Eligible Pilots shall have no claim on, or any beneficial ownership interest in, any assets of the Trust. Any rights created under the Bankruptcy Exit Agreement, the Plan of Reorganization, the Letter Agreement and this Trust Agreement shall be mere unsecured contractual rights against United and UAL. Any assets held by the Trust will be subject to the claims of the general creditors of United and UAL under federal and state law in the event of Insolvency, as defined in Section 3.1 of this Trust Agreement.

# ARTICLE 2
## Payments to Plan Participants and their Beneficiaries

2.1 Distribution of Trust Assets.   The assets of the Trust shall only be distributed (i) to pay the fees, costs and expenses of the Trustee incurred in administering the Trust (including the reasonable fees of its agents and counsel) following five (5) days notice to ALPA and the Company, (ii) to pay the fees and expenses of Athena Advisory Group, LLC upon written direction from ALPA to the Trustee, (iii) to pay the Company's portion of payroll taxes, if any, on the income generated by Trust assets and distributed as direct cash payments to Eligible Pilots ("Company Taxes"), (iv) to fund the Company's payments to Eligible Pilots (including any and

2

all withholding taxes with respect to such payments), in accordance with the Allocation Schedule, or (v) to forfeit funds to UAL provided that the Company contributes an equal amount of cash to the PDAP for the benefit of Eligible Pilots in accordance with the Allocation Schedule and directions provided to the Company by ALPA. Following consultation with the Company, ALPA will provide a written payment notice (a "Payment Notice") to the Company and the Trustee prior to 1:00 p.m., New York time, on the business day immediately preceding the date on which the Trustee is required to distribute funds to the Company for one of the purposes described in the preceding sentence. The Payment Notice shall specify the gross amount to be distributed to the Company by the Trustee (a "Distribution Amount"), the date by which such distribution should be made, and any relevant instructions for the funds. The Distribution Amount shall include (i) the aggregate amount to be paid directly to all Eligible Pilots (the "Pilot Payments"), (ii) the aggregate amount of all federal, state, FICA and local withholding taxes, if any, with respect to each Pilot Payment (collectively the "Withholding Tax Amount"), (iii) the Company Taxes, if any, and (iv) the aggregate amount deemed forfeited to UAL because the Company will contribute, in the aggregate, an amount equal thereto to the PDAP for the benefit of Eligible Pilots.

2.2 Holdback. At all times prior to the final determination of payments as described in Section 2.3, unless otherwise instructed in writing by ALPA (following consultation with the Company), the Trustee shall ensure that it has retained a holdback of cash in an aggregate amount equal to Thirty Million Dollars ($30,000,000.00) (the "Holdback Amount"). The Holdback Amount shall be used as a holdback until ALPA has determined that all Eligible Pilots have been identified and have received the distributions determined by ALPA.

2.3 Final Determination of Distributions; Termination. The identification of all Eligible Pilots, and the determination of the amounts payable to all Eligible Pilots, shall be determined by ALPA, subject to the Company's authority to determine the Withholding Tax Amount for each Eligible Pilot. The first to occur of February 25, 2007 or the complete distribution of the Trust assets in accordance with the Letter Agreement as in effect on the date hereof shall be the "Bookkeeping Close Date." Upon the Bookkeeping Close Date, following reasonable advance notice to the Company, and after the payment of all expenses associated with the Trust, including, without limitations, the fees, costs and expenses incurred by the Trustee in administering the Trust (including the reasonable fees of its agents and counsel), but no later than March 1, 2007, the Trust shall terminate and the Trustee shall distribute any remaining assets of the Trust, including all earnings on Trust assets, to the Company for the payment of all Taxes and for distribution to or for the benefit of the Eligible Pilots as directed by ALPA.

## ARTICLE 3
### Trustee Responsibility Regarding Payments when the Company Is Insolvent

3.1 Insolvency of UAL. The Trustee shall not make any distributions if either United or UAL is determined by the Trustee to be Insolvent under the terms of Section 3.3 below. United or UAL shall be considered "Insolvent" for purposes of this Trust Agreement if (i) such company is unable to pay its debts as they become due, or (ii) such company is subject to a pending proceeding as a debtor under the United States Bankruptcy Code (each, an "Insolvency").

3

3.2 <u>Change of Control of UAL</u>.  In the event of a Change of Control of UAL, the successor entity shall inure to UAL's rights and obligations under the Trust.  A Change of Control shall be defined as any of the following:

(i)     <u>Change in Ownership of UAL</u>.  Any one Person, or more than one Person Acting as a Group, acquires ownership of stock that, together with stock held by such Person or Group, constitutes more than 50% of the total fair market value or total voting power of the stock of UAL.  Notwithstanding the foregoing, for purposes of this paragraph, if any one Person, or more than one Person Acting as a Group, is considered to own more than 50% of the total fair market value or total voting power of the stock, the acquisition of additional stock by the same Person or Persons is not considered to cause a Change in Control.

(ii)    <u>Change in Effective Control</u>.

(A)     Any one Person, or more than one Person Acting as a Group, acquires (or has acquired during the 12-month period ending on the date of the most recent acquisition by such Person or Persons) ownership of stock of UAL possessing 35% or more of the total voting power of the stock of UAL; or

(B)     A majority of the members of UAL's Board of Directors is replaced during any 12-month period by directors whose appointment or election is not endorsed by a majority of the members of UAL's Board of Directors before the date of the appointment or election.

Notwithstanding the foregoing, for purposes of this paragraph, if any one Person, or more than one Person Acting as a Group, is considered to effectively control UAL, the acquisition of additional control of UAL by the same Person or Persons is not considered to cause a Change in Control.

(iii)   <u>Change in Ownership of a Substantial Portion of Assets</u>.  Any one Person, or more than one Person Acting as a Group, acquires (or has acquired during the 12-month period ending on the date of the most recent acquisition by such Person or Persons) assets from UAL that have a total gross fair market value equal to or more than 40% of the total gross fair market value of all of the assets of UAL (including capital stock of United) immediately prior to such acquisition or acquisitions.  For purposes of this paragraph, "gross fair market value" means the value of the assets of UAL, or the value of the assets being disposed of, determined without regard to any liabilities associated with such assets.  Notwithstanding the foregoing, a transfer of assets by UAL is not treated as a Change in Control if the assets are transferred to:

(A)     a shareholder of UAL (immediately before the asset transfer) in exchange for or with respect to its stock;

(B)     an entity, 50% or more of the total value or voting power of which is owned, directly or indirectly, by UAL;

4

(C)    a Person, or more than one Person Acting as a Group, that owns, directly or indirectly, 50% or more of the total value or voting power of all the outstanding stock of UAL; or

(D)    an entity, at least 50% of the total value or voting power of which is owned, directly or indirectly, by a Person, or more than one Person Acting as a Group, that owns, directly or indirectly, 50% or more of the total value or voting power of all the outstanding stock of UAL.

(iv)    "Person" and "Acting as a Group"

(A)    For purposes of this Section, "Person" shall have the meaning set forth in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended.

(B)    For purposes of this Section, Persons will be considered to be "Acting as a Group" if they are owners of a corporation that enters into a merger, consolidation, purchase or acquisition of stock or assets, or similar business transaction with UAL. If a Person, including an entity, owns stock in both corporations that enter into a merger, consolidation, purchase or acquisition of stock or assets, or similar transaction, such shareholder is considered to be Acting as a Group with other shareholders in a corporation prior to the transaction giving rise to the change and not with respect to the ownership interest in the other corporation. Notwithstanding the foregoing, Persons will not be considered to be Acting as a Group solely because they purchase or own stock or assets of the same corporation at the same time, or as a result of the same public offering.

3.3 Principal and Income Subject to Claims of Creditors.    At all times during the continuance of this Trust, as provided in Section 1.4 hereof, the principal and income of the Trust shall be subject to claims of the general creditors of United and UAL under federal and state law in the event of Insolvency as set forth below in this Section 3.3. The Company shall be deemed to be Insolvent for all purposes of this Trust Agreement only if the Trustee has actual knowledge of either UAL's or United's Insolvency or the Trustee has received written notice from the chief executive officer or chief financial officer of UAL or United that either entity is Insolvent.

(a) Duty to Inform.    The chief executive officer of UAL shall have the duty to inform the Trustee in writing of the Insolvency of United or UAL. Unless the Trustee has actual knowledge that either UAL or United is Insolvent, if a person claiming to be a creditor of either United or UAL alleges in writing to the Trustee that either company has become Insolvent, the Trustee shall request that the chief executive officer of UAL inform the Trustee in writing whether or not either United or UAL is Insolvent, and the chief executive officer of UAL shall promptly respond in writing to such request.

(b) No Duty to Inquire.    Unless the Trustee has actual knowledge of the Insolvency of United or UAL, or has received written notice from the chief executive officer or chief financial officer of United or UAL that either entity is Insolvent, the Trustee shall have no duty to inquire whether United or UAL is Insolvent. In the absence of actual knowledge on the

5

part of the Trustee of such Insolvency, the Trustee may in all events rely on such evidence concerning United's and UAL's solvency or Insolvency as may be furnished to the Trustee by UAL to make a determination concerning United's or UAL's solvency or Insolvency and such conclusion on the part of the Trustee shall be deemed binding and conclusive.

(c) <u>Discontinuance of Payments</u>.  If at any time the Trustee has determined that United or UAL is Insolvent under this Section 3.3, the Trustee shall not make any distributions from the Trust and shall hold the assets of the Trust for the benefit of the general creditors of United and UAL unless and until the Trustee determines that both UAL and United are no longer Insolvent pursuant to paragraph (d) of this Section 3.3.

(d) <u>Resumption of Payments</u>.   In the event the Trustee discontinues payments under paragraph 3.3(c) above, the Trustee shall periodically request a written statement from the chief executive officer of UAL stating whether UAL or United remains Insolvent. In the absence of actual knowledge on the part of the Trustee of such Insolvency, the Trustee may rely on such statement by UAL in determining whether UAL or United remains Insolvent and such determination by the Trustee shall be deemed binding and conclusive.  The Trustee shall resume distributions in accordance with Section 2.1 of this Trust Agreement only after the Trustee has determined that United and UAL are not Insolvent (or are no longer Insolvent) under this paragraph.

3.4 <u>Sufficiency of Trust Assets</u>.  Provided that there are sufficient assets, if the Trustee discontinues distributions pursuant to Section 3.3 of this Trust Agreement and subsequently resumes such distributions, the first distribution following such discontinuance shall include the aggregate amount of all distributions due the Company pursuant to a Payment Notice.

3.5 <u>Payments to Trustee During Insolvency</u>.  Notwithstanding anything herein to the contrary, during any period in which or any time at which UAL or United is determined to be Insolvent as provided herein, the Trustee shall be entitled to payment and reimbursement from the Trust assets for the fees, costs and expenses incurred by the Trustee in administering the Trust (including the reasonable fees of its agents and counsel) that would otherwise be payable to the Trustee were UAL or United not Insolvent.

<div align="center">

**ARTICLE 4**
**Payments to Company**

</div>

Except as provided in Articles 2 and 3 hereof, the Company shall have no right or power to direct Trustee to return to the Company or divert to others any of the Trust assets.

<div align="center">

**ARTICLE 5**
**General Trustee Provisions**

</div>

5.1 <u>Resignation of a Trustee</u>.  A Trustee may resign at any time by written notice to the Company and ALPA, which resignation shall be effective twenty (20) days after receipt of such notice unless the Company, ALPA and the Trustee otherwise agree; provided, however, that the Trustee may resign at any time if the Trustee concludes, in its reasonable judgment, that compliance with a direction submitted to the Trustee under the terms of this Trust Agreement

<div align="center">6</div>

UAL_ALPA Grantor Trust_(11227690_12).DOC

would subject the Trustee to financial liability which, in the Trustee's reasonable judgment, is not adequately indemnified by the Trust, and such resignation shall be effective immediately upon such notice and such notice shall relieve the Trustee of any obligation to exercise any of the rights, powers or duties vested in it by the Trust Agreement at the request or direction of any party hereto or ALPA. The Trustee's death or incapacity which prevents the Trustee from performing his duties hereunder shall be deemed a resignation as of the date of death or incapacity. ALPA shall determine if the Trustee is incapacitated, subject to the reasonable approval of the Company.

5.2 Replacement of Trustees.

(a) If the Trustee resigns, a successor shall be appointed, in accordance with Article 5 hereof, by the effective date of resignation or as soon thereafter as is reasonably practicable. If no appointment has been made, the Trustee may apply to a court of competent jurisdiction for appointment of a successor or for instructions. All expenses of the Trustee in connection with the proceeding shall be paid from the assets of the Trust.

(b) If a Trustee submits a notice of resignation, ALPA may, in its reasonable judgment, appoint any third party, such as a bank trust department or other party that may be granted corporate trustee powers under state law, as a successor to replace the Trustee upon the effective date of the Trustee's resignation; provided, however, that if ALPA fails to appoint a successor trustee within ten (10) calendar days after the date the Trustee submits a notice of resignation, the Company shall have the right to appoint a successor trustee. The appointment shall be effective when accepted in writing by the new Trustee, who shall have all the rights and powers of the former Trustee. The former Trustee shall execute any instrument necessary or reasonably requested by ALPA, the Company or the successor Trustee to evidence the transfer.

5.3 Successor Trustee Liability. The successor Trustee need not examine the records and acts of any prior Trustee and may retain or dispose of existing Trust assets, subject to Article 6 hereof. The successor Trustee shall not be responsible for any claim or liability resulting from any action or inaction of any prior Trustee or from any other past event, or any condition existing at the time it becomes a successor Trustee.

5.4 Transfer of Assets. Upon resignation of the Trustee and appointment of a successor Trustee, all assets shall be subsequently transferred to the successor Trustee. The transfer shall be completed within thirty days after the effective date of resignation, unless the Company and ALPA jointly extend the time limit.

5.5 Accountings. The Trustee shall keep accurate and detailed records of all investments, receipts, disbursements, and all other transactions, including such specific records as shall be agreed upon in writing between the Company, ALPA and the Trustee. Within thirty (30) days after (i) the end of each calendar year, (ii) the resignation of the Trustee, and (iii) termination of the Trust, the Trustee shall deliver to the Company and ALPA a written account of its administration of the Trust during the duration of the Trust or the term of the Trustee, as applicable, setting forth all investments, receipts, disbursements, and other transactions effected by the Trustee, including a description of all securities and investments purchased and sold with the cost or net proceeds of such purchases or sales (accrued interest paid or receivable being

7

shown separately), and showing all cash, securities, and other property held in the Trust at the termination of the Trust or as of the date of resignation, as the case may be.

5.6 Certain Duties and Responsibilities.

(a)  The Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Trust Agreement, and no implied covenants or obligations shall be read into this Trust Agreement against the Trustee; and, in the absence of gross negligence or willful misconduct on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon statements or directions furnished to the Trustee and conforming to the requirements of this Trust Agreement; but in the case of any such statements or directions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they conform to the requirements of this Trust Agreement.

(b)  For all purposes of this Trust Agreement, any application, request or direction on the part of ALPA to the Trustee to do, perform or take any act, or omit to take any act, shall be deemed to be appropriately given under the terms of this Trust Agreement if such application, request or direction is in writing, sent to the Trustee per the notice provisions set forth in Section 7.7, and signed by both of Duane Woerth, the President of the ALPA and Mark Bathurst, the Chairman of the United Master Executive Council of ALPA, or their successors duly elected in accordance with ALPA's Constitution and By-Laws.

(c)  No provision of this Trust Agreement shall be construed to relieve the Trustee from liability for its own gross negligent action, its own gross negligent failure to act, or its own willful misconduct, except that the Trustee shall not be liable for any error of judgment made in good faith by a responsible officer, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts; and

(d)  No provision of this Trust Agreement shall require the Trustee to expend its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

## ARTICLE 6
### The Trustee's Powers

6.1 General Powers.  The Trustee shall have, without exclusion, all powers conferred on Trustees by applicable law, unless expressly provided otherwise herein, provided, however, that if an insurance policy is held as an asset of the Trust, the Trustee shall have no power to name a beneficiary of the policy other than the Trust, to assign the policy (as distinct from conversion of the policy to a different form) other than to a successor Trustee, or to lend to any person the proceeds of any borrowing against such policy. Notwithstanding any powers granted to the Trustee pursuant to this Trust Agreement or to applicable law, the Trustee shall not have any power that could give this Trust the objective of carrying on a business and dividing the gains

therefrom, within the meaning of section 301.7701-2 of the Procedure and Administrative Regulations promulgated pursuant to the Code.

6.2 Compensation. All fees and expenses of the Trustee shall be paid from the Trust as administrative expenses of the Trust, including, as necessary, out of the Holdback Amount.

6.3 Compromise and Settlement. The Trustee may compromise, settle, or adjust any claim or demand by or against the Trust and may agree to any rescission or modification of any contract or agreement to which the Trust is a party, provided that no such compromise, settlement, or adjustment may be inconsistent with this Trust Agreement or the Letter Agreement.

6.4 Sale Transaction. The Trustee shall execute all documents, and undertake all actions, necessary to complete the Sale Transaction. The Trustee shall have no obligation, discretion, authority or power to review, assess or revise the Sale Transaction or to take any action with respect to the Notes other than the completion of the Sale Transaction.

6.5 Investment Powers in General. The Trustee may only invest and reinvest Trust assets in any combination of the following investments:

(a) Marketable obligations of, or fully and directly guaranteed by, the United States, which obligations have a maturity of not more than ninety (90) days; and

(b) Money market funds registered under the Investment Company Act of 1940, as amended from time to time, the portfolios of which are limited to Government Securities (as defined therein).

6.6 Disposition of Income. During the term of this Trust, all income received by the Trust, net of all fees and expenses paid by the Trust, shall be accumulated, reinvested and distributed in accordance with Article 2 of the Trust.

6.7 No Investment in Company Securities. In no event may the Trustee invest in securities (including stock or rights to acquire stock) issued by the Company, other than de minimis amounts held in common investment vehicles in which the Trustee invests. All rights associated with assets of the Trust shall be exercised by the Trustee or the person designated by the Trustee, and shall in no event be exercisable by or rest with the Eligible Pilots.

6.8 Use of Advisors. The Trustee may consult with legal counsel and financial consultants (who may also be counsel or consultants to the Company or ALPA generally) with respect to any of its duties or obligations under this Trust Agreement. The Trustee may retain agents, accountants, actuaries, investment advisors, financial consultants, or other professionals to assist it in performing any of its duties or obligations under this Trust Agreement, and all reasonable fees and expenses of such professionals shall be paid from the assets of the Trust.

6.9 Indemnification. The Trust from its own assets shall indemnify and hold harmless the Trustee, its agents, employees, counsel, financial advisors and representatives (each, an "Indemnified Person") from any and all losses, damages, fines, penalties, taxes, expenses, claims, lawsuits, or administrative charges of any sort whatsoever (including reasonable

<center>9</center>

attorney's fees and costs arising in connection with the investigation and defense of any such matter) relating to, concerning or connected with the administration or implementation of this Trust Agreement (any such event, a "Claim"), except to the extent that a Claim against an Indemnified Person is finally determined by a court of competent jurisdiction to have resulted from the gross negligence, fraud or willful misconduct of such Indemnified Person.

### ARTICLE 7
### Definitions and General Provisions

7.1 Amendment.  This Trust Agreement may only be amended by a written instrument executed by the Trustee and the Company, and approved in writing by ALPA.

7.2 Prohibited Law.  Any provision of this Trust Agreement prohibited by law shall be ineffective to the extent of any such prohibition without invalidating the remaining provisions of this Trust Agreement.

7.3 Spendthrift Clause.  Any beneficial interest under this Trust Agreement, if any, may not be anticipated, assigned (either at law or in equity), alienated, pledged, or encumbered by an Eligible Pilot or any other person.  For the avoidance of doubt, this provision shall not be construed to prohibit the payment of Trust assets through the Company to the estate of an Eligible Pilot or other designated beneficiary who dies prior to a distribution hereunder.

7.4 Rules of Interpretation.  Unless the context requires otherwise, words denoting the singular may be construed as denoting the plural, and words of the plural may be construed as denoting the singular.  Words of one gender may be construed as denoting that gender or the other gender as is appropriate within such context.

7.5 Consultation.  Whenever an action by ALPA requires prior consultation between ALPA and the Company, such requirement shall be deemed fulfilled if (i) the parties agree that consultation has concluded or (ii) ALPA has provided the Company with written notice and five (5) business days to consult with ALPA concerning the matter under consultation before issuing directions to the Trustee.  The Trustee shall have no power, responsibility or obligation to inquire into the nature of such consultation.

7.6 Beneficiary Designation.  In the event of an Eligible Pilot's death prior to the distribution of Trust assets under the Trust, the funds that would have been otherwise payable to the Eligible Pilot through the Company shall be payable by the Company to the Eligible Pilot's estate or other designated beneficiary.

7.7 Notices.  Any notice or other communication given under the terms of this Trust Agreement must be in writing and shall be deemed to have been duly given on the day it is delivered by hand, on the day it is sent by facsimile with confirmation of receipt by the transmitting machine, on the business day after it is sent by a national overnight mail service (delivery charge prepaid), or on the third business day after it is mailed first class, postage prepaid, in any case to the following addresses:

10

| | |
|---|---|
| If to the Trustee: | The Bank of New York<br>Corporate Trust Division<br>101 Barclay Street – Floor 8W<br>New York, New York 10286<br>Attention: Jeremy Finkelstein<br>Facsimile: 212-815-5704 |
| with copies to: | McDermott Will & Emery LLP<br>227 West Monroe Street, Suite 4400<br>Chicago, Illinois 60606<br>Attention: Michael L. Boykins, Esq.<br>Facsimile: 312-984-7700 |
| If to United or UAL: | UAL Corporation<br>United Air Lines, Inc.<br>1200 East Algonquin Road<br>Elk Grove Township, Illinois 60007<br>Attention: Treasurer<br>Facsimile: 847-700-4099 |
| with copies to: | Kirkland & Ellis LLP<br>200 East Randolph Drive<br>Chicago, Illinois 60601<br>Attention: R. Scott Falk, P.C.<br>Facsimile: 312-861-2200 |
| If to ALPA: | United Master Executive Council<br>Air Line Pilots Association, International<br>9550 West Higgins Road, Suite 1000<br>Rosemont, Illinois 60018<br>Attention: Master Chairman<br>Facsimile: 847-292-1777 |
| with copies to: | Cohen, Weiss and Simon, LLP<br>330 West 42nd Street<br>25th Floor<br>New York, New York 10036<br>Attention: Babette Ceccotti, Esq.<br>Facsimile: 212-695-5436 |

or to such other address or to such other person as any party shall have last designated by written notice provided to the other parties in the manner set forth in this paragraph.

   7.8 Headings of Articles, Sections, and Paragraphs.  The headings of articles, sections, and paragraphs used within this agreement are included solely for the convenience and reference

11

of the reader. They shall have no significance in the interpretation or construction of this agreement.

7.9 <u>Applicable State Law</u>.   The Trust Agreement shall be governed by the laws of the State of Delaware without regard to that state's choice of law doctrine.

7.10    <u>Effective Date</u>.  The effective date of this Trust Agreement shall be July 25, 2006.

UAL_ALPA Grantor Trust_(11227690_12).DOC

UAL CORPORATION

By: _____

Name: Frederic F. Brace
Its:    Executive Vice President and Chief
      Financial Officer


UNITED AIR LINES, INC.

By: _____

Name: Frederic F. Brace
Its:    Executive Vice President and Chief
      Financial Officer


THE BANK OF NEW YORK, not in its
individual capacity but solely as Trustee
of the Trust

By: _____

Name: Jeremy Finkelstein
Its:    Authorized Signatory


13

[1220490_7].DOC

UAL CORPORATION

By: _____

Name: Frederic F. Brace
Its:   Executive Vice President and Chief
       Financial Officer


UNITED AIR LINES, INC.

By: _____

Name: Frederic F. Brace
Its:   Executive Vice President and Chief
       Financial Officer


THE BANK OF NEW YORK, not in its
individual capacity but solely as Trustee
of the Trust

By: _____

Name: Jeremy Finkelstein
Its:   Authorized Signatory

13

# EXHIBIT 3



Lynn Hughitt
*Vice President   Compensation & Benefits*

# ✈ U N I T E D

A STAR ALLIANCE MEMBER ✧

July 18, 2006

Dear Colleague:

As part of United's Plan of Reorganization, many employees will be receiving cash proceeds from the sale of what are known as convertible notes. These notes, approved by the Bankruptcy Court, partially offset the retirement benefits that active employees lost when United's pension plans were terminated and replaced.   They are unrelated to the equity grants that nearly all employees received earlier this year in recognition of the reductions in wages and benefits agreed to as part of the 1113 process of our Chapter 11 restructuring.

In ALPA's case, the $550 million face amount of convertible notes will be sold and the proceeds of the sale will be distributed to eligible participants. The ALPA R & I Committee has developed a website created for the purpose of providing you with the information, data and methodology that was used to calculate your individual convertible note allocation.

The formula used to determine the allocation for ALPA was discussed and approved by the United MEC in January 2006. Eligible participants include those who were on the United Pilots Seniority list as of January 1, 2005. Pilots can view their estimated individual allocation at https://www.ualpilots.org/mynoteallocation. Allocation among the eligible participants will be based on a pilot's projected A-Plan benefit to age 60 considering recoveries from the PBGC and C-Plan. The actual amounts allocated will depend on the demographics of the eligible members and the final proceeds from the sale of the convertible notes. Other ALPA restrictions may apply.

Enclosed is a brief set of questions and answers that provides a general overview of convertible notes, timing of the distribution(s), depositing funds into PDAP accounts and other process-related issues. Information is also available on a new "Notes Proceeds" page on SkyNet. In addition, we will continue to keep you updated via NewsReal and SkyNet as more information becomes available.

Once again, specific questions about ALPA's eligibility requirements or allocation methodology should be directed to https://www.ualpilots.org/mynoteallocation.

Sincerely,

*Lynn Hughitt*

Lynn Hughitt
Vice President – Compensation & Benefits

World Headquarters  1200 East Algonquin Road  Elk Grove Township, Illinois 60007  Mailing Address: Box 66100, Chicago, Illinois 60666

*The following Q+A provides a general overview of convertible notes allocations, including what they are, why are they being issued, to whom they will be allocated, when they will be distributed and how much each eligible employee group is likely to receive.*

### What are convertible notes?  Why are they being issued?

Convertible notes are financial securities that can be converted into UAL stock at a designated conversion price. UAL Corporation is issuing convertible notes to each union group and Salaried and Management (SAM) employees as part of its Plan of Reorganization and to comply with the most recent round of labor agreements. These notes, approved by the Bankruptcy Court, partially offset the retirement benefits that active employees lost when United's pension plans were terminated and replaced.

### What will eligible employees receive?

Each union's leadership (and United senior management on behalf of SAM employees) has decided to sell their notes to the general financial community and distribute the cash proceeds to eligible employees.

Each union determined its own formula for allocating the cash proceeds to the employees it represents. The formula was set by the leadership of each labor group and, where required, approved by the labor group's membership during the ratification process. SAM's allocation formula was determined by United senior management. The amount of the notes as well as the allocation formula adopted by each group were designed to take into account part of the relative loss employees incurred due to the termination and replacement of their pension plans.

### When will the notes be issued?  When will employees receive the cash proceeds?

The notes will be issued by UAL on or before August 1, 2006 and will be sold shortly after issuance. Most of the cash proceeds will be distributed to employees – or contributed to their 401(k) or Pilot Directed Account Plan (PDAP) accounts – on or about August 15, 2006. Until the distributions are made, proceeds from the notes sales will be held in trusts for the benefit of individual employee groups.

Some unions (and United senior management for SAM employees) may opt to hold back a small percentage of the proceeds as a contingency reserve. Any remaining proceeds would be distributed at a later date, once the initial allocation has been completed successfully, but no later than March 15, 2007.

July 2006

**Which employee groups will be receiving notes?  How much will these groups be receiving?**

As outlined in United's Plan of Reorganization and approved by the Bankruptcy Court, convertible notes are being allocated as follows:

- APA -- $20 million
- ALPA -- $550 million
- AMFA -- $40 million
- IAM -- $60 million

- PAFCA -- $400,000
- SAM -- $56 million
- TWU -- $24,000

**How was it determined which employee groups would receive convertible notes?**

Notes allocations for applicable groups of represented employees were agreed to as part of the individual unions' latest collective bargaining agreements.  The company made the decision to provide notes to SAM employees, reflecting the similar termination and replacement of their pension plan.  The allocation of notes also was approved by the Bankruptcy Court as part of United's Plan of Reorganization.

**Why will the amounts that various employee groups receive vary so widely?**

The notes allocations for each labor group were determined by the company and the unions as part of negotiations that led to the most recent collective bargaining agreements.  The specific amounts for each employee group were approved by the Bankruptcy Court as part of United's Plan of Reorganization.

**Among the employee groups that will be receiving notes, which specific represented employees are eligible for an allocation?  Who set the eligibility requirements?**

Eligibility requirements for each employee group were set by the leadership of that group and, where required, approved by the union's membership during the ratification process.  Basic eligibility information is available in the letter that accompanies this document.  Questions about specific eligibility requirements should be directed to representatives of your labor group.

**Are any retirees, furloughees or other former employees eligible for notes?**

Each employee group's leadership addressed this question when they developed their allocation formula.  As a result, eligibility requirements vary among the employee groups.

**How will the cash proceeds of the notes be distributed?  Will this process involve employees' 401(k)/PDAP accounts, like the equity distribution process?**

As with the equity distribution process, each employee group is deciding whether or not it wishes to have United contribute the cash proceeds into employee 401(k) or Pilot Directed Account Plan (PDAP) accounts to the extent permissible under law.  Any funds in excess of 2006 401(k)/PDAP legal limits will be distributed directly to employees, as will proceeds due to members of any employee groups that decide not to utilize 401(k)/PDAP accounts for distributions.  Some employee groups are considering deferring a portion of each employee's distribution in excess of 2006 401(k)/PDAP limits until a contribution can be made in 2007 in order to defer or further minimize taxes.

Any direct distributions will occur through the normal payroll process as a taxable event. More information on this process will be available once the final decisions are made in the coming weeks.

**How do I know if my employee group is among those opting to deposit proceeds directly into 401(k)/PDAP accounts?**

The leadership of each employee group is communicating this information directly to its members. For SAM employees, the information will be available on SkyNet. Other employees should look to their union's website or contact their leadership if they have further questions.

**If I am a pilot and ALPA opts to deposit note proceeds into the PDAP, where will my proceeds be deposited?**

In this case, your cash proceeds will be deposited into the PDAP as a C-Plan Contribution. Your proceeds will be invested based upon the current C-Plan election you have on file. You may go online or contact the PDAP Service center between 0700-1900 CST on business days to change your C-Plan election. Additional information is available on the PDAP website at http://resources.hewitt.com/pdap or through the PDAP Service Center at 866-OUR-PDAP (866-687-7327).

**If I am not a pilot and my employee group is among those opting to deposit proceeds into 401(k) accounts, in which Fidelity fund will my proceeds be deposited?**

Your cash proceeds will be deposited into one of the Vanguard Lifecycle funds based on your age unless you choose to direct the deposit to a different fund. Additional information will be forthcoming from Fidelity closer to the distribution date describing when and how you can make this change. At that time, you will be able to make the election yourself on the internet at www.401k.com or you may call Fidelity directly at 800-245-9034 (or call collect from outside the U.S. at 508-787-9902).

**How much will the notes be worth to individual recipients?**

The ultimate value of the notes to each eligible employee will be determined by four primary factors:

- The total value of notes for your employee group;
- The formula used by each employee group to determine how much of the proceeds from the sale of the notes will be allocated to each eligible individual;
- The applicable tax rate for any direct (non-401(k) or PDAP) distributions of the proceeds; and
- Transaction costs — the costs associated with selling the notes and administering the transaction, which will be paid for from the proceeds from the sale of the notes.

Basic information about the allocation formula for your employee group is included in your letter. United will continue to keep employees informed via SkyNet, NewsReal and mail to their homes.

**Will employees be receiving the cash proceeds from the notes all at once?**

Not necessarily. Some employee groups have decided to hold back a portion of the proceeds as a contingency reserve to permit correction of any allocation errors in the original distribution or other unforeseen problems. Other employee groups are still evaluating the question. In addition, some

employee groups are considering deferring a portion of each employee's distribution in excess of 2006 401(k)/PDAP limits until a contribution can be made in 2007 in order to defer or further minimize taxes. Any cash proceeds held back as a contingency reserve or for 2007 401(k)/PDAP purposes would reside in a trust for each union group until the union's leadership is ready to proceed with a final distribution.

Tax requirements necessitate that all proceeds be distributed from the trusts to employees by March 15, 2007.

**Are these notes related in any way to the equity that most employees received after United emerged from bankruptcy?**

No, the notes are different from the recent equity distributions. As outlined in the company's Plan of Reorganization, the notes allocations are linked primarily to the termination and replacement of the company's defined benefit pension plans. Equity grants, on the other hand, reflect the new work rules and significant reductions in wages and benefits agreed to as part of the 1113 process of United's Chapter 11 restructuring.

**Will the allocation of the convertible notes affect the allocation of equity that I received earlier or that I might receive in the future?**

No.

**Do I need to take any special action at this time to receive any cash proceeds from the sale of these notes for which I may be eligible?**

No special action is needed to receive the proceeds from the sale of these notes. United will keep you informed of the process as the distribution date draws closer.

**Will employees have to pay taxes on the cash proceeds from the sale of the notes?**

Yes, if you receive a direct distribution of the cash proceeds. However, income taxes will be deferred -- and FICA taxes avoided -- on the portion of the distribution deposited into your 401(k)/PDAP account should your employee group's leadership elect to have the distribution made (to the extent possible) as a company contribution to your plan. Any 401(k)/PDAP contributions are governed by annual contribution limits established by the Internal Revenue Code. Any amounts not contributed to a 401(k)/PDAP account will be distributed directly through the payroll process and will be subject to applicable tax withholding.

**When will I be receiving more information?**

United will be providing additional updates on a special Notes Proceeds section of SkyNet and in NewsReal as more information becomes available. The company will also be mailing each eligible employee a detailed statement with the specifics of his or her allocation once the notes proceeds have been distributed. In addition, a call center for employee questions will be available in August.

Questions about eligibility requirements and allocation methodology for union-represented employees should be directed to the respective unions.

# UNITED

**EXHIBIT 4**

**Continuing Education Regarding**
**Convertible Note Allocation**
**MEC R & I Committee**

IMPORTANT NOTE!

**Any identification of data issues or other omissions must be brought to the**
**Committees attention, in writing no later than December 31, 2006.**
**Contact the R & I Committee at UALMECRI@alpa.org**

Distribution of the Convertible Note proceeds has now begun. In an effort to provide further information about the Convertible Notes, your MEC passed the following resolution at the July 2006 MEC meeting:

*"BE IT RESOLVED, that the MEC directs the Retirement & Insurance Committee to enact a renewed education effort for the pilot group to include, but not be limited to:*

> *an explanation of the original concept of the Notes allocation as presented during the ratification process for the 2005 exit agreement*

> *a simplified summary of the "building blocks" that make up a pilot's individual allocation*

> *an explanation of the variability of the amounts in the final allocation method"*

Your R & I Committee provides this document as additional education regarding the Note allocation methodology. We also encourage you to utilize this document and the following resources for further study of your individual allocation:

> Gap allocation website at https://www.ualpilots.org/myNoteallocation

> The "Gap Specifications" resources document on the MEC website

> The "PDAP Top-Off Taxable Remainder Qs & As" on the MEC website

> Convertible Notes Statement – provided by United

> R & I Memo dated 8/25/06 – RE: Note Allocation Issues

> MEC Representatives, LEC R & I Committees and the MEC R & I Committee structures are available as a resource to address Note allocation and distribution questions.

### Original Concepts of the Note Allocation

At the Bankruptcy Exit Agreement road shows in December 2004, pilots were told:

> ➤ Under the Agreement, all distribution mechanics, including eligibility and allocation among eligible pilots, would be determined by the MEC
>
> ➤ Subject to further MEC review and decision, the Note proceeds would be allocated by the MEC in a manner that took into account active pilot losses from the terminated A-Plan pension;
>
> ➤ Some, but not all, of the pension losses suffered by active pilots would be offset by PBGC payments and by future C-Plan contributions; and
>
> ➤ The pension losses suffered by active pilots includes two elements: losses of benefits attributable to service up to the date of A-Plan termination and losses of expected benefits attributable to pilot service over the rest of their careers

Beginning with its January 2005 meeting, after the Bankruptcy Exit Agreement was ratified by the pilot group, the MEC began exploring several allocation techniques suggested by the R&I Committee. By the fall of 2005, the MEC had narrowed the techniques under consideration to three: the "Gap 1" method, the "PLSA method" and the "Gap 2" method.

The "Gap 1" method was an allocation technique which would have considered only those losses on termination of the A Plan attributable to loss of benefits accrued prior to Plan termination, measured by the amount of pilots' accrued benefits as of the date of termination, minus the amount pilots would receive from the PBGC. Gap 1 ignored losses of benefits pilots would have accrued in the future, based on their service after Plan termination, and also ignored the value of pilots' post-termination C Plan benefits.

The "PLSA method" was a technique which would have allocated the Note proceeds in proportion to pilots' Partial Lump Sum entitlements under the A Plan. This methodology was a simplified proxy for the Gap 1 method in the sense that it would have based allocations on benefits attributable to service in the past, up to the date of plan termination.

The "Gap 2" method was an allocation technique that attempted to take into account both the loss of benefits accrued up to the date of Plan termination as well as the loss of benefits that would have accrued in the future had the Plan not been terminated, taking into account expected payments from the PBGC and the projected value of future C Plan contributions.

At its October 2005 meeting, after the latest in a series of detailed presentations from the R&I Committee and its actuarial and legal advisors, the MEC eliminated the "Gap 1" and "PLSA" methods from further consideration and directed a working group, consisting of

the R&I Committee and four MEC members to refine the Gap 2 methodology for consideration by the MEC. On January 18, 2006, the MEC formally adopted the Gap 2 method, thereafter referred to simply as the "Gap method", as the basis for allocation of the Note proceeds.

### Overview of the Gap Allocation Methodology

The Gap Allocation Methodology (previously called the "Gap 2 methodology") allocates the Convertible Note proceeds among eligible pilots in proportion to their losses on termination of the A-Plan, taking into account both:

    (a) The benefits already accrued as of the date the Plan terminated (called the "DOPT"); and

    (b) The additional benefits pilots could reasonably have expected to earn between DOPT and their age-60 normal retirement date if the A-Plan had survived.

For purposes of the Gap Methodology, a pilot's loss—the "Gap" in the "Gap Methodology"—is the difference between his total projected A Plan benefit (a + b), *minus* the smaller amount the pilot can actually expect to receive with the terminated A Plan from two sources: (*i*) PBGC payments; and (*ii*) projected C-Plan contributions between June 2005 and age 60 (including projected investment earnings on those contributions during that period). Putting it another way, the Gap Allocation Method has the following building blocks that determine every pilot's distribution amounts:

- Your A-Plan benefit projected to age 60, assuming a "normal" career, computed as if the A-Plan had not terminated

- Your estimated PBGC Payout

- Future Value of your projected C fund contributions (including accumulated investment earnings) to age 60

- Your Note Allocation proceeds

To build this recovery model, we first identify a target. Simply stated, we utilized our best actuarial resources to estimate your projected A-Plan benefit at normal retirement (age 60), ignoring the termination of the Plan, and using the A Plan benefit formula:

    Years of Participation *x* Final Average Earnings *x* Multiplier

3

Having projected the pilot's A-Plan benefit, we then determine the pilot's gap/loss by considering recoveries which include other sources of retirement income made available through C-Plan benefits and PBGC payments:

<div align="center">

Projected A-Plan Benefit
*Minus*
C-Plan Benefit (Annuitized)
*Minus*
PBGC Benefit (Annuitized)
*Equals*
GAP

</div>

We also make adjustments for any PLSA (and its effect on the PGBC guarantee) or other withdrawals from the Plan, as well as benefits accrued in other non-pilot plans, such as pilots who were previously hired as mechanics, flight attendants, etc.

Finally, the net Note proceeds are allocated among eligible pilots in proportion to their respective gap losses. Under the Gap Allocation Methodology, each pilot's share of the Note proceeds will enable the pilot to recover a percentage of his or her gap loss which is, as nearly as possible, equal to the recovery percentage provided to all other pilots. The final recovery percentage will not be known until the correction process is completed and all the Note proceeds have been distributed, but we currently expect it will be approximately 41%.

**Details of Gap Allocation Computations**

For pilots interested in mining down into the details of the computations of the projected A Plan benefit, the estimated PBGC payments and the value of the C-Plan contributions used to determine pilots' gap losses were given in the Gap Specifications Document available on the MEC website. Here are some highlights:

*Projected A Plan Benefit.* In the benefit formula used to project pilot A-Plan benefits (Years of Participation x Final Average Earnings x the Benefit Multiplier):

- "Years of Participation" include all Years of Participation (YOP) prior to Date of Plan Termination (DOPT) and all expected YOP after DOPT, projected to the pilot's age 60 normal retirement date, up to a maximum of 30 years.

- "Final Average Earnings" are determined on the basis of pilots' projected earnings under the "Adjusted Stove-Pipe" pay progression model.

- The "multiplier" is 1.35.

- The projected A-Plan benefit cannot be less than the pilot's "protected accrued benefit" as of May 31, 2003.

*Projected C Plan Benefit.* The C Plan benefit available to pilots at their normal retirement dates will be the amount the pilot accumulates from Company C-Plan

<div align="center">4</div>

contributions over the balance of the his or her career, plus the investment earnings generated by those contributions while they are credited to his or her PDAP account. The Gap Allocation Methodology, projects pilot C Plan contributions as 6% (the contractual C Plan contribution rate) of the pilot's projected annual pay under the Adjusted Stove-Pipe pay progression model. The Gap Allocation Methodology assumes that the contributions will generate an investment return averaging 6% a year. The MEC selected 6% based on the advice of its independent actuaries and after reviewing historical and actuarial non-risk free investment return data. Obviously, every pilot's actual rate of return will depend on his or her own investment selections. But in order to place a value on pilots' C-Plan benefits, some reasonable assumption as to investment returns must be used.

*Adjusted Stove-Pipe Pay Progression Model.* The purpose of the "Adjusted Stove-Pipe" pay progression model is to determine Final Average Earnings for purposes of projecting pilots' A Plan benefits and to project a pilot's future C-Plan contributions. The model assumes that pilot pay will increase and that the increases are attributable to two sources: (*i*) expected contractual increases (in accordance with Contract 2005 scheduled increases through the amendable date and 1½% pay raise a year as of each May 1 thereafter) and (*ii*) the pilot's exercise of his or her seniority rights to move upward in fleet and seat.

All pilots enter the "Adjusted Stove-Pipe" model in the fleet/seat status actually held on January 1, 2005. The pilot's actual 2005 pensionable earnings are used as the starting point for wage growth analysis. For 2006 and beyond, pilot seniority will determine the fleet/seat to which eligible pilots are assigned for purposes of determining annual pay for that year.

The Adjusted Stove-Pipe Pay Progression Model is based on the Company's fleet plan as of January 1, 2005. It recognizes vacancies created by normal age 60 retirements and assumes that, beginning February 1, 2006, each pilot will bid the vacancies thus created, thereby securing the highest-paying vacant fleet/seat position to which he or she is entitled by virtue of seniority (called "pos due" in the model.) The model further assumes that, as of each February 1st thereafter, the pilot will move up into the next higher-paying fleet/seat position ("pos due") which is deemed to be vacant and available under the model, to which seniority would entitle her/him. That becomes the pilot's position, and determines pensionable earnings, for the entire ensuing year. If, as of any February 1st, the model does not project the availability of any vacant higher-paying fleet/seat position which the pilot's seniority would entitle her/him to hold, the pilot is treated as remaining in the prior year's fleet/seat position. This exercise is repeated until the pilot reaches age 60. The resulting pay progression projection is the basis for projecting the pilot's C-Plan contributions over the balance of a career and for projecting a FAE to compute projected A-Plan benefit.

The Adjusted Stove-Pipe Pay Progression Model does not provide for displacements and does not recognize vacancies created through "trickle down" bidding dynamics or domicile preferences. For 2005 and 2006 only, it does recognize age 59 bypass pay and activation pay contractual provisions.

*Estimated PBGC Payments.* The PBGC will make payments to all pilots who were "vested," *i.e.*, all pilots who had at least 5 years of service as of DOPT (December 30, 2004.)

PBGC payments will be made from assets of the Plan (in the case of benefits in Priority Category 3) or from the PBGC's own funds (in the case of benefits in Priority Category 4) or from a combination of Plan assets and PBGC funds (where a pilot's funded Priority Category 3 benefit is less than the PBGC maximum guarantee.) *See,* Section 8 of the Gap Specifications Document on the MEC website for a more detailed explanation.

The amount pilots will receive from the PBGC has been estimated by Buck Consultants, LLP, a highly-regarded national actuarial consulting firm retained by the MEC to act as independent actuaries on behalf of UAL pilots, based on data furnished by UAL. Because the data on forming the basis for our actuaries' calculations has been corrected and updated as compared to the "unscrubbed" Company data on which PBGC estimated benefit statements are based, the R&I Committee believes that our actuaries' estimates are generally more reliable than the current PBGC estimates. (Our estimates have recently been adjusted to take into account the PBGC treatment of PLSA withdrawals, which was discussed in the recent letter we sent you concerning the web site and Company allocation figures.)

*Present Value of Future A-Plan Benefits, C-Plan Benefits and PBGC Payments.* The Note proceeds which have just been distributed *and* those that are being held for distribution early next year represent dollars on hand today. In contrast, the projected A Plan benefits, projected C Plan benefits and PBGC payments all represent dollars which will be paid in the future. Therefore, in order to compare apples-to-apples in the Gap Allocation Methodology, the A Plan and C Plan benefits and the PBGC benefits must be converted into the equivalent of today's dollars to be comparable to the Note proceeds. To do this, the value of a future benefit in today's dollars is calculated using a "discount rate" to reflect the time value of money. "Discount rate" is an expression of the opportunity cost of money, nominal interest rates and present and expected inflation, and reflects the fact that a promise to pay a dollar a year from today does not represent the same economic value as a dollar actually paid today. If you receive a dollar today and invest it for a year at, say, 1% interest, it will earn a penny during the year so, a year from now, that dollar would be worth $1.01. Or, putting it the other way round, a dollar payable a year from now is really only equivalent to 99¢ in today's money, using a discount rate of 1%.

Based on the actuarial advice it received from its independent actuarial consultants, the MEC selected a fixed 6% discount rate for determining the present value of benefits payable in the future

*Summary.* The Note proceeds are allocated to pilots in proportion to their losses determined under the Gap Allocation Methodology. Each pilot's gap loss is equal to the present value of his or her projected A Plan benefit (based on projected Years of Participation, FAE determined under the Adjusted Stove-Pipe pay progression model and the 1.35 multiplier), *minus* the present value of the pilot's projected C Plan benefit and estimated PBGC payments. The assumptions used in projecting pay and investment returns, and in determining the present value of future benefits, were adopted by the MEC based on the advice of its independent actuarial consultants.

*Special Cases.* Special eligibility and/or allocation rules may apply to pilots in certain categories including, for example, pilots who terminated or resigned prior to February 1, 2006; pilots who are deceased prior to that date; pilots currently or formerly

6

on furlough; pilots on Military Leave; Parental/Family Leave or other leave status; pilots on PDI; pilot instructors, standards captains and management pilots. These special cases are explained in the Gap Specifications Document on the MEC website.

### Variability of Individual Note Allocations

Some pilots have expressed concern about what they perceive to be a discrepancy between the amount of their allocation (as shown on the Gap Allocation website) and the amount they expected based on their understanding of what they were told, or shown, via graphs and other communications from the MEC. Those pilots' concern about the accuracy of the allocation model arises, in part, from their assumption that one can safely "compare their allocation amount with fellow pilots" who seem similar in age, seniority or some other demographic. Keep in mind: each pilot's projected earnings are unique. Projected earnings affect both the projected A Plan benefit, which is the starting point in analyzing loss, and the timing and amount of projected C Plan contributions, which is one of the sources of pilot recovery. What the Gap allocation model has highlighted is the individual differences among pilots within the A Plan and the resultant differences in allocations. Just as two different pilots with different career expectations would have received different benefit amounts under the A plan, these same pilots will have different Note allocations as a result of the Gap Allocation Methodology.

The Note allocation methodology has many individual inputs and considerations. As we examine the variability of allocations, we focus on 5 major inputs:

- Age
- Projected years of participation in the A plan, given a "normal" career
- PBGC Payout
- Final Average Earnings
- Future Value of C fund contributions

The variability of individual allocations is best illustrated by the use of examples and actual disbursements across all major input ranges. Consider the following examples:

### Example #1 (The effect of Age and Projected Years of Participation)

**Pilot A: 1992 Hire, Current Age 51, 320 Captain: $18,000 allocation**
**Pilot B: 1992 Hire, Current Age 46, 320 Captain: $39,000 allocation**
**Pilot C: 1998 Hire, Current Age 38, 767 First Officer: $55,000 allocation**

It is easy to see why pilots A and B might feel slighted when comparing allocations with pilot C. They have more years at the Company, more years of participation in the A plan,

7

and they are older, with less time until retirement to make up for the loss of the A plan. Pilots & B were hired a class apart from each other, and they have had identical seat movement through the last 14 years. There appear to be two reasons for these apparently counter-intuitive results:

1) **Note allocations are not based solely on seniority.**

2) **Payouts are not predicated solely on accrued retirement benefits. They are also based on what would have been earned given a normal career progression and retirement on an individual basis.**

As pilots, we are used to seniority being given precedence over other issues as it is in almost every other aspect of our professional lives.

However, the MEC decided to utilize the contractual and defined benefit plan rules and regulations to the maximum extent possible and as such, based the Note allocation payout on A Plan retirement expectations rather than just seniority.

The GAP methodology developed by the R & I Committee and adopted by the MEC uses the Note proceeds to fund a percentage of the gap that exists between your expected "full career" retirement annuity and what can reasonably be projected as annuity payments from the PBGC and C Fund.

Pilot A above would have received a yearly A-plan benefit of $50,000 at age 60, after 22 years of participation. Pilot B above would have received a yearly A-plan benefit of $63,000 at age 60, after 27 years of participation, and pilot C above an annual A-plan benefit of $83,000 at age 60, after 29 years of participation. **This A-plan benefit projection is the core metric from which your GAP allocation is calculated.**

In addition, the PBGC benefit will also be different for each pilot because of age and the rules associated with "protected benefits."

The MEC allocation formula is based on funding the "gap" between the normal A Fund retirement expected before A Plan termination and the sum of: (i) the PBGC payout and (ii) the projected, annuitized value of C fund contributions.

Pilots A&B are both receiving near the maximum annual age 60 payout from the PBGC of approximately $28,850. Pilot C will receive only $10,000 a year from the PBGC due to the fact that she had accumulated only 5 years of participation in the A-Plan and had not yet accrued much of an A Plan balance. (Remember, A-Plan accrual is affected by the formula: Multiplier x YOP x FAE; where FAE considers the last 10 years of a pilot's career). All other things being equal, the Gap methodology requires a larger payout for Pilot C as an offset to the smaller PBGC payout at age 60.

This is where some pilots feel the formula seems unfair. Pilots A&B have accrued a substantially larger retirement benefit at date of termination than pilot C, yet their payouts

8

are smaller. However, if we take each pilot as an individual and give them a full career with a normal A Plan retirement, minus their PBGC benefit and their annuitized C Plan benefit, the formula treats every pilot in exactly the same manner and "fills every pilot's GAP bucket" so that each pilot receives an equal recovery basis (approximately 41% of the GAP.)

### Example #2 (The effect of Age and C fund on distribution)

**Pilot D: 1985 Hire, Current Age 45, 767 Captain: $67,004 allocation**

**Pilot E: 1985 Hire, Current Age 49, 767 Captain: $93,928 allocation**

**Pilot F: 1985 Hire, Current Age 53, 767 Captain: $100,935 allocation**

In this example, all three of these pilots were hired in the same class, and had similar seat progression throughout their careers. Pilot D will receive substantially less money from the Note disbursement than his two classmates due to the fact that he has additional years of C fund contributions coupled with compounding of interest on all C fund deposits throughout those additional years.

In this example, the age difference between pilots D and E, and pilots E and F, is 4 years. In short, Pilot D is receiving less money than pilots E and F, because he has more time to make up for the loss of his A fund benefit, while Pilot F is getting more money to make up for the fact that he has less time to make up for the loss of his A fund benefit. Accordingly, Pilot F has a larger gap than Pilots D and E, and that corresponding gap results in a larger Note allocation to fill the individual gap. You may have noticed that the difference between pilots D and E is larger than the difference between Pilots E and F. This is because when Pilot F was hired at 32 years of age, he was looking at 27 years of participation in the A plan. Pilot D, hired at 24, had the effect of his looking at 35 years of participation and Pilot E, 31 years.

Pilots D and E are capped at 30 years of participation (C2003 provision), and will get credit for Final Average Earnings (FAE) times 30 years, multiplied by 1.35%. Pilot F will get FAE times 27 years times 1.35%. The reduction in the multiplier for Pilot F creates a smaller relative gap and therefore the difference in Note allocation between pilots E and D is not as large as the difference between pilots D and E.

It is important to realize that the age of a pilot does NOT always play the same role in the model, because there are other factors involved in determining Note payouts as evidenced in example #1.

## Example #3 (The effect of earnings on distribution)

**Pilot G: 1991 Hire, Current Age 55, A320 Captain: $57,850 allocation**

**Pilot H: 1991 Hire, Current Age 55, 767 Captain: $79,287 allocation**

In this case, the two pilots can be considered twins in all areas, except their current seat and past earnings. The pilots were hired in the same class and their birthdays are three days apart. The difference is that pilot G has always traded pay for quality of life issues, and pilot H has been aggressive at every opportunity to maximize pay.

The look back for final average earnings uses the highest 3 years of the last ten years of a pilot's pensionable earnings. Pilot H had FAE in excess of $220,000 prior to the C2003 wage reductions, and this FAE will roll forward to the FAE calculation for the Note distribution. Pilot G, who had lower earnings during the same period, will have to rely on his FAE based on his last 3 years of participation, as he does not have significantly larger numbers to carry forward.

As in the A-Plan benefit calculation, under the Note allocation methodology timing can be just as important as the amount of accrued and or projected earnings. It is important to note that in this example, if the pilots were 50 years old instead of 55, then their Note allocations would probably be very similar. This would occur because the FAE lookback of ten years would not include the higher earnings from Pilot H's pre-wage reduction earnings.

## Example #4 (Note allocation greater than $500,000)

The effect of "being in the right place at the right time". Yes—5 pilots out of the 7,501 of our total eligible pilots will receive in excess of $500,000 from the Note. Remember, these pilots have very large A-Plan losses and corresponding Gaps. These five pilots are getting exactly the same percentage of recovery from the Note allocation as every other pilot.

First, these pilots had above average career and final average earnings—which provided them with a large accrued and projected A-Plan benefit at age 60. The GAP allocation methodology does not recognize any difference between qualified and non-qualified benefits. It includes both, which is in contrast to the defined benefit pension plan and the PBGC, which do not recognize non-qualified earnings. Because of this, these pilots' A-Plan projected benefits are large. Second, these pilots have zero or close to zero C-Plan benefits due to their retirement in early 2005. (You will recall that the C-Plan benefit was effective in June 2005).

### "Stove-Pipe" pay progression model- Observations

There is one more issue that should be addressed regarding the inputs or "building blocks" of the gap allocation model. This would be a subset of the Final Average

Earnings (FAE) calculation that determines career progression, called the "Stove-Pipe" method. The Stove-Pipe model determines the point at which a pilot will progress through the seat changes associated with their projected career. Some pilots have questioned the timing of their progression, and sent a number of inquiries. The most common complaint is:

**"I can hold a 767 Captain bid now, but the website shows me as an LCO Captain until 2009, for example."**

It is important to realize that although this pilot may be able to hold 767 captain now, that is only because there are pilots senior to her that have elected not to take a 767 captain bid for quality of life or other reasons.

If all pilots senior to this pilot bid the highest paying position they could hold, then this pilot would not be able to hold the 767 until 2009. In trying to determine the best method for calculating the proceeds from the Note, it was determined to base career progression on a model that had all pilots bid the highest paying position that their seniority would allow. Since this method is used for all pilots, it creates a level playing field for determining seat progression and accompanying pay rate increases.

In addition, the Gap model does not hold a pilot back from upgrading to the next position due to restrictions associated with freezes or domicile selection criteria. The model also assumes no pay differential that would result from lineholder vs. reserve status. All pilots are assumed to be paid at 984 hours annually. In essence, this model simply moves you up in fleet and seat as pilots senior to you retire at age 60. There is no fleet growth built into the model, nor fleet shrinkage. In addition, potential mergers, new equipment or aircraft purchases or pending or proposed changes to age limitations via legislation are not included as the MEC dealt with the facts as they currently exist.

## In Summary

The MEC's stated purpose for the Note allocation and distribution was to fund to the maximum extent possible, the gap between the "normal" and current projected retirement benefits that exist for all qualifying pilots based on an individual pilot's anticipated career path. It would be nice if we had sufficient assets to fully fund our pension losses, but the projected proceeds from the sale of the Note will only cover approximately 41% of each pilot's individual funding gap.

It becomes obvious after looking at these examples that there is more to an individual's Note allocation than simply looking at age, seniority, or length of time invested in the A plan. The formula uses many different inputs to arrive at a pilot's specific "funding gap," and any comparisons between pilots must be looked at in light of the effects of all these specific inputs to fully understand the differences in payouts.

# For those of you who would prefer to see numbers:

The next section of the report includes various graphs and data that reveal how the Note allocation is dispersed throughout the pilot population.

## Allocation by Dollar Amounts—All Eligible Pilots

| Allocation Dollars | Number of Pilots | Allocation Dollars | Number of Pilots | Allocation Dollars | Number of Pilots |
|---|---|---|---|---|---|
| >600,000 | 0 | 300,001 - 350,000 | 50 | 50,001 - 75,000 | 2741 |
| 550,001 - 600,000 | 1 | 250,001 - 300,000 | 153 | 40,001 - 50,000 | 1650 |
| 500,001 - 550,000 | 4 | 200,001 - 250,000 | 181 | 30,001 - 40,000 | 723 |
| 450,001 - 500,000 | 7 | 150,001 - 200,000 | 133 | 20,001 - 30,000 | 353 |
| 400,001 - 450,000 | 17 | 100,001 - 150,000 | 419 | 10,001 - 20,000 | 207 |
| 350,001 - 400,000 | 11 | 75,001 - 100,000 | 807 | 01 - 10,000 | 43 |
| | | | | 0 - 0 | 1 |



Number of Pilots

The total number of eligible pilots = 7,501

Pilot Allocations ranges:
40,001 - 100,000     69%
30,001 - 100,000     79%

12

## Allocations by Dollar Amounts—MEC only



MEC Only

Total MEC members plus the 3 Officers = 27

40,001 – 100,000 range = 74%
30,001 – 100,000 range = 81%

### Corrections Process, the PLSA/PBGC Adjustments, and the Reserve Pool Funds

By now most pilots have accessed the Gap Allocation website and read the Gap Specifications document. Between the time the website went live on June 30, 2006 and the present, the Committee continued its due diligence and dynamic stress testing of the allocation model. We would like to thank every pilot who took the time to review their data and queried us on various topics. Pilot inquiries have been a great help in identifying anomalies. From the very beginning, the Committee endeavored to produce a process that was open, dynamic and interactive. Part of this process included facilities to make corrections as we moved closer to distribution day. Accuracy was and remains our primary goal.

We were careful to disclose and to continue to reiterate that the individual Note allocation payouts displayed on the Gap allocation website are estimates and these payouts assume

full distribution of the proceeds *without* the $30 million hold back.  Again, these are estimates for two main reasons:

1. We used an assumed Note proceeds amount of $500M.
2. We assumed no correction factors.

As you now know, our investment banker was successful in selling our Note for $544.5M.  The net amount to the pilots, after fees and expenses but before accrued interest, is $537M. This is a fantastic result.

The Committee would like to advise you of several issues that have come up since the website "live" date:

1. PBGC calculation of the guaranteed benefit for pilots who withdrew their PLSA from the A-Plan, and

2. PLSA amounts reported initially by the Company to ALPA, and

3. Participation dates associated with the "group of 570" pilots, and

4. Years of Participation credit for some pilots who worked as non-pilots prior to becoming eligible for the A-Plan benefit

5. Stove-Pipe Pay Progression Model seniority number anomaly

Every one of these issues has been corrected, and the result is that all pilots will have a revised Note allocation payout amount.  Approximately half the pilots will receive a larger Note payout than that displayed on the Gap Allocation website; approximately half will receive a smaller amount. The reason for this is obvious; some pilots were entitled to a larger Note payout than originally calculated—the funds must come from the total pool of Note proceeds.  In addition, there were originally 95 pilots that were to receive an allocation of ZERO—now all but one pilot will receive some Note allocation.

1. **PBGC calculation of the guaranteed benefit for pilots who withdrew their PLSA from the A-Plan**

What we have learned from pilots who are already receiving PBGC payments (retirees) is that the PBGC is calculating their guaranteed benefit differently than the Committee initially did. The PBGC used an alternate, but allowable, method to reflect the PLSA withdrawals. The result is that these pilots receive a much smaller PBGC benefit each year and therefore their originally calculated Note allocation was too low. In the end, these pilots' total benefits are the same as if they never took their PLSA.

As a result, these pilots' Note allocations had to be recalculated.  This new payout was reflected in the initial Note distribution on August 14-16[th], 2006

**2.    Initial PLSA amounts reported by the Company to ALPA**

In March 2006, the Company sent ALPA a file of all pilots who withdrew their PLSA's. We used this file to calculate the Note allocations. After inquiries by some pilots, we asked the Company to reaffirm the data in this file. On August 4, the Company informed us that there is another, more current file reflecting the PLSAs of pilots who retired in late 2005. Some of these pilots did not receive their non-qualified portion of the PLSA from the Company. You may recall that during the bankruptcy hearings, the Company unilaterally stopped paying the non-qualified portion of the PLSA to pilots who retired after September 2005. This new file reflects this dispute.

As a result, these pilots' Note allocations had to be recalculated. This new payout was reflected in the initial Note distribution on August 14-16[th], 2006

**3.    Participation dates associated with the "group of 570" pilots**

Letter 05-23, Exhibit A and the associated Grievance Settlement directed the Company to adjust the training dates of the "group of 570" pilots. In effect, this training date adjustment required an adjustment to their associated date of participation in the A-Plan.

As a result, these pilots' Note allocations had to be recalculated. This new payout was reflected in the initial Note distribution on August 14-16[th], 2006

**4.    Years of Participation credit for some pilots who transferred into the pilot plan from other plans**

We all know of pilots who were previously hired at UAL as mechanics, flight attendants or CSR's. The time they accumulated in those pension plans roll over to the pilots A-Plan. While most of these cases were displayed correctly, some of these pilots' years of participation in the A-plan were not reflected in the data shown on the website. There were 8 pilots in this category.

As a result, these pilots' Note allocations had to be recalculated. This new payout was reflected in the initial Note distribution on August 14-16[th], 2006

Another correction needed to be made for 1 pilot who had earnings in a contributory management plan during the 1970's. This plan was not a defined benefit plan; rather it was a contributory plan. The Company reported this withdrawal from this '70's plan as a PLSA withdrawal from the A-Plan, but it was not.

As a result, this pilot's Note allocation had to be recalculated. This new payout was reflected in the initial Note distribution on August 14-16[th], 2006

5.    **Stove-Pipe Pay Progression Model Programming Anomaly**

In the course of final review and testing, it was discovered that a programming error had occurred in connection with the Adjusted Stove-Pipe pay progression model.

Under the Stove-Pipe pay progression model, 2005 pay is actual 2005 pensionable earnings, as reported by the Company. For all subsequent years, pilot seniority determines projected fleet & seat and projected pay.

In the Gap model, a Pilot's seniority is determined by assigning an "effective seniority number" for each year, beginning in 2006 and ending with the year a pilot turns age 60.

A Pilot's effective seniority number is determined by subtracting the number of pilots with greater seniority who have left the seniority list (i.e., turned age 60 prior to the current year.) Actual retirements – early and normal – and deaths in 2005 are also accounted for. Consequently, for 2006, an individual pilot's effective seniority number is determined by removing from the pilot population those pilots who retired in 2005 and had greater seniority. For 2007, a pilot's effective seniority number is determined by removing from the pilot population pilots who retired in 2006 and had greater seniority. This algorithm for 2007 is repeated in every subsequent year until each pilot reaches age 60.

In the web site model, the determination of the effective seniority number for a given year was determined by removing from the pilot population the number of retired pilots with greater seniority in the second prior year, rather than in the immediately preceding prior year. Consequently, the assignment of effective seniority numbers was one year "off" and a pilot's movement up the Stove-Pipe was delayed one year.

The effect of the error was to treat everyone as retiring at age 59 rather than 60. The relevant corrections have been made to those pilots affected; these corrections were reflected in the August 14-16[th] distribution.

**Summary**

Some of these corrections were brought to the Committee by you via the ualmecrl@alpa.org email address; some by your LEC representatives; some by your telephone calls to us; and some by the Committee's continual stress testing of the model. We set out to ensure accuracy and we designed this corrections process with just these results in mind. We believe it worked, and will continue to ensure corrections are made throughout the distribution process.

The fact that we were able to make these corrections BEFORE the initial August 14-16 distribution is important as we did not need to utilize any of the $30M reserve pool. The reserve is intact and will be there for future corrections/omissions discovered between now and December 31, 2006. To the extent the reserve exceeds the amount needed to

make necessary adjustments for corrections/omissions; the excess will be distributed to pilots early next year.

IMPORTANT NOTE!

**Any identification of data issues or other omissions must be brought to the Committees attention, in writing no later than December 31, 2006. Contact the R & I Committee at UALMECRI@alpa.org**

The Committee is committed to seeing that this distribution is completed in a timely, orderly and thoughtful process. As you can see, the positive information loop created by the website and MEC/LEC internal and external communications has resulted in a strong allocation and distribution process. We will keep you advised of our progress on these and other issues that may surface during the August through February 2007 distribution process.

Fraternally,

UAL-MEC R&I Committee

Captain Jeffrey Barath, Chairman
Captains Marty Torres and Jim Bowman, members

17

# EXHIBIT 5

# UAL-MEC Retirement & Insurance Committee
# Final Gap Data Verification

November 21, 2006

Dear Fellow Pilot:

The UAL-MEC R & I Committee is preparing for final distributions from the ALPA Grantor Trust. As you are aware, the pilot Convertible Notes were sold on July 28, 2006, for approximately $537 million, net of transaction fees and expenses. The $537 million net proceeds of the sale were deposited with the Bank of New York as Trustee of the Grantor Trust, for distribution in accordance with the PDAP Top-Off and Taxable Remainder Program previously ratified by the membership.

After distribution of approximately $351 million in mid-August 2006, there remains in the Grantor Trust approximately $186 million (plus accumulated interest). This consists of $156 million earmarked for contribution to the PDAP in early 2007, in accordance with the PDAP Top-Off and Taxable Remainder Program. The $156 million is **not subject to the correction process described herein.**

This document addresses the distribution of the $30 million held in reserve. The reserve is for the purpose of making corrections arising during the allocation process. Under the terms of the Grantor Trust, all assets are required to be distributed no later than March 15, 2007.

*The final data verification step is being launched by the R&I Committee in preparation for 2007 PDAP Top-Off contributions and the final distribution of any balance remaining of the $30 million reserve pool.*

As a reminder:

- The Bankruptcy Exit Agreement, LOA 05-02, provided for issuance of $550 million face amount Senior Subordinated Convertible Notes to or on behalf of pilots no later than 6 months after exit from bankruptcy, with eligibility, allocation and distribution mechanics to be determined by ALPA.

- In June, 2006, the Committee established a website to enable individual pilots to review the personal information on which their allocation of the proceeds from the sale of the Convertible Notes would be calculated. During June, July and early August, the Committee processed and implemented all known corrections based on pilot feedback.

- On July 28, 2006, the Convertible Notes were issued and sold for approximately $537 million, net of transaction fees and expenses, the proceeds being wire transferred to the Bank of New York as Trustee of the Grantor Trust established for the purpose of distribution.

## UAL-MEC Retirement & Insurance Committee
## Final Gap Data Verification

- On August 10, 2006, the Trustee transferred approximately $351 million to United pursuant to ALPA's authorization on behalf of the 7,501 pilots eligible for note allocations.

- On August 14th, the Company deposited approximately $15 million of these transferred funds into the PDAP as the maximum additional employer contribution permitted under IRC §415 for 2006 on behalf of those pilots who still had capacity available under IRC §415 for 2006.

- The approximately $336 million remaining from the above transfer (after the 2006 PDAP contribution) was distributed, less applicable taxes, through the payroll system on or about August 16, 2006.

- As provided by the PDAP Top-Off and Taxable Remainder Program, the balance of the Grantor Trust assets, $186 million (plus accumulated interest), has been held for 2007 distribution.
  - o Approximately $156 million is earmarked for contribution to the PDAP for 2007 as soon as administratively feasible after the first of the year.
  - o Approximately $ 30 million is being held as a Reserve for corrections and adjustments to be distributed prior to March 15, 2007.

### PDAP Top-Off -2007

We are currently working to complete the PDAP Top-Off and Taxable Remainder program in early 2007. Approximately 6200 pilots can expect a deposit into their PDAP Account through the Top-Off Program no later than March 15, 2007. Individual Top-Off amounts were indicated as "Amount of initial distribution held for 2007 PDAP" on your United/provided Convertible Notes Statement issued in August 2006

As a PDAP Top-Off refresher, after considering an individual pilot's initial note allocation, the program:
- Topped-Off room available under IRC §415 for PDAP year 2006, as applicable
- Held back your specific 2007 PDAP Top-Off contribution, as applicable, in an amount equal to the available room under IRC §415 after consideration of a pilot's Employer B and C plan contribution throughout 2007

An analysis of the 6200 pilots who expect a PDAP Top-Off contribution in 2007 shows that approximately 700 will continue to have limited §415 capacity in PDAP Plan year 2007. What this essentially means, is that when the $156 million is contributed to the PDAP for 2007 under the PDAP Top-Off Program, the overwhelming majority of pilots will have no room under the Tax Code for further self-deferral through their 401(k). This analysis allows for continued Employer B and C Plan contributions throughout 2007. As envisioned, this will create the very desirable situation where pilots have achieved maximum tax deferral through employer contributions.

## UAL-MEC Retirement & Insurance Committee
## Final Gap Data Verification

### IRC 415 – 2007

IRC §415 limits the amount of employer and employee contributions that can be deposited into the PDAP in a given plan year. The IRC §415 limit for 2007 is $45,000.

PLEASE NOTE: A pilot over age 50 or turning age 50 in 2007 is also eligible for a "Catch-up" contribution of up to $5000 in addition to the §415 limit. The Note Allocation money cannot be used to fund the "Catch-up" limit. This must be an employee contribution via 401(k) contributions. The Note Allocation money is considered an employer contribution to the PDAP.

### Reserve Pool

As pilots look toward early 2007, all those who are eligible to share in distribution of the Convertible Note proceeds can expect an additional modest distribution from the $30 million Grantor Trust Reserve Pool (to include accrued interest). The Reserve Pool is subject to reduction by amounts required to make final corrections, both individual and collectively.

The Reserve Pool will be allocated among all eligible pilots in proportion to their final Convertible Note allocation. The Committee expects that the Reserve Pool distribution will occur no later than March 15, 2007.

### Final Individual Note Allocation Amounts

After this final review period ends on December 31, 2006, the R & I Committee will apply any corrections, as applicable, to the final allocation file, and proceed with Reserve Pool distributions.

Although the Notes were sold for $537 million, well above the baseline assumption of $500 million, pilots cannot precisely determine their top-line distribution number until all corrections have been processed. We know that the corrections found in advance of the August 2006 distributions resulted in the shifting of individual allocation amounts, up and down, within the model. As we move into the final distribution step, the reserve pool is available for applicable corrections/omissions identified between now and December 31, 2006.

For the final verification process, your MEC R & I Committee has updated the gap allocation website. The website will not be completely populated until the PDAP Top-Off and Reserve Pool distributions have taken place.

### Data Verification

## UAL-MEC Retirement & Insurance Committee
## Final Gap Data Verification

All pilots that participated in the Initial Note Distribution will be eligible for a piece of the Reserve Pool Allocation based on their final Allocation Percentage.

We have updated our website to incorporate all changes/corrections that have been brought to our attention. Our goal is to ensure that the final data being utilized is as accurate as possible considering any discrepancies individual pilots may identify. *To that end, we ask you to review your personal data on the updated website no later than December 31, 2006.*

### 1. Data Re-Verification

We have updated the website to reflect changes and corrections made to date. The corrections process requires that all pilots check their personal career data on the website to confirm that any and all changes reported or discovered in the initial review, as a result of the last correction process, are reflected properly on the site.

The website can be accessed at: https://www.ualpilots.org/mynoteallocationupdate

We would like all pilots to thoroughly examine the data being utilized in the website to ensure it is appropriate and correct. These items include:
- Birth Date
- Hire Date
- Longevity Date
- Participation Date
- Years of Participation
- PLSA Withdrawal Amount if applicable
- Stovepipe Progression
- Final Average Earnings
- PBGC Benefit
- C Plan Projections

### *If your data is accurate, no further action is required.*

PLEASE NOTE:
If you participated in a surplus reduction line during 2002 and you will be retiring prior to 2013, your United-provided data was incomplete. This may have erroneously impacted your note allocation requiring correction. If there are questions regarding surplus lines, or any other data issues, please initiate a request for review.

### 2. Pilot-Initiated Request for Review

If there are questions regarding a pilot's personal data, please formally request a review by contacting us at UALMECRI@ALPA.ORG.

4

## UAL-MEC Retirement & Insurance Committee
## Final Gap Data Verification

Pilots **must** include in their e-mail the item(s) that they believe to be incorrect and supporting documentation/information for review of their claim.

*In the subject line PLEASE indicate: **REQUEST FOR GAP DATA REVIEW***

### 3. Committee Verification and Implementation of Valid Data Changes

The R&I Committee will e-mail a response indicating receipt of the gap data review request.

The R&I Committee will advise pilots of the status of their request.

**The deadline for requesting a formal review is December 31, 2006**. After this date the correction process will proceed to the final stage.

### 4. Determination of Corrections Applicable to Final Allocation File

Any individual and systematic corrections found during this final data verification process will be applied within the final allocation file. This final allocation file will ultimately determine the total amount of a pilot's convertible note proceeds.

The Company has advised that pilots on military leave will not receive their share of the reserve pool until they return to active service with United Airlines (or their USERRA rights expire) in order to comply with USERRA regulations.

Please take the time to confirm your personal data on the updated website and send us a REQUEST FOR GAP DATA REVIEW by December 31, 2006 if your data is incorrect.

Fraternally,


Marty Torres, Chairman          Jim Bowman, Member          Fred Greene, Member

UAL-MEC R&I Committee

5

# EXHIBIT 6

## ALPA's and UAL's Representations Regarding the Pilot Program

**Ex. 4: Continuing Education Regarding Convertible Note Allocation, MEC  R&I Committee**

- "The [GAP 2] Methodology allocation the Convertible Note proceeds among eligible pilots in proportion to their losses on termination of the A- Plan . . . " (3)

**Ex. 9: PDAP Top-Off and Taxable Remainder Distribution Method**

- Proceeds from sale of Convertible Notes to be "deposited into PDAP as employer contribution for the 2006 Play Year" (2)
- Note allocation methodology "closely tracks the rules and assumptions associated with [the] terminated A-Plan" (4)
- In February 2007, "155M [to be] contributed to the PDAP" (5)
- PDAP method "would convert significant part of note distribution from current income . . . to a retirement benefit  . . ." (7)

**Ex. 10: MEC Retirement & Insurance Committee ALPA Convertible Note Allocation Gap Specification**

- Purpose of note proceeds is to "help offset expected amount of each eligible pilot's lost A-Plan pension benefit" (1)
- "Making up for this cornerstone of our retirement programs will not be easy; the successful investment of your note proceeds will make a significant difference in your ability to fund your expected retirement lifestyle" (15)

**Ex. 7: Convertible Note Distribution:  Tax Treatment, Implementation Processes, Committee Recommendations.  Captain Jeffrey Barath and Marty Torres, MEC Retirement & Insurance Committee**

- Approximately $190M "grows tax deferred in the PDAP" (Slide 12)
- PDAP methodology "[o]ptimizes use of the Qualified Pension System" (Slide 15)
- "You have told the pilots the purpose of the Notes is to offset Pension losses; the A-Plan was a tax deferred plan; by logical extension; the "offset" funds shall be tax deferred"  (Slide 17)

**Ex. 3: Hughitt Letter**

- Notes are to "partially offset the retirement benefits that active employees lost when United's pension plans were terminated and replaced"
- Notes are "unrelated to the equity grants that nearly all employees received earlier this year in recognition of the reduction in wages and benefits"

**Ex. 3:  Q&A**

- Notes "partially offset the retirement benefits plans that active employees lost when United's pension plans were terminated and replaced" (1)
- Formula for each group "designed to take into account part of the relative loss employees incurred due to the termination and replacement of their pension plans" (2)
- For ALPA, cash proceeds "will be deposited into the PDAP as a C-Plan Contribution [and] will be invested based upon the current C-Plan election on file" (3)
- "[N]otes allocations are linked primarily to the termination and replacement of the company's defined benefit pension plans  Equity grants, on the other hand, reflect the new work rules and significant reductions in wages and benefits agreed to as part of the 1113 process of United's Chapter 11 restructuring" (4)

**Ex. 11: Hughitt Letter and Garavito Convertible Notes Statement**

- Proceeds "will be deposited in PDAP as an incremental employer funded C-Plan contribution [and] will be invested based on current C-Plan election . . . on file"

# EXHIBIT 7



Cover/Cribe Note
Distribution

# Tax Treatment
## Implementation Processes
## Committee Recommendations

Captains Jeffrey Barath and Marty Torres
UALMEC R & I C
June 23, 2006





Meeting Agenda

- Tax Deferral Discussion
  - Committee Recommendation
- Gap Specifications Documentation
  - Read through and Discussion
- Next Steps



# R & I Committee Resolutions

## Requested Resolutions

- Distribution of Notes
- Accept Gap Specifications Document
  - Authorizing use of PBGC benefit estimates as calculated by Buck
  - Affirms Management Pilots Right to the ALPA Note proceeds
- Establish Reserve Pool
- Resolution directing that the consideration of the Cash Balance Plan be ended

Distribution of Convertible Notes

Tax Consequences
Discussion
*R & I Recommendation*



Tax Consequences

Failure to Defer Taxation

- Notes paid as current wages in '06 and '07
- Income and FICA taxes will be assessed on all pilots
- Highest tax rates will apply to many (AMT?)
  - Additive to equity allocations claim sale proceeds in 2006
  - Additive impact of 2007 equity distribution(s)

No escaping Uncle Sam...

- But can he be avoided?

# Tax Deferral

- Tax deferral opportunities very limited
- Two large pension plans reduced to one
  - DB fails
  - DC prevails
- Limited capacity available today
- Tax deferral can only be achieved using the PDAP
- Other schemes, e.g. "Structured Settlements", are not relevant and will not defer taxes!



## Who Benefits from Tax Deferral?

### For 2007:
- All eligible pilots
- Benefits of Deferral
- "401K holiday"
- Absorbed Lump Sum $$ available to invest in February
- Tax Deferred Compounding

### For 2006:
- Returning
  - Military Leave
  - Personal Leave
  - Furloughees
- Active
  - All LCO F/O's
  - Some 767/ WB F/O's



## How much Tax Can be deferred?
### 2006 Capacity Review

- Maximize the use of IRC 415c
- Absorption Analysis
  - Assumes B Plan of 9%
  - Assumes C Plan of 6%
  - YTD equity allocations
  - YTD claim allocations
  - YTD 401(k)
- 2006 Absorption Capacity before future in-flows
  - Next equity allocations



## How much Tax can be deferred?
### 2007 Capacity Review

- **Maximize the use of IRC 415c**
  - $45,000 in 2007
- **Absorption Analysis**
  - Projects 07 Salary
  - Assumes B Plan of 9%
  - Assumes C Plan of 6%
  - Assumes 401k = 0
- **2007 Absorption Capacity before future in-flows**
  - 2007 equity allocations

## 2007 Aggregate PDAP Capacity

| | Count | Limit | Results |
|---|---|---|---|
| Total 07<br>415 Available | 6500 | $45,000 | $292M |
| B & C Plan | | | $137M |
| PDAP<br>Capacity 07 | | | $155M |



## How is Tax Deferral Created?

- Estimate 2007 pilot earnings in the same manner as was done for the Equity Distribution—send absorption amount to the Trust
- Utilize and optimize available PDAP Room
- Results
  - Maximized use of 415c limits for 06 & 07
  - Make up for part of lost A-Plan benefit
  - Limit taxes on direct cash proceeds
  - *~$190,000,000 grows tax deferred in the PDAP*

Note Distribution Flow

Jul 2006: **Notes Issued**

Jul 2006: **Notes Sold**

Jul 2006: **Proceeds in Grantor Trust**

Aug 2006: **$280 Distributed in Cash**

Aug 2006: **$35 into PDAP**

Feb 2007: **$155 into PDAP**

Feb 2007: **$30 Distributed in Cash**



# Plain Language Review of IR & L Recommendation

- Limited Deferral of Note Proceeds into PDAP
  - Plan year 2006 and 2007
- August 2006
  - $35M will be contributed to the PDAP
  - $280M will be paid out as current wage
  - $30M will be held back as reserve pool
  - $155M will be held back for 07 contribution to PDAP
- February 2007
  - Grantor Trust closed down
    - $155M contributed to the PDAP
    - $30M reserve pool distributed
      - Plus interest
      - Minus any amounts used for corrections



RGL Recommendation
PDAP To Pre-Fill-Up

- Maximizes Tax deferral capacity
  - Optimizes use of the Qualified Pension System
  - Taxable remainder paid directly to pilot



## Why Defer Tax?

- You have told the pilots that the purpose of the Notes is to offset Pension losses; the A-Plan was a tax defered plan; by logical extension; the "offset" funds shall be tax deferred.



Why Defer Tax?

- You have directed this Committee to design an allocation that has as its basic premise rules and regulations modeled after the tax deferred, terminated A-Plan, you authorized this model last January.

Tax deferral Authority

- C 2005 LOA 05-02 Section 7
- Exhibit "D"
  - Bankruptcy Exit Agreement

<u>Pilots have demonstrated to you that they want it:</u>

- **95%** affirmative vote from Equity PDAP proposal
- **75%** affirmative vote on the C2005 proposal

Letter 05-01
(Bankruptcy Exit Agreement)

7.   Convertible Notes.  In the event that the A Plan is terminated pursuant to 29 U.S.C §1341 or §1342 following judicial approval of such termination, the Revised 2003 Pilot Agreement and the Plan of Reorganization shall provide for the issuance of $550 million of UAL convertible notes, as described in Exhibit D to this Letter of Agreement, to a trust or other entity designated by the Association.  The terms of the UAL convertible notes described in Exhibit D shall be subject to mutually-acceptable modifications to optimize implementation for all parties from an accounting, securities law and tax law perspective.

## Exhibit D
## Convertible Notes

A trust or similar non-permanent vehicle for the benefit of eligible United pilots; the Notes or the value of the Notes to be distributed to such pilots or pilot retirement accounts as soon as reasonably practicable given tax, accounting, securities and market considerations; all rights of the Notes to be exercised by individual pilots while the notes remain in the trust. Distribution mechanics, eligibility and allocation among such pilots to be reasonably determined by the Association.



Offer "Noise"

# The "Cash Now", all taxable crowd

- Two Groups:
  - "I Need the proceeds to pay current bills"
    - No problem—support tax deferral via the PDAP, then borrow the funds right back out!
    - Fix your personal financial situation, this one time shot in the arm won't help you long term...



The "Cash Now"; all taxable crowd

"I Don't trust the company...what if a "Chapter 22?"

- Solvency/Balance Sheet Test
- Capital markets have given this company:
  - Equity-- ~ $ 3.75 B
  - Debt-- ~ $ 550 M CN
           ~ $ 2 B exit financing
  - Cash Balance $ 3.6B
- New BK laws in effect..not very appetizing to management anymore
  - KERP restrictions
  - Automatic stay mandated to 180 days

Offer IV, p. 5.7



## Other "Noise"

### Constructive Receipt

- Why Can't Individual Pilots decide whether or not to take the proceeds as taxable income or to defer into the PDAP?
  - IRS mandate

Other "Noise"?

PBGC Estimates=Ours or Theirs?

- Why Are We not using the Estimates the PBGC sent to all pilots when calculating the Gap?
  - We asked for and were denied the file
  - Data from UAL to Buck = data from UAL to PBGC...big difference though!!
    - Buck/R & I C "scrub data" to minimize use of incorrect/incomplete data
      - Examples:
        - "SC" termination codes
        - Termination file dates prior to DOH
        - Name changes due marriage/divorce...



# Subject Matter Expert Review

- **Russ Woody**
  - Grantor Trust
  - Cash Balance
- **Paul Rusin**
  - Absorption Analysis
  - PBGC benefit calculations
- **Stephen Presser**
  - View of UAL



Grantor Trust Facility

- Legal Arrangement for Asset Protection
  - ALPA and UAL
- Large US Banking Institution
- Legally segregates Pilot Dollars
  - From UAL treasury
- Existence of Trust between
  - August 06 and February 07

## PDAP Absorption — IRC(c) Model

- $44,000 Limit on "Annual Addition" for 2006 per IRC Section 415(c)

*less*

- B-Plan and C-Plan Contributions (Projected and/or Actual)
- 401(k) Deferrals (will not back out $ already contributed in '06, assume '07 = $ 0)
- Stock Allocation in PDAP

*equals*

- "Room" for Note Allocation

## PDAP Absorption — Aggregate

- **Sum of Individual Pilots**

- **$44,000 per Pilot _times_ 7,000 Pilots _less_ 15% of Payroll _less_ Stock Allocation in PDAP (2006 only)**

- **$35 million for 2,900 Pilots in 2006**

- **$155 million for 6,500 Pilots in 2007**





# PBGC Benefit

## Calculations

- PGBC amount is just an estimate at this point
- Your R&IC and actuary have been "scrubbing" the data for several months
- Same methodology as that used by the PBGC

PBGC has denied the R&IC's request for its calculations

## Consistency

- Some Pilots will not report the PBGC's estimate
- Some Pilots will not report the PBGC's estimate if it's larger than the Buck estimate
- Can not have estimates from different sources

## Verification

- R&IC would require documentation before accepting the submitted PBGC estimate
- We do not have the resources or time to collect, sort, verify and tabulate over 9,300 pilot benefit statements



# Questions/Break?

○ Next up....

- Work in Progress
- Gap Specifications Document

  ***Page by page review***

  * *Not meant to re-open debate on methodology*
  * *Textual description of the Gap Charts you have seen previously. Simply MEC understanding and confirmation of "what you told us you wanted and you now have..."*
  * *Embodies treatment of*
    - *Management Pilots*
    - *PBGC Estimates*



## Gap Specifications Document

- Text version of actual computer code driving model
- Excellent educational review of Gap methodology
- Gap reference document for pilots

*Let's walk through the document*



## Gap Calculations

(1)  Seniority number, fleet & seat, pay and A-Plan years of participation are all projected to retirement

(2)  C-Plan contributions and investment earnings are likewise projected

(3)  The PBGC benefit is estimated (same calculation as the PBGC would use)

(4)  Present values are calculated based on interest and mortality assumptions approved by the MEC

Exceptions and adjustments are made for:

(a) Pilots with periods of Military Leave, authorized Leaves of Absence and Furlough

(b) Pilots who have withdrawn their Partial Lump Sum Amount (PLSA)

(c) Pilots who have died during the 13-month period from January 1, 2005 through January 31, 2006

(d) Pilots who are on PDI as of February 1, 2006

(e) Pilots who have resigned their pilot system seniority number between January 1, 2005 and February 1, 2006





## Allocation R & Distribution Team Leads

- Distribution Kick-off Meeting
  - 1st meeting held June 13, 2006 in Rosemont
- 24 decision makers and support staff
- Reviewed basics of upcoming note allocation & distribution

- **Participation and Representation**
  - ALPA
  - UAL
  - Huron Consulting
  - RLM Consulting
  - Frank Russell Trust
  - Hewitt Associates
  - Buck Consultants
  - Athena Advisors



Working Progress

# Continuation of Implementation

- Operational – Coordination of mission
- Communications – Coordination of message
  - Mitigate duplication
  - Strive for consistent messages
  - Look for focused resources
    - Note Allocation Website
    - PDAP Service Center
    - UAL



Questions????

# EXHIBIT 8

**UNITED STATES DISTRICT COURT**
~~**FOR THE DISTRICT OF COLUMBIA**~~

RAYMOND GARAVITO,            )
RAFAEL RODRIGUEZ, and        )
ELLI MIZRAHI,                )
                             )
              **Plaintiffs,**      )
                             )
       **vs.**                     )      CIVIL ACTION NO. 07-0384 (PLF)
                             )
AIR LINE PILOTS ASSOCIATION, )
INTERNATIONAL,               )
                             )
              **Defendant.**       )
                             )

### AFFIDAVIT OF RAYMOND GARAVITO

STATE OF FLORIDA              )
                             ) SS:
COUNTY OF MIAMI-DADE         )

BEFORE ME, the undersigned authority, personally appeared RAYMOND

GARAVITO, who, after first being duly sworn under oath, deposes and says:

1.    My name is Raymond Garavito and I am one of the Plaintiffs in this case.

I make this Affidavit on personal knowledge.

2.    I have been a pilot for United Airlines since 1978. I am still currently active

and fly overseas routes to the Far East on Boeing 747 aircraft. Mandatory retirement

for airline pilots comes at age 60 and I am scheduled for retirement in October, 2008. I

am a member of ALPA.

3.    As a United Airlines pilot for more than 28 years, I have accrued

substantial seniority. As a result of the United Airlines bankruptcy, I lost a significant

portion of my vested retirement "Plan A" benefits. I am unable to calculate my actual

losses with precision (because ALPA has not made the information available for me to

do so). My understanding, however, is that United's pre-bankruptcy pension obligation

to Plan A participants was in the range of $4 billion, and that as a result of the

bankruptcy reorganization, United agreed to pay only $550 million in satisfaction of this

obligation, an approximately 85% reduction. Having lost a huge portion of my

retirement benefit as a result of the bankruptcy alone, ALPA's failure to fairly allocate

the $550 million, as alleged in the Complaint, has caused me significant further harm.

    4.     Because I had lost such a significant portion of my retirement benefit as a

consequence of the bankruptcy, I tried to follow what the United MEC ("UAL-MEC") was

doing with regard to distributing the $550 million. While I found out that the UAL-MEC

had adopted a program called GAP 2 some time after January 20, 2006, I did not know,

and had great difficulty uncovering, the factors used and how they were applied in the

GAP 2 allocation methodology.

    5.     Over the course of several months after I learned about the adoption of

GAP 2, through the Summer and early Fall of 2006, I made phone calls to the MEC, the

Retirement & Insurance Committee, and to the Captains' Representative at ALPA

asking for further information. I spoke to several people, none of whom were able to

enlighten me about GAP 2. I specifically remember speaking to one representative,

Marty Torres, who could not describe the methodology, but referred me to the website,

which I found unhelpful.

    6.     It is my recollection that some actual information about what GAP 2 meant

started to be released in June of 2006. I did check the website with some regularity,

and did obtain the following documentation:

a.   PDAP Top-Off and Taxable Remainder Distribution Method, ALPA Convertible Notes, Questions and Answers, attached as Exhibit A. This document is undated but must have been first available after June 23, 2006.  It provided some general information about how the funds were to be allocated and distributed, and proposed timing, and called for a vote of the membership on whether to distribute some of the funds into retirement accounts or as current cash.  I do not remember when I first saw this document.

b.   Continuing Education Regarding Convertible Note Allocation, MEC R & I Committee, attached as Exhibit B.  This document was created sometime after August 16, 2006, and provided me with my first understanding of how GAP 2 would work, although I could not, as I mention later, discern the actual adverse impact on me (and do not know to this day the extent of that impact).  I do not remember when I first saw this document.

c.   United Airlines Master Executive Council, UAL-MEC Retirement & Insurance Committee Final Gap Data Verification, dated November 21, 2006, attached as Exhibit C.  This was the first document I recall seeing that specifically mentioned a distribution date of no later than March 15, 2007.

7.    I received my first check from this fund in August, 2006, and again, wanted an explanation about how the funds were allocated.  I again went to the website, where I had been directed, and printed out the document attached as Exhibit D.  As the Court can see, this shows a calculation of my benefit.  It says nothing about the weight given to each factor considered by GAP 2, or the extent to which I had been harmed by the adoption of GAP 2.  At no time did the MEC provide me with an analysis of the amounts I would have received under GAP 2 vs. GAP 1 vs. the PLSA Method (see Exhibit B at page 2).  Further, at no time has the MEC ever explained why it chose GAP 2 over GAP 1, the PLSA method or any other alternative method.

8.    During this time, I also knew that there was a lawyer in Chicago who was looking into this issue.  His office, Myron Cherry & Associates, had been hired by

several pilots who were concerned about this issue, and I believed (although I did not sign on with Mr. Cherry) that the issue was being investigated as early as July, 2006. After August, 2006, when it became apparent to me that nothing was going to happen quickly through Mr. Cherry's office, I began to search for a lawyer that I could contact. After several attempts, I was finally put in touch with Michael Olin.  It was only on February 8, 2007, after Mr. Olin, Kozyak Tropin & Throckmorton and Crowell & Moring were able to discern what had happened and complete the necessary legal research that they agreed to represent me.

9.      I do not believe that I delayed unreasonably in seeking to find out what was going to happen to the $550 million.  I am an airline pilot, not a lawyer, accountant or pension expert.  I know that this is complicated, and I did my best to understand what was happening throughout the first nine months or so of 2006.  After being frustrated at my inability to get the answers I needed, I contacted counsel as soon as I could locate a lawyer willing and able to attempt to unravel what had happened.

10.      When Kozyak, Tropin & Throckmorton and Crowell & Moring agreed to represent me, both Rafael Rodriguez and Elli Mizrahi, pilots I knew and had told of my plans, also contacted Kozyak Tropin & Throckmorton and Crowell & Moring to join in this claim.

11.      I understand that ALPA is demanding a security bond of over $30 million for the injunction we are seeking.  I am not in a position to post such a bond, and I don't know any member of the class who is, so if such a bond is required, we will be denied any relief.

FURTHER AFFIANT SAYETH NOT.

RAYMOND GARAVITO

STATE OF FLORIDA        )
                        )  SS:
COUNTY OF MIAMI-DADE)

The foregoing instrument was acknowledged before me this ___3rd___ day of
March
~~February~~, 2007, by Raymond Garavito, who is personally known to me and who did/did not

take an oath.

Notary Public - State of Florida

_____
(Name of Acknowledger Typed,
Printed or Stamped)

_____
(Title or Rank)

My Commission Expires:

ISMARY GARCIA
MY COMMISSION # DD 227902
EXPIRES: July 25, 2007
Bonded Thru Notary Public Underwriters

# EXHIBIT A

# *PDAP Top-Off and Taxable Remainder Distribution Method*
## *ALPA Convertible Notes*
### Questions and Answers

To:         All United Pilots

From:       UAL-MEC Retirement and Insurance Committee

On June 23, 2006 the United MEC passed the following resolutions. Consistent with the two resolutions below, this question and answer document has been prepared to help you make an educated decision on the membership ratification ballot under your consideration.

The R & I Committee has made every effort to ensure the accuracy of the answers. However, where describing the terms of the Pilot Directed Account Plan, if there is any discrepancy between the answers and the plan documents, the plan documents will control. Similarly, the R & I Committee has, when describing provisions of law or regulations, answered based on its understanding of the law or regulation involved. For further assurance, pilots are encouraged to seek legal and/or tax advice.

### Resolution No. 4

#### *PDAP Top-Off and Taxable Remainder Distribution Method and Membership Ratification*

***Whereas***, the Bankruptcy Exit Agreement, LOA 05-02, provides for issuance of $550 million face amount Senior Subordinated Convertible Notes to a trust or other non-permanent entity designated by ALPA, with eligibility, allocation and distribution mechanics to be determined by ALPA; and

***Whereas***, under the terms of the Bankruptcy Exit Agreement, the Convertible Notes are required to be issued not later than July 30, 2006; and

***Whereas***, the UAL MEC has resolved all questions of eligibility and allocation methodology, so that the only element of the process remaining for determination is the distribution mechanics to be used in delivering to pilots their allocated shares of the Convertible Note proceeds; and

***Whereas***, after receiving presentations from the UAL MEC Retirement and Insurance Committee, including a presentation regarding a proposed distribution mechanism known as the "PDAP Top-Off and Taxable Remainder Distribution Method", and after considering membership input and direction and receiving information from the MEC's legal, actuarial and financial advisors concerning the advantages and disadvantages of various methods for distributing the proceeds of sale of the Convertible Notes; and

***Whereas***, the UAL MEC has determined that the interests of the United pilots as a whole

7

would best be served by adoption of the "PDAP Top-Off and Taxable Remainder Distribution Method" of distributing proceeds from the Convertible Notes;

*Whereas*, LOA 05-02 authorizes the UAL-MEC to adopt the PDAP Top-Off and Taxable Remainder Procedure but, given the preference of at least some members for receipt of all proceeds as current cash, the UAL-MEC believes that it is appropriate, in this instance, to request the membership to determine whether to adopt the PDAP Top-Off and Taxable Remainder Procedure or to accept the proceeds of the Notes as current income subject to current taxation;

**THEREFORE BE IT RESOLVED**, that, if affirmed by a membership vote, the UAL MEC hereby adopts, and directs the Master Chairman to use all available resources to implement, the PDAP Top-Off and Taxable Remainder method of distribution as recommended by the Retirement & Insurance Committee, as follows:

(a) As soon as practicable after issuance of the Convertible Notes, as determined by the investment banker designated by ALPA, the Convertible Notes will be sold, the cash proceeds, net of fees and expenses of sale, shall be applied and distributed as provided below.

(b) First, there shall be set aside as a reserve for purposes of correcting any mistakes, over or under payments in the distribution process, an amount equal to 6% of the net proceeds of sale.

(c) Second, the net Note proceeds, less the reserve provided in (b) above, shall be allocated among eligible individual pilots in accordance with the Gap Allocation methodology previously developed by the R&I Committee and approved by the MEC.

(d) Third, out of the proceeds allocated in accordance with (c), an amount equal to the maximum amount permitted under IRC §415(c) to be contributed to the accounts of eligible pilots under the Pilot Directed Account Plan (after taking into account actual and projected B and C Plan contributions and all contributions of stock/claims sale proceeds prior to date) shall be deposited in the PDAP as an employer contribution for the 2006 Plan Year, such contribution to be made as soon as practicable after closing of the sale and determination of eligible pilot shares. To the extent, if any, that any pilot UAUA shares remain undistributed as of the time any contribution of Convertible Notes proceeds is to be made, Convertible Notes proceeds shall have priority and shall be contributed to the PDAP before any additional contributions of stock.

(e) Fourth, out of the remaining allocated proceeds, there shall be set aside an additional amount equal to the estimated maximum permissible employer contribution under IRC §415(c) for each eligible pilot for Plan Year 2007, based on the pilots' estimated earnings for the year, after taking into account estimated Company B and C Plan Contributions for 2007 but without regard to any potential 2007 401(k) contributions by pilots.

(f) Fifth, the balance of the net Note proceeds remaining, after setting aside the amounts

*8*

specified in (b) and (e) above and after making the PDAP contribution for Plan Year 2006 as provided in (d) above, less required income and FICA tax withholding, shall be distributed to the eligible pilots in the amounts to which each pilot is respectively entitled, in cash, as soon as reasonably practicable after closing of the sale of the Notes and computation of pilot shares.

(g) Sixth, the amounts set aside under (b) and (e) above shall be deposited and held in a grantor trust to be established for that purpose. The grantor trust shall be established under a trust agreement containing terms and provisions, and with a bank or trust company trustee, and for a duration, all acceptable to ALPA.

(h) Finally, as soon as administratively practicable after January 1, 2007, the amounts then held in the trust shall be used and applied: (i) to make the employer contribution to the PDAP contemplated in (e) above; (ii) to correct any mistakes or under payments which have been discovered and documented; and (iii) to the extent any amounts remain in the trust after (i) and (ii), to be distributed, less required income and FICA tax withholding, in cash to eligible pilots.

**BE IT FURTHER RESOLVED**, the membership be promptly balloted, by ALPA electronic ballot procedure, whether to adopt the PDAP Top-Off and Taxable Remainder Procedure, with an affirmative vote by a majority of those voting constituting direction to the Association to implement the PDAP Top-Off and Taxable Remainder Procedure and a vote not in the affirmative constituting direction that the proceeds of the Notes be issued as promptly as practicable to the eligible pilots as current cash income (with a 6% reserve placed in a grantor trust to protect against errors and omissions);

**BE IT FURTHER RESOLVED**, that the Master Chairman, with the assistance of the R&I and Negotiating Committees, legal staff and advisors, be authorized and directed to negotiate and enter into any necessary agreements or other documentation, including without limitation any modification of the Bankruptcy Exit Agreement and/or the terms of the Convertible Notes, necessary or appropriate, in his judgment, to effectuate and implement this Resolution and the choice made by membership vote;

### Resolution No. 5

**BE IT FURTHER RESOLVED**, that the UAL-MEC recommends adoption of the PDAP Top-Off and Taxable Remainder Procedure as providing the maximum value to the pilot group consistent with protection of the Notes proceeds.

**Question 1:**    I understand that eligible pilots will receive cash proceeds from the ALPA convertible note sometime in August 2006. Why am I receiving these proceeds?

**Answer 1:**    As part of the Bankruptcy Exit Agreement, we negotiated the right to receive $550M, face amount, in Senior Subordinated Convertible Notes to be issued by UAL not later than 180 days after exit from bankruptcy. The MEC has

9

adopted an allocation methodology under which the Notes will be sold as soon as possible after issuance and the net proceeds of the sale will be applied as a partial offset to the losses suffered by pilots as a result of termination of our A-Plan.

**Question 2:**   How much do we expect to realize when we sell the Notes?

>   **Answer 2:**   Obviously, the amount of the proceeds won't be known until the Notes are actually sold.  For purposes of the R&I Committee's prior communications and analyses, and on the MEC's Note Allocation website, we have assumed that the sale will generate net proceeds, after payment of fees and expenses and allowing for the possibility that the Notes sell slightly below par, of $500M.  The R & I Committee believes that the actual net proceeds may be somewhat greater than $500M.

**Question 3:**   How much will individual pilots' proceeds be?

>   **Answer 3:**   Under the MEC approved note allocation methodology, pilots will receive a portion of the Note proceeds based upon their individual losses on termination of the A-Plan, determined by projecting career earnings, FAE, and years of participation to age 60, offsetting expected C-Plan and PBGC-paid benefits.  Please refer to the Convertible Note Allocation website at https://www.ualpilots.org/mynoteallocation for detailed information.  In addition, refer to the Gap Specifications document enclosed in this mailing.

**Question 4:**   Who will be eligible to participate in this distribution?

>   **Answer 4:**   In general, pilots on the Company-compiled pilot system seniority list as of January 1, 2005, are entitled to share in the allocation of the Convertible Note proceeds. This general rule is subject to modification with respect to pilots in special circumstances, such as voluntary or involuntary termination, recall from furlough, death and other factors.  Again, please refer to the Gap Specifications document enclosed in this mailing for more detailed information regarding eligibility.  It can also be found on the website at https://www.ualpilots.org/mynoteallocation .

**Question 5:**   What will my individual allocation be?

>   **Answer 5:**   Since the Note allocation methodology closely tracks the rules and assumptions associated with our terminated A-Plan, each pilot will have a unique allocation amount.  Refer to https://www.ualpilots.org/mynoteallocation for your individual allocation calculation.

**Question 6:**   What will I receive?  Will I get cash, will I get Notes, or will I have a choice like I did with the stock?

10

**Answer 6**:     All the Notes will be sold and the net cash proceeds of the sale will be distributed to pilots. As explained below, depending on the outcome of the ratification vote, the distribution will either take the form of a combination of PDAP contributions and direct, taxable cash payments, or totally in the form of direct, taxable cash payments.

**Question 7**:     What fees will be paid with respect to the sale of the Notes?

**Answer 7**:  In the 2005 Bankruptcy Exit Agreement, approved by the MEC and ratified by the pilots, ALPA and the Company agreed that our investment banker, Athena Advisory Group, would act as the exclusive sales agent for the Notes.  It has always been the MEC's intent, based on the advice of its financial and legal consultants, to convert the Notes into cash as quickly as possible in order to minimize the credit risk associated with holding new UAL paper. To that end, Athena has been creating a market for the Notes, building a "book" of potential buyers, negotiating with United and the markets to determine an interest rate to be affixed to the Notes which will enable the Notes to sell as close to par as possible, and negotiating with United over the form of the delivery vehicle.  As was done with the Claims Sale, the fee associated with all this work will come in the form of a commission from the gross proceeds of the sale.  ALPA and Athena have negotiated a fee of 1.25%, which we believe to be below market for such work. Additionally, there may be some modest additional fees, but they are not expected to be significant.

**Question 8**:     When can I expect to receive the note proceeds?

**Answer 8**:     It depends on the outcome of the vote.

If the membership votes

## IN FAVOR

of the "PDAP Top Off and Taxable Remainder plan", and assuming the sale of the Notes generates net proceeds of $500M, you can expect:

*297,K*

1. August 2006

   a.  $ 35M will be contributed to the PDAP.
   b.  $280M will be paid as current wages and taxed at your appropriate federal and state tax rate, plus FICA.
   c.  $ 30M will be held back as a reserve pool inside the Grantor Trust (see Question 11).
   d.  $155M will be held by the Grantor Trust for February 2007 contributions to the PDAP.

*11*

2. February 2007
    a.  Grantor Trust closed
        i.  $155M contributed to the PDAP
    b.  $30M reserve pool, minus any amounts used for corrections, distributed directly to pilots and taxed at your appropriate federal and state tax rate, plus FICA.
    c.  Interest earned from inception to termination of the Grantor Trust, net of applicable taxes, distributed directly to pilots and taxed at your appropriate federal and state tax rate, plus FICA.

If the membership votes

### AGAINST

the PDAP Top Off and Taxable Remainder plan, you can expect (again assuming $500M in net proceeds):

1. August 2006
    a.  $ 470M will be paid out as current wages and taxed at your appropriate federal and state tax rate, plus FICA.
    b.  $  30M will be held back as a reserve pool inside the Grantor Trust (see Question 11)

2. As Soon as Administratively Feasible after August 2006
    a.  $30M reserve pool distributed and taxed at your appropriate federal and state tax rate, plus FICA.
    b.  Minus any amounts used for corrections
    c.  Plus Interest, taxed at your appropriate federal and state tax rate, plus FICA.

**Question 9**:  Why has the MEC pursued an agreement with the Company to allow the distribution of the notes directly into our PDAP system?

**Answer 9**:      To defer tax on note proceeds as indicated in the following contractual language:

The 2005 Bankruptcy Exit LOA 05-01 included a provision stating:

/2

UAL convertible notes described in Exhibit D shall be subject to mutually-acceptable modifications to optimize implementation for all parties from an accounting, securities law and tax law perspective.

In addition, Exhibit "D" regarding Convertible Notes includes the following paragraph:

**Initial Holder:**    A trust or similar non-permanent vehicle for the benefit of eligible United pilots; the Notes or the value of the Notes to be distributed to such pilots or pilot retirement accounts as soon as reasonably practicable given tax, accounting, securities and market considerations; all rights of the Notes to be exercised by individual pilots while the notes remain in the trust. Distribution mechanics, eligibility and allocation among such pilots to be reasonably determined by the Association.

By forgoing tax deferral, all pilots would be subjected to immediate withholding and payroll taxes on the proceeds.

In essence, the "PDAP Top-Off and Taxable Remainder Distribution Method" would convert a significant part of the note distribution from current income (subject to current income and FICA taxes) to a retirement benefit (subject to deferred income taxes but not subject to FICA). On a "big-picture" basis:

Error! Objects cannot be created from editing field codes.

For all eligible pilots, the R & I Committee has determined that approximately $67M in taxes can be deferred utilizing the PDAP Top Off and Taxable Remainder plan. As noted above, the IRS will take $175M of the $500M note proceeds without deferral; $108M of the $500M with deferral. (Assumes a 35% tax rate)

**Question 10:** Why conduct membership ratification on this proposal?

*not by pilots but by the ALPA MEC*

**Answer 10:** Although the Bankruptcy Exit Agreement was ratified with language authorizing the MEC to determine the mechanics of distribution, the MEC has determined that the pilots should make the final determination on the method of distribution of their convertible note proceeds.

Because of the vehicle that must be established to accomplish tax deferral for 2007 (Grantor Trust) and the Internal Revenue Code (IRC) requirement that this choice must be an "all or nothing" collective participation decision, the MEC

*/3*

believed it was appropriate and necessary for each eligible pilot to participate in the decision based on his/her individual financial circumstances.

**Question 11:** What is a Grantor Trust and why do we need to establish one to hold the convertible note proceeds?

**Answer 11:    A Grantor Trust is simply a "plumbing vehicle." <u>Its sole purpose is to legally segregate that portion of the Convertible Note that will be used to fund the 2007 PDAP contribution and reserve pool. The Trust will preclude UAL from using the assets for any corporate purpose</u> but, in order to avoid immediate taxation under IRC §83 and the doctrine of constructive receipt, the Trust must provide that assets are available to general creditors in the event of UAL's future insolvency.  However, the Trust will only be in existence during the interim time—6 months or less--required to distribute the 2007 PDAP contribution and reserve pool funds.**

Regardless of the outcome of the vote on the distribution method, the Grantor Trust must be established for:

1. Immediate tax deferral to shield the note proceeds from taxation beginning when the notes are sold into the market, the proceeds are received and then distributed to the pilots as taxable income and/or a portion withheld for the 2007 PDAP contributions, and

2. Short term tax deferral to shield the note proceeds from taxation until contributed to the 2007 PDAP accounts (if pilots vote FOR the PDAP Top Off and Taxable Remainder plan), and

3. Short term tax deferral to shield the reserve pool funds from immediate taxation.

While the likelihood of insolvency of the Company, necessitating the need for another bankruptcy filing between now and February 2007, is extremely low...it is not absolutely zero.  At present, the company has strong cash flows, excessive liquidity and approximately $3.6B in unrestricted cash in the treasury.  In addition, the markets have spoken as to their confidence in the Company's solvency:

- Capital markets have given this company:
  - Equity--        ~ $ 3.75 B
  - Debt--          ~ $ 550 M (Convertible Note)
                    ~ $ 2 B in exit financing
  - Cash Balance ~$ 3.6B

- New Bankruptcy law is now in effect...not very appetizing to management.

*14*

However, there are no guarantees that an unforeseen event may occur which could place not only the company but the entire industry at risk. You must weigh the positive aspect of tax deferral against the risk, however slight, of another UAL bankruptcy filing during the term of August 2006 to February 2007.

**Question 12:**  Are the entire convertible note proceeds going into the Grantor Trust?

**Answer 12:**    The precise mechanics for handling the 2006 PDAP contribution (if a majority of pilots vote FOR the PDAP Top Off and Taxable Remainder plan) and direct, taxable cash distributions to pilots in August 2006 have not been concluded and it is possible that those amounts would be passed through the Grantor Trust. But the only amounts which are expected to remain in the Grantor Trust for more than a few days at most would be the amount necessary to fund the 2007 PDAP Contribution (approximately $155M) and the reserve pool of $30M.

**Question 13:**  What is the purpose of the "reserve pool?"

**Answer 13:**    Although we are doing our very best to ensure that the Note Allocation and Distribution Program will produce correct results for every eligible pilot, prudent legal and financial planning dictates that a small set-aside be created to correct possible discrepancies and omissions.

Working with our financial advisors we have determined that a reserve of 6% of the total note proceeds is appropriate. These reserve dollars will be held in the Grantor Trust facility along with the pilots' 2007 estimated, allowable PDAP note proceeds that are to be contributed in February 2007. The distribution of reserve pool funds will occur after all corrections/discrepancies have been adjudicated but no later than the February 2007 PDAP funding date.

**Question 14:**  If the pilots vote **IN FAVOR** of having the note proceeds placed into a qualified plan in lieu of receiving it in a direct, taxable distribution, what plan(s) are we talking about?

**Answer 14:**    Presently, the pilot group has a qualified plan—the PDAP—or Pilot Directed Account Plan.  Money comes into the PDAP from a number of sources: the Company's "B" and "C" plan contributions, the pilot's elective pre-tax 401(k) contributions, post-tax elective pilot contributions and rollover contributions.  Once in the PDAP, the money is allocated to an account in the pilot's name appropriate to the source of the contribution.  The pilot is then able to direct how the money credited to his various accounts is invested: in one or more of the "core funds" or the Schwab Individual Brokerage Account ("IBA").

**Question 15:**  If the pilots vote AGAINST placing their note proceeds into the PDAP, how will I receive the assets?

15

**Answer 15**: The Company simply plans to deliver to each pilot, in August 2006, the cash proceeds to which he/she is entitled under the MEC allocation formula, minus the cash used to satisfy tax withholding requirements, and a reserve pool holdback.

**Question 16**: What are the benefits of distributing the note proceeds into the PDAP as opposed to distributing cash proceeds directly to pilots?

**Answer 16**: There are two financial benefits. First, to the extent the cash can go into the PDAP as an employer contribution, it will not be subject to FICA tax or withholding. Second, pilots will not pay income taxes on either the initial distribution or the investment returns on the distribution until the money is withdrawn at retirement or other termination of employment. This tax deferral benefit is substantial for any pilot who has 415(c) headroom remaining in the PDAP.

**Question 17**: If the pilots vote IN FAVOR of the proposal to contribute the pilot note proceeds into the PDAP, will I be able to put the entire amount allocated to me into the Plan?

**Answer 17**: That depends on a number of factors. Section 415(c) of the Internal Revenue Code limits the amount of "annual additions" to defined contribution plans like our PDAP to a maximum of $44,000 in 2006 and an estimated $45,000 in 2007. This includes any employer contributions on your behalf, as well as any voluntary pre-tax (401(k)) contributions and post-tax contributions you elect to make yourself. In addition, pilots who are 50 or older may make "catch-up" contributions ($5,000 in 2006, estimated $6000 in 2007) which do not count against the limit. Depending on the amount of proceeds to which the pilot is entitled, some pilots, especially more highly compensated pilots, will reach the 415(c) limits before all or most of the cash proceeds has been absorbed by the Plan. To the extent their allocation exceeds the amount which can be contributed to the plan, those pilots will receive the excess cash directly from the Company as a payroll event.

**Question 18**: Why can't the Company give every pilot the option of making their own decision? Why do we need one rule for everyone?

**Answer 18**: This would have the effect of converting the distribution from an employer contribution to an elective deferral for Plan purposes. This would have two unfortunate consequences which would substantially undercut any benefit to be gained from putting the note proceeds into the Plan.

One consequence is as an "elective deferral", the distribution would be subject to the lower Internal Revenue Code limits on 401(k) contributions ($15,000 in 2006, estimated $16,000 in 2007), making it likely that most pilots would be unable to shelter much, if any, of their distribution. A second consequence is the

distribution – whether deferred or not - would be subject to FICA tax.  Apart from the cost to the employee, this is a disincentive for the Company because, as long as the distribution is an employer contribution and not an elective deferral, the Company would not have to pay the employer FICA tax.  Maximizing the tax benefits of contributing the note proceeds to the Plan and providing the Company an incentive to agree drives an all or nothing decision.

**Question 19**:   Aren't the 401(k) and the PDAP the same thing?

**Answer 19:**    No, the PDAP receives contributions from several sources.  The 401(k) contribution is pretax money you personally contribute into your PDAP.  This is in addition to the Company (the B and C Plans, equity), employee post-tax, and rollover contributions.  Your 401(k) contribution is subject to its own set of contribution limits, separate from but included within the overall 415(c) limits for the entire PDAP.  These limits are described in Q&As 18 and 19 above.

**Question 20:**   Will ALPA dues be deducted from your Convertible Note allocation?

**Answer 20:**    No.  The ALPA Administrative Manual, Article IX Section 4 clearly defines what type of payment or pilot income is subject to dues—the Convertible Notes are not subject to dues.

Please forward any questions you may have regarding this issue to ualmecri@alpa.org.

/7

# EXHIBIT B

## ~~Continuing Education Regarding~~
## Convertible Note Allocation
### MEC R & I Committee

IMPORTANT NOTE!

**Any identification of data issues or other omissions must be brought to the Committees attention, in writing no later than December 31, 2006. Contact the R & I Committee at UALMECRI@alpa.org**

Distribution of the Convertible Note proceeds has now begun. In an effort to provide further information about the Convertible Notes, your MEC passed the following resolution at the July 2006 MEC meeting:

*"BE IT RESOLVED, that the MEC directs the Retirement & Insurance Committee to enact a renewed education effort for the pilot group to include, but not be limited to:*

> *an explanation of the original concept of the Notes allocation as presented during the ratification process for the 2005 exit agreement*

> *a simplified summary of the "building blocks" that make up a pilot's individual allocation*

> *an explanation of the variability of the amounts in the final allocation method"*

Your R & I Committee provides this document as additional education regarding the Note allocation methodology. We also encourage you to utilize this document and the following resources for further study of your individual allocation:

> Gap allocation website at https://www.ualpilots.org/myNoteallocation

> The "Gap Specifications" resources document on the MEC website

> The "PDAP Top-Off Taxable Remainder Qs & As" on the MEC website

> Convertible Notes Statement – provided by United

> R & I Memo dated 8/25/06 – RE: Note Allocation Issues

> MEC Representatives, LEC R & I Committees and the MEC R & I Committee structures are available as a resource to address Note allocation and distribution questions.

~~Original Concepts of the Note Allocation~~

At the Bankruptcy Exit Agreement road shows in December 2004, pilots were told:

> ➢ Under the Agreement, all distribution mechanics, including eligibility and allocation among eligible pilots, would be determined by the MEC

> ➢ Subject to further MEC review and decision, the Note proceeds would be allocated by the MEC in a manner that took into account active pilot losses from the terminated A-Plan pension;

> ➢ Some, but not all, of the pension losses suffered by active pilots would be offset by PBGC payments and by future C-Plan contributions; and

> ➢ The pension losses suffered by active pilots includes two elements: losses of benefits attributable to service up to the date of A-Plan termination and losses of expected benefits attributable to pilot service over the rest of their careers

Beginning with its January 2005 meeting, after the Bankruptcy Exit Agreement was ratified by the pilot group, the MEC began exploring several allocation techniques suggested by the R&I Committee. By the fall of 2005, the MEC had narrowed the techniques under consideration to three: the "Gap 1" method, the "PLSA method" and the "Gap 2" method.

The "Gap 1" method was an allocation technique which would have considered only those losses on termination of the A Plan attributable to loss of benefits accrued prior to Plan termination, measured by the amount of pilots' accrued benefits as of the date of termination, minus the amount pilots would receive from the PBGC. Gap 1 ignored losses of benefits pilots would have accrued in the future, based on their service after Plan termination, and also ignored the value of pilots' post-termination C Plan benefits.

The "PLSA method" was a technique which would have allocated the Note proceeds in proportion to pilots' Partial Lump Sum entitlements under the A Plan. This methodology was a simplified proxy for the Gap 1 method in the sense that it would have based allocations on benefits attributable to service in the past, up to the date of plan termination.

The "Gap 2" method was an allocation technique that attempted to take into account both the loss of benefits accrued up to the date of Plan termination as well as the loss of benefits that would have accrued in the future had the Plan not been terminated, taking into account expected payments from the PBGC and the projected value of future C Plan contributions.

At its October 2005 meeting, after the latest in a series of detailed presentations from the R&I Committee and its actuarial and legal advisors, the MEC eliminated the "Gap 1" and "PLSA" methods from further consideration and directed a working group, consisting of

~~the R&I Committee and four MEC members to refine the Gap 2 methodology for~~
consideration by the MEC. On January 18, 2006, the MEC formally adopted the Gap 2
method, thereafter referred to simply as the "Gap method", as the basis for allocation of
the Note proceeds.

### Overview of the Gap Allocation Methodology

The Gap Allocation Methodology (previously called the "Gap 2 methodology") allocates the
Convertible Note proceeds among eligible pilots in proportion to their losses on termination
of the A-Plan, taking into account both:

    (a)  The benefits already accrued as of the date the Plan terminated (called the
           "DOPT"); and

    (b)  The additional benefits pilots could reasonably have expected to earn between
           DOPT and their age-60 normal retirement date if the A-Plan had survived.

For purposes of the Gap Methodology, a pilot's loss—the "Gap" in the "Gap
Methodology"—is the difference between his total projected A Plan benefit (a + b), *minus*
the smaller amount the pilot can actually expect to receive with the terminated A Plan from
two sources: (*i*) PBGC payments; and (*ii*) projected C-Plan contributions between June 2005
and age 60 (including projected investment earnings on those contributions during that
period). Putting it another way, the Gap Allocation Method has the following building
blocks that determine every pilot's distribution amounts:

- Your A-Plan benefit projected to age 60, assuming a "normal" career,
  ~~computed as if the A-Plan had not terminated~~

- Your estimated PBGC Payout

- Future Value of your projected C fund contributions (including accumulated
  investment earnings) to age 60

- ~~Your Note Allocation proceeds~~

~~To build this recovery model, we first identify a target. Simply stated, we utilized our~~
best actuarial resources to estimate your projected A-Plan benefit at normal retirement
(age 60), ignoring the termination of the Plan, and using the A Plan benefit formula:

Years of Participation *x* Final Average Earnings *x* Multiplier

Having projected the pilot's A-Plan benefit, we then determine the pilot's gap/loss by considering recoveries which include other sources of retirement income made available through C-Plan benefits and PBGC payments:

Projected A-Plan Benefit
*Minus*
C-Plan Benefit (Annuitized)
*Minus*
PBGC Benefit (Annuitized)
<u>*Equals*</u>
GAP

We also make adjustments for any PLSA (and its effect on the PGBC guarantee) or other withdrawals from the Plan, as well as benefits accrued in other non-pilot plans, such as pilots who were previously hired as mechanics, flight attendants, etc.

Finally, the net Note proceeds are allocated among eligible pilots in proportion to their respective gap losses. Under the Gap Allocation Methodology, each pilot's share of the Note proceeds will enable the pilot to recover a percentage of his or her gap loss which is, as nearly as possible, equal to the recovery percentage provided to all other pilots. The final recovery percentage will not be known until the correction process is completed and all the Note proceeds have been distributed, but we currently expect it will be approximately 41%.

**<u>Details of Gap Allocation Computations</u>**

For pilots interested in mining down into the details of the computations of the projected A Plan benefit, the estimated PBGC payments and the value of the C-Plan contributions used to determine pilots' gap losses were given in the Gap Specifications Document available on the MEC website. Here are some highlights:

*Projected A Plan Benefit.* In the benefit formula used to project pilot A-Plan benefits (Years of Participation *x* Final Average Earnings *x* the Benefit Multiplier):

- "Years of Participation" include all Years of Participation (YOP) prior to Date of Plan Termination (DOPT) and all expected YOP after DOPT, projected to the pilot's age 60 normal retirement date, up to a maximum of 30 years.

- "Final Average Earnings" are determined on the basis of pilots' projected earnings under the "Adjusted Stove-Pipe" pay progression model.

- The "multiplier" is 1.35.

- The projected A-Plan benefit cannot be less than the pilot's "protected accrued benefit" as of May 31, 2003.

*Projected C Plan Benefit.* The C Plan benefit available to pilots at their normal retirement dates will be the amount the pilot accumulates from Company C-Plan

4

contributions over the balance of the his or her career, plus the investment earnings generated by those contributions while they are credited to his or her PDAP account. The Gap Allocation Methodology, projects pilot C Plan contributions as 6% (the contractual C Plan contribution rate) of the pilot's projected annual pay under the Adjusted Stove-Pipe pay progression model. The Gap Allocation Methodology assumes that the contributions will generate an investment return averaging 6% a year. The MEC selected 6% based on the advice of its independent actuaries and after reviewing historical and actuarial non-risk free investment return data. Obviously, every pilot's actual rate of return will depend on his or her own investment selections. But in order to place a value on pilots' C-Plan benefits, some reasonable assumption as to investment returns must be used.

   *Adjusted Stove-Pipe Pay Progression Model.* **The purpose of the "Adjusted Stove-Pipe" pay progression model is to determine Final Average Earnings for purposes of projecting pilots' A Plan benefits and to** project a pilot's future C-Plan contributions. The model assumes that pilot pay will increase and that the increases are attributable to two sources: (*i*) expected contractual increases (in accordance with Contract 2005 scheduled increases through the amendable date and 1½% pay raise a year as of each May 1 thereafter) and (*ii*) the pilot's exercise of his or her seniority rights to move upward in fleet and seat.

   All pilots enter the "Adjusted Stove-Pipe" model in the fleet/seat status actually held on January 1, 2005. The pilot's actual 2005 pensionable earnings are used as the starting point for wage growth analysis. For 2006 and beyond, pilot seniority will determine the fleet/seat to which eligible pilots are assigned for purposes of determining annual pay for that year.

   The Adjusted Stove-Pipe Pay Progression Model is based on the Company's fleet plan as of January 1, 2005. It recognizes vacancies created by normal age 60 retirements and assumes that, beginning February 1, 2006, each pilot will bid the vacancies thus created, thereby securing the highest-paying vacant fleet/seat position to which he or she is entitled by virtue of seniority (called "pos due" in the model.) The model further assumes that, as of each February 1st thereafter, the pilot will move up into the next higher-paying fleet/seat position ("pos due") which is deemed to be vacant and available under the model, to which seniority would entitle her/him. That becomes the pilot's position, and determines pensionable earnings, for the entire ensuing year. If, as of any February 1st, the model does not project the availability of any vacant higher-paying fleet/seat position which the pilot's seniority would entitle her/him to hold, the pilot is treated as remaining in the prior year's fleet/seat position. This exercise is repeated until the pilot reaches age 60. The resulting pay progression projection is the basis for projecting the pilot's C-Plan contributions over the balance of a career and for projecting a FAE to compute projected A-Plan benefit.

   The Adjusted Stove-Pipe Pay Progression Model does not provide for displacements and does not recognize vacancies created through "trickle down" bidding dynamics or domicile preferences. For 2005 and 2006 only, it does recognize age 59 bypass pay and activation pay contractual provisions.

   *Estimated PBGC Payments.* The PBGC will make payments to all pilots who were "vested," *i.e.*, all pilots who had at least 5 years of service as of DOPT (December 30, 2004.)

PBGC payments will be made from assets of the Plan (in the case of benefits in Priority Category 3) or from the PBGC's own funds (in the case of benefits in Priority Category 4) or from a combination of Plan assets and PBGC funds (where a pilot's funded Priority Category 3 benefit is less than the PBGC maximum guarantee.)   *See,* Section 8 of the Gap Specifications Document on the MEC website for a more detailed explanation.

The amount pilots will receive from the PBGC has been estimated by Buck Consultants, LLP, a highly-regarded national actuarial consulting firm retained by the MEC to act as independent actuaries on behalf of UAL pilots, based on data furnished by UAL. Because the data on forming the basis for our actuaries' calculations has been corrected and updated as compared to the "unscrubbed" Company data on which PBGC estimated benefit statements are based, the R&I Committee believes that our actuaries' estimates are generally more reliable than the current PBGC estimates. (Our estimates have recently been adjusted to take into account the PBGC treatment of PLSA withdrawals, which was discussed in the recent letter we sent you concerning the web site and Company allocation figures.)

*Present Value of Future A-Plan Benefits, C-Plan Benefits and PBGC Payments.* The Note proceeds which have just been distributed <u>and</u> those that are being held for distribution early next year represent dollars on hand today. In contrast, the projected A Plan benefits, projected C Plan benefits and PBGC payments all represent dollars which will be paid in the future. Therefore, in order to compare apples-to-apples in the Gap Allocation Methodology, the A Plan and C Plan benefits and the PBGC benefits must be converted into the equivalent of today's dollars to be comparable to the Note proceeds. To do this, the value of a future benefit in today's dollars is calculated using a "discount rate" to reflect the time value of money. "Discount rate" is an expression of the opportunity cost of money, nominal interest rates and present and expected inflation, and reflects the fact that a promise to pay a dollar a year from today does not represent the same economic value as a dollar actually paid today. If you receive a dollar today and invest it for a year at, say, 1% interest, it will earn a penny during the year so, a year from now, that dollar would be worth $1.01. Or, putting it the other way round, a dollar payable a year from now is really only equivalent to 99¢ in today's money, using a discount rate of 1%.

Based on the actuarial advice it received from its independent actuarial consultants, the MEC selected a fixed 6% discount rate for determining the present value of benefits payable in the future

*Summary.* The Note proceeds are allocated to pilots in proportion to their losses determined under the Gap Allocation Methodology. Each pilot's gap loss is equal to the present value of his or her projected A Plan benefit (based on projected Years of Participation, FAE determined under the Adjusted Stove-Pipe pay progression model and the 1.35 multiplier), *minus* the present value of the pilot's projected C Plan benefit and estimated PBGC payments. The assumptions used in projecting pay and investment returns, and in determining the present value of future benefits, were adopted by the MEC based on the advice of its independent actuarial consultants.

*Special Cases.* Special eligibility and/or allocation rules may apply to pilots in certain categories including, for example, pilots who terminated or resigned prior to February 1, 2006; pilots who are deceased prior to that date; pilots currently or formerly

6

on furlough; pilots on Military Leave; Parental/Family Leave or other leave status; pilots on PDI; pilot instructors, standards captains and management pilots. These special cases are explained in the Gap Specifications Document on the MEC website.

### Variability of Individual Note Allocations

Some pilots have expressed concern about what they perceive to be a discrepancy between the amount of their allocation (as shown on the Gap Allocation website) and the amount they expected based on their understanding of what they were told, or shown, via graphs and other communications from the MEC. Those pilots' concern about the accuracy of the allocation model arises, in part, from their assumption that one can safely "compare their allocation amount with fellow pilots" who seem similar in age, seniority or some other demographic. Keep in mind: each pilot's projected earnings are unique. Projected earnings affect both the projected A Plan benefit, which is the starting point in analyzing loss, and the timing and amount of projected C Plan contributions, which is one of the sources of pilot recovery. What the Gap allocation model has highlighted is the individual differences among pilots within the A Plan and the resultant differences in allocations. Just as two different pilots with different career expectations would have received different benefit amounts under the A plan, these same pilots will have different Note allocations as a result of the Gap Allocation Methodology.

The Note allocation methodology has many individual inputs and considerations. As we examine the variability of allocations, we focus on 5 major inputs:

- o Age

- o Projected years of participation in the A plan, given a "normal" career

- o PBGC Payout

- o Final Average Earnings

- o Future Value of C fund contributions

The variability of individual allocations is best illustrated by the use of examples and actual disbursements across all major input ranges. Consider the following examples:

## Example #1 (The effect of Age and Projected Years of Participation)

**Pilot A: 1992 Hire, Current Age 51, 320 Captain: $18,000 allocation**
**Pilot B: 1992 Hire, Current Age 46, 320 Captain: $39,000 allocation**
**Pilot C: 1998 Hire, Current Age 38, 767 First Officer: $55,000 allocation**

It is easy to see why pilots A and B might feel slighted when comparing allocations with pilot C. They have more years at the Company, more years of participation in the A plan,

7

and they are older, with less time until retirement to make up for the loss of the A plan. Pilots & B were hired a class apart from each other, and they have had identical seat movement through the last 14 years. There appear to be two reasons for these apparently counter-intuitive results:

1) **Note allocations are not based solely on seniority.**

2) **Payouts are not predicated solely on accrued retirement benefits. They are also based on what would have been earned given a normal career progression and retirement on an individual basis.**

As pilots, we are used to seniority being given precedence over other issues as it is in almost every other aspect of our professional lives.

However, the MEC decided to utilize the contractual and defined benefit plan rules and regulations to the maximum extent possible and as such, based the Note allocation payout on A Plan retirement expectations rather than just seniority.

The GAP methodology developed by the R & I Committee and adopted by the MEC uses the Note proceeds to fund a percentage of the gap that exists between your expected "full career" retirement annuity and what can reasonably be projected as annuity payments from the PBGC and C Fund.

Pilot A above would have received a yearly A-plan benefit of $50,000 at age 60, after 22 years of participation. Pilot B above would have received a yearly A-plan benefit of $63,000 at age 60, after 27 years of participation, and pilot C above an annual  A-plan benefit of $83,000 at age 60, after 29 years of participation. **This A-plan benefit projection is the core metric from which your GAP allocation is calculated.**

In addition, the PBGC benefit will also be different for each pilot because of age and the rules associated with "protected benefits."

The MEC allocation formula is based on funding the "gap" between the normal A Fund retirement expected before A Plan termination and the sum of: (i) the PBGC payout and (ii) the projected, annuitized value of C fund contributions.

Pilots A&B are both receiving near the maximum annual age 60 payout from the PBGC of approximately $28,850. Pilot C will receive only $10,000 a year from the PBGC due to the fact that she had accumulated only 5 years of participation in the A-Plan and had not yet accrued much of an A Plan balance. (Remember, A-Plan accrual is affected by the formula: Multiplier x YOP x FAE; where FAE considers the last 10 years of a pilot's career). All other things being equal, the Gap methodology requires a larger payout for Pilot C as an offset to the smaller PBGC payout at age 60.

This is where some pilots feel the formula seems unfair. Pilots A&B have accrued a substantially larger retirement benefit at date of termination than pilot C, yet their payouts

are smaller. However, if we take each pilot as an individual and give them a full career with a normal A Plan retirement, minus their PBGC benefit and their annuitized C Plan benefit, the formula treats every pilot in exactly the same manner and "fills every pilot's GAP bucket" so that each pilot receives an equal recovery basis (approximately 41% of the GAP.)

## Example #2 (The effect of Age and C fund on distribution)

### Pilot D: 1985 Hire, Current Age 45, 767 Captain: $67,004 allocation

### Pilot E: 1985 Hire, Current Age 49, 767 Captain: $93,928 allocation

### Pilot F: 1985 Hire, Current Age 53, 767 Captain: $100,935 allocation

In this example, all three of these pilots were hired in the same class, and had similar seat progression throughout their careers. Pilot D will receive substantially less money from the Note disbursement than his two classmates due to the fact that he has additional years of C fund contributions coupled with compounding of interest on all C fund deposits throughout those additional years.

In this example, the age difference between pilots D and E, and pilots E and F, is 4 years. In short, Pilot D is receiving less money than pilots E and F, because he has more time to make up for the loss of his A fund benefit, while Pilot F is getting more money to make up for the fact that he has less time to make up for the loss of his A fund benefit. Accordingly, Pilot F has a larger gap than Pilots D and E, and that corresponding gap results in a larger Note allocation to fill the individual gap. You may have noticed that the difference between pilots D and E is larger than the difference between Pilots E and F. This is because when Pilot F was hired at 32 years of age, he was looking at 27 years of participation in the A plan. Pilot D, hired at 24, had the effect of his looking at 35 years of participation and Pilot E, 31 years.

Pilots D and E are capped at 30 years of participation (C2003 provision), and will get credit for Final Average Earnings (FAE) times 30 years, multiplied by 1.35%. Pilot F will get FAE times 27 years times 1.35%. The reduction in the multiplier for Pilot F creates a smaller relative gap and therefore the difference in Note allocation between pilots E and D is not as large as the difference between pilots D and E.

It is important to realize that the age of a pilot does NOT always play the same role in the model, because there are other factors involved in determining Note payouts as evidenced in example #1.

## Example #3 (The effect of earnings on distribution)

**Pilot G: 1991 Hire, Current Age 55, A320 Captain: $57,850 allocation**

**Pilot H: 1991 Hire, Current Age 55,   767 Captain: $79,287 allocation**

In this case, the two pilots can be considered twins in all areas, except their current seat and past earnings. The pilots were hired in the same class and their birthdays are three days apart. The difference is that pilot G has always traded pay for quality of life issues, and pilot H has been aggressive at every opportunity to maximize pay.

The look back for final average earnings uses the highest 3 years of the last ten years of a pilot's pensionable earnings. Pilot H had FAE in excess of $220,000 prior to the C2003 wage reductions, and this FAE will roll forward to the FAE calculation for the Note distribution. Pilot G, who had lower earnings during the same period, will have to rely on his FAE based on his last 3 years of participation, as he does not have significantly larger numbers to carry forward.

As in the A-Plan benefit calculation, under the Note allocation methodology timing can be just as important as the amount of accrued and or projected earnings.  It is important to note that in this example, if the pilots were 50 years old instead of 55, then their Note allocations would probably be very similar. This would occur because the FAE lookback of ten years would not include the higher earnings from Pilot H's pre-wage reduction earnings.

## Example #4 (Note allocation greater than $500,000)

The effect of "being in the right place at the right time".  Yes—5 pilots out of the 7,501 of our total eligible pilots will receive in excess of $500,000 from the Note.  Remember, these pilots have very large A-Plan losses and corresponding Gaps. These five pilots are getting exactly the same percentage of recovery from the Note allocation as every other pilot.

First, these pilots had above average career and final average earnings—which provided them with a large accrued and projected A-Plan benefit at age 60.  The GAP allocation methodology does not recognize any difference between qualified and non-qualified benefits.  It includes both, which is in contrast to the defined benefit pension plan and the PBGC, which do not recognize non-qualified earnings. Because of this, these pilots' A-Plan projected benefits are large.  Second, these pilots have zero or close to zero C-Plan benefits due to their retirement in early 2005.  (You will recall that the C-Plan benefit was effective in June 2005).

### "Stove-Pipe" pay progression model- Observations

There is one more issue that should be addressed regarding the inputs or "building blocks" of the gap allocation model. This would be a subset of the Final Average

Earnings (FAE) calculation that determines career progression, called the "Stove-Pipe" method. The Stove-Pipe model determines the point at which a pilot will progress through the seat changes associated with their projected career. Some pilots have questioned the timing of their progression, and sent a number of inquiries. The most common complaint is:

**"I can hold a 767 Captain bid now, but the website shows me as an LCO Captain until 2009, for example."**

It is important to realize that although this pilot may be able to hold 767 captain now, that is only because there are pilots senior to her that have elected not to take a 767 captain bid for quality of life or other reasons.

If all pilots senior to this pilot bid the highest paying position they could hold, then this pilot would not be able to hold the 767 until 2009. In trying to determine the best method for calculating the proceeds from the Note, it was determined to base career progression on a model that had all pilots bid the highest paying position that their seniority would allow. Since this method is used for all pilots, it creates a level playing field for determining seat progression and accompanying pay rate increases.

In addition, the Gap model does not hold a pilot back from upgrading to the next position due to restrictions associated with freezes or domicile selection criteria. The model also assumes no pay differential that would result from lineholder vs. reserve status. All pilots are assumed to be paid at 984 hours annually. In essence, this model simply moves you up in fleet and seat as pilots senior to you retire at age 60. There is no fleet growth built into the model, nor fleet shrinkage. In addition, potential mergers, new equipment or aircraft purchases or pending or proposed changes to age limitations via legislation are not included as the MEC dealt with the facts as they currently exist.

### In Summary

The MEC's stated purpose for the Note allocation and distribution was to fund to the maximum extent possible, the gap between the "normal" and current projected retirement benefits that exist for all qualifying pilots based on an individual pilot's anticipated career path. It would be nice if we had sufficient assets to fully fund our pension losses, but the projected proceeds from the sale of the Note will only cover approximately 41% of each pilot's individual funding gap.

It becomes obvious after looking at these examples that there is more to an individual's Note allocation than simply looking at age, seniority, or length of time invested in the A plan. The formula uses many different inputs to arrive at a pilot's specific "funding gap," and any comparisons between pilots must be looked at in light of the effects of all these specific inputs to fully understand the differences in payouts.

11

## For those of you who would prefer to see numbers:

The next section of the report includes various graphs and data that reveal how the Note allocation is dispersed throughout the pilot population.

### Allocation by Dollar Amounts—All Eligible Pilots

| Allocation Dollars | Number of Pilots | Allocation Dollars | Number of Pilots | Allocation Dollars | Number of Pilots |
|---|---|---|---|---|---|
| >600,000 | 0 | 300,001 - 350,000 | 50 | 50,001 - 75,000 | 2741 |
| 550,001 - 600,000 | 1 | 250,001 - 300,000 | 153 | 40,001 - 50,000 | 1650 |
| 500,001 - 550,000 | 4 | 200,001 - 250,000 | 181 | 30,001 - 40,000 | 723 |
| 450,001 - 500,000 | 7 | 150,001 - 200,000 | 133 | 20,001 - 30,000 | 353 |
| 400,001 - 450,000 | 17 | 100,001 - 150,000 | 419 | 10,001 - 20,000 | 207 |
| 350,001 - 400,000 | 11 | 75,001 - 100,000 | 807 | 01 - 10,000 | 43 |
| | | | | 0 - 0 | 1 |



Number of Pilots

The total number of eligible pilots = 7,501

Pilot Allocations ranges:
| | |
|---|---|
| 40,001 - 100,000 | 69% |
| 30,001 - 100,000 | 79% |

## Allocations by Dollar Amounts—MEC only



Total MEC members plus the 3 Officers = 27

40,001 – 100,000 range = 74%
30,001 – 100,000 range = 81%

### Corrections Process, the PLSA/PBGC Adjustments, and the Reserve Pool Funds

By now most pilots have accessed the Gap Allocation website and read the Gap Specifications document. Between the time the website went live on June 30, 2006 and the present, the Committee continued its due diligence and dynamic stress testing of the allocation model. We would like to thank every pilot who took the time to review their data and queried us on various topics. Pilot inquiries have been a great help in identifying anomalies. From the very beginning, the Committee endeavored to produce a process that was open, dynamic and interactive. Part of this process included facilities to make corrections as we moved closer to distribution day. Accuracy was and remains our primary goal.

We were careful to disclose and to continue to reiterate that the individual Note allocation payouts displayed on the Gap allocation website are estimates and these payouts **assume**

13

full distribution of the proceeds *without* the $30 million hold back. Again, these are estimates for two main reasons:

1. We used an assumed Note proceeds amount of $500M.
2. We assumed no correction factors.

As you now know, our investment banker was successful in selling our Note for $544.5M. The net amount to the pilots, after fees and expenses but before accrued interest, is $537M. This is a fantastic result.

The Committee would like to advise you of several issues that have come up since the website "live" date:

1. PBGC calculation of the guaranteed benefit for pilots who withdrew their PLSA from the A-Plan, and

2. PLSA amounts reported initially by the Company to ALPA, and

3. Participation dates associated with the "group of 570" pilots, and

4. Years of Participation credit for some pilots who worked as non-pilots prior to becoming eligible for the A-Plan benefit

5. Stove-Pipe Pay Progression Model seniority number anomaly

Every one of these issues has been corrected, and the result is that all pilots will have a revised Note allocation payout amount. Approximately half the pilots will receive a larger Note payout than that displayed on the Gap Allocation website; approximately half will receive a smaller amount. The reason for this is obvious; some pilots were entitled to a larger Note payout than originally calculated—the funds must come from the total pool of Note proceeds. In addition, there were originally 95 pilots that were to receive an allocation of ZERO—now all but one pilot will receive some Note allocation.

**1.  PBGC calculation of the guaranteed benefit for pilots who withdrew their PLSA from the A-Plan**

What we have learned from pilots who are already receiving PBGC payments (retirees) is that the PBGC is calculating their guaranteed benefit differently than the Committee initially did. The PBGC used an alternate, but allowable, method to reflect the PLSA withdrawals. The result is that these pilots receive a much smaller PBGC benefit each year and therefore their originally calculated Note allocation was too low. In the end, these pilots' total benefits are the same as if they never took their PLSA.

As a result, these pilots' Note allocations had to be recalculated. This new payout was reflected in the initial Note distribution on August 14-16[th], 2006

14

2.    Initial PLSA amounts reported by the Company to ALPA

In March 2006, the Company sent ALPA a file of all pilots who withdrew their PLSA's. We used this file to calculate the Note allocations. After inquiries by some pilots, we asked the Company to reaffirm the data in this file. On August 4, the Company informed us that there is another, more current file reflecting the PLSAs of pilots who retired in late 2005. Some of these pilots did not receive their non-qualified portion of the PLSA from the Company. You may recall that during the bankruptcy hearings, the Company unilaterally stopped paying the non-qualified portion of the PLSA to pilots who retired after September 2005. This new file reflects this dispute.

As a result, these pilots' Note allocations had to be recalculated. This new payout was reflected in the initial Note distribution on August 14-16th, 2006

3.    Participation dates associated with the "group of 570" pilots

Letter 05-23, Exhibit A and the associated Grievance Settlement directed the Company to adjust the training dates of the "group of 570" pilots. In effect, this training date adjustment required an adjustment to their associated date of participation in the A-Plan.

As a result, these pilots' Note allocations had to be recalculated. This new payout was reflected in the initial Note distribution on August 14-16th, 2006

4.    Years of Participation credit for some pilots who transferred into the pilot plan from other plans

We all know of pilots who were previously hired at UAL as mechanics, flight attendants or CSR's. The time they accumulated in those pension plans roll over to the pilots A-Plan. While most of these cases were displayed correctly, some of these pilots' years of participation in the A-plan were not reflected in the data shown on the website. There were 8 pilots in this category.

As a result, these pilots' Note allocations had to be recalculated. This new payout was reflected in the initial Note distribution on August 14-16th, 2006

Another correction needed to be made for 1 pilot who had earnings in a contributory management plan during the 1970's. This plan was not a defined benefit plan; rather it was a contributory plan. The Company reported this withdrawal from this '70's plan as a PLSA withdrawal from the A-Plan, but it was not.

As a result, this pilot's Note allocation had to be recalculated. This new payout was reflected in the initial Note distribution on August 14-16th, 2006

### 5.    Stove-Pipe Pay Progression Model Programming Anomaly

In the course of final review and testing, it was discovered that a programming error had occurred in connection with the Adjusted Stove-Pipe pay progression model.

Under the Stove-Pipe pay progression model, 2005 pay is actual 2005 pensionable earnings, as reported by the Company.   For all subsequent years, pilot seniority determines projected fleet & seat and projected pay.

In the Gap model, a Pilot's seniority is determined by assigning an "effective seniority number" for each year, beginning in 2006 and ending with the year a pilot turns age 60.

A Pilot's effective seniority number is determined by subtracting the number of pilots with greater seniority who have left the seniority list (i.e., turned age 60 prior to the current year.)   Actual retirements – early and normal – and deaths in 2005 are also accounted for.  Consequently, for 2006, an individual pilot's effective seniority number is determined by removing from the pilot population those pilots who retired in 2005 and had greater seniority.  For 2007, a pilot's effective seniority number is determined by removing from the pilot population pilots who retired in 2006 and had greater seniority. This algorithm for 2007 is repeated in every subsequent year until each pilot reaches age 60.

In the web site model, the determination of the effective seniority number for a given year was determined by removing from the pilot population the number of retired pilots with greater seniority in the second prior year, rather than in the immediately preceding prior year.  Consequently, the assignment of effective seniority numbers was one year "off" and a pilot's movement up the Stove-Pipe was delayed one year.

The effect of the error was to treat everyone as retiring at age 59 rather than 60.  The relevant corrections have been made to those pilots affected; these corrections were reflected in the August 14-16[th] distribution.

### Summary

Some of these corrections were brought to the Committee by you via the ualmecri@alpa.org email address; some by your LEC representatives; some by your telephone calls to us; and some by the Committee's continual stress testing of the model. We set out to ensure accuracy and we designed this corrections process with just these results in mind.  We believe it worked, and will continue to ensure corrections are made throughout the distribution process.

The fact that we were able to make these corrections BEFORE the initial August 14-16 distribution is important as we did not need to utilize any of the $30M reserve pool.  The reserve is intact and will be there for future corrections/omissions discovered between now and December 31, 2006.  To the extent the reserve exceeds the amount needed to

~~make necessary adjustments for corrections/omissions; the excess will be distributed to~~
pilots early next year.

IMPORTANT NOTE!

| |
|---|
| **Any identification of data issues or other omissions must be brought to the Committees attention, in writing no later than December 31, 2006. Contact the R & I Committee at UALMECRI@alpa.org** |

The Committee is committed to seeing that this distribution is completed in a timely, orderly and thoughtful process. As you can see, the positive information loop created by the website and MEC/LEC internal and external communications has resulted in a strong allocation and distribution process. We will keep you advised of our progress on these and other issues that may surface during the August through February 2007 distribution process.

Fraternally,

UAL-MEC R&I Committee

Captain Jeffrey Barath, Chairman
Captains Marty Torres and Jim Bowman, members

17

# EXHIBIT C

# United Airlines Master Executive Council



Air Line Pilots Association
AFL-CIO

## UAL-MEC Retirement & Insurance Committee
## Final Gap Data Verification

November 21, 2006

Dear Fellow Pilot:

The UAL-MEC R & I Committee is preparing for final distributions from the ALPA Grantor Trust. As you are aware, the pilot Convertible Notes were sold on July 28, 2006, for approximately $537 million, net of transaction fees and expenses. The $537 million net proceeds of the sale were deposited with the Bank of New York as Trustee of the Grantor Trust, for distribution in accordance with the PDAP Top-Off and Taxable Remainder Program previously ratified by the membership.

After distribution of approximately $351 million in mid-August 2006, there remains in the Grantor Trust approximately $186 million (plus accumulated interest). This consists of $156 million earmarked for contribution to the PDAP in early 2007, in accordance with the PDAP Top-Off and Taxable Remainder Program. The $156 million is **not subject to the correction process described herein.**

This document addresses the distribution of the $30 million held in reserve. The reserve is for the purpose of making corrections arising during the allocation process. Under the terms of the Grantor Trust, all assets are required to be distributed no later than March 15, 2007.

*The final data verification step is being launched by the R&I Committee in preparation for 2007 PDAP Top-Off contributions and the final distribution of any balance remaining of the $30 million reserve pool.*

As a reminder:

- The Bankruptcy Exit Agreement, LOA 05-02, provided for issuance of $550 million face amount Senior Subordinated Convertible Notes to or on behalf of pilots no later than 6 months after exit from bankruptcy, with eligibility, allocation and distribution mechanics to be determined by ALPA.

- In June, 2006, the Committee established a website to enable individual pilots to review the personal information on which their allocation of the proceeds from the sale of the Convertible Notes would be calculated. During June, July and

## UAL-MEC Retirement & Insurance Committee
## Final Gap Data Verification

early August, the Committee processed and implemented all known corrections based on pilot feedback.

- On July 28, 2006, the Convertible Notes were issued and sold for approximately $537 million, net of transaction fees and expenses, the proceeds being wire transferred to the Bank of New York as Trustee of the Grantor Trust established for the purpose of distribution.

- On August 10, 2006, the Trustee transferred approximately $351 million to United pursuant to ALPA's authorization on behalf of the 7,501 pilots eligible for note allocations.

- On August 14th, the Company deposited approximately $15 million of these transferred funds into the PDAP as the maximum additional employer contribution permitted under IRC §415 for 2006 on behalf of those pilots who still had capacity available under IRC §415 for 2006.

- The approximately $336 million remaining from the above transfer (after the 2006 PDAP contribution) was distributed, less applicable taxes, through the payroll system on or about August 16, 2006.

- As provided by the PDAP Top-Off and Taxable Remainder Program, the balance of the Grantor Trust assets, $186 million (plus accumulated interest), has been held for 2007 distribution.
  - Approximately $156 million is earmarked for contribution to the PDAP for 2007 as soon as administratively feasible after the first of the year.
  - Approximately $ 30 million is being held as a Reserve for corrections and adjustments to be distributed prior to March 15, 2007.

### PDAP Top-Off -2007

We are currently working to complete the PDAP Top-Off and Taxable Remainder program in early 2007. Approximately 6200 pilots can expect a deposit into their PDAP Account through the Top-Off Program no later than March 15, 2007. Individual Top-Off amounts were indicated as "Amount of initial distribution held for 2007 PDAP" on your United/provided Convertible Notes Statement issued in August 2006

As a PDAP Top-Off refresher, after considering an individual pilot's initial note allocation, the program:
- Topped-Off room available under IRC §415 for PDAP year 2006, as applicable
- Held back your specific 2007 PDAP Top-Off contribution, as applicable, in an amount equal to the available room under IRC §415 after consideration of a pilot's Employer B and C plan contribution throughout 2007

2

# UAL-MEC Retirement & Insurance Committee
## ~~Final Gap Data Verification~~

An analysis of the 6200 pilots who expect a PDAP Top-Off contribution in 2007 shows that approximately 700 will continue to have limited §415 capacity in PDAP Plan year 2007. What this essentially means, is that when the $156 million is contributed to the PDAP for 2007 under the PDAP Top-Off Program, the overwhelming majority of pilots will have no room under the Tax Code for further self-deferral through their 401(k). This analysis allows for continued Employer B and C Plan contributions throughout 2007. As envisioned, this will create the very desirable situation where pilots have achieved maximum tax deferral through employer contributions.

## IRC 415 – 2007

IRC §415 limits the amount of employer and employee contributions that can be deposited into the PDAP in a given plan year. The IRC §415 limit for 2007 is $45,000.

PLEASE NOTE: A pilot over age 50 or turning age 50 in 2007 is also eligible for a "Catch-up" contribution of up to $5000 in addition to the §415 limit. The Note Allocation money cannot be used to fund the "Catch-up" limit. This must be an employee contribution via 401(k) contributions. The Note Allocation money is considered an employer contribution to the PDAP.

## Reserve Pool

As pilots look toward early 2007, all those who are eligible to share in distribution of the Convertible Note proceeds can expect an additional modest distribution from the $30 million Grantor Trust Reserve Pool (to include accrued interest). The Reserve Pool is subject to reduction by amounts required to make final corrections, both individual and collectively.

The Reserve Pool will be allocated among all eligible pilots in proportion to their final Convertible Note allocation. The Committee expects that the Reserve Pool distribution will occur no later than March 15, 2007.

## Final Individual Note Allocation Amounts

After this final review period ends on December 31, 2006, the R & I Committee will apply any corrections, as applicable, to the final allocation file, and proceed with Reserve Pool distributions.

Although the Notes were sold for $537 million, well above the baseline assumption of $500 million, pilots cannot precisely determine their top-line distribution number until all corrections have been processed. We know that the corrections found in advance of the August 2006 distributions resulted in the shifting of individual allocation amounts, up and down, within the model. As we move into the final distribution step, the reserve pool is available for applicable corrections/omissions identified between now and December 31, 2006.

3

## UAL-MEC Retirement & Insurance Committee
## ~~Final Gap Data Verification~~

For the final verification process, your MEC R & I Committee has updated the gap allocation website. The website will not be completely populated until the PDAP Top-Off and Reserve Pool distributions have taken place.

### Data Verification

All pilots that participated in the Initial Note Distribution will be eligible for a piece of the Reserve Pool Allocation based on their final Allocation Percentage.

We have updated our website to incorporate all changes/corrections that have been brought to our attention. Our goal is to ensure that the final data being utilized is as accurate as possible considering any discrepancies individual pilots may identify. *To that end, we ask you to review your personal data on the updated website no later than December 31, 2006.*

### 1. Data Re-Verification

We have updated the website to reflect changes and corrections made to date. The corrections process requires that all pilots check their personal career data on the website to confirm that any and all changes reported or discovered in the initial review, as a result of the last correction process, are reflected properly on the site.

The website can be accessed at: https://www.ualpilots.org/mynoteallocationupdate

We would like all pilots to thoroughly examine the data being utilized in the website to ensure it is appropriate and correct. These items include:
- Birth Date
- Hire Date
- Longevity Date
- Participation Date
- Years of Participation
- PLSA Withdrawal Amount if applicable
- Stovepipe Progression
- Final Average Earnings
- PBGC Benefit
- C Plan Projections

*If your data is accurate, no further action is required.*

PLEASE NOTE:
If you participated in a surplus reduction line during 2002 and you will be retiring prior to 2013, your United-provided data was incomplete. This may have erroneously impacted

# UAL-MEC Retirement & Insurance Committee
## Final Gap Data Verification

your note allocation requiring correction. If there are questions regarding surplus lines, or any other data issues, please initiate a request for review.

## 2. Pilot-Initiated Request for Review

If there are questions regarding a pilot's personal data, please formally request a review by contacting us at UALMECRI@ALPA.ORG.

Pilots **must** include in their e-mail the item(s) that they believe to be incorrect and supporting documentation/information for review of their claim.

*In the subject line PLEASE indicate:* **REQUEST FOR GAP DATA REVIEW**

## 3. Committee Verification and Implementation of Valid Data Changes

The R&I Committee will e-mail a response indicating receipt of the gap data review request.

The R&I Committee will advise pilots of the status of their request.

**The deadline for requesting a formal review is December 31, 2006.** After this date the correction process will proceed to the final stage.

## 4. Determination of Corrections Applicable to Final Allocation File

Any individual and systematic corrections found during this final data verification process will be applied within the final allocation file. This final allocation file will ultimately determine the total amount of a pilot's convertible note proceeds.

The Company has advised that pilots on military leave will not receive their share of the reserve pool until they return to active service with United Airlines (or their USERRA rights expire) in order to comply with USERRA regulations.

Please take the time to confirm your personal data on the updated website and send us a REQUEST FOR GAP DATA REVIEW by December 31, 2006 if your data is incorrect.

Fraternally,


Marty Torres, Chairman          Jim Bowman, Member          Fred Greene, Member

UAL-MEC R&I Committee

5

# EXHIBIT D

# United Airlines Pilots Convertible Note Allocation

## Summary Results

Name:                                    GARAVITO,RL

Birth Date:                              10/13/1948

Hire Date:                               01/16/1978

SSN:                                     *****6747

Note Allocation (gross amount):          $317,280.01

Copyright 2006, All rights reserved

*projected by P+I but did not received*

/

# United Airlines Pilots Convertible Note Allocation

## A-Plan Projected Annual Benefit at Retirement

| | |
|---|---|
| Multiplier: | 1.35% |
| Final Average Earnings (FAE) at Retirement: | x    281,600.05 |
| Years of Participation (YOP) at Retirement: | x    29.7500 |

Preliminary Projected A-Plan Annual Benefit at Retirement:

| | |
|---|---|
| 1.35% x FAE x YOP = | $113,097.62 |
| 5/31/2003 Protected Benefit: | $93,181.68 |

Final A-Plan Projected Annual Benefit at Retirement: (greater of projected and protected)   $113,097.62

### "Adjusted Stove Pipe" Pay Progression Model

| Year | Pension Pay | FAE (High 3/10) | YOP | Fleet/ Seat | Pay Rate |
|---|---|---|---|---|---|
| 1995 | 180,234.60 | | | | |
| 1996 | 180,783.05 | | | | |
| 1997 | 189,787.81 | | | | |
| 1998 | 202,932.06 | | | | |
| 1999 | 211,156.73 | | | | |
| 2000 | 258,295.18 | | | | |
| 2001 | 284,452.23 | | | | |
| 2002 | 302,052.74 | | | | |
| 2003 | 249,941.31 | | | | |
| 2004 | 201,036.10 | | | | |
| 2005 | 184,477.56 | 281,600.05 | 26.9167 | WB Cap | |
| 2006 | 184,477.56 | 281,600.05 | 27.9167 | | |
| 2007 | 184,477.56 | 281,600.05 | 28.9167 | | |
| 2008 | 154,176.40 | 281,600.05 | 29.7500 | | 188.02 |



WB Cap

Copyright 2006, All rights reserved

2

UAL Pilots

# United Airlines Pilots Convertible Note Allocation

## Estimated PBGC Annual Benefit at Retirement - 12/30/2004 Date of Plan Termination

**Estimated Annual Benefit Payable by PBGC at Retirement:**     $28,851.11

The PBGC benefit used in the calculation of your allocation of the notes is an estimate. This estimate may be different than the one provided to you by the PBGC. The PBGC has yet to determine the exact amount of your benefit.

The estimated PBGC benefit is based on a funded Priority Category (PC) 3 percentage of 80%. The PC-3 percentage affects the amount of the 12/30/2004 A-plan benefit paid by the PBGC to those pilots with a PC-3 benefit. The funded PC-3 percentage that the PBGC will use when it does its final calculations will very likely be different than the 80% used in your note allocation calculation. Nevertheless, the 80% funded ratio is herein applied consistently across all pilots.

It is possible that the historical earnings and service used in these calculations of the accrued A-plan benefit payable by the PBGC does not match the employee information used by the PBGC in its calculation of your estimated benefit. You may wish to communicate any disparities to the PBGC.

Estimated PC-4 benefits are based on PBGC guarantees for Plans terminating in 2004.

Copyright 2006, All rights reserved

MAX 24K

3

# United Airlines Pilots Convertible Note Allocation

## C-Plan Projected Annual Annuity at Retirement

| C-Plan Projected Account Balance at Retirement | | Annuity Purchase Factor | | C-Plan Projected Annual Annuity at Retirement |
|---|---|---|---|---|
| 41,892.37 | ÷ | 12.078288 | = | 3,468.40 |

| Year | Capped Pension Pay | C-Plan - Projection | | |
|---|---|---|---|---|
| | | Beginning Balance | Contributions (6%) | Rate of Return (6%) | Ending Balance |
| 2005 | 184,477.56 | 0.00 | 6,456.71 | 112.99 | 6,569.70 |
| 2006 | 184,477.56 | 6,569.70 | 11,068.65 | 726.24 | 18,364.59 |
| 2007 | 184,477.56 | 18,364.59 | 11,068.65 | 1,433.93 | 30,867.17 |
| 2008 | 154,176.40 | 30,867.17 | 9,250.58 | 1,774.62 | 41,892.37 |

Copyright 2006, All rights reserved

4

# United Airlines Pilots Convertible Note Allocation

## Gap Benefit

| A-Plan Projected Annual Benefit at Retirement | − | PBGC Annual Benefit at Retirement | + | C-Plan Projected Annual Annuity at Retirement | = | **Gap Benefit** |
|---|---|---|---|---|---|---|

| | | |
|---|---|---|
| A-Plan Projected Annual Benefit at Retirement: | $113,097.62 | |
| PBGC Annual Benefit at Retirement: | −  28,851.11 | ? |
| C-Plan Projected Annual Annuity: | −  3,468.40 | |
| Gap Benefit: | $80,778.11 | |

## Note Allocation
### Recovery From Notes

| | | |
|---|---|---|
| Gap Benefit (from above): | $80,778.11 | |
| Deferred Annuity Purchase Factor: | ×  9.498215 | — ? |
| PV Gap Benefit: | $767,247.86 | |
| Note Replacement Percentage: | 41.353% | — ? |
| Preliminary Note Allocation: | $317,280.01 | |
| PLSA Withdrawal (58.647% of value as of August 1, 2006): | 0.00 | |
| Final Note Allocation: | $317,280.01 | |

*Handwritten in right margin:*
30 M
+ 40 M
+ 2007 PDAP TOP OFF

Copyright 2006, All rights reserved

*Handwritten near bottom:*
351 M   DISBURSED
156 M   2007
30 M   RES
537 M   TOTAL

5

# United Airlines Pilots Convertible Note Allocation

## Participant Modeling

You may model hypothetical note allocation scenarios by changing your age, service or pay. You may change your age up to 10 years older or younger by changing the year of birth. You may change your benefit service up to 10 years by changing year of participation. The model will not allow ages at hire younger than 21 or older than 60. You may also change your projected pay by changing your seniority number (up to 1,000) in increments of 100.

After you change a variable, click Submit. Your hypothetical note allocation will be displayed in the "Values from Modeling" section of the "Gap Benefit & Note Allocation" page.

### Assumptions

| | |
|---|---|
| Year of Birth: | 1948 |
| Year of Participation: | 1979 |
| 2/1/2006 Seniority Number: | 44 |

Submit

Copyright 2006, All rights reserved



**EXHIBIT 9**

# *PDAP Top-Off and Taxable Remainder Distribution Method*
## *ALPA Convertible Notes*
### Questions and Answers

To:        All United Pilots

From:      UAL-MEC Retirement and Insurance Committee

On June 23, 2006 the United MEC passed the following resolutions. Consistent with the two resolutions below, this question and answer document has been prepared to help you make an educated decision on the membership ratification ballot under your consideration.

The R & I Committee has made every effort to ensure the accuracy of the answers. However, where describing the terms of the Pilot Directed Account Plan, if there is any discrepancy between the answers and the plan documents, the plan documents will control. Similarly, the R & I Committee has, when describing provisions of law or regulations, answered based on its understanding of the law or regulation involved. For further assurance, pilots are encouraged to seek legal and/or tax advice.

### Resolution No. 4

#### *PDAP Top-Off and Taxable Remainder Distribution Method and Membership Ratification*

*Whereas*, the Bankruptcy Exit Agreement, LOA 05-02, provides for issuance of $550 million face amount Senior Subordinated Convertible Notes to a trust or other non-permanent entity designated by ALPA, with eligibility, allocation and distribution mechanics to be determined by ALPA; and

*Whereas*, under the terms of the Bankruptcy Exit Agreement, the Convertible Notes are required to be issued not later than July 30, 2006; and

*Whereas*, the UAL MEC has resolved all questions of eligibility and allocation methodology, so that the only element of the process remaining for determination is the distribution mechanics to be used in delivering to pilots their allocated shares of the Convertible Note proceeds; and

*Whereas*, after receiving presentations from the UAL MEC Retirement and Insurance Committee, including a presentation regarding a proposed distribution mechanism known as the "PDAP Top-Off and Taxable Remainder Distribution Method", and after considering membership input and direction and receiving information from the MEC's legal, actuarial and financial advisors concerning the advantages and disadvantages of various methods for distributing the proceeds of sale of the Convertible Notes; and

*Whereas*, the UAL MEC has determined that the interests of the United pilots as a whole

would best be served by adoption of the "PDAP Top-Off and Taxable Remainder Distribution Method" of distributing proceeds from the Convertible Notes;

*Whereas*, LOA 05-02 authorizes the UAL-MEC to adopt the PDAP Top-Off and Taxable Remainder Procedure but, given the preference of at least some members for receipt of all proceeds as current cash, the UAL-MEC believes that it is appropriate, in this instance, to request the membership to determine whether to adopt the PDAP Top-Off and Taxable Remainder Procedure or to accept the proceeds of the Notes as current income subject to current taxation;

**THEREFORE BE IT RESOLVED**, that, if affirmed by a membership vote, the UAL MEC hereby adopts, and directs the Master Chairman to use all available resources to implement, the PDAP Top-Off and Taxable Remainder method of distribution as recommended by the Retirement & Insurance Committee, as follows:

(a) As soon as practicable after issuance of the Convertible Notes, as determined by the investment banker designated by ALPA, the Convertible Notes will be sold, the cash proceeds, net of fees and expenses of sale, shall be applied and distributed as provided below.

(b) First, there shall be set aside as a reserve for purposes of correcting any mistakes, over or under payments in the distribution process, an amount equal to 6% of the net proceeds of sale.

(c) Second, the net Note proceeds, less the reserve provided in (b) above, shall be allocated among eligible individual pilots in accordance with the Gap Allocation methodology previously developed by the R&I Committee and approved by the MEC.

(d) Third, out of the proceeds allocated in accordance with (c), an amount equal to the maximum amount permitted under IRC §415(c) to be contributed to the accounts of eligible pilots under the Pilot Directed Account Plan (after taking into account actual and projected B and C Plan contributions and all contributions of stock/claims sale proceeds prior to date) shall be deposited in the PDAP as an employer contribution for the 2006 Plan Year, such contribution to be made as soon as practicable after closing of the sale and determination of eligible pilot shares. To the extent, if any, that any pilot UAUA shares remain undistributed as of the time any contribution of Convertible Notes proceeds is to be made, Convertible Notes proceeds shall have priority and shall be contributed to the PDAP before any additional contributions of stock.

(e) Fourth, out of the remaining allocated proceeds, there shall be set aside an additional amount equal to the estimated maximum permissible employer contribution under IRC §415(c) for each eligible pilot for Plan Year 2007, based on the pilots' estimated earnings for the year, after taking into account estimated Company B and C Plan Contributions for 2007 but without regard to any potential 2007 401(k) contributions by pilots.

(f) Fifth, the balance of the net Note proceeds remaining, after setting aside the amounts

specified in (b) and (e) above and after making the PDAP contribution for Plan Year 2006 as provided in (d) above, less required income and FICA tax withholding, shall be distributed to the eligible pilots in the amounts to which each pilot is respectively entitled, in cash, as soon as reasonably practicable after closing of the sale of the Notes and computation of pilot shares.

(g) Sixth, the amounts set aside under (b) and (e) above shall be deposited and held in a grantor trust to be established for that purpose. The grantor trust shall be established under a trust agreement containing terms and provisions, and with a bank or trust company trustee, and for a duration, all acceptable to ALPA.

(h) Finally, as soon as administratively practicable after January 1, 2007, the amounts then held in the trust shall be used and applied: (i) to make the employer contribution to the PDAP contemplated in (e) above; (ii) to correct any mistakes or under payments which have been discovered and documented; and (iii) to the extent any amounts remain in the trust after (i) and (ii), to be distributed, less required income and FICA tax withholding, in cash to eligible pilots.

**BE IT FURTHER RESOLVED,** the membership be promptly balloted, by ALPA electronic ballot procedure, whether to adopt the PDAP Top-Off and Taxable Remainder Procedure, with an affirmative vote by a majority of those voting constituting direction to the Association to implement the PDAP Top-Off and Taxable Remainder Procedure and a vote not in the affirmative constituting direction that the proceeds of the Notes be issued as promptly as practicable to the eligible pilots as current cash income (with a 6% reserve placed in a grantor trust to protect against errors and omissions);

**BE IT FURTHER RESOLVED,** that the Master Chairman, with the assistance of the R&I and Negotiating Committees, legal staff and advisors, be authorized and directed to negotiate and enter into any necessary agreements or other documentation, including without limitation any modification of the Bankruptcy Exit Agreement and/or the terms of the Convertible Notes, necessary or appropriate, in his judgment, to effectuate and implement this Resolution and the choice made by membership vote;

### Resolution No. 5

**BE IT FURTHER RESOLVED,** that the UAL-MEC recommends adoption of the PDAP Top-Off and Taxable Remainder Procedure as providing the maximum value to the pilot group consistent with protection of the Notes proceeds.

**Question 1:**   I understand that eligible pilots will receive cash proceeds from the ALPA convertible note sometime in August 2006. Why am I receiving these proceeds?

**Answer 1:**    As part of the Bankruptcy Exit Agreement, we negotiated the right to receive $550M, face amount, in Senior Subordinated Convertible Notes to be issued by UAL not later than 180 days after exit from bankruptcy.  The MEC has

## *PDAP Top-Off and Taxable Remainder Distribution Method*
### *ALPA Convertible Notes*
Questions and Answers

To:        All United Pilots

From:      UAL-MEC Retirement and Insurance Committee

On June 23, 2006 the United MEC passed the following resolutions. Consistent with the two resolutions below, this question and answer document has been prepared to help you make an educated decision on the membership ratification ballot under your consideration.

The R & I Committee has made every effort to ensure the accuracy of the answers. However, where describing the terms of the Pilot Directed Account Plan, if there is any discrepancy between the answers and the plan documents, the plan documents will control. Similarly, the R & I Committee has, when describing provisions of law or regulations, answered based on its understanding of the law or regulation involved. For further assurance, pilots are encouraged to seek legal and/or tax advice.

### Resolution No. 4

#### *PDAP Top-Off and Taxable Remainder Distribution Method and Membership Ratification*

*Whereas*, the Bankruptcy Exit Agreement, LOA 05-02, provides for issuance of $550 million face amount Senior Subordinated Convertible Notes to a trust or other non-permanent entity designated by ALPA, with eligibility, allocation and distribution mechanics to be determined by ALPA; and

*Whereas*, under the terms of the Bankruptcy Exit Agreement, the Convertible Notes are required to be issued not later than July 30, 2006; and

*Whereas*, the UAL MEC has resolved all questions of eligibility and allocation methodology, so that the only element of the process remaining for determination is the distribution mechanics to be used in delivering to pilots their allocated shares of the Convertible Note proceeds; and

*Whereas*, after receiving presentations from the UAL MEC Retirement and Insurance Committee, including a presentation regarding a proposed distribution mechanism known as the "PDAP Top-Off and Taxable Remainder Distribution Method", and after considering membership input and direction and receiving information from the MEC's legal, actuarial and financial advisors concerning the advantages and disadvantages of various methods for distributing the proceeds of sale of the Convertible Notes; and

*Whereas*, the UAL MEC has determined that the interests of the United pilots as a whole

would best be served by adoption of the "PDAP Top-Off and Taxable Remainder Distribution Method" of distributing proceeds from the Convertible Notes;

*Whereas*, LOA 05-02 authorizes the UAL-MEC to adopt the PDAP Top-Off and Taxable Remainder Procedure but, given the preference of at least some members for receipt of all proceeds as current cash, the UAL-MEC believes that it is appropriate, in this instance, to request the membership to determine whether to adopt the PDAP Top-Off and Taxable Remainder Procedure or to accept the proceeds of the Notes as current income subject to current taxation;

**THEREFORE BE IT RESOLVED**, that, if affirmed by a membership vote, the UAL MEC hereby adopts, and directs the Master Chairman to use all available resources to implement, the PDAP Top-Off and Taxable Remainder method of distribution as recommended by the Retirement & Insurance Committee, as follows:

(a) As soon as practicable after issuance of the Convertible Notes, as determined by the investment banker designated by ALPA, the Convertible Notes will be sold, the cash proceeds, net of fees and expenses of sale, shall be applied and distributed as provided below.

(b) First, there shall be set aside as a reserve for purposes of correcting any mistakes, over or under payments in the distribution process, an amount equal to 6% of the net proceeds of sale.

(c) Second, the net Note proceeds, less the reserve provided in (b) above, shall be allocated among eligible individual pilots in accordance with the Gap Allocation methodology previously developed by the R&I Committee and approved by the MEC.

(d) Third, out of the proceeds allocated in accordance with (c), an amount equal to the maximum amount permitted under IRC §415(c) to be contributed to the accounts of eligible pilots under the Pilot Directed Account Plan (after taking into account actual and projected B and C Plan contributions and all contributions of stock/claims sale proceeds prior to date) shall be deposited in the PDAP as an employer contribution for the 2006 Plan Year, such contribution to be made as soon as practicable after closing of the sale and determination of eligible pilot shares. To the extent, if any, that any pilot UAUA shares remain undistributed as of the time any contribution of Convertible Notes proceeds is to be made, Convertible Notes proceeds shall have priority and shall be contributed to the PDAP before any additional contributions of stock.

(e) Fourth, out of the remaining allocated proceeds, there shall be set aside an additional amount equal to the estimated maximum permissible employer contribution under IRC §415(c) for each eligible pilot for Plan Year 2007, based on the pilots' estimated earnings for the year, after taking into account estimated Company B and C Plan Contributions for 2007 but without regard to any potential 2007 401(k) contributions by pilots.

(f) Fifth, the balance of the net Note proceeds remaining, after setting aside the amounts

specified in (b) and (e) above and after making the PDAP contribution for Plan Year 2006 as provided in (d) above, less required income and FICA tax withholding, shall be distributed to the eligible pilots in the amounts to which each pilot is respectively entitled, in cash, as soon as reasonably practicable after closing of the sale of the Notes and computation of pilot shares.

(g) Sixth, the amounts set aside under (b) and (e) above shall be deposited and held in a grantor trust to be established for that purpose. The grantor trust shall be established under a trust agreement containing terms and provisions, and with a bank or trust company trustee, and for a duration, all acceptable to ALPA.

(h) Finally, as soon as administratively practicable after January 1, 2007, the amounts then held in the trust shall be used and applied: (i) to make the employer contribution to the PDAP contemplated in (e) above; (ii) to correct any mistakes or under payments which have been discovered and documented; and (iii) to the extent any amounts remain in the trust after (i) and (ii), to be distributed, less required income and FICA tax withholding, in cash to eligible pilots.

**BE IT FURTHER RESOLVED,** the membership be promptly balloted, by ALPA electronic ballot procedure, whether to adopt the PDAP Top-Off and Taxable Remainder Procedure, with an affirmative vote by a majority of those voting constituting direction to the Association to implement the PDAP Top-Off and Taxable Remainder Procedure and a vote not in the affirmative constituting direction that the proceeds of the Notes be issued as promptly as practicable to the eligible pilots as current cash income (with a 6% reserve placed in a grantor trust to protect against errors and omissions);

**BE IT FURTHER RESOLVED,** that the Master Chairman, with the assistance of the R&I and Negotiating Committees, legal staff and advisors, be authorized and directed to negotiate and enter into any necessary agreements or other documentation, including without limitation any modification of the Bankruptcy Exit Agreement and/or the terms of the Convertible Notes, necessary or appropriate, in his judgment, to effectuate and implement this Resolution and the choice made by membership vote;

### Resolution No. 5

**BE IT FURTHER RESOLVED,** that the UAL-MEC recommends adoption of the PDAP Top-Off and Taxable Remainder Procedure as providing the maximum value to the pilot group consistent with protection of the Notes proceeds.

**Question 1:**   I understand that eligible pilots will receive cash proceeds from the ALPA convertible note sometime in August 2006. Why am I receiving these proceeds?

**Answer 1:**     As part of the Bankruptcy Exit Agreement, we negotiated the right to receive $550M, face amount, in Senior Subordinated Convertible Notes to be issued by UAL not later than 180 days after exit from bankruptcy.  The MEC has

adopted an allocation methodology under which the Notes will be sold as soon as possible after issuance and the net proceeds of the sale will be applied as a partial offset to the losses suffered by pilots as a result of termination of our A-Plan.

**Question 2:** How much do we expect to realize when we sell the Notes?

**Answer 2:**     Obviously, the amount of the proceeds won't be known until the Notes are actually sold. For purposes of the R&I Committee's prior communications and analyses, and on the MEC's Note Allocation website, we have assumed that the sale will generate net proceeds, after payment of fees and expenses and allowing for the possibility that the Notes sell slightly below par, of $500M. The R & I Committee believes that the actual net proceeds may be somewhat greater than $500M.

**Question 3:** How much will individual pilots' proceeds be?

**Answer 3:**     Under the MEC approved note allocation methodology, pilots will receive a portion of the Note proceeds based upon their individual losses on termination of the A-Plan, determined by projecting career earnings, FAE, and years of participation to age 60, offsetting expected C-Plan and PBGC-paid benefits. Please refer to the Convertible Note Allocation website at https://www.ualpilots.org/mynoteallocation for detailed information. In addition, refer to the Gap Specifications document enclosed in this mailing.

**Question 4:** Who will be eligible to participate in this distribution?

**Answer 4:**     In general, pilots on the Company-compiled pilot system seniority list as of January 1, 2005, are entitled to share in the allocation of the Convertible Note proceeds. This general rule is subject to modification with respect to pilots in special circumstances, such as voluntary or involuntary termination, recall from furlough, death and other factors. Again, please refer to the Gap Specifications document enclosed in this mailing for more detailed information regarding eligibility. It can also be found on the website at https://www.ualpilots.org/mynoteallocation .

**Question 5:** What will my individual allocation be?

**Answer 5:**     Since the Note allocation methodology closely tracks the rules and assumptions associated with our terminated A-Plan, each pilot will have a unique allocation amount. Refer to https://www.ualpilots.org/mynoteallocation for your individual allocation calculation.

**Question 6:** What will I receive? Will I get cash, will I get Notes, or will I have a choice like I did with the stock?

**Answer 6:**     All the Notes will be sold and the net cash proceeds of the sale will be distributed to pilots. As explained below, depending on the outcome of the ratification vote, the distribution will either take the form of a combination of PDAP contributions and direct, taxable cash payments, or totally in the form of direct, taxable cash payments.

**Question 7:**     What fees will be paid with respect to the sale of the Notes?

**Answer 7:**     In the 2005 Bankruptcy Exit Agreement, approved by the MEC and ratified by the pilots, ALPA and the Company agreed that our investment banker, Athena Advisory Group, would act as the exclusive sales agent for the Notes. It has always been the MEC's intent, based on the advice of its financial and legal consultants, to convert the Notes into cash as quickly as possible in order to minimize the credit risk associated with holding new UAL paper. To that end, Athena has been creating a market for the Notes, building a "book" of potential buyers, negotiating with United and the markets to determine an interest rate to be affixed to the Notes which will enable the Notes to sell as close to par as possible, and negotiating with United over the form of the delivery vehicle. As was done with the Claims Sale, the fee associated with all this work will come in the form of a commission from the gross proceeds of the sale. ALPA and Athena have negotiated a fee of 1.25%, which we believe to be below market for such work. Additionally, there may be some modest additional fees, but they are not expected to be significant.

**Question 8:**     When can I expect to receive the note proceeds?

**Answer 8:**     It depends on the outcome of the vote.

If the membership votes

$$\boxed{\textbf{IN FAVOR}}$$

of the "PDAP Top Off and Taxable Remainder plan", and assuming the sale of the Notes generates net proceeds of $500M, you can expect:

1. August 2006

   a.  $ 35M will be contributed to the PDAP.
   b.  $280M will be paid as current wages and taxed at your appropriate federal and state tax rate, plus FICA.
   c.  $ 30M will be held back as a reserve pool inside the Grantor Trust (see Question 11).
   d.  $155M will be held by the Grantor Trust for February 2007 contributions to the PDAP.

2. February 2007

    a. Grantor Trust closed
       i. $155M contributed to the PDAP
    b. $30M reserve pool, minus any amounts used for corrections, distributed directly to pilots and taxed at your appropriate federal and state tax rate, plus FICA.
    c. Interest earned from inception to termination of the Grantor Trust, net of applicable taxes, distributed directly to pilots and taxed at your appropriate federal and state tax rate, plus FICA.

If the membership votes

**AGAINST**

the PDAP Top Off and Taxable Remainder plan, you can expect (again assuming $500M in net proceeds):

1. August 2006

    a. $ 470M will be paid out as current wages and taxed at your appropriate federal and state tax rate, plus FICA.
    b. $ 30M will be held back as a reserve pool inside the Grantor Trust (see Question 11)

2. As Soon as Administratively Feasible after August 2006

    a. $30M reserve pool distributed and taxed at your appropriate federal and state tax rate, plus FICA.
    b. Minus any amounts used for corrections
    c. Plus Interest, taxed at your appropriate federal and state tax rate, plus FICA.

**Question 9:** Why has the MEC pursued an agreement with the Company to allow the distribution of the notes directly into our PDAP system?

**Answer 9:**     To defer tax on note proceeds as indicated in the following contractual language:

The 2005 Bankruptcy Exit LOA 05-01 included a provision stating:

UAL convertible notes described in Exhibit D shall be subject to mutually-acceptable modifications to optimize implementation for all parties from an accounting, securities law and tax law perspective.

In addition, Exhibit "D" regarding Convertible Notes includes the following paragraph:

**Initial Holder:**    A trust or similar non-permanent vehicle for the benefit of eligible United pilots; the Notes or the value of the Notes to be distributed to such pilots or pilot retirement accounts as soon as reasonably practicable given tax, accounting, securities and market considerations; all rights of the Notes to be exercised by individual pilots while the notes remain in the trust. Distribution mechanics, eligibility and allocation among such pilots to be reasonably determined by the Association.

By forgoing tax deferral, all pilots would be subjected to immediate withholding and payroll taxes on the proceeds.

In essence, the "PDAP Top-Off and Taxable Remainder Distribution Method" would convert a significant part of the note distribution from current income (subject to current income and FICA taxes) to a retirement benefit (subject to deferred income taxes but not subject to FICA). On a "big-picture" basis:

Error! Objects cannot be created from editing field codes.

For all eligible pilots, the R & I Committee has determined that approximately $67M in taxes can be deferred utilizing the PDAP Top Off and Taxable Remainder plan. As noted above, the IRS will take $175M of the $500M note proceeds without deferral; $108M of the $500M with deferral. (Assumes a 35% tax rate)

**Question 10:** Why conduct membership ratification on this proposal?

**Answer 10:**   Although the Bankruptcy Exit Agreement was ratified with language authorizing the MEC to determine the mechanics of distribution, the MEC has determined that the pilots should make the final determination on the method of distribution of their convertible note proceeds.

Because of the vehicle that must be established to accomplish tax deferral for 2007 (Grantor Trust) and the Internal Revenue Code (IRC) requirement that this choice must be an "all or nothing" collective participation decision, the MEC

believed it was appropriate and necessary for each eligible pilot to participate in the decision based on his/her individual financial circumstances.

**Question 11:** What is a Grantor Trust and why do we need to establish one to hold the convertible note proceeds?

> **Answer 11:** A Grantor Trust is simply a "plumbing vehicle." Its sole purpose is to legally segregate that portion of the Convertible Note that will be used to fund the 2007 PDAP contribution and reserve pool. The Trust will preclude UAL from using the assets for any corporate purpose but, in order to avoid immediate taxation under IRC §83 and the doctrine of constructive receipt, the Trust must provide that assets are available to general creditors in the event of UAL's future insolvency. However, the Trust will only be in existence during the interim time—6 months or less—required to distribute the 2007 PDAP contribution and reserve pool funds.

Regardless of the outcome of the vote on the distribution method, the Grantor Trust must be established for:

1. Immediate tax deferral to shield the note proceeds from taxation beginning when the notes are sold into the market, the proceeds are received and then distributed to the pilots as taxable income and/or a portion withheld for the 2007 PDAP contributions, and

2. Short term tax deferral to shield the note proceeds from taxation until contributed to the 2007 PDAP accounts (if pilots vote FOR the PDAP Top Off and Taxable Remainder plan), and

3. Short term tax deferral to shield the reserve pool funds from immediate taxation.

While the likelihood of insolvency of the Company, necessitating the need for another bankruptcy filing between now and February 2007, is extremely low...it is not absolutely zero. At present, the company has strong cash flows, excessive liquidity and approximately $3.6B in unrestricted cash in the treasury. In addition, the markets have spoken as to their confidence in the Company's solvency:

- Capital markets have given this company:
    - Equity–          ~ $ 3.75 B
    - Debt–           ~ $ 550 M (Convertible Note)
                      ~ $ 2 B in exit financing
    - Cash Balance ~$ 3.6B

- New Bankruptcy law is now in effect...not very appetizing to management.

However, there are no guarantees that an unforeseen event may occur which could place not only the company but the entire industry at risk. You must weigh the positive aspect of tax deferral against the risk, however slight, of another UAL bankruptcy filing during the term of August 2006 to February 2007.

**Question 12**: Are the entire convertible note proceeds going into the Grantor Trust?

**Answer 12**: The precise mechanics for handling the 2006 PDAP contribution (if a majority of pilots vote FOR the PDAP Top Off and Taxable Remainder plan) and direct, taxable cash distributions to pilots in August 2006 have not been concluded and it is possible that those amounts would be passed through the Grantor Trust. But the only amounts which are expected to remain in the Grantor Trust for more than a few days at most would be the amount necessary to fund the 2007 PDAP Contribution (approximately $155M) and the reserve pool of $30M.

**Question 13**: What is the purpose of the "reserve pool?"

**Answer 13**: Although we are doing our very best to ensure that the Note Allocation and Distribution Program will produce correct results for every eligible pilot, prudent legal and financial planning dictates that a small set-aside be created to correct possible discrepancies and omissions.

Working with our financial advisors we have determined that a reserve of 6% of the total note proceeds is appropriate. These reserve dollars will be held in the Grantor Trust facility along with the pilots' 2007 estimated, allowable PDAP note proceeds that are to be contributed in February 2007. The distribution of reserve pool funds will occur after all corrections/discrepancies have been adjudicated but no later than the February 2007 PDAP funding date.

**Question 14**: If the pilots vote **IN FAVOR** of having the note proceeds placed into a qualified plan in lieu of receiving it in a direct, taxable distribution, what plan(s) are we talking about?

**Answer 14**: Presently, the pilot group has a qualified plan—the PDAP—or Pilot Directed Account Plan. Money comes into the PDAP from a number of sources: the Company's "B" and "C" plan contributions, the pilot's elective pre-tax 401(k) contributions, post-tax elective pilot contributions and rollover contributions. Once in the PDAP, the money is allocated to an account in the pilot's name appropriate to the source of the contribution. The pilot is then able to direct how the money credited to his various accounts is invested: in one or more of the "core funds" or the Schwab Individual Brokerage Account ("IBA").

**Question 15**: If the pilots vote AGAINST placing their note proceeds into the PDAP, how will I receive the assets?

**Answer 15**: The Company simply plans to deliver to each pilot, in August 2006, the cash proceeds to which he/she is entitled under the MEC allocation formula, minus the cash used to satisfy tax withholding requirements, and a reserve pool holdback.

**Question 16**: What are the benefits of distributing the note proceeds into the PDAP as opposed to distributing cash proceeds directly to pilots?

**Answer 16**: There are two financial benefits. First, to the extent the cash can go into the PDAP as an employer contribution, it will not be subject to FICA tax or withholding. Second, pilots will not pay income taxes on either the initial distribution or the investment returns on the distribution until the money is withdrawn at retirement or other termination of employment. This tax deferral benefit is substantial for any pilot who has 415(c) headroom remaining in the PDAP.

**Question 17**: If the pilots vote IN FAVOR of the proposal to contribute the pilot note proceeds into the PDAP, will I be able to put the entire amount allocated to me into the Plan?

**Answer 17**: That depends on a number of factors. Section 415(c) of the Internal Revenue Code limits the amount of "annual additions" to defined contribution plans like our PDAP to a maximum of $44,000 in 2006 and an estimated $45,000 in 2007. This includes any employer contributions on your behalf, as well as any voluntary pre-tax (401(k)) contributions and post-tax contributions you elect to make yourself. In addition, pilots who are 50 or older may make "catch-up" contributions ($5,000 in 2006, estimated $6000 in 2007) which do not count against the limit. Depending on the amount of proceeds to which the pilot is entitled, some pilots, especially more highly compensated pilots, will reach the 415(c) limits before all or most of the cash proceeds has been absorbed by the Plan. To the extent their allocation exceeds the amount which can be contributed to the plan, those pilots will receive the excess cash directly from the Company as a payroll event.

**Question 18**: Why can't the Company give every pilot the option of making their own decision? Why do we need one rule for everyone?

**Answer 18**: This would have the effect of converting the distribution from an employer contribution to an elective deferral for Plan purposes. This would have two unfortunate consequences which would substantially undercut any benefit to be gained from putting the note proceeds into the Plan.

One consequence is as an "elective deferral", the distribution would be subject to the lower Internal Revenue Code limits on 401(k) contributions ($15,000 in 2006, estimated $16,000 in 2007), making it likely that most pilots would be unable to shelter much, if any, of their distribution. A second consequence is the

distribution – whether deferred or not - would be subject to FICA tax. Apart from the cost to the employee, this is a disincentive for the Company because, as long as the distribution is an employer contribution and not an elective deferral, the Company would not have to pay the employer FICA tax. Maximizing the tax benefits of contributing the note proceeds to the Plan and providing the Company an incentive to agree drives an all or nothing decision.

**Question 19**:  Aren't the 401(k) and the PDAP the same thing?

**Answer 19**:    No, the PDAP receives contributions from several sources. The 401(k) contribution is pretax money you personally contribute into your PDAP. This is in addition to the Company (the B and C Plans, equity), employee post-tax, and rollover contributions. Your 401(k) contribution is subject to its own set of contribution limits, separate from but included within the overall 415(c) limits for the entire PDAP. These limits are described in Q&As 18 and 19 above.

**Question 20**:  Will ALPA dues be deducted from your Convertible Note allocation?

**Answer 20**:    No. The ALPA Administrative Manual, Article IX Section 4 clearly defines what type of payment or pilot income is subject to dues—the Convertible Notes are not subject to dues.

Please forward any questions you may have regarding this issue to ualmecri@alpa.org.

# EXHIBIT 10

**UAL MEC R&I COMMITTEE**
**ALPA Convertible Note Allocation**
**Gap Specifications Document**

**June 21, 2006**

**Table of Contents**

1.   Overview ................................................................................. 1

2.   Pension Pay ............................................................................ 2

3.   "Adjusted Stove Pipe" Pay Progression Model ............................ 5

4.   Final Average Earnings ........................................................... 8

5.   A-Plan Years of Participation ................................................... 9

6.   Pay Rate ................................................................................ 9

7.   A-Plan Projected Annual Benefit at Retirement ..........................10

8.   Estimated PBGC Annual Benefit at Retirement ..........................12

9.   C-Plan Projected Annual Annuity at Retirement .........................12

10.  Gap Benefit ...........................................................................13

11.  Note Allocation Replacement Percentage ..................................14

12.  Summary ...............................................................................15

### 1.    Overview

Per Contract 2005, if the Pilot's Defined Benefit Pension Plan is terminated by Court order, the company will issue to ALPA, no later than 6 months after emergence from bankruptcy, $550M of convertible notes.  The MEC has stated during roadshows and in various publications and communications to the membership that the purpose of the note proceeds are to help offset the expected amount of each eligible pilot's lost A-Plan pension benefit.

Accordingly, proceeds from the notes will be allocated to each Pilot in proportion to the present value (PV) of his or her lost A-Plan pension benefits - both qualified and non-qualified.  (It should be noted that the PBGC only insures "qualified benefits.")

In general, each individual Pilot is expected to retire at normal retirement age - age 60.  As a result, the projected benefit that would have been paid by the A-Plan, had it not been terminated by the PBGC, is compared to the sum of (a) the projected benefit that will be earned under the new C-Plan and the benefit that the PBGC will actually pay.  The difference between these benefits is the amount of projected lost benefits, or the Gap Benefit.



The Pilot's individual note allocation is equal to the PV of the Pilot's Gap Benefit multiplied by a "Replacement Ratio," where the Replacement Ratio is defined as:

| Total Note Proceeds Available ÷ The SUM of the PV's of theGap Benefits for all Pilots |
| --- |

The MEC determined that the methodology agreed upon to allocate the note proceeds should closely track the rules and considerations used by the A-Plan.  Where a "judgment call" would need to be made, direction is to minimize the use of assumptions.

Nevertheless, because of the complexities associated with our varied workforce and parochial collective bargaining agreement provisions, pilot note proceed allocation amounts include a minimal number of assumptions and in some cases, additional calculations and adjustments, which include:

(1)    Seniority number, fleet & seat, pay and A-Plan years of participation are all projected to retirement;

(2)    C-Plan contributions and investment earnings are likewise projected;

(3)    The PBGC benefit is estimated (if not ascertained directly from the PBGC); and

(4)    Present values are calculated based on interest and mortality assumptions approved by the MEC.

Exceptions and adjustments are made for:

(a)    Pilots with periods of Military Leave, authorized Leaves of Absence and Furlough;

(b)    Pilots who have withdrawn their Partial Lump Sum Amount (PLSA);

(c)    Pilots who have died during the 13-month period from January 1, 2005 through January 31, 2006;

(d)    Pilots who are on PDI as of February 1, 2006; and

(e)    Pilots who have resigned their pilot system seniority number between January 1, 2005 and February 1, 2006.

In particular, the MEC has resolved that Pilots who have died or who are on PDI shall have the PV of their Gap Benefit calculated in two ways: the first reflective of their actual status as disabled or deceased and the second hypothetically assuming they remained healthy line Pilots until normal retirement at age 60. So as to not disadvantage all other Pilots, disabled and deceased Pilots will receive a note allocation based on the lesser of these two calculations.

The following pages describe in detail the assumptions, calculations and adjustments outlined above, generally in the order that they are listed.

2.    **Pension Pay**

The following payments are examples of items of compensation which are *not* included in your Pension Pay:

- Any compensation you elect to defer (other than 401(k) salary reduction and flexible spending plan deferrals);
- Company contributions made on your behalf to any benefit plan;

- ~~Distributions to you from any benefit plan, including cash distributions from the~~ Company's non-qualified excess benefit plan;
- Imputed income arising from the receipt of non-cash fringe benefits, including domestic partner benefits;
- Moving expenses, including relocation and housing allowances;
- Hiring bonuses or other special payments relating to initiation of employment;
- Membership dues and costs;
- Prizes and awards (other than annual awards which are paid in cash);
- Expense reimbursement payments and allowances;
- Per diems;
- Severance pay and other special payments relating to termination of employment;
- Pay received for accrued vacation time that was not actually taken as vacation (other than the 1995-1996 vacation buy back and the "Special Earnings Adjustment" described above);
- Payments received from a third party (e.g., workers compensation);
- Foreign service allowances, goods and services differential pay, hardship pay, tax equalization payments and any other special expatriate payments;
- Amounts realized with respect to restricted stock, non-qualified stock options, or stock appreciation rights; and
- Bonus payments under any retention program approved by the U.S. Bankruptcy Court.

Incentive compensation, annual awards, management profit sharing program compensation, and any lump sum wage adjustment payments that are considered to be Earnings will be credited in equal amounts to each Month of Participation in the calendar year of payment.

For purposes of determining your pension benefit, back pay will generally be credited to the months to which it relates.

Cash compensation for the 1995-1996 vacation buy back will be treated as received equally over the 12-month period starting May 1, 1995, unless you terminate employment prior to May 1, 1996, in which case the compensation will be treated as received equally over the months of employment.

~~In certain circumstances, such as during a military leave of absence, you are "deemed" to~~ receive Earnings.

**Actual pension pay for calendar years 1995 through 2005 was supplied by the Company.**

For 2006 and later, pension pay is determined according to the "Adjusted Stove Pipe" Pay Progression Model described in Chapter 3.

In general, pension pay is projected through the month of the Pilot's 60th birthday; i.e., through normal retirement date.   In addition, contractual provisions pertaining to "activation pay" and/or "age 59 bypass pay" are included.

- 3 -

With one exception (2003), pay is assumed to be earned uniformly in each calendar year and projected annual pay is pro-rated for the number of months paid in the year of retirement, death or onset of PDI. For 2003, 50% of reported pay is assumed earned through 5/31/03 and 50% is assumed earned after 5/31/03. As a result, FAE (see below) as of 5/31/03 is equal to (7 / 12 **x** 2000 pay + 2001 pay + 2002 pay + 50% of 2003 pay) / 3.

The following exceptions apply:

(1)    For Pilots who retired early from 2/1/05 through 2/1/06, pension pay is projected only until actual retirement date.

(2)    For Pilots who died after 1/1/05 but prior to 2/1/06, two complete Gap Benefit calculations are made. The first ignores the date of death and calculates the projected Gap Benefit at age 60 in the usual way. The second takes into account the date of death and calculates the projected A-Plan death benefit. For this second calculation, pension pay is only projected through the month of death.

(3)    For Pilots on PDI as of 2/1/06, pension pay is projected only until the effective date of PDI status.

Additionally, no <u>pay</u> is projected during periods of:

| | |
|------|--------------------------|
| FL   | family leave             |
| FR   | furlough                 |
| IL   | illness LOA              |
| LA   | personal LOA             |
| LM   | maternity / parental LOA |
| MD   | PDI                      |

Deemed pension pay for Pilots who have returned from **ML** (military leave) is calculated as follows:

(1)    Note the Fleet & Seat status indicated on the domicile roster, just prior to commencing to ML status.

(2)    Throughout the period of ML, multiply the pay rate in the year of return for this Fleet & Seat position at the rate of 70 hours / month. Longevity service upon return from ML, including service while on ML, is used for this purpose.

3.    **"Adjusted Stove Pipe" Pay Progression Model**

A.    **The model applies to all Pilots, with additional considerations (described below) for:**
- Pilot Instructors
- Standards Captains
- Management Pilots

B.    **The basic method is comprised of the following steps:**

(1)    2005 pay is actual 2005 pensionable earnings, as reported by the Company.

For all subsequent years:

(2)    Determine "pos due" for the year by comparing the Pilot's 2/1/06 seniority number to the 2/1/06 adjusted stove pipe seniority numbers of all other Pilots who have not yet retired (i.e.; turned age 60 prior to the current year), without regard to domicile selection.

**February 1, 2006 Adjusted Stove Pipe Seniority Number Ranges**

| Fleet | Seat | Seniority Number Range[1] |
|---|---|---|
| 400 / 777 | Captain | 1 - 750 |
| 757 / 767 | Captain | 751 - 1,908 |
| LCO | Captain | 1,909 - 2,901 |
| 400 / 777 | First Officer | 2,902 - 3,894 |
| 757 / 767 | First Officer | 3,895 - 5,461 |
| LCO | First Officer | 5,462 and greater |

[1]Reflects actual pilot bidding behavior as of December 2005.

(3)    ~~Look up Fleet & Seat pay rate associated with this "pos due" position taking into account service since longevity date. Service while on FR, IL and LA does not count for this purpose. Look up "pos due" pay rate from Contract 2005.~~ Pay rate for a calendar year is blended to reflect scheduled contractual increases on May 1, 2006/07, on January 1, 2008 and on May 1, 2008/09. After 2009, rates are assumed to increase 1½% per year on each May 1.

(4)    Multiply "pos due" pay rate by 984 hours to derive annual pay.

(5)    Compare pay from step (4) with pay from step (1) and use the greater of the two.

(6)    Projected pay is never less than pay based on "pos due."

### C.  Pilot Instructors (PIs)

PIs are paid the lesser of (i) 767 FO 6th year pay, based on 89 hours per month, and (ii) "pos due" pay.  Item (i) is referred to as the PI pay cap.  Since all PIs' current "pos due" positions generate pay above the PI pay cap, all are currently paid at the PI pay cap.

Calculation of 2005 pay (actual and contractual)

2005 PI pay cap:       $92.70 x 89 hours x 12 = $99,003.60

Example (PI "above the cap")

Consider a 6th year PI with a "pos due" of 777 FO.  Under the Stove Pipe model, 2006 pay is determined as follows:

Calculation of 2006 pay and all subsequent years:

2006 PI pay cap:       $93.63[1] x 89 hours x 12 = $99,996.84
2006 "pos due" pay:  $112.93[2] x 984 hours = $111,123.12

2006 pay used in the model: **$111,123.12** or actual 2005 pay, if greater

[1]Blended rate:  767 FO Year 6--$92.70 x 4/12 + $94.09 x 8/12 = $93.63
[2]Blended rate:  777 FO Year 6--$111.81 x 4/12 + $113.49 x 8/12 = $112.93

### D.  Standards' Captains (SCs)

Similar to PIs, SCs are paid the lesser of (i) 767 CAP 12th year pay, based on 89 hours per month, and (ii) "pos due" pay.  Item (i) is referred to as the SC pay cap.  Most, but not all, SCs' current "pos due" positions generate pay above the SC pay cap, and these SCs are paid at the SC pay cap.

Calculation of 2005 pay (actual)

2005 SC pay cap:       $149.75  x 89 hours x 12 = $159,933.00

Example 2 (SC "above the cap")

Consider a 12th year SC with a "pos due" of 777 CAP.  Under the Stove Pipe model, 2006 pay is determined as follows:

Calculation of 2006 pay and all subsequent years:

2006 SC pay cap:       $151.25[3] x 89 hours x 12 = $161,535.00
2006 "pos due" pay:  $180.70[4] x 984 hours = $177,808.80

2006 pay used in the model:  **$177,808.80** or actual 2005 pay, if greater

[3]Blended rate:  767 CAP Year 12--$149.75 x 4/12 + $152.00 x 8/12 = $151.25
[4]Blended rate:  777 CAP Year 12-- $178.91 x 4/12 + $181.59 x 8/12 = $180.70

Example (SC "at or below the cap")

Consider a 12th year SC with a "pos due" of 767 CAP.  Under the Stove Pipe model, 2006 pay is determined as follows:

Calculation of 2005 pay (actual)

2005 SC pay cap:        $149.75 **x** 89 hours x 12 = $159,933.00

Calculation of 2006 pay and all subsequent years:

2006 SC pay cap:        $151.25[3] **x** 89 hours x 12 = $161,535.00
2006 "pos due" pay:   $151.25[3] **x** 984 hours = $148,830.00

| 2006 pay used in the model:  $148,830.00 or actual 2005 pay, if greater---**$159,933.00** |
| --- |

[3]Blended rate:  767 CAP Year 12--$149.75 x 4/12 + $152.00 x 8/12 = $151.25
[4]Blended rate:  777 CAP Year 12-- $178.91 x 4/12 + $181.59 x 8/12 = $180.70

E.    **Management Pilots (MGTs)**

MGTs are paid based on "pos held" pay rates times 89 hours plus an additional percentage of pay (the "override") based upon job title.

Two factors impact the adjustments to the Stove Pipe model for MGTs.

(1)    MGTs serve in their capacity at the pleasure of their supervisor or of the Company's Board.  There is no guarantee that a Pilot now serving as an MGT will remain in that job classification for an entire career.

(2)    The MEC's intent and direction with respect to the GAP allocation model is that no Pilot receive an allocation based on extra contractual pay provisions not available to all active Line Pilots.

Accordingly, after 2005, an MGT's pay is based strictly on "pos due"; no override provisions.

Example (MGT)

Consider a 12th year MGT with a "pos held" of 777 CAP. Under the Stove Pipe model, 2006 pay is determined, based on "pos due", as follows:

Calculation of 2005 pay (actual)

2005 pay:              ($178.91 x 89 hours x 12) + override  = $191,075.88 + 12%
                       = $191,075.88 + $22,929.11 = $214,004.99

Calculation of 2006 pay and all subsequent years:

2006 pay ("pos due"): $ 180.70[4] x 984 hours  = $ 177,808.80

[4]Blended rate: $178.91 **x** 4/12 + $181.59 **x** 8/12 = $180.70

| 2006 pay used in the model:  $177,807.80, regardless of actual 2005 pay |
|---|

In recognizing and fulfilling the MEC's intent and direction for all pilots, regardless of job classification, this pilot's 2006 pay, for purposes of stove pipe methodology, will be $191,075.88.

4.    **Final Average Earnings**

Since pension pay has been reported and projected on an annual, rather than monthly basis, Final Average Earnings (FAE) as of any calculation date (i.e., date of early or normal retirement, date of death or date of onset of PDI), is based on the greatest of the following 8 amounts, where Y is the calendar year containing the calculation date and M is the number of full months of pay in the calculation year. FAE is calculated by taking the greatest amount and dividing by 3.

(1)   Pay in Y-9, Y-8 and Y-7

(2)   Pay in Y-8, Y-7 and Y-6

(3)   Pay in Y-7, Y-6 and Y-5

(4)   Pay in Y-6, Y-5 and Y-4

(5)   Pay in Y-5, Y-4 and Y-3

(6)   Pay in Y-4, Y-3 and Y-2

(7)   Pay in Y-3, Y-2 and Y-1

(8)   $\{(12-M) / 12\}$ x (pay in Y-3) + (pay in Y-2) + (pay in Y-1) + (M / 12) x (pay in Y)

- 8 -

If the calculation date is on or before 5/31/2010, FAE so derived will not be less than FAE as of 5/31/03.

If pay is zero in any considered year, the divisor of 3 will be reduced by one.

5. **A-Plan Years of Participation**

A-Plan Years of Participation (YOP) as of the date of plan termination, December 30, 2004, were provided by the Company. YOP is projected either to date of death, to date of early retirement or to date of normal retirement, as applicable, assuming continued full time employment until the applicable calculation date. Periods of IL (illness LOA) and LA (personal LOA) are excluded in the calculation of projected YOP.

6. **Pay Rate**

As noted in the discussion of the Adjusted Stove Pipe Pay Progression Model (Chapter 3), pay rates for a calendar year are blended to reflect scheduled contractual increases, and depend upon projected Fleet & Seat and projected Longevity Service. In addition, the seniority number ranges and pay rates for LCO Captains and 400/777 F/Os have been combined and averaged to reflect the actual Pilot bidding behavior that results in roughly equal numbers of Pilots in both of these ranges bidding for positions above or below their "pos due." Consider the following example:

|  | Pay Rates from Contract 2005 | |
|---|---|---|
|  | LCO Captain | |
| Longevity Service | 5/1/06 | 5/1/07 |
| 10th Year | $128.12 | $130.04 |
|  |  |  |
|  | 400/777 F/O | |
| Longevity Service | 5/1/06 | 5/1/07 |
| 10th Year | $121.37 | $123.19 |

2007 Blended Rates to Reflect May 1 increase:

$128.12 x 4/12 + $130.04 x 8/12 = $129.40
$121.37 x 4/12 + $123.19 x 8/12 = $122.58

2007 Pay Rate for projected LCO Captains and 400/777 F/Os:

($129.40 + $122.58) / 2 =  $125.99

2007 Pension Pay:

$125.99 **x** 984 hours =  $123,974.16

7.    **A-Plan Projected Annual Benefit at Retirement**

The A-Plan benefit formula is:

1.35% x FAE x YOP, with YOP limited to 30 years (**Projected Benefit)**

However, up until May 31, 2003, the benefit formula was:

1.5% x FAE x YOP, with no cap on service AND with FAE generally higher because pay rates after 5/31/03 were reduced as much as 40% (**Protected Benefit)**

Under US pension law, despite the reductions in pay and benefit formula, benefits already earned cannot be reduced.  Therefore, the A-Plan benefit is the greater of the projected benefit and the protected benefit.

The protected benefit was calculated and provided by the company.

Pilots within certain class codes (see Chapter 10) are treated as follows:

Deceased Pilots

Deceased Pilot benefits are calculated in two ways:

(1)   As described above; i.e., assuming they remain healthy line Pilots until normal retirement at age 60.

(2)   As deceased Pilots with their beneficiary entitled to the A-Plan death benefit.  The A-Plan death benefit is simply 25% of FAE at the time of death.  This amount is compared to 50% of the protected benefit because beneficiaries are typically entitled to one half of the Pilot's benefit.

Only the applicable calculation of the two is shown.

Exception:   The four "9/11" Pilots are ALWAYS treated as healthy, non-deceased line Pilots projected to retire at age 60.

Pilots on PDI

Pilots on PDI are also calculated in two ways:

(1) As described above; i.e., assuming they remain healthy line Pilots until normal retirement at age 60.

(2) As Pilots on PDI entitled to the A-Plan PDI benefit. The A-Plan PDI benefit is calculated based on projected YOP to age 60, but with FAE calculated and frozen as of onset of PDI. No pay is assumed after onset of PDI.

Only the applicable calculation of the two is shown.

PLSA Withdrawal

PLSA withdrawal and repayment data has been provided by the company. Pilots that did not repay their PLSA withdrawals by February 1, 2006 will have their allocation calculation adjusted. PLSA withdrawals are converted to a deferred normal retirement benefit by multiplying the withdrawn amount by a Deferred Annuity Purchase Factor based on age at withdrawal and the applicable interest and mortality at withdrawal, as specified by the A-Plan document.

The deferred benefit from the PLSA withdrawal is subtracted from the greater of the projected benefit and the protected benefit, resulting in a Net Benefit.

Adjustment for Early Retirement

For Pilots who have voluntarily retired early, the Net Benefit is reduced at the rate of 3% per year for every year and fraction of a year that early retirement precedes age 60. For example, for a Pilot who retires at an age of 58 years and 6 months, the Net Benefit is reduced 4.5%.

Final A-Plan Projected Annual Benefit considering PLSA withdrawal

GREATER OF

{Projected Benefit or Protected Benefit

**MINUS**

Deferred Benefit from PLSA Withdrawal}

**TIMES**

(1 - Early Retirement Reduction)

- 11 -

**8.    Estimated PBGC Annual Benefit at Retirement**

In general, the benefit payable by the PBGC is only a portion of the benefit accrued by each Pilot as of December 30, 2004, the date of the Court ordered A-Plan termination (DOPT). The PBGC makes its determination by calculating a "PC4 Benefit" for all Pilots and a "PC3 Benefit" for certain eligible Pilots only.

The PC3 Benefit is only calculated for those Pilots who were eligible to retire at least three years prior to the date of plan termination. It is based on the provisions of the plan in effect five years prior to the termination date (e.g., it is based on the 1.41% formula and not the 1.5% or 1.35% formulas) and on Final Average Earnings (FAE) and Years of Participation (YOP) as of December 30, 2001. It is also based on the A-Plan's early retirement factors (from the plan five years ago) that would have applied had the Pilot retired at that time. Finally, since the A-Plan's PC3 benefits were only about 80% funded at the time of termination; the PBGC guarantees only 80% of this benefit. The model assumes 80% PC-3 funding.

The PC4 Benefit is based on (i) FAE and YOP as of the date of plan termination, (ii) the provisions of the plan in effect five years prior to DOPT and (iii) a pro-rated, 20% per year recognition of plan changes made within five years of the DOPT. For example, 80% of the difference between the 1.41% formula and the 1.5% formula is included in the PC4 Benefit because the 1.5% formula was added to the A-Plan more than four years, but less than five years, before the DOPT. Finally, the PC4 benefit is capped by the 2004 statutory maximum on PBGC guaranteed benefits. The 2004 limit is $2,404.26 per month for those eventually retiring at age 60 and beginning to draw benefits from the PBGC at that age. This amount may be further adjusted for the minimum refund provided by the PLSA.

For Pilots with both a PC3 and a PC4 benefit, the PBGC will pay the greater of the two amounts.

**9.    C-Plan Projected Annual Annuity at Retirement**

Beginning June 1, 2005, the company makes monthly contributions equal to 6% of pay to each Pilot's newly established C-Plan account.

C-Plan contributions and account balances are projected to normal retirement, early retirement, death or onset of PDI, as applicable. For this purpose, pay is projected using the Adjusted Stove Pipe Pay Progression Model in the same way as it is for projected A-Plan benefits. However, pay is capped each year according to Federal statute. For 2005 and 2006, the pay caps are $210,000 and $220,000, respectively. Thereafter, the statutory pay cap is projected to grow 2% per year, truncated to the next lower $5,000. (The rounding and truncation is specified in the statute.)

C-Plan accounts are assumed to earn a rate of return of 6% per year, with contributions during the year earning half that amount because they are made monthly and, on average, are invested for just half of the year in the year of deposit.

For Pilots on PDI and for deceased Pilots, if the determining Gap Benefit calculation is based on PDI or deceased status rather than on a hypothetical healthy line Pilot projection to normal retirement, there will be no pay or C-Plan contributions after onset of PDI or date of death, as applicable.

The C-Plan Projected Account Balance at Retirement is converted to an Annual Annuity at Retirement using an Annuity Purchase Factor based on age at retirement, 6% interest and the same mortality assumption used elsewhere for converting PLSA withdrawals into deferred annuity benefits.

10.  **Gap Benefit**

It represents the difference between what a pilot may have received from the A-Plan had it continued in existence and what the pilot will receive from the PBGC and C-Plan.

It is calculated by taking the A-Plan projected annual benefit at a pilot's retirement date (incorporating his/her Years of Participation and Final Average Earnings via the Stove Pipe pay progression model) and subtracting the annual benefit payable by the PBGC at a pilot's retirement and subtracting the C-Plan projected annual annuity at retirement.  The Gap benefit is reduced by the annuity equivalent of any PLSA that has been withdrawn.  The Gap benefit is calculated prior to any allocation of the notes.  A pilot's note allocation will be based on a percentage of the "present value" as of January 1, 2005 of the Gap Benefit.

Remember:

The "Adjusted Stove Pipe" Pay Progression Model is used to project pay for both A-Plan and C-Plan purposes.

A PLSA withdrawal reduces the Projected A-Plan Benefit and *may* reduce the PBGC Benefit.

Special events or periods of special conditions from the list of company "class codes" (shown below) potentially affect all calculations.

| Special Condition | Description |
|---|---|
| DA | deceased |
| DN | deceased natural |
| DU | deceased United |
| FL | family leave |
| FR | furlough |
| FY | failed probation |
| IL | illness LOA |
| IS | inactive status |
| LA | personal LOA |
| LM | maternity/parental |
| LS | special leave (CBA Section 7-D) |
| MD | PDI |
| ML | military leave |
| PC | normal retirement |
| PE | early retirement |
| RP | resigned or terminated |
| SC | separated for cause |
| SD | disciplinary separation |
| SP | special assignment |

11. **Note Allocation Replacement Percentage**

Since the amount of Note proceeds to be realized is insufficient to offset all of the losses associated with the A-Plan termination, eligible pilots will receive an equal fraction of their projected A-Plan losses via the specifications as outlined within this document. The fraction is known as the "replacement percentage."

Note replacement percentage is defined as the ratio of the note proceeds to the sum of the Present Value of the Gap Benefit for all pilots.

The note replacement percentage determines the proportion of each individual pilot's Present Value of Gap Benefit that is replaced by the notes. The actual percentage will be determined when the proceeds of the notes are realized. This percentage may increase or decrease depending on, but not limited to, factors such as the amount of note sale proceeds received and any reserve pool that may be established.

PV Gap Benefit x Note Replacement Percentage = Individual Pilot Note Proceeds

The Preliminary Note Allocation is equal to The Individual Note Proceeds calculated in the equation above.

- 14 -

There is one final adjustment needed to get to the <u>Final</u> Note Allocation. As noted in Chapters 7 and 8, the A-Plan benefit and the PBGC benefit have been adjusted for any PLSA withdrawal. These adjustments result in a smaller Gap Benefit and a smaller Preliminary Note Allocation. But, because the Note Replacement Percentage is only about 40%, only about 40% of the value of the PLSA withdrawal is taken into account. Direct subtraction of an additional 60% of the PLSA Withdrawal completes the adjustment and yields the Final Note Allocation.

The full value of any PLSA withdrawal is subtracted from the Note Allocation so that when the Final Note Allocation and PLSA withdrawal are added together, the sum is the same whether a PLSA withdrawal has actually taken place or not.

The Final Note Allocation is the expected **gross** amount of each pilot's share of the note proceeds. This amount is before taxes are deducted or any amounts are deposited into your PDAP, as applicable.

12. <u>Summary</u>

The R & I Committee, in partnership with our actuarial consultant and financial advisor, has created a robust website that displays a pilot's respective gross allocation amount along with the underlying calculations utilizing the details described in this document. This website should become your primary vehicle for understanding your Gap allocation. This site can be found on the web at:

<u>https://www.ualpilots.org/mynoteallocation</u>

After a thorough review of all appropriate tax deferral options available to the pilot group, the Committee is recommending that the MEC utilize the tax deferral feature available in the PDAP for Plan Years 2006 and 2007. Keep in mind, with the loss of the A-Plan, pilots suffered the real loss of a large tax qualified arrangement. This was a fatal financial blow in our ability to defer taxation on any employer contributions contemplated today. Making up for this cornerstone of our retirement programs will not be easy; the successful investment of your note proceeds will make a significant difference in your ability to fund your expected retirement lifestyle.

As needed, pilots should proactively seek professional advice from the myriad of investment, tax and estate planning professionals and defend your B and C Plan into the future.

# EXHIBIT 11

ALPA

**Lynn Hughitt**
*Vice President — Compensation & Benefits*

## ◢◢◢ U N I T E D

A STAR ALLIANCE MEMBER ✧ ®

August 15, 2006

Dear Colleague:

I am pleased to let you know that you have received proceeds from the sale of employee convertible notes. The enclosed statement includes a summary of your individual distribution as well as a description of the allocation formula and eligibility requirements for your pilot employee group.

**Proceeds Deposited into a PDAP Account (Pilots)**

Your share of the allocated funds is being deposited into your PDAP account to the extent legally permissible. This approach provides you with tax benefits because income taxes are deferred – and FICA taxes avoided – on funds deposited into PDAP accounts.

PDAP contributions, however, are governed by annual contribution limits established by the Internal Revenue Code. Any funds in excess of PDAP legal limits will be paid directly to you in cash through United's payroll process, other than as described below. Any direct, (non-PDAP) cash payments will typically be subject to both income and FICA tax withholding unless you are retired or other special circumstances apply.

Your cash proceeds will be deposited into the PDAP as an incremental employer funded C-Plan contribution. These proceeds will be invested based upon the current C-Plan election you have on file. (In order for to allow for more of the distribution to be contributed to the PDAP, for pilots who are at least age 50, your pre-tax deferrals made in 2006 will be recharacterized as "catch-up" contributions in the event that you reach the annual contribution limits and have not already contributed the maximum catch-up amounts.)

You may go online or contact the PDAP Service center between 0700-1900 CST on business days to change your C-Plan election. Additional information is available on the PDAP website at http://resources.hewitt.com/pdap or through the PDAP Service Center at 866-OUR-PDAP (866-687-7327).

For other questions about employee notes, please visit the "Employee Notes" section of SkyNet or call the United Employee Convertible Notes Hotline at 800-572-0986 (or call 310-677-2994 from outside the U.S.). Additional information for pilots is available at the following website sponsored by the ALPA United MEC – https://www.ualpilots.org/mynoteallocation.

**Additional Convertible Notes Proceeds May Be Distributed in the Future**

ALPA has directed that a portion of the proceeds shall be held back as a contingency reserve to fund possible corrections/omissions for any individual allocation if there were errors made in the original distribution. In addition, ALPA has also opted to defer a portion of each eligible employee's distribution in excess of 2006 PDAP limits until a contribution can be made in 2007. This will allow additional deferment or minimization of taxes. Any cash proceeds held back as a contingency reserve or for 2007 PDAP purposes will reside in a trust fund until ALPA is ready to proceed with a final distribution. Tax requirements, however, necessitate that all proceeds be distributed from the trusts to employees by March 15, 2007.

If any of your proceeds were held back for 2007 PDAP purposes, this will be noted on the enclosed statement. <u>Amounts held back for contingency reserves are not delineated in the statement.</u> United will inform you in writing at a later date should you be eligible for an additional distribution of convertible notes proceeds in the future.

**For More Information**

Once again, for general questions about employee notes, please visit the "Employee Notes" section of SkyNet or call the United Employee Convertible Notes Hotline at 800-572-0986 (or call 310-677-2994 from outside the U.S.). Additional PDAP information is available on the PDAP website at http://resources.hewitt.com/pdap or through the PDAP Service Center at 866-OUR-PDAP (866-687-7327). Information specific to your allocation is available at the ALPA United MEC website https://www.ualpilots.org/mynoteallocation as well.

Sincerely,

*Lynn Hughitt*

Lynn Hughitt
Vice President – Compensation & Benefits

08/15/2006        CONVERTIBLE NOTES STATEMENT - ALPA

FN 028139   ORDFO   SEQ 00498

RAYMOND LESLIE GARAVITO
9767 S W 106 TERRACE
MIAMI FL      33176

Included below is an overview of the funds you are receiving related to the sale of United's convertible notes.

SUMMARY OF ALPA CONVERTIBLE NOTE ALLOCATION METHODOLOGY

For ALPA, the $550 million face amount of convertible notes is being sold and the proceeds of the sale are being distributed to eligible participants. The methodology used to determine the individual allocation for each pilot was discussed and approved by the United MEC in January 200

Eligible participants include those who were on the United Pilots' System Seniority list as of January 1, 2005 (exceptions may apply). Proceeds from the notes will be allocated to each Pilo in proportion to the present value (PV) of his or her lost A-Plan pension benefits - both qualified and non-qualified. In general, each individual Pilot is expected to retire at normal retirement age - age 60. As a result, the projected benefit that would have been paid by the A-Plan, had it not been terminated by the PBGC, is compared to the sum of (a) the projected benefit that will be earned under the new C-Plan and (b) the benefit that the PBGC will actuall pay. The difference between these benefits is the amount of projected lost benefits, or the Gap Benefit. The Pilot's individual note allocation is equal to the PV of the Pilot's Gap Benefit multiplied by a "Replacement Ratio", where the Replacement Ratio is defined as:

Total Note Proceeds Available divided by The Sum of the PV's of the Gap Benefits for all Pilots

As approved by a vote of ALPA-represented employees, allocated funds will be deposited into PDAP accounts to the extent legally permissible. Any remaining proceeds in excess of PDAP legal limits will be paid directly to you in cash, less applicable withholding taxes. Any direct cash payments will be made through United's payroll process.

Most of the proceeds will be distributed initially, with the balance held in trust until 2007. This process enables a greater portion of the funds to be considered a tax-deferred PDAP contribution as the distributions are being spread over two tax years.

SUMMARY OF CASH PROCEEDS FROM CONVERTIBLE NOTES

   Your total initial distribution*:                    $297,726.67
   (*Net of any reserve holdback amount)

   Amount of initial distribution to your PDAP account:     $0.00

   Amount of initial distribution paid directly to you in cash: $281,248.08

   Amount of initial distribution held for 2007 PDAP**:    $16,478.59
   (**2007 estimated PDAP deposit. Any amount in excess of actual 2007 PDAP limits at time of distribution will be paid directly to you in cash.)

For questions about your allocation, please call United's Employee Notes Information Hotline at 800-572-0986 (or call 310-677-2994 from outside the U.S.). Additional information for pilots i available at https://www.ualpilots.org/mynoteallocation.